13:12:40

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


VB ASSETS, LLC,                    )
                                   )
            Plaintiff,             )
                                   ) C.A. No. 19-1410(MN)
v.                                 )
                                   )
AMAZON.COM, INC., et al.,          )
                                   )
            Defendants.            )


                    Friday, July 7, 2023
                    3:30 p.m.
                    Oral Argument


                    844 King Street
                    Wilmington, Delaware



BEFORE:  THE HONORABLE MARYELLEN NOREIKA
              United States District Court Judge




APPEARANCES:


                    WILSON SONSINI GOODRICH & ROSATI PC
                    BY:  IAN ROBERT LISTON, ESQ.
                    BY:  JAMES C. YOON, ESQ.
                    BY:  JENNIFER A. WARD, ESQ.
                    BY:  RYAN R. SMITH, ESQ.


                         Counsel for the Plaintiff

1    APPEARANCES CONTINUED:

2

3            ASHBY & GEDDES
             BY:  STEVEN J. BALICK, ESQ.

4            -and-

5            FENWICK & WEST LLP
             BY:  J. DAVID HADDEN, ESQ.
6            BY:  JOHNATHAN CHAI, ESQ.

7                    Counsel for the Defendants

8

9

10           - - - - - - - - - - -

11

15:04:22  12

15:04:22  13          THE COURT:  All right.  Good afternoon.  Let's

15:28:15  14    start with some introductions.  Actually, why don't you

15:28:21  15    stand up.  We're trying something a little different because

15:28:24  16    nobody seems to stand anymore when they address the Court,

15:28:26  17    so now we're going to keep everyone standing until after

15:28:30  18    they're done so I don't have to sit there and ask you to

15:28:32  19    stand.

15:28:33  20          So introductions.

15:28:40  21          MR. LISTON:  Good afternoon, Your Honor.  Ian

15:28:42  22    Liston for the plaintiff, VB Assets.  With me today from our

15:28:47  23    Wilmington office is Jennifer Ward; from Palo Alto, Jim

15:28:50  24    Yoon; and from Seattle, Ryan Smith.

15:28:54  25          MR. SMITH:  Good afternoon, Your Honor.

15:28:55  1           THE COURT:  All right.

15:28:56  2           MR. LISTON:  Thank you, Your Honor.

15:28:58  3           THE COURT:  Mr. Balick.

15:29:00  4           MR. BALICK:  Hello, Your Honor.  Steven Balick

15:29:02  5   from Ashby & Geddes on behalf of the defendants, along with

15:29:05  6   co-counsel from Fenwick & West, from Your Honor's left,

15:29:09  7   David Hadden and next to him, Johnathan Chai.

15:29:12  8           THE COURT:  Welcome to everybody.  Good

15:29:14  9   afternoon and please be seated.

15:29:15 10           Okay.  So we have the motions.  How many claims

15:29:28 11   are there still at issue in this case, patent claims are at

15:29:34 12   issue?  I know that before when we were here there were six

15:29:47 13   patents, now there is five.  But are there really forty-one

15:29:50 14   claims at issue?

15:29:59 15           MR. YOON:  I apologize, Your Honor, we're

15:30:02 16   literally counting on the fly.  I apologize.

15:30:04 17           THE COURT:  That's never a good sign when you

15:30:06 18   have to count and you can't just see from looking at the

15:30:09 19   page.

15:30:10 20           MR. SMITH:  Your Honor, I think there are

15:30:11 21   approximately forty or so, perhaps a little bit less, but

15:30:16 22   that's approximately right.

15:30:17 23           THE COURT:  Okay.  All right.  So we had a

15:30:21 24   hearing here where we talked about eligibility.  I found

15:30:25 25   that certain claims of the '703, '536 and '097 patents were

directed to an abstract idea at Step 1.  But I denied the

motion to dismiss but said that the defendant could re-raise

the 101 arguments at summary judgment.

So here we are today addressing some of the same

101 issues as well as I guess defendant has raised nine

separate grounds for summary judgment, but I ordered you to

rank them so that we can try and do this in a more efficient

way.

So defendant's first ranked ground was its

request for summary judgment that the '703 patent claims are

directed to ineligible subject matter under Section 101.  So

I will hear from the defendant first.

MR. HADDEN:  Thank you, Your Honor.  David

Hadden for Amazon.

Starting with the '703 patent invalidity, again,

as Your Honor noted back at the motion to dismiss stage, the

Court found that the '703 patent which is this voice

purchasing patent is directed to organizing human activity

and is an abstract.  At this point, VB Assets does not

contest that.

THE COURT:  I'm sure they don't necessarily

agree, but I appreciate that they didn't try to have to

reargue it.

MR. HADDEN:  At Step 2, Your Honor, the Court

identified that identifying context basically on words or

1   phrases did not offer any concrete technological

2   improvements but merely claimed the implementation of the

3   abstract idea.

4           Now at the summary judgment stage, VB Assets'

5   expert, Dr. Polish, has put forth an opinion on Step 2, and

6   this is at DI 186, Exhibit 10, it starts at paragraph 803.

7   And his entire opinion is less than a page-and-a-half.  And

8   he doesn't differentiate between any of the claims in the

9   '703 patent, he treats them all the same.  And the only

10  claim element that he identifies as an inventive concept at

11  Step 2 is the element that requires identifying without

12  further user input after receipt of the user input a product

13  or service to be purchased based at least on a determined

14  context.

15          As Your Honor noted previously, that is claiming

16  a result.  There is no how in the patent claim describing

17  how a product is identified or how a context is identified.

18  And, in fact, there is no description of how this is done

19  even in the patent specification.  And Dr. Polish

20  acknowledges, this is on slide 5, we're going through the

21  examples in the patent and asked him about this buying

22  flowers example, and the question is, is there any steps in

23  the patent for explaining how you understand this context

24  for flowers?

25          And he went and said it doesn't, it's just

15:34:20 1  saying that you would do recognition on the word flowers and

15:34:23 2  there is no improved speech recognition in this patent, this

15:34:28 3  is all just about taking the words after the recognize and

15:34:32 4  identifying a product.

15:34:33 5       And he said then you would know that the user

15:34:35 6  would like to buy flowers and importantly he goes on and

15:34:38 7  says, and then you would take further steps to identify

15:34:42 8  exact product.  But those further steps are nowhere in the

15:34:46 9  claims and they're nowhere in the specification itself.  The

15:34:49 10 claim just says do it.  It doesn't tell you how.

15:34:53 11      And the fact that this patent doesn't describe

15:34:57 12 how to do it is not surprising because when we deposed

15:35:03 13 Mr. Kennewick, the lead inventor and we asked him, we went

15:35:06 14 through this step in the specification, determine without

15:35:10 15 further user input after receipt of the utterance based on

15:35:13 16 the utterance a product or service that is to be purchased

15:35:16 17 on behalf of the user, the very element that Dr. Polish says

15:35:21 18 is the inventive contribution, said did you develop some new

15:35:26 19 technology that enabled that, and he said no, it was not new

15:35:30 20 technology.

15:35:33 21      So identifying a product based on spoken words

15:35:34 22 is a result.  The claims don't tell you how to do it.  The

15:35:38 23 specification doesn't tell you how to do it.  And the

15:35:42 24 inventor acknowledged that he didn't invent any new

15:35:45 25 technology to do it.  So that as a matter of law, Your

Honor, can't be an abstract concept that can save these claims at Step 2.

As the Federal Circuit has told us repeatedly in *Affinity Labs* and other cases, the claim has to have a how to implement the concept for it to be an inventive contribution.  Just claim your result, he doesn't do it, and that's the holding in *TwoWay Media*, *SAP, BSG* and many other cases.  And that's all there is in this case.

The only other thing that Dr. Polish says in the less than page-and-a-half analysis is that it is his opinion that the asserted claims considered as a whole are an advance over the prior art.  But again, that is not the test as we know at 101 at Step 2.  The novelty of the claim as a whole, the Federal Circuit said in *BSG* and other cases is irrelevant to the eligibility determination, in particular the Step 2 inventive contribution.  You can have a novel abstract idea, it's still abstract, it's still ineligible, and that's the case here, Your Honor.

THE COURT:  All right.  So can we look at the claim language itself and tell me how we're not just claiming a result here.

