13:12:40

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


VB ASSETS, LLC,                    )
                                  )
          Plaintiff,              )
                                  ) C.A. No. 19-1410(MN)
v.                                )
                                  )
AMAZON.COM SERVICES LLC,          )
                                  )
          Defendant.              )



                    Monday, October 30, 2023
                    3:30 p.m.
                    Pretrial Conference


                    844 King Street
                    Wilmington, Delaware



BEFORE:  THE HONORABLE MARYELLEN NOREIKA
         United States District Court Judge




APPEARANCES:


               WILSON SONSINI GOODRICH & ROSATI PC
               BY:  NEAL C. BELGAM, ESQ.
               BY:  JAMES C. YOON, ESQ.
               BY:  MATTHEW A. MACDONALD, ESQ.
               BY:  RYAN R. SMITH, ESQ.
               BY:  BRAD TENNIS, ESQ.
               BY:  JAMIE Y. OTTO, ESQ.


                         Counsel for the Plaintiff

APPEARANCES CONTINUED:

       ASHBY & GEDDES
       BY:  STEVEN J. BALICK, ESQ.

       -and-

       FENWICK & WEST LLP
       BY:  J. DAVID HADDEN, ESQ.
       BY:  SAINA S. SHAMILOV, ESQ.
       BY:  RAVI R. RANGANATH, ESQ.
       BY:  VIGEN SALMASTLIAN, ESQ.
       BY:  MELANIE MAYER, ESQ.

             Counsel for the Defendant

          - - - - - - - - - -

       THE COURT:  All right.  Good afternoon,
everyone.  Please be seated.

         Start with some introductions.

         MR. BELGAM:  Good morning, Your Honor.  I'm
sorry, goody afternoon.  Hopefully that's the last mistake I
make during this trial.  Hopefully it is the worst one.
Neal Belgam representing the plaintiff, VB Assets.  I have
with me from Wilson Sonsini, James Yoon, Ryan Smith, Matthew
MacDonald and Jaime Otto.

         THE COURT:  Good afternoon to all of you.  Thank
you.

15:31:57 1          Mr. Balick.

15:31:58 2          MR. BALICK:  Good afternoon.  Steven Balick from

15:32:00 3  Ashby & Geddes on behalf of Amazon, along with co-counsel

15:32:04 4  from Fenwick & West, starting from Your Honor's left, David

15:32:08 5  Hadden, Saina Shamilov, Melanie Mayer, Ravi Ranganath, and

15:32:14 6  behind our table is Vigen Salmastlian.

15:32:18 7          THE COURT:  Good afternoon to all of you.

15:32:19 8          So we have reviewed the submissions.  And I

15:32:36 9  appreciate you limiting this to five claims.  We'll talk

15:32:41 10  about that a little bit more.  But let's deal with the

15:32:44 11  motions in limine.  So as I understand it, the parties have

15:32:49 12  come to an agreement as to defendant's motions in limine

15:32:53 13  numbers 1 and 3.  Right?

15:32:57 14          MR. YOON:  Yes, Your Honor.

15:32:58 15          MS. MAYER:  Yes, Your Honor.

15:32:59 16          MR. HADDEN:  Yes, Your Honor.

15:33:00 17          THE COURT:  And so we only have to address two

15:33:03 18  motions in limine, that would be plaintiff's motion in

15:33:06 19  limine and defendant's motion in limine number 2.

15:33:12 20          MR. YOON:  Your Honor, James Yoon.  We have

15:33:17 21  withdrawn the motion in limine with regards to Mr. Elston,

15:33:21 22  so that motion has been withdrawn, the plaintiff's motion.

15:33:24 23          THE COURT:  I didn't see where you withdrew

15:33:24 24  that.  Okay.

15:33:27 25          MR. YOON:  I thought we had sent a letter to

15:33:29 1   your court.   I apologize, Your Honor.

15:33:32 2                 THE COURT:   All right.   So you have no motions

15:33:33 3   in limine?

15:33:34 4                 MR. YOON:   That's correct, Your Honor.

15:33:36 5                 THE COURT:   And so the only motion in limine

15:33:38 6   that we need to address is defendant's motion in limine

15:33:43 7   number 2 to preclude argument or evidence disparaging Amazon

15:33:50 8   or referring to it as a monopoly or improperly leveraging

15:33:55 9   market power.

15:34:00 10                 MR. RANGANATH:   Good afternoon, Your Honor.

15:34:02 11   Ravi Ranganath of Fenwick & West for Amazon.

15:34:06 12                 So as so often happens, these motion in limine

15:34:09 13   negotiations narrow the disputes, so there is really two

15:34:13 14   separate issues that are now remaining with respect to this

15:34:15 15   motion in limine.   The first is the relative size of the

15:34:19 16   parties.   We refer to it according to case law as the David

15:34:25 17   versus Goliath theme.   The second is testimony and evidence

15:34:29 18   that Amazon used its market power to put VoiceBox out of

15:34:34 19   business, prevent it from getting customers or poaching

15:34:38 20   employees to put it out of business.

15:34:41 21                 I'll start with the first.   There is really no

15:34:44 22   dispute that the parties can talk about the size, each

15:34:47 23   other's size, that is relevant to the hypothetical

15:34:49 24   negotiation.   The issue is we don't want the size of Amazon

15:34:52 25   to be used in a disparaging manner.   So, for example, we

15:34:56  1    know that VB Assets' damages expert, Mr. Reed, paraphrases a

15:35:02  2    conversation with Mike Kennewick where he calls Amazon an

15:35:06  3    800-pound gorilla, right, which is a charged statement that

15:35:09  4    is not limited to the facts.  So that is one part of the

15:35:12  5    motion.

15:35:13  6              The next part is --

15:35:15  7              THE COURT:  So, I'm sorry, I don't know what

15:35:17  8    that means in a disparaging way.  Is it just the 800-pound

15:35:22  9    gorilla or is there something else -- I don't know how

15:35:25  10   they're supposed to say it's a big company without -- I

15:35:29  11   don't know what's disparaging, so I can't say you can't be

15:35:32  12   disparaging because I don't know what that entails.

15:35:36  13             MR. RANGANATH:  Your Honor, on the record, on

15:35:37  14   the evidence that we've seen, the 800-pound gorilla is the

15:35:40  15   primary comment.  And if Your Honor would exclude that, I

15:35:44  16   think that portion of the motion in limine would be

15:35:46  17   resolved.

15:35:46  18             THE COURT:  All right.  What's the next part?

15:35:49  19             MR. RANGANATH:  The next portion is discussion

15:35:51  20   of Amazon's independent development and launch of Echo and

15:35:55  21   Alexa as somehow driving VoiceBox out of the market.  I

15:36:00  22   think it's referred to in the expert report and complaint as

15:36:04  23   chilling.  And this idea that Amazon has poached VoiceBox

15:36:09  24   engineers in some way contributing to the demise of the

15:36:12  25   company.  There is really two problems with this.  The first

15:36:15 1   is there is no allegation -- I think as one of the motions

15:36:18 2   in limine has already been resolved, no allegation that

15:36:22 3   Amazon stole technology, engaged in anticompetitive conduct

15:36:26 4   that somehow put VoiceBox out of business.  There is also

15:36:29 5   record evidence that shows the employees that Amazon hired

15:36:33 6   were about to be laid off from VoiceBox and VoiceBox was

15:36:36 7   encouraging them to look for other work.

15:36:39 8           There is a secondary issue --

15:36:40 9           THE COURT:  Are you going to put in stuff about

15:36:42 10   how they were just like a two-bit company that couldn't come

15:36:48 11   up with anything that was of any use, that kind of thing?

15:36:52 12           MR. RANGANATH:  That they were a too big

15:36:53 13   company?

15:36:53 14           THE COURT:  Two-bit.

15:36:55 15           MR. RANGANATH:  Two-bit.

15:36:55 16           THE COURT:  They were a small company, they

15:36:57 17   couldn't come up with anything that was useful, that kind of

15:37:00 18   thing, is that going to be part of your story?

15:37:03 19           MR. RANGANATH:  We won't say they are a two-bit

15:37:05 20   company.

15:37:06 21           THE COURT:  That's not very helpful.

15:37:08 22           MR. RANGANATH:  We will describe their efforts

15:37:09 23   to build technology.

15:37:11 24           THE COURT:  So here is my question.  To the

15:37:12 25   extent that you guys are going to go in and say oh, my gosh,

15:37:16 1   tiny little company, they couldn't do anything, they were

15:37:19 2   laying off people, why can't they come back and say, well,

15:37:22 3   good lord, we were trying to compete against this behemoth.

15:37:27 4   It was impossible for us because they're so big and

15:37:30 5   everybody knows.  If you're going to open that door, why

15:37:32 6   can't they just slam right through it and call you at least

15:37:35 7   a 650-pound gorilla if not an 800-pound?

15:37:40 8          MR. RANGANATH:  We have no issue with VB Assets

15:37:44 9   explaining the reasons for VoiceBox's business failure.

15:37:46 10  There is no evidence to say it has anything to do with

15:37:49 11  Amazon.

15:37:50 12         There is another issue, Your Honor, which is

15:37:52 13  throughout most of this case, VB Assets has specifically or

15:37:56 14  unspecifically referred to itself as VoiceBox.  And VB

15:38:01 15  Assets, the plaintiff that's here today, is not VoiceBox

15:38:05 16  Technologies.  Now VoiceBox Technologies was the party at

15:38:07 17  the hypothetical negotiation, but there is a danger if this

15:38:10 18  becomes too large a part of the trial presentation, the jury

15:38:14 19  won't understand the difference between the party here today

15:38:16 20  and the VoiceBox Technologies that could not compete with

15:38:20 21  Amazon.

