08:06:45

```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF DELAWARE

 3

 4   VB ASSETS, LLC,            ) VOLUME 2
                                )
 5              Plaintiff,      )
                                ) C.A. No. 19-1410(MN)
 6   v.                         )
                                )
 7   AMAZON.COM SERVICES LLC,   )
                                )
 8              Defendant.      )

 9

10                    Tuesday, November 3, 2023
                      8:35 a.m.
11                    Jury Trial

12

                      844 King Street
13                    Wilmington, Delaware

14

15   BEFORE:   THE HONORABLE MARYELLEN NOREIKA
               United States District Court Judge
16

17

18
     APPEARANCES:
19

20            WILSON SONSINI GOODRICH & ROSATI PC
              BY:   NEAL C. BELGAM, ESQ.
21            BY:   JAMES C. YOON, ESQ.
              BY:   MATTHEW A. MACDONALD, ESQ.
22            BY:   RYAN R. SMITH, ESQ.
              BY:   BRAD TENNIS, ESQ.
23            BY:   JAMIE Y. OTTO, ESQ.

24
                        Counsel for the Plaintiff
25
```

242

1      APPEARANCES CONTINUED:

2

3                ASHBY & GEDDES
                 BY:  STEVEN J. BALICK, ESQ.
4
                 -and-
5
                 FENWICK & WEST LLP
6                BY:  J. DAVID HADDEN, ESQ.
                 BY:  SAINA S. SHAMILOV, ESQ.
7                BY:  RAVI R. RANGANATH, ESQ.
                 BY:  VIGEN SALMASTLIAN, ESQ.
8                BY:  MELANIE MAYER, ESQ.
                 BY:  JEFFREY WARE, ESQ.
9
                           Counsel for the Defendant
10

11

12                    - - - - - - - - - -

13

14

08:22:54 15

08:22:54 16

08:34:34 17          THE COURT:  All right, everyone.  Please be

08:34:36 18   seated.  So we have some objections.  I know you guys gave

08:34:41 19   some stuff to Mr. Buckson, but I haven't looked at it, you

08:34:42 20   can do that all on the clock.  Okay.  What do we have?

08:34:50 21          MR. YOON:  Your Honor, there are some issues

08:34:52 22   that have been made, but we did want to report to the court

08:34:52 23   that the parties did work through all the issues with

08:34:58 24   Dr. Polish.

08:34:58 25          THE COURT:  We're wasting the jury's time, I do

08:35:02 1    appreciate that and thank you, but let's not waste time.

08:35:06 2            MR. SALMASTLIAN:  Good morning, Your Honor,

08:35:09 3    Vigen Salmastlian.  There is an issue with a source code

08:35:14 4    exhibit that --

08:35:15 5            THE COURT:  I have this, this is the only

08:35:16 6    document that I have right now.  So do you have an objection

08:35:19 7    to this?

08:35:21 8            MR. WARE:  Yes.

08:35:22 9            THE COURT:  Let's deal with it.

08:35:24 10           That was the one that was actually timely made,

08:35:29 11   so let's deal with that first.

08:35:30 12           MR. WARE:  Jeffrey Ware for defendant.

08:35:33 13           And here Amazon is using -- sorry, let me just

08:35:39 14   put this -- Your Honor, may I put this on the Elmo?

08:35:43 15           THE COURT:  Yes.

08:35:46 16           MR. WARE:  So we are re-raising Amazon's Daubert

08:35:51 17   to the portion of the Daubert motion that was denied with

08:35:56 18   leave to re-raise at trial.  It may be appropriate, or more

08:36:02 19   appropriate for this Court to consider this issue after the

08:36:06 20   damages experts have testified and the Court has gotten more

08:36:11 21   information regarding the specifics of the methodology

08:36:14 22   Amazon is objecting to, and so for the appreciating the

08:36:21 23   issue of time here, Amazon simply re-raises--

08:36:25 24           THE COURT:  No.  No.  You're not re-raising

08:36:28 25   something.  Tell me what the objection is.

08:36:31   1                    MR. WARE:  Okay.

08:36:31   2                    THE COURT:  All you're going to do is say I

08:36:37   3        re-raise what I did, you know, weeks ago or even a week ago,

08:36:40   4        I have no idea what that is, okay?  So if you want to make

08:36:44   5        an objection, you're -- it's worth your time and you make

08:36:48   6        it.  Because I don't know what the problem is with it.

08:36:51   7                    MR. WARE:  Your Honor, so in the -- in Your

08:36:53   8        Honor's Daubert order, you granted the motion partially with

08:36:58   9        respect to Mr. Reed's math error with respect to his growth

08:37:05  10        input that he used as the basis for his hundred -- at that

08:37:10  11        time about $150 million damages opinion.  Now it is down to

08:37:15  12        46.7 million.  Amazon objects, though, to -- and that was

08:37:21  13        part of his cost savings methodology or so-called cost

08:37:25  14        savings methodology.

08:37:27  15                    Amazon still objects to the underlying cost

08:37:31  16        savings methodology as raised in the motion and specifically

08:37:35  17        --

08:37:35  18                    THE COURT:  You have to tell me what it is, I

08:37:37  19        don't remember.  I have no idea what that basis was.  So

08:37:41  20        rather than recap and waste that time, how about you just

08:37:45  21        start a new -- what did he do, what's objectionable?

08:37:51  22                    MR. WARE:  Your Honor, his cost saving

08:37:53  23        methodology compares Alexa's turn rate, versus for dialogs,

08:38:02  24        a turn rate is you speak to Alexa, Alexa provides a

08:38:07  25        response, that's one turn.  He took Alexa's turn rate and

08:38:13 1    compared it -- which right now they accuse the '681 patent

08:38:19 2    of infringing, and then he took Alexa Shopping's turn rate

08:38:26 3    which plaintiff accuses the remaining patents of infringe --

08:38:32 4    or Amazon of infringing the remaining patents, and because

08:38:36 5    at one point in time in 2018, there was a 1.5 turn

08:38:41 6    difference, and he further opines that there was a certain

08:38:47 7    thing that happened with Amazon Shopping, a simple CX

08:38:52 8    program that, at that time, made it so that he could support

08:38:57 9    the valuation for his 1.5 turns benefit analysis he compared

08:39:05 10   Alexa Shopping with Alexa active customers and so the basis

08:39:09 11   of his calculation if you look here on this -- on the

08:39:15 12   demonstrative is that he said because Alexa Shopping had

08:39:23 13   poor customer experience prior to this time, you can see

08:39:27 14   when Alexa Shopping, which is in red, goes way up in late

08:39:32 15   2018, that the benefit of 1.5 turns could be calculated

08:39:37 16   based on the difference here pre the September 18 of Alexa

08:39:43 17   and Alexa Shopping user growth.

08:39:46 18          So Amazon's first objection to cost saving

08:39:52 19   methodologies is no cost saving methodology at all except by

08:39:58 20   the Federal Circuit, because here at this time, plaintiffs

08:40:02 21   have accused Amazon of infringing both Alexa, and Alexa

08:40:08 22   Shopping, you can't take the difference of growth rates in

08:40:12 23   both to determine the cost savings of using either the '681

08:40:18 24   patent for Alexa, or the remaining asserted patents for

08:40:22 25   Alexa Shopping.

08:40:23  1                     So that is the first basis of Amazon's objection

08:40:29  2      that cost savings is supposed to be as recognized by the

08:40:32  3      Federal Circuit, the difference between infringing and a

08:40:40  4      non-infringing use, usually a non-infringing alternative or

08:40:44  5      sometimes the alternative of actually doing nothing.  In

08:40:48  6      this case, they're comparing two infringing products --

08:40:51  7                     THE COURT:  But infringing of different patents,

08:40:53  8      so it's an infringing of the '681, and non-infringing of the

08:40:57  9      '681, but infringing of the others?

08:41:00 10                     MR. WARE:  Well they accused '681 actually of

08:41:04 11      infringing all -- or they accused both Alexa and Alexa

08:41:08 12      Shopping of infringing all of the asserted patents, but only

08:41:13 13      specifically Alexa Shopping for infringing the other

08:41:16 14      asserted patents.

08:41:22 15                     THE COURT:  So they're comparing the red line is

08:41:25 16      alleged infringing '681, and the blue line is a different

08:41:29 17      product that also is alleged to infringe the '681?

08:41:33 18                     MR. WARE:  Yes, it's the Alexa Shopping growth

08:41:36 19      rate.  I'm sorry, the blue is Alexa, and red is Alexa

08:41:41 20      Shopping.

08:41:42 21                     THE COURT:  Okay.  What's your next basis?

08:41:46 22                     MR. WARE:  The next basis is it's an apples to

08:41:50 23      oranges comparison, and in order to effectively assert that

08:41:56 24      because Alexa worked well at the time because of the

08:42:00 25      patents, and even though Alexa Shopping wasn't working well

08:42:06 1    before this change in 2018, even though again it was using

08:42:10 2    -- it was practicing the other patents, that the 1.5 turn

08:42:14 3    rate --

08:42:15 4            THE COURT:  You keep saying the other patents.

08:42:17 5    So --

08:42:22 6            MR. WARE:  So the voice ad patents and the '703

08:42:26 7    patent.

08:42:26 8            THE COURT:  Yes, I know.  Where I'm getting

08:42:29 9    confused is what is -- you just -- when I thought that's

08:42:33 10   what you were talking about before, '681 versus the other

08:42:36 11   patents, you said no, no, everything infringes, is alleged

08:42:41 12   the infringe the '681, so now we're talking about something

08:42:44 13   different, right?  Now you're saying one thing is the '681

08:42:47 14   and another thing is the other patents?

08:42:49 15           MR. WARE:  Well, Your Honor, the '681 patent

08:42:53 16   claims the more -- just most generally may call it

08:43:00 17   contextual understanding using short and long-term

08:43:03 18   knowledge.  And so, they assert that all Alexa interactions

08:43:09 19   infringe the '681 based on that, whether it's in the Alexa

08:43:14 20   Shopping domain, or in any other Alexa domain.

08:43:17 21           With respect to the voice ad patents and the

08:43:20 22   '703 patent, they only accuse Alexa Shopping functionality

08:43:27 23   of infringing those patents.

08:43:30 24           THE COURT:  Okay.  So with that understanding,

08:43:33 25   can you tell me your second basis again?

08:43:35  1             MR. WARE:  So the second basis is that to use

08:43:40  2     the different turns between Alexa and Alexa Shopping, is

08:43:46  3     completely baseless and erroneous because the context for

08:43:50  4     Alexa and using Alexa more generally and Alexa Shopping are

08:43:55  5     very different, or quite often very different.  95 percent

08:43:58  6     of Alexa interactions are just one shot interactions, where

08:44:03  7     you may ask her "Alexa, turn on the lights," or "please play

08:44:10  8     me my play list," or please do any number of things, where

08:44:16  9     it doesn't require an extra dialogue turn to do anything

08:44:19 10     because it's Alexa just automatically does it.  Where Alexa

08:44:25 11     Shopping is often a more by-design, involves multiple turns.

08:44:30 12     So you may ask for a product and then you may then, want to

08:44:36 13     put that product in the shopping cart and then ultimately

08:44:39 14     you may want to purchase that product.  And you can do that

08:44:42 15     using voice or any number of -- or screen or anything else,

08:44:45 16     but that can be a multiple turn dialogue.  And really by

08:44:51 17     design by just the specifics of the whole purpose of the

08:44:57 18     Alexa Shopping app.

08:44:59 19             So to compare turn differences and attribute

08:45:04 20     that to the benefits of the patent while ignoring the true

08:45:08 21     difference of Alexa and Alexa Shopping, is an erroneous

08:45:12 22     comparison and it's comparing apples and oranges, not

08:45:20 23     actually comparing anything that reflects the value of the

08:45:22 24     patents to the accused product.

08:45:25 25             THE COURT:  Okay.  Any other grounds?

08:45:27  1          MR. WARE:  And the third ground is that he is

08:45:30  2  pointing to a single Alexa Shopping document, OP1 and the

08:45:35  3  purported improvement of Alexa Shopping after certain

08:45:40  4  improvements were made, but he's applying the value of those

08:45:45  5  improvements to Alexa overall.  Where again, specifics of

08:45:51  6  Alexa Shopping and Alexa are very different.  And on top of

08:45:58  7  that, he fails to show that even when you see the red line

08:46:03  8  moving up, he fails to show that the red line moving up is

08:46:07  9  actually caused by reduction of turns in the patent, or

08:46:10 10  reduction of turns in dialogue which is the purported

08:46:15 11  benefit that Mr. Reed claims, and is trying to monetize for

08:46:20 12  plaintiff.

08:46:21 13          And so again, that's -- it makes no logical

08:46:26 14  sense, and we would object under Rule 702 and Daubert for

08:46:31 15  that.

08:46:31 16          THE COURT:  Now, when you said before that this

08:46:36 17  might make more sense to raise after the experts testify,

08:46:41 18  wouldn't the expert already have testified about this, so

08:46:44 19  doesn't that suggest that this is not really a reliability

08:46:48 20  issue if you're willing to let the expert talk about this

08:46:50 21  before I rule on it?

08:46:52 22          MR. WARE:  Well, Your Honor, we believe that you

08:46:56 23  already considered this issue when you did rule on the

08:46:58 24  initial Daubert motion, and you had suggested that this may

08:47:01 25  be an issue for cross-examination.  But you granted Amazon

08:47:06 1   leave to re-raise it at trial.  We think and know that if a

08:47:11 2   damages verdict issues by the jury in this Court, that the

08:47:17 3   Federal Circuit will overturn because again, this makes no

08:47:23 4   -- first of all makes no logical sense, and it also fails to

08:47:27 5   follow any recognized cost savings methodology that's ever

08:47:31 6   been accepted by the Federal Circuit.

08:47:35 7           THE COURT:  I guess we'll have to find out.

08:47:38 8   Let's hear.  And I really want to hear mostly on the first

08:47:44 9   ground which is how can this -- how can this have anything

08:47:49 10  to do with infringing the benefits of the patent when you

08:47:55 11  are comparing infringing versus infringing.

08:48:05 12          MR. MACDONALD:  Thank you, Your Honor.  Matt

08:48:11 13  Macdonald on behalf of VB Assets.  Let me just get straight

08:48:14 14  to Your Honor's question.

08:48:15 15          THE COURT:  That would be good without even the

08:48:17 16  present preface of telling me, just get there.

08:48:19 17          MR. MACDONALD:  The answer is, we cannot run an

08:48:23 18  experiment inside Alexa that compare what would happen in

08:48:25 19  the but for world, where there is infringement and

08:48:27 20  non-infringement.  We can't do that, we don't have that

08:48:29 21  ability because our position is that Amazon continuously

08:48:33 22  infringes, and we don't control their system.

08:48:35 23          So what our expert did was look through Amazon

08:48:38 24  data and Amazon documents to attempt to find evidence that

08:48:41 25  would allow him to proxy for the effect of the infringing

alternative.

          Mr. Polish -- starting here, the benefit of the patent is that it simplifies interaction with Alexa.  He looked for evidence that would help him measure that.  What he found is basically three things that I will highlight. Number one is an internal Amazon document that is not up on the screen, even though I was looking there, that Amazon itself looked at a comparison between Amazon -- or excuse me, between Alexa and Alexa Shopping and it itself made that comparison as a way to look at the effect of additional complexity on user growth.  In effect, Amazon in that document says we see a lot more turns on Alexa Shopping than on Alexa and then connects that to a ten percent growth differential between the two.

          The second piece of evidence --

          THE COURT:  Why does that have anything to do with the patents?  Apportioning to the patents, that's what I'm not understanding.  As opposed to some other value use.

          MR. MACDONALD:  What happens is Amazon in this document equates a 1, 1-and-a-half I believe turn differential in Amazon Shopping and attributes that to a ten percent growth differential.

          THE COURT:  Yes, but you're not telling me what that one-and-a-half turns has to do with the patents versus -- I mean, both things that are supposed to be using the

08:50:11  1    patent, right?

08:50:12  2            MR. MACDONALD:  Yes, Your Honor.

08:50:13  3            THE COURT:  The one-and-a-half turn, is that a

08:50:15  4    patented feature?

08:50:16  5            MR. MACDONALD:  No, the one-and-a-half turns is

08:50:20  6    what Dr. Polish will testify is the consequence of using the

08:50:22  7    patent.

08:50:23  8            THE COURT:  But using which patent?

08:50:25  9            MR. MACDONALD:  All of the patented technology.

08:50:27 10            THE COURT:  Okay.  So that's where I'm missing

08:50:29 11    this.  You get the benefit of the one-and-a-half turns from

08:50:33 12    that, then how -- don't the blue things also have the

08:50:37 13    benefit of the patents because you're accusing them of

08:50:40 14    infringement?

08:50:41 15            MR. MACDONALD:  They absolutely do.  So the

08:50:43 16    question that Dr. Reed -- excuse me, that Mr. Reed attempted

08:50:47 17    to answer was what evidence in Amazon's files that I have,

08:50:51 18    that would allow me to quantify the impact of this 1.5

08:50:56 19    turns.  And we can't run an experiment --

08:50:58 20            THE COURT:  I don't understand how you can say

08:51:00 21    the effect of infringing the patents is you get this benefit

08:51:03 22    when you're accusing things of infringing the patents that

08:51:06 23    don't apparently have that benefit.

08:51:10 24            MR. MACDONALD:  I think the answer is that we

08:51:12 25    don't have -- we don't have -- we don't have real world

08:51:16  1    evidence of what would happen in the but for world --

08:51:18  2              THE COURT:  Are you saying the blue things use

08:51:20  3    the patents?

08:51:21  4              MR. YOON:  Yes, the blue things use the patents.

08:51:23  5              THE COURT:  How is Dr. Polish saying that that

08:51:25  6    gives you the one-and-a-half turns, that's what I'm missing.

08:51:28  7    And stop with this double teaming.  Then he's done and

08:51:31  8    you're making the argument.

08:51:33  9              MR. YOON:  Yes, Your Honor, I apologize.

08:51:34 10              THE COURT:  Fine.  One time and that's it.

08:51:36 11              MR. YOON:  I apologize, Your Honor, just to be

08:51:38 12    efficient.

08:51:39 13              THE COURT:  I hate this lurking in the

08:51:40 14    background, very distracting, I can't pay attention to

08:51:44 15    what's being said because I got this lurking.

08:51:46 16              MR. YOON:  My apologies, Your Honor.  Your

08:51:48 17    Honor, in this case, Amazon's own expert, Mr. Johnson,

08:51:53 18    indicated that a non-infringing alternative to the patent

08:51:58 19    would add one -- at least one turn to each of the Amazon

08:52:02 20    devices that would infringe.  So what you have here, Your

08:52:02 21    Honor, is you want to tie it to the patent is Amazon's

08:52:12 22    expert --

08:52:12 23              THE COURT:  I don't want to tie it to the

08:52:14 24    patent, I think you have to tie it to the patent if you want

08:52:16 25    to use it, right?

08:52:17 1          MR. YOON:  I am tying it to the patent, Your

08:52:19 2   Honor, I understand.  Amazon's expert had indicated that you

08:52:22 3   can have a non-infringing alternative by asking more

08:52:26 4   questions that would add turns.  Also Dr. Polish indicated

08:52:29 5   that as well in response to Amazon's expert.  So you have a

08:52:33 6   situation where both experts on the technical side agree

08:52:36 7   that a non-infringing alternative to the patented technology

08:52:39 8   would add turns.

08:52:43 9          And then the next step is, okay, what is the

08:52:45 10  consequence of adding turns?  We have an Amazon document

08:52:49 11  that shows adding 1.5 turns reduced growth by ten percent.

08:52:56 12  And then this was the issue with the math error, Your Honor,

08:52:59 13  this was the point, we have technical expert testimony that

08:53:02 14  shows the patents reduced turns, and that the non-infringing

08:53:06 15  alternative to the patents adds a turn.  Then we have --

08:53:10 16  when we then have to quantify the economic impact of what

08:53:15 17  adding a turn would mean, we then go to the Amazon

08:53:19 18  documents, Amazon's own study which shows that when you

08:53:22 19  added 1.5 turns, it reduced growth by ten percent.

08:53:26 20         And so, that is the patents reduce the number of

08:53:33 21  turns, all the patents reduced the number of turns by at

08:53:33 22  least one --

08:53:35 23         THE COURT:  Why do you have apportioning value

08:53:37 24  to the patents at the top, that's why I'm getting confused,

08:53:41 25  it makes it sound like you're comparing patented to

08:53:44  1    non-patented in this slide, and you're not.

08:53:46  2            MR. YOON:  We can remove that title.

08:53:47  3            THE COURT:  I understand what you're saying is

08:53:49  4    everybody agrees a non-infringing alternative has an extra

08:53:52  5    turn, and we're just trying to approximate what value not

08:53:57  6    having that extra turn gives.

08:53:59  7            MR. YOON:  Exactly, we have Amazon's own

08:54:02  8    internal study as to the consequence of having more turns,

08:54:05  9    and Amazon's own document shows that it reduced growth by

08:54:09 10    ten percent, so the rest of this would go to the weight,

08:54:12 11    Your Honor, and it was addressed earlier.

08:54:14 12            THE COURT:  All right.  Let me hear the response

08:54:17 13    on that.

08:54:19 14            MR. WARE:  Your Honor, regardless of whether the

08:54:22 15    patented benefit is 1.5 turns for Alexa, and 1.5 turns for

08:54:28 16    Alexa Shopping --

08:54:29 17            THE COURT:  That's not the question.  The

08:54:31 18    question is, respond to his argument.  His argument is you

08:54:36 19    all say there is a non-infringing alternative, is that

08:54:40 20    right?

08:54:40 21            MR. WARE:  Yes.

08:54:40 22            THE COURT:  And the non-infringing alternative,

08:54:44 23    he says, that it would have at least an additional turn.

08:54:50 24    And you guys can disagree as to whether that's true, but

08:54:54 25    that's his understanding.  He's saying look -- he's not

08:54:58 1   going to put that title up there, because I don't think this

08:55:00 2   is apportioning value to the patents.  He's saying all this

08:55:03 3   is doing is approximating how much value you lose or gain by

08:55:12 4   having an additional turn, or one less turn, so that's what

08:55:15 5   I need you to respond to.

08:55:17 6           MR. WARE:  Well, in the lines before

08:55:20 7   September 18th, the blue line has 1.5 less turns because

08:55:27 8   they're infringing the patents according to them, and the

08:55:29 9   red line has 1.5 less turns because they are accused of

08:55:34 10  infringing the patent.

08:55:35 11          THE COURT:  That's not the question.  You're not

08:55:37 12  responding to his argument.  His argument is this is trying

08:55:50 13  -- forget the patents for one minute.  He's saying all this

08:55:53 14  is doing is showing one thing has fewer turns, and it has

08:55:57 15  more value, and we're trying to approximate how much value

08:56:02 16  having one fewer turns is.

08:56:04 17          MR. WARE:  Your Honor, that's what Mr. Reed is

08:56:06 18  attempting to correct, but the issue with cost savings is

08:56:10 19  then he is trying to compare one thing that enjoys the

08:56:12 20  benefit with another thing that enjoys the benefit of the

08:56:16 21  patented technology, as opposed to cost savings methodology

08:56:21 22  which is where he fails, which is supposed to compare

08:56:25 23  infringing versus non-infringing, and here they're comparing

08:56:28 24  I think --

08:56:29 25          THE COURT:  Yes, but he's trying to compare as I

08:56:32 1    understand it, is infringing versus non-infringing.  He says

08:56:35 2    the infringing has one-and-a-half fewer turns, and the

08:56:39 3    non-infringing alternative that you all say would be out

08:56:42 4    there has 1.5 more turns.  And so he's comparing infringing

08:56:47 5    and non-infringing, and what he's trying to do here is to

08:56:51 6    say well, Amazon doesn't have a product because there is no

08:56:56 7    non-infringing product, so we have to come up with a

08:56:58 8    hypothetical or some way to evaluate what that amount would

08:57:02 9    be.

08:57:03 10              So we try and figure out what the value of that

08:57:05 11   extra turn for the infringing versus non-infringing is.

08:57:10 12              MR. WARE:  Well, Your Honor, then they could

08:57:12 13   have performed a survey where they compared the benefit of

08:57:15 14   the patent compared to not -- to implementing the specifics

08:57:21 15   that Dr. Johnson included for non-alternatives in --

08:57:27 16              THE COURT:  You're saying that's the only way

08:57:29 17   they could do it is a survey, there is no other way, they

08:57:32 18   can't just compare things that we know what one value is,

08:57:36 19   and we see -- we see what the value of that thing is.

08:57:42 20              MR. WARE:  That's not necessarily correct, Your

08:57:45 21   Honor, that is one way to do it.

08:57:47 22              THE COURT:  Okay.  Well they have a different

08:57:49 23   way of doing it, and you're saying well this is just wrong,

08:57:52 24   but you're not really responding -- you're more saying well

08:57:56 25   they're comparing patented to patented.  And what I

08:57:59  1    understand him to be saying is no, we're comparing patented

08:58:02  2    to unpatented, and what we're trying to do on this graph is

08:58:09  3    estimate the value that is given between the alleged

08:58:15  4    non-infringing alternative and the value of the patent.

08:58:23  5            MR. WARE:  That's what is claimed, you're

08:58:26  6    correct, Your Honor.

08:58:27  7            THE COURT:  All you're telling me is that's not

08:58:29  8    right and I don't understand what you're telling me.

08:58:32  9            MR. WARE:  Because for cost savings, he is not

08:58:35 10    again -- each one of these lines, the whole time, both of

08:58:38 11    those lines are enjoying the benefit of the 1.5 turn in a

08:58:44 12    different context.  But rather than him comparing the

08:58:48 13    benefit of the 1.5 turns in that context versus not --

08:58:55 14    versus doing these non-infringing alternatives, what he's

08:58:58 15    doing is he's comparing one way of receiving 1.5 turn

08:59:03 16    benefit to another way of receiving a 1.5 turn benefit.

08:59:07 17            THE COURT:  All right.  You guys aren't going to

08:59:09 18    have any time left to try your case at the rate you're

08:59:12 19    going.  What I am going to do is deny this motion again.  I

08:59:15 20    think that he is comparing based on the representation I

08:59:18 21    have gotten, he's comparing non-infringing to infringing,

08:59:22 22    and trying to estimate based on the information that they

08:59:26 23    have the value that the patent gives.  So I am going to

08:59:31 24    allow that.  I also think the fact that when we started this

08:59:35 25    that counsel said look, you can just decide this after the

08:59:38 1    jury has already heard this, also lends credence to the fact

08:59:43 2    that this is an issue for cross rather than an issue of

08:59:46 3    reliability.

08:59:46 4              All right.  So what's the next issue that we

08:59:49 5    have?

08:59:55 6              MR. SALMASTLIAN:  Your Honor, the issue, the

08:59:57 7    next issue is related to the document AMZ_VB_SCPRINT 74 to

09:00:05 8    77, and the issue here is this is a source code document

09:00:12 9    that Mr. Peck raised for the first time in his reply report,

09:00:16 10   but it was not for any issue related to any patent that's

09:00:20 11   currently at issue in this case.  He restricted his opinion

09:00:25 12   to be a response to paragraph 459 of Mr. Johnson

09:00:29 13   non-infringement report.  And that part of Mr. Johnson's

09:00:33 14   opinion relates to '536 patent, Claim 3.  That claim has

09:00:38 15   been long dropped, and that patent has been dropped from

09:00:41 16   this case.  And so we have no idea what Mr. Peck is going to

09:00:44 17   say about this source code document with respect to any

09:00:48 18   patent that's currently at issue in this case.

09:00:51 19             MR. SMITH:  Your Honor, Mr. Peck is a source

09:00:52 20   code expert and all he did was opine about the operation of

09:00:56 21   the source code.  His opinion is agnostic with respect to

09:01:02 22   any particular patents --

09:01:05 23             THE COURT:  So where did he say he's going to

09:01:07 24   rely on this document with respect to any issue that is

09:01:10 25   currently in the case?

09:01:11  1          MR. SMITH:  In his reply report --

09:01:14  2          THE COURT:  Show me where, because he's saying

09:01:17  3  it's not relevant to any patent left in this case.

09:01:20  4          MR. SMITH:  So in his reply report on page --

09:01:25  5  towards the bottom of page 10, if we can put that on the

09:01:29  6  screen.  It's exactly -- probably 20 percent of his report

09:01:37  7  is just on this particular file.  So of the ten page report,

09:01:41  8  two pages are about this file.  And all he's going to

09:01:44  9  testify to is exactly what he says in his report.  It's not

09:01:48 10  agnostic as to any particular patent, it's just Dr. Johnson

09:01:52 11  is saying that the Amazon Alexa works in a certain way, and

09:01:56 12  he was disputing based on code.

09:01:57 13          THE COURT:  But when you said it's agnostic, he

09:02:01 14  said this is response to '459.  What was '459?

09:02:04 15          MR. SMITH:  So if we go to '459, this was about,

09:02:09 16  then I'll quote, '459, Johnson says "Polish also accuses "a

09:02:16 17  dialog management feature that determines a context by

09:02:19 18  passing."  And he goes on from there.  And then he talks

09:02:21 19  about the context interpreter.  And the context interpreter

09:02:25 20  comes up again and again and again with respect to all of

09:02:28 21  the VoiceBox patents that are being asserted.  So

09:02:31 22  Dr. Johnson has a particular paragraph.  I'll say that his

09:02:34 23  report was 500 pages, and every single argument incorporates

09:02:39 24  everything else.  So it's basically a spiderweb of opinions

09:02:46 25  that cover everything seemingly.

09:02:50 1          THE COURT:  So a Section 459 addresses all the

09:02:53 2   patents and incorporates everything else he said?

09:02:57 3          MR. SMITH:  He said it addresses a feature which

09:02:59 4   is the context interpreter, which comes up again and again

09:03:02 5   and again through the allegations of VoiceBox in the

09:03:05 6   different patents he talks about this particular argument,

09:03:08 7   the file in this part of his report, but he's really also

09:03:13 8   just responding to something that Dr. Polish said about the

09:03:16 9   operation of Alexa, a dialogue management feature that

09:03:21 10  determines.

09:03:22 11         THE COURT:  How is he going to use this now

09:03:24 12  because it wasn't important for his infringement analysis,

09:03:26 13  he had to do it on reply, how is he going to use this?

09:03:30 14         MR. SMITH:  He's going to use it in the same way

09:03:32 15  that he had in his report where he's just --

09:03:34 16         THE COURT:  You're holding an iPad, it's really

09:03:37 17  not helpful to me to see what's on it.

09:03:40 18         MR. SMITH:  He's going to say exactly what he

09:03:43 19  said in his expert report, he's pointed out there a source

09:03:47 20  file for the rules-based context interpreter, and the fact

09:03:51 21  that Amazon is saying they don't use manual rules and they

09:03:54 22  have two pages in effect where they're saying they do, and

09:03:57 23  that is specifically dead on, it's the context interpreter

09:04:00 24  which is the heart of the infringement allegations for

09:04:03 25  several of these patents.  He's pointing out that he uses

09:04:07 1    source code analysis is inconsistent with what Amazon is

09:04:10 2    saying.

09:04:17 3                MR. SALMASTLIAN:  Your Honor, the opinion that

09:04:18 4    Mr. Peck provided has nothing to do with whether or not

09:04:21 5    Amazon uses rules, it was specifically in response to --

09:04:25 6                THE COURT:  Yes, but Amazon is now saying they

09:04:27 7    don't use rules, right?  And so why can't he say, well they

09:04:32 8    have rules.  They do have files that are relevant to rules.

09:04:36 9                MR. SALMASTLIAN:  I think the issue here, Your

09:04:37 10   Honor, is that he didn't provide an opinion on that with

09:04:40 11   respect to this code.  And we didn't have a chance --

09:04:43 12               THE COURT:  He did -- he did have an opinion but

09:04:46 13   you're saying he didn't with respect to one patent.

09:04:50 14               MR. SALMASTLIAN:  This is all with respect to

09:04:52 15   the '563 patent that has been dropped in this case.

09:04:55 16               THE COURT:  What about the fact that he said

09:04:56 17   your guy, this context, whatever interpreter comes up in all

09:05:00 18   the different patents, and everything was incorporated by

09:05:05 19   reference to everything else, so --

09:05:10 20               MR. SALMASTLIAN:  So there was no incorporation

09:05:11 21   by reference to other things, Your Honor, and the fact that

09:05:14 22   there is a module in Alexa called context interpreter does

09:05:20 23   not tell us what the opinion is about that context

09:05:24 24   interpreter with respect to any other patent where the

09:05:26 25   claims have different requirement.  So here, Dr. Polish only

09:05:31 1    addressed it with claim 3 of '536.

09:05:35 2          THE COURT:  I am going to let this go, to the

09:05:37 3    extent that it's just saying look, there is this rules-based

09:05:40 4    context interpreter, if he starts getting into much more

09:05:44 5    specifics that weren't disclosed, then you can object again

09:05:48 6    and I'll reconsider.  But I think it's fair to say that with

09:05:52 7    respect to the source code, it was disclosed that he was

09:05:55 8    going to note that there is a rules-based context

09:06:00 9    interpreter in the device.

09:06:02 10          All right.  Anything else we need to talk about?

09:06:06 11          MR. SALMASTLIAN:  There is just one other issue

09:06:07 12   Your Honor, and it might be resolved at this point, but

09:06:10 13   there was a late add source code exhibit this morning which

09:06:14 14   is Amazon -- go ahead.

09:06:16 15          MR. SMITH:  We'll withdraw that in light of your

09:06:19 16   ruling.

09:06:19 17          THE COURT:  All right.

09:06:20 18          MR. SALMASTLIAN:  Thank you.

09:06:22 19          THE COURT:  All right.  Mr. Buckson, do you want

09:06:24 20   to get the jury.

09:06:26 21          MR. YOON:  Your Honor, just one procedural point

09:06:27 22   just to let you know Your Honor, we're going to be starting

09:06:30 23   with Mr. Freeman.  The parties agreed to add some additional

09:06:34 24   testimony to Mr. DiCristo, so we'll start with Mr. Freeman

09:06:36 25   right away.  And we'll play DiCristo's testimony a little

Freeman - direct

09:06:43 1    bit later today.

09:06:44 2              THE COURT:  All right.  So I'm sorry, is Freeman

09:06:48 3    live?

09:06:48 4              MR. YOON:  Yes, he's coming live.

09:06:50 5              THE COURT:  And what was the agreement -- oh, to

09:06:52 6    Mr. DiCristo, so then you have to update the times.

09:06:56 7              MR. YOON:  They had asked us, there is no

09:06:57 8    dispute, we just have to get it done Your Honor, so to not

09:07:01 9    delay anything, we'll start with Mr. Freeman.

09:09:01 10             (Jury entering the courtroom at 9:09 a.m.)

09:09:15 11             THE COURT:  All right, everyone.  Welcome back.

09:09:24 12   Thank you for being here.  Everyone else can please be

09:09:26 13   seated.

09:09:27 14             What's next?

09:09:32 15             MR. SMITH:  Your Honor, plaintiff calls Tom

09:09:36 16   Freeman to the stand.

09:09:49 17             COURTROOM DEPUTY:  Please raise your right hand.

09:09:53 18   Please state and spell your full name for the record.

09:09:59 19             THE WITNESS:  My name is Thomas Edward Freeman,

09:10:02 20   F-R-E-E-M-A-N.

09:10:02 21             THOMAS EDWARD FREEMAN, having been duly sworn,

09:10:12 22   was examined and testified as follows:

09:10:12 23                  DIRECT EXAMINATION

09:10:12 24   BY MR. SMITH:

09:10:28 25   Q.    Good morning, Mr. Freeman.

Freeman - direct

09:10:31  1      A.      Yes, I am.

09:10:33  2      Q.      Sorry, I said, can you hear me, Mr. Freeman?

09:10:36  3      A.      Oh, can I hear you, I can indeed, thank you.

09:10:39  4      Q.      Good morning sir, how are you?

09:10:41  5      A.      I'm quite well, thank you.

09:10:42  6      Q.      Mr. Freeman, could you briefly introduce yourself to

09:10:45  7      the jury?

09:10:46  8      A.      Sure.  My name is Tom Freeman, I was born in Seattle

09:10:50  9      Washington, that's the other Washington, and that I lived

09:10:54 10      there my entire life with a short stint in Anchorage,

09:11:00 11      Alaska.  I was a co-founder of VoiceBox technologies.  And I

09:11:05 12      worked there for nine years.  And the reason I am here

09:11:09 13      today, I guess, is that I was responsible for the invention

09:11:14 14      of some of the important patents in this particular case.

09:11:19 15      Q.      Mr. Freeman, if we could just go over your background

09:11:23 16      briefly.  Did you attend college?

09:11:25 17      A.      Both graduate and undergraduate.

09:11:27 18      Q.      Where did you go?

09:11:28 19      A.      I went to the University of Washington.

09:11:30 20      Q.      Where is that?

09:11:30 21      A.      That's in Seattle, Washington.

09:11:33 22      Q.      What did you do professionally after college?

09:11:36 23      A.      I was in a technology world in which interpreting the

09:11:41 24      value of the technology to the customer was extremely

09:11:44 25      important, so I think you would call this technical sales

Freeman - direct

09:11:49 1   and technical product management.

09:11:51 2   Q.     And just generally, what sort of products were you

09:11:53 3   selling back then?

09:11:54 4   A.     Everything from database publishing to relational

09:12:01 5   databases, to holographic beam forming metamaterial

09:12:07 6   techniques, it was quite a broad world of technologies.

09:12:11 7   Q.     Do you have any formal engineering training?

09:12:14 8   A.     Oh, no, I do not, sir.

09:12:15 9   Q.     Did you learn technology on the job?

09:12:17 10  A.     I did indeed, sir, to be able to interpret it is

09:12:21 11  extremely important.

09:12:22 12  Q.     And Mr. Freeman, do you know the Kennewick brothers?

09:12:26 13  A.     I do know the Kennewick brothers, I know them well.

09:12:30 14  Q.     How did you first come to meet them?

09:12:32 15  A.     Rich and I worked together in a company called

09:12:35 16  Interleaf, which produced technical publishing software for

09:12:41 17  the '757, '767, and eventually the '787, and in that he

09:12:46 18  worked for me, and eventually I worked for him at VoiceBox.

09:12:51 19  Q.     And you mentioned VoiceBox.  How did it come about

09:12:56 20  that you guys founded that company?

09:12:58 21  A.     So the idea of being able to talk to your computer,

09:13:02 22  talk to the internet, be able to do information retrieval I

09:13:08 23  found extraordinarily compelling.  And so much so that when

09:13:12 24  we eventually began to form the company, it became clear

09:13:16 25  that, you know, early money is like yeast, and you have to

Freeman - direct

09:13:23 1   be able to, be able to address the marketplace, and in such

09:13:31 2   I invested the first $400,000, which I might add caused a

09:13:37 3   little distress in the marriage.

09:13:39 4   Q.      For you was that a lot of money?

09:13:41 5   A.      That was a significant amount of money.

09:13:43 6   Q.      And when you were going to decide to found VoiceBox

09:13:48 7   with the Kennewick brothers, and put all that money in of

09:13:53 8   your own money, were you aware of any other voice-based

09:13:56 9   computer solutions that were out there?

09:13:59 10  A.      There were a lot of people attempting there, there

09:14:02 11  was command and control systems, they would follow the menu

09:14:05 12  and say exactly the right words or nothing good would

09:14:08 13  happen.

09:14:09 14  Q.      What do you mean by command and control?

09:14:11 15  A.      So if I wanted to talk to a pharmacist, you had to be

09:14:17 16  able to say the exact words on the menu tree in order to get

09:14:24 17  to that particular destination.  As opposed to just saying

09:14:28 18  one shot and be able to say I would like to talk to a

09:14:32 19  pharmacist about my -- about the drugs that are being

09:14:36 20  assigned to me.

09:14:37 21  Q.      When you're saying talk to a pharmacist, is this

09:14:40 22  something on a computer or something like a phone?

09:14:43 23  A.      I'm sorry, this would be a telephone tree, the

09:14:46 24  primary form that this took was a telephone, telephone based

09:14:51 25  systems.

Freeman - direct

09:14:56  1    Q.      Okay.  After you founded VoiceBox with the Kennewick

09:15:00  2    brothers, did you make any sort of a product or service

09:15:05  3    initially?

09:15:06  4    A.      So, the whole notion became to develop this way that

09:15:11  5    one could talk to the internet, and talk to your computer.

09:15:14  6    And that's what the creation of Cybermind was all about.

09:15:18  7    Q.      And what was your responsibility with Cybermind back

09:15:24  8    in the early days of VoiceBox?

09:15:26  9    A.      I wore a lot of hats, but primarily what we're

09:15:30 10    talking about is, is the technology useful.  There is lots

09:15:34 11    of people creating lots of technology in which you wouldn't

09:15:37 12    cross the street in order to use.  And so the notion is that

09:15:40 13    okay, you're talking to the internet.  Why are you talking

09:15:44 14    to the Internet?  How is that useful?  How does that bring

09:15:48 15    value and make it compelling to the customer to use.

09:15:54 16    Q.      And were you responsible for any aspect of the

09:16:02 17    physical design of the Cybermind product?

09:16:04 18    A.      Yeah.  So I also wore the hat of creating the

09:16:07 19    physical head itself, the array microphones, the voice

09:16:11 20    cancelling system, the beam forming system that was inside

09:16:15 21    there because the whole system works if you have a robust

09:16:20 22    utterance that has a lot of detail in it.  And that is what

09:16:23 23    the Bluetooth implementation brought for us.

09:16:27 24    Q.      And could we -- I would like to show a video file,

09:16:35 25    543, to the witness on his screen, if we could do that?

Freeman - direct

09:16:39 1    A.       Yes, I'm seeing it.

09:16:40 2    Q.       Okay.  Well before we play this.  Mr. Freeman, are

09:16:46 3    you familiar with the video of PTX-543?

09:16:50 4    A.       I am indeed, sir.

09:16:52 5    Q.       Did you participate in the filming of that video?

09:16:56 6    A.       I was what they call in the business a talking head,

09:16:59 7    yes, sir.

09:17:01 8              MR. SMITH:  Your Honor, at this point plaintiff

09:17:02 9    would like to introduce into evidence PTX-543.

09:17:06 10             MR. HADDEN:  No objection.

09:17:08 11             THE COURT:  Thank you.  It is admitted.

09:17:08 12             (PTX Exhibit No. 543 was admitted into

09:17:08 13   evidence.)

09:17:11 14             MR. SMITH:  Mr. Smith, could you start playing

09:17:15 15   543, please?

09:17:18 16             (PTX-543 video played.)

09:17:39 17             MR. SMITH:  Can you pause that?

09:17:40 18             So Mr. Freeman, who is that individual talking

09:17:44 19   there in the video?

09:17:45 20   A.       That individual would be me, sir.

09:17:47 21   Q.       And here in this -- in the video, what were you

09:17:53 22   talking to?

09:17:54 23   A.       So that was the Cybermind, what we call the head, the

09:18:02 24   whole system together was called Cybermind because it

09:18:06 25   included the software, but that was the Bluetooth speaker

Freeman - direct

09:18:07 1    and mic.

09:18:09 2    Q.    Do you recall approximately when this video of you

09:18:13 3    and the Cybermind head was taken?

09:18:14 4    A.    Yeah, it was about 2006 that the NBC affiliate

09:18:20 5    approached us and said this would be useful to do.

09:18:23 6              MR. SMITH:  Mr. Smith, if you could continue

09:18:26 7    playing this.

09:18:27 8              (Video played.)

09:19:21 9    BY MR. SMITH:

09:20:06 10   Q.    So Mr. Freeman, I think at the end of that video, the

09:20:10 11   newscaster mentioned that there was going to be the hand

09:20:14 12   held thing out by Christmas.  And what was -- was VoiceBox

09:20:18 13   able to do that?

09:20:24 14   A.    We were not at the time.

09:20:26 15   Q.    Why not?

09:20:26 16   A.    There were compliments of issues, one was what's

09:20:30 17   called the bottom, the buildable materials to build that

09:20:36 18   thing, was expensive.  Number two, there wasn't like a post

09:20:40 19   sales revenue model to be able to bring it down.  And three,

09:20:42 20   Toyota, wonderful amazing company, approached us with a $5

09:20:42 21   million deal and said we want that technology in our cars,

09:20:52 22   so would you please defer your resources in order to do it.

09:20:56 23   Very difficult to turn down that kind of offer.

09:20:56 24   Q.    What did VoiceBox do then?

09:21:00 25   A.    What we did was, we said all right, the NLU and the

Freeman - direct

core technology we will continue to develop over time, and

we will make better but we will figure out how to shrink

this, in order to fit it into what's called the head unit of

an automobile which is the navigation unit, the infotainment

unit, the radio, heater, all that kind of stuff.

Q.      At this point, when you had decided to work with

Toyota and put the Cybermind technology into the Toyota

cars, at that point, did you give up on Cybermind?

A.      No.  Cybermind was the, the image that we were

chasing, the notion of why this would be compelling, again,

why would you cross the street.  We can make it this good in

an automobile, but we can make it this good in a living

room.

Q.      Did you work on any technical improvements for

Cybermind in that time period?

A.      The way software works, as you well know, is you just

don't put a formula into -- into software, instead you

iterate, and you iterate, and you get better, and you get

better, they're called drops, they're called -- they're

called release candidates, but yes, to answer your question,

completely.

Q.      Did you work on any potential patents at that point?

A.      We were working on ways, we believe very much in the

patent process, so we were working on ways of improving our

technology both from a recognition point of view, from an

Freeman - direct

09:22:38  1   audio path point of view, from a usefulness point of view so

09:22:43  2   that, we would patent that and be able to incorporate that

09:22:46  3   in our technology.

09:22:47  4   Q.      And Mr. Smith, I believe we can -- this has been

09:22:51  5   admitted.   Could you show JTX-001, which is the '681 patent

09:22:55  6   on the screen.

09:22:55  7           And Mr. Freeman, if you could take a look at

09:23:02  8   JTX-1, which is on the screen, and particularly in the upper

09:23:07  9   right-hand corner, do you see the last three digits of this

09:23:10  10  patent?

09:23:10  11  A.      I do, indeed.

09:23:11  12  Q.      Is this what we have been referring to as the '681

09:23:14  13  patent?

09:23:14  14  A.      This is indeed.

09:23:15  15  Q.      Are you one of the co-inventors of the '681 patent?

09:23:18  16  A.      Along with looks like 5, 4 others, yes, correct.

09:23:23  17  Q.      And what was the motivation for you and the other

09:23:28  18  co-inventors of the '681 patent to develop this?

09:23:31  19  A.      Cooperative conversation.   Voice is interesting,

09:23:35  20  right, it's like you talk, I talk, you talk, I talk.   But if

09:23:41  21  there is no purpose, if there is no goal, if we're not

09:23:44  22  trying to actually get somewhere, it's kind of jaded idol in

09:23:50  23  the garden of knowledge.   Why not be able to sharpen the

09:23:56  24  conversation, so that you're focused on actually achieving a

09:24:00  25  goal between the machine and the human.   And that's a

Freeman - direct

primary idea here.

Q.      Do you see here on the Item 22, there it says October 16, 2006, do you see that?

A.      I do.

Q.      And is that consistent with your recollection of when you filed for this patent?

A.      It's consistent with the video that we were listening to.

Q.      And at this time, had you thought about the idea of using long-term shared knowledge?

A.      Absolutely.  It turns out that when you and I have a conversation, two things happen.  One is we understand what's happening in the conversation right now.  But secondly, and importantly, you have a basis of past experience with me that makes a lot more sense.  You say I need to get to the freeway, what freeway are you talking about, are you talking about I95, or Interstate 5, there is a big difference between those two.  And that by having a long-term memory, we understand what freeway means in this particular context.

Q.      At the time that you filed the patent, were you aware of any other voice system that had that kind of long-term memory?

A.      Not to my knowledge, sir.

Q.      And what was your contribution for the '681 patent,

Freeman - direct

09:25:24 1    what role did you play?

09:25:26 2    A.      So my role was to sit there and give it the litmus

09:25:31 3    test, would this be used, why would it be used.  Are we just

09:25:34 4    having a technology chasing an idea, or is this actually

09:25:38 5    useful in the different use cases that we were talking

09:25:42 6    about, in the car, in the living room and different places.

09:25:45 7    Q.      And Mr. Smith, if could go to column 11, start around

09:25:51 8    line 10, please.

09:25:55 9            And Mr. Freeman, I moved to a section of the

09:25:58 10   patent, the '681 patent.  Do you see that on your screen

09:26:01 11   there?

09:26:02 12   A.      I do.

09:26:03 13   Q.      And in this section of the patent, it says, for

09:26:07 14   example, a user utterance of quote, what about traffic?

09:26:12 15   Close quote, may have a distinct meaning in various

09:26:18 16   contexts.  Do you see that?

09:26:18 17   A.      I do.

09:26:18 18   Q.      Is this part of the patent that you worked on?

09:26:20 19   A.      Yes, it is.

09:26:21 20   Q.      And what was the idea behind this example about

09:26:25 21   traffic?

09:26:26 22   A.      Well, if you were to look at me and say completely

09:26:29 23   cold, what about traffic, I would look at you and say I

09:26:31 24   think you're crazy.  But to be able to establish a context

09:26:38 25   about what traffic means, are we talking about music, are we

Freeman - direct

talking about a movie, did this request come from a movie

agent, did this request come from a smart television, did

this request come from a navigation system, that helps

narrow down what traffic means.  It doesn't mean you

wouldn't have a follow-up question because follow-up

questions are useful -- humans do this all the time.  But

you can make certain assumptions based on where it's coming

from, and what the user is doing, what "traffic" means in

this situation.

Q.     And would the long-term shared knowledge be helpful

for the system to figure out what was meant by traffic?

A.     Oh, yes, very much so.  How have you used this word

before, and how were you using this word before.  And so you

have not only the history of those -- of the usage of the

word traffic, but also of the different elements within

traffic itself.

Q.     And at that time when you invented the '681 patent,

what was it going to do for Cybermind in your view?

A.     It was -- so the power of the Cybermind was to make

-- to take the friction out of a conversation with a human.

So it's -- a lot of this user interface stuff is, I don't

want to repeat everything I just said, I want you to be

smart enough to understand what traffic means.  What is

traffic like on the way to the hospital?  Well if it

understands me, it understands the hospital I go to, every,

Freeman - direct

09:28:18 1    couple times a month, and it understands the route I take

09:28:23 2    every time.  Instead of saying gosh, I'm looking for traffic

09:28:26 3    information on the 520 going to Interstate 5 at the

09:28:29 4    interchange of Interstate 90, blah, blah, blah, sorry.

09:28:33 5    Q.     No, thank you.  I appreciate that.

09:28:36 6           Why don't we move to, Mr. Smith, if you could

09:28:39 7    pull up JTX-003.

09:28:44 8           And Mr. Freeman, do you see on the screen a

09:28:48 9    patent which ends in the numbers '176?

09:28:51 10   A.     I do indeed, sir.

09:28:53 11   Q.     And do you see in the left hand portion Item 75

09:28:59 12   there, you're listed as one of the inventors with Mike

09:29:02 13   Kennewick, do you see that?

09:29:03 14   A.     I do.

09:29:04 15   Q.     Did you work with Mike Kennewick on an invention that

09:29:09 16   turned into the '176 patent?

09:29:10 17   A.     I did.

09:29:11 18   Q.     And at a general level, what was the '176 about?

09:29:17 19   A.     The '176 was to start thinking of those agents, the

09:29:22 20   agents, the music agent and a movie agent and the other

09:29:27 21   kinds of things that Cybermind could do, adding to that an

09:29:32 22   advertising aspect.  So it would be like gosh, that is a

09:29:37 23   great tune, take some of you back to ring tone land, that I

09:29:41 24   would like a ring tone for that -- for Brown Eyed Girl and

09:29:45 25   be able to download that.  The world has moved on of course

Freeman - direct

09:29:49 1   since that particular technology.  But the aspect is

09:29:53 2   completely the same.

09:29:55 3   Q.     And so and what was -- so you're saying as an

09:30:02 4   example, you could tell Cybermind to play a song, and then

09:30:06 5   Cybermind might suggest that you might want to buy the ring

09:30:10 6   tone?

09:30:11 7   A.     Or I could ask it, right?  So one of the key notions

09:30:15 8   here, and how advertising expanded in the course of the time

09:30:19 9   that we were dealing with this, was that instead of it being

09:30:23 10  a one-way flow from the source -- from the radio, if you

09:30:28 11  will, into the consumer, if the world switches around where

09:30:33 12  I could say gosh, could I get a ring tone, that would be

09:30:37 13  pretty cool, and that advertising becomes interactive.

09:30:40 14  Q.     Why don't we now pull up JTX-005, please, Mr. Smith.

09:30:53 15  And Mr. Freeman, do you see that JTX-005, the upper

09:30:59 16  right-hand corner has the last three digits '097?

09:31:02 17  A.     I do.

09:31:03 18  Q.     And this one also lists you as a co-inventor with

09:31:07 19  Mike Kennewick, do you see that?

09:31:09 20  A.     I do.

09:31:10 21  Q.     What was the '097 patent about?

09:31:14 22  A.     The '097 was an -- there is a term of art you folks

09:31:18 23  use, an expansion, no, it was an expansion of our patents

09:31:21 24  that we had in the earlier ones, so it's a continuation,

09:31:25 25  that was the word I was looking for, it was a continuation

Freeman - direct

09:31:33 1    of the previous patents that we had in this advertising

09:31:38 2    space.

09:31:39 3    Q.     And when you say the previous patent we had, are you

09:31:41 4    talking about the '176 patent?

09:31:43 5    A.     I am talking about the '176.

09:31:46 6    Q.     Okay.  And one question I had for you is with respect

09:31:51 7    to the '097 patent, the '176 patent, with advertising, did

09:31:57 8    the idea of pronouns ever play a role in what you were

09:32:00 9    thinking about at the time?

09:32:02 10   A.     Yeah, if I could take you back to that part of the

09:32:06 11   conversation about removing the friction from the human to

09:32:09 12   machine interaction, part of that is as straightforward, but

09:32:15 13   technically not completely easy, of being able to substitute

09:32:20 14   a pronoun for a very long product name, a very long music

09:32:27 15   name, a very long artist, and which one doesn't want to risk

09:32:32 16   misrecognition, if you will.  So buy it, get it for me, ship

09:32:37 17   it, and these are words that add a lot of value in the

09:32:44 18   human/machine interface.

09:32:46 19   Q.     Okay.  Now, I believe that-strike that.

09:32:52 20          What was the '176 and '097 patents intended to

09:32:52 21   do for the Cybermind product?

09:33:01 22   A.     So, as I mentioned before, we had this challenge, and

09:33:04 23   that was that when you are a company, and you are trying to

09:33:04 24   produce something new and you're manufacturing it, you have

09:33:13 25   this bill of materials.  And the bill of materials are all

Freeman - direct

09:33:16 1    of the elements that go into Bluetooth, and all the elements

09:33:19 2    that go into the head, and all of the elements that you have

09:33:22 3    to require in terms of your R & D, and we were looking at

09:33:26 4    what is called a BOM cost, building and materials cost, that

09:33:33 5    once we put it in the channels was going to make it

09:33:36 6    prohibitively expensive for your average consumer, for your

09:33:41 7    above average consumer to be able to purchase.  So the

09:33:44 8    notion of being able to subsidize that by being able to have

09:33:48 9    an ad-free, or an ad-based system, being able to have people

09:33:52 10   be able to buy products in which we would get a percentage

09:33:58 11   of the opportunity, allowed us to have a post-sales business

09:34:05 12   model that would allow us to sell for less money than we

09:34:10 13   were currently thinking about doing.

09:34:12 14   Q.    So would the version of Cybermind that had ads on it

09:34:16 15   be less expensive, or more expensive than the version of

09:34:20 16   Cybermind without the ads?

09:34:21 17   A.    It would be less expensive.  And consumers became

09:34:24 18   used to this kind of model for this time period that you can

09:34:29 19   buy yourself down to a non-ad environment.

09:34:32 20   Q.    When did you leave VoiceBox?

09:34:34 21   A.    2010.

09:34:36 22   Q.    And when you left VoiceBox in 2010, had you been able

09:34:42 23   to implement the '681 patent with the long-term memory that

09:34:51 24   we talked about, and the '176 and '097 patents with the

09:34:56 25   advertising in a physical product at that point when you

09:34:59 1   left?

09:35:00 2   A.      Okay.   I'll respond carefully, because you said in a

09:35:04 3   physical product to be released.   The answer to that is no.

09:35:08 4   But the answer is, did we have point releases in engineering

09:35:12 5   that was getting us there, that software development is not

09:35:19 6   magic, sir, it is a lot of I wonder if that worked, let's

09:35:23 7   try this and you do it again and you do it again.   And

09:35:26 8   that's -- that iterative process is the process by which

09:35:32 9   software is realized.

09:35:35 10          MR. SMITH:   Thank you, Mr. Freeman.   Appreciate

09:35:38 11  your time.   I'll pass the witness.

09:35:40 12          THE WITNESS:   Thank you.

09:35:41 13          THE COURT:   Cross-exam.

09:35:43 14                  CROSS-EXAMINATION

09:35:45 15  BY MR. HADDEN:

09:35:49 16  Q.      Good morning, Mr. Freeman.

09:35:51 17  A.      Good morning.

09:35:51 18  Q.      Just to go back a little to your background, I

09:35:55 19  understand you went to the University of Washington.   What

09:35:58 20  was your degree in?

09:35:59 21  A.      So I had a liberal arts degree as an undergraduate,

09:36:02 22  and a masters of business administration from the Foster

09:36:06 23  School which is a prestige school at the University of

09:36:10 24  Washington.

09:36:10 25  Q.      And just to be clear, so you quit VoiceBox in May of

281

Freeman - cross

09:36:15 1    2010; is that correct?

09:36:18 2    A.       That is correct.

09:36:18 3    Q.       And over the ten years you spent at VoiceBox before

09:36:23 4    you quit, it's correct that VoiceBox spent more money than

09:36:28 5    it received; correct?

09:36:30 6    A.       I think it -- I'm not a subject matter expert in this

09:36:35 7    field, but I would say -- I'm not a subject matter expert in

09:36:40 8    that field.

09:36:40 9    Q.       So you don't know?

09:36:42 10   A.       It would -- I would answer yes to your question.

09:36:48 11   Q.       Now, when you left VoiceBox in 2010, VoiceBox didn't

09:36:55 12   have -- had never enabled eCommerce transactions through

09:37:01 13   voice, correct?

09:37:04 14   A.       Not true.

09:37:06 15   Q.       Excuse me?

09:37:07 16   A.       Not true.

09:37:09 17   Q.       So can --

09:37:10 18   A.       It depends what you mean, was it commercialized,

09:37:13 19   absolutely true, it was never commercialized.

09:37:16 20   Q.       Do you have a copy of your deposition, it should be

09:37:19 21   that binder there, do you remember when you were deposed in

09:37:22 22   this case, sir?  Were you able to find it there?

09:37:26 23   A.       Deposition transcript?  Sure.

09:37:33 24   Q.       I would ask you to look at page 47, lines 9

09:37:37 25   through 18.

Freeman - cross

09:37:42 1    A.        Page 47, lines 9 through?

09:37:46 2    Q.        18?

09:37:47 3    A.        18.

09:37:48 4    Q.        Do you see that?

09:37:53 5    A.        And that statement is accurate in that we never

09:37:58 6    enabled eCommerce transactions through voice, and I

09:38:03 7    interpreted your previous question is, were we actually

09:38:07 8    working on that and developing it.

09:38:08 9    Q.        So just to be clear, my question was:

09:38:11 10            Did you ever actually do it, were you ever able

09:38:15 11   to actually do it before you left in 2010, and your answer

09:38:20 12   was, you could not, right?

09:38:22 13   A.        Do it is a very uncomfortable word.  In that were we

09:38:27 14   able to demonstrate it?  Yes.  Were we able to commercialize

09:38:32 15   it?  No.

09:38:34 16   Q.        Now, could we see JTX-003, Mr. Patterson?

09:38:47 17            Now, this is one of the voice ad patents that

09:38:50 18   you're an inventor on, right, sir?

09:38:53 19   A.        Yes, sir.

09:38:52 20   Q.        And you didn't make any technical contributions to

09:38:57 21   this patent, did you?

09:39:02 22   A.        So the answer to your question is technical

09:39:10 23   contributions of -- well, did I develop an algorithm by

09:39:16 24   which engineers would at some point take and build a typical

09:39:22 25   solution, the answer is yes.  Was I an engineer who built a

Freeman - cross

09:39:26 1    technical solution, the answer is no.

09:39:29 2    Q.     So in February of 2007, when VoiceBox filed this

09:39:35 3    patent, did VoiceBox have a system that provided spoken

09:39:39 4    advertisements based on a user's utterance?

09:39:42 5    A.     In 2007 when we filed for this patent?

09:39:45 6    Q.     Correct.

09:39:46 7    A.     So in 2007 when we filed for this patent, we were

09:39:50 8    developing concept software that was certainly not ready for

09:39:57 9    the customer facing, but was proving out of thought.

09:40:02 10   Q.     Let's look at your deposition again, sir, this time

09:40:05 11   at page 174, lines 22 through 175, line 4?

09:40:18 12   A.     Page 74?

09:40:19 13   Q.     174, sir.

09:40:24 14   A.     174.  Okay, 174, what line, sir?

09:40:34 15   Q.     Do you see the question begins on line 22, and your

09:40:38 16   answer ends on line 4.  Do you see that?  Can we put up that

09:40:45 17   testimony, Mr. Patterson?

09:40:58 18           And you testified in 2007, VoiceBox did not have

09:41:25 19   such an implementation; correct?

09:41:28 20   A.     Certainly one that was not commercially available.

09:41:32 21   Q.     You didn't say anything about commercially available

09:41:34 22   in your sworn testimony, did you sir?

09:41:38 23   A.     I did not.  Implementation is a vague word.

09:41:42 24   Q.     I'm sorry, I didn't hear you?

09:41:45 25   A.     I was just saying that implementation is a very broad

Freeman - cross

09:41:48 1    word.

09:41:48 2    Q.    Let's look at the patent again, please,

09:41:51 3    Mr. Patterson, JTX-003.  And let's look at Claim 40.

09:42:05 4           Did you invent a conversational language

09:42:10 5    processor?

09:42:12 6    A.    Did I invent a conversational language processor?

09:42:15 7    Q.    Yes, sir.

09:42:15 8    A.    I did not.

09:42:16 9    Q.    Did you invent an adaptive misrecognition engine,

09:42:21 10   sir?

09:42:29 11   A.    So did I outline what the algorithm would be to make

09:42:32 12   it useful.  The answer is yes.  Did I write the code, the

09:42:35 13   answer is no.

09:42:37 14   Q.    Can you describe for me what the algorithm is that

09:42:42 15   you developed for an adaptive misrecognition engine?

09:42:45 16   A.    So it is about where the utterance comes from and

09:42:49 17   what the purpose of the utterance is.  For instance, if

09:42:51 18   you're in a distributed environment, and you have a

09:42:55 19   navigation system and that you're picking up the words about

09:43:00 20   traffic from a navigation system, that's telling you in an

09:43:00 21   enormous amount of information about what the word traffic

09:43:06 22   means in that particular context, poison IV and Poison Ivy

09:43:16 23   are phenetically extremely close to each other, but one

09:43:16 24   comes from medical, and one comes from a gardening app, then

09:43:21 25   you have a clue as to what that information means.  So even

09:43:25 1   though it might be misrecognized originally, that because of

09:43:30 2   the source of the information you're able to say, that's

09:43:35 3   probably about a medical situation, and not about a

09:43:39 4   gardening situation.

09:43:40 5   Q.      And that's the algorithm that is in this patent?

09:43:48 6   A.      So that -- so the algorithm in this patent is about

09:43:51 7   what it is that the engineers are going to be sent off in

09:43:57 8   order to build, in order to make the rest of the situation

09:44:00 9   compelling.

09:44:01 10  Q.      And what you told the engineers to build is what you

09:44:06 11  just described to the jury?

09:44:07 12  A.      Say again?

09:44:08 13  Q.      What you told the engineers to build is what you just

09:44:12 14  described to the jury?

09:44:13 15  A.      Yes, sir.

09:44:13 16  Q.      Thank you.

09:44:14 17          Let's look at DTX -- I'm sorry, JTX-005, please,

09:44:21 18  Mr. Patterson.  And this is the '097 patent that you were

09:44:27 19  asked about by your counsel, do you recall that, sir?

09:44:30 20  A.      Yes.

09:44:30 21  Q.      And could we go to Claim 23, please, Mr. Patterson?

09:44:35 22          And this is the claim that talks about pronouns.

09:44:45 23  Do you remember being asked about pronouns by your counsel,

09:44:45 24  sir?

09:44:45 25  A.      I do.

Freeman - cross

09:44:49  1   Q.      Did you invent a way for a computer to understand the

09:44:52  2   meaning of a pronoun?

09:44:56  3   A.      So what I did was to say we have a requirement here

09:45:01  4   for pronouns to be able to take -- to be able to substitute

09:45:07  5   for the actual nouns in this situation.  How you do it in

09:45:11  6   engineering, I don't have a dog in this fight, I don't care,

09:45:14  7   but you need to be able to do this.  Engineering in

09:45:16  8   response, of course, will come up with 5, 10, 15, 20

09:45:21  9   different ways of doing this, and we'll evaluate them

09:45:24 10   accordingly.

09:45:25 11   Q.      Just to be clear, you didn't invent a way for a

09:45:27 12   computer to understand the meaning of a pronoun, correct?

09:45:31 13   A.      I said, sure, I agree.

09:45:37 14   Q.      Let's look at -- there is a document in your binder,

09:45:41 15   sir, DTX-102, it's in the binder that we gave you.

09:45:47 16   A.      DTX-102?

09:45:50 17   Q.      Yes, sir.

09:45:51 18   A.      Yes.

09:45:53 19   Q.      Okay.  Do you recognize that document, sir?

09:45:55 20   A.      I do.

09:45:58 21          MR. HADDEN:  Move DTX-102 into evidence, Your

09:46:02 22   Honor.

09:46:02 23          MR. SMITH:  No objection.

09:46:04 24          THE COURT:  Thank you.  It is admitted.

09:46:06 25          (DTX Exhibit No. 102 was admitted into

09:46:08 1   evidence.)

09:46:08 2   BY MR. HADDEN:

09:46:09 3   Q.      So this is a paper that you wrote with Mr. Baldwin,

09:46:14 4   another inventor on the '681 patent.  Is that correct?

09:46:17 5   A.      That is correct.

09:46:18 6   Q.      And you wrote this paper with Mr. Baldwin, it's a

09:46:25 7   marketing material for VoiceBox, correct?

09:46:27 8   A.      It was a vision piece, correct.

09:46:34 9   Q.      If we look at page 6 of this paper.  Can you move to

09:46:41 10  that Mr. Patterson?

09:46:42 11            At the top is a heading cooperative

09:46:45 12  conversation.  Do you see that, sir?

09:46:46 13  A.      I do.

09:46:48 14  Q.      And then it goes on and it says what is a cooperative

09:46:53 15  conversation, and you wrote in this paper that the

09:46:56 16  cooperative principle was first described by Paul Grice in

09:47:01 17  1975.  Do you see that?

09:47:04 18  A.      I do.

09:47:04 19  Q.      And the cooperative principle is what you were

09:47:07 20  talking about with your counsel, where people need to work

09:47:12 21  together to get to some goal in their conversations,

09:47:14 22  correct?

09:47:15 23  A.      Correct.

09:47:15 24  Q.      And that idea that you're talking about with your

09:47:19 25  counsel, you got from this paper from Mr. Grice, right?

Freeman - cross

09:47:22 1   A.      Correct.

09:47:23 2   Q.      And if we look lower down, if we could go down to --

09:47:30 3   so if we highlight the paragraph that begins a cooperative

09:47:33 4   conversation, and the material just below it, it would be

09:47:36 5   the second paragraph, Mr. Patterson.

09:47:40 6          There is --

09:47:41 7          MR. SMITH:  I object, I think referencing this

09:47:45 8   is Mr. Patterson, if we could clarify Mr. Freeman for the

09:47:50 9   record.

09:47:50 10         MR. HADDEN:  I was talking to Mr. Patterson who

09:47:52 11  is --

09:47:53 12         THE COURT:  Don't talk to each other, talk to

09:47:55 13  me.

09:47:55 14         MR. HADDEN:  Sorry, Your Honor.  I did not mean

09:47:58 15  to misstate your name.  I was talking to Mr. Patterson, sir.

09:48:03 16         THE WITNESS:  No offense taken.

09:48:05 17  BY MR. HADDEN:

09:48:05 18  Q.      If we look at this from this paper you wrote with

09:48:08 19  Mr. Baldwin, you're laying out here the principle of a

09:48:12 20  cooperative conversation that Mr. Grice described in his

09:48:12 21  paper in 1975, right?

09:48:17 22  A.      Correct.

09:48:18 23  Q.      And that included this notion of the parties in a

09:48:25 24  conversation using shared knowledge, right?

09:48:28 25  A.      Correct again.

Freeman - cross

Q.      And that included both long-term shared knowledge and short-term shared knowledge, correct?

A.      Correct.

Q.      And so the notion of -- the importance of using long-term and short-term shared knowledge to understand what is being said in a conversation is something that you got from Mr. Grice; right?

A.      This was part of the intellectual averment, and this was a very useful way of sharpening our vocabulary around this, the answer is yes, sir.

Q.      I just want to be clear, this was Mr. Grice's idea, that wasn't your idea?

A.      Correct.

Q.      And then it talks about hypothesis building, intent determination, that also came from Mr. Grice's paper?

A.      Correct.

Q.      And adaptive response, that also came from Mr. Grice's paper?

A.      Correct.

Q.      And this marketing paper where you describe these principles that Mr. Grice had laid out, this is essentially the '681 patent in ordinary language, right?

A.      So this is '681 but '681 takes this to a machine, as opposed to human to human.

Q.      So what you did in the '681 patent is you said let's

Freeman - cross

09:49:52 1    take all these ideas from Mr. Grice about a cooperative

09:49:57 2    conversation, and let's propose that we should do the same

09:50:00 3    thing when we talk to computers; right?

09:50:05 4    A.      Yes, sir.  And he's attributed in the '681.

09:50:11 5    Q.      Actually when you went -- here in this paper you cite

09:50:14 6    to Mr. Grice, if you look at the references in the back, can

09:50:18 7    we look at page 7, please, Mr. Patterson, and blow up that

09:50:22 8    first reference there.

09:50:24 9            You credit Mr. Grice's paper here in this

09:50:31 10   marking material you wrote, correct?

09:50:33 11   A.      Yes.

09:50:34 12   Q.      But when you filed the '681 patent, you didn't say

09:50:40 13   anything about Mr. Grice, did you?

09:50:41 14   A.      We attributed the view paper, and the view paper

09:50:44 15   attributes this.

09:50:45 16   Q.      There was nothing in the patent itself that says that

09:50:47 17   these ideas about using long-term shared knowledge and

09:50:51 18   short-term shared knowledge and intent determination and

09:50:55 19   adapting a response, that that all came from Mr. Grice,

09:50:59 20   that's not anywhere in your patent, is it?

09:51:02 21   A.      Well, it is attributed to the -- the paper is

09:51:06 22   attributed, and the paper attributes that.

09:51:10 23   Q.      So you're saying -- just to be clear, Mr. Grice's

09:51:17 24   article did not provide --

09:51:21 25   A.      Say again?

Freeman - cross

09:51:22 1    Q.      Mr. Grice's article that you got all these ideas

09:51:25 2    from, you did not provide that to the Patent Office during

09:51:30 3    the prosecution of the '681 patent, correct?

09:51:35 4    A.      It was included by reference.

09:51:36 5    Q.      Well it wasn't included by reference, what was

09:51:39 6    included by reference was your view paper?

09:51:41 7    A.      Correct.

09:51:41 8    Q.      There is no reference in the '681 patent to

09:51:45 9    Mr. Grice, or the paper you copied those ideas from,

09:51:50 10   correct?

09:51:52 11   A.      There was no attempt to deny Mr. Grice's

09:51:56 12   contribution.

09:51:56 13   Q.      I understand that, sir, and I'm not saying you were

09:52:00 14   attempting to deny his contribution, I just want to state

09:52:03 15   the facts.  The fact is that the patent that you filed, the

09:52:06 16   '681 patent, doesn't say anywhere that these ideas came from

09:52:12 17   Mr. Grice, correct?

09:52:14 18   A.      I disagree.

09:52:19 19   Q.      Well, do you want to look at the patent and show me

09:52:22 20   where Mr. Grice's name appears?

09:52:22 21   A.      So it is in the reference to the view paper, and the

09:52:29 22   view paper attributes him.

09:52:31 23   Q.      So you're saying if someone found the view paper and

09:52:35 24   read it, they would figure out that actually these ideas

09:52:38 25   came from Mr. Grice, but you didn't tell the Patent Office

09:52:41  1  that, correct?

09:52:43  2  A.      We were talking about implementing a lot of these

09:52:47  3  ideas in a machine, and that as such, that was less

09:52:52  4  important.

09:52:57  5          MR. HADDEN:  I have no further questions.  Thank

09:52:58  6  you for your time.

09:53:00  7          THE WITNESS:  Thank you.

09:53:00  8          THE COURT:  All right.  Thank you.

09:53:01  9          Redirect.

09:53:04 10          MR. SMITH:  No redirect.  Thank you.

09:53:06 11          THE COURT:  All right.  Thank you, sir.  You are

09:53:08 12  excused.

09:53:09 13          THE WITNESS:  Thank you.

09:53:10 14          THE COURT:  What's next?

09:53:13 15          MR. YOON:  Your Honor, at this time, we are

09:53:15 16  going to call by deposition, Kelly Vanee, who was the former

09:53:23 17  Vice-President of Learning and Engineering at Amazon.

09:53:31 18          (Videotape deposition of Kelly Vanee:)

09:53:44 19  Q.      -- PowerPoint presentation with a Bates number ending

09:53:46 20  in 44736?

09:53:49 21  A.      Oh, there we go.  Yep, it's open now.

09:53:52 22  Q.      Well, do you recognize Exhibit 226 to be a slide deck

09:53:57 23  that you presented at Amazon?

09:53:59 24  A.      Yes, this is a slide deck that I helped author and

09:54:02 25  present.

Polish - direct

09:54:04 1    Q.        And do you recall when you presented this slide deck?

09:54:09 2    A.        This was presented numerous times throughout the --

09:54:13 3    the history of Alexa.   And it was -- the presentation was

09:54:17 4    recorded and watched by a large number of individuals, as

09:54:23 5    well.

09:54:34 6                        (End of videotape. )

09:54:36 7                        MR. YOON:   Your Honor, at this time, we move

09:54:39 8    into evidence PTX-226.

09:54:42 9                        MR. HADDEN:   No objection.

09:54:46 10                       THE COURT:   All right.   It's admitted.

09:54:48 11                       (PTX Exhibit No. 226 was admitted into

09:54:49 12   evidence.)

09:54:49 13                       MR. YOON:   And Your Honor, at this time,

09:54:53 14   VoiceBox will call its expert, Nathaniel Polish.

09:55:00 15                       THE COURT:   Okay.

09:55:08 16                       COURTROOM DEPUTY:   Please raise your right hand.

09:55:14 17   Please state and spell your full name for the record.

09:55:44 18                       THE WITNESS:   Nathaniel Polish,

09:55:46 19   N-A-T-H-A-N-I-E-L, P-O-L-I-S-H.

09:55:52 20                       NATHANIEL POLISH, having been duly sworn, was

09:55:52 21   examined and testified as follows:

09:56:02 22                       DIRECT EXAMINATION

09:56:02 23   BY MR. YOON:

09:56:02 24   Q.        Good morning, Dr. Polish.

09:56:10 25   A.        Good morning.

Polish - direct

09:56:11  1    Q.      Could you please introduce yourself to the jury?

09:56:14  2    A.      Sure.  My name is Nathaniel Polish.  I'm from New

09:56:20  3    York City, and I'm here to testify on behalf of VB Assets.

09:56:26  4    Q.      And if we could have PDX-32 on the screen.

09:56:32  5    Dr. Polish, could you briefly describe your educational

09:56:35  6    background?

09:56:36  7    A.      Sure.  I have a bachelor's in physics from Columbia,

09:56:40  8    and I have a Ph.D. in computer science from Columbia.  My

09:56:44  9    Ph.D. work was in computer speech.

09:56:47 10    Q.      And Dr. Polish, could you briefly describe your

09:56:50 11    professional experience?

09:56:51 12    A.      Sure.  Outside of -- as soon as I got done with high

09:56:55 13    school, I started with a consulting firm called Daedalus

09:57:02 14    Technology Group, it's a research and development outsource

09:57:04 15    for other companies, companies coming to me and ask me to

09:57:06 16    help them create new technologies, and we and a team of

09:57:11 17    engineers produce prototypes and early stage concepts for

09:57:15 18    the clients.

09:57:16 19    Q.      And Dr. Polish, could you briefly describe your

09:57:18 20    professional experience?

09:57:20 21    A.      Yeah.  So in addition to Daedalus, I from time to

09:57:25 22    time start companies that commercialize technologies that I

09:57:27 23    invent.  I have probably done that seven or eight times over

09:57:32 24    the last forty years.  Two of the companies relevant to

09:57:36 25    here, one of them is SimplicITY, which developed a

09:57:40 1  conversational speech access to databases, particularly from

09:57:45 2  music and eCommerce in the late '90s.  And also I recall

09:57:50 3  that was doing linking of note taking applications to things

09:57:55 4  like audio and video recordings.

09:57:58 5  Q.     And Dr. Polish, are you a named inventor on any

09:58:02 6  patents?

09:58:02 7  A.     Yes.  My work has resulted in I think, at this time,

09:58:05 8  10 patents, there are a few others pending.  And at least

09:58:09 9  one of them involves conversational speech systems.

09:58:12 10          MR. YOON:  Your Honor, at this time we would

09:58:14 11  like to offer Dr. Polish as an expert on interactive voice

09:58:17 12  and speech technology.

09:58:18 13          MR. HADDEN:  No objection.

09:58:19 14          THE COURT:  All right.  Thank you.  He'll be

09:58:20 15  recognized as such.  There is an echo going on.  Maybe you

09:58:25 16  can turn down the volume or something.

09:58:30 17          THE WITNESS:  How is it now?  Is it better?

09:58:32 18          MR. YOON:  Is that better, Your Honor?

09:58:38 19  BY MR. YOON:

09:58:39 20  Q.     If we could go to PDX slide 3 on the screen.

09:58:42 21  Dr. Polish, in general, what areas of technology do the

09:58:42 22  patents in this case relate to?

09:58:48 23  A.     So the patents relate to systems that are conversant

09:58:55 24  systems where a person is talking to a computer, and the

09:59:00 25  computer is talking back, and there is some conversation

Polish - direct

09:59:03 1  that goes on for some particular purpose, in some cases,

09:59:07 2  involving eCommerce.

09:59:10 3  Q.      And if we could have PDX slide four.  Dr. Polish,

09:59:16 4  what have you been asked to do in this case?

09:59:23 5  A.      So I was asked to look at the patents, look at the

09:59:25 6  accused products, and determine whether I believe that there

09:59:28 7  was infringement of those -- of those patents by those

09:59:32 8  products.

09:59:32 9  Q.      And what did you do to prepare yourself to offer such

09:59:37 10 an opinion?

09:59:37 11 A.      I looked at a lot of documents.  I reviewed the

09:59:40 12 patents.  I looked at the prosecution histories.

09:59:43 13 Prosecution histories are the interaction between the

09:59:46 14 patentee and the Patent Office as part of getting the

09:59:49 15 patent.  I looked at the Court's claim construction order.

09:59:52 16 I looked at PTAB rulings, I used Alexa extensively.  I

09:59:55 17 reviewed many technical documents provided to me in the case

10:00:04 18 relating to Alexa, and then I confirmed my analysis with

10:00:08 19 source code.  And I ultimately compared the claims of the

10:00:11 20 patents to the Alexa system.

10:00:14 21 Q.      And if I could have PDX slide five.

10:00:16 22         Dr. Polish, as part of your analysis, did you

10:00:22 23 review the Court's claim construction of certain claim terms

10:00:28 24 with respect to the four patents?

10:00:29 25 A.      I did.

Polish - direct

10:00:30 1    Q.      And for example, do you see there is a reference

10:00:33 2    there to speech recognition engine/speech recognition?

10:00:38 3    A.      Yes.

10:00:38 4    Q.      And for illustration, do you see that it's software

10:00:42 5    or hardware that recognizes the words or phrases in the

10:00:46 6    natural language utterance?

10:00:47 7    A.      Yes.

10:00:47 8    Q.      And in your analysis, did you apply the Court's claim

10:00:52 9    construction to your infringement analysis?

10:00:53 10   A.      I did.

10:00:56 11   Q.      Now, Dr. Polish, if a claim term was not expressly

10:01:01 12   interpreted by the Court, did you apply the ordinary meaning

10:01:06 13   of claim terms to a person of ordinary skill in the field?

10:01:09 14   A.      Yes, I did.

10:01:10 15   Q.      If we could have slide six on the screen.

10:01:13 16           And Dr. Polish, in your opinion, what's the

10:01:17 17   level of ordinary skill in the art with respect to the four

10:01:20 18   patents?

10:01:20 19   A.      So, a person of ordinary skill in my view, is

10:01:25 20   somebody who has a bachelor's degree in computer science or

10:01:28 21   related field, plus two years of practical experience in

10:01:32 22   various kinds of speech systems.  You could trade some of

10:01:39 23   that off with more education or more experience, but this is

10:01:42 24   approximately the level of skill that you would need to

10:01:45 25   understand the patents.

Polish - direct

10:01:46 1    Q.      And is it your understanding that the patents were

10:01:49 2    written for people of such skill?

10:01:51 3    A.      Yes.

10:01:51 4    Q.      And that would be the background of someone reading

10:01:54 5    the patent?

10:01:55 6    A.      Yes, that's right.

10:01:57 7    Q.      And if we could now have on the screen JTX-1, the

10:02:05 8    '681 patent.

10:02:09 9            And Dr. Polish, what conclusions have you

10:02:14 10   reached regarding Claim 13 of the '681 patent?

10:02:19 11   A.      My conclusion is that the Alexa products infringe

10:02:22 12   Claim 13 of the '681 patent.

10:02:25 13   Q.      And if we could now have on the screen the '176 and

10:02:31 14   '097 patents.

10:02:34 15           And Dr. Polish, with respect to the asserted

10:02:39 16   claims to each of the patents in this case, what are the

10:02:42 17   opinions that you have reached with respect to whether or

10:02:45 18   not Alexa infringes those patents?

10:02:46 19   A.      So the asserted claims of each of those patents are

10:02:49 20   infringed by the Alexa systems.

10:02:52 21   Q.      In particular Alexa Shopping?

10:02:54 22   A.      Yes.

10:02:59 23   Q.      And let's go specifically, if we could have just the

10:03:01 24   '176 patent on the screen.  And what conclusions have you

10:03:05 25   reached with respect to Claim 40 of the '176 patent?

Polish - direct

10:03:09 1    A.      Claim 40 is infringed by the Alexa systems.

10:03:17 2    Q.      And looking at -- would that be Alexa Shopping?

10:03:23 3    A.      Yes.

10:03:23 4    Q.      Looking at the '097 patent, what conclusions have you

10:03:27 5    reached with regard to Claim 23 of the '097 patent?

10:03:31 6    A.      That Claim 23 is infringed by the Alexa Shopping

10:03:35 7    systems.

10:03:36 8    Q.      And if we could have the '703 patent on the screen.

10:03:41 9    And sir, what conclusions have you reached regarding Claim

10:03:44 10   25 of the '703 patent?

10:03:46 11   A.      Claim 25 is infringed by the Alexa Shopping system.

10:03:50 12   Q.      And Dr. Polish, we're going to walk through element

10:03:53 13   by element, your infringement analysis for those patents

10:03:56 14   shortly, but let's talk a little bit about the background

10:03:59 15   for each patent.

10:04:00 16              If we could have on the screen the '681 patent.

10:04:10 17   If we could turn to column one, lines 7 to 8 of the '681

10:04:15 18   patent.

10:04:16 19              And -- I'm sorry, column one lines 5 to 9, I

10:04:22 20   apologize.

10:04:22 21              What was the field of invention for the '681

10:04:25 22   patent?

10:04:25 23   A.      Well the invention relates to a cooperative

10:04:30 24   conversation model for human to machine voice.

10:04:34 25   Q.      And the '681 patent you understand relates to a

Polish - direct

10:04:38 1    machine voice user interface, correct?

10:04:41 2    A.      That's right.

10:04:44 3    Q.      And what is a cooperative conversation model, sir?

10:04:47 4    A.      A cooperative conversation model is some kind of

10:04:51 5    model that represents an expected dialogue between a user

10:04:55 6    and a computer.  So it's something that represents what

10:05:00 7    interaction would be expected between the human and the

10:05:03 8    computer for some particular purpose.

10:05:06 9    Q.      And if we could now have Figure 1 of the '681 patent.

10:05:11 10   And column six lines 64 and 65.  Dr. Polish, can you

10:05:20 11   describe the system disclosed in the '681 patent?

10:05:23 12   A.      Sure, so this block diagram, a very high level

10:05:31 13   diagram of how this all works.  In the upper left is what's

10:05:35 14   labeled as input, that's the human speech that comes in.

10:05:38 15   The next box is labeled ASR, Automatic Speech Recognition

10:05:43 16   that converts it, converts the speech into some form of

10:05:47 17   text.  Then there is a Conversational Language Processor

10:05:51 18   which is, also can be an NLU or Natural Language

10:05:55 19   Understanding processor that seeks to understand what the

10:05:58 20   text is talking about.  And that, in combination with

10:06:02 21   applications and databases, tries to understand what the

10:06:08 22   user's intentions or goals are, and ultimately constructs an

10:06:14 23   output which goes out on the left as generated speech.

10:06:17 24   Q.      If we could now have Figure 3 of the '681 patent, and

10:06:24 25   column seven, lines 1 to 3.

Polish - direct

**Dr. Polish, what's shown in Figure 3?**

A.      So this is a little bit of a drill down on how the models work for a cooperative conversations.  It's showing the input is coming in from the bottom, that's some kind of recognized speech, and then that is combined with shared knowledge, that is to say knowledge from prior utterances or prior conversations, it's combined with that, it's combined with some kind of hypothesis builder where it's making guesses if you will, intelligent guesses as to what the user means.  And then based on that, it comes up with some kind of a response.

Q.      And if we could now have column four, lines 45 to 50 and column five, lines 25 to 30 of the '681 patent on the screen.

**Dr. Polish, how is shared knowledge used by the system in the '681 patent?**

A.      So the '681 patent talks about several different kinds of shared knowledge.  They referred to long-term shared knowledge, and short-term shared knowledge. Generally, the knowledge is used, is combined with new utterances that comes in to try to figure out what the intention of the user is.

Q.      And if we could focus on, for example, lines 53 to 55, does the patent describe short-term shared knowledge?

A.      Yes, it does.

Polish - direct

10:08:10 1    Q.      And what does it say?

10:08:12 2    A.      So short-term shared knowledge is accumulated during

10:08:16 3    a single conversation.  So if you're engaged in a

10:08:20 4    conversation with a computer that's a multiple interaction

10:08:24 5    with the computer, from interaction to interaction, that's

10:08:29 6    short-term knowledge.

10:08:30 7    Q.      And if we look at lines 63 to 65, do you see there is

10:08:35 8    a reference there to build long-term shared knowledge?

10:08:38 9    A.      Yes.

10:08:39 10   Q.      How does the '681 describe how long-term shared

10:08:43 11   knowledge can be built?

10:08:44 12   A.      So long-term shared knowledge, is knowledge about the

10:08:47 13   user that extends over multiple conversations, so it would

10:08:54 14   be things about the user that presumably don't change, it

10:08:57 15   might involve where their device is, it might involve the

10:09:01 16   acoustics of their room, it might involve their profile in

10:09:05 17   some other way that would help with the conversation.

10:09:08 18   Q.      And if we could now look at Figure 3 and have column

10:09:13 19   13, lines 31 to 36 on the screen.

10:09:19 20           And does the '681 patent describe how long-term

10:09:25 21   and short-term shared knowledge can be used?

10:09:28 22   A.      Yes, so it talks about that for long-term and

10:09:34 23   short-term shared knowledge, it accumulates over a single

10:09:38 24   conversation to help build user profiles, other information

10:09:42 25   about the user.

Polish - direct

10:09:43  1    Q.      And what is the benefit of using long-term and
10:09:50  2    short-term shared knowledge?
10:09:51  3    A.      There is a lot of benefits to it.  It generally
10:09:55  4    streamlines the conversations.  It means that the user
10:09:58  5    doesn't have to keep repeating themselves because you have
10:10:01  6    already set a context of what you're looking for, so you
10:10:04  7    don't have to keep saying the context over and over again.
10:10:07  8    It streamlines the conversation, it makes errors less likely
10:10:11  9    because you're interpreting things from the point of view of
10:10:15  10   what's come before.  With long-term knowledge, you might
10:10:18  11   have information about whether someone is an expert or a
10:10:22  12   novice, or whether they're a native English speaker or
10:10:25  13   something of that nature.
10:10:26  14   Q.      Would the '681 patent reduce the number of turns or
10:10:30  15   interactions a user would have to have in order to get
10:10:35  16   something done?
10:10:35  17   A.      Yes, it would streamline a number of things including
10:10:38  18   the number of times you would have to go around.
10:10:40  19   Q.      And if we could now discuss the '176 and '097 patent
10:10:42  20   together.  And for convenience sake, Dr. Polish, you
10:10:42  21   understand that the '176 patent and '097 patent share the
10:10:52  22   same specification?
10:10:52  23   A.      Yes, I do.
10:10:52  24   Q.      And so I'll just for convenience, direct you to where
10:10:52  25   it is in the '176 patent, but I'll be asking you about both.

Polish - direct

10:11:03 1    A.      Okay.

10:11:04 2    Q.      If I could go to column one, lines 8 to 10 of the

10:11:08 3    '176 patent.   What is the field of invention for the '176

10:11:13 4    and '097 patents?

10:11:15 5    A.      So the field of the invention of these patents is

10:11:18 6    selecting and presenting advertisements based on natural

10:11:22 7    language processing of voice-based input.

10:11:26 8    Q.      And if we could have Figure 1, column two, lines 50

10:11:30 9    to 53 on the screen.   And looking at Figure 1 of the '176

10:11:37 10   and '097 patent, can you describe the system disclosed in

10:11:41 11   those patents?

10:11:43 12   A.      Sure, similar to what we saw before, the input, which

10:11:47 13   is human speech, is on the upper left connecting to an ASR,

10:11:55 14   which connects to a Conversational Language Processor or

10:12:02 15   NLU.   This then connects to applications including an

10:12:06 16   advertising application and connects to databases.   From

10:12:12 17   that, output is generated and sent to the user in the form

10:12:17 18   of vocalized speech.

10:12:23 19   Q.      If we could also have Figure 1, column 4, lines 17 to

10:12:29 20   34, if you could move it down a little it.   Column 17 is cut

10:13:11 21   in half.

10:13:12 22          Dr. Polish, does the '176 and '097 patent

10:13:16 23   explain how the Conversational Language Processor operates?

10:13:20 24   A.      Yes, it describes it here, it talks about long-term

10:13:22 25   and short-term knowledge.   And using that to understand the

Polish - direct

10:13:29 1    current utterance.

10:13:31 2    Q.      And looking at line 25, do you see the statement "for

10:13:36 3    example, Conversational Language Processor 120 may use

10:13:41 4    context determination model 130 to establish context for a

10:13:48 5    current utterance by having domain agents."  Do you see

10:13:52 6    that?

10:13:52 7    A.      Yes.

10:13:52 8    Q.      What is a domain agent?

10:13:55 9    A.      A domain agent is some piece of code that is

10:13:59 10   associated with a particular topic area.  So the domain

10:14:02 11   might be shopping, it might be weather.  It might be travel.

10:14:07 12   But it's some topic area where the interactions with the

10:14:12 13   users make sense to group them together within a single

10:14:16 14   module.

10:14:16 15   Q.      Do you see there is a reference there to scoring

10:14:20 16   possible interpretations and selecting a highest scoring

10:14:23 17   interpretation?

10:14:24 18   A.      Yes.

10:14:25 19   Q.      What do you understand that to be part of?

10:14:29 20   A.      So these systems are not -- they're not ever

10:14:34 21   completely sure about themselves, I mean, sometimes they may

10:14:37 22   be, but usually they operate with competing hypotheses.  So

10:14:42 23   someone is talking to it, and it thinks they're probably

10:14:45 24   talking about the weather, but maybe they're talking about

10:14:48 25   travel.  So it will often maintain a collection of competing

Polish - direct

10:14:55 1   hypotheses with different levels of confidence.  And this is

10:15:00 2   talking about generating those different hypotheses and

10:15:06 3   scoring them.

10:15:06 4   Q.    Briefly talking about Alexa for a moment, we'll get

10:15:09 5   into more detail later, does Alexa have domains?

10:15:12 6   A.    Yes, it does.

10:15:13 7   Q.    And does Alexa score possible interpretations and

10:15:17 8   select the highest?

10:15:18 9   A.    Yes, it does.

10:15:19 10  Q.    Now, if we could now go to Figure 1 and column four,

10:15:25 11  lines 55 -- 45 to 55.  Do the '176 and '097 patents explain

10:15:36 12  how the Conversational Language Processor can adapt to

10:15:40 13  incorrect interpretation?

10:15:42 14  A.    Yes.  It describes how it can support, essentially

10:15:48 15  changing its mind about a given hypothesis, deciding that

10:15:54 16  what it thought was going on was actually wrong and it

10:15:57 17  should do something else.

10:15:58 18  Q.    If we could go to Figure 2, and column two, lines 53

10:16:04 19  to 54.  Figure 2.

10:16:12 20        Dr. Polish, what's shown in Figure 2 of the '176

10:16:18 21  and '097 patents?

10:16:20 22  A.    So, this is talking about an advertising server, so

10:16:27 23  this is how an advertiser might create advertisements that

10:16:34 24  would be used within the system.

10:16:38 25  Q.    And if we could now have Figure 2, column two, lines

Polish - direct

10:16:45 1    7 to 12 on the screen.  Does the '176 patent provide

10:16:50 2    examples of the types of ads that may be used, or how ads

10:16:55 3    may be selected?

10:16:58 4    A.     Yes, it talks about ways in which ads could be

10:17:02 5    selected based upon any number of things, including user

10:17:07 6    profiles, demographics, so that things would be served to a

10:17:11 7    user that would be appropriate to their needs or might be

10:17:15 8    more likely to be purchased than some other offering.

10:17:23 9    Q.     And if we could have column two, lines 21 to 25 on

10:17:30 10   the screen.

10:17:58 11          Does the '176 and '097 patents provide examples

10:18:15 12   of the types of advertisements that can be used by the

10:18:20 13   system?

10:18:20 14   A.     Yes.  They talk, for example, about the

10:18:25 15   advertisements could include sponsored messages, purchase

10:18:29 16   opportunities, other marketing communications.  It would be

10:18:34 17   -- it could be a pretty broad range of things, but

10:18:38 18   importantly, it could be just any kind of message that is

10:18:42 19   offering a purchase.

10:18:42 20   Q.     If we can now go to Figure 3, column two, lines 55 to

10:18:51 21   57.

10:18:52 22          Dr. Polish, what's shown in Figure 3 of the '176

10:18:52 23   and '097 patents?

10:19:02 24   A.     So this is a flow chart that is showing roughly what

10:19:02 25   happens when voice input is received where voice input comes

Polish - direct

10:19:14  1   in at the top, it's identified and then -- and then an ad is

10:19:21  2   chosen, and it's then presented to the user in the form of

10:19:28  3   speech.  And then -- and then the user can interact with

10:19:33  4   that, with that advertisement, presumably to purchase

10:19:37  5   something or ask a follow-up question or something like

10:19:40  6   that.  And then action is taken based on that.  And it can

10:19:44  7   loop where it continues to present output and get

10:19:50  8   interaction from the user, and ultimately the behavior of

10:19:54  9   the user is being tracked.

10:19:57 10   Q.    And given the interface between the user and the

10:20:00 11   system, do the '176 and '097 patents streamline the

10:20:10 12   communications between the user and the system such as the

10:20:13 13   number of turns or interactions?

10:20:16 14   A.    Yes, as you go through these loops, things become

10:20:19 15   more focused as you're interacting with the system in

10:20:24 16   response to this ad.  And more information is being

10:20:29 17   obtained.  So this approach to sort of focusing the

10:20:33 18   interaction reduces the amount of cycles through the system

10:20:39 19   you would have to do.

10:20:40 20   Q.    If we could go to JTX-2, the '703 patent.  And if we

10:20:45 21   could now have column one, lines 11 to 17 on the screen.

10:20:52 22         And what is the field of invention for the '703

10:20:55 23   patent?

10:20:55 24   A.    So the '703 patent is related to voice commerce, and

10:21:01 25   particularly to systems and methods around streamlining

Polish - direct

10:21:06 1   checkout.  So it makes the checkout process more efficient.

10:21:14 2   Q.     And if we could now have Figure 1, column three,

10:21:19 3   lines 20 to 21 of the '703 patent on the screen.

10:21:24 4            And what's shown there, sir?

10:21:28 5   A.     All right.  So this is a diagram that's showing

10:21:33 6   various components of the system.  It's showing the voice

10:21:39 7   commerce application that has various components within it

10:21:42 8   that are managing profiles and managing the user interface,

10:21:46 9   that are then talking -- are working with storage devices

10:21:51 10  and processors, and have databases associated with them.

10:21:56 11  And then this whole system communicates to various

10:22:02 12  third-party external systems which would include search

10:22:05 13  engines and retailers and service providers.

10:22:08 14  Q.     And if we could now have Figure 2 and column three,

10:22:12 15  lines 20 to 23 on the screen.

10:22:15 16           And what's shown in Figure 2, Dr. Polish?

10:22:20 17  A.     So this is showing block diagrams for different

10:22:24 18  components of the systems and how they communicate, it's

10:22:27 19  actually showing something fairly similar to things we've

10:22:31 20  seen before.  On the upper left are input devices such as an

10:22:36 21  Alexa, which would go into a speech recognition engine.

10:22:40 22  That would feed a Natural Language Processing system or NLU

10:22:45 23  and also talk to a database, and also talk to applications.

10:22:50 24  And ultimately the result of all that goes to output devices

10:22:55 25  where the system speaks.

Polish - direct

10:22:57 1    Q.       And if we could now have Figure 3, column 3, line 24

10:23:03 2    to 26.

10:23:06 3              Can you explain what's shown in Figure 3 of the

10:23:11 4    '703 patent?

10:23:13 5    A.       This is a flow chart that is showing the operation of

10:23:19 6    the system from where it receives a natural language

10:23:23 7    utterance, and then the steps it takes to automatically

10:23:29 8    without further user input, complete the purchase and

10:23:33 9    ultimately complete the transaction for the user.

10:23:38 10   Q.       And if you look in Step 304 and 310, there is

10:23:43 11   reference to without further user input.  Do you see that?

10:23:46 12   A.       Yes.

10:23:47 13   Q.       What does that indicate?

10:23:48 14   A.       Well that means that it's not waiting for some sort

10:23:52 15   of step from the user, that when it gets to that point, it

10:23:58 16   just effectively falls through and gathers the information

10:24:01 17   it needs from other sources besides the user.  So it's an

10:24:06 18   ultimate streamlining of a purchase.

10:24:08 19   Q.       Does that reduce the number of turns or interactions

10:24:11 20   the user has with the system?

10:24:13 21   A.       Yes, if it can operate without further user input,

10:24:17 22   then there is no further turns at all, and it just completes

10:24:20 23   the transaction.

10:24:25 24   Q.       If we could now have Figure 3, column eight, lines 19

10:24:25 25   to 24 on the screen.

Polish - direct

10:24:37 1          And let's start to talk a little bit about

10:24:41 2   Step 304.  Does the '703 patent explain how products could

10:24:46 3   be selected?

10:24:47 4   A.     Yes, it talks about being able to use search and also

10:24:54 5   to be able to use groupings of products, and categorizations

10:25:01 6   of products to make the determination as efficiently as

10:25:07 7   possible.

10:25:07 8   Q.     Now, if we could have Figure 3, column five, lines 44

10:25:11 9   to 46 on the screen.  And let's talk about Steps 306, which

10:25:23 10  retrieve payment information that is to be used to pay for

10:25:26 11  the product or service, and 308, retrieve shipping

10:25:30 12  information that is to be used to deliver the product or

10:25:34 13  service.

10:25:34 14          Does the '703 patent explain how user profile

10:25:39 15  information could be used to perform these steps and

10:25:43 16  complete a transaction?

10:25:44 17  A.     Yes, it's talking specifically about storing payment

10:25:48 18  information, storing shipping information, precisely so that

10:25:52 19  a purchase can be completed without having to ask for it

10:25:56 20  again.

10:26:01 21  Q.     And, now, Dr. Polish, let's now turn to the product

10:26:02 22  at issue in this case, Amazon Alexa, okay?

10:26:02 23  A.     Okay.

10:26:10 24  Q.     And if we could have slide four on the screen.  And

10:26:15 25  just kind of refresh, Dr. Polish, when you were doing your

Polish - direct

10:26:23  1    analysis to determine whether or not Alexa infringed the

10:26:28  2    VoiceBox patents, what did you review and base your opinion

10:26:31  3    on?

10:26:31  4    A.      I reviewed technical documents provided to me in the

10:26:35  5    case.  I looked at the Court's construction order.  I used

10:26:41  6    Alexa.  And I confirmed what I saw by looking at source

10:26:48  7    code.  And then I looked at the patents and compared it to

10:26:51  8    what I was seeing in Alexa.

10:26:54  9    Q.      If you would open your binder, sir, and do you

10:26:58 10    recognize exhibit PTX-68?

10:27:05 11    A.      Yes.

10:27:06 12    Q.      And is that the document entitled ASR overview and

10:27:11 13    workflows?

10:27:11 14    A.      That's right.

10:27:12 15    Q.      Is that one of the technical documents from Amazon

10:27:15 16    that you based your opinion on?

10:27:16 17    A.      Yes, it is.

10:27:17 18            MR. YOON:  I would like to move into evidence

10:27:19 19    now, Your Honor, exhibit PTX-68.

10:27:22 20            MR. HADDEN:  No objection.

10:27:24 21            THE COURT:  Thank you.  It is admitted.

10:27:26 22            (PTX Exhibit No. 68 was admitted into evidence.)

10:27:26 23    BY MR. YOON:

10:27:27 24    Q.      And so do you see here sir on the bottom right corner

10:27:32 25    you can see there is an AMZ_VB_00046286.  Do you see that?

Polish - direct

10:27:41  1    A.      Yes.

10:27:41  2    Q.      And that would be what I referred to earlier in this

10:27:44  3    case as the Bates number and that would indicate that this

10:27:48  4    document came from Amazon?

10:27:49  5    A.      Yes, my understanding.

10:27:51  6    Q.      And do you see that in this document here it's

10:27:56  7    entitled ASR overview and work flow?

10:27:59  8    A.      Yes.

10:28:00  9    Q.      That's for Alexa, correct?

10:28:02 10    A.      That's correct.

10:28:02 11    Q.      If we can scan back.  And for example, at the bottom,

10:28:07 12    if you could just expand there, there is a logical -- and

10:28:12 13    this document provides information such as a logical

10:28:15 14    architecture overview of Alexa?

10:28:17 15    A.      Yes, that's right.

10:28:19 16    Q.      If we could now go to page 6.  And if we could just

10:28:25 17    expand what's shown on the top part of page 6, the diagram.

10:28:34 18    Does Alexa have an ASR, sir?

10:28:37 19    A.      Yes, it does.

10:28:38 20    Q.      And where is that indicated?

10:28:39 21    A.      So the box on the upper right of this diagram is

10:28:42 22    labeled ASR, that's where the speech recognition takes

10:28:48 23    place.

10:28:48 24    Q.      Does the Amazon Alexa include an NLU engine?

10:28:52 25    A.      Yes.

Polish - direct

| | |
|---|---|
| 10:28:53 | 1 |
| 10:28:54 | 2 |
| 10:28:58 | 3 |
| 10:29:01 | 4 |
| 10:29:04 | 5 |
| 10:29:13 | 6 |
| 10:29:17 | 7 |
| 10:29:18 | 8 |
| 10:29:20 | 9 |
| 10:29:24 | 10 |
| 10:29:27 | 11 |
| 10:29:32 | 12 |
| 10:29:34 | 13 |
| 10:29:39 | 14 |
| 10:29:46 | 15 |
| 10:29:50 | 16 |
| 10:29:54 | 17 |
| 10:29:59 | 18 |
| 10:30:00 | 19 |
| 10:30:04 | 20 |
| 10:30:33 | 21 |
| 10:30:39 | 22 |
| 10:30:40 | 23 |
| 10:30:47 | 24 |
| 10:30:51 | 25 |

Q.      Where is that?

A.      That's just in the box below, it's labeled NLU on it.

Q.      Now, if we can now expand that document back.

        And if you could now expand the bottom there
that says flow description.  -- oh, actually, would go back
Mr. Smith, I apologize.  If we can just expand out that top
part.

        Dr. Polish, what's an ASR?

A.      It's a speech recognizer, it's something that takes
speech and does some kind of recognition on it, turning it
into text or some other kind of more compact representation.

Q.      And what is an NLU, sir?

A.      An NLU is a Natural Language Understanding system,
which is some kind of -- can be referred to as Artificial
Intelligence, it tries to make sense of speech in the
context of a particular purpose.  So it puts the speech into
some kind of context, you think of it as understanding or
assigning meaning.

Q.      If we could have a split screen with this figure and
the flow description below.  If we can just focus on the
flow description through steps 1 to 5 for a moment.

A.      Okay.

Q.      Mr. Smith, can you expand it more?  And I'm only
doing this, Dr. Polish, to try to make it a little easier to
read.

Polish - direct

10:30:52 1    A.      Yes.

10:30:53 2    Q.      Now, does this flow description and document describe

10:30:58 3    how Alexa operates?

10:31:00 4    A.      Yes, in part it does.

10:31:01 5    Q.      Could you walk through that for us?

10:31:04 6    A.      Sure, it starts off at Item 1 where the examiner asks

10:31:13 7    Echo or Alexa what's the weather today.  So you then have,

10:31:18 8    it notices the wake word, which is Alexa, and it streams the

10:31:23 9    rest of it, what is the weather today to the ASR.  So that

10:31:31 10   goes there.  The ASR takes it and does further processing on

10:31:38 11   it, and it comes up with what it's referring to as the NBest

10:31:43 12   utterances, which is what its NBest guesses are as to what

10:31:49 13   the audio stream contains.

10:31:52 14   Q.      Is that Step 2?

10:31:54 15   A.      Yes.

10:31:57 16   Q.      And what happens next?

10:32:04 17   A.      So the NBest gets sent to a, what is referred to as a

10:32:12 18   speechlet which is some application code that is oriented to

10:32:19 19   a particular task such as shopping, or getting the weather.

10:32:28 20   And ultimately, the NLU detects what is referred to as the

10:32:38 21   domain which is "Weather", in this case, and the intent is

10:32:47 22   "get the weather", and it says here no slot is detected.

10:32:47 23   And that means that the intent "GetWeather" would have slots

10:32:54 24   associated with it which are pieces of information that

10:33:02 25   would be needed to fulfill the request such as location and

Polish - direct

10:33:05  1   time.

10:33:05  2   Q.      If you look at 4(a), it says it goes in parallel

10:33:11  3   through both FST's, rule-based and exact match and

10:33:15  4   statistical models paths and then goes to a range to choose

10:33:20  5   the best output, do you see that?

10:33:22  6   A.      Yes.

10:33:22  7   Q.      We discussed in this case about rules-based and AI

10:33:25  8   and machine learning, do you recall that?

10:33:26  9   A.      Yes.

10:33:27 10   Q.      Does the NLU of Amazon Alexa use rules to determine?

10:33:32 11   A.      Yes, my understanding is that there are rules-based

10:33:38 12   components to the NLU among other things that it does.  So

10:33:44 13   it's definitely using rules and that's indicated here.

10:33:48 14   Q.      If we can now go to and re-expand it, and focus on

10:33:54 15   steps 6 through 9.  What happens after the NLU detects the

10:34:00 16   domain which is "Weather," the intent, which is

10:34:04 17   "GetWeather," and no slot is detected?

10:34:07 18   A.      So what it is talking about here is that it's

10:34:11 19   noticing that it doesn't have all the information that it

10:34:16 20   needs, so it's saying, if you look at 6(b), where it says

10:34:24 21   that the "Weather" speechlet detects a missing slot, this

10:34:28 22   case location, and you can have a pre-configured rule that

10:34:32 23   says that it should now perform an action which is ask for

10:34:36 24   location in that case, you can have a different rule which

10:34:42 25   says use the location where the device is located, or some

Polish - direct

10:34:46 1    other rule, but in this case, the rule is set to if you

10:34:49 2    don't have a location, ask for it.  So it then goes off and

10:34:53 3    prompts the user for the location.

10:34:55 4    Q.      And would the slot eventually be filled?

10:35:00 5    A.      Yes, if the user cooperates and provides the

10:35:04 6    location, the slot would eventually be filled and that would

10:35:08 7    be satisfied and they could fulfill the request.

10:35:11 8    Q.      If we could now turn in your binder to PTX-78.

10:35:16 9    A.      Okay.

10:35:18 10   Q.      And do you recognize exhibit PTX-78?

10:35:22 11   A.      Yes, I do.

10:35:23 12   Q.      And what is the title?

10:35:26 13   A.      The title is history of Alexa Shopping and Alexa, and

10:35:30 14   it's dated December 17th, 2020.

10:35:35 15   Q.      And this is -- was one Amazon technical documents you

10:35:40 16   reviewed to base your opinion on?

10:35:42 17   A.      Yes.

10:35:42 18           MR. YOON:  I would now like to move into exhibit

10:35:46 19   PTX Exhibit 78.

10:35:47 20           MR. HADDEN:  No objection.

10:35:48 21           THE COURT:  Thank you.  It is admitted.

10:35:49 22           (PTX Exhibit No. 78 was admitted into evidence.)

10:35:49 23   BY MR. YOON:

10:35:50 24   Q.      If we could now turn to page Amazon 8041.  Generally,

10:35:55 25   what's shown in the diagram at the top of the page?

Polish - direct

10:36:01 1    A.        So this is a diagram similar to what we saw before,

10:36:06 2    it's showing the connection of the device, in this case the

10:36:10 3    Echo on the far left, passing information to this operating

10:36:15 4    system called DeeSOS, which communicates with the ASR and

10:36:23 5    communicates with the NLU and communicates with speechlets,

10:36:28 6    and potentially other Amazon internal services.

10:36:31 7    Q.        See the input to the ASR is audio, correct?

10:36:34 8    A.        Yes.

10:36:35 9    Q.        And the output of the ASR then would be the text,

10:36:42 10    list of possible interpretations?

10:36:43 11    A.        Yes.

10:36:43 12    Q.        And would that be an input into the NLU?

10:36:46 13    A.        Yes, it would.

10:36:47 14    Q.        And what is the output of the Amazon Alexa NLU?

10:36:53 15    A.        The output of the Amazon Alexa NLU is a collection of

10:37:07 16    intents and slots, each of them having a domain associated

10:37:12 17    with them.  The output of the NLU is a collection of the

10:37:15 18    hypotheses of what the user's intent is, and how different

10:37:19 19    slots have been filled.

10:37:20 20    Q.        Is the intent output indicated on this Amazon graph?

10:37:26 21    A.        Yes, the right most are coming out of NLU, it's

10:37:30 22    labeled intent.

10:37:30 23    Q.        Now, if we expand the page back.  Let's go to

10:37:36 24    Section 2.1, the glossary, how Amazon defines the terms.

10:37:41 25    How does Amazon define ASR or Automatic Speech Recognition?

Polish - direct

10:37:55 1    It's the sub-bullet point under SLU?

10:38:02 2    A.      They say the ASR, Automatic Speech Recognition, is

10:38:04 3    the act of taking audio and turning it into recognized text.

10:38:09 4    Q.      How does Amazon define NLU?

10:38:11 5    A.      They say NLU is natural language recognition, I think

10:38:14 6    that may be a typo, I think it's Natural Language

10:38:18 7    Understanding, but the act of taking recognized text and

10:38:21 8    turning it into an intent.

10:38:22 9    Q.      How does Amazon define intent?

10:38:27 10   A.      They say intent is a language understanding concept

10:38:30 11   referring to the goal of the speech, what the speaker was

10:38:33 12   trying to communicate.

10:38:35 13   Q.      And do you see the bullet point below it says at

10:38:40 14   Amazon, though, refer to intent, we are almost always

10:38:45 15   referring specifically to the blueshift intent format.  Do

10:38:48 16   you see that?

10:38:50 17   A.      Yes.

10:38:50 18   Q.      Is that the acronym BIF?

10:38:54 19   A.      Yes.

10:38:54 20   Q.      Is that the output of the NLU?

10:38:55 21   A.      Yes, the output of the NLU, my understanding of it is

10:38:59 22   a BIF, and a BIF is a collection of intents and scores for

10:39:11 23   them.

10:39:11 24   Q.      If we could now go to PTX-84?

10:39:14 25   A.      Okay.

Polish - direct

| | | |
|---|---|---|
| 10:39:15 | 1 | Q.      PTX-84, what's the title of that document? |
| 10:39:18 | 2 | A.      Dialogue platform. |
| 10:39:19 | 3 | Q.      Is this another one of the Amazon technical documents |
| 10:39:23 | 4 | that you based your opinion on? |
| 10:39:24 | 5 | A.      Yes, it is. |
| 10:39:25 | 6 |        MR. YOON:  I would like to now move into |
| 10:39:27 | 7 | evidence, PTX-84. |
| 10:39:29 | 8 |        MR. HADDEN:  No objection. |
| 10:39:30 | 9 |        THE COURT:  Thank you.  It is admitted. |
| 10:39:32 | 10 |        (PTX Exhibit No. 84 was admitted into evidence.) |
| 10:39:32 | 11 | BY MR. YOON: |
| 10:39:34 | 12 | Q.      Do you see on this document here, it has the |
| 10:39:36 | 13 | reference to dialogue platform? |
| 10:39:38 | 14 | A.      Yes. |
| 10:39:39 | 15 | Q.      And do you see there is a primary owner of this |
| 10:39:42 | 16 | Amazon technical document is Amazon Shopping? |
| 10:39:47 | 17 | A.      Yes, I do. |
| 10:39:48 | 18 | Q.      And do you see that it provides -- if we can go back. |
| 10:39:55 | 19 | If you can go to the section there, it provides an overview, |
| 10:39:59 | 20 | do you see that, Section 1? |
| 10:40:00 | 21 | A.      Yes. |
| 10:40:00 | 22 | Q.      And that includes an overview on conversation run |
| 10:40:04 | 23 | time, what's new to Alexa Shopping, conversation management, |
| 10:40:04 | 24 | do you see that? |
| 10:40:09 | 25 | A.      Yes. |

Polish - direct

Q.      If we can now turn to page 5509.  And if we could
expand conversation runtime.

                Dr. Polish, what are the three primary
components of the Alexa Shopping dialogue platform?

A.      There is the Shopping FrontDoor, the Shopping
Orientation, and Shopping Conversation State Management.

Q.      If we could expand shopping conversation state
management, let's start with the word "state."  What is
state?

A.      State generally refers to the state of a system or
all the different parts of the system at the current moment.
So in a person it might be, you know, weight, height, heart
rate, things like that, things that might change, but at a
given moment, it has a particular state.

Q.      Does Alexa use states?

A.      Yes, it does, it uses states as part of taking
somebody through a conversation to make something happen.

Q.      Now, with regards to the Alexa Shopping platform,
what does shopping conversation state management do?

A.      Well, what it does, what it is explaining here is
that it's keeping track of what's been done across time so
that it can help -- it can help a user make progress through
their purchase, or make progress through their transaction
and keep track of what they've done and what they need to
do.

322

Polish - direct

10:42:15 1    Q.      Do you see the statement "we enable a smarter

10:42:20 2    conversation with customers by paying attention to what they

10:42:23 3    have said and done to make better decisions later."  Do you

10:42:27 4    see that?

10:42:27 5    A.      Yes.

10:42:28 6    Q.      Is that done by Alexa?

10:42:29 7    A.      Yes, it is.

10:42:30 8    Q.      If we can now go to PTX-226.  And this document, Your

10:42:40 9    Honor, was already admitted during the deposition of

10:42:45 10   Mr. Vanee.

10:42:48 11              THE COURT:  Okay.

10:42:49 12   By Mr. Yoon:

10:42:49 13   Q.      Looking at Exhibit 226, do you see this is entitled

10:42:52 14   Natural Language Understanding Deep Dive?

10:42:54 15   A.      Yes.

10:42:54 16   Q.      And you were here, you understand that one of the

10:42:57 17   authors of this document is an Amazon Alexa engineer, Kelly

10:43:02 18   Vanee?

10:43:04 19   A.      Yes.

10:43:05 20   Q.      And was this one of the documents you based your

10:43:08 21   opinion on with regards to Alexa?

10:43:10 22   A.      Yes, it is.

10:43:14 23   Q.      And if we could now go to page 2.  And do you see

10:43:21 24   that this slide is entitled where does NLU fit in?

10:43:25 25   A.      Yes.

Polish - direct

10:43:25 1    Q.      And do you see there is a reference there to what's

10:43:28 2    the weather tomorrow?  Do you see that?

10:43:32 3    A.      Yes.

10:43:32 4    Q.      Would that be an utterance by a user?

10:43:35 5    A.      Yes.  Where you're showing it there, that's -- the

10:43:40 6    utterance is spoken by the user into a device, and that is

10:43:45 7    then sent to the ASR.

10:43:47 8    Q.      And you understand those wavy lines below would

10:43:50 9    indicate kind of the sound of a person's voice?

10:43:53 10   A.      Yeah, that's sort of a time domain representation of

10:43:56 11   human speech.

10:43:57 12   Q.      And does this slide demonstrate how the ASR in Alexa

10:44:01 13   and the NLU interact?

10:44:05 14   A.      Yes, at a very high level.

10:44:07 15   Q.      And could you explain that?

10:44:11 16   A.      Sure.  What it's showing here is that the person

10:44:14 17   speaks to the device, the speech goes to the ASR which then

10:44:23 18   turns it into text, which turns it into an NLU, and the NLU

10:44:28 19   outputs an intent which is in the form of get weather

10:44:32 20   forecast, and it has a slot, and the slot is the date,

10:44:38 21   March 18, 2016.

10:44:38 22   Q.      And so when the user says "what's the weather

10:44:42 23   tomorrow," the NLU in Alexa would interpret that as the

10:44:42 24   intent of wanting the weather forecast?

10:44:51 25   A.      Yes, it's the intent of the weather forecast and it

Polish - direct

10:44:55 1   also has the -- it's interpreted tomorrow to mean that date.

10:44:59 2   Q.      And if could go to the next page?  And does this

10:45:07 3   slide indicate the stages of the Alexa NLU engine?

10:45:12 4   A.      Yes, it gives you a little more detail, it's showing

10:45:15 5   there is an intent classification where it comes up with the

10:45:19 6   notion that this is a get weather forecast intent, and then

10:45:22 7   it has a separate step which is slot resolution where it's

10:45:26 8   trying to figure out how to fill in the date slot which it's

10:45:31 9   doing here with the word tomorrow.

10:45:33 10  Q.      Do you see at the bottom the reference there to BIF?

10:45:36 11  A.      Yes.

10:45:37 12  Q.      That's the output of the NLU right?

10:45:39 13  A.      Yes, that's the same BIF we saw before.

10:45:41 14  Q.      So the NLU engine of Alexa would go through a

10:45:45 15  recognition step, and then a resolution step before it

10:45:50 16  outputted the BIF?

10:45:51 17  A.      That's right.

10:45:52 18  Q.      What is recognition?

10:45:54 19  A.      I'm sorry, say that again.

10:45:55 20  Q.      What does recognition refer to?

10:45:59 21  A.      Recognition refers to that it's taking the recognized

10:46:02 22  speech, and it's breaking it up into pieces that it can then

10:46:09 23  use to further process and determine the intent.

10:46:12 24  Q.      And then what's resolution, sir?

10:46:16 25  A.      So resolution is where it's taking any number of

325

Polish - direct

10:46:19 1    possible words that the user could have used to indicate

10:46:24 2    time, and turning it into a recognizable time entry.

10:46:32 3    Q.      So that, for example, when you ask about the weather,

10:46:36 4    Alexa, before it gave you the weather would want to know

10:46:39 5    what date you wanted the weather associated with?

10:46:42 6    A.      That's correct.

10:46:46 7    Q.      If we could now go to page 10?

10:46:51 8            What is illustrated on this page?

10:46:53 9    A.      This is another view on this process, this is where

10:46:56 10   somebody says "what is the weather in Seattle," recognition

10:47:01 11   takes place, and it turned it into domain is weather, and

10:47:06 12   the intent is get weather forecast.

10:47:10 13   Q.      And this would be done by the NLU?

10:47:11 14   A.      Yes.

10:47:17 15   Q.      If we go to page 11.  Now, we have been talking about

10:47:24 16   the recognition in the NLU.  Do you recall that, sir?

10:47:29 17   A.      Yes.

10:47:29 18   Q.      And what's shown on this page?

10:47:31 19   A.      So this is a particular view on what's taking place

10:47:34 20   in the NLU, particularly around recognition.  It's showing

10:47:39 21   that a number of things are happening simultaneously.  So

10:47:46 22   the input comes in on the left where it says input request,

10:47:48 23   and it's going to, in this case, four different places.  The

10:47:52 24   first one it goes to is labeled exact match rules.  So those

10:47:57 25   are rules that it -- that the recognition system would have

Polish - direct

10:48:03  1    to look for particular words, to look for particular

10:48:06  2    patterns, and then the next thing over that diamond is a

10:48:12  3    decision, and if it matches, then it's done, it bypasses the

10:48:16  4    whole thing and goes to the slot filling step, it thinks

10:48:24  5    it's now figured out what the intent is.

10:48:26  6            If it doesn't match exactly, it tries to match a

10:48:30  7    little bit more collectively with that pattern of reject

10:48:35  8    rules, and if that matches, then it says okay, we're done.

10:48:39  9    If it doesn't work, then it waits to see if this other step

10:48:44 10    called FST returns anything, and the FST is going to be

10:48:50 11    slower than the rule matching.  And finally, if that doesn't

10:48:54 12    return things, it will wait to see whether these models or

10:48:57 13    statistical models will complete and come up with their idea

10:49:02 14    of what the intent is.

10:49:04 15            So it will do all three of these things at once,

10:49:10 16    if the rules complete, then it bypasses the rest and doesn't

10:49:16 17    waste time, but if they don't, then it falls through to ever

10:49:20 18    more computationally approaches, as a fourth way, using this

10:49:26 19    totally separate system called the EVI recognizer, it can

10:49:33 20    also contribute.

10:49:33 21    Q.    During the opening, we would been hearing about

10:49:33 22    machine learning and AI.  Do you recall that sir?

10:49:33 23    A.    Yes.

10:49:33 24    Q.    Would that be the step relating to models?

10:49:41 25    A.    Yes.  I think when Amazon talks about machine

Polish - direct

10:49:44 1    learning and AI, they're talking about the model there.

10:49:48 2    Q.      What would be the FST step?

10:49:51 3    A.      The FST step is something involving something

10:49:55 4    referred to as parsing, where it's trying to, in a more

10:50:05 5    deterministic rules-based approach, try to take apart the

10:50:10 6    words and understand what they mean using rules rather than

10:50:13 7    statistics.

10:50:14 8    Q.      Let's talk about one possible operation in the Alexa

10:50:17 9    system.  Okay, sir?

10:50:19 10                   THE COURT:  At the end of this, let's take our

10:50:21 11   break.

10:50:21 12                   MR. YOON:  Yes, let me just finish this

10:50:24 13   paragraph.

10:50:25 14   BY MR. YOON:

10:50:25 15   Q.      In this example here, an utterance is received at the

10:50:28 16   ASR, it interprets it and detects and it provides that to

10:50:31 17   the recognition engine of the NLU core pipeline.  Okay, sir?

10:50:37 18   A.      Yes.

10:50:37 19   Q.      And if that input satisfies the rules in the system,

10:50:40 20   it would reach resolution, correct?

10:50:42 21   A.      Yes.

10:50:42 22   Q.      And so, in the Alexa system when the NLU is

10:50:51 23   interpreting intent, there are situations where it will only

10:50:55 24   use rules and will not use AI or machine learning?

10:50:58 25   A.      Yes, if a rule can be satisfied, it will satisfy the

Polish - direct

10:51:03 1    rule preference over the other things because it's faster.

10:51:07 2    Q.    And you have been -- I will?

10:51:09 3            MR. YOON:  I'll stop there, Your Honor.

10:51:11 4            THE COURT:  All right.  Let's take our 15-minute

10:51:14 5    morning break.

10:51:15 6            COURTROOM DEPUTY:  All rise.

10:51:17 7            (Jury exiting the courtroom at 10:51 a.m.)

10:51:44 8            THE COURT:  All right.  Anything we need to

10:51:46 9    discuss?

10:51:47 10           MR. YOON:  No, Your Honor.

10:51:47 11           MR. HADDEN:  No, Your Honor.

10:51:48 12           (A brief recess was taken.)

11:10:52 13           COURTROOM DEPUTY:  All rise.

11:10:54 14           (Jury entering the courtroom at 11:10 a.m.)

11:11:14 15           THE COURT:  All right, everyone welcome back.

11:11:20 16   Everyone else, you can be seated.

11:11:23 17           Please continue.

11:11:24 18           MR. YOON:  Yes, Your Honor.

11:11:25 19   BY MR. YOON:

11:11:26 20   Q.    Dr. Polish, do you recall earlier this morning we

11:11:29 21   were talking about how the NLU would score, come up with

11:11:32 22   hypotheses and provide scores?

11:11:37 23   A.    Yes.

11:11:37 24   Q.    And if we could now go to page 18 of Exhibit 226.

11:11:42 25   What is illustrated in this Amazon document regarding Alexa?

Polish - direct

A.     So this is showing if you look on the top, it says
utterance play Hunger Games, so the user has presumably said
play Hunger Games, and the system is trying to figure out
what that means, so it's come up with, in this case, four
different intent hypotheses.  Two of them are music related,
one of them is books, one of them is video.  So those are
potentially different domains.  And it scored them with
these different ranked values on the right, and the blue
arrow means that it's picked the first one as the best
hypothesis, so it's assuming that when the user said play
Hunger Games, it's talking about a song named Hunger Games.

Q.     If we go to the next page.  With Alexa, if you make
the same utterance play Hunger Games, is there information
that the system could use that would result in the NLU
selecting something different than the scoring of just
Hunger Games?

A.     Yes, so what this is showing at the top is in
addition to saying play Hunger Games, the device that that
request came from was a Fire TV, which is a video play back
device, so in that case, it has decided that the best one
was actually the last one, which was play a video called
Hunger Games.

Q.     So, in the first example, just the words play Hunger
Games, it ranked play the song Hunger Games number one, with
just that information, right?

Polish - direct

11:13:47  1    A.       That's correct.

11:13:47  2    Q.       But when it knew that the request came from a Fire

11:13:52  3    TV, it altered the selection because it came from a TV, to

11:13:56  4    video?

11:13:56  5    A.       Right, that was additional information that was

11:13:59  6    available that changed the score, that changed the results

11:14:02  7    of its decision making.

11:14:03  8    Q.       If we go to the next page.  Does information stored

11:14:10  9    by the user, could that affect what's selected?

11:14:13 10    A.       Right.  So in this case, it's saying that intent

11:14:20 11    resolution, which is a component of the system which is

11:14:23 12    described in the document found that the user had an album

11:14:27 13    called Hunger Games in their cloud player.  So in that case,

11:14:30 14    the user had previously purchased, or somehow obtained an

11:14:35 15    album called Hunger Games and stored it.  So now when it

11:14:39 16    goes through this recognition process, the hypothesis that

11:14:44 17    you mean the album Hunger Games, that becomes the best

11:14:50 18    hypothesis.

11:14:51 19    Q.       Could that purchase of the album Hunger Games come

11:14:56 20    from buying it over Alexa?

11:14:57 21    A.       Certainly.

11:14:58 22    Q.       Could that be based on a prior conversation?

11:15:01 23    A.       Yes.

11:15:01 24    Q.       And so, how does the information that Alexa has

11:15:06 25    determine what the intent interpretation is?

Polish - direct

11:15:09 1    A.      So, the information that Alexa has is both -- is

11:15:18 2    long-term information about the user, it is information

11:15:21 3    provided by the user from previous interactions, and all

11:15:24 4    that goes into interpreting what the user said and going

11:15:30 5    into ranking the hypotheses and picking out which one is the

11:15:34 6    most likely to be correct.

11:15:36 7    Q.      If we go to the next page.  There is a page 22,

11:15:44 8    what's this show?

11:15:47 9    A.      So this is showing that this is talking about this

11:15:50 10   sort of re-ranking process of reconsidering what the user

11:15:57 11   means, and it's showing that the re-ranker can use system

11:16:03 12   features such as the ASR, the recognizer, what they call

11:16:09 13   entity resolution, and context.

11:16:11 14   Q.      And the example we discussed earlier, it used entity

11:16:16 15   resolution, correct?

11:16:17 16   A.      Yes.

11:16:17 17   Q.      And that would result in a change from range 1 or 2?

11:16:22 18   A.      Yes, that's what happened in that case.

11:16:25 19   Q.      So originally, it was the song Hunger Games had a

11:16:30 20   score of .89, and the album Hunger Games had a 4.7?

11:16:37 21   A.      Yes.

11:16:37 22   Q.      After the resolution entity occurred, what was the

11:16:41 23   ranking of the album?

11:16:42 24   A.      The album was .82.

11:16:45 25   Q.      What was the song?

Polish - direct

11:16:46 1    A.        .6.

11:16:49 2    Q.        Could context also be used by the Alexa system to

11:16:52 3    cause a re-ranking or readjustment?

11:16:57 4    A.        Yes.

11:16:58 5    Q.        And if we go to the previous page to this one.  And

11:17:04 6    what's shown here on this Alexa technical document?

11:17:08 7    A.        This is just some text on this presentation that says

11:17:11 8    based on additional signals or features from the rest of the

11:17:13 9    system, the recognition results can be rescored and

11:17:18 10   re-ranked.  So the signals are features is a very broad

11:17:23 11   statement of pretty much any kind of input could be taken to

11:17:28 12   influence what the ranking is on these different hypotheses.

11:17:33 13   Q.        One of those inputs could be context?

11:17:35 14   A.        That's correct.

11:17:36 15   Q.        If we could now go to PTX-472.  And Dr. Polish, do

11:17:48 16   you recognize exhibit PTX-472?

11:17:50 17   A.        Yes, I do.

11:17:51 18   Q.        Is that one of the documents you relied on in forming

11:17:53 19   your opinion and understanding regarding the design and

11:17:56 20   operation of Alexa?

11:17:57 21   A.        Yes.

11:17:57 22            MR. YOON:  I would like to now move into

11:17:59 23   evidence exhibit PTX-472.

11:18:01 24            MR. HADDEN:  No objection.

11:18:02 25            THE COURT:  Thank you.  It is admitted.

Polish - direct

11:18:03 1                    **(PTX Exhibit No. 472 was admitted into**

11:18:04 2     **evidence.)**

11:18:04 3     **BY MR. YOON:**

11:18:07 4     **Q.      And do you see there is a reference there to speaker**

11:18:16 5     **ID cloud.  Do you see that?**

11:18:18 6     **A.      Yes.**

11:18:18 7     **Q.      And what is that, sir?**

11:18:21 8     **A.      So speaker ID is where the system identifies**

11:18:27 9     **different speakers from within a household, so there is a**

11:18:31 10    **speaker registration process where you can say a few**

11:18:36 11    **sentences, and it learns your voice so that particularly if**

11:18:39 12    **you have multiple people in the same household, it can**

11:18:43 13    **distinguish those different people within the household and**

11:18:46 14    **do different things depending on who they are.**

11:18:48 15    **Q.      If could go to page 2 of this document, and if you**

11:18:53 16    **would expand speaker ID cloud, speaker identification**

11:18:57 17    **service.  And what's that, sir?**

11:19:00 18    **A.      So this is just -- this is talking about what I just**

11:19:05 19    **said, which is that it's using this service to distinguish**

11:19:12 20    **individual users of the device in a single household.  They**

11:19:12 21    **would use the speaker ID service.**

11:19:12 22    **Q.      And is this -- what type of information is this in**

11:19:22 23    **the system?**

11:19:24 24    **A.      So this would be long-term information, so your**

11:19:26 25    **registration with the system when you enroll yourself in**

Polish - direct

11:19:33 1   this, would retain some piece of information that would be

11:19:36 2   retained from conversation to conversation, presumably over

11:19:40 3   the course of months or years, that would be used by the

11:19:44 4   system to customize your experience depending upon who you

11:19:49 5   are.

11:19:49 6   Q.      Looking at the last sentence there, it says "the

11:19:51 7   incoming audio stream is forked to the speaker ID service,

11:19:56 8   and this service helps in determining who in the household

11:19:59 9   is currently using the device."  Do you see that?

11:20:02 10  A.      Yes.

11:20:03 11  Q.      What does that indicate?

11:20:04 12  A.      When they say forked, what they mean is that the

11:20:09 13  stream, audio stream is split, so it's going to both the

11:20:14 14  speaker ID service, as well as, the speech recognizers, this

11:20:20 15  is happening without causing some sort of disruption, so

11:20:24 16  it's happening in parallel if you will to the regular speech

11:20:31 17  recognition.

11:20:31 18  Q.      Does Alexa, ASR and NLU use this speaker ID

11:20:36 19  information in interpreting what is said?

11:20:39 20  A.      Yes.

11:20:39 21  Q.      How so?

11:20:40 22  A.      Well, it knows, it learns from this -- who the user

11:20:45 23  is, and loads various profiles and information about the

11:20:49 24  user that is then used to direct the conversation.

11:20:54 25  Q.      And if we could now expand back and do you see there

Polish - direct

11:20:57 1    is another reference there at the top to NLU cloud-Natural

11:21:04 2    Language Understanding service?

11:21:06 3    A.      Yes.

11:21:06 4    Q.      And what does that indicate?

11:21:08 5    A.      So that's sort of an overall wrapper for the NLU,

11:21:13 6    it's saying that the input is a SIRF, S-I-R-F, which is just

11:21:21 7    the speech, and then some other things including user info,

11:21:25 8    information about the user, the user's history, so it's

11:21:30 9    taking all these inputs and its output is a BIF, which we've

11:21:35 10   seen before is a collection of scored intents.

11:21:44 11   Q.      And so do you see that with the input to the NLU and

11:21:48 12   the ASR be the SIRF, the hint, user info and history?

11:21:56 13   A.      Yes.

11:21:56 14   Q.      And the output is the intent determination of the

11:21:59 15   NLU?

11:22:00 16   A.      Yes.

11:22:00 17   Q.      If we could take that down.   Thank you.

11:22:02 18          Now, Dr. Polish, do you know of Mr. John Peck?

11:22:07 19   A.      Yes.

11:22:07 20   Q.      And how did you work with Mr. Peck for your analysis

11:22:10 21   in this case?

11:22:11 22   A.      So John Peck is a -- is a very experienced programmer

11:22:19 23   and software analyst, and he reads lots of source code and I

11:22:28 24   read source code too, but I didn't have enough time to put

11:22:31 25   into looking at everything that was required.   So he was

336

Polish - direct

11:22:36 1    retained by the lawyers in the case to look at Amazon's

11:22:40 2    source code, and when I had questions about things I wanted

11:22:44 3    to understand about the source code, I told lawyers about

11:22:48 4    it, they instructed Mr. Peck, and he went off and did the

11:22:53 5    research.  And I got reports back from him, including a

11:22:58 6    report that he filed in this case of what he found.

11:23:02 7    Q.      Now, Dr. Polish, have you helped prepare a video

11:23:06 8    illustrating a conversation with Alexa?

11:23:09 9    A.      Yes, I have.

11:23:10 10   Q.      And if we could have PDX-3-7 on the screen.

11:23:22 11           And when you were having your actual

11:23:25 12   conversation with Alexa, what features did you look for?

11:23:27 13   A.      So I went through this conversation with Alexa

11:23:33 14   particularly looking for Voice ID, the presence of long-term

11:23:41 15   information, the presence of short-term information, I

11:23:45 16   showed voice purchasing, I showed pronoun use which is

11:23:50 17   important in one of the patents, and I showed a voice

11:23:54 18   advertisement.  And when you watch the video, you can see

11:23:58 19   all these -- all these elements come out in the video.

11:24:02 20   Q.      Why don't we play the first video now.

11:24:12 21           (PDX-3-7 video played.)

11:27:17 22           MR. YOON:  If we can play the next video.

11:27:22 23           (Video played. )

11:28:00 24           MR. YOON:  Your Honor, at this time, we would

11:28:07 25   like to move into physical evidence PTX-674.

Polish - direct

11:28:13  1                    MR. HADDEN:  No objection, Your Honor.

11:28:15  2                    THE COURT:  Thank you.  It is admitted.

11:28:15  3                    (PTX Exhibit No. 674 was admitted into

11:28:21  4     evidence.)

11:28:21  5     BY MR. YOON:

11:28:27  6     Q.    Now, Dr. Polish, let's now go into the specifics of

11:28:35  7     your infringement analysis.  If we could have PDX3-9 on the

11:28:41  8     screen.

11:28:45  9                    And focusing on the '681 patent, Dr. Polish,

11:28:50 10     what's your opinion with respect to Claim 13 of the '681

11:28:54 11     patent?

11:28:55 12     A.    It's my opinion that Claim 13 is infringed by the

11:28:59 13     Alexa system.

11:29:00 14     Q.    And now let's discuss Claim 13.  If I could have

11:29:05 15     PDX3-10 on the screen.  Do you see on that screen is the

11:29:10 16     full language of Claim 13 of the '681 patent?

11:29:14 17     A.    Yes.

11:29:15 18     Q.    Dr. Polish, what's a nontransitory computer readable

11:29:20 19     medium containing computer-executable instructions?

11:29:24 20     A.    That's patent language for some piece of storage

11:29:30 21     computer code, so the computer executable instructions are

11:29:35 22     just computer code, and nontransitory means that it's stored

11:29:41 23     somewhere.

11:29:41 24     Q.    So focusing on the first part of Claim 13, what we

11:29:46 25     call the preamble, if we can just expand that Claim 13

Polish - direct

11:29:56 1    begins a nontransitory computer readable medium containing

11:30:00 2    computer-executable instructions for providing a cooperative

11:30:05 3    conversational voice user interface, the computer-executable

11:30:10 4    instructions operable when executed to."  Is that present in

11:30:16 5    Alexa?

11:30:16 6    A.      Yes, it is.

11:30:17 7    Q.      And what's the basis of that opinion?

11:30:19 8    A.      Well, it's Alexa runs on servers, the servers are

11:30:27 9    computers, they're running code, I have seen code.  And

11:30:32 10   those servers are loaded from non-transitory sources, so the

11:30:40 11   code is written, and it's loaded into those server computers

11:30:44 12   that is then operable when executed.

11:30:47 13   Q.      When the code that's stored on the Amazon servers is

11:30:52 14   executed, does it practice the invention of Claim 13?

11:30:55 15   A.      Yes, it does.

11:30:56 16   Q.      If we go to the next element of Claim 13, if we could

11:30:59 17   expand that.  Do you see that the next element is "receive

11:31:02 18   an utterance at a voice input device, during a current

11:31:07 19   conversation with a user, wherein the utterance includes one

11:31:10 20   or more words that have different meanings in different

11:31:14 21   contexts."  Do you see that?

11:31:17 22   A.      Yes.

11:31:17 23   Q.      Is that present in the Alexa system?

11:31:19 24   A.      Yes, it is.

11:31:20 25   Q.      And what's the basis of that opinion?

Polish - direct

11:31:22 1    A.      Well, technical documents that I've seen, as well as,

11:31:29 2    from my own use of the system.

11:31:33 3    Q.      And if you would look at now PDX3-11.

11:31:45 4            Does this slide illustrate how the Alexa system

11:31:50 5    meets the receive an utterance requirement?

11:31:53 6    A.      Yes.  This is showing an Alexa device receiving

11:32:00 7    speech and that the speech, the utterance is being sent to

11:32:06 8    the Alexa voice service.

11:32:07 9    Q.      And when someone speaks to Alexa, can we speak in one

11:32:11 10   or more words that have different meanings and different

11:32:15 11   contexts?

11:32:15 12   A.      Yes, they can.

11:32:16 13   Q.      If we now go back to the next element of the claim,

11:32:20 14   PDX3-10.  If we could have the next one on the screen,

11:32:25 15   accumulate short-term.  This element recites "accumulate

11:32:30 16   short-term shared knowledge about the current conversation,

11:32:33 17   wherein the short-term shared knowledge includes knowledge

11:32:36 18   about the utterance received at the voice during the current

11:32:40 19   conversation."

11:32:41 20           Is that element present in that by Alexa?

11:32:42 21   A.      Yes, it is.

11:32:42 22   Q.      What's the basis of that opinion?

11:32:50 23   A.      Well, again, technical documents that I've seen, my

11:32:52 24   own use -- and my own use of the system.

11:32:52 25   Q.      If we go to the next slide, please.

Polish - direct

11:33:05  1            Was the accumulation of short-term knowledge

11:33:09  2    illustrated in the demonstration that you provided in the

11:33:13  3    video?

11:33:13  4    A.      Yes.

11:33:15  5    Q.      How so?

11:33:16  6    A.      Well, so when I was setting the alarm and I said

11:33:21  7    6:30, it knew 6:30, it wasn't -- it had multiple meanings,

11:33:28  8    6:30, it could be in the morning or in the evening, so it

11:33:31  9    retained that short-term knowledge for the further

11:33:36  10   conversation to disambiguate between 6:30 a.m. and p.m.

11:33:44  11   Q.      Is that when Alexa asked is that 6:30 in the morning

11:33:47  12   or the evening?

11:33:48  13   A.      Yes, that was when Alexa realized that that -- that

11:33:54  14   it didn't have enough information to set the alarm, its slot

11:33:59  15   wasn't full, wasn't fully filled out, so it had to get more

11:34:03  16   information which it did by soliciting me for more

11:34:07  17   information.

11:34:08  18   Q.      If we can now go to PDX3-14.  Does this also provide

11:34:13  19   support for your opinion that Alexa stores short-term

11:34:20  20   knowledge and meets that element?

11:34:30  21   A.      So this is from a technical document, actually we

11:34:34  22   looked at that document before, this is what it does when it

11:34:37  23   has ambiguity that it needs to figure out, and so here it

11:34:41  24   takes what they call a two-step approach where it creates

11:34:46  25   another, effectively another intent looking for some kind of

Polish - direct

1  response from the user, and it goes out and makes a request

2  of the user and then tries to interpret what the user says

3  as a response to that disambiguous request.

4  Q.    So in the example here, when it hears the number six,

5  it could be either an intent to set the volume, it could be

6  a song name, or it could mean this is a put multi-turn?

7  A.    That's correct.

8  Q.    In the example you gave in your video, that was

9  multi-turn?

10 A.    That was 6:30, followed by a request for morning or

11 evening, followed by my saying morning.

12 Q.    And PTX-226, that's the deep dive document that

13 Mr. Vanee was the author of what we discussed, correct?

14 A.    That's right.

15 Q.    Go to the next element.

16       Can we go to PDX3-15, please.  And what is --

17 does that document that you have been discussing provide

18 further support for your opinion about whether the

19 accumulate short-term knowledge is met?

20 A.    Yes, it does.  This is talking -- this is again from

21 that same document.  This is talking about a component

22 called the context interpreter that merges the results of

23 the disambiguation request of what came before so as to come

24 up with the intent.

25 Q.    If could go to PDX3-16.  And this is also an

Polish - direct

11:36:41 1    Exhibit 226, how does this support your opinion regarding

11:36:46 2    accumulating short-term knowledge about a current

11:36:50 3    conversation?

11:36:50 4    A.      Right, so this is a work example from that slide

11:36:56 5    deck.  The utterance is set for 6 o'clock.  It thinks it's

11:37:03 6    setting an alarm, and it sees there are two possibilities,

11:37:10 7    0600 or 1800 or 6:00 p.m., and so it needs to have a

11:37:18 8    dialogue which is slot solicitation, that is asking for more

11:37:27 9    information.

11:37:27 10   Q.      Here it doesn't know whether it's 6:00 a.m. or

11:37:31 11   6:00 p.m.?

11:37:32 12   A.      That's correct.

11:37:32 13   Q.      And 6:00 p.m. is indicated by 1800 hours?

11:37:37 14   A.      Right.

11:37:37 15   Q.      If we can go to the next element in the claim, go

11:37:42 16   back to PDX3-10, if we can expand the next element.  This

11:37:48 17   also requires, "accumulate long-term shared knowledge about

11:37:51 18   the user, wherein the long-term shared knowledge includes

11:37:55 19   knowledge about one or more past conversations with the

11:37:58 20   user."  Do you see that?

11:37:58 21   A.      Yes.

11:37:58 22   Q.      Is that element practiced in that by Alexa?

11:38:01 23   A.      It is.

11:38:02 24   Q.      What's the basis of your opinion?

11:38:04 25   A.      Technical documents that I have seen, and my own use

Polish - direct

11:38:07 1    of it including from that demo you saw.

11:38:09 2    Q.      And if we could now go to PDX3-17.  And this is

11:38:16 3    another document that we've -- that you've relied on.

11:38:23 4    What's shown here in PDX3-17?

11:38:25 5    A.      Right, so this is a document, it's a technical

11:38:28 6    document that's talking about among other things, the

11:38:31 7    speaker ID system that we were talking about before where it

11:38:37 8    talks about that if people in a household can register

11:38:41 9    themselves or enroll themselves in this program which allows

11:38:45 10   the system to differentiate people in the household.  And

11:38:48 11   this would be a form of long-term shared knowledge.

11:38:51 12   Q.      And in order to do the speaker ID, you had a

11:38:56 13   conversation with Alexa, correct?

11:38:58 14   A.      Yes, it was done within Alexa, as you saw in the

11:39:01 15   demo, it's part of Alexa.

11:39:03 16   Q.      If we can now go to the next slide.  And how did your

11:39:07 17   video here illustrate that -- how did your video illustrate

11:39:19 18   how Alexa accumulates long-term shared knowledge about the

11:39:23 19   user?

11:39:22 20   A.      Well, in this case, you can see that I'm changing an

11:39:28 21   alarm.  So the long-term information was the old setting of

11:39:35 22   the alarm, and I am changing it to a new time.  So it has --

11:39:40 23   it's accumulated long-term information that informs the

11:39:42 24   conversation and makes the conversation more streamlined.

11:39:47 25   Q.      At this time you had already done the speaker ID?

Polish - direct

11:39:51  1    A.      Yes.

11:39:51  2    Q.      And Alexa recognized you as Nat?

11:39:53  3    A.      That's right.

11:39:54  4    Q.      Was that also a form of long-term shared knowledge

11:39:57  5    from the communication?

11:39:58  6    A.      Yes, it was.

11:40:00  7    Q.      If we could now go to slide PDX3-19.  And how do the

11:40:07  8    documents here that you based your opinion on illustrate the

11:40:11  9    use of long-term shared knowledge?

11:40:13 10    A.      So this is a document that talks about what they call

11:40:18 11    an enrollment profile, mutable model, which as it's

11:40:28 12    described here, this is something that would listen to your

11:40:31 13    voice, understand some of the acoustic properties of your

11:40:34 14    voice and your environment and make changes to the, to this

11:40:39 15    model that it stores that would cause the ASR to do a better

11:40:44 16    job over time.

11:40:48 17    Q.      And now let's go to the next element.  And we could

11:40:52 18    have that next element on the screen identified.  The next

11:41:07 19    element of Claim 13 refers to identify a context associated

11:41:12 20    with the utterance, wherein a conversational speech engine

11:41:16 21    identifies the context associated with the utterance from

11:41:19 22    the short-term shared knowledge and the long-term shared

11:41:24 23    knowledge."  Do you see that?

11:41:25 24    A.      Yes.

11:41:25 25    Q.      And is that element met by Alexa?

Polish - direct

11:41:29 1    A.      It is.

11:41:30 2    Q.      And what's the basis for your opinion, sir?

11:41:32 3    A.      The technical documents and my own use of the system.

11:41:36 4    Q.      And would one of the documents be the NLU deep dive

11:41:41 5    document which is PTX-226?

11:41:45 6    A.      Yes.

11:41:47 7    Q.      Can we go -- if we can now go to the next element.

11:41:56 8    And this element says "establish an intended meaning for an

11:42:01 9    utterance within the identified context, wherein the

11:42:04 10   conversational speech engine establishes the intended

11:42:08 11   meaning within the identified context to disambiguate an

11:42:12 12   intent that the user had in speaking the one or more words

11:42:16 13   that have the different meanings in the different contexts."

11:42:21 14   Is that element met by Alexa?

11:42:23 15   A.      Yes, it is.

11:42:24 16   Q.      And what do you base that opinion on?

11:42:26 17   A.      The technical documents that we've seen, as well as,

11:42:29 18   my own use of it.

11:42:30 19   Q.      If we can now go to PDX3-21.  How did your opinions,

11:42:40 20   how were they supported by PTX-226?

11:42:52 21   A.      We talked about this before, what's going on here is

11:42:56 22   where you have some kind of ambiguity that the system needs

11:43:00 23   to resolve and it has, and it gets more information and then

11:43:06 24   this context interpreter needs to run to combine the result

11:43:11 25   of this ambiguation request with what came before.  So this

Polish - direct

11:43:18  1    is combining information from different con -- from

11:43:24  2    different utterances into the context.

11:43:26  3    Q.     If we can go now to the next slide?

11:43:31  4              MR. HADDEN:  Objection, Your Honor.  This is not

11:43:33  5    a slide that was in the demonstratives we were given in the

11:43:38  6    exchange.

11:43:39  7              THE COURT:  Can you talk to me.

11:43:43  8              MR. HADDEN:  Your Honor, our understanding is

11:43:45  9    this slide was withdrawn per our agreement this morning.

11:43:49 10              MR. YOON:  Your Honor, there appears to be an

11:43:52 11    error, counsel is correct.  We had made a change, but the

11:43:55 12    change did not pop up.  We can put the correct slide on now,

11:43:58 13    and I'll remove it from the demonstrative, I'll redo it now

11:44:02 14    Your Honor with the proper demonstrative.

11:44:04 15              MR. HADDEN:  I'll move to strike the testimony

11:44:07 16    with the demonstrative that we agreed wouldn't be shown.

11:44:10 17              THE COURT:  We'll strike that.

11:44:12 18              This was some testimony given, it was just a

11:44:15 19    mixup with the slide.  They're going to put the correct

11:44:18 20    slide up and redo that testimony, and the testimony that you

11:44:20 21    saw on the prior slide, we'll strike.

11:44:22 22    BY MR. YOON:

11:44:23 23    Q.     And so let me just go back really quick.  If we could

11:44:30 24    have PDX3-10 on the screen.  PDX3-10.

11:44:41 25              Looking at -- could I have the element -- we can

Polish - direct

11:44:49  1    do it this way.  If I could just have the element on the

11:44:53  2    screen, identify a context associated, we can go over that

11:44:57  3    again.  Just expand the identify.  Thank you.

11:45:05  4             Dr. Polish, with respect to this element, do you

11:45:09  5    see that it says, "identify a context associated with the

11:45:12  6    utterance, wherein a conversational speech engine identifies

11:45:16  7    the context associated with the utterance from the

11:45:20  8    short-term shared knowledge and the long-term shared

11:45:23  9    knowledge."

11:45:24 10    A.      I do.

11:45:25 11    Q.      And is that element met by Alexa?

11:45:27 12    A.      It is.

11:45:28 13    Q.      And what's your basis for your opinion?

11:45:31 14    A.      Technical documents and my own use of the system.

11:45:34 15    Q.      Can you explain how the technical documents supported

11:45:36 16    your opinion?

11:45:37 17    A.      Well, what this is talking about is identifying the

11:45:40 18    context which is, in part anyway, an intent, so the NLU

11:45:49 19    generates an intent, or a collection of intents based upon

11:45:55 20    the speech of the user, and the long-term information that

11:46:02 21    informs it, as well as, the short-term information from

11:46:08 22    prior utterances within the same conversation.

11:46:12 23    Q.      Let's go to the next element.  We'll just expand it

11:46:15 24    to the next element now.  If we could go to establish.  The

11:46:20 25    next element in the claim says "establish an intended

Polish - direct

11:46:24 1    meaning for the utterance within the identified context,

11:46:27 2    wherein the conversational speech engine establishes the

11:46:30 3    intended meaning within the identified context to

11:46:34 4    disambiguate an intent that the user had in speaking the one

11:46:40 5    or more words that have different meanings in the different

11:46:43 6    contexts."  Do you see that?

11:46:45 7    A.      Yes.

11:46:45 8    Q.      Is that element met by Alexa?

11:46:47 9    A.      It is.

11:46:48 10   Q.      What's the basis for your opinion?

11:46:50 11   A.      Technical documents and my own use of the system.

11:46:52 12   Q.      And if we could now go, I want to go to PDX3-22,

11:46:58 13   we're skipping 21, go to 22.   22.   PDX3-22.

11:47:37 14           Could you just advance it to 22, please.   If we

11:48:11 15   could just go back up with regards to, put PDX3-10 up again.

11:48:22 16   And sir, can you explain how Alexa does this, please?

11:48:27 17   A.      So this is talking about the disambiguation of words

11:48:34 18   that have one or more meanings, that have more than one

11:48:40 19   meaning.   So we've seen this already with when I said 6:30

11:48:47 20   which could mean two different things, and it went off and

11:48:52 21   established which it meant.   There was also, we saw in the

11:49:00 22   technical document, we saw Hunger Games being interpreted,

11:49:05 23   there were different possible meanings for that, a song, an

11:49:09 24   album, a video, and Alexa went off and figured out,

11:49:12 25   disambiguated which it meant, and it used short-term

Polish - direct

11:49:18  1    information to do that to establish what the meaning was in

11:49:26  2    the different topics.

11:49:29  3    Q.       Going back to Exhibit 226, how is this demonstrated

11:49:36  4    in terms of the establishing the intended meaning?

11:49:39  5    A.       Right.  So this is the example of Hunger Games, and

11:49:43  6    so Hunger Games can mean in this case, I guess four

11:49:47  7    different things, a song, an album, a book and a video.  And

11:49:51  8    it was able to use, in this case long-term information which

11:49:57  9    was whether somebody had purchased the album before to

11:50:01 10    disambiguate it and decide that it meant the album.

11:50:07 11    Q.       We can keep that language up and then turn to slide

11:50:23 12    22 of 226.  Advance two pages from the right.  Thank you.

11:50:39 13             And we looked at this during your testimony.

11:50:42 14    How does this support the basis for your opinion that the

11:50:47 15    identified context is to disambiguate an intent that the

11:50:52 16    user had in speaking one or more words?

11:50:55 17    A.       So, this is showing that you can re-rank, or in this

11:51:03 18    case, that would mean disambiguate the intent of the user

11:51:10 19    and the meaning of the words based upon the ASR, the ER, or

11:51:17 20    the content, and that can be long-term information,

11:51:22 21    short-term information, it could be further information from

11:51:25 22    the user.

11:51:28 23    Q.       And did that support your opinion, sir?

11:51:30 24    A.       It does.

11:51:31 25    Q.       If we could now go back to PTX3-10 and go to the last

Polish - direct

11:51:37  1    element of Claim 13 of the '681 patent.  You see this is

11:51:42  2    "generate a response to the utterance where in the

11:51:44  3    conversational speech engine, grammatically or syntactically

11:51:49  4    adapts the response based on the intended meaning

11:51:52  5    established within the identified context."  Do you see

11:51:54  6    that?

11:51:54  7    A.      Yes.

11:51:55  8    Q.      Is that element met by Alexa?

11:51:58  9    A.      It is.

11:51:58 10    Q.      What is the basis of that opinion?

11:52:00 11    A.      Documents that I have seen, and how I have used the

11:52:03 12    system.

11:52:04 13    Q.      We now have PDX3-24.  And is that element met, the

11:52:39 14    last element of Claim 13 met by Alexa and supported by the

11:52:44 15    technical documents?

11:52:45 16    A.      Yes.  So this technical document is showing after the

11:52:50 17    utterance has gone through the system, ultimately what comes

11:52:54 18    out is a voice response that is played back through the

11:52:57 19    speaker.

11:52:58 20    Q.      And if we could go to Exhibit 226, slide 32.  This is

11:53:11 21    a multi-turn example for Alexa, correct?

11:53:14 22    A.      Yes.

11:53:14 23    Q.      And this example is very similar to what you used in

11:53:19 24    your video, correct?

11:53:20 25    A.      Yes, it is.

Polish - direct

Q.      And this is the example set forth in the Amazon
technical documents that was the deep dive?

A.      Yes, it is.

Q.      And would Claim 13 of the '681 patent be practiced
during the multi-turn example?

A.      Yes, absolutely.

Q.      Now, there is some discussion in this case about like
a single-turn conversation.  Are you familiar with that?

A.      Yes, generally.

Q.      And would single-turn conversations include
short-term shared knowledge?

A.      It certainly could.  It wouldn't -- not all would
necessarily, but you certainly could have a single-turn that
would have short-term information in it.

Q.      And where the single-turn have short-term
information, would Alexa also use long-term information?

A.      The long-term faster information is used with speaker
ID, there is lots of long-term information that would be
used all the time, so in a situation where a single-turn is
using short-term, it would be using both.

Q.      And in the case where a single-turn utterance
included short-term shared knowledge, would Claim 13 be
practiced?

A.      Yes.

Q.      Now, let's turn to your opinion as to the '176

Polish - direct

11:54:41 1  patent, the first of the voice ad patents.  And if we could

11:54:48 2  have PDX3-26 on the screen, that's Claim 40.

11:54:58 3  A.      Okay.

11:54:59 4  Q.      Dr. Polish, what is your opinion with respect to

11:55:02 5  Claim 40 of the '176 patent?

11:55:05 6  A.      That it is infringed by the Alexa system.

11:55:09 7  Q.      Now, this is Alexa Shopping, correct?

11:55:12 8  A.      Yes.

11:55:12 9  Q.      Would Alexa Shopping involve multi-turns?

11:55:17 10 A.      Yes, it certainly can.

11:55:19 11 Q.      And would that -- now, let's talk about the preamble

11:55:24 12 of Claim 40.  Do you see that this preamble recites a system

11:55:32 13 for selecting and presenting advertisements in response to

11:55:36 14 processing natural language utterances, do you see that?

11:55:40 15 A.      Yes.

11:55:41 16 Q.      Is that present in Alexa?

11:55:42 17 A.      Yes, it is.

11:55:43 18 Q.      And what's the basis for your opinion?

11:55:45 19 A.      Technical documents and the use of it that I showed.

11:55:51 20 Q.      So let's now go to the next element.  Does Alexa

11:56:00 21 include an input device that receives a natural language

11:56:02 22 utterance containing at least one request at an input

11:56:02 23 device?

11:56:07 24 A.      Yes.

11:56:07 25 Q.      And what's the basis for your opinion?

Polish - direct

11:56:09 1    A.      Technical documents and my own use of it.

11:56:14 2    Q.      And if we could look at now PDX3-27.  And does this

11:56:22 3    support your opinion that Alexa includes an input device

11:56:28 4    that receives a natural language utterance?

11:56:30 5    A.      Yes, this is showing the input device and it's

11:56:34 6    showing the user's utterance being sent to the Alexa voice

11:56:37 7    service.

11:56:37 8    Q.      If we could now go back to PDX3-10 -- PDX3-26.  Thank

11:56:46 9    you.  Looking at the next element, "a speech recognition

11:56:51 10   engine coupled to the input device, wherein the speech

11:56:55 11   recognition engine recognizes one or more words or phrases

11:56:58 12   in the natural language utterance."  Is that element met by

11:57:04 13   Alexa?

11:57:05 14   A.      Yes, it is.

11:57:05 15   Q.      What's the basis for your opinion?

11:57:07 16   A.      The technical documents and my own use.

11:57:09 17   Q.      And if we can now go to the next slide.  And how does

11:57:19 18   the technical documents show that Alexa practices this

11:57:26 19   element?

11:57:26 20   A.      Right.  So these documents are showing that the

11:57:29 21   speech comes in on the input device and is sent to the ASR

11:57:34 22   which is in the upper right, the Automatic Speech

11:57:38 23   Recognition system which is also shown in Figure 1 of the

11:57:41 24   '176 patent as the ASR in the Figure 1.

11:57:46 25   Q.      Going to the next element.  This element of the claim

Polish - direct

recites "a conversational language processor coupled to the speech recognition engine, wherein the conversational language processor is configured to."  Do you see that?

A.     Yes.

Q.     Is that present in Alexa?

A.     Yes, it is.

Q.     And what's the basis for your opinion?

A.     From the technical documents that I have seen.

Q.     And how does Alexa meet this?

A.     The conversational language processor is the NLU and some other components, it's also including -- it's also including speechlets as well, as part of that, that we talked about, but in this diagram that's contained within the NLU.

Q.     And if we can go to the next slide.  And how does this support your opinion regarding whether or not the Alexa Shopping system has a conversational language processor coupled to the speech recognition engine?

A.     So this is from the technical document we have seen before, the coupling to the speech recognition system is via this thing on the left labeled SIRF, S-I-R-F, that's what's coming from the speech recognition, and goes into this recognition engine within the NLU.

Q.     And so there is a recognition engine within the NLU engine of Alexa?

Polish - direct

11:59:33 1   A.      That's right.

11:59:34 2   Q.      If could go to now, the next element.  Can you expand

11:59:42 3   that, interpreting, interpret the recognized.  The next

11:59:50 4   element recites "interpret the recognized words or phrases,

11:59:54 5   wherein the interpreting the recognized words or phrases

11:59:57 6   includes establishing a context for the natural language

12:00:00 7   utterance."  Is that met by Alexa Shopping?

12:00:03 8   A.      It is.

12:00:04 9   Q.      And what's the basis for your opinion?

12:00:05 10  A.      The technical documents.

12:00:07 11  Q.      And how do those documents support this opinion?

12:00:11 12  A.      So, the interpretation of the words and phrases is

12:00:16 13  what we've seen before, the coming up with an intent and

12:00:25 14  slots based on the words that are presented.

12:00:29 15  Q.      And is that supported by the technical documents such

12:00:32 16  as the one shown on the screen?

12:00:34 17  A.      Yes.

12:00:35 18  Q.      And how so?

12:00:36 19  A.      So the output of the NLU which we've seen other

12:00:40 20  places is, I believe it's called a BIF, which is this

12:00:44 21  collection of intents that are -- that establish the context

12:00:51 22  for those words.

12:00:54 23  Q.      So the output of the NLU is intent; correct?

12:00:58 24  A.      Yes.

12:00:58 25  Q.      And that establishes context?

356

Polish - direct

12:01:00 1  A.      Yes.

12:01:05 2  Q.      Can you go to the next element?

12:01:10 3          Do you see this element recites select an

12:01:16 4  advertisement in the context established for the natural

12:01:19 5  language utterance.  Do you see that?

12:01:22 6  A.      Yes.

12:01:22 7  Q.      Is that found in Alexa Shopping?

12:01:26 8  A.      It is.

12:01:26 9  Q.      And what's the basis for your opinion?

12:01:28 10 A.      The technical documents.

12:01:30 11 Q.      And how do they support your opinion?

12:01:33 12 A.      So what happens is the user says that they want to

12:01:40 13 shop for something, that is -- that's recognized, and that

12:01:46 14 information is sent to a shopping speechlet which is a piece

12:01:49 15 of application code that is connected to the NLU, and it

12:01:55 16 selects a device or selects a product which is then

12:02:00 17 presented.  So the example that I gave in my demo was that I

12:02:05 18 said "Alexa, I want to buy an iPhone case," and the

12:02:09 19 speechlet went off, shopping speechlet went off and figured

12:02:14 20 out that it wanted to sell me this case.

12:02:17 21 Q.      And stay on this slide, stay on this slide, but I

12:02:21 22 notice here that this also has the next element recited in

12:02:24 23 the claim, press a selected advertisement via an output

12:02:28 24 device, do you see that?

12:02:29 25 A.      Yes.

Polish - direct

12:02:30  1    Q.      Is that found in Alexa?

12:02:31  2    A.      Yes, it is.

12:02:32  3    Q.      And do you base that opinion on the technical

12:02:36  4    documents you reviewed?

12:02:36  5    A.      Yes, it's based on the technical documents and my own

12:02:40  6    use of it.

12:02:40  7    Q.      And in the example here, did the Echo device present

12:02:44  8    the advertisements?

12:02:45  9    A.      Yes, it did.

12:02:48 10    Q.      If we could now go back to the language of Claim 40,

12:02:53 11    the last element.  Go to slide 26.  The last element of

12:03:09 12    Claim 40 recites "an adaptive misrecognition engine

12:03:14 13    configured to determine that the conversational language

12:03:18 14    incorrectly interpreted the words or phrases in response to

12:03:22 15    detecting a predetermined event, wherein the conversational

12:03:28 16    language processor reinterprets the words or phrases in

12:03:30 17    response to the predetermined event."  Do you see that?

12:03:33 18    A.      Yes.

12:03:34 19    Q.      Is that element practiced by Alexa Shopping?

12:03:37 20    A.      Yes, it is.

12:03:38 21    Q.      And what's the basis of that opinion?

12:03:40 22    A.      The technical documents.

12:03:42 23    Q.      And how do the technical document that you reviewed

12:03:42 24    support that opinion?

12:03:47 25    A.      So, we've seen that Alexa can get information that

Polish - direct

12:03:54 1    causes it to rescore, or to reevaluate what -- which intent

12:04:02 2    is the right one.  So that can be done based upon any number

12:04:07 3    of signals that are passed into it to change the scoring of

12:04:14 4    the intent.

12:04:15 5    Q.      If we could have Exhibit 226, page 22 on the screen.

12:04:22 6    This is the NLU deep dive document that we were discussing.

12:04:33 7    And does re-ranking support your opinion with regard to the

12:04:39 8    last element?

12:04:39 9    A.      Yes, so this re-ranking could happen in response to

12:04:45 10   getting some information that indicated that you had gotten

12:04:49 11   it wrong, that the top scoring intent was wrong, and then it

12:04:54 12   would re-rank it and try a different intent.

12:04:57 13   Q.      And one of the events that could cause that, an input

12:05:01 14   would be context, correct?

12:05:03 15   A.      Yes, that's one of the inputs listed here.

12:05:07 16   Q.      All right.  Let's now turn to the '097 patent.

12:05:20 17   Looking at Claim 23 of the '097 patent, starting with the

12:05:24 18   preamble, do you see that this recites a system providing

12:05:31 19   natural language processing based on advertisements, the

12:05:34 20   system comprising.  Do you see that?

12:05:36 21   A.      Yes.

12:05:37 22   Q.      Is that present in Alexa Shopping?

12:05:38 23   A.      Yes, it is.

12:05:40 24   Q.      And what's the basis for that?

12:05:42 25   A.      The documents and my own use.

Polish - direct

12:05:44 1    Q.      And if we could go to the next element.  You see that

12:05:59 2    it says one or more physical processors programmed with the

12:06:02 3    computer program instructions, which when executed, cause

12:06:05 4    one or more physical processors to, do you see that?

12:06:08 5    A.      Yes.

12:06:09 6    Q.      Is that met by Alexa Shopping?

12:06:10 7    A.      Yes, it is.

12:06:11 8    Q.      Why is it met by Alexa Shopping?

12:06:14 9    A.      Well, the Alexa voice system is running on servers,

12:06:17 10   the servers have processors, those processors execute

12:06:23 11   instructions, so it has to be running on a server somewhere,

12:06:27 12   it's a physical server.

12:06:29 13   Q.      And looking at the exhibit here from DTX-586, do you

12:06:34 14   see there is a reference there to Alexa voice services?

12:06:38 15   A.      Yes.

12:06:39 16   Q.      Do you see at the bottom it says AWS?

12:06:41 17   A.      Yes.

12:06:42 18   Q.      What do you understand AWS to be?

12:06:44 19   A.      AWS is Amazon's, is the cloud hosting service for

12:06:50 20   hosting servers, I use it as part of my business all the

12:06:54 21   time.  It's an enormous infrastructure that supports many,

12:06:58 22   many servers.

12:07:01 23   Q.      Is it fair to say that those many servers have many

12:07:04 24   physical processors?

12:07:06 25   A.      Yes.

Polish - direct

12:07:05 1    Q.     And those processors are programmed with the computer

12:07:09 2    instruction; correct?

12:07:11 3    A.     Yes.

12:07:11 4    Q.     Can we go to the next element?  This one recites

12:07:17 5    "provide an advertisement associated with a product or

12:07:20 6    service for presentation to a user."  Is that element

12:07:25 7    present in Alexa Shopping?

12:07:27 8    A.     Yes, it is.

12:07:27 9    Q.     And why is it?

12:07:31 10   A.     From the technical documents and from my own use of

12:07:33 11   it.

12:07:35 12   Q.     And how did your own use illustrate providing an

12:07:41 13   advertisement associated with a product or server for

12:07:44 14   presentation to the user?

12:07:45 15   A.     When I asked Alexa for an iPhone case, it came up

12:07:50 16   with one to offer me.  It offered it to me, it presented it,

12:07:54 17   it gave me its price.  That offering is an advertisement,

12:08:01 18   certainly as it was discussed in the patent.

12:08:03 19   Q.     And what the Alexa advertisement offered is Amazon's

12:08:12 20   choice is a Lago compatible with iPhone 13 Pro case liquid

12:08:16 21   silicone case, right?

12:08:20 22   A.     That's right.

12:08:21 23   Q.     And that was selected by Alexa Shopping, correct?

12:08:26 24   A.     Yes, that was selected by Alexa Shopping, I had

12:08:30 25   nothing to do with choosing it.

Polish - direct

12:08:35 1    Q.      Can we go to the next element?  Does Alexa Shopping

12:08:38 2    receive the natural language utterance of a user?

12:08:40 3    A.      Yes, it does.

12:08:42 4    Q.      And that was illustrated when you spoke to Alexa to

12:08:45 5    order the iPhone case, right?

12:08:47 6    A.      That's right.

12:08:48 7    Q.      Can we go to the slide for that?

12:08:51 8             And so in the example here, was colored in

12:08:57 9    white, Alexa what color or what color is it, or the previous

12:09:02 10   one about I want to buy an iPhone case, those were

12:09:06 11   utterances, right?

12:09:07 12   A.      Correct, those were all natural language utterances

12:09:11 13   of the user.

12:09:12 14   Q.      If we go to the next element.  The last element says

12:09:25 15   "interpret the natural language utterance based on the

12:09:28 16   advertisement and responsive to the existence of a pronoun

12:09:31 17   in the natural language utterance, determine whether the

12:09:35 18   pronoun refers to one or more of the product or service or a

12:09:40 19   provider of the product or service."  Do you see that?

12:09:42 20   A.      Yes.

12:09:42 21   Q.      Is that element present in Alexa Shopping?

12:09:47 22   A.      Yes, it is.

12:09:48 23   Q.      And why is it present?

12:09:49 24   A.      Based upon technical documents and my own use of it.

12:09:52 25   Q.      If we go to the next slide.

Polish - direct

12:09:55 1          And how did your communication with Alexa

12:10:05 2   Shopping indicate that this element was present?

12:10:08 3   A.      So, when I asked it -- so it had just offered me this

12:10:12 4   iPhone case, and then I asked it what color, and it came

12:10:17 5   back with the definition of the word peach.  So it clearly

12:10:25 6   didn't know what I was talking about because the iPhone case

12:10:28 7   isn't peach.  But when I later said, Alexa what color is it,

12:10:34 8   it being the pronoun, it recognized that I was referring to

12:10:39 9   the color of the iPhone case, and it correctly said the

12:10:43 10  color is stone.  So there it's clear that Alexa is using the

12:10:51 11  presence of the pronoun to understand that I was referring

12:10:56 12  to the product in the advertisement and not just some random

12:11:01 13  color.

12:11:01 14  Q.      And turning to now the last of our patents, the '703

12:11:05 15  patent.  On the screen is the language of Claim 25 of the

12:11:09 16  '703 patent, okay?

12:11:12 17  A.      Okay.

12:11:12 18  Q.      And is it your opinion that Alexa Shopping infringes

12:11:18 19  Claim 25 of the '703 patent?

12:11:21 20  A.      Yes.

12:11:22 21  Q.      And let's focus on, as we have been, element by

12:11:25 22  element.  Can we have the first one?  "A system for

12:11:31 23  providing voice commerce, the system comprising."  Is Alexa

12:11:36 24  Shopping a system for providing voice commerce?

12:11:38 25  A.      Yes, it is.

Polish - direct

12:11:39 1    Q.      Can we go to the next element?

12:11:42 2            This element recites, "one or more physical

12:11:49 3    processors programmed with computer program instructions

12:11:52 4    which, when executed, cause the one or more physical

12:11:56 5    processors to."  Do you see that?

12:11:58 6    A.      Yes.

12:11:58 7    Q.      Is that element present in Alexa Shopping?

12:12:02 8    A.      Yes, it is.

12:12:03 9    Q.      And why is it?

12:12:04 10   A.      Same as we had before, these are -- this is running

12:12:08 11   on servers, the servers are running in AWS which has

12:12:14 12   physical processors, so there are physical processors

12:12:17 13   running the computer programs embodying Alexa Shopping.

12:12:21 14   Q.      Going to the next element.  Receive a user input

12:12:30 15   comprising a natural language utterance.  Does Alexa receive

12:12:36 16   a user input comprising a natural language utterance?

12:12:39 17   A.      Yes.

12:12:42 18   Q.      Can we go to the next slide.  Did your demonstration

12:12:45 19   illustrate how Alexa receives a user input comprising a

12:12:51 20   natural language utterance?

12:12:52 21   A.      Yeah, certainly when I said, "Alexa I want to buy an

12:12:55 22   iPhone case," that was the user input was natural language.

12:13:02 23   Q.      Can you go to the next element.  This element

12:13:02 24   requires "provide, without further user input after the

12:13:10 25   receipt of the user input, the natural language utterance as

Polish - direct

12:13:13 1    an input to a speech recognition engine."

12:13:18 2              Is that element present in Alexa Shopping?

12:13:21 3    A.      Yes, it is.

12:13:22 4    Q.      And why is it?

12:13:23 5    A.      Based upon the technical documents and my own use.

12:13:26 6    Q.      And how do the technical documents illustrate that it

12:13:32 7    would provide without further user input after the receipt

12:13:36 8    of user input the natural language utterance that's an input

12:13:41 9    to the speech recognition engine?

12:13:47 10   A.      What goes on is I speak to the Echo, the Echo

12:13:51 11   receives it, and sends it straight to the ASR, there is no

12:13:56 12   further action I have to take, I just speak and it goes.

12:13:59 13   Q.      If we go to the next element.  Obtain without further

12:14:05 14   user input after the receipt of the user input, one or more

12:14:09 15   words or phrases recognized from the natural language

12:14:13 16   utterance as an output of the speech recognition engine.  Is

12:14:18 17   that element present in Alexa Shopping?

12:14:21 18   A.      Yes.

12:14:21 19   Q.      And why is it present?

12:14:23 20   A.      Technical documents and the fact that the output of

12:14:33 21   the ASR goes straight to the NLU without my having to do

12:14:40 22   anything further.

12:14:41 23   Q.      So the natural utterance that was said is received by

12:14:45 24   the ASR?

12:14:46 25   A.      Yes.

Polish - direct

12:14:47 1    Q.      And the ASR will provide it to the NLU?

12:14:50 2    A.      Yes.

12:14:51 3    Q.      And will it require any additional input to do that?

12:14:55 4    A.      No.

12:14:56 5    Q.      If we go to the next element.  This element is

12:15:03 6    "determine, without further user input after the receipt of

12:15:06 7    the user input, a context based at least on the one or more

12:15:11 8    words or phrases."  Do you see that?

12:15:13 9    A.      Yes.

12:15:14 10   Q.      Is that element met by Alexa Shopping?

12:15:17 11   A.      Yes, it is.

12:15:18 12   Q.      And why is it met?

12:15:19 13   A.      It's met because the NLU comes up with an intent, and

12:15:25 14   that intent is part of the context.  And that's done without

12:15:31 15   any further input from the user.

12:15:33 16   Q.      And do the Amazon technical documents support the

12:15:37 17   fact that it's a context based on one or more words or

12:15:42 18   phrases?

12:15:42 19   A.      Yes, that's -- we have seen it in technical documents

12:15:46 20   so far including PTX-226.

12:15:48 21   Q.      And one of the things that the Alexa NLU has is a

12:15:52 22   context interpreter?

12:15:54 23   A.      That's right.

12:15:56 24   Q.      Is that illustrated in the red box here from PTX-226?

12:16:02 25   A.      Yes the context interpreter is there, it's a 2 step

Polish - direct

12:16:08 1    approach that combines context information from different

12:16:10 2    sources.

12:16:20 3    Q.      Let's go to the next element, identify without

12:16:24 4    further user input after the receipt of the user input, the

12:16:27 5    product or service to be purchased on behalf of the user

12:16:30 6    based at least on the determined context."

12:16:33 7    A.      Yes.

12:16:34 8    Q.      Is that element practiced by Alexa Shopping?

12:16:37 9    A.      Yes.

12:16:37 10   Q.      And why is it practiced?

12:16:39 11   A.      Well, we've seen it in documents and you could see it

12:16:43 12   in my use of it that it found an iPhone case to offer me

12:16:49 13   without my having to do anything further.

12:16:52 14   Q.      If we go to the next slide.  And how is that

12:16:55 15   illustrated in your video demonstration of use with Alexa?

12:16:59 16   A.      Yeah, so I asked for an iPhone case, and it without

12:17:03 17   any further queries from me, just came up with that

12:17:07 18   particular offer.

12:17:07 19   Q.      Which is the Lago compatible with iPhone 13 proliquid

12:17:14 20   silicone case?

12:17:14 21   A.      Yes.

12:17:14 22   Q.      If we go to the next element here.  "Obtain payment

12:17:22 23   information with which to pay for the product or service."

12:17:22 24   Do you see that?

12:17:27 25   A.      Yes.

Polish - direct

Q.      Is that element met by Alexa Shopping?

A.      Yes.

Q.      And was that illustrated in your demonstration?

A.      Yes, it was.

Q.      Could we go to the next slide.  Also here the next element is "obtain, without further user input after the receipt of the user input, shipping information with which to deliver the product or service, wherein the shipping information specifies a name or address of a recipient to which the product or service is to be delivered after the product or service is purchased."  Is that element present in Alexa Shopping?

A.      Yes.

Q.      And why is it present?

A.      Well, it's present from my own use of it, it's also in documents that are discussed.

Q.      Next slide.  Let me just ask you.  Sir, in your example of the video, when you said buy it, did Alexa Shopping ask for your credit card or purchasing information?

A.      No, it didn't.

Q.      Did Alexa Shopping ask for your address?

A.      No.

Q.      Did it, when you said buy it, ship the case to you without requiring any input with respect to either financial information or address information?

Polish - direct

12:19:06 1    A.      That's right, it did it without any of that

12:19:08 2    information being given by me at the time.

12:19:12 3    Q.      Going to the next element, "provide, without further

12:19:15 4    user input after the receipt of the user input, a request

12:19:19 5    for user confirmation to use the payment information and the

12:19:23 6    shipping information for a purchase transaction for the

12:19:26 7    product or service."

12:19:29 8            Is that element met by Alexa Shopping?

12:19:34 9    A.      Yes.

12:19:35 10   Q.      And what's the basis of that opinion?

12:19:37 11   A.      My own use of it and their documents.

12:19:42 12   Q.      Now looking at the last three elements that we have

12:19:45 13   been talking about, but in particular, provide without

12:19:49 14   further user input after the receipt of the user input a

12:19:52 15   request for user confirmation to use the payment information

12:19:56 16   and the shipping information for a purchase transaction for

12:20:00 17   the product or service, was that illustrated in your video

12:20:04 18   demonstration?

12:20:04 19   A.      Yes.  It provided -- it provided -- it provided the

12:20:12 20   information about what was going on.

12:20:12 21   Q.      So when you said, "Alexa, buy it now," what happened?

12:20:20 22   A.      It made a beep tone, and said that it was -- that it

12:20:26 23   was placing the order and it will be shipped to me and what

12:20:31 24   the costs were.

12:20:32 25   Q.      And did it indicate that it would be delivered to New

Polish - direct

12:20:35 1    York, 10025?

12:20:37 2    A.      Yes.

12:20:37 3    Q.      That's your address?

12:20:38 4    A.      That's my Zip code, yes.

12:20:40 5    Q.      And that, did it indicate that the total including

12:20:45 6    tax after $0.65 in discounts and credits, was $13.44?

12:20:52 7    A.      Yes, that's what it said.

12:20:53 8    Q.      Was that charged to your credit card without any

12:20:56 9    additional input?

12:20:57 10   A.      Yes.

12:20:57 11   Q.      Were all the elements of Claim 25 met by Alexa

12:21:01 12   Shopping?

12:21:01 13   A.      Yes.

12:21:16 14   Q.      Just a few more questions, Dr. Polish.  In this case,

12:21:22 15   did you review the expert report of Amazon expert

12:21:27 16   Dr. Johnson?

12:21:27 17   A.      Yes.

12:21:28 18   Q.      And did Dr. Johnson offer an opinion regarding

12:21:32 19   possible non-infringing alternatives to the VoiceBox patent?

12:21:36 20   A.      Yes, he did.

12:21:37 21   Q.      And what impact did these non-infringing alternatives

12:21:42 22   have on the number of turns that a user would have to use to

12:21:47 23   perform the operations without practicing the patents?

12:21:50 24   A.      In Dr. Johnson's view, the number of turns would

12:21:56 25   increase.

Q.      And would that increase -- let me ask this first.
Would it increase by approximately how much, at least?

A.      I don't remember the exact number, but it was on the
order of, you know, of 2 or 3 number of turns, it may have
been one-and-a-half turns, something like that.

Q.      And do the VoiceBox patents reduce the number of
turns that a user needs to make?

A.      Yes, they will.

Q.      And does that streamline the user's interface with
respect to how they interact with Alexa?

A.      Yes, the whole point is to reduce the amount of
effort the user has to go through.

Q.      Would the patents in this case reduce the friction
between the user and the system performing it?

A.      Yes.

        MR. YOON:  Your Honor, at this time, we would
also like to admit Exhibit 586.

        MR. HADDEN:  I don't recall what that is.

        MR. YOON:  That's the DTX-586 document.  I'm
sorry.  It's the one in the slide.

        MR. BELGAM:  Your Honor, can we confer?

        MR. HADDEN:  No objection, Your Honor.

        THE COURT:  Thank you.  It is admitted.

        (DTX Exhibit No. 586 was admitted into
evidence.)

12:23:24  1    MR. YOON:  Thank you, Dr. Polish.  No questions.

12:23:27  2    THE COURT:  Did he talk about that document?

12:23:30  3    MR. YOON:  Those were the documents in all the

12:23:32  4  slides, it was the slide, each slide that said PDX, I forgot

12:23:35  5  to mention that, he did talk about, that's the main, if we

12:23:40  6  can call up one of the slides, he repeatedly talked about

12:23:43  7  those documents.

12:23:44  8    THE COURT:  I just want to make sure --

12:23:46  9    MR. YOON:  He did.

12:23:47 10    THE COURT:  All right.  Thank you.  How about

12:23:49 11  before cross we take our lunch break.

12:23:51 12    MR. HADDEN:  Sure.

12:23:51 13    THE COURT:  Let's take our lunch break.  We'll

12:23:53 14  come back after, a little bit after 1:00.

12:23:58 15    COURTROOM DEPUTY:  All rise.

12:23:59 16    (Jury leaving the courtroom at 12:23 p.m.)

12:24:21 17    THE COURT:  All right.  You guys can be seated.

12:24:33 18  And sir, you can step down.

12:24:36 19    Claim construction, is there going to be an

12:24:38 20  issue on that?  I didn't hear Dr. Polish talk about it, so

12:24:42 21  I'm just curious.

12:24:42 22    MR. HADDEN:  Yeah, I think we can avoid that

12:24:47 23  issue at this point.  He kind of pointed to something but he

12:24:52 24  didn't redefine it.

12:24:52 25    THE COURT:  And there was no objection, so I

Polish - cross

12:24:56 1   didn't hear that, but if you think there is, then you're

12:24:59 2   going to have to tell me so I can deal with it.  All right.

12:25:03 3                   COURTROOM DEPUTY:  All rise.

12:25:04 4                   (A luncheon recess was taken.)

13:08:31 5                   COURTROOM DEPUTY:  All rise.

13:08:32 6                   MR. YOON:  I just have one brief procedural

13:08:43 7   thing.  Your Honor, the next witness after this one will be

13:08:47 8   Mr. Peck, and Mr. Peck is the source code witness.  Your

13:08:50 9   Honor, the protective order, the parties agreed we wouldn't

13:08:52 10  be making copies so for Exhibit 541(a) and 541(b), Mr. Smith

13:08:59 11  will be using the Elmo but the witness won't be given a

13:09:03 12  copy.

13:09:03 13                  THE COURT:  How are you going to give it to the

13:09:05 14  jury when they deliberate?

13:09:07 15                  MR. YOON:  We'll submit it to the jury when they

13:09:10 16  deliberate, there is no objection to being submitted, but

13:09:13 17  the order limited the number of copies, but it will be

13:09:18 18  submitted to jury, there is no dispute there, it's just two

13:09:21 19  copies.

13:09:21 20                  THE COURT:  You guys agree?

13:09:24 21                  MR. HADDEN:  Fine, Your Honor.

13:09:31 22                  (Jury entering the courtroom at 1:09 p.m.)

13:09:33 23                  THE COURT:  All right.  Everyone, welcome back.

13:09:48 24          Please proceed.

13:09:52 25                       CROSS-EXAMINATION

Polish - cross

13:09:52 1   BY MR. HADDEN:

13:09:53 2   Q.      Good afternoon, Dr. Polish.

13:09:55 3   A.      Good afternoon.

13:09:56 4   Q.      Now the Alexa NLU or Natural Language Understanding,

13:10:01 5   uses machine learned neural networks, correct?

13:10:08 6   A.      There are some neural networks components of the NLU.

13:10:12 7   Q.      And those neural networks are domain models, those

13:10:18 8   are machine learned DNN's and they're used to classify the

13:10:22 9   user's intent, correct?

13:10:24 10  A.      That's part of what the NLU does, it also does other

13:10:28 11  things as I talked about.

13:10:29 12  Q.      But you agree that the domain models are machine

13:10:34 13  learned DNN's used to classify the user's intent, correct?

13:10:40 14  A.      As I said, there are machine learned models within

13:10:45 15  the NLU that are also rules and other things used to

13:10:50 16  classify intent.

13:10:51 17  Q.      Well, you prepared an expert report in this case that

13:10:55 18  included your opinions about how Alexa worked and your

13:10:59 19  opinions on infringement, correct?

13:11:01 20  A.      Yes.

13:11:02 21  Q.      Okay.  And you have that in your binder in front of

13:11:05 22  you.  Let's look at your expert report.  Mr. Patterson, can

13:11:12 23  we look at Dr. Polish's opening report at paragraph 90.  On

13:11:21 24  page 31?

13:11:24 25  A.      Tell me which tab it is in this.

Polish - cross

13:11:28 1    Q.      You should have a tab for your report, pretty thick,

13:11:32 2    probably the thickest thing in your cross binder.  Do you

13:11:36 3    have that?  There should be two binders there.

13:11:58 4    A.      Yes, there is another binder labeled -- oh, and

13:12:03 5    expert reports.  Okay.

13:12:08 6    Q.      It's on page 31 of your opening report.  If you look

13:12:31 7    at paragraph 90, you start by saying the domain models are

13:12:36 8    machine-learned DNN's used to classify the user's intent,

13:12:40 9    such as does the customer want to play music, get the

13:12:44 10   weather, or shop, do you see that?

13:12:46 11   A.      Yes.

13:12:47 12   Q.      And that's accurate, right?

13:12:55 13   A.      Yes, for the -- yes.

13:12:58 14   Q.      And you don't say anything in here about rules, you

13:13:02 15   talk about machine-learned DNN's, right, in fact, if we go

13:13:17 16   up to paragraph 88, Mr. Patterson.  Highlight that sentence.

13:13:26 17   You said in your expert report when you're describing

13:13:30 18   Alexa's NLU, the first step in the 1P pipeline, "X-domain

13:13:40 19   recognition and re-ranking" refers to running all the 1P

13:13:44 20   domain models in parallel and running them through a

13:13:47 21   re-ranking model that merges all results.  Do you see that?

13:13:50 22   A.      I see that.

13:13:51 23   Q.      When you talk about 1P models, those are those deep

13:13:54 24   neural networks, those machine learning neural networks,

13:14:00 25   right?

Polish - cross

13:14:01 1    A.      Just give me one second to review the rest of this

13:14:06 2    section in the report here.

13:14:36 3    Q.      You wrote this report, right?

13:14:38 4    A.      Yes.

13:14:44 5    Q.      Okay.

13:14:45 6    A.      So the section we're talking about refers to one

13:14:50 7    particular pipeline through the NLU.

13:14:52 8    Q.      Right, and that's the 1P pipeline, that's the

13:14:54 9    pipeline that is used to determine whether the user's

13:15:01 10   request relates to one of the functionalities of Alexa that

13:15:05 11   Amazon itself provides rather than a third-party skill,

13:15:10 12   right, that's why it's called 1P, correct?

13:15:14 13   A.      It's one of the pipelines that the NLU runs, it's

13:15:20 14   part of what the NLU does.

13:15:21 15   Q.      Well, let's be clear here.  1P refers to it being a

13:15:26 16   pipeline for the Amazon speechlet, like shopping or weather,

13:15:35 17   or alarms, and the other examples that you used that you

13:15:37 18   just talked about with VB Assets's counsel, right?  Let me

13:15:47 19   ask a clearer question, maybe.  Every example that you

13:15:51 20   talked about earlier today, those are all examples of these

13:15:56 21   domain models running in the 1P pipeline, those generated

13:16:00 22   intents, right?

13:16:00 23   A.      What I talked about with counsel this morning was

13:16:02 24   about generating intents within the NLU.

13:16:12 25   Q.      Right.  And every one of these examples you used,

376

Polish - cross

13:16:15 1 those intents were generated by these deep neural networks

13:16:19 2 that are run in the 1P pipeline; right?  Do you not know how

13:17:05 3 the intents were generated that you talked about all

13:17:08 4 morning?

13:17:08 5 A.    I know that the intents were generated within the

13:17:11 6 NLU.  I don't know -- what I'm not clear about is whether

13:17:15 7 they were part of the 1P pipeline in particular.

13:17:19 8 Q.    Okay.  So you don't know other than that they came

13:17:21 9 out of the NLU box, how they were actually generated?

13:17:24 10 A.    Well, we talked about they were generated based upon

13:17:28 11 the document we had from Mr. Vanee, that they were generated

13:17:33 12 by executing a variety of different pipelines, including

13:17:41 13 ones that contained rules including ones that contained

13:17:47 14 finite data machines including one that contained models.

13:17:48 15 Q.    You don't know whether these are generated by the 1P

13:17:52 16 models that you talk about in your report?

13:17:54 17 A.    I don't recall whether the -- whether what was in

13:17:59 18 Mr. Vanee's diagram was entirely part of 1P or not entirely

13:18:05 19 part of 1P.

13:18:06 20 Q.    So in your report here, you claim that the

13:18:11 21 information that's in paragraph 90, the information in a

13:18:16 22 SIRF, is passed to all the domain models, roughly 37 to

13:18:22 23 produce intents and token labels, do you see that?

13:18:24 24 A.    Yes.

13:18:26 25 Q.    And those 37 domain models, those are 37 of those

Polish - cross

13:18:34 1    machine learned deep neural networks, right?

13:18:36 2    A.    Yes, that's my understanding.

13:18:37 3    Q.    And each of those domain models produces multiple

13:18:42 4    results, including intent classification and name entity

13:18:48 5    recognition; right?

13:18:50 6    A.    Yes.

13:18:51 7    Q.    And then the Alexa NLU -- before I get there, yeah,

13:19:02 8    and the Alexa NLU sorts those results based on confidence

13:19:10 9    scores and retains the NBest to be passed along to

13:19:18 10   downstream processing.

13:19:20 11   A.    Yes.

13:19:22 12   Q.    Yes, and the output of the NLU retains multiple

13:19:26 13   interpretations of a customer's request right?

13:19:29 14   A.    Yes, the different intents are different

13:19:31 15   interpretations.

13:19:37 16   Q.    At least what you described in your report is what I

13:19:41 17   showed in the opening, right, so we have this NLU and it

13:19:46 18   receives the words from ASR, that's what's in that SIRF,

13:19:53 19   right?

13:19:56 20   A.    The SIRF contains the recognized words.

13:19:57 21   Q.    Right, that's the output of ASR, right?

13:20:00 22   A.    The SIRF is the output of the ASR.

13:20:03 23   Q.    And those words, that's what is provided to these

13:20:07 24   deep neural network domain models, and here I only show six,

13:20:12 25   but as you explained in your report, there is actually 37,

Polish - cross

13:20:17 1    right?

13:20:17 2    A.      Yes.

13:20:18 3    Q.      And those guys receive whatever the words are, right,

13:20:23 4    and they process those neural networks, and each one comes

13:20:29 5    up with its own meaning, right?

13:20:34 6    A.      So you used -- so first of all, the implication here

13:20:38 7    is that the entirety of the NLU is of these -- are these

13:20:43 8    DNN's, which it's not, and also you're calling them

13:20:48 9    meanings.  They're different intents and associated slots.

13:20:52 10   Q.      So let's just follow along with what you said in your

13:20:55 11   expert report.  What you describe in your expert report is

13:20:58 12   exactly what I showed on the screen, which is the output of

13:21:01 13   ASR goes through each of the deep neural networks and they

13:21:06 14   all provide at least one, maybe multiple interpretations,

13:21:10 15   correct?

13:21:12 16   A.      They each can provide one or more intents and slots.

13:21:19 17   Q.      Well you called them interpretations in the expert

13:21:22 18   report, are they interpretations?

13:21:24 19   A.      Yes, that's in the form of those intents.

13:21:26 20   Q.      Right, so these are interpretations of what the words

13:21:31 21   meant that the user spoke; right?

13:21:38 22   A.      I'm cagey about using the word meaning here because I

13:21:42 23   think it implies --

13:21:42 24   Q.      Meaning today in the claim, and you talked about

13:21:46 25   determining the meaning of the words that are ambiguous in

Polish - cross

13:21:51  1    an utterance, right?

13:21:51  2    A.       Yes.

13:21:53  3    Q.       And in that use of meaning, you were referring to

13:21:56  4    exactly this, which are the intents and slots that are

13:21:59  5    determined by the NLU, right?

13:22:02  6    A.       Broadly speaking, an interpretation of what comes out

13:22:06  7    of the ASR is an intent and slot.

13:22:12  8    Q.       Right.

13:22:12  9    A.       Yes.

13:22:13 10    Q.       That's what I'm showing exactly here on the diagram

13:22:16 11    right, you have different meanings for the words that come

13:22:19 12    out of each of these neural networks, right, and they're

13:22:23 13    collected in this list; right, that's the NBest words,

13:22:28 14    correct?

13:22:28 15    A.       This is your slide, this is -- are you saying that

13:22:35 16    change is the intent and 6:45 is the slot.

13:22:43 17    Q.       I'm using meaning to incorporate both the intent and

13:22:45 18    the slot, do you understand that?

13:22:47 19    A.       Okay.

13:22:48 20    Q.       Okay, so given that interpretation, this diagram is

13:22:52 21    correct, right?

13:22:52 22    A.       This diagram is extremely high level and it's -- I

13:23:05 23    was trying to make reference to actual Amazon documents that

13:23:08 24    had more technical terminology there.  I'm not sure I see

13:23:12 25    anything wrong with this diagram, but it's not -- I'm not

Polish - cross

1    adopting it as the truth.

2    Q.    One important thing about this diagram and also when

3    you say in your expert report is that the Alexa NLU runs all

4    of these deep neural networks, 37 in your report.  And they

5    all do their job and come up with their interpretation

6    before any context is selected, right?

7    A.    My understanding is that as I testified to this

8    morning, there are rules -- there are rules approaches taken

9    that would complete before these NLU -- these neural

10   networks would finish processing.

11   Q.    I understand that.  But the question is, if we take

12   music as an example of a context, Alexa doesn't determine

13   that the user's request had to do with music before it runs

14   all 37 neural networks and comes up with all the different

15   meanings, right?

16   A.    Well, there is more to the context than just -- than

17   just this one output.  In a multi-turn environment, you're

18   going to have, as I showed, you're going to have prior --

19   you're going to have prior -- prior intents as the current

20   context.

21   Q.    Let's just focus on what we're talking about now.

22   Speech comes into through the ASR, the words are recognized,

23   every utterance goes through this process, and we create a

24   list of meanings before Alexa has picked which of these

25   contexts is the right one; correct?

Polish - cross

13:25:03 1    A.      Well, also going into these are the current contexts

13:25:08 2    and the information about the prior -- the prior dialogue

13:25:16 3    acts.

13:25:16 4    Q.      That's not true, you know that's not true.  The input

13:25:19 5    to the deep neural network, that's only the words that come

13:25:23 6    out of the ASR, right?

13:25:25 7    A.      I don't know if that's solely the inputs.

13:25:27 8    Q.      You don't know how these work, right?  Do you know

13:25:32 9    how these work or not?

13:25:34 10   A.      My understanding is that the deep neural networks

13:25:37 11   take into account contexts, as well as the speech that comes

13:25:42 12   out.

13:25:42 13   Q.      So you believe that when the NLU processes the words

13:25:48 14   from SIRF, it somehow has other inputs?

13:25:52 15   A.      My understanding is that the NLU takes into account

13:25:57 16   context.

13:25:58 17   Q.      Let's be more precise than that.  We're not talking

13:26:04 18   about everything that's done in the NLU, I'm talking about

13:26:06 19   the processing of the words by these deep neural networks

13:26:10 20   that you talk about in your report.  What they receive is

13:26:13 21   only the words from the utterance, correct?

13:26:16 22   A.      I'm looking at the NLU, the NLU takes into account

13:26:20 23   the other things.  It may be that there is a portion of the

13:26:22 24   code that doesn't take into account the contexts.  But the

13:26:28 25   NLU takes into account the contexts.

Polish - cross

13:26:30 1    Q.      Answer my question.  My question is, I'm not talking

13:26:34 2    about the NLU, I'm talking about the deep neural networks

13:26:37 3    that you described in your report, and it's true fact, isn't

13:26:40 4    it, that the only thing that they receive as input are the

13:26:44 5    words from NLU, isn't that a true fact?

13:26:50 6    A.      I don't know whether the particular deep neural

13:26:52 7    network that you're pointing to just takes in speech or

13:26:56 8    takes in other things.  The NLU takes into other things

13:26:59 9    beside just the speech.

13:27:00 10   Q.      As far as you know, what I have got on the screen is

13:27:02 11   absolutely accurate, right?

13:27:04 12   A.      I'm not adopting your slide, as you already said the

13:27:07 13   NLU does more than just run the deep neural networks.

13:27:11 14   Q.      I'm not asking about that, I'm asking about the

13:27:13 15   process that you describe in your report where the output of

13:27:17 16   the ASR is processed by deep neural networks, this is

13:27:21 17   accurate, right?

13:27:25 18   A.      The deep neural -- I don't know whether the deep

13:27:28 19   neural networks use more than just speech.

13:27:30 20   Q.      You don't know what they do because you actually

13:27:35 21   didn't look at any of Alexa source code in this case, did

13:27:40 22   you?

13:27:40 23   A.      Well, yes, I certainly did look at source code.

13:27:44 24   Q.      You did?  Do you recall being deposed in this case?

13:27:47 25   A.      I do.

Polish - cross

13:27:48 1    Q.      Let's look in your deposition.  Let's look at page 7,

13:28:02 2    lines 1 through 4.  Mr. Patterson, if you could pull up a

13:28:15 3    clip, if you have it.  Did you find that in your deposition,

13:28:23 4    sir?

13:28:23 5    A.      Yes.

13:28:25 6    Q.      Can we play the clip?

13:28:26 7                  (Videotape deposition:)

13:28:31 8    Q.      Is it correct that you did not review any of the

13:28:34 9    Alexa source code that Amazon made available in this case?

13:28:38 10   A.      That is correct.

13:28:39 11                 MR. YOON:  Objection, Your Honor.

13:28:41 12                 THE COURT:  Go ahead.

13:28:42 13                 MR. YOON:  I understood, Your Honor, under the

13:28:45 14   procedure they're not supposed to be able to look at it.

13:28:48 15                 THE COURT:  We don't play it up there, that's

13:28:51 16   not even impeachment.  Why don't you ask him if he read it

13:28:55 17   and looked at it, tell him what it says, but don't play it.

13:28:59 18                 MR. HADDEN:  Okay, Your Honor.

13:29:00 19                 THE COURT:  You did not ask him any questions I

13:29:02 20   just looked at it --

13:29:02 21   BY MR. HADDEN:

13:29:02 22   Q.      Do you see your testimony from your deposition on

13:29:02 23   page 7, line 1?

13:29:02 24   A.      Yes.

13:29:02 25   Q.      Were you asked the question:

384

Polish - cross

13:29:10 1          "Question:  Is it correct you did not review any

13:29:14 2   Alexa source code that Amazon made available in this case?"

13:29:16 3          Is it correct that you answered:

13:29:18 4          "Answer:  This is correct."

13:29:21 5   A.     I said that is correct, yes.

13:29:23 6   Q.     Is that a true statement?

13:29:24 7   A.     Yes, I did not review code.  I didn't sit at a source

13:29:28 8   code review computer and review it.

13:29:31 9   Q.     And is it also true that you relied entirely on

13:29:36 10  Mr. Peck's analysis of the Alexa source code?

13:29:40 11  A.     I relied -- yes, I relied on Mr. Peck's analysis of

13:29:45 12  the source code and I looked at the code that was in his

13:29:47 13  report and that he provided to me.

13:29:51 14  Q.     Is it correct that -- did you direct any of

13:30:03 15  Mr. Peck's source code review or analysis?

13:30:06 16  A.     Indirectly through the lawyers.

13:30:12 17  Q.     Let's turn to your deposition again, page 8.  Do you

13:30:15 18  have it?  Line 5 through 7.  Were you asked:

13:30:22 19         Question:  Did you direct any of Mr. Peck's

13:30:25 20  source code review or analysis?

13:30:27 21         Did you answer:

13:30:29 22         Answer:  No, I did not.

13:30:34 23  A.     Yes, I said that.

13:30:35 24  Q.     Is that how you testified?

13:30:37 25  A.     That is.

Polish - cross

Q.      And you didn't tell or ask Mr. Peck to analyze
certain features of the Alexa source code, is that right?

A.      Yes, I did not tell Mr. Peck directly to do anything.
I saw the questions that the lawyers were asking him, I
contributed to that, and I saw what was going on through
that interaction.

Q.      And you could have reviewed the Alexa source code, it
was all made available to you, correct?

A.      Yes, I think so.

Q.      But you didn't bother to look at any of that code
that was made available to you?

A.      I resist the term bother there, sir.  I had somebody
who was looking at the code very diligently and I interacted
through the lawyers with him and had his report.  I
certainly took seriously my responsibility to confirm what I
found with the code.

Q.      But you had the opportunity to see exactly how what
we saw on the screen work in the source code, and you chose
not to look at it, correct?

A.      I did not look at the source code.  I did not review
the source code on a source code computer.

Q.      Can we put the demonstrative back up.
        Now, you agree that the output of NLU is a list
of possible interpretations, right?

A.      The output-- my understanding is the output of these

Polish - cross

13:32:12 1    models is an NBest list of intents and slots.

13:32:17 2    Q.    Right, that's what I have here is this list and

13:32:21 3    meaning, right?

13:32:21 4    A.    Okay.

13:32:23 5    Q.    Now, if Alexa chose a context for all these DNN's

13:32:31 6    processed the user's words, then my example from the opening

13:32:40 7    of "do I need an umbrella," versus "I need an umbrella,"

13:32:47 8    wouldn't work, right?

13:32:49 9    A.    I'm not sure I'm following.

13:32:51 10   Q.    Sure.  So if Alexa decided before figuring out the

13:32:57 11   meaning of the user's words in all possible contexts, they

13:33:01 12   decided beforehand that it was going to be focused on the

13:33:05 13   shopping context, and we only ran the neural network for

13:33:11 14   shopping, then if I said "Alexa, do I need an umbrella," I

13:33:17 15   would get intent about buying an umbrella, and not a weather

13:33:22 16   forecast, right?

13:33:24 17   A.    No, I don't think that's -- I don't think that's

13:33:27 18   right.

13:33:27 19   Q.    Well, the weather forecast intent would come from the

13:33:33 20   operation of the weather model, when it operates on the

13:33:33 21   words, right, isn't that how it works?

13:33:47 22   A.    So maybe we can re-examine this hypothetical.  Give

13:33:47 23   me the example that you're talking about.

13:33:49 24   Q.    Sure.  I say "Alexa, do I need an umbrella?"

13:33:55 25   A.    Okay.

Polish - cross

13:33:55 1    Q.      And we agree the words the way it works now, the

13:33:58 2    words "Do I need an umbrella?", would be provided as input

13:34:03 3    to all thirty-seven of those neural networks in the 1P

13:34:07 4    pipeline; correct?

13:34:08 5    A.      Among other things, yes.

13:34:09 6    Q.      And now if instead of doing that, Alexa decided this

13:34:14 7    is a shopping context, and only provided those words to the

13:34:20 8    model for shopping, then I would never get a weather intent,

13:34:25 9    right?

13:34:25 10   A.      No, as I was saying, the NLU takes into account

13:34:30 11   context, so you could absolutely have all those words

13:34:34 12   supplied to all these DNN's, they would all put up what they

13:34:38 13   thought things were and then they were interpreted in the

13:34:42 14   context of the context.  So if you said "do I need an

13:34:45 15   umbrella," and you were in the middle of discussing weather

13:34:49 16   with Alexa, there would be a propensity to decide this was

13:34:54 17   weather, not shopping.

13:34:55 18   Q.      That wasn't my hypothetical.  The hypothetical was,

13:34:59 19   you decide a context before the words are processed by the

13:35:02 20   DNN, right?

13:35:02 21   A.      Okay.

13:35:02 22   Q.      You do that, you're never going to get a weather

13:35:02 23   intent, you picked shopping as the context?

13:35:11 24   A.      So you're assuming that having decided on the

13:35:14 25   context, you would shut down the other DNN's.

Polish - cross

13:35:16 1    Q.      Sure.

13:35:18 2    A.      I don't believe that that's what occurs.

13:35:20 3    Q.      I agree that doesn't occur, we'll get into the

13:35:24 4    claims, but the claims require identifying a context before

13:35:27 5    you determine anything, right?

13:35:30 6    A.      The claim talks about finding a context.  And as I've

13:35:37 7    talked about, that context can come from a variety of

13:35:41 8    sources.

13:35:42 9    Q.      Let's look at the claim to make it clear.

13:35:45 10   Mr. Patterson, could we get PDX3-10?  This is Claim 13 of

13:36:00 11   the '681 patent from the counsel's presentation this

13:36:11 12   morning.  And before we get to the context, if we just blow

13:36:16 13   up the preamble again.  I think as you testified this

13:36:23 14   morning, this is a claim to computer executable

13:36:28 15   instructions, right?

13:36:29 16   A.      Yes.

13:36:30 17   Q.      And that's computer code; right?

13:36:34 18   A.      That's part of the preamble, yes.

13:36:37 19   Q.      And so if we want to find out whether this specific

13:36:42 20   computer code that's required by this claim was in Alexa,

13:36:42 21   the best place to look for that would be in the Alexa source

13:36:52 22   code, right?

13:36:52 23   A.      I'm not sure I understand.  My understanding is that

13:36:52 24   there is servers that are running Alexa, and that those

13:37:02 25   servers are embodied in executable code that's sitting on a

Polish - cross

13:37:10 1    server.

13:37:11 2    Q.      Sure, but if we're going to understand whether or not

13:37:14 3    Alexa has the specific computer instructions that are

13:37:18 4    required by this claim, the place we should look is in the

13:37:22 5    computer instructions in Alexa's source code; right?

13:37:27 6    A.      The computer source code and the computer executable

13:37:31 7    instructions are not the same thing.

13:37:34 8    Q.      The computer source code is where it gets compiled to

13:37:38 9    make the executable instructions the computer to run, right?

13:37:42 10   A.      There are many steps between the source code and

13:37:45 11   computer executable instructions.  The point is, that what

13:37:50 12   Alexa is doing, the Alexa server is running codes sitting on

13:37:57 13   computers and that's what is -- what's being talked about

13:38:01 14   here.

13:38:01 15   Q.      Right, and if you're going to look at the code in a

13:38:05 16   form that a human can read it, it would be in the source

13:38:08 17   code, right?

13:38:09 18   A.      Well, code in human readable form is source code.

13:38:15 19   But this preamble is not talking about source code.

13:38:19 20   Q.      You're telling me that the computer executable

13:38:22 21   instructions in Alexa are not created from source code?

13:38:28 22   A.      Well, of course they're created, they're created from

13:38:32 23   source code.  What this preamble is talking about is

13:38:35 24   computer readable medium, not human, computer readable and

13:38:40 25   computer executable instructions that are -- that are

Polish - cross

13:38:44  1    providing this user interface.  So I'm talking about not

13:38:47  2    source code here, but the code that runs the server.

13:38:50  3    Q.    Right, and you didn't look at the code that runs the

13:38:54  4    servers, right?

13:38:55  5    A.    I did not look at the machine code that was sitting

13:38:58  6    on the servers, no.

13:39:00  7    Q.    Let's look at the -- one of the requirements of this

13:39:09  8    claim is receiving an utterance; right?

13:39:17  9    A.    Yes.

13:39:18 10    Q.    And that utterance then has to be processed by those

13:39:23 11    computer executable instructions in a specific way; right?

13:39:28 12    A.    Okay.

13:39:29 13    Q.    And if we look at the accumulate short-term shared

13:39:35 14    knowledge element, that has to be knowledge about the

13:39:40 15    utterance.  Can you see that?  I have it highlighted there,

13:39:50 16    sir, right?

13:39:51 17    A.    Well it includes knowledge about the utterance that

13:39:53 18    was received, but the short-term shared knowledge is about

13:39:56 19    the current conversation.  So those are -- the conversation

13:40:00 20    can contain multiple utterances and the knowledge, the

13:40:02 21    short-term knowledge is knowledge that goes from utterance

13:40:02 22    to utterance within the same conversation.

13:40:03 23    Q.    Right, but it has to be included knowledge about the

13:40:12 24    utterance and that has to be the utterance that was received

13:40:12 25    in the receive an utterance step, right?  It has to be the

Polish - cross

13:40:21 1    same utterance, right?

13:40:25 2    A.      Well, the short-term shared knowledge includes

13:40:28 3    knowledge about the -- it includes other things as well.

13:40:31 4    Q.      Sure, but the utterance in this element has to be the

13:40:34 5    same utterance that we receive when we receive an utterance,

13:40:38 6    right?

13:40:40 7    A.      Well, it is accumulating short-term knowledge from

13:40:44 8    the current utterance.  The short-term knowledge includes

13:40:49 9    knowledge accumulated from prior, that's what it means to be

13:40:52 10   accumulating.

13:40:54 11   Q.      Right, this is not that complicated.  All I'm trying

13:40:59 12   to confirm is when it says knowledge about the utterance,

13:41:02 13   that has to be the same utterance that's referred to above

13:41:05 14   where it says receive an utterance, right?

13:41:10 15   A.      Again, it's not that complicated, short-term

13:41:15 16   knowledge about the current conversation and it's

13:41:17 17   accumulating some knowledge about the current utterance.

13:41:22 18   Q.      Right, and then we go down to the identify context

13:41:28 19   step.  And we have to identify a context associated with the

13:41:33 20   utterance again, right?

13:41:37 21   A.      Yes.

13:41:37 22   Q.      And that has to be the utterance that we received

13:41:40 23   above; right?

13:41:42 24   A.      Yes, it's the utterance.

13:41:45 25   Q.      And if we go to the next element, we have to

Polish - cross

13:41:51 1    establish an intended meaning for the utterance, it has to

13:41:56 2    be the same utterance we started with, right?  Correct?

13:42:03 3    A.      Yes, this is talking about establishing an intended

13:42:07 4    meaning for this particular utterance.

13:42:08 5    Q.      Right, and then we have to go down to the last one

13:42:13 6    where we generate a response to the utterance, right?

13:42:17 7    A.      Yes.

13:42:18 8    Q.      So nowhere this morning did you identify what-strike

13:42:26 9    that.   Nowhere this morning did you tell the jury this is

13:42:30 10   the utterance and here is how every one of these steps is

13:42:36 11   performed on that utterance, did you?

13:42:39 12   A.      So I reviewed the example of a demonstration and I

13:42:51 13   talked about how utterances were received and processed by

13:42:55 14   the NLU.

13:42:57 15   Q.      No, my question is very specific.  This claim

13:43:01 16   requires taking a specific utterance and doing these

13:43:06 17   highlighted things to it.  You didn't identify an utterance

13:43:09 18   and show how each of these steps is performed on that

13:43:13 19   utterance, did you?

13:43:14 20   A.      That is why I walked through my infringement

13:43:18 21   analysis, I walked through my infringement analysis by

13:43:21 22   looking at the documents and about my demonstrated use.

13:43:25 23   Q.      Understood.  But going back to my football/soccer

13:43:30 24   ball example in the opening, to prove infringement, you have

13:43:33 25   to prove that Alexa receives an utterance, the specific

Polish - cross

13:43:38 1    utterance, and that each of these things required, right?

13:43:43 2    A.    I have to prove that Alexa does each of the elements

13:43:46 3    of the claims.

13:43:47 4    Q.    Right, and each of the elements have to be performed

13:43:51 5    consistently on a single utterance as recited here; right?

13:43:59 6    A.    Well, it traces through what happens with an

13:44:03 7    utterance and how knowledge is gained through the utterance

13:44:07 8    and knowledge gained previously is used with the utterance.

13:44:11 9    Q.    So what utterance did you show this that each of

13:44:17 10   these steps maps to?

13:44:20 11   A.    Well, I showed -- I showed the conversation that I

13:44:26 12   had with Alexa, and I showed the technical documents to show

13:44:29 13   what Alexa is doing.

13:44:31 14   Q.    That's not what's required.  What's required is you

13:44:34 15   have to identify an utterance and show to the jury that each

13:44:37 16   of these things is gone through.  So what is the utterance

13:44:40 17   that you think you showed that for?

13:44:43 18   A.    I did not show it that way, I showed what Alexa is

13:44:47 19   doing and -- showed that Alexa is doing each and every thing

13:44:52 20   that is in the claim.

13:44:52 21   Q.    It's a fact, isn't it sir, that you can only prove

13:44:52 22   infringement if you prove that every element of this claim

13:44:52 23   was performed; right?

13:45:01 24   A.    Yes.

13:45:02 25   Q.    Okay.  And to perform every element of this claim,

Polish - cross

13:45:05 1    you have to have a specific utterance and show that each of

13:45:09 2    these highlighted steps is performed with respect to that

13:45:13 3    utterance; isn't that what is required, isn't that the law?

13:45:17 4    A.    I'm not a lawyer.  I know that I showed that Alexa

13:45:22 5    was doing each of these things, and I showed documents

13:45:25 6    around it and I showed an example of Alexa in use.

13:45:30 7    Q.    Let's be very clear.  True fact or not, did you show

13:45:36 8    the specific utterance that is processed in the way required

13:45:39 9    by Claim 13?

13:45:52 10   A.    It's possible that my demo example would fit this and

13:45:58 11   could be analyzed that way.  That isn't how I presented it.

13:46:03 12   It's possible that my demo example shows receiving an

13:46:08 13   utterance and using -- and accumulating short-term

13:46:11 14   knowledge, identifying the context and establishing intended

13:46:14 15   meaning and generating a response, I didn't analyze it in

13:46:20 16   that way.

13:46:21 17   Q.    But you didn't show any utterance that Alexa has ever

13:46:27 18   processed, that's processed as required by the steps of this

13:46:31 19   claim, right?

13:46:32 20   A.    I showed a demonstration and I analyzed documents.

13:46:37 21   Q.    You're not answering my question.  Showing a

13:46:41 22   demonstration doesn't prove anything to the jury.  What the

13:46:44 23   jury has to see is that you proved that each step of this

13:46:48 24   claim is performed on a specific utterance so that we can

13:46:51 25   show that, you can show that the claim is met.  You didn't

Polish - cross

13:46:55 1  do that, right?

13:46:56 2  A.      I did not prove it by showing one specific utterance.

13:47:00 3  Q.      So let's look at your presentation.  And let's go to

13:47:17 4  the PDX3-12.  Now, PDX3-12, you cite to that deep dive

13:47:32 5  Amazon document on the right.  Is that correct?

13:47:36 6  A.      That's correct.

13:47:37 7  Q.      And what you show above, is the output of the NLU

13:47:44 8  when user says six, right?

13:47:49 9  A.      I don't know if that would be considered the output

13:47:52 10 of the NLU.  It certainly -- it's the NLU has reached a

13:47:56 11 number of different hypotheses about what six means.

13:48:00 12 Q.      But we all agree that the output of the NLU is this

13:48:06 13 NBest list which is, it looks like this, right, it's got

13:48:12 14 intent and slots and multiple contexts, right?

13:48:15 15 A.      Yes, that is true.

13:48:17 16 Q.      And so this has already been done before any context

13:48:24 17 has been identified in your mapping of the claim, right?

13:48:34 18 A.      So no, there is a context associated with what the

13:48:42 19 state of the system is already, and this is being

13:48:47 20 interpreted within the context of that context.  And there

13:48:51 21 is further example of how it processes this two-step

13:48:58 22 approach that takes into account the context that it had

13:49:01 23 before, and looks at new utterances and interprets them.

13:49:07 24 Q.      I'm confused now.  So let's look at the language that

13:49:11 25 you highlighted and red in the claim.  One or more words

Polish - cross

13:49:20 1   that have different meanings in different contexts.  Do you

13:49:22 2   see that?

13:49:23 3   A.      Yes.

13:49:23 4   Q.      You're saying that this slide proves that, right?

13:49:26 5   A.      I'm showing that this slide -- I'm saying that this

13:49:30 6   slide shows an example of Amazon considering the case where

13:49:34 7   the word six has different meanings and different contexts.

13:49:37 8   Q.      And the different contexts you identify are volume

13:49:41 9   level and song name, or are those a different meaning?

13:49:48 10  A.      So those are different slots within different

13:49:54 11  intents.

13:49:55 12  Q.      Just to be clear, when you say volume level equals

13:49:59 13  six, that's one meaning for the word six; correct?

13:50:02 14  A.      Yes.

13:50:03 15  Q.      And time equals six is another meaning for the word

13:50:07 16  six, right?

13:50:08 17  A.      That's right.

13:50:08 18  Q.      And song name equals six is another meaning for the

13:50:13 19  word six, right?

13:50:14 20  A.      Yes, because they each have different intents

13:50:18 21  associated with them.

13:50:18 22  Q.      And those different meanings are in different

13:50:23 23  contexts, so the different contexts you show here are global

13:50:28 24  set volume intent, is that a context?

13:50:31 25  A.      That's an intent, these are intents, and it's trying

Polish - cross

13:50:35 1    -- it's going to try to disambiguate, figure out which is

13:50:39 2    the correct intent.

13:50:42 3    Q.    That wasn't the question, though.  What the claim

13:50:45 4    requires is different meanings and different contexts.

13:50:48 5    A.    Yes.

13:50:48 6    Q.    We've gone over what the different meanings are.  So

13:50:51 7    where are you showing the different contexts on these

13:50:54 8    slides?

13:50:54 9    A.    Well, those different intents, set volume, multi-turn

13:51:03 10   notification, and multi-turn music are different -- in the

13:51:08 11   context of -- in the way of thinking about it in the claim,

13:51:12 12   those are different contexts.

13:51:13 13   Q.    That was what I said originally.  So you agree that

13:51:17 14   the different -- that set volume is a context, notifications

13:51:22 15   multi-turn intent is a context, music multi-turn intent is a

13:51:28 16   context, right?

13:51:30 17   A.    In the sense of the patent, those are different

13:51:32 18   contexts, yes.

13:51:33 19   Q.    We have three contexts here with a separate meaning

13:51:36 20   for each of them, right?

13:51:38 21   A.    Yes.

13:51:38 22   Q.    Okay.  And we haven't picked a context, right?

13:51:50 23   A.    Well, what do you mean we haven't picked a context?

13:51:55 24   Q.    We'll get to that.

13:51:57 25            Now, this, what we see on this slide, this is an

Polish - cross

| | |
|---|---|
| 13:52:01 | 1 |

1  example of what I showed on my demonstrative of that table

2  with the different meanings; right?

3  A.      I'm not sure I know what you're referring to.

4  Q.      Well, this is a portion -- right.  Here we go.  This,

5  what I showed here, what I have changed 6:45, meaning two,

6  meaning three, that is equivalent, if could go back, to what

7  you showed at the top of your slide where it says get set

8  volume intent, that would be one of the outputs from one of

9  the deep neural networks and it would include six, the

10  meaning, the meaning of six is volume level, right?

11  A.      I don't know that this is the output of an DNN.  This

12  is an output -- this is output from the NLU which as I said

13  does things besides the DNN, this could have been the result

14  of an DNN, but I don't know how it produced this.

15  Q.      And the same is true for the music intent song name

16  equals six, so six went into the music DNN and it figured

17  out that that could be the name of a song, right?

18  A.      Again, I don't know that it went through the DNN to

19  come up with this, it could have gone in through a rule or

20  gone in through an FST.

21  Q.      And the result, though, is that the NLU has already

22  determined the meaning of the word six in each of these

23  possible contexts, right?

24  A.      Those different -- those different meanings are

25  hypothetically in an NBest list.

Polish - cross

13:53:50  1    Q.      They are meanings for the word six in each of the

13:53:54  2    possible contexts, right?

13:53:55  3    A.      I think that's what I just said.

13:54:02  4    Q.      Now -- and at this point, we haven't used any

13:54:12  5    short-term shared knowledge, right?

13:54:17  6    A.      I don't know that that's -- that that's true.  The

13:54:22  7    NLU uses information from prior speech acts and from other

13:54:28  8    pieces of information.

13:54:30  9    Q.      Well let's look at that.  Let's look at PTX-226,

13:54:42 10    Mr. Patterson.  Let's look at page 32.  This is that

13:54:57 11    multi-turn example you talked about, right?

13:55:00 12    A.      Yes.

13:55:01 13    Q.      And in fact, the user is saying six, that's what we

13:55:07 14    saw on the top of your slide, PDX3-12, right, the result --

13:55:16 15    that six corresponds to the user saying six in this example,

13:55:20 16    right?

13:55:20 17    A.      They're both saying six.

13:55:23 18    Q.      Now, if we look in the same document and we go to the

13:55:34 19    next slide, 33, it explains that when the NLU processes that

13:55:42 20    word six to come up with those different meanings, it says

13:55:50 21    explicitly here, NLU models are currently not aware of

13:55:54 22    dialogue context, right?

13:55:56 23    A.      It says that, yes.

13:55:59 24    Q.      This is saying in fact, when Alexa interprets the

13:56:02 25    word six, it's not using any of that short-term shared

Polish - cross

13:56:08 1   knowledge about what the user had said before; right?

13:56:11 2   A.      That's not how I interpret this, I interpret this as

13:56:14 3   saying the NLU model, the statistical models, the DNN's, may

13:56:19 4   not be aware of dialogue contexts but the rules and FST's

13:56:24 5   are.

13:56:25 6   Q.      You haven't seen any Alexa source code or

13:56:30 7   documentation at least that you have shown the jury that

13:56:33 8   says that rules are FST's are where dialogue context, have

13:56:40 9   you?

13:56:40 10  A.      I haven't shown the jury any source code.

13:56:43 11  Q.      Or technical documents that said rules and FST's use

13:56:47 12  dialogue contexts, right?

13:56:49 13  A.      That's not true.  This document has examples of rules

13:56:55 14  and FST's running within the NLU along with models, and it's

13:57:01 15  showing use of dialogue contexts in this very example.  So

13:57:06 16  from that I think it's quite reasonable --

13:57:09 17  Q.      Let us walk through this example here to be a little

13:57:12 18  clear.

13:57:13 19  A.      Okay.

13:57:12 20  Q.      Because what happens in this example, is we run six

13:57:18 21  through the model with no dialogue context, as the Amazon

13:57:27 22  document itself says.  We get to the next slide, 34, please,

13:57:34 23  Mr. Patterson.  And this is what happens, right?  The

13:57:39 24  recognizer generates these intents and slots, these contexts

13:57:45 25  and meaning of words that we just saw in your chart, right?

Polish - cross

A.       This is showing for each of those utterances six,
yeah, and nope, the three different groups of three
different interpretations of those utterances.

Q.       Right, and the one that you used in your chart is the
one for six, the top line, right?

A.       That's right.

Q.       We just saw in this document that those meanings were
generated without using any dialogue context, right, that's
what the document said?

A.       Well, at this point in the process, it's showing you
what we get without dialogue contexts.

Q.       Right, so the meanings of the word six have all been
determined without any dialogue contexts, right?

A.       I don't know about determined, it's this is what it
is coming up with for each of these utterances just by
themselves.

Q.       Right, but the intents and slots, set volume intent
and volume equals six, for example, that doesn't get changed
anywhere in NLU after it gets generated?

A.       I mean, this example as I went through disambiguates
six to mean -- to mean what it's supposed to mean and then
uses the context interpreter to join back up with the point
in the dialogue where things have become ambiguous.

Q.       Let's just be clear.  Each of these examples here,
global set volume intent, notifications multi-turn intent,

Polish - cross

13:59:39 1    music multi-turn intent, they don't get changed anywhere in

13:59:42 2    the NLU process after they get generated in this step?

13:59:45 3    A.      I don't know that they get changed or not, that isn't

13:59:48 4    what this example is using it for.

13:59:50 5    Q.      Right, so as far as you know, all the meanings of the

13:59:53 6    words have already been determined before we have used any

13:59:59 7    dialogue context, right?

14:00:02 8    A.      The words are -- this is talking about how the words

14:00:07 9    are received and how the words can then -- and then later on

14:00:12 10   it talks about how the words can be used to disambiguate an

14:00:17 11   existing dialogue.

14:00:18 12   Q.      Let's be clear.  You just identified volume level

14:00:23 13   equals six as a meaning of the word six, right?

14:00:27 14   A.      That is -- that's one of the possible meanings, yes.

14:00:30 15   Q.      Right.  And time equals six is another meaning of the

14:00:33 16   word six, right?

14:00:34 17   A.      Yes.

14:00:35 18   Q.      And song name equals six is another meaning of the

14:00:38 19   word six, right?

14:00:39 20   A.      Yes.

14:00:39 21   Q.      And those meanings have all already been established

14:00:42 22   once we get to this step in the NLU process; right?

14:00:46 23   A.      I don't know what you mean by established.

14:00:48 24   Q.      They're right there.

14:00:50 25   A.      So those are three hypotheses.

Polish - cross

14:00:52 1   Q.      Right, and the output of NLU is a set of hypotheses,

14:00:57 2   right?

14:00:58 3   A.      It's a NBest list of hypotheses.

14:01:03 4   Q.      Right, so these are exactly the hypotheses that are

14:01:08 5   going to be output from the NLU, right?

14:01:12 6   A.      This is showing what the NLU comes up with.  I don't

14:01:17 7   -- I think calling that establishing the meaning is

14:01:19 8   misleading.

14:01:20 9   Q.      Okay.  Let's go forward in your example.  After we

14:01:49 10  accumulate the short-term shared knowledge, we accumulate

14:01:55 11  the long-term shared knowledge, we have to identify a

14:02:00 12  context.  Right?

14:02:01 13  A.      I'm sorry, we're talking about the '681?

14:02:06 14  Q.      Claim 13.

14:02:07 15  A.      Okay.

14:02:08 16  Q.      And look at slide PDX3-21, please, Mr. Patterson.

14:02:23 17  Sorry, that's the wrong slide.  Go to slide 20.  Yeah, that

14:02:46 18  was wrong.  You actually didn't show a slide where you

14:02:51 19  explained how Alexa identifies a context associated with the

14:03:01 20  utterance, did you?

14:03:02 21  A.      I don't remember -- I know I talked about it, I don't

14:03:05 22  remember whether it was in the slide or not.

14:03:07 23  Q.      And you didn't actually identify what the context

14:03:12 24  was, did you?  You have to have a word, it can have

14:03:20 25  different meanings in multiple contexts and then you're

Polish - cross

14:03:24 1    supposed to somehow identify one of those contexts from this

14:03:28 2    long-term and short-term knowledge; right?  Isn't that

14:03:40 3    correct?

14:03:42 4    A.     I'm sorry, which element are we talking about here?

14:03:45 5    Q.     Well, let's go to--well, I don't have it highlighted

14:03:49 6    because you don't have a slide that shows it, but it's the

14:03:53 7    identify context element.

14:03:57 8    A.     Okay.

14:03:57 9    Q.     Right, we can go here.  This is the element where we

14:04:04 10   have this utterance, you have some long-term shared

14:04:09 11   knowledge and some short-term shared knowledge, you're

14:04:12 12   supposed to use that to identify context; right?  And you

14:04:17 13   didn't show that step to the jury at all this morning, did

14:04:21 14   you?

14:04:23 15   A.     So we talked about examples involving the Hunger

14:04:35 16   Games example.  We had an example involving disambiguating

14:04:44 17   the word -- you know, 6:30 based upon short-term knowledge.

14:04:53 18   Q.     But that's not what's required here.  Here we have to

14:04:57 19   take the utterance we started with and we have to identify a

14:05:00 20   context associated with it, and we have to do that in a

14:05:02 21   specific way.  It uses both the short-term shared knowledge

14:05:02 22   and also long-term shared knowledge, right?  That's what's

14:05:11 23   required here.  And you didn't show a single example of

14:05:17 24   that, did you?

14:05:22 25   A.     I don't remember what the examples would be.  The

Polish - cross

14:05:32 1    Harry Potter example, where it was deciding whether or not

14:05:37 2    it was a song or an album was using knowledge about whether

14:05:47 3    the person had purchased the album.

14:05:50 4    Q.    Well, that's not both long-term shared knowledge and

14:05:55 5    short-term shared knowledge, is it?  You got to use both,

14:06:00 6    right?

14:06:03 7    A.    Let me think about that example.

14:06:09 8    Q.    You certainly didn't explain this to the jury, did

14:06:12 9    you?

14:06:12 10   A.    Well, I explained to the jury that we were

14:06:15 11   identifying a context associated with the utterance where it

14:06:22 12   was using short-term knowledge that came from additional

14:06:34 13   elements in the conversation.

14:06:36 14   Q.    You didn't show that.  Tell me what the utterance

14:06:40 15   was, what the additional conversation information was, and

14:06:44 16   what the long-term shared knowledge was.  Because that is

14:06:48 17   all required to show that you did this.

14:06:52 18   A.    So, I showed that 6:30 was a.m. -- was a.m. based

14:07:03 19   upon subsequent information that came in on the next

14:07:08 20   utterance.

14:07:11 21   Q.    That doesn't have anything to do with what this claim

14:07:14 22   requires.  You're just talking about a Harry Potter example,

14:07:18 23   now you're switching to 6:30 a.m.  Do you have any example

14:07:22 24   where you actually did this?

14:07:25 25   A.    I don't know that I have a specific example in mind

Polish - cross

14:07:28 1   other than the ones that I presented.

14:07:29 2   Q.    So you acknowledge that you did not show the jury

14:07:33 3   that this required element of the claim is actually done by

14:07:37 4   Alexa, right?

14:07:38 5   A.    Alexa is in the NLU as we saw from the documents, is

14:07:46 6   -- is disambiguating words that have multiple meanings based

14:07:53 7   upon different pieces of information.

14:07:57 8   Q.    Okay.  But that is not what this claim requires.  The

14:07:59 9   claim does not say disambiguate words using different pieces

14:08:05 10  he have information, that is not what this claim requires,

14:08:07 11  the claim requires these specific steps and you haven't

14:08:10 12  shown that Alexa does any of them, and specifically not this

14:08:19 13  one; right?

14:08:20 14          Let's go forward to the last element -- well,

14:08:38 15  let's go forward to the last element which is to generate

14:08:44 16  response to utterance, this would be PDX3-9, I think, can

14:08:52 17  you see that, Mr. Patterson.  Sorry, that's not the right

14:09:00 18  number.  We don't have a slide for this either.  Let's go

14:09:15 19  back in to the claim itself, Mr. Patterson.  Here we go.

14:09:24 20          So this claim element requires not just

14:09:28 21  generating a response, but it requires wherein the

14:09:33 22  conversational speech engine grammatically or syntactically

14:09:39 23  adapts the response based on the intended meaning, do you

14:09:44 24  see that?

14:09:47 25  A.    Yes.

Polish - cross

14:09:44 1   Q.    You do not cite a single Amazon document that talks

14:09:49 2   about grammatically or syntactically adapting this response,

14:09:55 3   correct?

14:09:56 4   A.    I showed examples of responses that Alexa was

14:10:04 5   generating that were responsive to the needs of the user.

14:10:10 6   And those responses were grammatically or syntactically

14:10:17 7   adapted.

14:10:17 8   Q.    You didn't show that.  You showed a response, but

14:10:20 9   this requires more than generating a response, it

14:10:23 10  specifically requires grammatically or syntactically

14:10:28 11  adapting it, and what you showed was this slide here which

14:10:31 12  doesn't show anything about grammatically or syntactically

14:10:35 13  adapting anything, does it?

14:10:37 14  A.    No, I think one of ordinary skill would understand

14:10:40 15  that grammatically or syntactically adapted simply means

14:10:44 16  that it's not just a canned response, it's not just okay, or

14:10:49 17  some canned response, it's something which is customized to

14:10:53 18  the situation.

14:10:54 19  Q.    You haven't seen any Amazon source code that

14:10:57 20  grammatically or syntactically adapts a response, correct?

14:11:02 21  A.    I'm sure I have, Amazon respond -- and I showed in my

14:11:07 22  demo that Amazon responds to things in ways that are

14:11:10 23  specific to the user's request.

14:11:12 24  Q.    No, that wasn't my question.  My question was it's a

14:11:15 25  true fact you haven't seen any Amazon source code that

Polish - cross

14:11:19 1   grammatically or syntactically adapts a response, correct?

14:11:22 2   A.      I don't recall specifically.

14:11:24 3   Q.      You haven't seen any testimony from any Amazon

14:11:28 4   witness or engineer that says that Amazon grammatically or

14:11:33 5   syntactically adapts a response, correct?

14:11:35 6   A.      They haven't so-they don't use those words, they say

14:11:38 7   that the response is in response to what the user has

14:11:42 8   requested.

14:11:43 9   Q.      And the only evidence you provided to this jury today

14:11:47 10  is this diagram that doesn't say anything about

14:11:52 11  grammatically or syntactically adapting a response, correct?

14:11:57 12  A.      I provided this and the fact that Amazon is

14:12:00 13  responding to a request from a user.

14:12:02 14  Q.      Okay.  Let's move to the '176 patent.  If we look at

14:12:22 15  slide PDX3-32.  You put up this slide in this element about

14:12:39 16  interpreting the recognized words or phrases wherein

14:12:45 17  interpreting the recognized words or phrases includes

14:12:49 18  establishing a context, do you see that?

14:12:51 19  A.      Yes.

14:12:51 20  Q.      And your example utterance was Alexa, I want to buy

14:12:57 21  an iPhone case; right?

14:13:00 22  A.      That was one example I gave, yes.

14:13:10 23  Q.      Right.  When you say Alexa, I want to buy an iPhone

14:13:15 24  case, this context interpreter is not used at all?

14:13:20 25  A.      This particular example here that was shown was

409

Polish - cross

14:13:25 1    associated with the two-step approach for resolving

14:13:29 2    ambiguities and things of that nature.

14:13:32 3    Q.       You're not answering my question.   In the example

14:13:35 4    that you used to try to show that Alexa does this, your

14:13:38 5    utterance was Alexa, I want to buy an iPhone case, and it's

14:13:43 6    a true fact that when you say Alexa, I want to buy an iPhone

14:13:47 7    case, what you have shown on the right-hand side of this

14:13:50 8    slide is not used at all?

14:13:54 9    A.       I don't believe it's using the two-step approach

14:13:58 10   that's talked about in this part of the document.

14:14:00 11   Q.       So you agree with me that this is inapplicable to

14:14:04 12   your example, right?

14:14:08 13   A.       The context interpreter may well be being used but

14:14:12 14   it's definitely not part of a two-step approach.

14:14:21 15   Q.       Let's go to slide PDX3-35, please, Mr. Patterson.

14:14:28 16   Now, this is the element that requires reinterpreting the

14:14:32 17   words or phrases in response to your predetermined event.

14:14:37 18   Right?

14:14:38 19   A.       Yes.

14:14:38 20   Q.       And what you show on the right is in re-ranking

14:14:46 21   process within Alexa's NLU?

14:14:46 22   A.       That's correct.

14:14:46 23   Q.       And this re-ranking process happens before the NLU

14:14:52 24   outputs its result; right?

14:14:56 25   A.       Well, the re-ranking process, there can be a run

Polish - cross

14:15:04 1    through the system where it has -- where it ranks it, then

14:15:08 2    there is an issue, there is something that happens, and

14:15:12 3    there is a signal of some sort and then it re-ranks and then

14:15:16 4    it outputs the re-ranked version.

14:15:19 5    Q.      You said that, but what really happens is that within

14:15:24 6    the NLU, the re-ranker will re-rank based on information

14:15:31 7    that had already been provided to the NLU when it was

14:15:34 8    interpreting the current utterance, right?

14:15:37 9    A.      Well the timing of when it gets that information

14:15:43 10   isn't particularly discussed.  It's -- it has -- the idea is

14:15:48 11   that the NLU produces an NBest list, and then other

14:15:53 12   information can be brought in to re-rank it.

14:15:56 13   Q.      But the NBest list is not provided to a speechlet or

14:16:07 14   a program that would respond to the user until after this

14:16:10 15   re-ranking process has been done, right?

14:16:12 16   A.      Not necessarily, under system features that feed the

14:16:16 17   re-ranker, one of the inputs is the ASR.  So you could have

14:16:21 18   -- you could have things feeding into the -- the decision to

14:16:25 19   re-rank that come in at various points in time.

14:16:28 20   Q.      Well, let's be clear about this.  When it says ASR,

14:16:32 21   that's the ASR results that were -- that was produced, these

14:16:39 22   are the words from speech recognition that produced or that

14:16:42 23   are being used to generate the intents we're looking at

14:16:46 24   here; right?

14:16:46 25   A.      I mean, it doesn't -- it doesn't say that, and the

Polish - cross

14:16:51 1    ASR was already provided as input to the NLU.

14:16:55 2    Q.    Let's be clear.  You don't have any evidence that

14:16:59 3    re-ranker somehow operates because a user indicates that

14:17:05 4    Alexa made a mistake, right, you just made that up?

14:17:09 5    A.    That the user said it?  I don't think I said that

14:17:13 6    because the user said it made a mistake.

14:17:15 7    Q.    You don't identify any actual predetermined event

14:17:18 8    that would cause Alexa's NLU to reinterpret the words or

14:17:25 9    phrases, correct?

14:17:26 10   A.    It says that their system features and various kinds

14:17:30 11   of input including context that would cause it to re-rank.

14:17:33 12   Q.    That wasn't the question.  You haven't identified a

14:17:37 13   single predetermined event that would could cause Alexa to

14:17:40 14   somehow reinterpret the words or phrases, correct?

14:17:43 15   A.    I haven't picked one out, no.

14:18:07 16   Q.    Let's look at slide PDX3-42.  This one that interpret

14:18:14 17   the natural language utterance based to the advertisement

14:18:16 18   and responsive to the existence of a pronoun in the natural

14:18:20 19   language utterance, determine whether the pronoun refers to

14:18:22 20   one or more of the product or service, and you understand

14:18:27 21   that for Alexa's NLU to interpret a pronoun, a speechlet has

14:18:30 22   to first provide a dialog act, right?

14:18:42 23   A.    I'm sorry, say that again.

14:18:42 24   Q.    Sure, for Alexa's NLU to actually determine the

14:18:42 25   meaning of a pronoun if it's going to do that, it has to

Polish - cross

14:18:51 1    first receive a dialog act from the speechlet, right?

14:18:59 2    A.      Dialog act from the speechlet.  I'm not sure I'm

14:19:03 3    following what you mean in this context here.

14:19:05 4    Q.      Sure.  So you actually have no evidence other than

14:19:10 5    what you thought you heard from Alexa, whether or not the

14:19:15 6    NLU actually determines whether the pronoun refers to one or

14:19:21 7    more of a product or service, correct?

14:19:23 8    A.      So, I don't know whether it's -- I don't know what

14:19:28 9    it's done with the pronoun, I don't know that -- what it

14:19:31 10   thinks about the pronoun, what I know and what I have shown

14:19:36 11   here, is that it is responsive to the existence of the

14:19:42 12   pronoun in the natural language utterance.  So the pronoun

14:19:46 13   exists in one utterance, doesn't exist in another, and there

14:19:49 14   are different responses.

14:19:50 15   Q.      Right.  But you don't know whether in either of these

14:19:54 16   cases the pronoun is actually used by the NLU, is used to

14:20:01 17   identify a product or service, right?

14:20:03 18   A.      I don't know -- in this particular case, I didn't

14:20:07 19   analyze any deeper than seeing that it clearly is doing

14:20:12 20   exactly what's in the claim element.

14:20:15 21   Q.      Well it's not, right, because this claim element

14:20:20 22   requires that the system, right, Alexa, do a determination,

14:20:25 23   which is whether the pronoun refers to a product or service.

14:20:29 24   And we both know from your deposition and the evidence in

14:20:34 25   this case, that when a user says buy it now, Alexa ignores

413

Polish - cross

14:20:41 1    the it, right, you get the same result when you say buy now,

14:20:46 2    right?

14:20:46 3    A.      Buy it now is a different example than this.

14:20:49 4    Q.      I understand.  I understand.  We agree on that, don't

14:20:52 5    we?

14:20:52 6    A.      I believe it is true if you say buy now or buy it

14:20:57 7    now, the behavior is the same.

14:20:59 8    Q.      Right.

14:21:00 9    A.      Clearly here what color produces a different result

14:21:05 10   from what color is it.

14:21:06 11   Q.      Sure.  And the reason what color gets a different

14:21:09 12   result, is that the intent is generated from what color gets

14:21:14 13   routed through a different speechlet in this example in the

14:21:18 14   shopping speechlet, right?

14:21:20 15   A.      It would seem that what color gets routed to

14:21:24 16   something that's looking up on the internet for a

14:21:27 17   definition, but it also, it's looking up the color peach,

14:21:33 18   which I don't know where that came from.  It just seems

14:21:35 19   clear that the existence of the pronoun tells Alexa that

14:21:40 20   we're talking about the purchase that we were making

14:21:44 21   previously.

14:21:44 22   Q.      Well, the existence of the pronoun may make it more

14:21:50 23   likely that the intent gets routed to the shopping

14:21:54 24   speechlet, it doesn't show that the NLU resolves the pronoun

14:21:59 25   to anything, right?

Polish - cross

A.      It's clearly showing that when I use the pronoun, that I'm talking about the product that I'm trying to purchase.

Q.      Well that's not true.  As far as the NLU knows, this could be just like buy now or buy it now, the only difference in this example is one of those utterances got routed to something other than shopping; right?

A.      I think the behavior of the system speaks for itself.

Q.      Well, let's be clear, you haven't identified any Amazon engineer testimony that supports that the pronoun is being resolved in this example, right?

A.      You said the pronoun is being resolved --

Q.      Sure, you have no evidence from this slide from any Amazon engineer that this pronoun is being resolved in the way the claim requires; right?

A.      I have no testimony from an Amazon engineer about it.

Q.      And you have no document from Amazon --

            THE COURT:  I think he was --

            You can finish your answer.

            THE WITNESS:  Thank you, Your Honor.  I think that the claim doesn't say resolve, it's clear that the presence of the pronoun tells Alexa that we're talking about the thing that I'm buying it, and you can tell that by the fact that it's giving me the color stone, which is the color of the thing that is being purchased.

Polish - cross

14:23:32  1   BY MR. HADDEN:

14:23:33  2   Q.      Let's be clear.  You do not have any Amazon document

14:23:36  3   that says that Amazon's NLU determines whether the pronoun

14:23:41  4   it refers to anything; correct?

14:23:43  5   A.      I am not presenting -- I am not presenting Amazon

14:23:49  6   technical documents on this.

14:23:50  7   Q.      You are not presenting Amazon source code that would

14:23:54  8   show that the pronoun is determined to refer to anything;

14:23:58  9   right?

14:23:59 10   A.      I'm not presenting source code here.

14:24:02 11   Q.      Let's look at the '703 patent.  Now, the utterance

14:24:12 12   that you used when you were explaining this example was

14:24:19 13   Alexa, I want to buy an iPhone case, right?

14:24:22 14   A.      Yes, I believe so.

14:24:24 15   Q.      And when you say Alexa, I want to buy an iPhone case,

14:24:31 16   you don't have any evidence to show that Alexa would obtain

14:24:38 17   your shipping information; right?

14:24:45 18   A.      Well it shipped it to my home, so --

14:24:48 19   Q.      Let's be clear.  Let's look at slide PDX3-55, please,

14:25:04 20   Mr. Patterson.  So if we look at the element obtain without

14:25:10 21   further user input after the receipt of the user input

14:25:13 22   shipping information, do you see that?

14:25:15 23   A.      Yes.

14:25:16 24   Q.      Right.  So this stuff about without further user

14:25:20 25   input means that the user can't say anything else after they

Polish - cross

14:25:25  1    said in your example Alexa, I want to buy an iPhone case;

14:25:29  2    right?

14:25:57  3    A.       So, when I say buy it now --

14:26:01  4    Q.       That's not the utterance that got you started.   You

14:26:04  5    got to have the same utterance, right, we start receive a

14:26:07  6    user input, comprising a natural language utterance.   And

14:26:11  7    what you said was, I want to buy an iPhone case, right?

14:26:14  8    A.       I did say that, that's right.

14:26:16  9    Q.       So that's the user input.   Now without any other user

14:26:21 10    input, we have to obtain shipping information.   Right?

14:26:27 11    Alexa doesn't obtain your shipping information when you say

14:26:32 12    I want to buy an iPhone case, right?

14:26:38 13    A.       I believe when I say buy it now, it then goes through

14:26:41 14    and --

14:26:41 15    Q.       Sir you're not reading the claim.   It says you have

14:26:50 16    to obtain without further user input after the receipt of

14:26:54 17    the user input.   And the user input was I want to buy an

14:26:58 18    iPhone case, right?

14:27:00 19    A.       And the user --

14:27:01 20    Q.       Let me finish the question, please, so it has to

14:27:04 21    obtain the shipping information at that point without any

14:27:08 22    further user input.   So you haven't shown and it's a true

14:27:12 23    fact that Alexa does not obtain the shipping information

14:27:16 24    when you say Alexa I want to buy an iPhone case; right?

14:27:20 25    A.       That may well be, when I say Alexa buy it now, at

Polish - cross

14:27:26  1   that point it obtains my shipping information and my payment

14:27:29  2   information and it process all the way through.

14:27:31  3   Q.      Right and when --

14:27:32  4            THE COURT:  Hold on, you're still cutting him

14:27:36  5   off when he's still talking, you finish and then you start.

14:27:39  6   Go ahead, sir.

14:27:40  7            MR. HADDEN:  Sorry, Your Honor.

14:27:42  8            THE WITNESS:  When I say Alexa buy it now, at

14:27:45  9   that point, it obtains my shipping information, it obtains

14:27:47 10   my payment information and it completes the purchase without

14:27:50 11   any further user intervention.

14:27:52 12   BY MR. HADDEN:

14:27:52 13   Q.      Sure.  But if we look at what the claim requires, it

14:27:55 14   requires that the shipping information has been obtained

14:27:59 15   after you say in your example Alexa, I want to buy an iPhone

14:28:04 16   case because it explicitly requires without further user

14:28:09 17   input.  If you were going to say buy it now, that would be

14:28:13 18   further user input; right?

14:28:16 19   A.      I think buy it now is the user -- is the initial user

14:28:25 20   input.

14:28:26 21   Q.      That's not what you told us this morning.  This

14:28:28 22   morning you told us, it was I want to buy an iPhone case.

14:28:32 23   So let's say instead you said buy it now.  If you say buy it

14:28:41 24   now, the rest of the claim doesn't work because you don't

14:28:47 25   identify the product based on buy it now; right?  You need

Polish - cross

14:28:59 1    to pick one input and stick with it through the claim.

14:29:16 2    A.      I think when I said I want to buy an iPhone case,

14:29:21 3    that was establishing various information, short-term

14:29:24 4    information, and I said buy it now, that was the utterance

14:29:30 5    that's being talked about here, and from that it completed

14:29:34 6    the purchase.

14:29:38 7    Q.      Well, the problem is if you look at the identifying

14:29:43 8    stuff, right, identify without further user input after the

14:29:48 9    receipt of the user input, the product or service to be

14:29:54 10   purchased, right?  Now the product you're trying to buy, the

14:29:58 11   iPhone case, it had already been identified before you said

14:30:02 12   buy it now.  That's why in your presentation to this jury

14:30:05 13   this morning, you said instead, Alexa, I want to buy an

14:30:09 14   iPhone case, right?

14:30:10 15   A.      I think you're misinterpreting here.  The identify,

14:30:15 16   obtain and obtain steps, there is an identify, and then the

14:30:20 17   next step is obtain, and the next was obtain, those are all

14:30:24 18   internal.  So the obtain, I have already provided payment

14:30:27 19   information to Amazon, so when it says obtain, I have

14:30:31 20   already provided that on the website.  And when it says

14:30:34 21   obtain payment information, it's getting it from the

14:30:39 22   database.  And when I say obtain -- obtain without further

14:30:42 23   user input shipping information, it's doing that from my

14:30:47 24   account, the long-term information that it has with Amazon.

14:30:52 25   So those identify, obtain, obtain, are internal.

Polish - cross

14:30:57 1   Q.     Understood.  I'm going back to what your input was.

14:31:02 2   Your input, Alexa I want to buy an iPhone case, is that

14:31:06 3   where we start this claim, or do we start with the claim

14:31:10 4   with the buy it now?

14:31:11 5   A.     I think for the purposes of this analysis, it's Alexa

14:31:14 6   buy it now.

14:31:14 7   Q.     So if it's buy it now, nowhere did you show the

14:31:18 8   identify without further user input receipt of the user

14:31:22 9   input the product or service to be purchased.  Right?

14:31:27 10  That's not identified by buy it now, right?

14:31:31 11  A.     That information is already part of the context of

14:31:33 12  the conversation.  I've already established it and the

14:31:38 13  identify is that Alexa is getting it from the context.

14:31:47 14  Q.     I didn't follow that.  But we'll move on.

14:31:50 15         Let's look at the last element of this claim,

14:31:52 16  please, Mr. Patterson.  Now, this required that the system,

14:31:59 17  Alexa, request, provide a request for user confirmation to

14:32:08 18  use the payment information and the shipping information for

14:32:12 19  a purchase transaction, correct?  And you didn't show that

14:32:17 20  at all; correct?  You showed this slide.  Nowhere did you

14:32:25 21  show Alexa saying Dr. Polish, please confirm this payment

14:32:31 22  information and the shipping information, right?

14:32:41 23  A.     I think that's right, I think the receipt was sent --

14:32:44 24  was sent via e-mail.

14:32:46 25  Q.     And you mentioned this morning that though you didn't

Polish - redirect

14:32:54 1 show it to the jury, that you could somehow have a

14:32:58 2 single-turn utterance that would itself include short-term

14:33:05 3 knowledge about itself, right?

14:33:10 4 A.   I don't think I said exactly those words, but I did

14:33:13 5 say that you could have -- you could have -- it's possible

14:33:16 6 to have a single -- a single utterance that would have

14:33:20 7 short-term information in it.

14:33:23 8 Q.   But you didn't give the jury any example of one of

14:33:26 9 those, did you?

14:33:27 10 A.   That's correct.

14:33:28 11 Q.   You never testified that such a thing actually --

14:33:31 12 well, in all of the interaction that you talked about with

14:33:37 13 Alexa, you did not provide an example of such an utterance,

14:33:41 14 correct?

14:33:41 15 A.   That's right.

14:33:43 16       MR. HADDEN:  No further questions.  Thank you.

14:33:46 17       THE COURT:  Redirect.

14:33:48 18          REDIRECT EXAMINATION

14:33:49 19 BY MR. YOON:

14:33:49 20 Q.   So, Dr. Polish, a couple of things.  First of all, in

14:33:54 21 the questioning by counsel for Amazon, counsel did not ask

14:34:02 22 you about the speaker ID or Voice ID, did he?

14:34:05 23 A.   That's correct.

14:34:06 24 Q.   And the speaker ID and Voice ID you showed in your

14:34:10 25 demonstration, what is that?

Polish - redirect

14:34:12 1    A.      So, the Speaker Voice ID is a -- its a component of

14:34:20 2    the Alexa system that you have to enroll, when you speak a

14:34:25 3    number of sentences, I think it was in my example, and it

14:34:29 4    learns your voice so that later on when you use the system,

14:34:35 5    it identifies you as you, and can customize the operation of

14:34:39 6    it for you.

14:34:39 7    Q.      And is that long-term shared information that's used

14:34:45 8    in each communication with Alexa thereafter?

14:34:48 9    A.      Yes, absolutely.

14:34:49 10   Q.      Now, there was a discussion regarding -- if we could

14:34:54 11   have slide PDX3-55, on the screen.  Do you recall there was

14:35:10 12   a discussion, if we could just focus on the right side for a

14:35:13 13   moment.  There was a discussion regarding the I want to buy

14:35:18 14   an iPhone case and buy it now.  Do you recall that?

14:35:21 15   A.      Yes.

14:35:21 16   Q.      And this is after you had already done the speaker

14:35:24 17   ID?

14:35:24 18   A.      Yes.

14:35:25 19   Q.      And so at the time you did this transaction because

14:35:28 20   of the speaker ID, what did Alexa know?

14:35:31 21   A.      It knew it was me, and it had my payment and shipping

14:35:33 22   information.

14:35:35 23   Q.      Okay.  If we go to the bottom on there.  The

14:35:39 24   statement buy it now, do you see that we had some discussion

14:35:42 25   about pronouns, do you recall that, sir?

Polish - redirect

14:35:45 1    A.      Yes.

14:35:46 2    Q.      And when Alexa heard the word it, what did it

14:35:50 3    understand it would refer to?

14:35:51 4    A.      Well, it was referring to the previously established

14:35:54 5    iPhone case that I had asked for.

14:35:56 6    Q.      So when you said buy it now, that phrase, did Alexa

14:36:04 7    know what it was going to buy?

14:36:06 8    A.      Yes.

14:36:06 9    Q.      Did it have your shipping information?

14:36:08 10   A.      Yes.

14:36:09 11   Q.      Did it have your financial information?

14:36:11 12   A.      Yes.

14:36:11 13   Q.      Did it execute the transaction without further input?

14:36:14 14   A.      It did.

14:36:15 15   Q.      Now, let's now go to PTX-226.  And this is the

14:36:26 16   PTX-226, this is the natural language deep dive that has

14:36:31 17   been shown to a large number of people at Amazon?

14:36:34 18   A.      Yes.

14:36:35 19   Q.      And this was what Mr. Vanee testified about?

14:36:38 20   A.      Yes.

14:36:38 21   Q.      And both counsel for VoiceBox and Amazon have asked

14:36:42 22   you about this document; correct?

14:36:42 23   A.      Yes.

14:36:42 24   Q.      Now, looking at this one, let's now go to the example

14:36:50 25   given in the Amazon, actual Amazon technical document, shall

Polish - redirect

14:36:55 1    we.  And if we could turn to page 12.  Slide 32, I'm sorry,

14:37:03 2    slide 32.

14:37:04 3              This is the multi-turn example about setting an

14:37:09 4    alarm clock.

14:37:11 5    A.     Yes.

14:37:11 6    Q.     And prior to this conversation, Alexa would have the

14:37:17 7    long-term information from your speaker ID?

14:37:19 8    A.     Yes.

14:37:20 9    Q.     And if, for example, you had previously set the

14:37:24 10   alarm, Alexa would also have the long-term information about

14:37:27 11   what was previously set as an alarm?

14:37:30 12   A.     Yes.

14:37:30 13   Q.     Let's walk through what if actual Amazon technical

14:37:34 14   document says.  The first phrase there is what the user

14:37:39 15   would say to Alexa, Alexa set alarm.  That's an utterance,

14:37:43 16   correct?

14:37:43 17   A.     Yes.

14:37:44 18   Q.     And if we could have in a split screen this slide and

14:37:49 19   Claim 13 of the '681 patent on the screen.  Let's walk

14:37:52 20   through the element.

14:37:52 21              So, looking at Claim 13, the first one is

14:38:02 22   receive an utterance at a voice input device?

14:38:02 23   A.     Yes.

14:38:08 24   Q.     If we can just highlight the first part of that one.

14:38:11 25              In this example, has Alexa received an utterance

Polish - redirect

14:38:15 1  at a voice input device?

14:38:17 2  A.     Yes.

14:38:18 3  Q.     Now, let's go to see what happened when you say that,

14:38:23 4  Alexa says for what time?  Do you see that?

14:38:26 5  A.     Yes.

14:38:26 6  Q.     And now the user says six.  Do you see that?

14:38:30 7  A.     Yes.

14:38:31 8  Q.     Now, let's go to what is shown in the Alexa technical

14:38:41 9  document.  If we can go to slide 36.  At slide 36, the

14:38:50 10 statement six is made, do you see that?

14:38:53 11 A.     Yes.

14:38:53 12 Q.     And at the time the word six is made in this

14:38:57 13 conversation with Alexa, has short-term knowledge, shared

14:39:02 14 knowledge been accumulated about the current conversation?

14:39:05 15 A.     Yes.

14:39:06 16 Q.     And what is that?

14:39:07 17 A.     Well, that we're working on an alarm and that we're

14:39:11 18 setting a notification.

14:39:15 19 Q.     Right.  And in fact, the previous intent was set

14:39:12 20 notification intent, that's to set the alarm?

14:39:22 21 A.     Right, that's at least in part the context and it is

14:39:25 22 the short-term information.

14:39:26 23 Q.     If we can highlight short-term shared knowledge about

14:39:30 24 the current conversation.  And if we can highlight

14:39:42 25 accumulate, too.

Polish - redirect

14:39:47  1              Let's talk about the next element, accumulate

14:39:50  2    long-term shared knowledge about the user.  Do you see that?

14:39:53  3    A.      Yes.

14:39:54  4    Q.      And an example of that was the speaker ID that you

14:39:58  5    showed in your example?

14:39:59  6    A.      Yes.

14:39:59  7    Q.      And another example would be a previous alarm?

14:40:03  8    A.      Yes.

14:40:05  9    Q.      Now, let's go back to the multi-turn example in the

14:40:10 10    Amazon technical document.  Can we go back to slide 32.  And

14:40:14 11    you see that in response to six, Alexa says is that six in

14:40:19 12    the morning or evening.  Do you see that?

14:40:21 13    A.      Yes.

14:40:21 14    Q.      And so now if we could go to slide 38, at this time,

14:40:34 15    from previous conversations would Alexa know that this was

14:40:39 16    for an alarm to be set?

14:40:40 17    A.      Yes.

14:40:40 18    Q.      Would that be the previous intent?

14:40:42 19    A.      Yes, it would.

14:40:43 20    Q.      And would Alexa know in the short-term information

14:40:47 21    what time was previously offered in the build slot?

14:40:52 22    A.      It has time equals 0600 and 1800.

14:40:57 23    Q.      When you say morning, what does Alexa do having known

14:41:02 24    the context of the conversation in the previous short-term

14:41:05 25    information?

Polish - redirect

14:41:06  1    A.      Then it changes the slot to be time equals 0600.

14:41:11  2    Q.      Okay.  And so looking at the next element, it says

14:41:15  3    identify a context associated with the utterance, did Alexa

14:41:22  4    do that?

14:41:24  5    A.      Yes.

14:41:24  6    Q.      Did it use both the short-term and long-term

14:41:27  7    knowledge?

14:41:27  8    A.      Yes.

14:41:27  9    Q.      For example, with regards to the long-term knowledge,

14:41:30 10    would that be the speaker ID?

14:41:32 11    A.      Yes.

14:41:33 12    Q.      And if you were changing the alarm, would the

14:41:36 13    long-term knowledge include the previous alarm?

14:41:39 14    A.      Yes.

14:41:40 15    Q.      Now, if you look at the next element, establish an

14:41:44 16    intended meaning for an utterance within the identified

14:41:46 17    context, as shown in slide 38, does Alexa do that?

14:41:53 18    A.      Yes.

14:41:54 19    Q.      And if you go to the last element, generate a

14:41:57 20    response to the utterance, if we can now go back to slide

14:42:01 21    32, after the user says morning, what does Alexa do?

14:42:08 22    A.      Well, it has figured out the slot now and it comes

14:42:12 23    back with alarm set for 6:00 a.m. tomorrow.

14:42:16 24    Q.      So does Alexa practice that element in the example

14:42:20 25    that you provided?

Polish - redirect

14:42:20 1   A.      Yes.

14:42:22 2   Q.      Now, there was some discussion about whether or not

14:42:29 3   Alexa might ask the user to help it resolve ambiguity, do

14:42:35 4   you recall that?

14:42:35 5   A.      Yes.

14:42:36 6   Q.      You can take that down, Mr. Smith.  If we could go to

14:42:39 7   slide 24.

14:42:40 8           Actually, go to slide 23, please.  This is on

14:42:56 9   PTX-226, slide 23, I believe, PTX, the actual exhibit.  Next

14:43:09 10  page.  And next page.  There it is.

14:43:13 11          Are there situations where for example in the

14:43:17 12  utterance play Hunger Games that Alexa would find what they

14:43:22 13  call true ambiguity?

14:43:24 14  A.      Yes.

14:43:24 15  Q.      In this situation here, the scores were close, .82

14:43:30 16  and point .81.

14:43:32 17  A.      Right.

14:43:32 18  Q.      Because the scores were so close, Alexa couldn't make

14:43:36 19  a call as to what would be the blue arrow, is that fair to

14:43:39 20  say?

14:43:39 21  A.      That's right.

14:43:40 22  Q.      If you go to the next page.  When Alexa faces true

14:43:46 23  ambiguity, does it ask the user to help it correct it?

14:43:49 24  A.      Yes, this is an example of it, where it's asking the

14:43:52 25  user for some information to help it out.

Polish - redirect

Q.      And would that be part of a multi-turn conversation that Alexa would have with the user?

A.      Yes.  This is a multi-turn conversation.

Q.      In that conversation, would the NLU do multiple turns?

A.      Yes, it would cycle through multiple times to resolve it.

Q.      And if we could now go back to slide 22.  And sir, there were some questions about whether or not Alexa interpreted certain things.  But I wanted to point out one thing here, actually.  If we go back to the question that you were asked -- I apologize, I'm going to move to a different slide and come back to this.  It was -- do you see on slide 33, please.  Do you remember counsel for Amazon asking you about whether the NLU models are currently aware of a dialog context, do you recall that?

A.      Yes.

Q.      If we could go back to slide 11.  And do you see that this is the recognition for the NLU core pipeline?

A.      Right.

Q.      And here is the model, do you see that, sir?

A.      Yes.

Q.      And the slide we're talking about is the models might not be at the time using the dialog context, is that fair to say?

Polish - redirect

14:45:38  1  A.        That's right.

14:45:38  2  Q.        And you recall that in your response to counsel, you

14:45:43  3  indicated there was also rules and FST, do you see that?

14:45:47  4  A.        Right.

14:45:47  5  Q.        And this input, this would be coming from the ASR?

14:45:52  6  A.        That's right.

14:45:53  7  Q.        And so the match, the rules, the FST and the models

14:45:58  8  would receive the output from the ASR, correct?

14:46:02  9                MR. HADDEN:  Objection, leading Your Honor.

14:46:03 10                THE COURT:  Could you make this a little less

14:46:06 11  leading.

14:46:08 12                MR. YOON:  Yes, Your Honor, my fault.

14:46:10 13  BY MR. YOON:

14:46:10 14  Q.        Do you see this in this document here just the

14:46:13 15  reference to the rules, FST and models.  How does that

14:46:17 16  receive the input from the ASR?

14:46:19 17  A.        So the ASR provides input to the NLU and that's --

14:46:25 18  according to this diagram, it's sent to the rules on

14:46:30 19  pathway, the FST pathway and the models pathway.

14:46:34 20  Q.        And now going back to slide 34.  Now, do you recall

14:46:42 21  you were asked some questions about this slide in the

14:46:47 22  context of the models, the DNN models, do you recall that?

14:46:52 23  A.        Yes.

14:46:52 24  Q.        And you were asked questions, particularly I think

14:46:56 25  you discussed six?

Polish - redirect

14:46:58  1    A.      Yes.

14:46:59  2    Q.      Now, do you see the title of this slide is a two-step

14:47:02  3    approach?

14:47:02  4    A.      Yes.

14:47:03  5    Q.      And what was Step 1?

14:47:06  6    A.      So, Step 1 it says that recognizer generate the yes

14:47:14  7    intent, no intent, or slots for the current turn utterance.

14:47:19  8    Q.      And that's only the first step of the two-step

14:47:22  9    approach, correct?

14:47:22 10    A.      Yes.

14:47:23 11    Q.      And if you go to the next slide.  What occurs in

14:47:31 12    Step 2?

14:47:31 13    A.      In Step 2, the context interpreter merges the yes,

14:47:40 14    no, multi-turn intent with previous intent and slots so it

14:47:49 15    takes the previous intent that was somehow ambiguous and

14:47:54 16    merges it with the results here to disambiguate.

14:47:56 17    Q.      If we go to the next -- page 36.  And that Step 2 is

14:48:02 18    what we were discussing with regard to the clock setting

14:48:05 19    example, correct?

14:48:05 20    A.      Yes.

14:48:06 21    Q.      Take that down.

14:48:06 22            Just two more questions, Dr. Polish.  Now, you

14:48:12 23    answered multiple questions regarding source code during the

14:48:12 24    cross-examination, do you recall that?

14:48:20 25    A.      Yes.

14:48:21  1   Q.      And how did you work with Mr. Peck?

14:48:24  2   A.      So Mr. Peck was doing his analysis of Amazon's source

14:48:33  3   code, he was being communicated with by the lawyers.  I saw

14:48:37  4   the questions that were being provided to Mr. Peck and I

14:48:42  5   added my own questions and consulted on what he was -- what

14:48:47  6   he was tasked with looking for.  And then I saw his results

14:48:52  7   and I saw his reports as a result of his investigation.

14:48:58  8   Q.      And did you read Mr. Peck's report?

14:49:00  9   A.      Yes.

14:49:01 10   Q.      And did you look at the source code that Mr. Peck

14:49:04 11   identified in his report?

14:49:05 12   A.      Yes.

14:49:05 13   Q.      And you understand that Mr. Peck will be a witness in

14:49:08 14   this case?

14:49:09 15   A.      Yes.

14:49:09 16           MR. YOON:  No further questions, Your Honor.

14:49:11 17           THE COURT:  All right.  Thank you.  Thank you,

14:49:13 18   sir.  You may step down.

14:49:14 19           We're going to take our afternoon break.

14:49:16 20           COURTROOM DEPUTY:  All rise.

14:49:16 21           (Jury exiting the courtroom at 2:49 p.m.)

14:49:32 22           THE COURT:  All right.

14:49:46 23           MR. YOON:  Your Honor, we can -- Dr. Polish is

14:49:46 24   excused and we can then recall him in rebuttal?

14:49:52 25           THE COURT:  Excuse me?

Peck - direct

14:49:53  1          MR. YOON:  I apologize, Your Honor, I just

14:49:55  2  wanted to confirm that we can now talk to him that he's off

14:49:59  3  the stand and everything.

14:50:00  4          THE COURT:  Yes.

14:50:00  5          MR. YOON:  Thank you.

14:50:01  6          (A brief recess was taken.)

15:10:33  7          COURTROOM DEPUTY:  All rise.

15:10:38  8          (Jury entering the courtroom at 3:10 p.m.)

15:10:50  9          THE COURT:  All right everyone, welcome back.

15:10:58 10  Please be seated.

15:10:59 11          What's next?

15:11:02 12          MR. SMITH:  Your Honor, the plaintiff calls John

15:11:06 13  Peck.

15:11:17 14          COURTROOM DEPUTY:  Please raise your right hand.

15:11:23 15  Please state and spell your full name for the record.

15:11:26 16          THE WITNESS:  My name is John Charles Peck

15:11:29 17  junior, J-O-H-N, Charles, C-H-A-R-L-E-S, Peck, P-E-C-K,

15:11:38 18  junior.

15:11:40 19          CHARLES JOHN PECK, JR., having been duly sworn

15:11:42 20  was examined and testified as follows:

15:11:42 21                    DIRECT EXAMINATION

15:11:42 22  BY MR. SMITH:

15:11:52 23  Q.      Good afternoon, Mr. Peck.

15:11:52 24  A.      Good afternoon.

15:11:52 25  Q.      Could you please introduce yourself to the jury?

15:12:00 1   A.        Yes.  My name is John Charles Peck, Jr.

15:12:04 2   Q.        And generally what's your role in this case?

15:12:08 3   A.        On this case I have been reviewing Amazon source

15:12:13 4   code, Alexa source code.

15:12:14 5   Q.        And what's your educational background, briefly?

15:12:18 6   A.        Yes, so I have a bachelor of science in computer

15:12:22 7   engineering in Carnegie Mellon University and I have a

15:12:26 8   master of science from computer science from the University

15:12:30 9   of California.

15:12:33 10  Q.        Mr. Peck, what's your work experience be like since I

15:12:36 11  graduated college?

15:12:37 12  A.        I have been a practicing computer engineer for over

15:12:41 13  twenty-five years, I have developed a lot of software and

15:12:44 14  hardware products.

15:12:46 15  Q.        And do you have any experience with voice related

15:12:51 16  technology, like at issue in this case?

15:12:57 17  A.        I do.  I had a client several years ago who was

15:13:01 18  interested in ASR technology.  They wanted me to investigate

15:13:06 19  and profile a software package called Sphinx, it performs

15:13:11 20  ASR.

15:13:11 21  Q.        Do you have any experience with big computer systems

15:13:12 22  with lots of servers?

15:13:17 23  A.        I do.  Part of my prior employment at Foxfire

15:13:24 24  Technologies Corporation, and Transarc Corporation which

15:13:27 25  made distributed file systems, and also with a company

15:13:31  1    called Adion Systems, a client that interacted with servers

15:13:35  2    on a network.

15:13:36  3    Q.      And during your professional career, have you ever

15:13:38  4    been awarded patents?

15:13:41  5    A.      Yes, I have.  I am the named inventor on ten U.S.

15:13:46  6    patents issued.

15:13:46  7    Q.      And in what kind of expertise are you bringing to

15:13:54  8    this case?

15:13:54  9    A.      In this case I performed a source code review of the

15:13:58 10    Amazon Alexa source code.

15:14:00 11    Q.      And have you done source code review like this in

15:14:05 12    other litigation matters?

15:14:08 13    A.      Yes, I have.  I have performed source code review on

15:14:11 14    several other litigation related matters in the past.

15:14:16 15            MR. SMITH:  Your Honor, at this point, VoiceBox

15:14:19 16    offers Mr. Peck as an expert witness in the field of

15:14:22 17    computer source code analysis.

15:14:23 18            MR. HADDEN:  No objection.

15:14:24 19            THE COURT:  All right.  He will be so

15:14:26 20    recognized.

15:14:27 21            MR. SMITH:  Thank you, Your Honor.

15:14:28 22    BY MR. SMITH:

15:14:28 23    Q.      Mr. Peck, first of all, what is source code?

15:14:34 24    A.      So source code are a set of commands that are given

15:14:35 25    to the computer to execute, to perform a function.  Text

Peck - direct

15:14:39 1    code can be textual form typed in by a person.

15:14:49 2    Q.      And when you did you start looking at source code in

15:14:53 3    this case?

15:14:53 4    A.      I began looking at source code in this case after

15:14:57 5    July 2020, when I joined the case.

15:15:00 6    Q.      And what generally was your assignment for you when

15:15:06 7    you joined the case?

15:15:07 8    A.      Generally I was asked to examine Amazon Alexa source

15:15:13 9    code to identify certain features in the source code that

15:15:19 10   perform the system function and report back on that.

15:15:22 11   Q.      How did you go about reviewing the code, for example,

15:15:27 12   was it -- did you go somewhere to do that?

15:15:29 13   A.      That's right.  So this source code was produced by

15:15:34 14   Amazon on to a computer that I understand was located in

15:15:40 15   Amazon's counsel's offices, and I was able to access that

15:15:43 16   computer by a remote computer and examine the source code

15:15:47 17   that way.

15:15:48 18   Q.      And was there any way for you to get any evidence

15:15:54 19   from the source code that you were looking at that you could

15:15:58 20   bring to the trial?

15:15:58 21   A.      Yes, that's right.  There was a process where I could

15:16:02 22   print out source code that I thought was of relevance, and

15:16:06 23   make it available for this trial.

15:16:10 24   Q.      And did you hear -- strike that.  Were you here for

15:16:16 25   Dr. Polish's testimony earlier?

A.      Yes, I was.

Q.      And were you asked to compare the source code to the patent claims like -- or to the patent claims in this case?

A.      No, I was not.

Q.      What was your role as you understood it relative to Dr. Polish?

A.      I understood that Dr. Polish would be performing that comparison between the source code and the claims.

Q.      And aside from looking at source code, did you look at any other types of evidence in the case?

A.      Yes.  I attended depositions from Amazon's witnesses. I read several deposition transcripts.  And I reviewed Amazon technical documents.

Q.      And those depositions, what sort of employees were you going to depositions for?

A.      These were Amazon engineers who worked on the Amazon Alexa system.  There were several witnesses who worked on different parts of the Amazon Alexa system, including the NLU, the ASR, and something called ranking arbitration as well as the shopping.

Q.      Based on your analysis of the source code, would you say that the diagram that Amazon has been showing that they say indicates Alexa, was that accurate based on the source code analysis that you did?

A.      No, I don't think that's entirely accurate.

Peck - direct

15:17:48  1    Q.      Okay.  Well, for one thing, did you take a look at a

15:17:54  2    source code for what we have been referring to as the ASR in

15:17:57  3    this case?

15:17:58  4    A.      Yes, I did.  I reviewed source code for two different

15:18:03  5    versions of Amazon Alexa ASR, there was an older version and

15:18:08  6    a newer version that was put to use later.

15:18:10  7    Q.      And did you review any--strike that.

15:18:14  8            Did you find any source code for an NLU?

15:18:17  9    A.      Yes, I did.

15:18:19 10    Q.      And did you review that code for the NLU, too?

15:18:23 11    A.      Yes, I reviewed that source code for the NLU.

15:18:27 12    Q.      And were you able to identify source code for reusing

15:18:34 13    information from a prior utterance?

15:18:37 14    A.      Yes, I did identify a source code that uses

15:18:41 15    information from a prior utterance.

15:18:44 16    Q.      Now, Mr. Peck, I'm going to show you a document here

15:18:49 17    on the screen here.  My understanding is it's sensitive

15:18:56 18    information from Amazon.  So we don't have extra copies.

15:19:00 19    But I'm just going to put it up on the Elmo for you to take

15:19:04 20    a look.

15:19:05 21            And first of all, could you take a look at the

15:19:11 22    bottom here and just identify the exhibit there, exhibit

15:19:14 23    number there in the middle?

15:19:15 24    A.      Yes.  So this source code is stamped with a Bates

15:19:20 25    stamp that reads AMZ_VB_ SC print_000074.

Peck - direct

15:19:32 1    Q.       Was this some of the evidence that you were able to

15:19:37 2    collect from the Amazon Alexa source code computer?

15:19:42 3    A.       Yes, it was.  And you can see at the very top, it's

15:19:47 4    hard to see but there is a patent name that's at the very

15:19:53 5    top and that patent name includes the NLU.  Then also in the

15:20:01 6    code you can see there is a number of statements that say

15:20:04 7    import and they say Amazon dots blue shift dot NLU for

15:20:10 8    example, several lines, 11 and 19, for example.

15:20:13 9    Q.       The first thing you were referencing was that name up

15:20:17 10   here, you said?

15:20:17 11   A.       Yes, that's right, I can see that there now.  You can

15:20:21 12   see there is an NLU in the package name in the beginning, a

15:20:27 13   name of this particular source code at the file is at the

15:20:30 14   end, rule based context interpreter dot JAVA.

15:20:35 15   Q.       At this point the plaintiff VB Assets would move into

15:20:42 16   evidence PTX-541(a)?

15:20:45 17            MR. HADDEN:  No objection.

15:20:52 18            THE COURT:  It's admitted.

15:20:54 19            ( PTX Exhibit No. 541(a) was admitted into

15:20:55 20   evidence.)

15:20:55 21   BY MR. SMITH:

15:20:55 22   Q.       At a general level, what does the source code in

15:21:00 23   Exhibit 541(a) do based on your review?

15:21:02 24   A.       So generally it adds information to current

15:21:08 25   interpretations from previous interpretations.

Peck - direct

15:21:11 1    Q.      And I think part of the file name here is called it's

15:21:17 2    called a rule based context interpreter, is that right?

15:21:21 3    A.      Yes, that's correct.

15:21:23 4    Q.      And is this code part of the NLU?

15:21:29 5    A.      Yes, it's part of the NLU.

15:21:32 6    Q.      And why don't we go to line 26.  And do you see that

15:21:44 7    kind of here, line 26, there is a text that's kind of green

15:21:49 8    and there is kind of some asterisk next to it.  Do you see

15:21:53 9    that?

15:21:53 10   A.      Yes.

15:21:53 11   Q.      What is that type of text in the source code?

15:21:56 12   A.      Yes.  So this is what's called a comment.  And a

15:22:01 13   comment is a description that's left by a source code

15:22:04 14   developer.  To convey information to one who is reading and

15:22:08 15   writing the source code.  In this case, it reads class merge

15:22:12 16   current turn NBest with discourse context using rules.

15:22:17 17   Q.      So you're saying this comment would be something the

15:22:22 18   Amazon engineers would put into the code?

15:22:25 19   A.      Yes, that's correct.

15:22:26 20   Q.      Do you see here at the very end it says context using

15:22:29 21   rules.  Do you see that?

15:22:30 22   A.      I see that.

15:22:31 23   Q.      And so based on the comment here, is the source code

15:22:38 24   that you looked at that follows consistent with how it's

15:22:42 25   being described by the Amazon engineers with the comment?

Peck - direct

15:22:46  1    A.      Yes, it is.  And this source code file is making use

15:22:51  2    of rules as a way to accomplish what I described earlier as

15:22:57  3    its function.

15:22:58  4    Q.      Is this an example of Alexa using manual rules?

15:23:03  5    A.      Yes, it is.

15:23:05  6    Q.      Now, Mr. Peck, in the course of your analysis of this

15:23:13  7    code, were you able to figure out approximately when this

15:23:20  8    source code file was added to the Amazon computer that you

15:23:26  9    looked at?

15:23:27 10    A.      Yes, I recorded the date in my report.  That date was

15:23:33 11    August 31st, 2020.

15:23:34 12    Q.      So you found examples of manual rules on the Amazon

15:23:38 13    computers in August 2020?

15:23:42 14    A.      That's correct.

15:23:47 15    Q.      Now, why don't we go to line, the next page here, you

15:24:03 16    see here line 79?

15:24:07 17    A.      I see that.

15:24:07 18    Q.      And then if you go over there is some text here.

15:24:12 19    When you see this text here on line 79, what is that text?

15:24:16 20    A.      So this text is actual source code that's executed by

15:24:22 21    the computer when it runs.  And this is one statement, one

15:24:28 22    operation that takes place in the source code.

15:24:31 23    Q.      And so this is how -- this is code that Alexa would

15:24:36 24    actually use when it's running?

15:24:38 25    A.      Yes, that's correct.

Peck - direct

15:24:39  1    Q.      And do you see where it says get rules, do you see

15:24:43  2    that?

15:24:43  3    A.      I do see that.

15:24:45  4    Q.      What does that refer to?

15:24:46  5    A.      So this is what's called a function call.  It's

15:24:52  6    retrieving a set of rules to use in part of this operation.

15:24:58  7    Q.      And does this operation relate to what we heard

15:25:03  8    earlier from Dr. Polish about context and using past

15:25:11  9    information to fill in the gap for what the user wants?

15:25:17 10    A.       Yes, it does.  This component is named the

15:25:20 11    rules-based context interpreter.  It's taking information

15:25:24 12    from previous interpretations and adding to current

15:25:29 13    interpretations.

15:25:31 14    Q.      Now, Mr. Peck, was this code file that we're looking

15:25:36 15    at the only example of Amazon Alexa using manual rules?

15:25:41 16    A.      No, there were many other examples.

15:25:45 17    Q.      Let me put on the document viewer the next document.

15:25:54 18    And do you see here, if we go down to the very bottom,

15:25:58 19    Mr. Peck, do you see it's labeled PTX-541(b)?

15:26:02 20    A.      I see that.

15:26:02 21    Q.      And are you able to read the real small text at the

15:26:10 22    very top?

15:26:11 23    A.      Yes, I can read that.

15:26:12 24    Q.      Okay.  Sorry this is an eye exam test.  Is this one

15:26:17 25    of the files that you were able to obtain from the Amazon

Peck - direct

15:26:22 1    Alexa computer when you did your analysis?

15:26:24 2    A.     Yes, it was.

15:26:26 3    Q.     Okay.  And --

15:26:29 4           MR. SMITH:  At this point, Your Honor, we would

15:26:31 5    move PTX-541(b) into evidence.

15:26:40 6           MR. HADDEN:  No objection.

15:26:41 7           THE COURT:  Thank you.  It is admitted.

15:26:41 8           (PTX Exhibit No. 541(b) was admitted into

15:26:43 9    evidence.)

15:26:43 10   BY MR. SMITH:

15:26:48 11   Q.     Mr. Peck, is this code that we're looking at here in

15:26:51 12   Exhibit 541(b), is this part of the NLU of Alexa?

15:26:58 13   A.     Yes, it is.  In the patent name, NLU indicating its

15:27:06 14   an NLU.  The name of this file is the contextual content

15:27:14 15   carry over dot JAVA.  As well as I see references in the

15:27:19 16   actual code informing that, indicate that it's from the NLU.

15:27:23 17   Q.     Does this indicate that Alexa uses this content?

15:27:31 18   A.     Yes, that's correct.

15:27:32 19   Q.     And were there other indications here in the code

15:27:35 20   that it's from the NLU?

15:27:37 21   A.     Yes.  For example, at line 10, there is an import

15:27:42 22   statement, you can see that it says

15:27:51 23   comment.amazon.Blushift.NLU, that indicates to you that this

15:27:52 24   is NLU source code.

15:27:55 25   Q.     Let me go the line 63 of this.  Do you see some is

15:28:17 1    something that is public class, contextual intent carrier

15:28:25 2    IPMPL.  Do you see that?

15:28:25 3    A.      Yes.

15:28:26 4    Q.      What does that refer to?

15:28:30 5    A.      This is the name of this class.

15:28:34 6    Q.      And what does this class do generally.

15:28:39 7    A.      So this is class is deciding which intents are to be

15:28:45 8    carried forward into the current set of intents being

15:28:48 9    considered.

15:28:58 10   Q.      Why don't we go down here do you see line 71 where it

15:29:02 11   says intent carryover engine, rules engine, do you see that?

15:29:06 12   A.      I see that.

15:29:07 13   Q.      And based on your analysis, did you determine that

15:29:12 14   Alexa as an entire engine devoted to rules?

15:29:16 15   A.      Yes, in this particular model, there is a particular

15:29:21 16   engine put in use that uses rules to perform its function.

15:29:24 17   Q.      Is this file that we just looked at Exhibit 541(b)

15:29:30 18   another example of Alexa using manual rules in 2020 or

15:29:38 19   later?

15:29:39 20   A.      Yes, it is.

15:29:42 21           MR. SMITH:  Thank you, Mr. Peck.  Pass the

15:29:47 22   witness.

15:29:48 23           THE COURT:  Cross.

15:29:55 24           MR. HADDEN:  You can leave that up.

15:29:57 25                CROSS-EXAMINATION

15:29:58  1   BY MR. HADDEN:

15:30:02  2   Q.      Good afternoon, Mr. Peck.

15:30:04  3   A.      Good afternoon.

15:30:06  4   Q.      Now, you're not an expert in Natural Language

15:30:10  5   Understanding, are you?

15:30:12  6   A.      I'm not an expert on Natural Language Understanding,

15:30:17  7   I'm a practicing engineer of over 25 years with experience

15:30:20  8   in software and hardware development.

15:30:22  9   Q.      Thank you, sir.

15:30:23 10           And you're not offering any opinion to the jury

15:30:27 11   here today that Amazon infringes any of these patents, are

15:30:31 12   you?

15:30:31 13   A.      No, I am not.

15:30:33 14   Q.      And you're not offering any opinion to the jury today

15:30:36 15   that these patents are valid, are you?

15:30:38 16   A.      No, I am not.

15:30:40 17   Q.      Thank you.

15:30:41 18           Your assignment, if I understand it correctly,

15:30:47 19   was to answer questions from VB Assets's lawyers, is that

15:30:52 20   right?

15:30:52 21   A.      Yes, that's correct.

15:30:54 22   Q.      And Dr. Polish didn't ask you any questions, did he?

15:31:00 23   A.      I received communication from counsel about what

15:31:04 24   parts to look at.  Dr. Polish testified today about that

15:31:06 25   process.

Peck - cross

15:31:09 1    Q.      Okay.  But when you were doing your analysis, you

15:31:11 2    weren't talking to Dr. Polish, correct?

15:31:13 3    A.      No, I didn't talk to Dr. Polish directly.  My

15:31:18 4    instructions came from counsel.

15:31:22 5    Q.      Can we look at JTX-001, please, Mr. Patterson.  Claim

15:31:30 6    13.

15:31:37 7    A.      I have that in front of me.

15:31:48 8    Q.      Now is it fair to say that between you and

15:31:55 9    Dr. Polish, you're the one who knows most about how Alexa

15:32:00 10   source code operates?

15:32:01 11   A.      I would say I reviewed the source code for Amazon

15:32:06 12   Alexa.

15:32:06 13   Q.      If we look at this Claim 13, did VB Assets' counsel,

15:32:12 14   did they ask you to go find out if there was Alexa source

15:32:17 15   code that accumulated short-term shared knowledge about the

15:32:20 16   current conversation?

15:32:24 17   A.      So I recall my report addressing questions that

15:32:28 18   counsel presented me, those particular questions are in my

15:32:32 19   report.  I don't recall this point being a particular

15:32:34 20   question being asked.

15:32:36 21   Q.      Okay.  So even though this claim requires computer

15:32:40 22   code that accumulates short-term shared knowledge, VB

15:32:44 23   Assets's lawyers didn't ask you to try to find that in

15:32:44 24   Alexa; correct?

15:32:50 25   A.      No, the questions that I was asked, I don't think

15:32:55 1    relate to the claim language here.  They were another terms

15:33:01 2    that were questions.

15:33:01 3    Q.      If we look at the next element C, which requires

15:33:06 4    accumulating long-term shared knowledge, is it also the case

15:33:10 5    that VB Assets's lawyers didn't ask you to find out whether

15:33:14 6    Alexa has source code that accumulates long-term shared

15:33:17 7    knowledge?

15:33:17 8    A.      I don't remember a question with those exact terms in

15:33:21 9    it.

15:33:21 10   Q.      Okay.  If we go to the next element, identify a

15:33:24 11   context associated with the utterance wherein the

15:33:30 12   conversational speech engine identifies the context

15:33:32 13   associated with the utterance from the short-term shared

15:33:37 14   knowledge and the long-term shared knowledge, is it also the

15:33:41 15   case that VB Assets's lawyers didn't ask you to find out

15:33:46 16   whether or not the Alexa source code does that?

15:33:48 17   A.      Yeah, I don't remember a question posed in those

15:33:52 18   terms.

15:33:52 19   Q.      Okay.  And the same with element E, establish an

15:33:55 20   intended said meaning for the utterance, and then continues,

15:33:55 21   do you see the text there, sir, is it true that VB Assets's

15:34:02 22   lawyers didn't ask you to try to find out whether the Alexa

15:34:02 23   source code does this?

15:34:08 24   A.      That's correct, I don't recall such a question being

15:34:11 25   asked.

Peck - cross

| | |
|---|---|
| 15:34:12 | 1 |

Q.     Okay.  And if we go to the last element, generating a

response to the utterance, is it also true that the VB

Assets's lawyers didn't ask you to find out whether or not

the Alexa source code does this?

A.     Yes, I don't recall a question like this being asked.

Q.     Let's look at JTX-002, sir, the '703 patent, Claim

25.  If we look here, sir, in particular there is an element

-- I can use this as well, thank you, Mr. Patterson.

          There is an element here E, determine without

further user input after the receipt of the user input, a

context based at least on the one or more words or phrases,

do you see that element, sir?

A.     I see that.

Q.     Did VB Assets's lawyers ask you to find out whether

or not the Alexa source code did that?

A.     I don't recall the question being put in these terms.

Q.     Okay.  If we go to the next element, F, sir, identify

without further user input after the receipt of the user

input, the product or service to be purchased on behalf of

the user based at least on the determined context.  Did VB

Assets 's lawyers ask you to try to find out whether or not

the Alexa source code does that?

A.     I don't remember a question like this being posed to

me.

Q.     Okay.  Let's go to the '176 patent, please,

Peck - cross

15:36:01 1    Mr. Patterson.  This is JTX-003, Mr. Peck.  Look at Claim

15:36:11 2    40.  Claim 40 has this piece at the end, an adaptive

15:36:16 3    misrecognition engine configured to determine that the

15:36:18 4    conversational language incorrectly interpreted the words or

15:36:22 5    phrases, and it continues, do you see that language,

15:36:24 6    Mr. Peck?

15:36:24 7    A.      I see that.

15:36:26 8    Q.      Did VB Assets's lawyers ask you to try to figure out

15:36:29 9    whether or not the Alexa source code performs that step?

15:36:33 10   A.      No, I don't recall a question like that being posed

15:36:35 11   to me.

15:36:38 12   Q.      Let's look at JTX-005, sir, this is the '097 patent.

15:36:43 13   If we could go to Claim 23.  This claim it requires the last

15:36:55 14   element, requires interpreting the natural language

15:36:58 15   utterance based on the advertisement and responsive to the

15:37:01 16   existence of a pronoun in the natural language utterance,

15:37:05 17   determine whether the pronoun refers to one or more of the

15:37:08 18   product or service, or a provider of the product or service?

15:37:11 19            Did VB Assets's lawyers ask you to try to find

15:37:15 20   out whether or not the Alexa source code did that.

15:37:22 21   A.      No, I don't recall a question put in those terms to

15:37:25 22   me.

15:37:26 23   Q.      Thank you, sir.  From your review of the Alexa NLU

15:37:30 24   source code, it's true, isn't it, that NLU generates

15:37:36 25   multiple interpretations at a given utterance, right?

15:37:41  1    A.      Yes, that's correct.

15:37:42  2    Q.      Thank you, sir.

15:37:44  3            And that context interpreter code that you were

15:37:48  4    shown earlier by counsel, that code takes the interpretation

15:37:54  5    that has already been part of the NBest list of

15:37:58  6    interpretation and reorders and re-ranks them, is that

15:38:04  7    correct?

15:38:04  8    A.      Yes, that's one of the things that takes place within

15:38:07  9    that piece of code.

15:38:09 10            MR. HADDEN:  Thank you for your time, sir.  No

15:38:12 11    further questions.

15:38:12 12            THE COURT:  All right.  Redirect?

15:38:14 13            MR. SMITH:  No redirect, Your Honor.

15:38:16 14            THE COURT:  Thank you, sir.  You're excused.

15:38:19 15            What's next?

15:38:20 16            MR. YOON:  Yes, Your Honor, at this time, VB

15:38:23 17    Assets will play by videotape deposition, the deposition

15:38:28 18    testimony of Philippe DiCristo, who is the former senior

15:38:32 19    science manager at Amazon from 2016 to 2022.

15:38:37 20            THE COURT:  Thank you.

15:38:41 21            (Videotape deposition of Philippe DiCristo:)

15:38:55 22    Q.      Dr. DiCristo, could you please state your full name

15:39:02 23    for the record?

15:39:02 24    A.      Yes.  My full name is Philippe Jack Joel DiCristo.

15:39:08 25    Q.      Doctor, you were the chief scientist at VoiceBox

15:39:12 1  Technologies, correct?

15:39:13 2  A.      This has been my title at VoiceBox Technologies.

15:39:16 3  Q.      And you were the VP of speech and NLU R & D at

15:39:24 4  VoiceBox Technologies, correct?

15:39:24 5  A.      That is also the title I own at VoiceBox.

15:39:27 6  Q.      Okay.  And NLU is that an abbreviation for Natural

15:39:33 7  Language Understanding?

15:39:33 8  A.      Yes, it is.

15:39:35 9  Q.      And you were at VoiceBox from July 2003 to

15:39:40 10  September 2016.

15:39:43 11          Is that fair to say?

15:39:45 12  A.      Yes.  I don't remember if it's the -- the dates

15:39:49 13  specific there, but that -- that sounds right.  Yeah, that

15:39:52 14  sounds accurate.

15:39:54 15  Q.      And you were employee number nine at VoiceBox?

15:39:58 16  A.      That's what I recall.

15:39:59 17  Q.      And you were at VoiceBox for over 13 years?

15:40:02 18  A.      I was at VoiceBox for a long time, yes.

15:40:08 19  Q.      And over 13 years; correct, sir?

15:40:11 20  A.      Over 13 years, probably.

15:40:13 21  Q.      Now, at VoiceBox, you led a team of 100 engineers and

15:40:17 22  scientists designing and implementing new speech recognition

15:40:23 23  and natural understanding algorithms, is that fair to say?

15:40:28 24  A.      Yeah, we were building a product that leveraged

15:40:34 25  technologies such as speech recognition and natural link --

15:40:40 1    language understanding.

15:40:41 2    Q.        Dr. DiCristo, during the time at VoiceBox, you did

15:40:45 3    lead a large team of engineers and scientists; correct?

15:40:49 4    A.        I did lead a large team of people, which included

15:40:52 5    engineers, scientists, program managers, TPM, and so on,

15:40:57 6    technical program managers and so on.

15:41:00 7    Q.        What was VoiceBox Cybermind?

15:41:02 8    A.        Cybermind was a product that we developed and that

15:41:13 9    leveraged existing technologies such as speech recognition

15:41:16 10   and Natural Language Understanding, and allowed people to --

15:41:19 11   to communicate with the machine and turn some command into

15:41:25 12   actions.

15:41:26 13   Q.        When you prepared your LinkedIn profile, you believed

15:41:31 14   that the Cybermind was an Amazon-like system; correct?

15:41:37 15   A.        Well, I think the "like" -- you know, when we say

15:41:41 16   like, of course you can take into different interpretation

15:41:45 17   here.  It's open for interpretation.

15:41:47 18             But on the surface, they have like appearance.

15:41:50 19   Of course, their implementation could be quite different.

15:41:57 20   Q.        But you described Cybermind as the Amazon Echo-like

15:42:02 21   system; correct?

15:42:04 22   A.        Again, I think like is very -- it's Echo-like.

15:42:09 23   Right.  Like, is there -- there is different flavors of

15:42:12 24   like.

15:42:15 25             And as -- as a person, as a customer without any

technical background, you could consider that they look alike.

Q.      And they operated alike, correct?

A.      That would -- that's actually very vague.  They are -- I think they are -- they are very different on the -- on the way they are implemented in terms of code is different. The system that they use to recognize speech is different. There a lot of differences that we could go into.

Q.      But the Cybermind, the first version of it came out in 2006, correct?

A.      So the Cybermind product was actually never productized, but it was demoed.  And I definitely -- I definitely think I remember even from the video that in 2006, we had something that looked like that.

Q.      And the -- to your knowledge, the Amazon Echo product was publicly announced in the 2014 time frame; correct?

A.      I don't recall when exactly the Amazon system came out, so I think it's hard for me to say.  2014 or 15 or around that time frame.

Q.      In 2013, IEEE ranked VoiceBox Technologies number 13 in patent power for the computer software industry.  Do you see that?

A.      Yes, I do.

Q.      And you put that statement in your LinkedIn profile; correct?

15:43:39 1    A.      I did put that statement in my LinkedIn profile.

15:43:43 2    Q.      And so you understood that at least in the 2013 time

15:43:48 3    frame, the IEEE had ranked VoiceBox Technologies as having

15:43:53 4    the 13th most significant patent portfolio in the computer

15:43:59 5    software industry; correct?

15:44:00 6    A.      So I remember actually seeing a document that was

15:44:03 7    actually provided by Mike Kennewick.  That was a link where

15:44:07 8    the IEEE had ranked different companies of something they

15:44:12 9    call patent power.  And that seems like a good thing to put

15:44:16 10   on your LinkedIn profile.

15:44:19 11   Q.      So sir, you -- you began working after VoiceBox for

15:44:23 12   Amazon in October 2016.  Is that fair to say?

15:44:26 13   A.      I began to work for Amazon in October 2016.

15:44:31 14   Q.      And when did you stop working for Amazon, sir?

15:44:35 15   A.      I stopped working for Amazon on July 1st, 2022, --

15:44:40 16   January 1st.  I'm sorry.  I don't know why I said July 1st.

15:44:46 17   January 1st, 2022.

15:44:51 18   Q.      Okay.  Dr. DiCristo, looking at Exhibit 48, do you

15:44:56 19   see the top e-mail is from Rich Kennewick, dated April 30th,

15:45:02 20   2012?

15:45:02 21   A.      Yes, I can see the E -- I can see that.

15:45:07 22   Q.      And the subject there is:  "Next

15:45:14 23   steps-VoiceBox/Intel."  Do you see that?

15:45:15 24   A.      Yes, I see that.

15:45:16 25   Q.      And it says:  "Bob, Michael, and Philippe; can we

15:45:21 1    meet today around 4:30 to discuss the two docs Intel has

15:45:28 2    sent us."  Do you see that?

15:45:30 3    A.       I can see that.

15:45:31 4    Q.       And when you were working with Intel for VoiceBox,

15:45:34 5    was it your understanding that -- that Intel had an interest

15:45:37 6    in a speech-enabled system?

15:45:39 7    A.       So I don't fully recall the -- the Intel project

15:45:44 8    itself.  Maybe it's a bit far.  But that's -- usually

15:45:48 9    customers were interested in some type of assistant-type

15:45:52 10   system based on NLP.

15:45:56 11   Q.       If you'll look at the Intel ideal system document.

15:46:01 12   If you'll look at page 91949.  One of the things that Intel

15:46:09 13   identified was:  "Use of context."

15:46:17 14            Do you see that?

15:46:18 15   A.       Okay.  So can you repeat the question?

15:46:21 16   Q.       Do you see the Intel document, in terms of

15:46:25 17   identifying the ideal system, number seven included:  "Use

15:46:29 18   of context."

15:46:31 19            Do you see that?

15:46:32 20   A.       Yes, I do.

15:46:34 21   Q.       And that includes two types of history:  "History of

15:46:38 22   the current conversation."  And "history of prior

15:46:42 23   conversations by current user."  Do you see that?

15:46:45 24   A.       I can see that.

15:46:46 25   Q.       And it says:

15:46:48  1                "Useful for personalization/preference setting

15:46:53  2    over time."

15:46:54  3                Do you see that?

15:46:55  4    A.    I can see that -- that text from Intel, yeah.

15:46:58  5    Q.    In VoiceBox, is agents use context that included both

15:47:03  6    the history of the current conversation and prior

15:47:07  7    conversations; correct?

15:47:10  8    A.    It's a bit -- it's a bit vague.  I mean, there are --

15:47:14  9    there are some implementation detail of it.  I think I

15:47:17 10    mentioned that the agents had -- that the context basically

15:47:20 11    is all about prior information provided, which could be a --

15:47:25 12    a private conversation, and they -- they could take

15:47:28 13    advantage of it at that time.

15:47:31 14    Q.    And so VoiceBox agents could take advantage of using

15:47:35 15    context that included prior conversations from the user;

15:47:38 16    correct?

15:47:40 17    A.    Like I said, I think an agent had the

15:47:44 18    responsibilities to determine if a -- a request -- they can

15:47:47 19    respond to a request.  And they would use information

15:47:50 20    available, which that we call these contexts.

15:47:52 21    Q.    And that information available could also include the

15:47:52 22    prior conversations; correct?

15:48:01 23    A.    Like, I don't remember exactly the whole

15:48:04 24    implementation detail of how -- what it would entail what

15:48:08 25    the context structure was.  And as I said, it's more -- at a

15:48:12 1    high level, the context is general information of prior

15:48:15 2    event, basically, at the time of the request.

15:48:18 3    Q.      And those prior events could include prior

15:48:22 4    conversations, correct?

15:48:23 5    A.      Again, it's prior information that was available

15:48:26 6    before that -- that I know for -- that -- that conversation.

15:48:29 7    Q.      And so prior information could include information

15:48:34 8    that came from prior conversations, correct?

15:48:39 9    A.      I'm not sure I understand the question, because I

15:48:42 10   guess, like I said, it depends on how we define context.  As

15:48:45 11   I mentioned, I define context as prior information that was

15:48:50 12   either provided by the system or by a person.  And an agent

15:48:53 13   could leverage that information if they were designed to do

15:48:59 14   so, or if that was relevant.

15:49:02 15   Q.      And looking at Item 10 in the Intel documentation, it

15:49:06 16   says:  "Learning from interactions-wants system to learn

15:49:12 17   from previous conversation."

15:49:14 18            Do you see that?

15:49:15 19   A.      I can see that.

15:49:18 20   Q.      And one of the capabilities that the VoiceBox system

15:49:21 21   had and its agents had was the capability of learning from

15:49:25 22   previous conversations, correct?

15:49:26 23   A.      So I guess it's hard for me to answer, because it's

15:49:31 24   -- like you see, learn is in quote marks, so learn has a lot

15:49:35 25   of vague notion of it.  But I can say that actually, there

15:49:39 1   were no artificial intelligence in that -- in that -- at

15:49:44 2   that time.

15:49:44 3   Q.      But the operation of the VoiceBox system could adapt

15:49:48 4   over time based on prior conversations, correct?

15:49:52 5   A.      I don't recall that capability.

15:49:57 6   Q.      And Dr. DiCristo, why don't you just take a moment to

15:50:01 7   look at Exhibits 55, 56, and 57.  And when you've had a

15:50:06 8   chance to look at those text messages, I'll ask you a

15:50:09 9   question.  Okay?

15:50:11 10  A.      Okay.

15:50:12 11  Q.      Dr. DiCristo, these are texts that you exchanged with

15:50:17 12  Kelley Price in the January 2006 to January -- sorry --

15:50:23 13  January 6, 2017, to January 9, 2017, time frame; correct?

15:50:30 14  A.      Yes, this is correct.

15:50:35 15  Q.      And these are screen shots of the texts that you

15:50:42 16  exchanged, correct?

15:50:43 17  A.      This is correct.

15:50:45 18  Q.      And sir, with regards to this, Ms. Price was a

15:50:49 19  VoiceBox employee; correct?

15:50:50 20  A.      Kelley Price was a -- dealing with human resources,

15:50:55 21  as I previously stated.

15:50:57 22  Q.      And so, she was the human resources at VoiceBox;

15:51:02 23  correct?

15:51:02 24  A.      She was a human resources at VoiceBox.  She was a

15:51:07 25  human resources employee at VoiceBox, yeah.

15:51:12  1    Q.      And with regards to this text here, there is a

15:51:18  2    reference on Exhibit 57; right?   There is a reference here

15:51:28  3    to -- looking at Ms. Price, it says:   "Hey, can I forward an

15:51:34  4    invite to the Amazon event tomorrow night to folks who were

15:51:38  5    laid off, and maybe some who weren't?"   Do you see that?

15:51:43  6    That's at 12:26 p.m.

15:51:46  7    A.      Yes, I do.

15:51:49  8    Q.      And I'd now like to mark from Tab 6 as Exhibit 58 a

15:51:55  9    document that shows eventbrite.com, bearing Bates numbers

15:52:02 10    VoiceBox 8212.

15:52:09 11            And Dr. DiCristo, do you see Exhibit 58 is a

15:52:14 12    document where the top says:   "Eventbrite.com, do you see

15:52:20 13    that?

15:52:23 14    A.      Yes, I do.

15:52:24 15    Q.      And then it says, the description it says the

15:52:26 16    executive leadership team for Amazon's voice and advanced

15:52:29 17    shopping hosts an informal event to discuss our vision for

15:52:33 18    the future, with drinks and appetizers."   Do you see that?

15:52:37 19    A.      Yes, I do.

15:52:40 20    Q.      Understood, sir.   What I wanted to ask you was, you

15:52:44 21    understand that this event is the event that Ms. Kelley is

15:52:48 22    referring to in Exhibit 1 -- in Exhibit 57; correct?

15:52:52 23    A.      Kelley Price is -- is -- probably was aware of that

15:52:57 24    event and was probably interested in sending some of the

15:53:00 25    people there.

15:53:01  1    Q.      I'm just saying that the event -- the -- the Amazon

15:53:06  2    event that Ms. Kelley Price was referring to in Exhibit 57

15:53:10  3    was the event described in Exhibit 58 that lists you as an

15:53:15  4    attendee, but you did not attend; correct?

15:53:18  5    A.      Well, as I mentioned, this was an event organized,

15:53:23  6    like, by my team at that time.  I did not participate.  And

15:53:27  7    I -- Kelley Price was probably interested in sending people

15:53:31  8    to that event.

15:53:33  9                (End of videotape. )

15:53:36 10                MR. YOON:  Your Honor, at this time we would

15:53:40 11    like to move into evidence exhibit PTX-42 and 48.

15:53:45 12                MR. HADDEN:  No objection.

15:53:47 13                THE COURT:  Thank you.  They're admitted.

15:53:49 14                ( PTX Exhibits No. 42 and 48 were admitted into

15:53:49 15    evidence.)

15:53:49 16                MR. YOON:  Your Honor, now at this time we would

15:53:51 17    like to play the video testimony of Rino Caruccio, who is

15:53:57 18    the vice-president of financial analysis for devices at

15:54:01 19    Amazon.

15:54:02 20                MR. HADDEN:  I'm sorry, we have other exhibits

15:54:02 21    for that depo designation we would like to move in.

15:54:02 22                MR. YOON:  I can do that for you.

15:54:11 23                MR. HADDEN:  That would be great.

15:54:12 24                MR. YOON:  Your Honor, this was the one we had

15:54:14 25    to add.  The parties would also like to move into evidence

15:54:19  1    exhibit PTX-42, 48, 55, 56, 57, and 58.

15:54:28  2              MR. HADDEN:  No objection.

15:54:31  3              THE COURT:  All right.  Thanks.  They are

15:54:32  4    admitted.

15:54:33  5              (PTX Exhibits No. 42, 48 55, 56, 57 and 58 were

15:54:34  6    admitted into evidence.)

15:54:34  7              MR. YOON:  And now, Your Honor, we would like to

15:54:36  8    play to deposition testimony of Rino Caruccio, who is the

15:54:41  9    vice-president of financial analysis for devices at Amazon.

15:54:46 10              THE COURT:  All right.

15:54:48 11              (Videotape deposition of Rino Caruccio:)

15:54:50 12    Q.    Mr. Caruccio, Exhibit 173 is an e-mail from someone

15:54:55 13    named Andy Vu dated September 8, 2021, with the subject

15:55:02 14    line, Re:  OP1 outputs review, ten-year P&L, LTVLF and

15:55:11 15    IBVLF.  Do you see that?

15:55:11 16    A.    Okay.  I have it, yes.  I see the e-mail.

15:55:14 17    Q.    Mr. Caruccio, are you familiar with an OP1, what an

15:55:21 18    OP1 is at Amazon?

15:55:23 19    A.    Yes, I am.

15:55:24 20    Q.    What is that?

15:55:25 21    A.    OP1 is a mechanism within the Amazon company usually

15:55:30 22    held in September/October time frame whereby businesses,

15:55:40 23    products, review their strategy including investment needed,

15:55:45 24    financial projections, financial forecast for the next 12 to

15:55:51 25    18 months.

15:55:53 1    Q.      What are some of the ways that this strategy benefits

15:55:58 2    the whole company system?

15:56:00 3    A.      Again, in my personal opinion, when a customer

15:56:03 4    engages with a -- an Amazon device such as an Echo, there

15:56:09 5    are -- there is value in terms of music that they may

15:56:14 6    purchase from our Amazon music business.  It would be

15:56:20 7    products that they may buy, you know, on our Amazon

15:56:24 8    marketplace and our consumer business.  It could include

15:56:28 9    advertising that we would gain from advertising--

15:56:36 10   advertisers being willing to advertise on our devices.

15:56:40 11   There are sometimes some subscriptions that we provide or

15:56:45 12   garner.  There are skills or third-party Alexa-enabled

15:56:51 13   devices that we might be able to engage with.  There are

15:57:06 14   some modernization opportunities with, you know, partners,

15:57:15 15   stake holders, so there are -- those are some of the ones

15:57:23 16   off the top of my head that we would garner.

15:57:24 17   Q.      Are you familiar with the term get big, with respect

15:57:29 18   to Alexa or EFD?

15:57:33 19   A.      Yes, I'm familiar with the term get big.

15:57:36 20   Q.      And what do you understand about it?

15:57:38 21   A.      As -- as kind of a strategic overview of the Alexa

15:57:48 22   business and as a way of categorizing some of the key themes

15:57:52 23   that the Alexa business needs to think about, they decided

15:57:58 24   their -- categorized their strategy into three buckets, get

15:58:02 25   big, get close, get fit.  And as -- and used that as kind of

15:58:15 1   a theme in terms of determining where to invest and where to

15:58:19 2   prioritize.

15:58:25 3                    (End of videotape.)

15:58:28 4                    MR. YOON:  Your Honor, at this time, we would

15:58:30 5   seek to move into evidence exhibit PTX-173.

15:58:34 6                    MR. HADDEN:  No objection.

15:58:35 7                    THE COURT:  Thank you.  It is admitted.

15:58:35 8                    (PTX Exhibit No. 173 was admitted into

15:58:39 9   evidence.)

15:58:39 10                    MR. YOON:  At this time, Your Honor, the

15:58:40 11   plaintiff will now present the video deposition testimony of

15:58:45 12   Vinod Krishnan, who is the director of engineering and

15:58:49 13   science for Alexa Shopping at Amazon.

15:58:54 14                    (Videotape deposition of Vinod Krishnan:)

15:59:00 15   Q.     All right.  In your folder, for the record,

15:59:03 16   Exhibit 78 is a document about with Bates numbers ending in

15:59:09 17   58040.  Does the Alexa Shopping team use Wikis to document

15:59:15 18   the Alexa Shopping technology?

15:59:21 19   A.     As a team, Alexa shop be uses many -- many

15:59:27 20   technologies to capture the thought process.  Wikis could be

15:59:41 21   one of those.

15:59:42 22   Q.     And so Exhibit 78, we're looking at a Wiki for a

15:59:46 23   document in the technology of Alexa Shopping, right?

15:59:50 24   A.     It looks like this Wiki, or this document, captures a

15:59:55 25   version of -- of Alexa Shopping.

16:00:04 1    Q.      And for the record, Exhibit 80 is an e-mail and

16:00:08 2    attachments, the Bates number on the first page ends in

16:00:15 3    342249.

16:00:17 4                Mr. Krishnan, do you recognize Exhibit 80 to be

16:00:22 5    an e-mail?

16:00:23 6    A.      Exhibit 80, the first part of Exhibit 80 is an

16:00:28 7    e-mail, but then later on it turns into a document.

16:00:36 8    Q.      Okay.  And do you see that you received Exhibit 80,

16:00:42 9    your name is on there in the recipients?

16:00:45 10   A.      Yes.  A lot of names.  Yeah.

16:00:56 11   Q.      And you received the e-mail around August 30th of

16:01:01 12   2018?

16:01:02 13   A.      Yes.

16:01:04 14   Q.      And if you look at -- so Michelle Solano sent the

16:01:09 15   e-mail and she says please find attached the docs for

16:01:14 16   today's 2:00 p.m. PT 2019 NA consumer OP1:  Alexa Shopping,

16:01:22 17   do you see that?

16:01:23 18   A.      I see that.

16:01:24 19   Q.      And there are 1, 2, 3 attachments that all have OP1

16:01:30 20   Alexa shopping, and 2019 OP1 in the file name?

16:01:36 21   A.      I see all three of them.

16:01:38 22   Q.      Okay.  If you could now go to Exhibit 84, which has

16:01:42 23   an ending Bates number of 85508.  And do you recognize this

16:01:52 24   to be a Wiki page from the Alexa Shopping Wiki that is

16:01:57 25   entitled "Dialog Platform"?

16:02:00 1    A.      Yes.

16:02:02 2    Q.      And Exhibit 87 is -- Exhibit 87 is the -- this is an

16:02:09 3    e-mail attaching the 2022 OP1; correct?

16:02:15 4    A.      That's correct.

16:02:18 5    Q.      An e-mail you received?

16:02:21 6    A.      Yes.

16:02:26 7    Q.      And just like the other OP1's, the 2022 OP1 was

16:02:34 8    presented to Amazon senior leadership?

16:02:39 9    A.      It was presented to Amazon consumer and Alexa senior

16:02:44 10   leadership.

16:02:47 11            (End of video.)

16:02:50 12            MR. YOON:  Your Honor, at this time we would

16:02:53 13   like to move into evidence exhibit PTX-78, PTX-80, PTX-84,

16:03:01 14   and PTX-87.

16:03:03 15            MR. HADDEN:  No objection.

16:03:10 16            THE COURT:  Is it clear what the corresponding

16:03:12 17   exhibit is with the script.

16:03:15 18            MR. YOON:  I believe so, Your Honor.

16:03:17 19            THE COURT:  I have been trying to follow it, I

16:03:19 20   just want to make sure that some day we don't have a

16:03:22 21   question as to what exhibit was talked about versus what

16:03:22 22   exhibit you entered.

16:03:27 23            MR. YOON:  Yes, the exhibits that were talked

16:03:29 24   about in the transcript are the videos, are the ones that

16:03:32 25   are put into evidence.

16:03:34   1        THE COURT:  With the same number?  My problem is

16:03:37   2   there is a deposition number that's mentioned, no one knows

16:03:40   3   what the correlation is between the deposition exhibit and

16:03:43   4   the exhibit you just put in.

16:03:45   5        MR. YOON:  Yes, Your Honor.  It's our practice

16:03:47   6   in our deposition numbers, our exhibits and our exhibit

16:03:51   7   numbers are one in the same.  We see sequentially numbered

16:03:54   8   our deposition exhibits and they should be the same as our

16:03:57   9   exhibit numbers.

16:03:58  10        THE COURT:  Well, if at any point they're not,

16:04:00  11   make sure we have on the record, what the correlation is.

16:04:04  12        MR. YOON:  Will do, Your Honor.

16:04:05  13        THE COURT:  Thank you.

16:04:06  14        MR. YOON:  And lastly, we are now playing the

16:04:08  15   deposition testimony of Scott Hayden who is the

16:04:10  16   vice-president of intellectual property at Amazon.

16:04:13  17        (Videotape deposition of Scott Hayden:)

16:04:19  18   Q.    I think earlier in your testimony you mentioned you

16:04:21  19   looked at the Comverse patent purchase agreement, is that

16:04:28  20   right?

16:04:28  21   A.    Yes.

16:04:28  22   Q.    And why don't we -- figure out where that is, what

16:04:33  23   was the motivation to enter a patent purchase agreement with

16:04:40  24   Comverse?

16:04:44  25   A.    So knowing that Alexa was coming and that we really

16:04:43 1    didn't have time to secure patents on our own technology, we

16:04:47 2    wanted to make sure that we had some assets that we could

16:04:51 3    counter claim or use in discussions or negotiations with

16:04:56 4    others.  And we bought a small patent portfolio with

16:05:05 5    Comverse.

16:05:05 6    Q.    Exhibit 158 is a document entitled objections and

16:05:10 7    responses of defendants to plaintiff VB Assets LLC's first

16:05:15 8    set of interrogatories, numbers 1 through 14?

16:05:20 9    A.    I see that.

16:05:20 10   Q.    And have you seen Amazon's interrogatory responses

16:05:24 11   before today?

16:05:26 12   A.    I may have seen one subsection of one of these, but I

16:05:31 13   don't recall this one.

16:05:32 14   Q.    Why don't we go to page 21 of Exhibit 158.

16:05:40 15   A.    Okay.

16:05:41 16   Q.    And the bottom of page 21, do you see there is a

16:05:44 17   sentence that says "Amazon became aware of U.S. Patent Nos.

16:05:49 18   '8,886,536; 8,073,681; and 9,015,049 in 2015."  Do you see

16:06:05 19   that?

16:06:05 20   A.    Yes.

16:06:06 21   Q.    And do you understand that the three patents I just

16:06:10 22   quoted from the interrogatory response have been referred to

16:06:14 23   in this case as the '536, the '681, and the '049 patents?

16:06:22 24   A.    I do.

16:06:24 25   Q.    Do you know how Amazon became aware of the those

16:06:29  1   three patents in 2015?

16:06:32  2   A.      My understanding is those were cited in prosecution

16:06:36  3   of our own patent applications.

16:06:40  4   Q.      And does -- and do you have any other facts about the

16:06:43  5   context for how those patents came to be cited in Amazon

16:06:50  6   patents?

16:06:50  7   A.      A patent examiner would have thought they needed to

16:06:54  8   be cited and cited them.  Often times it's got the right

16:06:58  9   words in a search result.  Sometimes it's something they are

16:07:02 10   aware of.  I don't know why or how that came about.

16:07:06 11   Q.      Do you know if the citation was from the patent

16:07:10 12   examiner or if it was from the patent prosecution counsel of

16:07:14 13   Amazon?

16:07:15 14   A.      I don't.  I don't know.

16:07:17 15               (End of videotape deposition.)

16:07:22 16               MR. YOON:  Your Honor, at this time we would

16:07:24 17   like to move into evidence PTX-158.

16:07:27 18               THE COURT:  So you got a forty-page document of

16:07:31 19   their interrogatory responses that has a whole bunch of

16:07:34 20   stuff in there that's not related to what he just talked

16:07:37 21   about.  Why are we doing this?

16:07:39 22               MR. YOON:  I apologize.  That was what was used

16:07:42 23   at deposition.  We can excerpt it so it's just one or two

16:07:45 24   pages.

16:07:47 25               THE COURT:  I'm not admitting this.  You can

16:07:49 1    figure out what you want to excerpt it to, talk with them

16:07:52 2    and we'll talk about it on Monday.

16:07:54 3              MR. YOON:  Understand, Your Honor.

16:07:56 4              At this time we'll be calling Mr. Brett Reed.

16:07:59 5              THE COURT:  How about we give the jury a break,

16:08:01 6    let you go a little early.  I think we're making good time.

16:08:05 7    We'll be fine.  And it's Friday afternoon and some of us are

16:08:09 8    getting tired.  So I'll just remind you don't talk to anyone

16:08:13 9    about the case, which you probably want to, and have safe

16:08:18 10   travels and we'll see you on Monday morning.

16:08:20 11             COURTROOM DEPUTY:  All rise.

16:08:22 12             (Jury exiting the courtroom at 4:08 p.m.)

16:08:44 13             THE COURT:  All right.  So I don't think that's

16:08:47 14   going to be a problem, but I'm not putting in a bunch of

16:08:52 15   stuff that I don't know how it's going to be cited some day

16:08:55 16   as evidence, so let's figure out how to deal with that one.

16:08:59 17             Anything we need to talk about.

16:09:01 18             MR. YOON:  Only procedurally, Your Honor, two

16:09:04 19   things.  One is that I had a discussion with the local

16:09:10 20   counsel.  I think we were trying to have a discussion this

16:09:12 21   weekend of how to make things more efficient for the Court

16:09:12 22   on Monday, as counsel indicated we don't have a claim

16:09:19 23   construction issue anymore, and so hopefully this weekend we

16:09:22 24   can come back with a proposal to you to make Monday evening

16:09:26 25   or Tuesday much more efficient.

16:09:28  1                    THE COURT:  All right.  I appreciate that.

16:09:31  2       Anything else?

16:09:31  3                    MR. HADDEN:  No, Your Honor.

16:09:32  4                    COURTROOM DEPUTY:  Court is adjourned.

          5                    (Court adjourned at 4:09 p.m.)

          6

          7                    I hereby certify the foregoing is a true and
             accurate transcript from my stenographic notes in the proceeding.
          8

          9                                   /s/ Dale C. Hawkins
                                         Official Court Reporter
         10                                U.S. District Court

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25