MR. LISTON:  Sure, Your Honor.  I actually don't have that on the screen right now, but I can point you to --

THE COURT:  I have it.  I have it in your demonstratives.

15:37:36 1    MR. LISTON:  Thank you.  So in *Affinity Labs* the

15:37:40 2  Federal Circuit explained at page 1260, there was nothing in

15:37:44 3  the flow chart or the text of the specification that

15:37:47 4  provides any detail regarding the manner in which the

15:37:49 5  inventive concept, or the invention accomplishes the recited

15:37:53 6  functions.  The specification contains no further discussion

15:37:56 7  --

15:37:56 8    THE COURT:  That's sort of what he's saying.

15:37:58 9    MR. LISTON:  Right.

15:37:59 10    THE COURT:  I want you to focus on what's

15:38:01 11  claimed rather than reading stuff in from the specification.

15:38:04 12  But they're basically saying look, you're not -- you're

15:38:08 13  saying that there is all this stuff out there, but you're

15:38:11 14  not claiming it.  So where is it claimed?

15:38:14 15    MR. LISTON:  So I can look to the specification,

15:38:17 16  Your Honor.  I specifically looked column 5, line 44 to

15:38:23 17  column 6, line 8 which includes some of that how.  It

15:38:28 18  describes how the '703 patent, the invention might pre-store

15:38:33 19  user information and associated default shipping

15:38:36 20  information, for example.

15:38:38 21    THE COURT:  Is that required by the claim?

15:38:40 22    MR. LISTON:  That language does not appear in

15:38:41 23  the claim, Your Honor.

15:38:42 24    THE COURT:  Okay.  So if I'm looking at whether

15:38:45 25  what you're claiming is eligible, why is that helpful to me

15:38:51 1    when that could or could not be relevant to the claim?

15:38:57 2            MR. LISTON:  Your Honor, what we have is

15:39:00 3    testimony from Dr. Polish talking about how the -- that this

15:39:04 4    invention does advance the art in that way.  The

15:39:07 5    specification provides an example of how that is

15:39:10 6    implemented.  And we've seen that -- we see that in the

15:39:17 7    specification.  The claim language, however, does not

15:39:20 8    include that particular information.

15:39:21 9            But *Affinity Labs* looked at both the

15:39:25 10   specification and the claim language to determine whether

15:39:27 11   that Step 2 had been met.

15:39:29 12           THE COURT:  Didn't your expert focus on their

15:39:32 13   argument that these things were well-known as evidenced by

15:39:35 14   two prior art systems?

15:39:37 15           MR. LISTON:  He did discuss those two prior art

15:39:42 16   --

15:39:42 17           THE COURT:  Okay.  So it seemed to me that -- I

15:39:45 18   mean, they have to show that these things were well-known,

15:39:48 19   routine, conventional, and I don't know that you can

15:39:50 20   actually show that just because it was known in some prior

15:39:54 21   art reference, that doesn't seem to be it necessarily meets

15:39:57 22   that criteria, so I'm surprised you're focused on what's in

15:40:01 23   the specification and not kind of hitting at their argument

15:40:05 24   that these things were well-known, routine and conventional.

15:40:08 25           MR. LISTON:  Well, here, Your Honor, I was

specifically just responding to them, but I would take issue

with what they've said there.  So if we look at their

alleged prior art that Amazon has put forth, they actually

don't make any showing that the prior art -- that the

systems that they allege as prior art actually qualify as

that.  Their statement of fact addresses only one --

    THE COURT:  Let's assume it is prior art.

    MR. LISTON:  Okay.

    THE COURT:  Let's assume it is prior art.

Something that's prior art that can invalidate a patent can

be found in a random library in Siberia.  Right?  And so

just because something is in a piece of prior art, does that

necessarily mean that it's well-known and conventional to a

person of skill in the art?

    MR. LISTON:  It does not, and *Berkheimer* teaches

that.  It says the mere fact that something is disclosed in

a piece of prior art does not mean it is well understood,

routine and conventional.  And so Amazon has not put forth

any evidence whatsoever regarding these prior art systems

and how well-known they were in the industry.  There is a

dispute between the experts as to whether this invention

advanced the art and Amazon can't show by clear and

convincing evidence that it has done so because it has not

established record evidence showing that these systems do

qualify as prior art.

15:41:33  1          THE COURT:  Okay.

15:41:41  2          MR. LISTON:  With the one instance of prior art

15:41:45  3  that they did identify in their statement of facts, we

15:41:48  4  disputed that.  We said disputed to the extent *MIT Galaxy*

15:41:56  5  *System* is being relied on as prior art to the '097 patent.

15:41:59  6  They don't say anything else is undisputed, we dispute that

15:42:02  7  for purposes of summary judgment with respect to the others.

15:42:10  8          THE COURT:  Okay.

15:42:10  9          MR. LISTON:  And that's all I have for this

15:42:12 10  patent, Your Honor.

15:42:15 11          THE COURT:  Mr. Hadden.

15:42:18 12          MR. HADDEN:  Would you like me to respond on

15:42:24 13  this patent or go to the next one, Your Honor?

15:42:26 14          THE COURT:  No, we're doing one at a time and

15:42:29 15  I'm going to rule on them and decide if we even go on to the

15:42:32 16  next one.  So you can respond.

15:42:36 17          MR. HADDEN:  We're not arguing in this motion

15:42:40 18  today about novelty or whether this claim was known in the

15:42:45 19  prior art.  The only issue now is whether that identifying a

15:42:51 20  product step which is the only thing their expert has

15:42:52 21  identified in the claim as being a potential inventive

15:42:59 22  concept whether that is merely a result and a functional

15:43:02 23  limitation which the Federal Circuit has told us cannot be

15:43:02 24  the saving element at Step 2.  That's what the Court said in

15:43:12 25  *TLI*, that's what it said in *Affinity Labs*.  *Affinity Labs*

talked about the spec because in that opinion, Judge Bryson
said even if I look beyond the claim and put the entire
spec, pretend like the entire spec is part of the claim,
there is still not how here.  And that is true in this case,
too.  And the notion that the patent talks about storing
customer shipping information, that can't possibly be an
inventive concept.

THE COURT:  We read the papers and the real
focus of these papers was that the prior art system showed
well understood, conventional, routine things.  So are you
changing the argument?  I'm just not sure I really follow
how what you're saying to me right now fits with what we
were looking at in the papers.

MR. HADDEN:  I'm not changing the argument, both
points apply.  The steps in this claim were well-known and
conventional.  But even if they weren't, the one element
that they have identified is purely functional and a result
as Your Honor indicated back at the motion to dismiss stage.
At this point, there is nothing to try because as a matter
of law, that single element that they have put forth as the
potential savior of this claim is as a matter of law, purely
functional and a result, it cannot save this claim at
Step 2.

Thank you, Your Honor.

THE COURT:  All right.  Give me a second.  I

15:45:25 1    want to just take a break for a minute and take a look at

15:45:28 2    something.

15:45:29 3              COURT CLERK:  All rise.

15:45:33 4              (A brief recess was taken.)

16:02:45 5              THE COURT:  Please be seated.  Thank you for

16:02:45 6    that.  Okay.

16:02:45 7              Plaintiff asserts claims 15, 16, 20 to 22, 25,

16:02:45 8    26, 30 and 33 of the '703 Patent.  These claims are

16:02:45 9    generally directed to systems and methods for providing

16:02:45 10   voice commerce.  I previously found claim 30 directed to an

16:02:45 11   abstract idea but stopped there because fact issues remained

16:02:45 12   as to step 2 of the *Alice/Mayo* inquiry.  In particular, I

16:02:46 13   found that claim directed to the abstract idea of "a spoken

16:02:46 14   request to buy something."  I will note that I previously

16:02:46 15   warned Defendants to do a better job addressing

16:02:46 16   representativeness if they chose to renew their § 101

16:02:46 17   arguments at summary judgment.  In the motion at issue

16:02:46 18   today, Defendants say "claim 30 of the '703 Patent is

16:02:46 19   representative" and then do a little bit of handwaving to

16:02:46 20   argue that the other asserted claims are directed to the

16:02:46 21   same abstract idea.  But Plaintiff does not seem to object

16:02:46 22   to this showing so I will let it go, particularly because I

16:02:46 23   ultimately decide I am not going to grant the motion and

16:02:46 24   Defendants would not be presenting representativeness at

16:02:46 25   trial anyway because I limit the number of asserted claims.