15:38:20 22         THE COURT:  Who cares?  Why does that matter?

15:38:23 23  Really, they can't call themselves what they want to call

15:38:26 24  themselves?  Tell me what this horrible prejudice is going

15:38:30 25  to be if they call themselves VoiceBox instead of VB Assets,

15:38:34 1    so that they call themselves whatever they want to call

15:38:38 2    themselves, why do I care?

15:38:40 3              MR. RANGANATH:  VoiceBox, the company, their

15:38:43 4    technology, their patents, that passed to VB Assets and are

15:38:48 5    property of another company, they have nothing to do with

15:38:50 6    the plaintiff here.

15:38:51 7              THE COURT:  Why do you get to tell them -- if

15:38:53 8    you guys decided you wanted to be called Amazon the Great,

15:38:56 9    okay, fine, you could be called that.  That one is denied.

15:39:00 10   You don't get to tell them what they call themselves.

15:39:03 11             Let me hear on the rest of it.  The 800-pound

15:39:07 12   gorilla, you guys really need to call them an 800-pound

15:39:11 13   gorilla?

15:39:14 14             MR. MACDONALD:  Your Honor, Matt MacDonald for

15:39:17 15   VB Assets.

15:39:17 16             No, we do not need to call them an 800-pound

15:39:21 17   gorilla.

15:39:21 18             THE COURT:  That one they'll win.  I'll reserve

15:39:24 19   on the 650-pound.

15:39:24 20             MR. MACDONALD:  Thank you, Your Honor.  I guess

15:39:29 21   I'm here to address the Court's questions.

15:39:31 22             THE COURT:  I want you to respond to what he

15:39:33 23   said on the second part about the allegations that, you

15:39:35 24   know, they were poaching, they were poaching your people,

15:39:40 25   that kind of thing.

MR. MACDONALD:  Sure.  Let me take poaching

first.  As I understood the reply, I think the request is

that we not use the word "poaching."  If that's the ask,

we're happy to not use the word "poaching."  I do think it's

important that we be able to present evidence of the fact

that Amazon, in fact, recruited and hired a large number of

--

THE COURT:  What's that relevant to?

MR. MACDONALD:  I think one of the themes, Your

Honor, that --

THE COURT:  What is it relevant to?  I don't

care about theme, I want to know what it's relevant to.

Themes are just stories that may or may not be relevant.

MR. MACDONALD:  It's relevant to infringement

and it's relevant --

THE COURT:  How is them poaching your clients,

assuming they poached, or your business people, how is that

relevant to whether or not they used your patents?

MR. MACDONALD:  Well, I think the answer to

that, Your Honor, is that their expert, Mr. Johnson, has put

in evidence that effectively argues on the infringement case

that VoiceBox was not innovative.  It was as Your Honor so

aptly put it --

THE COURT:  I'm still missing where am I in the

infringement analysis.  I mean, I get it, for validity,

15:40:48 1    maybe he says they didn't come up with anything new, but you

15:40:51 2    said infringement, so I want to stick with infringement.  We

15:40:54 3    have claim construction and we have whether their product

15:40:57 4    uses, meets every limitation of the claims.  So I am missing

15:41:03 5    in there where poaching of people comes into play.

15:41:08 6              MR. MACDONALD:  We intend to -- on infringement,

15:41:10 7    Your Honor, we intend to use that evidence to rebuttal

15:41:14 8    argument that is made by their expert, Dr. Johnson, that

15:41:18 9    says using evidence that is I would say qualitative in

15:41:23 10   nature that where he says VoiceBox was, as you put it, a

15:41:27 11   two-bit company, a two-bit company that did not have any

15:41:32 12   useful technology.

15:41:33 13             THE COURT:  Is that what you're going to say for

15:41:35 14   infringement?  It doesn't --

15:41:36 15             MR. HADDEN:  No, Your Honor, we're not.

15:41:38 16             THE COURT:  So they're not going to say that.

15:41:40 17             MR. MACDONALD:  All right.  Well, then, I think

15:41:42 18   the question is it becomes relevant to damages where many of

15:41:45 19   the same arguments come into play where their expert,

15:41:48 20   Mr. Ugone, is going to tell the story that VoiceBox was this

15:41:52 21   little company without any valuable technology, it wasn't

15:41:52 22   particularly innovative, there was not success, there is

15:41:59 23   going to be a lot of that testimony.  There are pages and

15:42:02 24   pages and pages of that testimony in the Ugone report.  And

15:42:05 25   the fact that they hired a lot of VoiceBox employees is I

15:42:10 1    think relevant to rebut the suggestion that there was not a

15:42:13 2    successful company with no valuable technology to bring to

15:42:16 3    the table.

15:42:17 4              THE COURT:  What about the other things?  I

15:42:20 5    don't even know what else they want.  They want to keep

15:42:23 6    everything about Amazon's size, well, negotiations, I don't

15:42:30 7    even remember what the other things were they wanted to keep

15:42:33 8    out.

15:42:33 9              MR. MACDONALD:  I think the rest of what they're

15:42:35 10   asking at least as I understand it is any evidence of

15:42:39 11   Amazon's size.  There I think we plainly need it to rebut

15:42:42 12   arguments about the hypothetical negotiation for the reasons

15:42:44 13   I just explained.  And I think they also sort of make this

15:42:47 14   argument about not claiming that Amazon put us out of

15:42:50 15   business.  In that particular case, I think, again, it is

15:42:52 16   relevant to rebut a number of arguments that they're going

15:42:55 17   to make about the quality of VoiceBox's technology.

15:42:58 18             THE COURT:  Are you going to make them in

15:42:59 19   rebuttal or are you going to preview them before they even

15:43:00 20   say a word?

15:43:02 21             MR. MACDONALD:  I think as a practical matter we

15:43:02 22   would have to rebut them when we call Mr. Reed, our damages

15:43:12 23   expert because we know what the rebuttal to his testimony is

15:43:12 24   going to be, so we're going to have to put that testimony

15:43:12 25   on.

15:43:18  1          THE COURT:  All right.  So why isn't that fair,

15:43:21  2   damages?

15:43:25  3          MR. RANGANATH:  Dr. Ugone will testify about

15:43:30  4   facts of VoiceBox's financial condition and its inability to

15:43:34  5   license the patents.  Dr. Ugone will say nothing about the

15:43:38  6   abilities of VoiceBox engineers and I don't think the fact

15:43:40  7   that Amazon hired a few of those engineers shows that

15:43:44  8   VoiceBox had a solution or business prospects that would be

15:43:47  9   relevant to its bargaining position as of the hypothetical

15:43:51 10   negotiation.  In fact, some of the record evidence shows

15:43:56 11   some of the engineers left because VoiceBox was not

15:43:58 12   succeeding and did not have good technology.

15:44:00 13          THE COURT:  I am going to deny this motion.

15:44:02 14   They said they're not going to use the 800-pound gorilla, so

15:44:06 15   I guess that part is granted, but I am going to otherwise

15:44:10 16   deny it.  But, you know, if it turns out that there is mud

15:44:14 17   slinging going on, both sides, I can see you guys saying

15:44:18 18   stuff and you're going to say you opened the door, so be

15:44:21 19   careful on opening the door.  And if they want to put in

15:44:22 20   stuff that you think is unfair, you can object.

15:44:27 21          MR. RANGANATH:  Thank you, Your Honor.

15:44:28 22          THE COURT:  All right.  That's the end of our

15:44:32 23   motions in limine.  Thank you for coming to agreements on

15:44:37 24   some of those.

15:44:38 25          All right.  Some other miscellaneous issues.  So

15:44:43 1    five claims, four patents.  In the recent letter, plaintiff

15:44:48 2    said it reduced the number of trial witnesses, but in the

15:44:52 3    pretrial order plaintiff list twenty-three witnesses it

15:44:55 4    intends to call with ten of those being called live.  So how

15:44:58 5    many witnesses are you actually planning to call?

15:45:01 6              MR. YOON:  Yes, Your Honor, this is James Yoon

15:45:03 7    on behalf of VoiceBox.  We are only calling four witnesses

15:45:09 8    live.  That would be Mr. Kennewick, Mr. Freeman -- five,

15:45:13 9    Your Honor.  I apologize.  John Peck, Nate Polish and Brett

15:45:18 10   Reed.  Those are the five witnesses we're calling live.  And

15:45:21 11   we then have deposition testimony that we're playing as to a

15:45:27 12   number of other witnesses.

15:45:29 13             THE COURT:  Okay.

15:45:31 14             MR. YOON:  And, Your Honor, just because you had

15:45:34 15   mentioned it, the parties did reach an agreement to further

15:45:37 16   reduce the number of claims and prior art.  We're now down

15:45:40 17   to four claims, one on each patent, Your Honor.  We're no

15:45:43 18   longer asserting claim 29 of the '681 patent.  And the

15:45:48 19   parties have agreed for prior art purposes a single prior

15:45:55 20   art theory as to the '176, '097, and '703 patents, and two

15:46:00 21   prior art theories as to the '681, which would obviously

15:46:04 22   have to update the verdict form.

15:46:11 23             THE COURT:  Okay.  All right.  And then how many

15:46:21 24   witnesses do you all have?

15:46:25 25             MS. SHAMILOV:  Your Honor, Saina Shamilov.

15:46:30 1    Seven live witnesses and three by deposition depending on

15:46:33 2    how their case-in-chief goes.

15:46:35 3              THE COURT:  Who are your live witnesses?