Turning to the substance of the § 101 challenge to the '703 Patent, Plaintiff is not challenging my prior finding that claim 30 of the '703 Patent is directed to an abstract idea under step 1. Both sides are only focused on whether the claim elements either individually or as an ordered combination supply the necessary inventive concept to save claim 30 and the rest of the claims from abstraction. Previously at the motion to dismiss stage, the parties only offered "a paragraph or two" on step 2 of the *Alice/Mayo* inquiry. Defendants do not seem to include much more at the summary judgement stage to help convince me there is no issue of material fact remaining as to whether the claims contain an inventive concept. For example, citing their expert, Defendants argue that there is no inventive concept in the claims because "the asserted claims only call for using known technologies in conventional ways." That expert report, by the way, is an absolutely mind-boggling and unnecessary 1,500 pages. Indeed, at one point, Defendants cite nearly 250 paragraphs to me in support of a single proposition. Nevertheless, Defendants assert that the claimed processors and instructions required by the three independent claims are all generic and conventional computer components insufficient to supply an inventive concept. Specifically, as to the functional steps of identifying a product or service, obtaining payment and

shipping information and completing a purchase, Defendants
again cite their expert to argue that these were all well
understood, routine and conventional, as evidenced by two
prior art systems (HeyAnita and MINT) that purportedly
employed responding to a spoken request to complete a
transaction.  Defendants go on to attack the remaining steps
of the independent claims as being only functional
limitations where the specification provides no technical
detail for how to carry out those steps.

        First, I will note that, in this case, I am
doubtful that disclosure of claim element(s) in either or
both of HeyAnita and MINT prior art systems mandates a
finding that the element is well understood, routine or
conventional within the meaning of the *Alice/Mayo* step 2
inquiry.  Moreover, contrary to Defendant's suggestion,
Plaintiff's expert apparently does dispute that certain
steps may be found in the prior art systems identified by
Defendants.  As just one example, in the context of
non-obviousness, Plaintiff's expert opines that the HeyAnita
system fails to disclose allowing users to complete
purchases using their voice.  In Plaintiffs's view, if these
prior art systems do not disclose the claim elements, then
they cannot be used to demonstrate those claim elements were
well understood, routine and conventional.  I don't know
whether Plaintiff's expert opinion will prevail over

Defendants', but I think this is enough to create a barrier to granting summary judgment of invalidity under § 101. This is because I am left with dueling expert testimony as to whether the claim elements or their ordered combination are simply well understood, routine and conventional and thus unable to supply an inventive concept to the asserted independent claims.  I cannot resolve the dispute among experts without making credibility determinations and weighing evidence, which I cannot do at summary judgment. Therefore, a fact issue remains at step 2 for the patent eligibility of the asserted claims of the '703 Patent - and that goes for both independent and dependent claims.

I should note that during argument, Defendant repeated that Dr. Polish only identified one element as supplying the inventive concept and then Defendant argued that that one element is purely functional.  But I think we need to keep the burden in mind - and it is Defendants' burden to show that the claimed elements or their ordered combination were simply well-understood, routine or conventional and thus not supplying an inventive concept. As I have just said, I don't think that Defendant has done that sufficiently to merit grant of summary judgment.

So I'm denying Defendants' motion for summary judgment of invalidity of the '703 Patent on the basis that the claims are directed to ineligible subject matter, and

16:02:47  1    because that is the first ground on Defendants' rank-choice

16:02:47  2    list of summary judgment grounds across their two summary

16:02:47  3    judgment motions, I am denying the remaining grounds and

16:02:47  4    both motions.

16:02:47  5              So that takes care, I think, of the summary

16:02:47  6    judgment motions.  But I did want to talk about the *Daubert*

16:02:47  7    motions because I did look at Defendants' *Daubert* motion to

16:02:49  8    exclude certain testimony of Plaintiff's expert, Mr. Reed.

16:02:54  9    And I got to tell you, that one caught my attention because

16:02:58  10   he made a quite large error, but then magically he came up

16:03:04  11   with exactly the same number in his reply report.  So I do

16:03:10  12   need to understand what's going on because it does call into

16:03:16  13   question the reliability of his report.

16:03:25  14             So I'll hear from you first.  I think I

16:03:33  15   understood the error that he made, and I understand the

16:03:37  16   difference that that error makes.

16:03:41  17             MR. HADDEN:  Okay.

16:03:41  18             THE COURT:  So you don't have to -- if it turns

16:03:44  19   out that I misunderstood that, I'll let you explain it to

16:03:47  20   me, but I do think I understand that and how it makes a

16:03:50  21   difference.  And I guess my question is if I agree with you

16:04:04  22   and I say look, he said $140 million and he got it by making

16:04:11  23   the wrong calculation, and if he actually used the correct

16:04:15  24   calculation, it would have been $40 million, do you agree

16:04:15  25   that he could present that corrected version or are you

16:04:28 1    saying he's just out of luck?

16:04:30 2              MR. HADDEN:  I think he's just out of luck.

16:04:34 3    Now, obviously if the Court rules he can present that,

16:04:37 4    that's fine.

16:04:39 5              THE COURT:  Not fine --

16:04:40 6              MR. HADDEN:  The reason -- if I could, Your

16:04:42 7    Honor, just to go, because even at 40 million is still

16:04:45 8    broken, the methodology.  Right?  Because in that he still

16:04:49 9    purports to use this cost savings approach.  And this is our

16:04:55 10   slide 3.  And we all agree on a cost saving approach is a

16:05:00 11   legitimate way to calculate patent damages.  And the way it

16:05:04 12   works is you compare the cost of the infringing service or

16:05:10 13   the good with the cost of a non-infringing alternative, and

16:05:15 14   that delta is some measure of the value of the patents.

16:05:18 15   That's fine.

16:05:19 16             But he didn't do that.  He didn't do that in his

16:05:22 17   original report, and he didn't do it in this report.  So in

16:05:26 18   this report and in his reply report, to come up with a fudge

16:05:31 19   factor he uses to get back to $140 million.

16:05:34 20             THE COURT:  I didn't understand really the fudge

16:05:36 21   factor how he got back up there.  Do you want to explain

16:05:40 22   that to me?

16:05:41 23             MR. HADDEN:  I'll try to explain it right here.

16:05:44 24   So what he does is he compares a version of Alexa Shopping

16:05:51 25   that was released after 2019 with another version of Alexa

16:05:59 1   Shopping that was in use before 2019 and he says that

16:06:04 2   between 2019 and 2021, Alexa Shopping's growth as a

16:06:10 3   percentage of overall Alexa use went up by a compounded

16:06:15 4   average rate of 25 percent.  And he takes that 25 percent

16:06:19 5   and he said that's my fudge factor, that's the amount that

16:06:23 6   Alexa overall should have grown under some theoretical

16:06:29 7   world.  But that's how he gets the multiplier to get the

16:06:32 8   error corrected and get back to $140 million.

16:06:36 9           Now, the flaws in this are kind of -- they're

16:06:42 10  not small, right?  The first issue is how does this make any

16:06:46 11  sense as to the way to value patents.  He says we infringed

16:06:51 12  before, you infringe now, so what do we know about that

16:06:54 13  delta?  Well, the one thing we know is it has nothing to do

16:06:58 14  with using the patent because both systems purportedly use

16:07:01 15  the patent.  So to try to gloss over that fact, VB Assets

16:07:09 16  comes up with this theory that well, we can use this later

16:07:13 17  shopping version as a proxy for the patent because it

16:07:18 18  reduced terms, dialogue turns by 1.5, and our expert says

16:07:24 19  that the patents could also reduce dialogue turns by 1.5.

16:07:30 20  And this goes to slide 6, Your Honor.

16:07:33 21          And the problem with that theory is he's got no

16:07:39 22  data to support it.  He has no evidence that in this later

16:07:42 23  version of Alexa Shopping, dialogue turns were reduced by

16:07:46 24  1.5.  There is just no data for it.  He's made it up.

16:07:50 25          The other --

16:07:51  1                THE COURT:  He says he's specifically addressing

16:07:55  2      that in the new dots, that always gets my attention when

16:07:59  3      there are dots.

16:07:59  4                MR. HADDEN:  He cited dots and one document said

16:08:02  5      as part of our redesign we're going to include something

16:08:06  6      about one turn dialogs so people can add to their list.