15:46:37 4              MS. SHAMILOV:  Who are they?

15:46:39 5              THE COURT:  Yes.

15:46:39 6              MS. SHAMILOV:  It will be Nikko Strom, Ryan

15:46:42 7    Thomas, Rajiv Mehta, Adesh Desai, Joe Polifroni, and two

15:46:46 8    experts, Mike Johnson and Keith Ugone, is the ones marked

15:46:51 9    live in our list.

15:46:53 10             THE COURT:  How many depositions do you think

15:46:54 11   you're going to have?

15:46:56 12             MS. SHAMILOV:  Three.  They should be short.

15:47:01 13             THE COURT:  Okay.  I think you list six

15:47:04 14   witnesses live in the pretrial order.  Is that right?

15:47:13 15             MS. SHAMILOV:  I can put it on the Elmo, Your

15:47:15 16   Honor, if that's helpful.

15:47:17 17             THE COURT:  Just tell me.

15:47:20 18             MS. SHAMILOV:  It's seven on my list.

15:47:26 19             THE COURT:  Don't put it on the Elmo, just tell

15:47:28 20   me where it is.

15:47:31 21             MS. SHAMILOV:  Our trial witness list -- I'm

15:47:39 22   sorry, Your Honor, I don't recall what schedule it is to the

15:47:41 23   pretrial order.

15:47:42 24             THE COURT:  The problem I'm having is the way

15:47:52 25   this was put together, and maybe you guys could talk with

15:47:56 1    your staffs about putting this together.  When I have a

15:47:59 2    Tab 5, it says Exhibit 5, but that's Schedule C2.  It

15:48:06 3    doesn't make it easy on us.  So I can now look at Schedule

15:48:11 4    E1 which is behind Tab 9.  So why don't you all like, you

15:48:16 5    know, make it user friendly.  But in any event, this is --

15:48:23 6             MS. SHAMILOV:  It's E2, pretrial order Schedule

15:48:31 7    E2.

15:48:31 8             THE COURT:  I see six live.

15:48:33 9             MS. SHAMILOV:  Yes.  So Mr. Mehta, the parties

15:48:37 10   discussed that Mr. Mehta will be called live, so he's number

15:48:41 11   three on the list of may call, but we will call.

15:48:45 12            THE COURT:  So I was right, there are six, not

15:48:47 13   what you said.  Got it.  Okay.  Seven live, and is

15:48:53 14   Mr. Mehta, is he going to be called in their case or your

15:48:56 15   case?

15:48:56 16            MS. SHAMILOV:  Our case, Your Honor.

15:48:57 17            THE COURT:  Do you have any witnesses that you

15:48:59 18   all are both calling?

15:49:01 19            MR. YOON:  Yes, Your Honor.  I'm sorry, yes,

15:49:02 20   Your Honor.  The parties have agreed as to Mike Kennewick

15:49:07 21   and Tom Freeman that we're presenting in our case, they're

15:49:12 22   only going to testify once.  And the cross-examination can

15:49:15 23   go beyond the scope of the direct.  As to Mr. Strom and

15:49:19 24   Mr. Thomas who Amazon is presenting, we agree that their

15:49:24 25   cross-examination can go beyond the scope of the direct, and

15:49:27 1    that any judgment as a matter of law motion with respect to

15:49:31 2    the VoiceBox, VB Assets case will be made after Mr. Thomas's

15:49:37 3    testimony is over.

15:49:38 4            THE COURT:  Okay.  All right.  Thank you.

15:49:42 5            So does that -- all these Amazon objections in

15:49:47 6    the plaintiff's witness list, I haven't seen anything like

15:49:52 7    that, and it seems kind of obnoxious, so I'm going to strike

15:49:56 8    all of those.  If you have objections to people, you can

15:50:00 9    raise them at the appropriate time.  I'm not dealing with

15:50:04 10   them.  I don't think it's appropriate to just put them in

15:50:07 11   there, so that is stricken.

15:50:09 12           Willfulness, what is the willfulness case here?

15:50:14 13           MR. YOON:  Yes, Your Honor.  It is undisputed

15:50:18 14   between the parties starting in 2011, VoiceBox at the time

15:50:25 15   informed and identified the patents, began to identify the

15:50:30 16   patents at issue in this case to Amazon.  In particular at

15:50:34 17   the October 1st is the '176 patent, Your Honor, and the

15:50:40 18   patent was identified and what was covered was described.

15:50:43 19   In Amazon's interrogatory responses, they admit that they

15:50:47 20   knew about the '681 patent in 2015 and that they knew about

15:50:51 21   the '097 and '703 patents in 2017.  In 2017, with respect to

15:50:55 22   the '176 patent, the '703 patent and the '097 patent, those

15:51:02 23   were again identified to Amazon in communications with the

15:51:06 24   parties.  And that Amazon's product, the Echo and the Alexa

15:51:12 25   was introduced in November 2014 and Amazon with full

15:51:16 1    knowledge of our patents willfully infringed, Your Honor.

15:51:19 2         THE COURT:  Where is the evidence of knowledge

15:51:22 3    of infringement since you need knowledge of the patent and

15:51:25 4    knowledge of infringement.

15:51:26 5         MR. YOON:  Yes, Your Honor.  Well, with regards

15:51:28 6    to knowledge of infringement, and for example with regards

15:51:31 7    to the '176 patent, it was specifically described and

15:51:34 8    explained what that patent covers, the voice ads and that

15:51:38 9    Amazon knew about the patent, they knew what we believed it

15:51:42 10   covered and they introduced the product with full knowledge

15:51:46 11   of that.  And they're aware of how this product was

15:51:49 12   operated.

15:51:50 13        They also were aware of the '681 patent and they

15:51:53 14   had received numerous communications from us regarding our

15:51:57 15   patent portfolio, including the fact, for example, the '681

15:52:00 16   patent at the time the application was pending and the

15:52:02 17   nature of the technology that would be covered by our

15:52:05 18   patents they were also informed of.

15:52:08 19        THE COURT:  All right.  Okay.  Defendant asserts

15:52:12 20   invalidity.  I got to say, plaintiff seems to have limited

15:52:16 21   their case a lot more than defendant here, but I guess now

15:52:20 22   defendant is taking out another piece of prior art.  We have

15:52:25 23   defendant's defenses under Section 101, 103 and 112.  So

15:52:32 24   103, that's what we were talking about, there is just going

15:52:35 25   to be one piece of prior art for three of the patents.

15:52:40 1                 MR. HADDEN:  It's a total of three systems for

15:52:44 2      three of the four patents there will be one system for each

15:52:50 3      patent, and then two of those same systems will be used for

15:52:55 4      the '681.  So we have a total of three systems, 1, 1, 1 and

15:53:00 5      2.

15:53:00 6                 THE COURT:  Can you tell me what the systems

15:53:02 7      are?

15:53:05 8                 MR. HADDEN:  Sure.  So there is MIT Galaxy.

15:53:08 9      There is something called Hey Anita, those will be the two

15:53:11 10     for the '681.  And I may get this wrong and my colleagues,

15:53:19 11     Ravi and Vigen will correct me, '176 is going to be MIT

15:53:33 12     Galaxy.  The '097 is going to be MIT Galaxy.  And for the

15:53:39 13     '703, it's a separate system, United.

15:53:44 14                THE COURT:  Okay.

15:53:46 15                MR. HADDEN:  I should add, there is a combo

15:53:50 16     patent with them, so they're obviousness combos, each of

15:53:54 17     those also includes another patent, Yonobashi or Notobi, but

15:53:59 18     the system is a primary piece for each.

15:54:01 19                THE COURT:  Okay.  All right.  What about 112,

15:54:11 20     it looks like only written description is included, right?

15:54:14 21                MR. HADDEN:  Correct, Your Honor.

15:54:15 22                THE COURT:  There is indefiniteness in the

15:54:17 23     pretrial order, but that's not being asserted?

15:54:21 24                MR. HADDEN:  Correct, Your Honor.

15:54:25 25                THE COURT:  And then 101, when is it that I'm

15:54:31 1    supposed to address Step 1?

15:54:33 2          MR. HADDEN:  I don't know, Your Honor.  So we

15:54:39 3    brought the summary judgment motion and we didn't get past

15:54:42 4    the first one.  So I have seen this done different ways.  In

15:54:47 5    one case I had we tried Step 2 to the jury and then there

15:54:51 6    was JMOL motions about whether or not Step 1 was met.  So, I

15:54:56 7    think it's really up to Your Honor.

15:55:01 8          THE COURT:  What, if any, is the impact of what

15:55:05 9    I already did?  I found one -- I found a claim of the '681

15:55:10 10    patent not to be directed to an abstract idea, and then

15:55:14 11    claims of others to be directed, but making me realize that

15:55:19 12    I'm much better off not addressing 101 motions at the motion

15:55:25 13    to dismiss.  Apparently I did all of that for nothing

15:55:29 14    because none of those claims is still here, unless you're

15:55:32 15    going to tell me that my rulings with respect to those

15:55:36 16    claims somehow applies to the claims here, with an agreement

15:55:41 17    on that, not that you're just going to tell me because you

15:55:45 18    already failed to say they were representative, at least for

15:55:48 19    some of those.

15:55:48 20          MR. HADDEN:  I think what I can tell you, Your

15:55:50 21    Honor, is that your ruling on the '703, that it was an

15:55:55 22    abstract idea should apply.

15:55:55 23          THE COURT:  Did I actually address the claims at

15:56:02 24    issue here?

15:56:02 25          MR. HADDEN:  I believe at summary judgment you

15:56:05 1    did, Your Honor.