16:08:11  7      That's it.  It's not a measure of the average number of

16:08:16  8      turns after this redesign or anything else.

16:08:18  9                But the other key point, Your Honor, is you can

16:08:21 10      reduce dialogue turns lots of ways.  You can have better

16:08:26 11      speech recognition so people don't have to repeat

16:08:29 12      themselves.  Right?  That has nothing to do with these

16:08:33 13      patents.  You can do what Amazon did, in fact, which was get

16:08:39 14      people not to use their voice but to use the touchscreens on

16:08:42 15      their phones and their computers to complete transactions.

16:08:46 16      So that's what this redesign was largely aimed at, it was

16:08:50 17      introducing non-voice features of Alexa Shopping.  So Amazon

16:08:56 18      would use the back-end AI that powered Alexa to make product

16:09:01 19      recommendations and allow people to buy things on their

16:09:05 20      phones and mobile devices, exactly the opposite of what

16:09:08 21      these patents are about.

16:09:10 22                So he counted that, and then this kind of shows

16:09:17 23      why this -- the wheels come off the wagon, because during

16:09:21 24      this period where there is this big growth in Alexa Shopping

16:09:26 25      uses that he's using to create his fudge factor.  What was

16:09:31 1 happening was people were using non-voice features of Alexa

16:09:35 2 to buy things more than voice features.  So by August of

16:09:39 3 2021, that voice use of shopping features was the minority.

16:09:46 4 Right?  So this fudge factor had nothing to do with the

16:09:50 5 patents, it had nothing to do with even using voice, it was

16:09:55 6 because Amazon introduced non-voice features, people used

16:09:58 7 them and Amazon started counting those people as active

16:10:03 8 Alexa Shopping users.

16:10:05 9         The other key issue with this fudge factor is he

16:10:10 10 used worldwide data, and it turns out during this period

16:10:14 11 from 2019 to 2021, Amazon rolled out Alexa Shopping in

16:10:24 12 India, Brazil and other countries for the first time.  So of

16:10:28 13 course there was a huge jump in the number of Alexa Shopping

16:10:31 14 users because there are these new markets that were coming

16:10:36 15 on line for the first time.  So again, he treated those as

16:10:39 16 somehow being a result of the patent to come up with this

16:10:45 17 fudge factor.  There is just no basis for using any of this

16:10:49 18 as a proxy for the patent or a value of the patent or a way

16:10:55 19 to extrapolate some theoretical growth rate.

16:11:02 20         Do you have any questions on that, Your Honor?

16:11:07 21 I'm happy to respond.

16:11:07 22         THE COURT:  No.

16:11:09 23         MR. YOON:  Hello, Your Honor, James Yoon on

16:11:11 24 behalf of the plaintiff, VB Assets.  And Your Honor, I am

16:11:17 25 going to make sure that we start with the actual opinion

16:11:21 1   that Mr. Reed is offering, and then I will --

16:11:24 2            THE COURT:  Let me ask you a few questions

16:11:26 3   first.

16:11:27 4            MR. YOON:  Absolutely, Your Honor.

16:11:28 5            THE COURT:  So all of the changes to assumptions

16:11:31 6   that happened in the reply report, that's based on evidence

16:11:34 7   that was available at the time of the opening report; right?

16:11:38 8            MR. YOON:  Yes, Your Honor, well --

16:11:39 9            THE COURT:  He didn't say -- he didn't say I

16:11:41 10  found $140 million using this, you know, calculation that

16:11:48 11  turned out to be based on incorrect math, and I also found

16:11:53 12  $140 million based on this other thing, he didn't say that.

16:11:56 13           MR. YOON:  Your Honor --

16:11:57 14           THE COURT:  He just came up with the new, by the

16:12:00 15  way, it's still $140 million under this new thing, he only

16:12:05 16  did that first in his reply report.

16:12:07 17           MR. YOON:  I don't think that's completely

16:12:08 18  accurate, Your Honor, I understand that --

16:12:10 19           THE COURT:  I need to understand how that's not

16:12:12 20  accurate, because it's not like he said, as I read it, it's

16:12:15 21  not like he said I came up with 140 million these three

16:12:20 22  different ways, no matter what I do, I come up with

16:12:24 23  $140 million, it must be right, instead he did it this way

16:12:27 24  and said it's $140 million and he came back and admitted

16:12:31 25  that he got the math wrong and said but let me go through

another way and show you, and it seemed to me if he was going to go through that other way, he should have done it in the first instance.

MR. YOON:  Let me address that.  Two points, Your Honor, one with regards to in the opening report there was substantial discussions about his methodology which did not change, I think that's the key point that I wanted to start with, Your Honor.  There was a calculation difference and then there was the use of the growth factor based on the new calculation which was math that was not done originally and the results were similar.  But let me take it one step at a time so we're accurate so we know what his theory is that has never changed, Your Honor, there was an issue as to calculation.

Your Honor, you have in front of you --

THE COURT:  Let me ask you this.  When you say it's a calculation, if nothing in his report changed other than he fixed that calculation, his number would be different.  Right?

MR. YOON:  Your Honor, mathematically, that would be correct.  I do want to address the fact that he had identified and explained what he was doing in his opening report and that his second report, Your Honor, continued the exact same methodology recognizing that one of the numbers he used was not correct, and I did want to make -- at least

16:13:50 1   state for the record what that is, if I may, Your Honor.

16:13:53 2   But you're right, the math is, if I plugged in the exact

16:13:56 3   same formula --

16:13:57 4           THE COURT:  If his report was identical, it had

16:14:00 5   everything the same except for that mistake, his number

16:14:05 6   would not be $140 million?

16:14:07 7           MR. YOON:  If you are applying the mathematical

16:14:10 8   formula, Your Honor --

16:14:11 9           THE COURT:  I don't know why you're saying

16:14:13 10  something different than what I asked.  So I need to know if

16:14:16 11  you're saying something different because I'm wrong or

16:14:19 12  because you just don't want to agree with me.  So if he had

16:14:22 13  his report and he didn't do another new analysis, a

16:14:25 14  different analysis, if he just went with what he disclosed

16:14:29 15  in his report, but he did the correct math, he could not

16:14:34 16  have asked for $140 million, his number would not have been

16:14:40 17  $140 million.

16:14:41 18          MR. YOON:  Yes, Your Honor, his math would be

16:14:44 19  different the way he calculated --

16:14:46 20          THE COURT:  So he would not have asked for

16:14:49 21  $140 million?

16:14:50 22          MR. YOON:  Your Honor, that's the point I am

16:14:51 23  trying to address, Your Honor.  I am trying to be

16:14:54 24  respectful.

16:14:55 25          THE COURT:  You're not saying yes or no, you're

just saying words that I don't understand if you're

weaseling out of something.

MR. YOON:  I am not weaseling out, Your Honor.

THE COURT:  All I'm trying to figure out is I

know you're saying look, there are some other words over

here that suggest he was also thinking of something else, I

will let you say that.  But what I need to understand is,

the analysis that he actually did, that he said look, I

subtracted 0.23 from 0.37, put it over 0.37 and I got 0.37

and I used that number and here is how I used that number

and I got $140 million.  Then it was corrected to subtract

1.23 from 1.37 over 1.37.  If he had just the only change I

let him make in that opening report was to fix his number,

he could not have gone through with all of his calculations

and come up with $140 million.  Right?

MR. YOON:  It would be 1037, the original

number, correct, Your Honor.

THE COURT:  So aside from the 1037, is it

correct, he could not have asked for $140 million?

MR. YOON:  It's correct, Your Honor.  And I

don't want to argue with you that if you look at his opening

report at Tab 16 which laid out the calculation using the

37 percent.

THE COURT:  And the basis for his calculation.

MR. YOON:  And the basis, and if you look at the

16:16:25  1    calculation that he did in Tab 16R which is the replacement

16:16:30  2    report, the one difference that you're pointing out, Your

16:16:35  3    Honor, would have -- if he could not have changed any of the

16:16:39  4    waitings, Your Honor, the number would have been different

16:16:41  5    and less, that is a fact.

16:16:46  6                    THE COURT:  Okay.

16:16:50  7                    MR. YOON:  Your Honor, may I address some of the

16:16:54  8    comments by opposing counsel?  I don't want to argue with

16:16:57  9    Your Honor.