15:56:11 2              THE COURT:  Guys, help me out here.

15:56:15 3              MR. YOON:  Your Honor, I thought the issue of

15:56:17 4    the '703 was addressed in the motion to dismiss, not the

15:56:20 5    summary judgment, to the extent that I recall it.

15:56:23 6              THE COURT:  I thought at summary judgment I just

15:56:25 7    said even if it were not directed to an abstract idea, there

15:56:29 8    is an issue of fact, but I don't really remember.

15:56:32 9              MR. YOON:  Yes, I believe that's what you said,

15:56:34 10   Your Honor, on that.  As to the '681 from the standpoint of

15:56:39 11   the motion to dismiss and not being an abstract idea in the

15:56:43 12   claim that's being asserted here, I don't think there is any

15:56:45 13   material difference between them.  And I think that that --

15:56:49 14   the reasoning behind that would apply equally to claim 13,

15:56:53 15   Your Honor.

15:56:54 16             THE COURT:  Well, you guys haven't -- no one has

15:56:58 17   asked me to make this determination, so I don't know when

15:57:01 18   exactly you think I'm going to do this.  Let me ask you

15:57:07 19   this.  In opposing summary judgment on 101, plaintiff's

15:57:14 20   expert appears to opine that context is used in the '703

15:57:18 21   patent and I think context is also in the '176 patent.  As

15:57:22 22   an inventive concept, as an inventive concept it removes the

15:57:28 23   claims from abstraction.  He opined about the accumulation

15:57:33 24   of data from a user during one conversation improved

15:57:36 25   functioning of online shopping and that is not something

15:57:40   1    that was found in the prior art, not otherwise

15:57:44   2    well-understood, routine or conventional, that goes to

15:57:47   3    Step 2.  During claim construction I found that no

15:57:50   4    construction was necessary for context.  I'm trying to

15:57:53   5    figure out is there some kind of lingering claim

15:57:55   6    construction dispute that I need to address with respect to

15:57:58   7    this 101 issue or what?

15:58:00   8            MR. YOON:  I don't believe there is an issue in

15:58:01   9    terms of claim construction, Your Honor, or a dispute from

15:58:05  10    the standpoint of what you just mentioned.

15:58:07  11            THE COURT:  You guys agree, what does context

15:58:09  12    mean, what do you think context means?

15:58:13  13            MR. YOON:  The context here means, there is both

15:58:16  14    long-term and short-term share of knowledge that relates to

15:58:20  15    context, but context would be information relating to what

15:58:23  16    was spoken during the conversation.  And that could be

15:58:26  17    relating to the speaker --

15:58:28  18            THE COURT:  Tell me what the construction is so

15:58:30  19    that I know if everybody agrees.  It's context for you and

15:58:32  20    the way your expert would use it in making this 101 argument

15:58:38  21    is information relating to what?

15:58:41  22            MR. YOON:  As I understand it, Your Honor, it's

15:58:45  23    information relating to the communication made by the

15:58:49  24    speaker, such information could be --

15:58:52  25            THE COURT:  I'm not doing such information could

15:58:54 1    be.  We're not giving examples of information.

15:59:00 2                 MR. YOON:  I understand.

15:59:01 3                 THE COURT:  Does your construction require that

15:59:03 4    I say such information includes but is not limited to?

15:59:07 5    Because right now I'm thinking we're not going to get

15:59:10 6    agreement as to what this means.

15:59:12 7                 MR. YOON:  I understand, Your Honor.

15:59:13 8                 THE COURT:  So what is your construction --

15:59:14 9    actually, you know what, give me your whole construction and

15:59:18 10   if they don't agree, then I guess we're going to have to

15:59:21 11   figure out what to do.  What is your construction for

15:59:23 12   context?

15:59:24 13                MR. YOON:  Your Honor, may I have one minute to

15:59:26 14   communicate with my colleague just to make sure I get it

15:59:31 15   right, such as the such as, I just want to be completely

15:59:36 16   accurate.

15:59:37 17                THE COURT:  I'm coming to you guys next, so I

15:59:40 18   need a response from the defendant.

16:00:30 19                Do you guys have a construction you want to give

16:00:34 20   me?

16:00:35 21                MR. HADDEN:  I'll offer one.  It's subject area

16:00:37 22   of the user's utterance.

16:00:38 23                THE COURT:  The subject area of what?

16:00:41 24                MR. HADDEN:  The user's utterance.  Subject area

16:00:46 25   of the user's utterance.

16:00:50 1          MR. YOON:  Your Honor, I would suggest that

16:00:51 2     context refers to information relating to the past or

16:00:56 3     current conversation of the user or about the user.

16:01:07 4          MR. HADDEN:  I disagree with that, Your Honor.

16:01:11 5     In the claim it's clear that there is this short-term shared

16:01:15 6     knowledge about the current conversation and it is long-term

16:01:20 7     shared knowledge about the user from past conversations.

16:01:23 8     And those are separate from context.  The claim explicitly

16:01:27 9     said those are used to identify a context for the current

16:01:31 10    utterance.  So those are things that are used to identify

16:01:35 11    the subject area of the current utterance, they're not

16:01:39 12    themselves context, so they would be redundant in the claim.

16:01:42 13         THE COURT:  It seems we don't have an agreement

16:01:45 14    as to what context means.  Is that relevant, that difference

16:01:51 15    as to scope relevant to an issue that the jury is going to

16:01:54 16    have to decide?

16:01:55 17         MR. HADDEN:  It is, Your Honor, and if I could

16:01:57 18    just flag it.  Beyond the construction that Mr. Yoon

16:02:03 19    offered, what their expert said in his infringement report

16:02:06 20    is that context is the state of the system.  He basically

16:02:12 21    said it can be anything that you arrive at, and that is the

16:02:18 22    context.  So that is an issue that I think we do need to

16:02:24 23    resolve.

16:02:27 24         THE COURT:  So we need to resolve that for --

16:02:31 25    where this came up was we saw it in the summary judgment on

16:02:36 1  the 101 issue.  Is this something that's going to be

16:02:39 2  relevant to infringement, or something other than 101?

16:02:43 3          MR. HADDEN:  Yes, Your Honor.

16:02:44 4          THE COURT:  Why is it not -- why did no one tell

16:02:47 5  me this?  I just figured this out for myself on 101.  If

16:02:52 6  it's an issue for infringement, why am I hearing about it

16:02:55 7  now and what am I supposed to do about it?

16:02:58 8          MR. HADDEN:  I think you're hearing about it now

16:03:00 9  because at the claim construction, Your Honor decided you

16:03:03 10 needed no construction.

16:03:04 11         THE COURT:  But you guys know that there is a

16:03:07 12 dispute.  What if I didn't raise it right now, when was it

16:03:12 13 going to come up?

16:03:13 14         MR. HADDEN:  Well, their expert would come up

16:03:15 15 and say the ordinary meaning of the context to me is the

16:03:17 16 state of the system, and I would object.

16:03:24 17         THE COURT:  Wow.  Why don't you just -- why

16:03:28 18 don't we just have a second trial when you guys set me up

16:03:32 19 for failure.  Seriously, that's what you think is

16:03:35 20 appropriate, that you don't raise it to me that I could

16:03:38 21 construe the claim, instead you just say no.  I mean, I

16:03:42 22 don't even know what to say about that.

16:03:46 23         MR. HADDEN:  Well, understood, Your Honor.  We

16:03:49 24 had a Markman, we moved for summary judgment, and we are

16:03:52 25 where we are.

16:03:54  1          THE COURT:  Well, that's really unhelpful to me.

16:03:57  2     I mean, what is it -- truly, how is this going to play out?

16:04:01  3     How under your theory does it play out?  If I say yeah, he

16:04:06  4     can't testify about that or if I say he can, because I feel

16:04:11  5     like this is just really, you know, you guys are not raising

16:04:18  6     things in a timely way, you're saving it to the end and you

16:04:21  7     can be like too bad, judge, you're just totally hosed

16:04:25  8     because you can't even -- I mean, I'm just speechless that

16:04:30  9     you're just sitting there like too bad, judge, that's nuts

16:04:34 10     to you.

16:04:35 11          MR. HADDEN:  I don't mean that, Your Honor.  We

16:04:37 12     are prepared to address --

16:04:38 13          THE COURT:  How is it going to work if I say no,

16:04:41 14     he can say that, then what happens?

16:04:43 15          MR. HADDEN:  Then we would proceed as well, our

16:04:45 16     expert responded to that construction and said even under

16:04:48 17     that construction, we don't do what he said.

16:04:57 18          THE COURT:  All right.  So why am I not hearing

16:04:59 19     about this before today from you?

16:05:02 20          MR. YOON:  Because it should not be an issue,

16:05:04 21     Your Honor, at all.  If we could just have on the screen

16:05:07 22     claim 13 of the '681 patent.  The parties in this case, Your

16:05:14 23     Honor, first of all identified claim terms for the Court's

16:05:18 24     construction.  The Court had a Markman.

16:05:20 25          THE COURT:  Yeah, I know, but you guys, now your

expert wants to get up there and say it means something and
they don't agree.  The Federal Circuit says if there is an
issue of claim scope, I have to decide it.  You guys have
given me no time to decide it.  And everybody is just like
well, I don't know, we're just going to -- I don't even
understand, but I can bet you those appeal briefs that you
all are going to be filing to the Federal Circuit are going
to be like, do you believe her, she just didn't bother to
construe the term.

          MR. YOON:  I don't believe that's the situation
here, Your Honor.

          THE COURT:  I don't know why we're looking at
the '681 patent because it was the '703 and '176 that had
context in it where the issue came up.