16:16:57 10                    THE COURT:  I just need to know -- if you're not

16:17:00 11    agreeing with me and there is a reason, that's fine, but

16:17:03 12    when you sort of sound like you're agreeing, I don't want to

16:17:06 13    think you're agreeing with me but actually you're going to

16:17:09 14    say no, I wasn't agreeing because I said these other words,

16:17:12 15    that's why I'm asking because it's not that, you know, I

16:17:15 16    think you're doing something wrong, it's just that I want to

16:17:18 17    make sure that if I think you agree, it's because you said

16:17:21 18    yes and not because you said yes, well, it's correct that

16:17:24 19    blank because it almost sounds like there is a but coming,

16:17:28 20    so I need to understand what you're saying.

16:17:30 21                    MR. YOON:  To be accurate, Your Honor, if

16:17:33 22    Mr. Reed applied the exact same mathematical approach in his

16:17:40 23    supplemental report as he did in his original one, the

16:17:42 24    number would have been different.  The issue is that when

16:17:45 25    Mr. Reed became aware that there was an error, instead of

16:17:51 1   37 percent and 10 percent, he went back and the difference

16:17:55 2   and the only difference, Your Honor, which is what I wanted

16:17:58 3   to just point out for the record, if you look at, Your

16:18:01 4   Honor, I handed you a copy -- do you have a copy of this?

16:18:04 5   Do you have Tab 16 in the document I handed out?  And the

16:18:08 6   second page is 16R.  And this is DI 183, Exhibit I.

16:18:15 7            So Your Honor, Tab 16 is the original

16:18:24 8   calculation, Your Honor, and then Tab 16R is the calculation

16:18:29 9   that he made that was similar, but there was a difference.

16:18:34 10  Right?  And so you can see what Mr. Reed did in his opening

16:18:39 11  report as Your Honor correctly pointed out was there was

16:18:43 12  37 percent, he applied an 80/20 rule --

16:18:46 13           THE COURT:  What I don't understand is why are

16:18:48 14  there not -- why does 16R have so even much more stuff?

16:18:54 15           MR. YOON:  That's what I just wanted to state

16:18:55 16  for the record, Your Honor, if I may, I can explain that.

16:18:58 17           THE COURT:  I need -- first of all, I need my

16:19:01 18  glasses.  Mark, can you get me my glasses because I can't

16:19:05 19  read this.

16:19:27 20           MR. YOON:  And Your Honor, while the glasses are

16:19:28 21  coming, maybe I can make a couple of other points real quick

16:19:32 22  --

16:19:32 23           THE COURT:  No, I want to get this first.

16:19:35 24           MR. YOON:  Yes, Your Honor.

16:19:55 25           THE COURT:  So on Tab 16, at the top of Tab 16

16:20:03 1   there is a chart that has monthly average users Alexa, Alexa

16:20:08 2   MAU percent growth and Alexa MAU at lower growth.  Does that

16:20:13 3   correspond with the top chart on 16R but with fixed numbers?

16:20:23 4              MR. YOON:  Yes, Your Honor.

16:20:24 5              THE COURT:  Okay.  So then we have another chart

16:20:29 6   below on Tab 16, there is one chart --

16:20:33 7              MR. YOON:  Yes.

16:20:33 8              THE COURT:  -- at the top.  Tab 16R, two charts

16:20:36 9   at the top.  So the first one is what corresponds to Tab 16

16:20:42 10  with no -- with a fix in the calculation.  So what's the

16:20:48 11  second one?

16:20:49 12             MR. YOON:  The second one, Your Honor, is then

16:20:51 13  taking into account as you can see here, it says the above

16:20:54 14  comparison does not take into account that based on overall

16:20:59 15  Alexa users, including Alexa use growth, Alexa Shopping

16:21:04 16  growth should have been larger, and what the --

16:21:06 17             THE COURT:  Let me ask you this.

16:21:08 18             MR. YOON:  Yes.

16:21:08 19             THE COURT:  Did the chart number 1 on Tab 16,

16:21:11 20  did that comparison take into account that based on overall

16:21:11 21  Alexa usage, including Alexa use growth, Alexa Shopping

16:21:20 22  growth should have been larger?

16:21:22 23             MR. YOON:  That one, Your Honor, did not

16:21:23 24  explicitly do that, no.

16:21:25 25             THE COURT:  So he didn't do it at Tab 16, he

16:21:28 1  didn't do it at the top of Tab 16R, but then instead of just

16:21:34 2  leaving it like he did originally, he goes on to say oh,

16:21:37 3  well, wait, wait, wait, now we have to take into account

16:21:41 4  something else.  Right?

16:21:43 5           MR. YOON:  Yes, Your Honor, and that's what I

16:21:44 6  wanted to address.

16:21:45 7           THE COURT:  Why couldn't he have done that in

16:21:49 8  Tab 16?

16:21:50 9           MR. YOON:  There are two issues on that, Your

16:21:52 10  Honor.  Well, clearly with regards to this calculation could

16:21:56 11  have been performed as Your Honor had indicated as an

16:21:59 12  alternative in the opening report, I think that was the

16:22:01 13  question Your Honor had indicated in the opening.  You said

16:22:06 14  you could have done A or B or C and they all end up in the

16:22:09 15  same place.  Right?  And he had done it and we had indicated

16:22:12 16  in our papers at Tab 5 and 6, he had calculated the growth

16:22:17 17  rates of various features and that they were all coming out,

16:22:22 18  you know, in the similar one he felt that the 37 percent was

16:22:26 19  a fair proxy once you then adjusted it because it was too

16:22:31 20  high with an 80/20.

16:22:33 21           So, Your Honor, the best -- if you give me just

16:22:36 22  one moment so I can explain the model because it may be

16:22:41 23  easier to answer your questions.  If I have a moment, I want

16:22:44 24  to address something else that Mr. Hadden said.  I don't

16:22:47 25  want you to think I'm moving off of something, Your Honor,

16:22:49 1    but I think I need to lay a groundwork to explain something.

16:22:52 2    May I have just two minutes on that, Your Honor?

16:22:54 3                    THE COURT:  Yes.

16:22:55 4                    MR. YOON:  Thank you.

16:22:56 5                    Your Honor, the first thing is if we could have

16:22:59 6    their slide up, Your Honor, they misrepresent or

16:23:02 7    mischaracterize --

16:23:03 8                    THE COURT:  Don't say that.  We don't say that.

16:23:06 9                    MR. YOON:  I apologize.

16:23:07 10                   THE COURT:  If you're going to say that, that's

16:23:09 11   a serious allegation and you're going to have to prove it.

16:23:11 12   Okay?  Them misrepresenting to the Court is very serious, I

16:23:15 13   take it seriously.

16:23:16 14                   MR. YOON:  I apologize for the word, Your Honor,

16:23:18 15   and I also apologize to Mr. Hadden.  We have known each

16:23:22 16   other for a long time.  I was not accusing him of anything

16:23:26 17   unethical.

16:23:27 18                   To be accurate, Your Honor, we disagree with

16:23:29 19   their characterization of what Mr. Reed did.  Again, Your

16:23:32 20   Honor, you were clear and I apologize that I used that word.

16:23:35 21   Okay, Your Honor?

16:23:36 22                   THE COURT:  I appreciate the apology.

16:23:38 23                   MR. YOON:  Your Honor, what Mr. Reed did, and

16:23:41 24   this is set forth, you have the expert report of Nathan

16:23:45 25   Polish, Your Honor, and if you look at Mr. Polish's report I

16:23:49 1   handed you in the black binder, in particular pages 226 to

16:23:55 2   231, Mr. Polish compares the non-infringing alternatives

16:23:59 3   identified by Amazon to the use of the patent.  And those

16:24:03 4   non-infringing alternatives, Your Honor, indicate that they

16:24:08 5   would increase the number of turns by one to two turns in

16:24:13 6   the dialogue.  And that is the effect of not using the

16:24:17 7   patents.

16:24:17 8        Then the second question that Mr. Reed did, Your

16:24:20 9   Honor, was to then try to determine what would be a

16:24:24 10  calculation of a value, the detriment to Amazon if it did

16:24:31 11  not have those one to two turns.  And Your Honor, I have --

16:24:36 12  if you look in what we handed you, Your Honor, this is

16:24:40 13  Exhibit 80, Your Honor, that's in front of you right now.