          MR. YOON:  I understand.  Your Honor, I don't
believe this is an issue nor should it be an issue.  We
submitted -- we went through claim construction, we
submitted our expert reports, our expert reports were
submitted, they submitted rebuttal records.  Their rebuttal
report doesn't say that our understanding of claim
construction was wrong.  Their expert expressed his opinion,
both experts said that they were applying the plain and
ordinary meaning and there was no dispute as to the word
"context," Your Honor, the issue that came up and Your
Honor's question and I tried to answer it in a forthright

16:06:38 1    manner is what did I believe context was in the context of

16:06:42 2    determining whether or not something was a technical

16:06:44 3    innovation or not.

16:06:46 4            THE COURT:  I just want to know how it's going

16:06:49 5    to be used for the issues the jury needs to decide.  I'm not

16:06:53 6    asking for some like hypothetical what it means.  I want to

16:06:57 7    know what the jury is going to be told and what their expert

16:07:01 8    is going to tell the jury, what your expert is going to tell

16:07:05 9    the jury and are they asking the jury to construe it.

16:07:09 10           MR. YOON:  Agreed, Your Honor.  And I think that

16:07:11 11   it is clearly set forth in the Rule 26 reports.  When they

16:07:14 12   submitted their expert report on the 101 issue, their expert

16:07:17 13   set forth --

16:07:18 14           THE COURT:  What did your expert say that you

16:07:20 15   think is so clear that context means?  Did your expert say

16:07:27 16   -- you said it's clear, so what did your expert say?

16:07:30 17           MR. YOON:  Could I have the expert report on the

16:07:32 18   issue of the patent, the '703, '176 patents, does someone

16:07:38 19   have it?  One second, Your Honor.  I'll call it up.  I just

16:07:42 20   want to be accurate.

16:08:01 21           So I'll state what our expert's opinion was with

16:08:02 22   regards -- this is the '703 patent, Your Honor --

16:08:02 23           THE COURT:  Well, does context mean something

16:08:11 24   different in -- I mean, what claims of the four asserted is

16:08:11 25   context in?  I saw it in the '176 and the '703.  Is context

16:08:25 1    in the '097?

16:08:31 2            MR. YOON:  I have it right here.  One second.

16:08:36 3    The '097 patent is claim -- is it 23 or -- 23.  One second.

16:09:09 4    I don't see the word "context" in the asserted claim of the

16:09:13 5    '097, Your Honor, just to be clear.  I'm going to look at

16:09:16 6    the other patents now.

16:09:17 7            THE COURT:  So does context mean the same in the

16:09:20 8    two patents where it is, the '703 and the '176?

16:09:25 9            MR. HADDEN:  It's in the -- three of the four

16:09:31 10   have context.

16:09:32 11           THE COURT:  What did your expert say context

16:09:34 12   means?  He said their expert said it means something and

16:09:38 13   your expert didn't disagree.  What did your expert say?

16:09:41 14           MR. HADDEN:  Our expert says what I just said,

16:09:44 15   which is the subject area of the conversation.

16:09:47 16           THE COURT:  Show me.  Do you have your expert,

16:09:49 17   because he said your expert didn't dispute what their expert

16:09:51 18   said.

16:09:54 19           MR. YOON:  Here is what our expert said in

16:09:56 20   context, Your Honor, I have the exact quote.  "Context as

16:09:59 21   used in the '703 patent is disclosed as a concept of

16:10:02 22   accumulating data about the speaker doing a single

16:10:08 23   conversation short-term cross modularity awareness and

16:10:12 24   incorporating this information for the purposes of

16:10:15 25   identifying the speech in question."  That's what he said in

16:10:19 1    regards to context.  Then I'm looking at the '176, Your

16:10:22 2    Honor, I don't -- this has never really been a disputed

16:10:27 3    issue between the parties.

16:10:30 4            THE COURT:  Okay.  So their expert said that, he

16:10:32 5    read that to me.  What did your expert say?

16:10:35 6            MR. HADDEN:  I'm finding it, Your Honor.  One

16:10:38 7    second.

16:11:34 8            MR. YOON:  Your Honor, I'm just double-checking

16:11:37 9    elsewhere, but I don't believe our expert's opinion as to

16:11:40 10   why something has an inventive step or why it's not an

16:11:44 11   abstract idea turns on the definition or construction of the

16:11:48 12   word "context," that's why I don't think it's an issue, Your

16:11:52 13   Honor, and I don't think it's an issue with regards to

16:11:55 14   infringement.  Their non-infringement opinions are set forth

16:11:57 15   there and it doesn't -- at least not hinged upon or the main

16:12:03 16   pivot as to why they believe they don't infringe.

16:12:19 17           And, Your Honor, there was obviously just a

16:12:24 18   control there trying to find it.  With regards to the '176

16:12:28 19   and '097 patent, we didn't see any other definition of

16:12:31 20   context in our position.

16:15:03 21           MR. HADDEN:  I'm sorry for the delay, Your

16:15:05 22   Honor.  While they're doing that, I just want to raise the

16:15:08 23   point that the issue for us on context relates primarily to

16:15:11 24   the '681 patent, because that's the patent that requires

16:15:11 25   identifying this context from the shared short-term memory

16:15:21 1    and the long-term memory and then interpreting the meaning

16:15:26 2    of the words in that context.  The issue that came up was

16:15:30 3    their expert, Dr. Polish, didn't identify what that was.  He

16:15:35 4    never said you infringe because you find this context so

16:15:41 5    then when we deposed him in his deposition, we said what is

16:15:44 6    the context, and that's when he came up with it's the state

16:15:48 7    of the system.

16:15:49 8           So whatever the system is, right, Alexa does a

16:15:53 9    lot of processing, ultimately it determines things that are

16:15:56 10   called incidents and slots and whatever else you end up

16:16:00 11   getting to.  He said the state of the system at the time,

16:16:02 12   whatever that is, that's the context.

16:16:05 13          And that's really the main issue we have on

16:16:09 14   that.

16:16:09 15          THE COURT:  So what I am not -- I'm not sure

16:16:16 16   that that's a claim construction issue versus you disagree

16:16:20 17   that under his ordinary meaning that that is -- that meets

16:16:24 18   the claim limitation.

16:16:27 19          MR. HADDEN:  I understand.  I think that's kind

16:16:30 20   of the construction of the issue, but if this were two

16:16:34 21   different ordinary meanings or is he giving some special

16:16:37 22   definition, I can see it either way.

16:16:39 23          THE COURT:  This is what I am going to do.

16:16:41 24   Clearly, unless you have something where your guy construed

16:16:45 25   this term and said he's wrong, is that what you have?

16:16:49  1          MR. HADDEN:  Well, he does say that it can't be

16:16:51  2     the state of the system, it's something you have to

16:16:54  3     identify.

16:16:54  4          THE COURT:  I want to know if he gave a

16:16:58  5     construction.

16:17:18  6          MR. HADDEN:  So what our expert said in his

16:17:21  7     deposition is essentially it relates to the domains, the

16:17:24  8     subject of what the user is talking about.  That is the

16:17:29  9     understanding that he applied.  And you can say that's just

16:17:34 10     two experts applying the ordinary meaning as they see it in

16:17:38 11     different ways or it's a claim construction dispute.

16:17:40 12          THE COURT:  All right.  I don't know what it is.

16:17:44 13     So what I am going to do is we'll see how this plays out and

16:17:49 14     I am going to reserve time on Monday at the end of trial

16:17:54 15     day, and Tuesday at the end of trial day, and if it turns

16:17:58 16     out that it's a claim construction dispute that we need to

16:18:00 17     deal with, you're going to argue it then and I will make my

16:18:05 18     decision and instruct the jury.  And I also am at that time

16:18:10 19     going to address 101, Step 1 for the claims that are

16:18:12 20     currently in issue.  And I will say this.  Monday afternoon

16:18:17 21     and Tuesday afternoon when we do this, every single counsel

16:18:21 22     who is here in this room must be present for those.  So

16:18:25 23     we're not going to have that some of you can go off and do

16:18:29 24     something while I have to do things that should have been

16:18:32 25     brought to my attention long before now.

16:18:35  1          So plan to be here Monday night and Tuesday

16:18:39  2   night after trial.  We'll also do the jury instructions at

16:18:44  3   that point.  And I will listen to whether or not we have a

16:18:49  4   claim dispute because I'm not convinced that there is a

16:18:53  5   claim construction dispute.  It doesn't seem to me -- it

16:18:57  6   seems like from what I heard from plaintiff, their expert

16:19:00  7   said this is what it means, and for all the five people over

16:19:03  8   on the defendant's side who have been looking for this, he

16:19:08  9   didn't dispute that that was the appropriate construction.

16:19:13 10   Instead it sounds like he said look, the specific thing that

16:19:16 11   you identified as being context is not context.  So I am not

16:19:22 12   sure there actually is a claim construction dispute.

16:19:26 13          The fact that I might be right about that is

16:19:28 14   also supported by the fact that nowhere in the pretrial

16:19:32 15   order, nowhere before I just asked about it in the context

16:19:35 16   of 101 was that raised to me.

16:19:39 17          But nevertheless, if there is a dispute, I'm

16:19:42 18   willing to consider whether it would be appropriate for me

16:19:47 19   to find that that needs to be addressed.  And as I said, I

16:19:52 20   will also address Step 1 for the claims because if I do find

16:19:58 21   that they're not directed to an abstract idea, I'm not going

16:20:02 22   to send that issue to the jury.

16:20:06 23          All right.  Plaintiff in the pretrial order has

16:20:11 24   a whole section on IPR estoppel.  Is that an issue?