16:24:43 14  It's one of the documents I handed to you.

16:24:45 15        THE COURT:  That's fine.  I'm looking at

16:24:47 16  something else, but go ahead, I'm listening.

16:24:51 17        MR. YOON:  Exhibit 80, Your Honor, this is the

16:24:53 18  operating plan, DI 183 Exhibit 7, and it says "at the start

16:24:58 19  of 2018, Shopping CX for most customer requests presented

16:25:00 20  multiple operating series each followed by a do you want to

16:25:08 21  buy it call to action.  These complex multi-turn dialogue

16:25:11 22  interactions, 2.7 turns versus Alexa average 1.2 turns,

16:25:19 23  assume most customers requests were urgent."

16:25:22 24        So Amazon itself had calculated and determined

16:25:25 25  that the number of dialogue requests, 1.5, resulted in a

16:25:31 1    lower adoption of Alexa Shopping relative to Alexa as a

16:25:37 2    whole.  So the comparison, Your Honor, that counsel was

16:25:40 3    pointing to was a comparison that Mr. Reed first did that

16:25:44 4    Alexa was growing at a certain rate and Alexa Shopping

16:25:47 5    because it had that extra 1.5 turns, Your Honor, was growing

16:25:52 6    at a slower rate.  That's the ten percent number, Your

16:25:54 7    Honor.  The number, the ten percent came from Amazon's

16:25:57 8    operating plan.

16:25:59 9          The issue then became a calculation then as to

16:26:03 10   how many users Amazon would have lost of either the Alexa or

16:26:09 11   shopping, Your Honor, as a result of having to add 1.2 --

16:26:16 12   1.5 dialogue turns.  And in Mr. Reed's initial analysis, he

16:26:22 13   used the 37 percent based on the other numbers, and then

16:26:26 14   calculated of that 37 percent, 80 percent of that would have

16:26:31 15   been focused on Amazon's own activities and growth, and

16:26:36 16   20 percent he attributed to the patents which gave you the

16:26:39 17   7.4 percent that then applies to the products, and either

16:26:44 18   $20 for the devices or $11 for shopping ended up how he

16:26:49 19   calculated the $143 million number.

16:26:54 20         The issue in terms of his original methodology

16:26:57 21   that he laid out in his report, Your Honor, and I understand

16:27:00 22   the discussion that we had, was you looked for a proxy of

16:27:03 23   the value of the cost of the dialogue turns, you then looked

16:27:08 24   at the impact that adding 1.5 more turns to all of Amazon,

16:27:14 25   the devices and the shopping, would have to the system in

16:27:19  1    terms of the reduced rate.  And then that reduced rate,

16:27:25  2    understanding that Amazon would be doing other things he did

16:27:28  3    the 80/20 rule.

16:27:30  4             If we can go real quickly to a couple of the

16:27:33  5    slides that Mr. Hadden used, counsel for Amazon.  Your Honor

16:27:37  6    had asked about the testimony and there was some key

16:27:39  7    testimony that was -- you can see on the screen, but I did

16:27:46  8    see and it's reflected in a variety of the operating plan

16:27:49  9    reports, I did see information addressing that the later

16:27:53 10    period, Alexa Shopping was focused on single turns.  They

16:27:57 11    were 2.7 turns and they were focused on that.  So that

16:28:00 12    informed me that Alexa or that Amazon was successful in

16:28:05 13    largely getting most of the shopping interactions down to

16:28:08 14    the lower number of turns.

16:28:11 15             If we can then go to the next slide that Amazon

16:28:14 16    used, Your Honor, I think this is a key point, Your Honor,

16:28:18 17    they had pointed out leveraging other things such as

16:28:21 18    displays, that was addressed in Mr. Reed's reports, that's

16:28:24 19    part of what's covered by 80 percent to Amazon, 20 percent

16:28:28 20    to the patents.

16:28:28 21             And I think the last one is actually quite

16:28:31 22    important, Your Honor, this is the last slide.  Counsel for

16:28:34 23    Amazon, Your Honor, you recall he pointed to this slide.  A

16:28:37 24    couple of key points that are very critical, Your Honor.  If

16:28:40 25    you look at the date here, it's August 2020 to August 2021.

This is already laid in the damages period.  And you can see

that the inflection begins at February of 2021.

The key point, though, Your Honor, you noticed

that the voice MAU is always increasing the whole time.  The

fact that the non-voice started increasing in late 2021 was

addressed by Mr. Reed in his analysis.  And this has nothing

to do with the primary issue here.

So --

THE COURT:  Which one is that, the red line?

MR. YOON:  The red line is the non-voice

interaction MAU, Your Honor.

THE COURT:  You said it was always -- it was

always increasing, but wasn't it decreasing at points?

MR. YOON:  I was talking about during this

period of voice one.  I apologize, Your Honor, I'll be a

little more accurate.  Counsel for Amazon had pointed to

this chart and in particular the large increase in non-voice

interaction such that non-voice interaction in the

August '21 time frame exceeded the voice interaction.  That

was the point that was made during their presentation.  You

can see that large jump began in the February '21 time

frame.

This we believe is irrelevant to the value of

the technology in this case and was addressed by Mr. Reed.

If you notice the voice technology that was at issue in this

case is still increasing this whole time.  We believe that

this particular slide has nothing to do with the damages

analysis at all, Your Honor.

So I want to get back now to what was

characterized as the fudge factor and obviously, Your Honor,

I apologize at any point if I frustrated the Court, I wanted

to address now 16R like I said I would do.

Going to 16R, Your Honor, if you recall in the

analysis that Mr. Reed did, and it was based in part on, for

example, Exhibit 80, what is undisputed, Your Honor, is that

there was a ten percent difference in the growth of Amazon

shopping relative to -- sorry, Alexa Shopping as relative to

Alexa as a whole.  But what Mr. Reed indicated in his report

is when he went back and looked at the data, Amazon was

expecting that it would grow, Alexa as a whole would grow

25 percent and Alexa as a whole was using the invention, if

Alexa as a whole would have to stop using the invention and

add 1.5 turns, then that growth delta would also have to be

taken into account.  And a fair way of putting it, Your

Honor, if you take the 10 percent and the 25 percent, that

delta is very close to the 27 percent.  And Your Honor, just

to be clear --

THE COURT:  My problem, aside from that it seems

fishy, is he didn't do this the first time.  He did this for

the first time in his reply.  That's not right.  That's not

16:31:52 1    the way we litigate things, right?  If he wants to say oh,

16:31:57 2    what I originally did, it doesn't take into account certain

16:32:01 3    things and so if he had said the first time, you know, by

16:32:05 4    the way, I didn't take into account certain things, maybe it

16:32:08 5    would be okay that he fixed it, but now it's like well, the

16:32:13 6    way I did it the first time, that number got reduced so now

16:32:19 7    I'm going to figure out how I can bump that number up again.

16:32:23 8         And I don't mean to say that he's doing that in

16:32:26 9    some kind of nefarious way, but he's doing it in an untimely

16:32:31 10   way if nothing else.

16:32:32 11        Why is it that it's appropriate in 16R to put

16:32:36 12   the above comparison does not take into account that based

16:32:40 13   on overall Alexa usage, including Alexa use growth, Alexa

16:32:46 14   Shopping growth should have been larger.  Why is it okay for

16:32:48 15   that to come into play in the reply report but not in the

16:32:54 16   opening report?  He could have done it in the opening report

16:32:57 17   and he just chose not to.

16:32:58 18        MR. YOON:  Your Honor, his calculation that way

16:33:01 19   was not in the opening report.  As Your Honor had suggested,

16:33:04 20   there was much discussion in the opening report --

16:33:07 21        THE COURT:  His calculation was not based on

16:33:08 22   that in the opening report.  It was not.

16:33:11 23        MR. YOON:  Yes, Your Honor, and I would point

16:33:12 24   out --

16:33:15 25        THE COURT:  And, in fact, in the opening report

16:33:14 1   he suggested that even if he were to say there was some

16:33:19 2   things that weren't taken into account, the fact that he

16:33:21 3   didn't adjust his number based on that suggest that it's not

16:33:25 4   appropriate to adjust his number that he got based on that,

16:33:29 5   but yet in the second report, in the reply, suddenly he's

16:33:34 6   adjusting his number based on that.