16:20:22 25               MR. SMITH:  I don't think we brought up -- I

16:20:28 1   think they limited the prior art to two systems.  And I

16:20:31 2   think to the extent it's strictly limited to a system as

16:20:34 3   opposed to a printed publication reference, it wouldn't be

16:20:39 4   an issue in this case.

16:20:42 5           THE COURT:  So I appreciate that.  It's just

16:20:45 6   when you start using words like to the extent and it

16:20:49 7   wouldn't, I need something more affirmative, like it isn't.

16:20:54 8   Is that right?  It is not an issue?  You're telling me well,

16:20:59 9   maybe it is, maybe it isn't, then I need more.

16:21:02 10          MR. SMITH:  So the issue is that the way they

16:21:05 11  prove what the system supposedly does is just through things

16:21:10 12  that we said should be printed publications and could have

16:21:14 13  been submitted to the PTAB.  So we think that if all the

16:21:19 14  evidence they put forward is just based on printed

16:21:22 15  publications, and they just labeled the system, then we

16:21:27 16  would think that IPR estoppel could still apply.

16:21:31 17          THE COURT:  When were you planning to ask about

16:21:34 18  this?  It's not in a motion in limine.  Where was this going

16:21:37 19  to come up?

16:21:38 20          MR. SMITH:  I think that would come up in a

16:21:40 21  Rule 50 motion to the extent -- depending on what sort of

16:21:44 22  evidence actually came in for the particular prior art

16:21:46 23  evidence.  For example, if the only way they prove what

16:21:48 24  they're calling the MIT Galaxy system was through prior art

16:21:52 25  was let's say through thesis or an article about it, then we

16:21:58  1    would say IPR estoppel should apply, but if there is other

16:22:02  2    evidence, they're trying to introduce source code and other

16:22:06  3    things like that, then that might -- may take it outside the

16:22:10  4    realm of being strictly a printed publication.

16:22:13  5              In our view it depends on what evidence

16:22:16  6    ultimately came on in.  For example, the MIT Galaxy, the

16:22:21  7    number of references that they said prove what the system

16:22:23  8    did were voluminous.  I mean, there were over ten different

16:22:28  9    documents, maybe twenty, so it's hard for us to understand

16:22:30 10    what is actually going to come into evidence and that's

16:22:33 11    going to -- that impacts IPR estoppel in our view.

16:22:39 12              THE COURT:  What I don't understand is why don't

16:22:43 13    -- why is this an issue that's going to come up after the

16:22:46 14    jury decides it?  I mean --

16:22:52 15              MR. SMITH:  I think in our view it would be --

16:22:54 16    it just depends on what evidence is presented for

16:22:57 17    invalidity.

16:22:58 18              THE COURT:  You don't have a clue of what

16:22:58 19    they're going to say already?  We're two days before trial.

16:23:02 20              MR. SMITH:  I think part of the problem was, we

16:23:04 21    had -- I think the expert report was over a thousand pages.

16:23:06 22    We tried to depose their expert for two days on it.  He

16:23:10 23    literally wouldn't even answer a question about whether he

16:23:12 24    actually even inspected a system.  He literally wouldn't

16:23:16 25    answer that question.  We basically ended up with very

16:23:19 1     little information about what evidence he was going to

16:23:22 2     testify about at trial and which of the twenty or thirty

16:23:25 3     references they were actually going to try to admit into

16:23:28 4     evidence.  So I think in our view we couldn't rule out the

16:23:32 5     possibility that at the end of the day, this might be a case

16:23:34 6     where IPR estoppel could preclude them on one or more of the

16:23:40 7     patents.

16:23:42 8               THE COURT:  All right.  I guess we'll have to

16:23:44 9     deal with that if we have to deal with it.  But I will tell

16:23:50 10    you that I have some thoughts on how IPR estoppel applies to

16:24:00 11    systems, and you should read my decisions on that before you

16:24:03 12    just raise the issue.

16:24:06 13              MR. SMITH:  Thank you, Your Honor.

16:24:07 14              THE COURT:  All right.  Then let's go through

16:24:10 15    some of these paragraphs.  There are some uncontested facts.

16:24:14 16    What's the plan for getting those in the record?

16:24:17 17              MR. SMITH:  I think we agreed we could read the

16:24:19 18    uncontested facts into the record.

16:24:21 19              THE COURT:  All right.  If you guys read them

16:24:23 20    in, they're in.  If you don't, or you forget, they're not

16:24:27 21    in.

16:24:28 22              Paragraph 34, supplementing the exhibit list, or

16:24:35 23    objections.  So no supplementing of exhibit lists or

16:24:39 24    objections unless you ask me for permission.  But there is a

16:24:44 25    motion to supplement that's out there.  So go ahead and tell

16:24:49 1    me what that is.

16:24:52 2              MR. SMITH:  So, Your Honor, we recently learned

16:24:55 3    of evidence that was -- pertained to the accused Alexa

16:25:02 4    system, and the -- there was a public presentation by Amazon

16:25:07 5    on I believe it was September 20th --

16:25:09 6              THE COURT:  Can I see these documents?

16:25:11 7              MR. SMITH:  If we could put up the slide

16:25:14 8    presentation.  At least have a screen shot.  If we go down

16:25:20 9    further -- if we go down to the end of presentation, next

16:25:31 10   slide, next slide.  So -- maybe slide 5.  Your Honor, slide

16:25:36 11   5 was a presentation that Amazon put on their website on

16:25:41 12   September 20th in conjunction with a public demonstration of

16:25:47 13   Alexa.  And we noticed this, or I noticed doing some

16:25:54 14   internet browsing in October after we submitted the pretrial

16:26:00 15   order, and the statements in here seem very relevant to our

16:26:04 16   infringement case because they were -- it really gets to the

16:26:08 17   heart of the infringement case about context and

16:26:10 18   conversations.

16:26:11 19             And so we thought these documents were relevant

16:26:16 20   to infringement, damages as well.  And if we go to the next

16:26:24 21   slide, this is one of the exhibits we are seeking to admit

16:26:29 22   was a video of Amazon, and this is a high level executive at

16:26:34 23   Amazon who is actually doing a live demonstration in

16:26:38 24   Virginia with one of the Echo devices connected to Alexa.

16:26:42 25   And again, he's talking about it's doing these conversations

16:26:47 1    and showing this functionality that really gets to the heart

16:26:50 2    of the '681 patent and what the infringement allegations

16:26:53 3    were about.

16:26:54 4              Now, Amazon has --

16:26:57 5              THE COURT:  I guess my question is, is that the

16:27:02 6    way Amazon -- the products that are asserted here work?  So

16:27:07 7    if I -- I don't know, is it the Alexa the thing that's

16:27:12 8    asserted here?

16:27:13 9              MR. SMITH:  Yeah, Alexa is the thing on the

16:27:16 10   cloud and Echo is the box that you talk to.

16:27:18 11             THE COURT:  So if I said how is my favorite

16:27:21 12   football team doing, does the current iteration of the

16:27:25 13   product remember that or are they talking about what's going

16:27:28 14   to be happening in the future?  So you should know I assume

16:27:32 15   you tried it and said hey --

16:27:35 16             MR. SMITH:  The latter.

16:27:36 17             THE COURT:  The latter.

16:27:38 18             MR. SMITH:  The latter.  So what it says, I have

16:27:41 19   asked Alexa this a few times and what she says is it's not

16:27:42 20   ready yet.  I'll notify you when it is.

16:27:42 21             THE COURT:  It's not ready yet, that wasn't the

16:27:52 22   subject matter.  Maybe you got another case coming down the

16:27:52 23   pike, but that's not what the discovery in this case has

16:27:52 24   been about.  That's not what the experts have opined on.  So

16:28:02 25   why are we putting in stuff that's going to confuse them as

16:28:07 1    to what's coming down the pike but isn't there now?

16:28:10 2         MR. SMITH:  Your Honor, I think one concern we

16:28:12 3    had was we were worried if we didn't raise this now, what

16:28:15 4    we're calling the accused product is Alexa, we were also

16:28:19 5    worried if we didn't raise it now there could be res

16:28:24 6    judicata.

16:28:24 7         THE COURT:  Do you want to stop?  Do you want to

16:28:26 8    go and wait for them to come out with the product, take

16:28:28 9    depositions on that and then have a trial, or do you want to

16:28:31 10   have a trial on the current version?

16:28:33 11        MR. SMITH:  On the current version.  And their

16:28:35 12   opposition made clear that this is something new and it's

16:28:38 13   distinct from what had been in the case up to this point.

16:28:43 14   So they did clarify that in their opposition brief.  So I

16:28:48 15   think part of our concern was just we needed to --

16:28:51 16        THE COURT:  But yet you're sitting here right

16:28:54 17   now asking me to grant the motion.  You didn't say oh, we

16:28:57 18   don't need to now.  So I'm still not understanding what the

16:29:00 19   basis of putting in documents on a product that doesn't

16:29:02 20   exist yet is.

16:29:02 21        MR. SMITH:  Well, then, I think the second issue

16:29:07 22   it's relevant to in our opinion is damages.  Damages, we

16:29:12 23   thought it was relevant that Amazon on the one hand seems to

16:29:14 24   be saying hey, the context conversation, contextual

16:29:14 25   conversation and things like that with long term and short

16:29:22 1    term isn't important to us, it wasn't something we thought

16:29:26 2    was important to do.  We wouldn't pay a lot of money for

16:29:29 3    patents.  But then we thought it was relevant on the other

16:29:33 4    hand they are releasing a new feature that seems to get

16:29:36 5    right to the heart of what the '681 patent --

16:29:39 6            THE COURT:  That one sounds interesting.  If

16:29:41 7    someone is going to get up and say we don't care about this,

16:29:45 8    why can't they say like well, it seems like maybe you do?