16:33:36 7          MR. YOON:  Two points on that, Your Honor.  One

16:33:38 8   thing is just to be clear, when you mentioned that that's

16:33:44 9   not the way we litigate, we did meet and confer with counsel

16:33:48 10  for Amazon.  We did agree that Mr. Ugone could submit a

16:33:54 11  rebuttal report to that.

16:33:56 12         THE COURT:  I know, because they were good

16:33:58 13  sports about it doesn't mean that it was the right thing to

16:34:00 14  do, they didn't want to bring an issue to the court doesn't

16:34:03 15  mean that it's appropriate.

16:34:05 16         MR. YOON:  Well, there are two issues, Your

16:34:07 17  Honor.  I think both counsel in this case have, you know,

16:34:10 18  two fine -- we've gotten along very well and we try to work

16:34:15 19  things out, Your Honor.  The only issue there was there was

16:34:18 20  no attempt to ambush or prejudice in this matter, and

16:34:22 21  Mr. Reed was deposed on the report and Mr. Ugone did have a

16:34:28 22  chance to respond to it.  So Your Honor, I think the

16:34:31 23  question really comes down to the following, there is really

16:34:38 24  two issues here and I think they have collapsed, Your Honor.

16:34:41 25  Issue one is the Rule 26 issue as to whether or not

16:34:44 1    something should or should not have been in Mr. Reed's

16:34:47 2    opening report.  Issue two is the *Daubert* issue as to

16:34:52 3    whether or not for the purposes of *Daubert*, whether or not

16:34:56 4    his opinion was unreliable and that -- and we don't believe

16:35:01 5    that for *Daubert* purposes --

16:35:03 6            THE COURT:  I do, I think this actually makes me

16:35:06 7    wonder if it's reliable.

16:35:07 8            MR. YOON:  I understand, Your Honor.  Obviously

16:35:09 9    I respectfully disagree, Your Honor, I think his methodology

16:35:12 10   is laid out.  I think Your Honor had noted that he explains

16:35:15 11   what he did and how he did it.

16:35:17 12           THE COURT:  To me the question comes down to

16:35:19 13   what happens if I say that he can't do anything more than

16:35:26 14   correct the mathematical mistake, what do we do then?

16:35:30 15           MR. YOON:  Your Honor, then we would go forward

16:35:32 16   at trial with the -- following the Court's guidance.  That's

16:35:37 17   simply what would happen, Your Honor, we obviously would be

16:35:41 18   limited to the report that the Court would have us use, the

16:35:45 19   original calculation with the 10 percent, not the

16:35:48 20   37 percent.  From the standpoint of the Court and managing

16:35:52 21   the trial, it's quite simple, it's not hard to do.

16:35:55 22           THE COURT:  Well, I don't know, because I guess

16:35:58 23   the question then is does this cast such reliability on

16:36:02 24   everything that he's done that I start to look more

16:36:06 25   carefully as to what he can testify to at all?

MR. YOON:  That's, Your Honor, where I have the biggest concern where I think that the issue with regards to *Daubert* and Rule 26 reports are quite distinct.  Here, Mr. Reed's methodology -- his qualifications aren't in dispute, his review of evidence is not in dispute, the methodology is the methodology that this Court, actually with Mr. Reed himself, Judge Andrews had indicated that this method was proper.

And Your Honor, to be clear for the purposes of *Daubert*, I understand your point as to Rule 26, Your Honor, as to *Daubert*, his methodology was -- you know, his overall approach and how he did it, did not change except for this calculation point.  He was trying to determine what would be the calculation and the detriment to Amazon if Amazon was forced to go to 1.5 more turns, and that would result in a smaller number of users and that -- and I would point out, Your Honor, Amazon had not moved to exclude the per unit number calculation that Mr. Reed used for either the Alexa or as to -- or the shopping.

The issue here, Your Honor, is twofold.  One, whether or not there was sufficient information to show as a proxy for the value, and we believe that that's clear, that non-infringing alternative added the one to two turns, Amazon documents, Your Honor, the other thing I would like to point out just for the record here is -- and again, Your

Honor, I apologize for using that term, I did not mean to disparage counsel.

Your Honor, I would also -- if you look at Exhibit 183, Exhibit I, this is the Reed report, and this was actually Reed's Tab 5 from his original report, Your Honor.  And this is on page 2 of 3 of Tab 5.  And it's one of the documents that I handed to you, Your Honor, and it says, this is Amazon, "quickly improve CX.  Eliminate turns and better leverage screens.  In Q3 we began a program to accelerate improvements in CX quality and engagement by simplifying our multi-turn features.  We launched single term treatment for search by and reorder."

Then it goes on to focus, this is Amazon, Your Honor, "we hypothesize CX which minimizes turns, provides lightweight interaction and the flexibility to complete their purchases on Alexa or desktop and mobile would more effectively build customer habits."

There is no dispute, Your Honor, that Amazon QBR, which is their quarterly business review and Amazon operating plans all indicate the importance of reducing turns and how reducing turns increases the engagement and the use of Alexa.  And so we have no dispute that Mr. Polish correctly identified the increases in one to two turns of the non-infringing alternative.  We have Amazon's own analysis of that 1.45 turns resulted in lower adoption of

Alexa Shopping.  The ten percent number, Your Honor, is not disputed.

The only issue here we believe is two issues, Your Honor, one, whether under Rule 26 he could offer a different calculation in the rebuttal report, and under rule -- under *Daubert*, whether you think that this alternative way of calculating the number impunes the reliability and credibility of Mr. Reed to such an extent that he would not be able to testify in front of the jury.  And Your Honor, as to the second point, we don't believe that anything along those lines are here.

We were open with opposing counsel, the report was clear that a change was made.  Mr. Reed himself acknowledged the error, Your Honor, so I think that also goes to Mr. Reed's credibility.  And Your Honor, I think that we also, they would have the opportunity to have Mr. Ugone submit a supplemental report and be deposed.  And I understand, Your Honor, that that may not be, but I don't think that calls into question Mr. Reed's behavior or credibility.  I acknowledged the mistake, he explained the difference, and I don't think that anything with regards to the alternative calculation would justify having Mr. Reed excluded under *Daubert*.  I understand Your Honor's questioning on the other item.

THE COURT:  All right.  Anything you want to

add?

MR. HADDEN:  Just very briefly, Your Honor.
Just this slide, Your Honor.  This goes to the fudge factor.
Right?  The fudge factor was calculated by adding the red
line and the blue line and attributing both of those
increases somehow to the patent.  Neither has anything to do
with the patent.  The red line is completely non-voice
users.  And included these new worldwide markets and counted
that as being somehow attributed to the patent.  So the
fudge factor is a complete fiction.  The 25 percent, it had
no basis in reality and no connection to these patents.

When they talk about that was Amazon's expected
growth, no, there is no Amazon document that said that
25 percent, that's his fudge factor that he calculated by
comparing two different purportedly infringing versions of
Alexa Shopping and not taking into account the increase in
users was all due to these non-voice activities in foreign
markets.

Thank you, Your Honor.

MR. YOON:  Your Honor, may I just respond very
briefly?

THE COURT:  Okay.

MR. YOON:  Two things, Your Honor, as indicated
in our papers, Amazon itself had projected a 24 percent
growth, and as indicated in our papers and indicated, also,

16:42:30 1    Your Honor, in that 16R, you can look at it, the 25 percent

16:42:34 2    compounded growth was from years 2019 through 2021.  And it

16:42:40 3    was the average growth, the 25 percent was consistent with

16:42:44 4    Amazon's own prediction of a 24 percent growth, all before

16:42:49 5    this February 2021 issue.  I think, Your Honor, the issue

16:42:54 6    Your Honor has put squarely in front of me is the case, but

16:42:59 7    I don't believe as I indicated before that this chart at all

16:43:02 8    reflects what Mr. Reed did in terms of the growth.  He had

16:43:07 9    indicated Amazon had a 24 percent, and he calculated from

16:43:11 10   2019 to '21 and the chart that counsel had put up really

16:43:16 11   focuses starting on the February 2021 and I don't believe

16:43:20 12   that that really is the way Mr. Reed had done his analysis.

16:43:28 13            THE COURT:  Okay.  I want to take a look at some

16:43:31 14   more issues so I will get you a decision on this one.  I

16:43:34 15   can't rule from the bench.