16:29:53 9            MR. RANGANATH:  Your Honor, no witness is going

16:29:54 10   to get up and say we don't care about this.  What they'll

16:29:57 11   say is as of the date of the hypothetical negotiation, the

16:30:00 12   patents had a certain value.  Twelve years later, Amazon

16:30:04 13   introduced a feature that has the word "context."  There is

16:30:07 14   no evidence --

16:30:09 15           THE COURT:  Clearly that has some kind of memory

16:30:11 16   in it if it remembered that Vanderbilt was his favorite

16:30:15 17   football team, right?

16:30:18 18           MR. RANGANATH:  The large language model, what

16:30:21 19   we figured out from the investigation so far --

16:30:23 20           THE COURT:  I assume that if I used one of those

16:30:25 21   things and talked about football, it would understand that

16:30:28 22   Vanderbilt is not my favorite football team.

16:30:32 23           MR. RANGANATH:  You may be right, Your Honor, we

16:30:34 24   just don't know.  There has been no discovery taken on this.

16:30:37 25   We have had very high level conversations with the

16:30:41 1    engineers, the folks who will testify at trial --

16:30:43 2            THE COURT:  I'm going to do this.  I'm going to

16:30:45 3    let you add those documents to your list.  You cannot use

16:30:49 4    them for infringement.  To the extent that you're going to

16:30:54 5    use them -- to the extent that Amazon makes the argument

16:30:58 6    that this feature was not an important feature, was not a

16:31:04 7    valuable feature, then you can ask me permission to use

16:31:07 8    those documents.

16:31:08 9            MR. RANGANATH:  Your Honor, just a point of

16:31:09 10   clarification.  When you say this feature, you're talking

16:31:12 11   about the use of context in interpreting --

16:31:15 12           THE COURT:  I don't know what it's talking

16:31:16 13   about, but they can tell me if you open the door to it and

16:31:19 14   then we'll have an argument about it.  You guys better be

16:31:22 15   careful because I do take your point that if they're like

16:31:26 16   no, oh, nobody cares about whether it remembers this stuff

16:31:29 17   so it wouldn't be very valuable to us.  It is relevant that

16:31:32 18   at some point you realize hey, gosh, that is kind of

16:31:36 19   valuable to them and it's a nifty feature, good enough that

16:31:39 20   the person giving a presentation to a bunch of people would

16:31:42 21   bring it up.  So I'm going to grant that motion.  But with

16:31:50 22   limits to how you can use those documents.

16:31:53 23           All right.  Paragraph 38, you seem to have

16:32:00 24   incorporated my procedure for getting electronic copies of

16:32:05 25   witness binders.  Thank you.  I just want to make clear that

physical copies of the witness binders must already be on the stand when the witness gets there or you must hand the binder to the witness on their way up.  We are not going to be going up to the witness box with binders and exhibits once the person is seated.

There appears to be a typo in the last sentence of paragraph 38.  You say you will give the other side electronic versions of direct, but then say only the courtroom deputy gets direct.  I think that means to say only the courtroom deputy gets the cross.

Paragraphs 48 and 49 have the dispute about presenting inducement and contributory infringement.  From your letter this morning I understand that that is addressed, is that correct?

MR. YOON:  Yes, Your Honor, we are not going to be arguing indirect infringement at trial.

THE COURT:  Excellent.  Okay.  Paragraphs 62 through 65, I will address trial logistics and jury selection in a couple of minutes.

Paragraph 67 about briefing and post-trial motions, brief them using the local rules, not what you propose.

Paragraph 75, we will get you edits to the verdict sheet sometime later.  I think you guys said you had a new verdict sheet, so why don't you submit -- do you have

16:33:30 1   something you have agreed on or you each have your own

16:33:34 2   versions?

16:33:35 3            MS. SHAMILOV:  We need to meet.  I think we're

16:33:37 4   going to be very close and hopefully we'll agree and submit

16:33:40 5   a single one, but we do have an updated one.

16:33:42 6            THE COURT:  Why don't you try and do that and

16:33:44 7   just submit us the updated version.

16:33:47 8            MS. SHAMILOV:  When would you like that, Your

16:33:49 9   Honor, today or tomorrow?

16:33:51 10           THE COURT:  Can I have that by Friday.

16:33:53 11           MS. SHAMILOV:  Okay.

16:33:58 12           THE COURT:  I don't think it's proper to have

16:34:00 13  all the argument from Amazon in the footnote about the

16:34:03 14  verdict sheet.  I'm going to strike that footnote and you

16:34:06 15  guys will have the opportunity to make any objections you

16:34:09 16  want to the verdict sheet and jury instructions later.

16:34:14 17           Paragraph 85 about talking to a witness is fine.

16:34:19 18           Paragraph 93 about removing exhibits.  Are you

16:34:24 19  really anticipating removing exhibits?

16:34:32 20           MR. YOON:  Your Honor, I don't believe so.

16:34:35 21           THE COURT:  Okay.  Paragraph 94 I think is okay,

16:34:44 22  but I just want to be clear that documents that are used to

16:34:47 23  cross don't come into evidence unless they are on the

16:34:52 24  exhibit list.

16:34:55 25           Paragraph 117, time taken to argue objections

16:34:57 1   about expert testimony and whether it's beyond the scope of

16:35:00 2   disclosures, ordinarily will be charged to the losing party,

16:35:04 3   but of course I can choose to allocate that time however I

16:35:10 4   find appropriate.

16:35:12 5            Paragraphs 120 about sealing the courtroom.

16:35:18 6   I'll address that in a second.

16:35:19 7            All right.  So now for trial logistics.  Each

16:35:24 8   side will get eleven hours trial time, that includes opening

16:35:27 9   statements, closing arguments, witness examinations, and

16:35:31 10  arguments over objections.  Generally if we are in the

16:35:34 11  courtroom, someone is being charged for time, unless I'm

16:35:37 12  reading jury instructions.  The parties are required to set

16:35:40 13  aside at least half an hour of trial time for closing

16:35:43 14  arguments which will occur at the close of the evidence.

16:35:47 15           Jury selection will take place on Thursday of

16:35:50 16  this week, November 2nd.  The presentation of evidence will

16:35:55 17  begin after the jury is seated.  We will start at 9:00 a.m.

16:35:59 18  each morning after that and plan to present evidence until

16:36:02 19  at least 4:30, and will plan to have our normal

16:36:07 20  fifteen-minute break in the morning and fifteen-minute break

16:36:10 21  in the afternoon, as well as a lunch break of around half

16:36:14 22  hour, forty-five minutes.  I think you're all familiar --

16:36:18 23           MR. BELGAM:  Your Honor, Neal Belgam.  What time

16:36:20 24  do you want us on Thursday?  Do you want us before 9:00?

16:36:24 25           THE COURT:  It depends if you guys have

16:36:25 1   objections.  I'll tell you if you don't have anything, you

16:36:29 2   can show you up right before the jury gets here.  If you

16:36:32 3   have objections, then we'll have to come in earlier.

16:36:35 4                MR. BELGAM:  Thank you, Your Honor.

16:36:36 5                MR. YOON:  Your Honor, I apologize, just maybe I

16:36:39 6   misheard.  At paragraph 62, I thought the parties each had

16:36:43 7   thirteen hours?

16:36:44 8                THE COURT:  You proposed, that's not what I gave

16:36:47 9   you have.

16:36:47 10               MR. YOON:  I apologize, Your Honor.  I

16:36:50 11  apologize, Your Honor.  Understood.  My fault.

16:36:53 12               THE COURT:  All right.  Jury selection.  I know

16:36:55 13  some of you have recently been in my jury selection, maybe

16:36:59 14  all of you.  So what we do is we have jurors 1 through 14

16:37:03 15  over here.  Jurors 15 through 28 here.  And 29 through

16:37:08 16  whatever over here.  Each juror will wear a number and be

16:37:15 17  provided a sheet that includes the voir dire questions and a

16:37:19 18  pencil so that they can keep track of the yes answers.

16:37:23 19               What I will do is I will ask questions and I

16:37:25 20  will say if you answer yes to any question, mark it down.

16:37:29 21  So then when that's finished, I would say folks over here,

16:37:32 22  how many of you answered yes to any question?  If they

16:37:36 23  answered yes to a question, we will take them into the back

16:37:39 24  and talk to them one on one about their answer to the

16:37:42 25  question.  We will keep doing that until we have fourteen

people who have either not been excused or who have not
answered yes to any questions.

Once we have that, we'll put those fourteen
people over there and then we'll exercise peremptories.  You
each get three peremptories and we wind up with a jury of
eight.

We have the proposed voir dire and preliminary
instructions and we'll get you edits.  Plaintiff is
responsible for bringing enough pens or pencils and enough
copies of the voir dire for the prospective jurors.  We ask
those to be delivered to the clerk's office by noon on
Wednesday.

We are not going to require people in Court to
wear masks, but if you're coughing, show up with a mask or
leave the courtroom.  Jurors get freaked out and they don't
like it.  And I keep telling people that, and yet I still
have people who are like sitting there coughing through the
whole trial.  The jurors hate it and they feel like you're
infecting them.  If that's what you want, I guess you can
sit there and cough at your leisure, but you probably
shouldn't do it.