16:43:38 16            All right.  Now, we need to set a pretrial

16:43:43 17   conference and trial in this case.  Before we get there, I

16:43:46 18   want to discuss case narrowing.  As you said earlier, you

16:43:51 19   still had forty-some claims across five patents.  What's the

16:43:52 20   plan for narrowing things down for trial?

16:43:55 21            MR. YOON:  Your Honor, I was going to pose to

16:43:59 22   counsel that we limit ourselves to no more than three claims

16:44:03 23   per patent.  That would reduce to a maximum of 15, up to

16:44:08 24   three, I was hoping to get up to -- now I would propose we

16:44:15 25   have up to three claims per patent.

16:44:18 1          THE COURT:  Okay.

16:44:19 2          MR. YOON:  And we'll provide the list to

16:44:21 3  opposing counsel.  We'll work out a mutually agreed upon

16:44:26 4  time well before pretrial.

16:44:29 5          THE COURT:  When you're thinking about this, you

16:44:31 6  should know you're probably only going to have eleven hours

16:44:34 7  for trial, so you want to start thinking about what you can

16:44:37 8  prove.

16:44:38 9          MR. YOON:  Understood, Your Honor.  We knew that

16:44:39 10 we had to reduce claims by quite a bit in order to clean up

16:44:40 11 the record.

16:44:40 12         THE COURT:  Fifteen claims still seems like a

16:44:42 13 lot for a jury to have to deal with in a four-and-a-half day

16:44:45 14 trial if you take into account jury selection, which when we

16:44:49 15 have a defendant, Amazon, we're going to have a lot of

16:44:52 16 people who say they've heard of Amazon, so we're going to

16:44:55 17 have a longer voir dire so that's going to cut into your

16:44:59 18 time.  So I will give you guys the opportunity to try and

16:45:05 19 narrow it.  I would think that you should probably get down

16:45:07 20 to no more than ten claims just to make it reasonable, but

16:45:10 21 I'll let you try and figure out how to narrow that and

16:45:14 22 narrow the defenses that are going to be raised.

16:45:18 23         MR. YOON:  Your Honor, we'll get it down to ten

16:45:20 24 claims.

16:45:20 25         THE COURT:  All right.  Defendant, do you have

16:45:21 1    any idea how many invalidity defenses -- your expert report

16:45:25 2    as I noted stunned us and seemed a bit excessive.  So you're

16:45:34 3    not going to be able to get through all that.

16:45:36 4              MR. HADDEN:  Understood, Your Honor.  There are

16:45:38 5    basically three prior art systems that we're going to

16:45:41 6    present.  And we have third-party witnesses who will testify

16:45:46 7    about each of those.

16:45:51 8              THE COURT:  And those same three prior arts will

16:45:54 9    apply to each of the patents?

16:45:55 10             MR. HADDEN:  Yes, Your Honor.  I want to be

16:45:58 11   clear, there may be -- it will be three total across all

16:46:02 12   patents, that's what I mean.

16:46:04 13             THE COURT:  All right.  That's helpful.  So just

16:46:06 14   get together and try and keep narrowing things down.

16:46:13 15             Pretrial conference, October 2nd, 2023.

16:46:19 16   Five-day jury trial, but as I said, it's five days, so we

16:46:24 17   have Monday to Friday.  Hold on, let me take a look at one

16:46:27 18   thing.

16:46:29 19             MR. HADDEN:  I do know that in the Autobahn case

16:46:34 20   that I'm involved, I think you tentatively set that for

16:46:39 21   October 2nd.

16:46:40 22             THE COURT:  Yes, the pretrial conferences I

16:46:42 23   usually do like 4:30, so you'll be here, it will be very

16:46:44 24   convenient for you.  It may be possible, but it may not be

16:46:51 25   possible, we'll know closer to the pretrial conference, but

16:47:05 1    it may be possible that we could pick the jury on Friday so

16:47:10 2    that we have all of Monday, all of Tuesday, all of

16:47:16 3    Wednesday, Thursday, is that something that you all think we

16:47:20 4    could do?  Like I said, I have another trial then, but if

16:47:24 5    that trial is early or something, maybe we could do that.

16:47:27 6    Is that something that would appeal to you if it works?

16:47:30 7             MR. HADDEN:  So I do have a conflict.  On

16:47:34 8    October 23rd I have a trial in front of Judge Albright.

16:47:38 9             THE COURT:  Oh, I can call Judge Albright.

16:47:41 10            MR. HADDEN:  That was the case I think you heard

16:47:43 11   about this morning.

16:47:45 12            THE COURT:  But our trial is the 16th to the

16:47:49 13   20th.  What I was thinking is if we picked the jury on

16:47:53 14   Friday, then it makes your -- I guess what I'm saying, by

16:48:00 15   you raising Judge Albright's trial on the 23rd, are you

16:48:06 16   saying you don't want to have a trial on the 16th?

16:48:08 17            MR. HADDEN:  I do not.  If I could avoid that,

16:48:11 18   Your Honor, I would be very grateful.

16:48:16 19            THE COURT:  The problem is that this case is

16:48:20 20   very old.  Is this case very old or am I confusing it with

16:48:27 21   another of your cases which is very old?  No, this case is

16:48:30 22   very old.  This case is very old.  When is your trial with

16:49:04 23   Judge Albright, October 28th?

16:49:05 24            MR. HADDEN:  23rd.

16:49:05 25            THE COURT:  October 23rd.  What if we split the

16:49:16 1   weeks and we started on, for example, Wednesday the 1st of

16:49:24 2   November, and went into, you know -- so that would be

16:49:30 3   Wednesday, so we would start Wednesday, and then go to the

16:49:34 4   following Tuesday.  Can you guys check that one?

16:49:40 5           MR. YOON:  That works for us, Your Honor.  But

16:49:44 6   obviously I want to make sure it's reasonable for counsel.

16:49:47 7           MR. HADDEN:  We would still be waiting for a

16:49:49 8   verdict on November 1st.  I think we're picking a jury on

16:49:52 9   the 23rd.

16:49:53 10          THE COURT:  At some point that's just too bad

16:49:55 11  because we're not going -- I'll give you one, but I'm not

16:49:59 12  giving you -- you know, we're not putting it off until 2024.

16:50:06 13          MR. HADDEN:  Okay.

16:50:06 14          THE COURT:  So you can choose, you get the week

16:50:08 15  of the 16th of October, or we can start on the 1st, we can

16:50:18 16  start on the 1st -- we can start on the 1st and go to the

16:50:30 17  7th of November.  So you guys can let us know which of those

16:50:35 18  you prefer send us a joint submission by next Wednesday.

16:50:41 19          MR. YOON:  Yes, Your Honor.

16:50:42 20          THE COURT:  All right.  Anything else that we

16:50:45 21  need to discuss?

16:50:45 22          MR. YOON:  No, Your Honor.

16:50:50 23          MR. HADDEN:  No, Your Honor.

16:50:51 24          MR. YOON:  We're prepared and the flexibility, I

16:50:55 25  did want to point out there was a Friday selection of the

16:50:56 1    jury, we would be totally okay with that.  I think the most

16:51:00 2    important issue is that I work with counsel to find a

16:51:03 3    mutually agreed upon trial date.

16:51:06 4                THE COURT:  Yes, the Friday trial -- I mean the

16:51:09 5    Friday jury selection just because I think we're going to

16:51:12 6    have people who even if there is no conflict, they're going

16:51:17 7    to say they heard of Amazon so everybody is going to come

16:51:20 8    back and talk, so it will just take longer than it normally

16:51:24 9    does.  But I guess we can just find a way to deal with that.

16:51:28 10               Okay.  All right.  And you guys are going to

16:51:31 11   mediate.  Who are you mediating with?

16:51:34 12               MR. HADDEN:  Judge Ware.

16:51:39 13               THE COURT:  And when is that?

16:51:40 14               MR. YOON:  Thursday, Your Honor, the 13th, this

16:51:43 15   month.

16:51:46 16               THE COURT:  All right.  So let us know how that

16:51:51 17   goes.  And we'll be in touch.

16:51:54 18               COURT CLERK:  All rise.  Court is adjourned.

19               (Court adjourned at 4:51 p.m.)

20

21               I hereby certify the foregoing is a true and
     accurate transcript from my stenographic notes in the proceeding.
22

23                          /s/ Dale C. Hawkins
                        Official Court Reporter
24                         U.S. District Court

25