We're limiting the movement in the courtroom.
Attorneys stay at the podium or behind the podium.  If
you're giving an opening statement, if you want to walk back
and forth, mix it up behind the podium, you can do that,

16:39:07 1    just don't move forward into the jury space.  I already told

16:39:11 2    you that they should have a binder so when the witness goes

16:39:15 3    up to the stand, you have a direct binder and if it's going

16:39:19 4    to be a cross before a break, make sure the witness also has

16:39:23 5    the cross binder.

16:39:25 6         On or before noon on Wednesday, the parties need

16:39:29 7    to provide electronic versions of all trial exhibits on the

16:39:33 8    exhibit list to us in a single folder.  How you get that to

16:39:37 9    us is up to you.  You can use a shared link or flash drive,

16:39:40 10   I don't care, just work with your IT department and

16:39:43 11   coordinate with Mr. Buckson so we can have all the trial

16:39:47 12   exhibits electronically on the first day.

16:39:49 13        The exhibits need to be named with their exhibit

16:39:51 14   numbers, JTX, PTX, DTX, and in a folder in ascending

16:39:58 15   chronological order.  Exhibits should be grouped together.

16:40:00 16   So if I click sort, it's just going to give me PTX 1 through

16:40:05 17   whatever, JTX 1 through whatever, DTX 1 through whatever.

16:40:09 18        As previously mentioned, the parties need to

16:40:11 19   provide Mr. Buckson with flash drives every morning that

16:40:15 20   contains the witness folders or shared whatever, shared

16:40:18 21   drive, I don't care, for any direct examinations on that

16:40:21 22   day.  The witness folder shall contain the exhibits that

16:40:24 23   would have otherwise been in a witness binder, organized by

16:40:27 24   exhibit number.  Also should include demonstratives to be

16:40:30 25   used with that witness and a deposition transcript if you

16:40:34 1    plan to have one in there, though that's usually I guess

16:40:38 2    more on the cross binders.

16:40:40 3            So the same thing with the cross binders, if

16:40:42 4    you're going to use a deposition transcript, whatever

16:40:47 5    exhibits, put them in the cross binder so that we have them

16:40:50 6    and the clearest objection, it makes it easier for us.

16:40:54 7            We're not going to have sidebars at the bench.

16:40:57 8    If there is a need for one, we'll go out into the hall.  If

16:41:00 9    I have to let the jury recess to decide an objection, all of

16:41:04 10   the time including relocating the jury will be assigned to

16:41:07 11   one or both parties, probably assign it to the loser, but I

16:41:11 12   may do it differently if I think that will be more fair.

16:41:14 13           As to closing the courtroom, I think you're all

16:41:18 14   aware at this point that I'm disinclined to close it.  If a

16:41:22 15   party anticipates asking to seal the courtroom, the party

16:41:25 16   must keep it to a bare minimum and provide sufficient

16:41:29 17   advanced notice to the other side.

16:41:31 18           You must be prepared to make your requisite

16:41:34 19   showing of a specific harm under the Third Circuit Avandia.

16:41:39 20   That doesn't mean to say oh, gosh, we're going to be talking

16:41:42 21   about financials, I need someone who is going to say we're

16:41:44 22   going to be talking about our profit margins and that's

16:41:49 23   historically something we keep confidential and it will

16:41:51 24   result in a specific harm to us if people know, and tell us

16:41:56 25   what that harm us.

16:41:57 1          Paragraph 121 which is about the transcript, I

16:42:01 2  just am not exactly sure what you're suggesting there.  So

16:42:08 3  if the time goes by and I get nothing, nothing sealed, I

16:42:18 4  don't understand what's being -- my guess is this is one of

16:42:24 5  those days, everyone is going to forget it, I'm going to

16:42:30 6  have nothing and I don't know what I'm expected to do.

16:42:34 7          MR. MACDONALD:  Your Honor, I think my

16:42:37 8  interpretation or our understanding of this would be yes, if

16:42:40 9  we didn't submit something, then you --

16:42:43 10         THE COURT:  This is what I am going to do.  I am

16:42:45 11 going to require you to submit something either way, that

16:42:48 12 way I don't have to be the one who is keeping track of this.

16:42:51 13 You guys can tell me in that time period whether anything is

16:42:54 14 going to be kept under seal or not.

16:43:01 15         Jury binders, if the parties agree on a set of

16:43:06 16 documents that the jury should have as jury binders, you may

16:43:09 17 give them to the jury.  If you don't agree, then there are

16:43:12 18 no jury binders.  But if you do agree, bring eight copies of

16:43:16 19 that on the first day of trial.

16:43:17 20         Consistent with the Court's procedures, counsel

16:43:21 21 shall provide an electronic version of the completed AO

16:43:25 22 Form 187 exhibit list to the courtroom deputy on or before

16:43:28 23 the first day of trial.

16:43:30 24         After trial, I need you to review the trial

16:43:33 25 transcript and submit any necessary corrections no later

16:43:36  1    than two weeks after trial so that way we don't have a bunch

16:43:40  2    of corrected post-trial briefs to deal with.

16:43:42  3            If you need access to the courtroom to set up

16:43:45  4    for trial, you may do so on Wednesday, November 1st, in the

16:43:48  5    afternoon, coordinate with Mr. Buckson.

16:43:50  6            And with respect to the telling us when there

16:43:57  7    are objections, I don't have a note on it, so I assume that

16:44:01  8    you guys are following my procedures.  I just want to make

16:44:06  9    sure that when you do, if you do have objections, you need

16:44:18 10    to tell us by 7 o'clock, and send that e-mail to both my

16:44:24 11    judicial administrator, Ms. Welham, and Mr. Buckson, that

16:44:28 12    way we have it doubly covered.

16:44:30 13            No argument with those, but you can send us

16:44:35 14    electronic versions of the documents that are the subject of

16:44:39 15    the objections, and also have them handy when you come in.

16:44:46 16    Because often times we like the hard copies as well.

16:44:51 17            All right.  Those are the issues that I had.

16:44:57 18    Anything else that you all want to ask?

16:45:02 19            MS. SHAMILOV:  I have an issue, Your Honor, if I

16:45:04 20    may.

16:45:07 21            Just one of our witnesses, Mr. Ryan Thomas, has

16:45:12 22    a heart condition and has heart surgery scheduled for

16:45:16 23    November 14.  He's cleared to testify.  We think he'll be

16:45:20 24    fine, but in situations that are stressful, he might have a

16:45:24 25    heart episode that will require him to take a break.  We

16:45:27 1    conferred with the other side.  If it happens, we don't

16:45:30 2    think it will, but we can't rule it out, if it happens, I

16:45:34 3    guess one of us will ask the Court for a break, we'll ask

16:45:38 4    him to flag us for the Court.  We want to know what your

16:45:40 5    preference is for that situation.

16:45:41 6            THE COURT:  I certainly don't want anyone to

16:45:43 7    have a medical episode or medical emergency, so yeah, just

16:45:50 8    flag it to me, flag it to counsel, and we'll deal with the

16:45:57 9    time that we need to deal with how we're going to allocate

16:46:01 10   that time once we see what it is, but that should not be

16:46:04 11   something that the expert worries about or the witness

16:46:07 12   worries about.  If he thinks there is an issue, just let us

16:46:11 13   know.

16:46:12 14           MS. SHAMILOV:  And we also talked about if it

16:46:13 15   happens, we would like for the Court to -- he's right now

16:46:17 16   very uncomfortable to talk about it in front of the jury, so

16:46:20 17   if it happens, we don't want --

16:46:22 18           THE COURT:  Why don't you come up with some

16:46:24 19   keywords he can say, something like -- something to the

16:46:29 20   effect that I need a break, and we will understand with this

16:46:34 21   witness.

16:46:34 22           MS. SHAMILOV:  Okay.

16:46:35 23           THE COURT:  Who is the witness again?

16:46:37 24           MS. SHAMILOV:  It's Ryan Thomas, fact witness,

16:46:40 25   Amazon employee.

16:46:41 1          THE COURT:  We'll recognize if Mr. Thomas says I

16:46:44 2  need a break, that we will take that request seriously.

16:46:47 3          MS. SHAMILOV:  And then we also talked about at

16:46:50 4  that time we may want the Court to give some sort of an

16:46:53 5  instruction to the jury that we're taking the break -- I

16:46:56 6  don't want them to think he needs a break because he is

16:47:00 7  uncomfortable with the cross.

16:47:01 8          THE COURT:  You guys can discuss it.  If there

16:47:03 9  is something you can agree on, I'll consider that.

16:47:05 10          MS. SHAMILOV:  Thank you, Your Honor.

16:47:06 11          MR. YOON:  Your Honor, this is an administrative

16:47:08 12  note.  We have to update the preliminary jury instructions.

16:47:11 13  We have reduced the number of claims.

16:47:14 14          THE COURT:  You don't need to update those, I

16:47:16 15  can deal with that.

16:47:17 16          MR. YOON:  Thank you.

16:47:18 17          THE COURT:  But the final jury instructions, if

16:47:20 18  you all have agreed on anything there, you can submit us new

16:47:26 19  final instructions by Friday.

16:47:30 20          Anything else?

16:47:32 21          MR. YOON:  No, Your Honor.

16:47:32 22          MR. HADDEN:  Not from me, Your Honor.

16:47:35 23          THE COURT:  All right.  We'll see you on

16:47:37 24  Thursday.

16:47:38 25          COURT CLERK:  All rise.  Court is adjourned.

1          (Court adjourned at 4:47 p.m.)

2

3          I hereby certify the foregoing is a true and
   accurate transcript from my stenographic notes in the proceeding.

4

5                              /s/ Dale C. Hawkins
                               Official Court Reporter
6                              U.S. District Court

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25