08:25:06 1                IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF DELAWARE

3

4     VB ASSETS, LLC,                ) VOLUME 3
                                     )
5                 Plaintiff,         )
                                     ) C.A. No. 19-1410(MN)
6     v.                             )
                                     )
7     AMAZON.COM SERVICES LLC,       )
                                     )
8                 Defendant.         )

9

10                      Monday, November 6, 2023
                        8:45 a.m.
11                      Jury Trial

12

13                      844 King Street
                        Wilmington, Delaware

14

15    BEFORE:   THE HONORABLE MARYELLEN NOREIKA
                United States District Court Judge
16

17

18

      APPEARANCES:
19

20                 WILSON SONSINI GOODRICH & ROSATI PC
                   BY:   NEAL C. BELGAM, ESQ.
21                 BY:   JAMES C. YOON, ESQ.
                   BY:   MATTHEW A. MACDONALD, ESQ.
22                 BY:   RYAN R. SMITH, ESQ.
                   BY:   BRAD TENNIS, ESQ.
23                 BY:   JAMIE Y. OTTO, ESQ.

24
                            Counsel for the Plaintiff
25

1

**APPEARANCES CONTINUED:**

2

3       ASHBY & GEDDES
       BY:  STEVEN J. BALICK, ESQ.

4       -and-

5

6       FENWICK & WEST LLP
       BY:  J. DAVID HADDEN, ESQ.
       BY:  SAINA S. SHAMILOV, ESQ.

7       BY:  RAVI R. RANGANATH, ESQ.
       BY:  VIGEN SALMASTLIAN, ESQ.

8       BY:  MELANIE MAYER, ESQ.
       BY:  JEFFREY WARE, ESQ.

9

                Counsel for the Defendant

10

11

12           - - - - - - - - - -

13

14

08:27:13 15     THE COURT:  All right.  Good morning, everyone.

08:44:57 16 Please be seated.  We have a thousand and five objections.

08:45:05 17 Let's go through each one.

08:45:09 18     MR. SMITH:  Your Honor, the first one was DTX

08:45:25 19 208.  And that's an exhibit that Amazon is trying to get in

08:45:32 20 through their expert, Dr. Johnson.  And the issue here is

08:45:35 21 this is a third-party technical document, purportedly about

08:45:41 22 a system that United Airlines put together.  There is no

08:45:45 23 fact witness who is providing any testimony about what the

08:45:49 24 United system was, no testimony about what this document

08:45:55 25 was, whether it was authentic, when it was made.  And so

08:45:57 1   Dr. Johnson is not testifying about a technical comparison,

08:46:01 2   he's really just testifying to the underlying fact of

08:46:05 3   whether United Airlines actually did this and when they did

08:46:08 4   it.

08:46:10 5               THE COURT:  Okay.

08:46:11 6               MR. GREGORIAN:  Thank you, Your Honor.

08:46:16 7               So we're not just trying to introduce a random

08:46:20 8   document.  This is documents produced from the files of

08:46:24 9   Nuance Communications --

08:46:25 10              THE COURT:  All right.  Is there anybody who has

08:46:28 11  said what this is.

08:46:29 12              MR. GREGORIAN:  Yes, there is a declaration

08:46:31 13  authenticating the document from Nuance.

08:46:33 14              THE COURT:  How are you going to put that into

08:46:34 15  evidence at trial, how are you going to get everything into

08:46:37 16  evidence at trial as to what this document is?

08:46:40 17              MR. GREGORIAN:  I understand, Your Honor.  They

08:46:41 18  did not contest the authenticity --

08:46:44 19              THE COURT:  Did they in the pretrial order?

08:46:45 20              MR. GREGORIAN:  No, they did not, it is not

08:46:48 21  identified as a jury issue at all.

08:46:50 22              THE COURT:  In the pretrial order where they

08:46:52 23  have objections to exhibits, they did not put authenticity

08:46:55 24  as an objection?

08:46:55 25              MR. GREGORIAN:  No, they did put authenticity as

08:47:00 1    an objection, and we understand that to be an objection to

08:47:03 2    Your Honor's gatekeeping role and we counter designated our

08:47:03 3    authenticating information which was disclosed to them over

08:47:08 4    a year and a half ago to which they offered no --

08:47:09 5              THE COURT:  How are you going to put that in, so

08:47:11 6    I don't know what this authenticating information is, tell

08:47:14 7    me what it is.  Show me it.

08:47:16 8              MR. WARE:  Sure, Your Honor.

08:47:18 9              THE COURT:  How are we going to get that --

08:47:23 10             MR. WARE:  Sure.  So there is two things Your

08:47:25 11   Honor, there is a declaration, which was identified as a

08:47:28 12   trial exhibit from Nuance, DTX --

08:47:31 13             THE COURT:  We're not putting a declaration in

08:47:33 14   front of a jury.

08:47:34 15             MR. WARE:  Understood.  We have deposition

08:47:36 16   testimony from the primary developer of the system at Nuance

08:47:38 17   that we had designated --

08:47:40 18             THE COURT:  So you have testimony and that

08:47:42 19   testimony says that this is an authentic document.

08:47:45 20             MR. WARE:  Correct, Your Honor, and I have the

08:47:47 21   clips ready to go if you would like to see them.

08:47:49 22             THE COURT:  All right.  Let's see.

08:48:10 23             (Video deposition clips played.)

08:48:12 24   Q.    Do you recognize this document?

08:48:12 25   A.    Yes, it looks like the document from United Airlines

08:48:23 1    project.

08:48:24 2    Q.      What is the CTI Phrase 1 referring to?

08:48:29 3    A.      CTI would be computer telephony interaction and I

08:48:39 4    assume this was the first phase of that part of the system.

08:48:41 5    Q.      Did you work on this project?

08:48:43 6    A.      Yes.

08:48:45 7    Q.      What was your role?

08:48:51 8    A.      Tech lead and developer.

08:48:54 9    Q.      Okay.  And this document, it identifies version 2.04.

08:48:58 10   Do you see that?

08:48:59 11   A.      Yes.

08:49:01 12   Q.      So here the document says phase one.  So I guess it

08:49:06 13   means that this is version two of phase one; is that right?

08:49:09 14   A.      Yeah, just version two of this document.

08:49:20 15   Q.      Okay.  Understood.

08:49:21 16           And what is the purpose of a detail design

08:49:25 17   specification?

08:49:28 18   A.      Well, this --

08:49:31 19           (End of videotape.)

08:49:33 20           THE COURT:  All right.  I have seen enough on

08:49:33 21   that.  You're going to play that for the jury?

08:49:37 22           MR. WARE:  We can if Your Honor requires, we

08:49:39 23   designated it.

08:49:41 24           THE COURT:  That's authenticity, what about

08:49:42 25   hearsay?

08:49:43 1                MR. WARE:  Your Honor, there is no testimonial

08:49:46 2     statements offered for the truth here, it's like any other

08:49:48 3     prior art, it's just evidence of what was disclosed in the

08:49:51 4     public regardless of whether it was "true or not".

08:49:54 5                THE COURT:  All right.

08:49:56 6                MR. SMITH:  Your Honor, in terms of the depo

08:49:59 7     clip, there is a specific procedure for designating

08:50:02 8     deposition clips and then giving us enough time to do

08:50:05 9     counter designations, making the video, they didn't do any

08:50:08 10    of that, this witness --

08:50:10 11               THE COURT:  So they aren't going to play that

08:50:12 12    for the jury?

08:50:14 13               MR. SMITH:  To date they have not identified

08:50:16 14    this takes a deposition that they will be playing to the

08:50:19 15    jury, this is the first time that they've said it.

08:50:21 16               THE COURT:  Is that in the pretrial order that

08:50:23 17    you would have that?

08:50:25 18               MR. SMITH:  They listed him as a may call.

08:50:27 19               THE COURT:  Did they designate that testimony in

08:50:29 20    the pretrial order in the deposition designations?

08:50:32 21               MR SMITH:  In the deposition testimony

08:50:34 22    designations, that was included.  But they did not give us

08:50:36 23    the four days required under the pretrial order to do this,

08:50:41 24    make a video clip or anything.  We had counter designations

08:50:45 25    as well that we would have played had we known they were

08:50:48 1  actually going to use the testimony.

08:50:51 2           THE COURT:  All right.  Well what about their

08:50:53 3  position that look, this is just part of my gatekeeping role

08:50:56 4  as to authentication so they don't actually need to play it,

08:51:00 5  they just need to convince me that its met the requirement?

08:51:05 6           MR. SMITH:  Well this is fundamentally different

08:51:08 7  than some prior art, for patent prior art it's not asserted

08:51:11 8  for the truth of the matter, it's just simply what's in the

08:51:14 9  patent.  Here they're trying to prove a system, so they're

08:51:17 10 trying to prove that United Airlines actually did this and

08:51:20 11 at a certain date.  And I think the problem with letting a

08:51:23 12 document like this in is it's hearsay about the fact that

08:51:26 13 United actually did it in a time frame --

08:51:30 14          THE COURT:  I'm sorry, is this a piece of prior

08:51:33 15 art?  I don't remember this being the hey Alexa, and the

08:51:37 16 three things that this was limited to, where does this come

08:51:40 17 in.  And no, one person, he already started.

08:51:44 18          MR. WARE:  Sure, Your Honor.  Yeah, it's the

08:51:47 19 combination that Dr. Johnson will testify about, '703, Claim

08:51:52 20 25, it's his 103 grounds.  This United in combination with

08:51:55 21 the Pardovi patent, it was disclosed in his report a

08:52:00 22 year-and-a-half ago, including all this information.

08:52:05 23          THE COURT:  Here is what I am going to do, if

08:52:07 24 you want to do counter designations, do counter

08:52:10 25 designations.  You limit them to these designations and they

08:52:14 1    can counter-designate anything that they want and I don't

08:52:16 2    want to hear any objections from you all because I'm letting

08:52:19 3    you do this late.

08:52:21 4                 MR. WARE:  Thank you, Your Honor.

08:52:21 5                 THE COURT:  Is that the same issue with 209?

08:52:24 6                 MR. SMITH:  Same issue, Your Honor.

08:52:26 7                 THE COURT:  Do you have testimony on 209 that

08:52:28 8    authenticates it?

08:52:30 9                 MR. WARE:  Yes, Your Honor.

08:52:30 10                THE COURT:  Why don't you designate that, tell

08:52:32 11   them they can counter designate anything they want from that

08:52:36 12   testimony.  All right.  Anything else on DTX 208 and 209?

08:52:41 13                MR. SMITH:  No, Your Honor.

08:52:42 14                THE COURT:  All right.  Now we have DTX 0417.

08:53:01 15                MR. SMITH:  And Your Honor -- I'll let you get

08:53:05 16   there.

08:53:06 17                THE COURT:  Yes.

08:53:07 18                MR. SMITH:  The issue for this is that for this

08:53:09 19   slide, for example, what they're doing is they're using

08:53:12 20   doctor -- snippets of Dr. Polish's trial testimony and

08:53:12 21   basically --

08:53:17 22                THE COURT:  No, no trial testimony.  You're not

08:53:19 23   putting that on the screen.  The jury can remember it or

08:53:22 24   not.  That's argument and you're not putting it on the

08:53:25 25   screen.  So that's 14.

08:53:29 1                     MR. SMITH:  That's the vast majority of these --

08:53:33 2                     THE COURT:  No, we're going to go through them

08:53:34 3     all because I'm not taking things out that I haven't looked

08:53:37 4     at.

08:53:39 5                     MR. SMITH:  Okay.

08:53:39 6                     THE COURT:  So 17, 21, 22, I don't have anything

08:53:45 7     about 25.  What's the problem with 25?

08:53:48 8                     MR. SMITH:  They reference trial testimony of

08:53:50 9     Mr. Peck and they say no source code next to --

08:53:54 10                    THE COURT:  But they didn't put the trial

08:53:55 11    testimony -- I mean, take off the reference to trial

08:53:58 12    testimony because the jury is not going to have the

08:54:02 13    transcript.  That's argument, you can do that in your

08:54:04 14    closings.  But here if they take off the reference to the

08:54:07 15    pages of the trial, no source code, he didn't look at source

08:54:14 16    codes.  Okay.

08:54:14 17                    35.  Same thing.  39, same thing.  48, same

08:54:27 18    thing.  55, yeah, we're not quoting testimony.  One expert

08:54:40 19    quoting another's.

08:54:45 20                    Same for 63, No. 69, remove the reference to the

08:54:52 21    trial transcript.  72, no.

08:55:01 22                    75, no.

08:55:05 23                    And just so we're clear, the expert can say he

08:55:08 24    testified that he didn't review source code, but he can't

08:55:12 25    plop it up there with a quote.

08:55:14  1                 75, no.

08:55:17  2                 77, remove the reference to the trial

08:55:20  3     transcript.

08:55:21  4                 80, no.  We're not going to put up snippets of

08:55:30  5     his testimony.

08:55:31  6                 85, get rid of the reference to source code.

08:55:51  7                 93, same.  96, I already ruled.

08:56:00  8                 101, I have already ruled on that issue.

08:56:04  9                 112, I've ruled.  113 I have ruled.  114 I have

08:56:10 10     ruled.  118, I have ruled.  120, 121, 134, 135, 139, 168.

08:56:38 11     So for those, yes, I will sustain the objections for the

08:56:44 12     reasons I just said.  I do think it's overly prejudicial,

08:56:50 13     incomplete, and we're not going to do that for either side.

08:56:56 14                 All right.  What are the second group.

08:57:02 15                 MR. SMITH:  Your Honor, I think that takes care

08:57:04 16     of most of -- the second group was really ones where it was

08:57:10 17     they were depositions, deposition transcripts for witnesses

08:57:14 18     who hadn't testified or they testified and then they're

08:57:20 19     still relying on depositions that were in the case.  For

08:57:23 20     example, 209 was an example, this was a compilation of

08:57:23 21     different -- Dr. Polish deposition --

08:57:32 22                 THE COURT:  Wait.  I have 106, 107, 108, 109,

08:57:40 23     110, 111, 115, what are those?

08:57:47 24                 MR. SMITH:  This was -- 106 was, we thought it

08:57:52 25     was overly prejudicial to reference Dr. Polish's report and

08:57:59 1   his picture suggesting that he -- suggest that he said this.

08:58:04 2   But this is actually pulled from the patent.  So I think we

08:58:07 3   just thought it was misleading in the sense of it's showing

08:58:11 4   his picture, it's showing a picture of the patent and it's

08:58:14 5   referencing his report.  So it's suggesting that he had a

08:58:17 6   report that said no solution.  So I think they're just

08:58:21 7   characterizing an expert report that wasn't even discussed

08:58:25 8   in his testimony.

08:58:27 9            THE COURT:  Why are we referring to expert

08:58:28 10  reports?  The jury doesn't have a clue about expert reports,

08:58:32 11  so what are we doing here?  It does sort of suggest that

08:58:36 12  this comes from his expert report.

08:58:38 13            MS. MAYER:  We can remove the cite to --

08:58:40 14            THE COURT:  Well, then, do that.

08:58:41 15            MS. MAYER:  This is actually an excerpt from the

08:58:43 16  patent.

08:58:44 17            THE COURT:  That takes care of 106, 107, 108,

08:58:49 18  109, 110, 111, 115 and 186.  I don't know what the problem

08:59:07 19  is with 186.  Actually, what is the problem with 186?  There

08:59:11 20  is no citation to anything there.  This says no dispute.

08:59:12 21            MR. SMITH:  Yeah, I think that one is fine, Your

08:59:21 22  Honor, we'll withdraw that one.

08:59:24 23            THE COURT:  That's withdrawn.  I'll sustain the

08:59:27 24  objections to 106, 108, 109, 110, 111, 116 and 116 and

08:59:35 25  overrule it as to 186.  Now we will we have 126.

08:59:42  1          MR. SMITH:  This is testimony of Freeman, Tom

08:59:45  2    Freeman is a trial witness and he had trial testimony, but

08:59:48  3    now they're referring to his deposition testimony, and we

08:59:51  4    think that's prejudicial just because the jury --

08:59:54  5          THE COURT:  Is his deposition testimony going to

08:59:56  6    be played?  Well, then it shouldn't be on a slide.  You can

09:00:00  7    summarize what he said, but if this is not actually quoted

09:00:03  8    in the trial transcript, we're not putting it before the

09:00:08  9    jury.

09:00:09 10          MR. SMITH:  And that's the same issue on 27,

09:00:13 11    Mr. Kennewick's deposition, and then we get to 32, 132,

09:00:20 12    that's Dr. Polish --

09:00:21 13          THE COURT:  Again, citing to the expert's

09:00:23 14    deposition, if you didn't get it on cross-examination where

09:00:26 15    you can tell the jury, hey, remember he said this, then

09:00:29 16    we're not putting it in through his deposition.  So whatever

09:00:32 17    of those I think you should be able to understand my ruling

09:00:35 18    and cut out that stuff.

09:00:42 19          What about 188, 204 and 214?

09:00:46 20          MR. SMITH:  Those are resolved by your ruling on

09:00:50 21    United exhibits, so those are withdrawn in light of that

09:00:53 22    ruling.

09:00:53 23          THE COURT:  All right.  Anything else?

09:00:56 24          MR. SMITH:  No, Your Honor.  Thank you.

09:00:59 25          THE COURT:  You guys need to figure your slides

09:01:01 1   before they go up so we don't have to waste time when the

09:01:07 2   jury is here.

09:01:07 3                   Mark, is the jury here?

09:01:14 4                   COURTROOM DEPUTY:  Yes.

09:01:16 5                   THE COURT:  All right.  Let's bring them in.

09:01:42 6                   (Jury entering the courtroom at 9:02 a.m.)

09:03:42 7                   All right.  Welcome back, everyone.  Hope you

09:03:46 8   had a good weekend.  Everyone else can be seated.

09:03:49 9                   What's next?

09:03:51 10                  MR. YOON:  Your Honor, before the plaintiff

09:03:55 11  calls its next witness, Brett Reed, just a couple of

09:04:01 12  admission issues.  Your Honor had indicated after the

09:04:03 13  deposition -- I mean after the deposition testimony was

09:04:07 14  played of Mr. Hayden, you had a concern about the

09:04:09 15  interrogatories.  The parties met and conferred and redacted

09:04:14 16  everything but the answer.  And we now move into evidence as

09:04:18 17  modified and provided a copy to the court, PTX-158.

09:04:23 18                  THE COURT:  That's just the one interrogatory,

09:04:26 19  the one answer.

09:04:27 20                  MR. YOON:  It's literally the question and the

09:04:29 21  answer.

09:04:30 22                  THE COURT:  All right.

09:04:31 23                  MR. HADDEN:  No objection.

09:04:32 24                  THE COURT:  Thank you.  It is admitted.

09:04:32 25                  (PTX Exhibit No. 158 was admitted into

09:04:32 1    evidence.)

09:04:34 2            MR. YOON:  Your Honor, we've reviewed the

09:04:35 3    transcript over the weekend, the deposition testimony of

09:04:38 4    Mr. DiCristo was played, and Your Honor, after the testimony

09:04:44 5    was played, we asked that we had moved in Exhibits 78, 80,

09:04:49 6    84 and 87, it was not objected to, and then Your Honor asked

09:04:52 7    a question as to whether the deposition exhibit and the

09:04:55 8    trial exhibit was the same number, but technically Your

09:04:59 9    Honor never said Exhibits 80 and 84 were admitted.  We just

09:05:03 10   wanted to make it clear on the record that they were?

09:05:05 11           THE COURT:  All right.

09:05:05 12           MR. HADDEN:  No objection.

09:05:06 13           THE COURT:  All right.  I think they were

09:05:08 14   admitted.  If they weren't --

09:05:10 15           MR. YOON:  I didn't want to take a chance Your

09:05:12 16   Honor.

09:05:12 17           THE COURT:  Fine.  What's next?

09:05:15 18           MR. YOON:  My colleague, Mr. McDonald, will be

09:05:24 19   calling Mr. Reed.

09:05:26 20           MR. MACDONALD:  Your Honor, the plaintiff calls

09:05:32 21   Brett Reed.

09:05:40 22           COURTROOM DEPUTY:  Please raise your right hand.

09:05:42 23   Please state and spell your full name for the record.

09:05:46 24           THE WITNESS:  Brett Lamar Reed, B-R-E-T-T,

09:05:52 25   L-A-M-A-R, R-E-E-D.

09:05:59 1           **BRETT LAMAR REED, having been sworn as examined**

09:06:05 2     **and testified as follows:**

09:06:09 3                    **DIRECT EXAMINATION**

09:06:10 4     **BY MR. MACDONALD:**

09:06:12 5     **Q.      Good morning, Mr. Reed.  Could you introduce yourself**

09:06:15 6     **briefly to the jury, please?**

09:06:16 7     **A.      Yes, good morning.  My name is Brett Reed, I'm an**

09:06:20 8     **economist.**

09:06:21 9     **Q.      Can you give the jury an overview of your educational**

09:06:24 10    **background?**

09:06:25 11    **A.      Yes, I have a bachelors in economics and geography**

09:06:29 12    **from the University of California Irvine.  Then I went to**

09:06:33 13    **the Ph.D. program at UCLA, where I received a masters**

09:06:37 14    **degree.  And that was almost forty years ago.  My focus was**

09:06:41 15    **on economics, and I started working in that field, in the**

09:06:47 16    **field I'm doing now, analyzing economic issues and**

09:06:51 17    **commercial disputes.**

09:06:53 18    **Q.      Mr. Reed, how long have you been analyzing economic**

09:06:57 19    **issues and commercial disputes?**

09:06:58 20    **A.      For over thirty-nine years with a focus on**

09:07:01 21    **intellectual property, in particular patent infringement**

09:07:04 22    **matters like I'm addressing today.**

09:07:05 23    **Q.      Have you ever testified in a case involving patent**

09:07:08 24    **damages before, sir?**

09:07:09 25    **A.      Yes, I'll focus on testimony in U.S. District Courts**

Reed - direct

09:07:13 1    like this in front of the Court and the jury, this is about

09:07:16 2    30 times which I presented testimony on economic issues

09:07:21 3    relating to patent infringement damages.

09:07:24 4                MR. MACDONALD:  Your Honor, at this time I would

09:07:25 5    like to offer Mr. Reed as a qualified expert in the field of

09:07:29 6    economics for the purposes of offering expert testimony on

09:07:32 7    damages.

09:07:32 8                MS. SHAMILOV:  No objection.

09:07:33 9                THE COURT:  Okay.  They will be so recognized.

09:07:36 10   BY MR. MACDONALD:

09:07:37 11   Q.    Mr. Reed, what was your assignment in this case?

09:07:38 12   A.    My assignment was to address economic issues with a

09:07:42 13   focus on patent infringement damages here.

09:07:45 14   Q.    And can you explain to the jury what information you

09:07:47 15   reviewed while preparing your opinions in this case?

09:07:51 16   A.    I reviewed quite a bit of material, including over

09:07:55 17   1,000 Amazon documents focusing on strategy, plans,

09:08:00 18   financial information, monthly active activity with respect

09:08:05 19   to Alexa, Alexa shopping, I also considered testimony from

09:08:11 20   depositions of many individuals, conversations with

09:08:11 21   Mr. Kennewick and Dr. Polish, and I also analyzed the other

09:08:16 22   expert reports including reports from Amazon experts and

09:08:21 23   Dr. Polish.

09:08:21 24   Q.    In total, how much time did you spend working on this

09:08:26 25   matter, sir?

09:08:27 1    A.      I personally spent over 1,000 hours analyzing this

09:08:30 2    information.

09:08:30 3    Q.      Mr. Reed, as an economist, how do you go about

09:08:34 4    analyzing damages in a patent case?

09:08:35 5    A.      With patent damages, individuals like, you have the

09:08:40 6    advantage of the U.S. statute on patent damages and we see

09:08:43 7    it here.  So what this tells us is that if there is a

09:08:48 8    finding of infringement that the plaintiff or the patent

09:08:50 9    owners is entitled to damages adequate to compensate for the

09:08:54 10   infringement, to compensate the patent owner for the

09:08:58 11   infringement by the other party, but no less than a

09:09:01 12   reasonable royalty.  So often the analysis becomes an

09:09:05 13   assessment of a reasonable royalty.

09:09:07 14   Q.      What is a royalty?

09:09:09 15   A.      Well, think of royalty as a payment, one would be a

09:09:15 16   payment for rent, so the royalty rate would be a payment,

09:09:21 17   the payment amount, like the monthly rent and then the

09:09:24 18   royalty base would be the number of payments that are being

09:09:28 19   made, so that calculation of the royalty base times the

09:09:31 20   royalty rate is the reasonable royalty.

09:09:34 21   Q.      All right.  And as an economist, how do you go about

09:09:39 22   determining what a reasonable royalty is?

09:09:41 23   A.      Once again, we have guidance from the courts.

09:09:45 24   Decades ago there was a court case called Georgia-Pacific

09:09:48 25   where the court laid out financial, economic, and licensing

Reed - direct

09:09:52 1   factors or issues to analyze.  And they're called the

09:09:55 2   Georgia-Pacific factors here.  So this shows that case and

09:10:00 3   the listing of these 15 factors.  So these factors are

09:10:04 4   analyzed by individuals like myself to determine what a

09:10:08 5   reasonable royalty would be for a payment from the accused

09:10:11 6   infringer to the patent owner in the event of a finding of

09:10:16 7   infringement.

09:10:17 8   Q.    Did you consider all of these factors in forming your

09:10:20 9   opinions?

09:10:20 10  A.    Yes, in my analysis I considered all of them, certain

09:10:23 11  of them are most relevant and will be focused on here.

09:10:26 12  Q.    The last factor, listed is the outcome of a

09:10:31 13  hypothetical negotiation.  Did you consider a hypothetical

09:10:35 14  negotiation in this case?

09:10:36 15  A.    Yes.  And this is typical.  We analyze these factors

09:10:40 16  in this context of a hypothetical negotiation where the two

09:10:45 17  parties would sit at a negotiation table before infringement

09:10:49 18  began to evaluate the information, the cards are up on the

09:10:55 19  table, both parties would understand the facts and they

09:10:57 20  evaluate those facts to help willingly agree on what a

09:11:02 21  reasonable royalty would be.

09:11:02 22  Q.    How did the hypothetical negotiation differ if at all

09:11:08 23  from a real negotiation that happens in the real world?

09:11:11 24  A.    It differs in important ways.  And most important,

09:11:15 25  probably the differences of the assumptions.  At that

Reed - direct

09:11:19 1   hypothetical negotiation table, it's understood by both

09:11:22 2   parties that the patents at issue are valid, and that the

09:11:26 3   patents at issue are infringed by the product that would be

09:11:32 4   introduced after this negotiation.  So a party like Amazon

09:11:35 5   in this case would know that if it doesn't modify its

09:11:39 6   products, it would be infringing the patent at issue here if

09:11:43 7   it introduced the product.  So that's an important

09:11:46 8   distinction.

09:11:46 9   Q.      So at the negotiating table, can Amazon say to

09:11:50 10  VoiceBox, we shouldn't have to pay because we don't infringe

09:11:53 11  the patent?

09:11:54 12  A.      No, the parties would understand that the

09:11:56 13  infringement would be a fact.

09:11:59 14  Q.      When in this case would a hypothetical negotiation or

09:12:03 15  hypothetical negotiation have happened?

09:12:05 16  A.      The hypothetical negotiation takes place just before

09:12:07 17  the first infringement.  And here there is two different

09:12:11 18  dates of first infringement.  So there would be two

09:12:14 19  hypothetical negotiations.  One would be in November 2014.

09:12:20 20  This would relate to the voice ads patents and the '681

09:12:25 21  patent.  Patents at issue in those families at that time.

09:12:30 22  And then November 2014 Amazon introduced echo and Alexa so

09:12:35 23  that would be the first infringement.  So the negotiation

09:12:38 24  would be right before that.

09:12:39 25          Then with respect to the voice commerce patent,

09:12:42 1   the '703 patent, that patent issued in April of 2017, so

09:12:47 2   that would give rise to infringement of that patent, and

09:12:52 3   there would be another negotiation about that time.

09:12:54 4   Q.    Mr. Reed, can you briefly summarize for the jury your

09:12:57 5   conclusions about what the outcome of these hypothetical

09:13:01 6   negotiations would have been?

09:13:01 7   A.    Yes.  So at a high level, in my opinion, one aspect

09:13:06 8   would be a running royalty, an annual royalty that would be

09:13:09 9   paid over time based on a user growth of Alexa and Alexa

09:13:15 10   Shopping and Alexa Shopping purchasers.  And then over the

09:13:17 11   course of time, from late 2014 through this year,

09:13:23 12   through 2023, the accumulation of those annual payments for

09:13:28 13   all three patent families would be a grand total of

09:13:33 14   $46.7 million.

09:13:33 15   Q.    I would like now to have you walk the jury through

09:13:37 16   how you reached that conclusion.  Can you first start by

09:13:39 17   explaining to the jury how you went about applying and

09:13:42 18   analyzing the Georgia-Pacific factors?

09:13:44 19   A.    Yes, so what I typically do is I group common

09:13:47 20   Georgia-Pacific factors into categories.  And I focus on,

09:13:50 21   typically as shown here, five different groups.  Some of

09:13:55 22   these have more important information, some less.  So I'll

09:13:58 23   be focusing here on the most important information in my

09:14:02 24   opinion.

09:14:02 25   Q.    Let's start with the first category, the benefits of

Reed - direct

09:14:06 1   the patent.  Can you tell the jury what you looked at?  That

09:14:09 2   group of factors?

09:14:10 3   A.      Yes.  This relates to Georgia-Pacific factors 8

09:14:13 4   through 11, which go to things like profitability of the

09:14:16 5   accused product or service.  Popularity.  The benefits from

09:14:22 6   the use of the patented technology.  And in particular,

09:14:25 7   benefits of that use compared to other alternatives.  And so

09:14:29 8   those are the types of information that I considered here.

09:14:32 9           And I did it in the context of the key strategy

09:14:37 10  that I saw over and over again in the Amazon documents,

09:14:40 11  strategy for echo and Alexa was I'll describe it as get big,

09:14:47 12  get fit, and get close.

09:14:51 13  Q.      Mr. Reed, can you explain to the jury what that

09:14:55 14  means, get big, get fit, get close?

09:14:58 15  A.      Get big, this was expected to be a very competitive

09:15:02 16  environment, this being the competition to provide voice

09:15:06 17  speakers, voice assistant technology for the home.  And

09:15:10 18  Amazon knew that it would be competing with large tech

09:15:14 19  companies like Google and it knew that it was going to be

09:15:18 20  what was called a land rush to be the leader in this case,

09:15:22 21  so it's sought to get big and get big fast.  And then with

09:15:27 22  respect to get close, that had to do with having technology

09:15:33 23  that would be, technology that would be helpful for having a

09:15:35 24  close relationship with the user.  So it sought to have a

09:15:42 25  well operating system that would be -- that would help it

Reed - direct

09:15:50 1    get close to the user.

09:15:52 2              And then get fitted to do with profitability

09:15:56 3    because a lot of money was going to be spent by Amazon to

09:15:59 4    develop the system.  And I'll be addressing that a moment.

09:16:02 5    So in part that required a mechanism to eventually make

09:16:07 6    money from this effort.  And so get big had to do with plans

09:16:11 7    to eventually use the Alexa system to help make money with

09:16:16 8    Alexa Shopping, with shopping overall, with services like

09:16:21 9    Amazon Music, and that's the get fit portion.

09:16:25 10   Q.    I would like -- let me ask this question.  How did

09:16:28 11   you reach the conclusion that patent damages on strategy?

09:16:34 12   A.    It's very relevant on the documents, but it was based

09:16:38 13   on the review of strategy and planning documents.

09:16:41 14   Q.    I would like to walk together through with some of

09:16:43 15   those strategy and planning documents that you considered.

09:16:46 16   If you could look at your binder at PTX 301.

09:16:50 17             Do you recognize this document?

09:16:52 18   A.    Yes, this is one of the strategy documents that

09:16:55 19   Amazon said I analyzed.

09:16:57 20   Q.    What is it entitled?

09:16:58 21   A.    2019 Alexa three-year strategy review with a date of

09:17:04 22   June 4th, 2018.

09:17:06 23             MR. MACDONALD:  Your Honor, the plaintiff moves

09:17:07 24   to admit PTX 301 into evidence.

09:17:11 25             MS. SHAMILOV:  No objection.

Reed - direct

09:17:13 1          THE COURT:  Thank you.  It is admitted.

09:17:13 2          (PTX Exhibit No. 301 was admitted into

09:17:14 3   evidence.)

09:17:14 4   BY MR. MACDONALD:

09:17:14 5   Q.     Can we have the next page of this document, I'm

09:17:20 6   sorry, one more page.  And then the line under the chart.

09:17:27 7   Mr. Reed, can you explain what this passage signified to

09:17:31 8   you?

09:17:31 9   A.     Yes.  Well this is a summary instance if you will

09:17:36 10  where Amazon is noting the strategy, it's changing its ship,

09:17:42 11  it's recognizing the competition from Google as reflected in

09:17:47 12  this document, to achieve the figures they're presenting get

09:17:51 13  big fast, get close, and get fit framework, that's

09:17:56 14  continuing through documents.

09:17:58 15  Q.     Can we look at the previous page and the second chart

09:18:01 16  on that page, lines 12 and 11.

09:18:05 17  A.     You can see right between those two tables there is a

09:18:09 18  discussion about Google and the investments that were being

09:18:13 19  made by Amazon.  But if you look down at line 11, this is

09:18:18 20  essentially showing the plan profitability with respect to

09:18:22 21  the Alexa Echo business.  And the amounts there, that

09:18:27 22  reflects millions, 2019 the three-year plan is a loss of

09:18:35 23  $2.36 billion, again because of the large investments to get

09:18:41 24  big fast, and get close, get fit.

09:18:45 25          Part of the reason for the loss is that the

09:18:47 1   devices that were being sold, the Echo Dot type devices were

09:18:53 2   being sold well below cost, so in a sense Amazon was

09:18:58 3   subsidizing users to purchase a device and try Alexa.

09:19:02 4   Q.     Why was Amazon willing to lose so much money on

09:19:05 5   Alexa?

09:19:06 6   A.     Because of how strategic this area was, not only to

09:19:10 7   create opportunities by having Alexa in homes, enabling the

09:19:15 8   use of the technology to do things like shopping and other

09:19:17 9   things and to get close with consumers, but also to protect

09:19:21 10  the business from other companies that could potentially

09:19:24 11  work with Google or other companies that might develop this

09:19:27 12  type of technology and potentially take away business from

09:19:31 13  the Amazon marketplace.

09:19:35 14  Q.     Could you turn to PTX 306 in your binder now?  Do you

09:19:42 15  recognize this document?

09:19:43 16  A.     I do, yes.

09:19:44 17  Q.     What is this document?

09:19:46 18  A.     It's an OP1, which is a planning document of Amazon's

09:19:51 19  titled Alexa OP1 2019, dated October 15, 2018.

09:19:56 20          MR. MACDONALD:  Your Honor, plaintiff moves to

09:19:58 21  admit into evidence PTX 306.

09:20:01 22          MS. SHAMILOV:  No objection.

09:20:01 23          THE COURT:  Thank you.  It is admitted.

09:20:01 24          (PTX Exhibit No. 306 was admitted into

09:20:05 25  evidence.)

Reed - direct

BY MR. MACDONALD:

Q.     Can we have the first line below the introduction here?  Could you explain what was significant to you about this section?

A.     Generally this entire section is based on the introduction of the strategic theme here.  I think actually what I was focusing on is the beginning of the third paragraph of the introduction section.

Q.     Beginning with -- sorry, where are you?

A.     The third section, two paragraphs below that.  That's it.  So this is addressing in that first sentence, Amazon's direct revenue model is modest at this time.  And they're many years from achieving the break even and then they address this long-term valueless fixed cost, so that's saying that the revenue that's being earned on devices like Echo Dot are low, they're not covering costs, and it's going to be many years until there is enough shopping revenue to come in to make this profitable, that statement, the next statement says last year we asked ourselves how much we should invest, we answered how much is in the bank.  This is addressing how strategic this is.  It's very important to invest for the future.

Q.     Overall, Mr. Reed, was Amazon successful with this get big, get fit, get close strategy?

A.     I believe so, yes.  They began and held on to the

Reed - direct

09:21:42 1  leadership position with voice assistance and it provides a

09:21:49 2  lot of opportunities for Amazon.

09:21:50 3  Q.      Overall, how would this first factor of factors

09:21:54 4  affect what would happen in a hypothetical negotiation in

09:21:56 5  your opinion?

09:21:56 6  A.      It does several things, it provides a guide for

09:22:00 7  assessing the value of these benefits, which I will address

09:22:03 8  later, but more generally it goes to the question of this

09:22:06 9  was very important, the Alexa service was very important to

09:22:10 10 Amazon, and they wanted to be able to get close and to do

09:22:15 11 that they were benefited, in my opinion, from the use of the

09:22:19 12 patented technology, and that supports a stronger royalty

09:22:24 13 here.

09:22:24 14 Q.      Can we look at the second factor that you considered?

09:22:32 15 A.      The second factor --

09:22:34 16 Q.      Convoyed sales?

09:22:35 17 A.      Convoyed sales.

09:22:36 18 Q.      Can you explain what the significance of this factor

09:22:39 19 is?

09:22:39 20 A.      Sure, sorry for over talking you.  The

09:22:41 21 Georgia-Pacific factor six is convoyed sales and what that

09:22:45 22 means is if you sell a product or a service, but you get a

09:22:49 23 benefit because the customer who buys that service might buy

09:22:52 24 other things from you, or increase their purchases of other

09:22:55 25 services on or products from you, that's the convoyed

Reed - direct

09:22:59 1   aspect.  And here there are important convoyed aspects.  And

09:23:04 2   you can kind of see it there in the picture of the two apps

09:23:08 3   there, Amazon music was something that was enhanced by Alexa

09:23:15 4   and Amazon Shopping generally.  Customers would purchase

09:23:18 5   more, potentially could purchase a lot more, and there was

09:23:21 6   actually evidence that Alexa customers bought more from the

09:23:25 7   Amazon Marketplace than other customers.

09:23:27 8   Q.    And so how did this factor affect your analysis?

09:23:30 9   A.    Again, it goes to the value of the ability to offer

09:23:35 10  the -- an improved system that will attract more customers,

09:23:42 11  retain more customers, and it supports a larger royalty.

09:23:45 12  Q.    Let's look at the third factor.  Can you explain, Mr.

09:23:49 13  Reed, what you considered in connection with this factor?

09:23:51 14  A.    Yeah.  So this is Georgia-Pacific factor five, which

09:23:54 15  goes to the commercial relationship, is it a competitive

09:23:59 16  relationship between the two parties?  Is it a cooperative

09:24:02 17  relationship?  And here there is a competitor relationship

09:24:06 18  between VoiceBox and Amazon.  They're in the same space

09:24:10 19  offering services to similar companies.  And here I focused

09:24:14 20  on the relationships that VoiceBox had with customers about

09:24:11 21  that time of the first hypothetical negotiation in late

09:24:22 22  2014.

09:24:24 23  Q.    So what are the factors that were most -- what were

09:24:26 24  the facts that were most important to you in considering

09:24:29 25  this factor?

A.      Well the facts go to the issue of protecting the patented technology for VoiceBox, and protecting its relationship with key customers.  And the key customers for VoiceBox in that time period, 2014 and 2015, are Toyota and Samsung.

         But with respect to the value of the patents, we heard last week about the IEEE ranking the patents as number 13 in the software space in the world.  So there is already validation of these patents.  Apple offered $25 million for certain patents and then Nuance actually was able to get that, those patents, noncore patents here, VoiceBox kept the core patent, the noncore patents sold for $27.5 million to Nuance.  And more importantly, around the time of this hypothetical negotiation, Nuance was entered into a nonbinding agreement to purchase VoiceBox for $200 million.  So this is very important, this negotiation, around the same time, to protect this value and protect the association, the association of the value with the patented technology.

Q.      And Mr. Reed, how would these customer relationships with Toyota and Samsung have affected the hypothetical negotiation?

A.      Well, Toyota and Samsung had -- Toyota had been working with VoiceBox since 2006 generating TENS of millions of dollars in revenue.  Toyota was paying VoiceBox on an ongoing basis, a running fee if you will, paid on a per car

09:26:04 1 basis for technology that was included in the cars.  And

09:26:08 2 that was obviously a very important relationship.  Samsung

09:26:12 3 had entered into an agreement with VoiceBox about the time

09:26:16 4 that the power finding of IEEE and Samsung had also paid

09:26:24 5 TENS of millions of dollars to VoiceBox and had importantly

09:26:27 6 an agreement related to Alibaba, I believe you heard about

09:26:30 7 this, an Alibaba, Samsung, and VoiceBox arrangement where

09:26:35 8 there would be V commerce, voice commerce, and money would

09:26:39 9 flow to VoiceBox that was anticipated to be about $20

09:26:44 10 million per year in the 2016 through 2020 time period and

09:26:48 11 perhaps beyond that.  So very important relationships.

09:26:52 12 Q.    Why would negotiating a license agreement with Amazon

09:26:55 13 have anything to do with those commercial relationships?

09:26:58 14 A.    Because they could undermine the relationships in two

09:27:03 15 ways.  One is the companies, these companies like Samsung

09:27:09 16 believed about the significance of the patented technology.

09:27:11 17 If they saw that that technology was licensed to Amazon,

09:27:15 18 that would relate to voice commerce and the use of voice

09:27:19 19 assistance, it would undermine its own thinking about that

09:27:22 20 it paid too much, why is Samsung paying for this technology.

09:27:26 21 And then at the same time there is a competitive aspect

09:27:28 22 which is Toyota had targets for auto companies with respect

09:27:34 23 to Alexa in the car, and ultimately one business with Toyota

09:27:39 24 and Amazon also had designs to work with companies that made

09:27:45 25 smart phones, for example, to get Alexa on the smart phones

Reed - direct

09:27:48 1   and on televisions.  And was offering what they called

09:27:52 2   bounties, payments to companies like Samsung to take Alexa

09:27:55 3   and put Alexa into the devices.  That obviously has a strong

09:28:02 4   competitive concern for a company like VoiceBox that's

09:28:05 5   working with these companies.

09:28:06 6   Q.     Overall how did this factor affect your analysis?

09:28:09 7   A.     This would suggest that the royalty should take into

09:28:13 8   account running royalty concepts, it should be adequate to

09:28:16 9   compensate for the concern that VoiceBox would have about

09:28:19 10  this competitive threat.

09:28:21 11  Q.     Let's turn to the fourth factor, licensing factor.

09:28:24 12  What does this factor consider?

09:28:26 13  A.     This considers things like licensing policies on

09:28:30 14  behalf of the patent owner, which I kind of addressed in the

09:28:33 15  previous factor.  But it also addressed whether there is

09:28:36 16  evidence of VoiceBox ever entering into license agreements

09:28:39 17  that would be similar to the analysis here, did they ever

09:28:46 18  enter into an agreement that they licensed their competitive

09:28:50 19  technology to a company like Amazon that could get value as

09:28:52 20  to what those royalty payments was.  Here is no such

09:28:57 21  information.  If the licenses that included rights to

09:29:00 22  patents and asset deals with Nuance or Oracle, there was not

09:29:03 23  a situation where the patents were licensed by themselves in

09:29:07 24  exchange for a royalty payment to a company positioned like

09:29:11 25  Amazon.

Reed - direct

09:29:11 1    Q.      So overall, how did this factor affect your analysis?

09:29:14 2    A.      It did not have that much of a bearing on my

09:29:18 3    analysis.

09:29:18 4    Q.      Let's talk about factor five.  What is this factor

09:29:23 5    consider?

09:29:23 6    A.      This Georgia-Pacific factor two is kind of the flip

09:29:26 7    side of that, is there information from Amazon that Amazon

09:29:31 8    getting patent rights from another company for patents that

09:29:33 9    could be viewed to be comparable or similar to the patents

09:29:38 10   at issue here, and if so, what were the payments that were

09:29:41 11   made by Amazon for those rights, can that be useful for

09:29:44 12   assessing royalty here.  In my opinion there is no

09:29:47 13   information in this regard that's very useful as well.

09:29:51 14   Q.      Has Amazon pointed to any deals that it believes are

09:29:56 15   comparable?

09:29:56 16   A.      Yes, Amazon and Amazon's expert have pointed to two

09:30:00 17   situations where Amazon purchased patents.  This was done

09:30:04 18   before the introduction of echo and Alexa, we saw testimony

09:30:11 19   on video last week that it was done for defensive purposes

09:30:15 20   before the introduction of Echo and Alexa because at the

09:30:20 21   time Amazon did not have patents related to those products

09:30:23 22   and services.  So there were a purchase of less than a

09:30:29 23   million dollars of several patents from a company called

09:30:33 24   Converse and a company called Telekinesis, but in my opinion

09:30:37 25   that is not comparable to the situation here with the

09:30:39  1   hypothetical negotiation.

09:30:39  2   Q.      Can you explain why you think those situations are

09:30:43  3   not comparable?

09:30:43  4   A.      Yes, there is important differences in the

09:30:50  5   assumptions.  Remember at that hypothetical negotiation, the

09:30:52  6   parties understand that the -- the patents here, the

09:30:58  7   VoiceBox patents-in-suit are valid and would be infringed by

09:31:02  8   Alexa and Alexa Shopping systems.  So there is no question

09:31:07  9   about that.  Here there is not equivalent evidence with

09:31:10 10   respect to these patents that were purchased by Amazon.

09:31:13 11   There is no evidence that those patents were used and there

09:31:16 12   is certainly no information that parties would have agreed

09:31:19 13   that they were valid patents that would be infringed by any

09:31:24 14   company, let alone by Amazon.

09:31:26 15   Q.      Overall how did this factor affect your analysis?

09:31:29 16   A.      It did not have much bearing on my analysis.

09:31:32 17   Q.      Let's talk briefly about the structure of the royalty

09:31:35 18   that you described.  You said the parties would agree to a

09:31:38 19   running royalty.  Why did you conclude the parties would

09:31:41 20   agree to a running royalty?

09:31:42 21   A.      I believe it was consistent not only with the

09:31:46 22   relationships that VoiceBox had with other companies, but it

09:31:48 23   was also reasonable for the agreement between Amazon and

09:31:52 24   VoiceBox.  VoiceBox would get consideration associated with

09:31:56 25   its success of Alexa and Alexa Shopping.

Reed - direct

09:32:01 1   Q.      All right.  Now I would like to walk through your

09:32:03 2   calculation of the royalty in this case.  Mr. Smith, can we

09:32:08 3   have slide 17?  Thank you.

09:32:09 4              Is this the basics of the formula that you used

09:32:13 5   to calculate damages here?

09:32:14 6   A.      Yes, it is.

09:32:15 7   Q.      Let's start with the royalty base.  What did you use

09:32:18 8   for the royalty base?

09:32:19 9   A.      I used net new active users, so on a year to year

09:32:27 10  basis, so it looks at the increase in net active users, or

09:32:32 11  Alexa for example with respect to the '681 patent.

09:32:34 12  Q.      Just so that we understand if there is a year in

09:32:37 13  which Amazon has no user growth, what royalty does Amazon

09:32:41 14  pay?

09:32:41 15  A.      The royalty would be 0, there would have to be growth

09:32:46 16  to correlate with the royalty.

09:32:47 17  Q.      If Amazon grows up 100 users in a year, what's the

09:32:51 18  royalty base?

09:32:51 19  A.      The royalty would apply to those 100 additional users

09:32:55 20  in that year.

09:32:55 21  Q.      All right.  Now, let's turn to how you calculated the

09:33:00 22  second number.  Can you explain how you calculated the

09:33:02 23  royalty rate?

09:33:02 24  A.      Yes, I calculated a rate that would correspond to a

09:33:05 25  per user value.  And the top focus here on the top formula,

09:33:14 1   that relates to the '681 patent, and it relates to Alexa

09:33:17 2   users.  So I start with a calculation of the savings

09:33:23 3   associated with not having to get an additional customer.

09:33:28 4   So it goes to this user growth concept.

09:33:30 5   Q.      Just to summarize, the column on the right, it's for

09:33:35 6   the '681 patent, the royalty rate is $0.40 per new user, is

09:33:35 7   that right?

09:33:42 8   A.      That's correct, the $0.40 would be applied to the

09:33:46 9   active users every year.

09:33:48 10  Q.      The lower one, the other patents, 22 cents, is that

09:33:53 11  for new Amazon Shopping users?

09:33:55 12  A.      Right, this is focused on Alexa Shopping active

09:33:59 13  users.

09:33:59 14  Q.      Let's just walk through how you got to that number.

09:34:02 15  You start out, you got $20 and $11 on the left hand column,

09:34:07 16  can you explain to the jury what those numbers reflect?

09:34:10 17  A.      Certainly.  So I look for information showing the

09:34:13 18  losses that Amazon was incurring in order to attract

09:34:18 19  customers.  This is a measure of would be saved by having

09:34:22 20  technology that would retain customers.  So in the case of

09:34:22 21  the '681 patent, I was considering the costs for the Echo

09:34:31 22  Show and the Echo Dot that are sold by Amazon, and you could

09:34:36 23  actually see here and I have focused on the period 2017 and

09:34:42 24  after and I did so because that was the period that was most

09:34:42 25  relevant to retaining customers and gaining customers.

09:34:48 1        And the price that Amazon sold these products

09:34:53 2   for was $20 less than their actual cost to purchase them, so

09:34:59 3   they're purchasing the product, selling them for a $20 loss.

09:35:02 4   This is a measure of the savings for Amazon if it doesn't

09:35:05 5   need to retain another customer because the benefits of the

09:35:09 6   patented technology.

09:35:10 7   Q.     All right.  And for the $11 for the other patent

09:35:14 8   group?

09:35:14 9   A.     Yes.  This one was is a little more difficult because

09:35:19 10  there wasn't any studies or analysis or data that

09:35:23 11  consistently showed the amount of money that Amazon was

09:35:27 12  paying to encourage customers to try Alexa Shopping, but

09:35:32 13  there were a wide variety of different promotions and some

09:35:35 14  of those are listed here.  These are promotions that were

09:35:39 15  done for Alexa customers to encourage them to try Alexa

09:35:44 16  Shopping and become an active user of Alexa Shopping.  Some

09:35:47 17  of them relate to $5 credits that are given, and others

09:35:51 18  relate to selling products below costs like a smart plug to

09:35:55 19  encourage the use of Alexa.  So I used two of these that

09:35:58 20  were offered around the same time, together $11 as a measure

09:36:02 21  of the cost savings from being able to retain an Alexa

09:36:02 22  Shopping customer.

09:36:03 23  Q.     Did you see any other evidence in Amazon's documents

09:36:12 24  that confirmed in your mind the reasonableness of these cost

09:36:12 25  estimates?

Reed - direct

A.      Yes.  And one in particular relates to the cost of acquiring a new customer.  So there was data that existed, I counted at least one more, one month where it showed what Amazon was considering the cost of acquiring a customer.

Q.      Can you turn to PTX 351 in your binder?

A.      351?

Q.      351.

A.      I'm there.  Thank you for waiting.

Q.      Do you recognize this document?

A.      I do.  It's another document that I analyzed in the case, it's entitled Alexa economic profit statement review, August 30, 2021.

            MR. MACDONALD:  Plaintiff moves to admit PTX 351.

            MS. SHAMILOV:  No objection.

            THE COURT:  Thank you.  It is admitted.

            (PTX Exhibit No. 351 was admitted into evidence.)

BY MR. MACDONALD:

Q.      Can we have page ending in 898 up on the screen with the section marked Q3, please?  Is this that document that you were referring to about user costs?

A.      Yes, it is.  And you see second line from the bottom that there is a discussion about the monthly Alexa level new customer acquisition costs for August, this was addressing

09:37:43 1    August 2021, it seems like this would be a way to track it

09:37:48 2    and it's saying that the cost of a customer acquisition is

09:37:52 3    almost $36, so this is to me supporting the notion of $20 is

09:37:57 4    a reasonable figure to look at the cost savings related to a

09:38:02 5    device and that $11 is reasonable for looking at the cost of

09:38:06 6    promotions to encourage the use of Alexa Shopping.

09:38:10 7    Q.     Let's look back at the overall formula.  Now, you're

09:38:19 8    multiplying the $20 by only two percent.  Can you explain

09:38:22 9    how you arrived at that figure?

09:38:24 10   A.     Yes.  That figure was my effort to have a measure for

09:38:29 11   the apportionment of the cost savings to the badges of the

09:38:35 12   patented technology.  So I only applied a portion of that

09:38:38 13   cost savings that is linked to the benefits of the patented

09:38:41 14   technology.

09:38:42 15   Q.     So are you a technical expert in the operation of

09:38:45 16   Alexa?

09:38:45 17   A.     I am not, so in my work I rely on the technical

09:38:49 18   experts.

09:38:49 19   Q.     What information did you rely on from the technical

09:38:52 20   experts in forming an understanding about the effect that

09:38:55 21   the patents have on the operation of Alexa?

09:38:57 22   A.     Well, I relied on -- there is two pieces, 1 piece is

09:39:01 23   what Amazon said about not using the patented technology,

09:39:05 24   which is they identified in an interrogatory that they would

09:39:09 25   have additional dialogue turns.  So with that, I considered

Reed - direct

09:39:14 1  information from Dr. Polish about one, did he agree with

09:39:20 2  that assessment and two, is there a way to estimate the

09:39:22 3  reduction in dialogue turns because of the benefit of the

09:39:26 4  patented technology.  And Dr. Polish agreed that there would

09:39:30 5  be additional turns.  And his assessment suggests that there

09:39:33 6  would be an additional 1 to 2 dialogue turns if Amazon

09:39:38 7  attempted to avoid the advantages of the patented technology

09:39:42 8  and it would also have friction and some disadvantages but

09:39:45 9  part of that would be additional turns.

09:39:47 10  Q.    Did you find anything in your review that would help

09:39:50 11  you to estimate the affect that that one to two additional

09:39:54 12  turns would have on user growth in Alexa?

09:39:56 13  A.    Yes, I looked for that type of information and found

09:40:00 14  an example in Amazon's documents where this proxy could be

09:40:05 15  measured to address that issue.

09:40:07 16  Q.    Can you turn to PTX-80 in your binder, which has been

09:40:11 17  previously admitted.  And Mr. Smith, can we have the page

09:40:18 18  ending in 2254 and call out the third paragraph, please?

09:40:24 19         Mr. Reed, is this the document that helped you

09:40:37 20  do that?

09:40:38 21  A.    It is.  And the information on it is relative to this

09:40:42 22  one paragraph.

09:40:42 23  Q.    Did you explain that to the jury?

09:40:44 24  A.    Yes.  So in the second line it's talking about a

09:40:47 25  complex multi-turn dialogue interactions.  This was Amazon's

09:40:53 1  strategy and planning document addressing that there were

09:40:55 2  problems with Alexa Shopping, and they're noting that it has

09:40:59 3  to do with complex dialogue interactions.  And they compare,

09:41:03 4  Amazon compares the number of turns that were associated

09:41:09 5  with shopping compared to Alexa.  There was a difference,

09:41:12 6  you can see the 2.7 versus 1.2.  So it was my effort to

09:41:17 7  address the impact of additional turns.  They were comparing

09:41:22 8  the two, and you can see there is a difference about 1.5,

09:41:26 9  1-and-a-half turns between the two, so I can look at royalty

09:41:30 10 differences between the two to provide input to any

09:41:33 11 analysis.

09:41:33 12 Q.    Did you see any other documents in Amazon's

09:41:36 13 materials?

09:41:37 14 A.    Well, I did, but I point out here at the bottom, if

09:41:40 15 you go to this, the last full line here in that same

09:41:50 16 paragraph.  So the very -- the lower line is talking about

09:41:57 17 there is a difference in growth rate between the two.  So

09:42:02 18 Alexa Shopping had a growth rate that was 123 percent year

09:42:08 19 over year, and Alexa had a higher growth rate which was

09:42:14 20 137 percent growth year over year, that growth difference

09:42:17 21 was ten percent.  What this is saying with the extra turns

09:42:19 22 in Alexa Shopping, Alexa Shopping had lower growth.  So I

09:42:23 23 used this as a proxy to evaluate the impact of additional

09:42:27 24 turns on a reduction in growth.

09:42:31 25 Q.    Apologize for jumping ahead.  Did you see any other

Reed - direct

09:42:35 1    evidence in Amazon's materials that sort of confirmed this

09:42:38 2    for you?

09:42:38 3    A.      Yes, there were a wide variety of materials that were

09:42:41 4    addressing the impact of additional turns.  Amazon would

09:42:45 5    talk about reduction in turns were -- especially unnecessary

09:42:49 6    turns were very important for improving retention of

09:42:53 7    customers, lowering friction.  And frequently there was an

09:42:56 8    evaluation of the impact and benefits that were occurred

09:43:00 9    with fewer dialogue turns.

09:43:02 10   Q.      Can you turn to Exhibit 277 in your binder, please?

09:43:05 11   A.      277?

09:43:07 12   Q.      Yes.  277.

09:43:23 13   A.      That's correct.  Thank you.

09:43:29 14   Q.      Do you recognize this document?

09:43:30 15   A.      I do, yes.  Another document that I analyzed.

09:43:33 16   Q.      What is it?

09:43:34 17   A.      This is titled Doppler launch status report

09:43:41 18   8/28/2014.  Doppler was the code name for Echo.

09:43:44 19            MR. MACDONALD:  Plaintiffs move to admit PTX

09:43:47 20   277.

09:43:48 21            MS. SHAMILOV:  No objection, Your Honor.

09:43:50 22            THE COURT:  Thank you.  It is admitted.

09:43:50 23            (PTX Exhibit No. 277 was admitted into

09:43:51 24   evidence.)

09:43:51 25   BY MR. MACDONALD:

09:43:51 1    Q.      Can we have the paragraph on 676, just below

09:44:00 2    accuracy.  Mr. Reed, can you explain what you found here

09:44:03 3    that was significant to you?

09:44:05 4    A.      Yeah.  So this document was just a few months before

09:44:08 5    that first hypothetical negotiation.  And this was

09:44:11 6    addressing, you'll look at the second line from the bottom,

09:44:15 7    there was a reduction in the average number of turns from

09:44:18 8    1.25 to 1.15.  So this is essentially a reduction of turns

09:44:24 9    of .1.  And this is being noted as being a highlight with

09:44:32 10   lower friction interaction with the customer.  So even this

09:44:36 11   small reduction, what appears to be a small reduction in .1

09:44:40 12   in turns is noted to be quite important for reducing

09:44:44 13   friction.

09:44:45 14   Q.      All right.  Now, you said you found a ten percent

09:44:48 15   growth differential, but if we look back at your formula,

09:44:51 16   it's only got two percent.  Can you explain why you didn't

09:44:54 17   use ten percent and you instead used two percent?

09:44:57 18   A.      That's correct.  Ten percent would be a proxy, but I

09:45:01 19   used an apportionment to the patents, and an apportionment

09:45:04 20   to Amazon.  So I applied a 20 percent apportionment, which

09:45:10 21   means instead of taking the ten percent reduction in growth,

09:45:12 22   I applied a two percent reduction in calculating the royalty

09:45:15 23   here, and gave credit to Amazon for the remaining

09:45:19 24   80 percent.

09:45:20 25   Q.      Can you briefly walk the jury through your final math

Reed - direct

09:45:23 1    for each of the patents.  Can we have PDX 4-23?  One more

09:45:35 2    slide, Mr. Smith.  I apologize.

09:45:37 3           Is this your calculation of damages for the '681

09:45:42 4    patent?

09:45:42 5    A.    Yes, it is, it reflects the entire period, and you

09:45:45 6    can see that the total growth in the Alexa users was

09:45:51 7    76.1 million, and this reflects the United States.  40 cent

09:45:56 8    royalty for the additional users, and only one payment for

09:46:00 9    an additional user.  The total royalties of 30.44 million.

09:46:06 10   Q.    And for the Voice Ad patents?

09:46:10 11   A.    For the Voice Ad patents, it's a similar calculation,

09:46:14 12   but this is using Alexa Shopping monthly active users, so

09:46:18 13   this reflects the growth of Alexa Shopping the calculation

09:46:25 14   for the 22 cent royalty rate is $9.592 million, that's the

09:46:32 15   calculation for the Voice Ad patents.

09:46:34 16   Q.    For the last patent, the Voice Commerce?

09:46:36 17   A.    The Voice Commerce, this is focused on Alexa Shopping

09:46:39 18   purchasers and so it's a smaller base of new users,

09:46:46 19   30.42 million total new users with a 22 cent royalty, the

09:46:54 20   reasonable royalty damages for all these are through 2023 is

09:47:00 21   6,699,204.

09:47:00 22   Q.    What was the total you calculated for all patents?

09:47:02 23   A.    The total is shown here, 46,724,400.

09:47:02 24   Q.    Mr. Reed when you originally calculated this number

09:47:11 25   doing your work, did you calculate this number correctly?

Reed - direct

A.      No, I did not, I made a math error and over stated the royalty rate.

Q.      Was that a small math error?

A.      No, it was not, it was a large error that I made.

Q.      How did you learn about your math error?

A.      Amazon's expert, Dr. Ugone pointed out the math error and pointed out that the royalty rates are figures as shown here.

Q.      Have you ever made a mistake like that in your forty-year career doing damages analysis?

A.      I have not and obviously it's embarrassing, I have to say it's my fault, it has nothing to do with VB Assets, this was an Amazon document that I was analyzing, I made a mistake and I didn't catch it with my checking process and I was personally responsible.

Q.      Are you nevertheless confident that you got this number right?

A.      Yes, I am, and I believe that this is a reasonable royalty for this hypothetical negotiation in this case.

Q.      You mentioned an opinion about an expert for Amazon several times.  What is your understanding of Amazon's position as to the damages amount?

A.      Well, Amazon's damages expert, his position is that the amount would be a lump sum payment rather than a running royalty and it would be five to $10 million in total.  And

Reed - direct

09:48:29 1  that that payment would cover the entire life of the patents

09:48:33 2  which continues out to 2033, so another ten years, but

09:48:38 3  Amazon would make that payment up front and get the

09:48:40 4  advantages of the use of the patented technology for the

09:48:43 5  life of the patents.

09:48:44 6  Q.    Do you agree that that would be a reasonable royalty

09:48:46 7  in this case?

09:48:47 8  A.    No, I do not.

09:48:48 9  Q.    Why could you not agree with Dr. Ugone?

09:48:51 10  A.    A variety of reasons, one, I don't think it takes

09:48:53 11  into account the situation that VoiceBox was in in late

09:48:58 12  2014, in particular with its relationship with Toyota and

09:49:01 13  Samsung, and the potential for a deal with Nuance for a $200

09:49:07 14  million acquisition, I believe that's completely

09:49:09 15  inconsistent with that setting.

09:49:11 16  Q.    Dr. Ugone has pointed -- Amazon has pointed earlier

09:49:15 17  in this trial to some efforts that VoiceBox made to sell

09:49:19 18  some of these patents in 2018, doesn't that support Dr.

09:49:24 19  Ugone's opinion?

09:49:24 20  A.    I believe there is a fundamental difference between

09:49:28 21  those circumstances.  Difference in timing and differences

09:49:31 22  in assumptions.  He's pointing to information that was

09:49:34 23  taking place from 2017, 2018, with an individual named Cash

09:49:41 24  Elston, and Dr. Ugone, Amazon's expert, points to offers

09:49:45 25  that included seven to $8 million, 5 to $10 million to offer

Reed - direct

09:49:50 1   -- in offering the patents, but it's important to give

09:49:54 2   timing and assumptions.

09:49:55 3   Q.      Why are the timing and assumptions important?

09:49:58 4   A.      I think I kind of addressed that, the situation was

09:50:01 5   very different in late 2014 than it was in 2017 and 2018.

09:50:05 6   Q.      And what about the assumptions, why are those

09:50:09 7   important?

09:50:09 8   A.      Again, at the hypothetical negotiation table, there

09:50:12 9   is no arguments about whether the patents are valid, and

09:50:15 10  whether the patents would be infringed.  In 2017 and 2018,

09:50:21 11  those assumptions do not apply.  The parties can argue about

09:50:25 12  the patents not being valid or the patents not being

09:50:28 13  infringed, that can not happen at the hypothetical

09:50:31 14  negotiation.

09:50:31 15  Q.      Has Dr. Ugone presented any ways that Amazon can

09:50:35 16  change its products to avoid the infringing patent?

09:50:38 17  A.      Yes, now initially Amazon addressed that it could add

09:50:44 18  additional turns, but in Dr. Ugone's analysis, he addresses

09:50:48 19  what I guess I would call dumbing down Alexa to avoid some

09:50:52 20  of the patent technology at issue here.  Like adding manual

09:50:55 21  input instead of using voice input.  Adding -- taking away

09:51:01 22  some of the magic of Alexa but not having brand advertised,

09:51:11 23  not having as much information about the products that are

09:51:14 24  being offered, so he has suggested that these modifications

09:51:18 25  could be made at a relatively small cost and suggested that

Reed - direct

09:51:21 1  that also puts downward pressure on the royalty amount.

09:51:24 2  Q.      To your knowledge has Amazon implemented any of these

09:51:27 3  strategies?

09:51:28 4  A.      My understanding is Amazon has not, something that

09:51:31 5  would cost a million to 1.4 million according to Dr. Ugone

09:51:36 6  and they would not implement is my understanding.

09:51:39 7  Q.      Are these non-infringing alternatives that you

09:51:41 8  described consistent in your mind with the documents that

09:51:44 9  you have reviewed from Amazon?

09:51:45 10  A.      They are inconsistent with the documents that I have

09:51:48 11  reviewed.  Remember, the documents that are addressing

09:51:51 12  getting close, getting personalized, having context, being

09:51:57 13  able to have the magic of Alexa of offering information

09:52:00 14  about the brand, the pricing, what product it is that you're

09:52:04 15  going to get, so it's inconsistent with that.

09:52:08 16  Q.      Mr. Reed, can I have you look at one more document?

09:52:11 17  Can you pull up PTX 441, please?

09:52:15 18  A.      441?

09:52:16 19  Q.      Yes.

09:52:17 20  A.      I have it, thank you.

09:52:18 21  Q.      Do you recognize this document?

09:52:18 22  A.      Yes.  Another document that I analyzed.  It's called

09:52:23 23  voice shopping on prime now, and it's from 2016.

09:52:27 24          MR. MACDONALD:  Plaintiff moves to admit PTX

09:52:30 25  441.

Reed - cross

We'll just skip that.

Q.      Let me just go straight to the conclusion.  Mr. Reed,
do you believe that the damages figure that you have listed
or come to in this case is a reasonable royalty?

A.      Absolutely, a reasonable royalty for both parties and
especially for Amazon.

Q.      Can you explain to the jury why you believe that's a
reasonable royalty?

A.      Yes.  I think it takes into account these
Georgia-Pacific factors, the important position that
VoiceBox was in late 2014 with respect to its relationship
with others, the belief that its patented technology was
validated in the industry by companies like Apple.  And it
also reflects value that Amazon is getting from the amount
of money it would save by being able to retain customers.

                MR. MACDONALD:  Thank you very much.  Pass the
witness.

                THE COURT:  Cross-exam.

                        CROSS-EXAMINATION

BY MS. SHAMILOV:

Q.      Good morning, Mr. Reed.

A.      Good morning.

Q.      I would like to start by trying to define what I
understand your role is in this case.  Is that all right?

A.      Sure.

Reed - cross

09:53:58 1    Q.      You are not here telling the jury that Amazon

09:54:01 2    infringes these patents; is that correct?

09:54:03 3    A.      Correct, I am not a technical expert.  The damages

09:54:07 4    expert assumes that there would be infringement and that the

09:54:09 5    patents are valid.

09:54:09 6    Q.      And you're also not telling this jury that these

09:54:12 7    patents are valid; is that correct?

09:54:14 8    A.      Correct.

09:54:15 9    Q.      And in fact, you just said that you assumed that

09:54:18 10   Amazon infringes and the patents are valid in your analysis;

09:54:21 11   correct?

09:54:21 12   A.      That's a standard assumption that damages experts

09:54:25 13   apply in every case.

09:54:26 14   Q.      But you do understand that Amazon contests both of

09:54:29 15   those issues?  Amazon does not infringe these patents, it

09:54:34 16   does not use these patents, and that the patents are

09:54:36 17   invalid, do you understand that, sir?

09:54:37 18   A.      I do understand that, yes.

09:54:38 19   Q.      And so if the jury finds that Amazon does not use

09:54:42 20   these patents, the damages would be 0, correct?

09:54:46 21   A.      That's correct.

09:54:46 22   Q.      And if the jury finds that the patents are invalid,

09:54:50 23   the damages would also be zero, is that correct?

09:54:54 24   A.      That's also correct and that's true in all these

09:54:57 25   types of cases.

Reed - cross

09:54:58  1    Q.      In both of those situations if the jury finds that

09:55:00  2    Amazon doesn't use the patents or that the patents are

09:55:02  3    invalid, with all due respect they can just ignore your

09:55:06  4    testimony, correct, they don't need to consider it, correct?

09:55:09  5    A.      My testimony would be irrelevant in that instance.

09:55:13  6    Q.      But as an Amazon lawyer, I have to acknowledge that

09:55:17  7    it's the jury's decision not mine, so I would like to ask

09:55:20  8    you a few questions about what you just presented to the

09:55:23  9    jury, if that's all right?

09:55:24 10    A.      Understood.   Thank you.

09:55:26 11    Q.      You are getting paid for your work on this case,

09:55:28 12    correct?

09:55:28 13    A.      Yes, but with a provision, the provision being that

09:55:35 14    once my error came to light, I stopped charging for my time.

09:55:41 15    Q.      Okay.   But -- and the rate, your hourly rate is what

09:55:46 16    about $600, if I recall correctly?

09:55:48 17    A.      It was 595 when I started the case, and I don't

09:55:51 18    change my rate when I'm working on a project, so it has been

09:55:57 19    595.

09:55:57 20    Q.      And it's fair to say you have been getting paid for

09:56:00 21    at least what, 900 hours, sir, is that right?

09:56:03 22    A.      No.   The total payment was -- that my firm has

09:56:07 23    received is the same as what was addressed in my deposition

09:56:10 24    that Amazon took.

09:56:11 25    Q.      That was a half a million dollars, sir?

09:56:14  1    A.      It was a little less than that, $430,000.

09:56:18  2    Q.      Let's talk a little bit about the hypothetical

09:56:21  3    negotiation, which is a strange concept, the one you just

09:56:24  4    went through with your counsel.  Now, at that hypothetical

09:56:27  5    negotiation, all Amazon is going to get is a license to the

09:56:33  6    four patents we have been discussing in this courtroom

09:56:36  7    throughout the trial; correct?

09:56:38  8    A.      Correct.  They would get a license to be able to use

09:56:40  9    that patented technology.

09:56:42 10    Q.      They would not -- Amazon would not get any

09:56:46 11    technology, actual technology from VoiceBox or VB Assets,

09:56:49 12    correct?

09:56:49 13    A.      Correct.  They would be able to use these patents

09:56:52 14    with their own large investments in their technology.

09:56:55 15    Q.      So Amazon would have to build all of its technology,

09:56:59 16    all the technology that would potentially use these patents,

09:57:03 17    Amazon would have to build it and do all the work, correct?

09:57:07 18    A.      Remember at the hypothetical negotiation, everything

09:57:08 19    had been built, but there were ongoing investments in Amazon

09:57:12 20    would still have to do that, that's right.

09:57:14 21    Q.      What was built at the time of the hypothetical

09:57:18 22    negotiation, I just --

09:57:19 23    A.      What was built?

09:57:21 24    Q.      Yes, I'll start again.  Everything that was built

09:57:24 25    already at the time of the hypothetical negotiation, that's

09:57:27 1   all the work of Amazon's engineers, correct?

09:57:29 2   A.      Absolutely.

09:57:31 3   Q.      And the license that Amazon would receive at the

09:57:35 4   hypothetical negotiation would be a nonexclusive license,

09:57:39 5   meaning, you know, these patents can be licensed to other

09:57:41 6   people, right, the other companies, correct?

09:57:44 7   A.      That's correct, other companies including VoiceBox,

09:57:47 8   of course, VoiceBox would be able to develop its system and

09:57:50 9   use its patented technology.

09:57:52 10   Q.      And Amazon would not own the patents; correct?

09:57:56 11   A.      Correct, this would be a license only, nonexclusive

09:57:59 12   license as you correctly described.

09:58:01 13   Q.      And then if I owned the patent, I can sell it and get

09:58:06 14   money for it, correct?

09:58:07 15   A.      And license others, that's right.

09:58:09 16   Q.      Correct.  So I could sell and get money for it or get

09:58:13 17   licensing fees for it, if I license it, correct?

09:58:16 18   A.      That's correct.

09:58:16 19   Q.      And Amazon would not be able to do any of that as a

09:58:19 20   result of the hypothetical negotiation; correct?

09:58:22 21   A.      Correct, they would have the right to use the

09:58:26 22   patented technology however they wanted.

09:58:28 23   Q.      I think you already acknowledged that VoiceBox was

09:58:32 24   willing to sell these four patents, plus more, for $10

09:58:40 25   million or less, isn't that right, sir?

09:58:43 1    A.      In the 2017/2018 time period when they're looking for

09:58:49 2    money and funding, that's correct.

09:58:51 3    Q.      Correct.  So it was again just to be clear, at the

09:58:55 4    time they were willing to take less than $10 million for

09:58:58 5    these four patents, plus more, in a sale, not on a license,

09:59:03 6    right?

09:59:03 7    A.      To be fair, you said willing to take, and I think

09:59:06 8    what the evidence shows is they were trying to explore what

09:59:10 9    the possibilities were.  I don't think there was ever a

09:59:13 10   decision made that VoiceBox would accept 5 million or 10

09:59:17 11   million.  But I do acknowledge that in that later time

09:59:22 12   period that there were considerations to try to raise money.

09:59:26 13   Q.      But you're not disputing, sir, are you, that the

09:59:30 14   document that Mr. Kennewick testified about where he

09:59:34 15   acknowledged that he would take $7 to $8 million from TiVo

09:59:38 16   for sale of four patents plus more, you're not disputing

09:59:42 17   that, right, sir?

09:59:43 18   A.      I do recognize that TiVo instance with if seven to $8

09:59:48 19   million discussion, in 2018 I think.

09:59:50 20   Q.      But you think, sir, that Amazon should pay many, many

09:59:54 21   more millions of dollars to just the license to the four

09:59:57 22   patents only, is that correct sir?

09:59:59 23   A.      Correct, for the license through the period 2023,

10:00:02 24   that's correct.

10:00:02 25   Q.      You also do know that Mr. Cash Elston I think was

10:00:10 1    mentioned, just to remind the jury, Mr. Elston was a broker

10:00:14 2    that VoiceBox hired to try to sell the patents; correct?

10:00:19 3    A.      He initially came into contact with VoiceBox when he

10:00:23 4    was working for Apple, so he was helping Apple evaluate

10:00:27 5    patents.  And as part of that $25 million offer from Apple.

10:00:31 6    And later he became associated with -- as a broker as you

10:00:35 7    mentioned for VoiceBox.

10:00:37 8    Q.      And just so -- since you mentioned the $25 million

10:00:43 9    figure with Apple, that was not for the four patents we have

10:00:47 10   been talking about here, correct?

10:00:48 11   A.      My understanding was that Apple was interested in the

10:00:52 12   '681 patent, so they verified the '681 patent was part of

10:00:57 13   that.  But that was rejected.  And ultimately VoiceBox did a

10:01:02 14   deal with Nuance around the same time and the '681 patent

10:01:05 15   was pulled out and Nuance actually paid more for the

10:01:08 16   remaining noncore patents.

10:01:11 17   Q.      It wasn't just the '681 patent, it was a lot more

10:01:15 18   patents than that that Apple was willing to pay for,

10:01:18 19   correct?

10:01:19 20   A.      Sure, Apple, but they were interested in the '681 and

10:01:22 21   then these other, what I call, the noncore patents, and the

10:01:25 22   noncore patents were associated with the Nuance purchase.

10:01:28 23   Q.      But Mr. Elston tried to sell the patents we have been

10:01:32 24   talking about, plus more, to others on behalf of VoiceBox,

10:01:36 25   correct?

Reed - cross

10:01:36 1    A.       In the 2017, 2018 time period, that's correct.

10:01:40 2    Q.       And he tried to sell them to Google, do you remember

10:01:44 3    that?

10:01:44 4    A.       There was a list of companies that there was

10:01:47 5    inquiries with respect to this.

10:01:48 6    Q.       And of that it also included Microsoft, do you recall

10:01:52 7    that?

10:01:52 8    A.       I do recall that.

10:01:53 9    Q.       And Wal-Mart, do you recall that?

10:01:55 10   A.       I recall the list that was shown during

10:01:59 11   Mr. Kennewick's testimony.

10:01:59 12   Q.       Just to be clear, the record is clear, that would

10:02:02 13   also include Samsung, Intel, Adobe, Alibaba, among others,

10:02:09 14   correct?

10:02:09 15   A.       That's what I recollect, yes.

10:02:10 16   Q.       And none of them purchased any of the patents,

10:02:13 17   correct?

10:02:13 18   A.       That's my understanding.

10:02:26 19   Q.       Now your job in this case is to value the patents;

10:02:22 20   correct, the four patents we have been talking about?

10:02:32 21   A.       I think my job in this case is to evaluate a

10:02:38 22   reasonable royalty that would be adequate compensation and

10:02:42 23   part of that relates to valuing the patents, but it's

10:02:45 24   broader than that.

10:02:45 25   Q.       You cannot value Voicebox's technology that it

Reed - cross

10:02:48 1    provided to Samsung; is that right?

10:02:50 2    A.    I'm sorry, can you ask the question again?

10:02:53 3    Q.    You cannot value the technology that VoiceBox

10:02:56 4    provided to Samsung, for example, correct?

10:02:59 5    A.    You said you cannot?

10:03:02 6    Q.    Correct.   That's what I said.

10:03:05 7    A.    I'm not sure what you're asking.   Certainly it can

10:03:08 8    be.   But here I'm focusing on the value that would relate to

10:03:11 9    the patented technology as used by Amazon.

10:03:18 10   Q.    You do know, sir, that VoiceBox never built anything

10:03:24 11   that used these patents, you agree on that one?

10:03:28 12   A.    That's consistent with the testimony that I am aware

10:03:32 13   of, for the time period that existed, the products and

10:03:37 14   services that VoiceBox was offering did not include these

10:03:40 15   particular patent technologies at that time.

10:03:44 16   Q.    You should have a binder that you received from us in

10:03:48 17   front of you?

10:03:49 18   A.    Yes, I have two binders that you gave me.

10:03:52 19   Q.    Can you turn to Tab 232 in your binder, sir, and you

10:03:57 20   can tell me when you're there.

10:03:59 21   A.    232?

10:04:00 22   Q.    232, DTX 232.

10:04:05 23   A.    Sorry.   DTX 232?

10:04:10 24   Q.    Yes, sir.

10:04:17 25   A.    Unless it's in the other binder, I don't see it here.

Reed - cross

10:04:22 1    Q.       It may be in the other binder.

10:04:24 2    A.       Here it is.  DTX 232.

10:04:29 3    Q.       What you see should be titled plaintiff VB Assets

10:04:33 4    response to interrogatories, is that what you see here, sir?

10:04:37 5    A.       Yes.

10:04:38 6    Q.       You reviewed this document?

10:04:39 7    A.       Yes I did.

10:04:40 8            MS. SHAMILOV:  Your Honor I move DTX 232 into

10:04:43 9    evidence, please.

10:04:44 10           MR. MACDONALD:  No objection.

10:04:45 11           THE COURT:  Thank you.  It is admitted.

10:04:45 12           (DTX Exhibit No. 232 was admitted into

10:04:46 13   evidence.)

10:04:46 14   BY MS. SHAMILOV:

10:04:49 15   Q.       Mr. Patterson, can you please go to page 10 of this

10:04:52 16   document?  If we can blow this up.  An interrogatory, sir,

10:04:58 17   is what a plaintiff would tell the Court, right, about the

10:05:02 18   facts; correct?

10:05:03 19   A.       That's my understanding based on my experience, yes.

10:05:02 20   Q.       And just to be clear so we're all on the same page,

10:05:02 21   VoiceBox never had any product, technology or service that

10:05:14 22   used the four patents in this case; correct?

10:05:17 23   A.       That VoiceBox or its licensees would practice or

10:05:2 24   embody, yes, that's my understanding.

10:05:2 25   Q.       So to the extent the jury got an impression that any

10:05:29 1    of Voicebox's technology, including the Cybermind product

10:05:33 2    that we saw, that speaker, used any of these

10:05:38 3    patents-in-suit, that would be a wrong impression, wouldn't

10:05:40 4    it?

10:05:40 5                    MR. MACDONALD:  Objection, I think that's beyond

10:05:42 6    the scope of this witness's expertise and it's summarizing

10:05:47 7    testimony of other witnesses.

10:05:48 8                    THE COURT:  All right.

10:05:57 9                    MS. SHAMILOV:  I can respond, Your Honor.

10:06:01 10                    THE COURT:  I'll sustain the objection.

10:06:04 11   BY MS. SHAMILOV:

10:06:04 12   Q.    So you talked about the relationship that VoiceBox

10:06:06 13   had with Toyota, remember that?

10:06:08 14   A.    Yes, I do.

10:06:09 15   Q.    And that technology that VoiceBox provided to Toyota,

10:06:13 16   that technology did not use these patents, correct?

10:06:16 17   A.    That's my understanding is that it did not use these

10:06:20 18   particular patents at that time.

10:06:21 19   Q.    And again, with respect to the Samsung deal that you

10:06:22 20   talked about and the technology that VoiceBox was providing

10:06:26 21   to Samsung, that technology has nothing to do with these

10:06:30 22   patents either, correct?

10:06:32 23                    MR. MACDONALD:  Objection, again, I think this

10:06:33 24   is beyond the scope of this witnesses expertise, he's a

10:06:36 25   damages expert.

Reed - cross

10:06:41 1          MS. SHAMILOV:  You have knowledge -- he talked

10:06:43 2   about these deals.

10:06:44 3          THE COURT:  He is a damages expert, he doesn't

10:06:46 4   know what is using the patents or not.  So I'll sustain the

10:06:50 5   objection.

10:06:55 6   BY MS. SHAMILOV:

10:06:55 7   Q.     But you did review this interrogatory response

10:06:57 8   correct, sir?

10:06:58 9   A.     I did.

10:06:58 10  Q.     And you do acknowledge that VoiceBox never had any

10:07:02 11  technology that used these patents, correct?

10:07:04 12  A.     I believe I acknowledged this in my report, so yes.

10:07:08 13  Q.     Thank you, sir.

10:07:09 14         Now, you talked about Alexa's success, I think

10:07:16 15  you talked about that Amazon was successful with its

10:07:19 16  introduction of Alexa; correct?

10:07:21 17  A.     Correct.

10:07:22 18  Q.     Now, you cannot credit VB Assets or VoiceBox for

10:07:28 19  Amazon's success that Amazon achieved with respect to

10:07:31 20  technology or efforts that have nothing to do with the

10:07:34 21  patents in this case, correct?

10:07:36 22  A.     Well, certainly there were very large efforts by

10:07:41 23  Amazon, and that would be a huge part of the success of

10:07:46 24  Alexa, Echo.  But I'm addressing the advantages that Amazon

10:07:51 25  had from using the patented technology to make its product

10:07:54 1    have less friction, help it retain customers, and help it

10:07:59 2    grow, and that's the part that I'm focusing on.

10:08:02 3    Q.    But you do agree with me that Amazon made significant

10:08:07 4    contributions to the success of Alexa that are unrelated to

10:08:10 5    the patents; correct?

10:08:11 6    A.    Sure.  Huge investments and a lot of great ideas.

10:08:17 7    Q.    And we heard here this notion of deep neural networks

10:08:21 8    that Alexa uses, and you do acknowledge that the deep neural

10:08:25 9    networks, any success that contributed to the deep neural

10:08:29 10   networks, that is not success related to these patents

10:08:32 11   correct?

10:08:32 12         MR. MACDONALD:  Again, objection, Your Honor, I

10:08:36 13   think she's asking technical questions.

10:08:40 14         THE COURT:  All right.  Hold on.  Why isn't that

10:08:48 15   a question as to the allocation, or the apportionment of the

10:08:51 16   patented issues?

10:08:55 17         MR. MACDONALD:  I guess Your Honor, the question

10:08:58 18   baked into this is that it's an implicit understanding

10:09:02 19   whether any portion of the deep neural networks infringe,

10:09:02 20   which is sort of the heart of the question.

10:09:02 21         THE COURT:  I'm letting this question go and see

10:09:02 22   what comes next.

10:09:11 23   BY MS. SHAMILOV:

10:09:12 24   Q.    And sir you did serve reports in this case, I think

10:09:14 25   you acknowledged that?

Reed - cross

A.      Yes.

Q.      And you do recall acknowledging in the reports that Alexa made significant contributions, Alexa made significant contributions such as deep neural networks and far field recognition technology that related to the patents, do you remember that, sir?

A.      You're saying whether that's unrelated, I think that is a technical question, I was acknowledging that were significant efforts related to the far field voice, for example, and that these were noted by Amazon itself to be significant contributions.

Q.      Sir, you should have in those binders that you got from us, there should be copies of your report, and they should be your report on commercial success issues, sir. And if you find it, if you could he --

A.      I think I'm getting there.  I think this binder only has my reports in it, my deposition.

Q.      I'm sorry --

A.      I think it has only my reports and deposition.

Q.      Yes, it should be one binder that only has that, I think.

A.      Yes.  Thank you.  I found the report on commercial success.

Q.      And if I could-if you could turn to page 5 of your report, your footnote 14.  And I'm just going to read what

10:10:43 1   you said and please tell me if I read it correctly, if

10:10:46 2   that's all right.  You said in that footnote "while I

10:10:52 3   specifically focused on the link between the patents-in-suit

10:10:55 4   and the commercial success of Alexa in the report, I

10:10:58 5   acknowledge that Amazon has made significant contributions

10:11:01 6   to the success of Alexa that are unrelated to the

10:11:08 7   patents-in-suit.  For example, see the discussion on Amazon

10:11:12 8   for the far field speech recognition and a piece of deep

10:11:16 9   neural technology in Dr. Johnson's report."  Did I read that

10:11:21 10  correctly?

10:11:21 11  A.      You did read that correctly.

10:11:22 12  Q.      So in addition to all that contribution, significant

10:11:27 13  contributions that Amazon made that's unrelated to the

10:11:30 14  patents-in-suit, you do also know that the Patent Office

10:11:33 15  gave Amazon about 400 patents its Alexa and you did not take

10:11:38 16  that into consideration at all, sir, correct?

10:11:44 17  A.      I'm not sure why you say I did not take that into

10:11:48 18  consideration, I'm certainly aware that Amazon made

10:11:52 19  significant contributions as part of my analysis.

10:11:56 20  Q.      You didn't carve out the value of Amazon patents from

10:11:59 21  these damages analysis, correct?

10:12:01 22  A.      That value was not reflected in my underlying

10:12:05 23  calculations, my calculations are focusing on the difference

10:12:09 24  in performance, not on the overall level of performance.

10:12:14 25  Q.      Do you know, sir, that 95 percent of conversations

10:12:22 1    that people have with Alexa are single shot conversations,

10:12:26 2    like Alexa, set the timer, Alexa, tell me a joke, do you

10:12:30 3    know that, sir?

10:12:30 4    A.     I know that that's the position of Amazon's experts.

10:12:34 5    Q.     But you saw documents to that effect, didn't you?

10:12:38 6    A.     Yes, there is a document that shows the portion of

10:12:41 7    what the conversations that are specified to be multi-turn

10:12:46 8    and that was growing in the 2020 time frame, and I think the

10:12:51 9    overall average was close to five percent.

10:12:53 10   Q.     So the 95 percent of conversations are these one shot

10:12:57 11   conversations, you would agree with me?

10:12:58 12   A.     That's my understanding of what Amazon's argument is.

10:13:01 13   Q.     You were here during Dr. Polish's presentation on

10:13:05 14   Friday, were you?

10:13:06 15   A.     I was, yes.

10:13:07 16   Q.     And you saw him provide examples to the jury of

10:13:10 17   conversations that he thought were infringing, do you recall

10:13:12 18   that?

10:13:13 19   A.     I do.  Yes.

10:13:14 20   Q.     Dr. Polish did not provide any example of a single

10:13:18 21   shot conversation, did he?

10:13:20 22   A.     I think that perhaps requires a technical assessment.

10:13:25 23   I think we all saw what we saw.  But I don't know whether

10:13:29 24   one of those would be considered a single shot or not.

10:13:32 25   Q.     And actually Dr. Polish said that and I wrote it

10:13:35 1    down, that not all single-turn conversations would

10:13:40 2    necessarily infringe, do you recall him saying that?

10:13:42 3    A.      I do recall some testimony to that effect.

10:13:45 4    Q.      But you sir, in your analysis, assumed that

10:13:49 5    100 percent of conversations infringe, didn't you, sir?

10:13:51 6    A.      I don't think it's fair to say that I assumed a

10:13:54 7    hundred percent infringed.  I believe what Dr. Polish had

10:13:58 8    told me in my analysis was that the single-turn

10:14:02 9    conversations would benefit from machine learning and in

10:14:05 10   that sense infringe, and that almost all of the interactions

10:14:10 11   would infringe.

10:14:11 12   Q.      Well, sir, just to be clear, if I am a new Alexa user

10:14:17 13   and I only use Alexa to set a timer in my kitchen and for

10:14:22 14   nothing else and that's all I say to Alexa, Alexa set a

10:14:26 15   timer, five minutes, you still would count me in your

10:14:30 16   analysis and charge Amazon a tax for me using the Alexa,

10:14:38 17   isn't that true, sir?

10:14:40 18   A.      If you used it every month, you would then become a

10:14:44 19   new Alexa monthly active user at the end of the year.  And

10:14:50 20   that would give rise to a 40 cent royalty and there would be

10:14:56 21   no additional royalties if two years later you became a much

10:15:02 22   more active user, there would be no additional royalties if

10:15:06 23   five years later you would be using it for a variety of

10:15:10 24   uses, including minimal type turn, with your illustration,

10:15:16 25   yes there would be a 40 cent royalty but that would give

10:15:20 1  flexibility for Amazon for many years to be able to take

10:15:24 2  advantage of improving its system to take advantage of the

10:15:28 3  turns.

10:15:28 4  Q.    If have but if I am a new user, use Alexa in a way

10:15:32 5  that Dr. Polish did not say infringes, in your analysis, you

10:15:36 6  would still say that Amazon has to pay for me; isn't that

10:15:43 7  right?

10:15:43 8  A.    Assuming that there is such a person that would never

10:15:46 9  have a multi-turn and never have a single-turn that

10:15:50 10 satisfies Dr. Polish's analysis of infringement.

10:15:52 11 Q.    You would count that person, you count that person in

10:15:55 12 your analysis?

10:15:57 13 A.    If there was such a person, they would be counted.

10:16:01 14 But again, it provides unknown value to Amazon to be able to

10:16:08 15 develop that customer into a more, what they call closer

10:16:12 16 customer with additional value.

10:16:16 17 Q.    Whatever value I provide has nothing to do with the

10:16:18 18 patent, correct, because my use of the technology does not

10:16:21 19 involve the patent, is that right?

10:16:22 20 A.    I think you're asking technical questions now.  I

10:16:22 21 have explained why I think it still would be a reasonable

10:16:22 22 royalty even if there was such a customer that never did

10:16:33 23 anything besides a single-turn that would not be found to be

10:16:36 24 infringing.

10:16:36 25 Q.    I would like to now switch gears just a little bit

534

Reed - cross

10:16:41 1   and understand what you say would be the negative

10:16:43 2   consequence of Amazon not using these patents.  Is that all

10:16:50 3   right?

10:16:50 4   A.      Okay.

10:16:51 5   Q.      Okay.  Now, I think if I understood correctly, your

10:16:56 6   opinion is if Amazon does not use these patents, Amazon

10:16:59 7   would need to get more users, is that right?

10:17:04 8   A.      Close.  But the difference is if Amazon was not using

10:17:08 9   the patents, then there would be the additional turns that

10:17:13 10  Dr. Polish addressed.  Additional turns would cause friction

10:17:17 11  and would cause a loss of customers.  So to satisfy the get

10:17:23 12  big, get big fast concepts, Amazon would have to encourage

10:17:28 13  additional people to purchase Echo devices which cost Amazon

10:17:33 14  money and encourage them to use Alexa as a monthly active

10:17:37 15  user.

10:17:37 16  Q.      Sir, what you're telling the jury if I understand

10:17:40 17  correctly, if Amazon didn't use the patent, it would need to

10:17:44 18  sell more Echo, correct?

10:17:46 19  A.      It would need to encourage more monthly active users,

10:17:51 20  yes.

10:17:51 21  Q.      And that would be by selling the Echos, correct?

10:17:54 22  A.      I'm sorry, that would?

10:17:56 23  Q.      That would be by selling the Echos, correct?

10:17:58 24  A.      Correct, selling the Echos below cost to encourage

10:18:02 25  more use, trying to get a monthly active user to compensate

10:18:06 1    for those that would leave because of friction and poor

10:18:09 2    performance.

10:18:10 3    Q.      Okay, so is Amazon Echo saying if Amazon didn't use

10:18:12 4    the patent and we need to sell more Echos, doesn't Amazon

10:18:16 5    want to sell more Echos?

10:18:18 6    A.      No, it does not, except for its goal to get big,

10:18:21 7    because the more Echos that Amazon sells, and they're

10:18:25 8    selling them at a loss, means more loss.  And it also means

10:18:31 9    that you do this more and more trying to capture additional

10:18:35 10   marginal customers, customers that otherwise did not want to

10:18:38 11   buy an Echo but now maybe they do because the prices are a

10:18:42 12   little bit cheaper, it's even a better deal, now I'll try

10:18:46 13   out an Echo, I'll try out an Alexa, that is not necessarily

10:18:49 14   a good goal for a company to continue to drive down its

10:18:53 15   prices to try to encourage even more lost money to each

10:18:58 16   device being sold.

10:18:59 17   Q.      Sir, when Amazon runs Super bowl ads advertising

10:19:04 18   Alexa and Echo, are you telling the jury this is a bad

10:19:07 19   business strategy, it doesn't want to sell more Echos, it's

10:19:10 20   bad for it?

10:19:11 21   A.      No, it's not a bad business strategy as long as it

10:19:14 22   fits in with the goal.  What I'm addressing is the need to

10:19:18 23   do it at a higher level, try to do it above even what they

10:19:21 24   were planning, which requires more losses.

10:19:24 25   Q.      But you do know, sir, you have looked at a lot of

Reed - cross

10:19:26  1   data, that Amazon did make profit on at least some Echos in

10:19:31  2   the past, correct?

10:19:32  3   A.      In the very early years, back in 2015, for example,

10:19:38  4   Amazon sold Echos priced similar to other companies, like

10:19:43  5   Bose and Sony, who also sold smart speakers, and then Amazon

10:19:48  6   dropped its prices dramatically when they started to see the

10:19:53  7   threat of Google.

10:19:53  8   Q.      Just to be clear, at the time of the hypothetical

10:19:56  9   negotiation, the time frame of 2013 to 2016, the product was

10:20:01 10   $35, isn't that true?

10:20:02 11   A.      That sounds about right, in that very early period,

10:20:05 12   selling if Echo, the old Echo towers that were purchased for

10:20:10 13   playing music.

10:20:10 14   Q.      And the same is true in the 2017 and 2019 time frame,

10:20:14 15   right, Echo sold at a profit of over $10, correct?

10:20:18 16   A.      Not very many of them, by then the focus had changed

10:20:22 17   to the Dot, it was smaller, cheaper, easier to sell to

10:20:26 18   customers to try Alexa.

10:20:27 19   Q.      But it is your opinion that Amazon would rather pay

10:20:31 20   VoiceBox than sell more Echos to make a profit, is that your

10:20:37 21   testimony sir?

10:20:37 22   A.      The payment to VoiceBox is a small part of a huge

10:20:41 23   investment, huge cost and that was being incurred by Amazon.

10:20:52 24   Q.      You talked a little bit about you introduced the

10:20:55 25   Georgia-Pacific factors and one of them you said was the

10:20:59 1   commercial success, do you recall that?

10:21:01 2   A.    I recall one of the factors being commercial

10:21:05 3   relationship, is that what you're asking about?

10:21:07 4   Q.    One of the factors, the 15 factors, is commercial

10:21:10 5   success, isn't it, that's what you put on your slide, sir?

10:21:13 6   A.    I don't believe that was put on a slide, certainly

10:21:17 7   Georgia-Pacific factors included popularity, profitability,

10:21:22 8   and those get to the issue of commercial success.

10:21:28 9   Q.    Mr. Patterson, can you please pull PDX 4-6.  This is

10:21:35 10  the slide that I thought was showed to the jury, is it not,

10:21:40 11  sir?

10:21:40 12  A.    Well, this is the list of the Georgia-Pacific

10:21:43 13  factors, and yes, eight is definitely here.

10:21:46 14  Q.    Commercial success?

10:21:47 15  A.    Commercial success.

10:21:48 16  Q.    And I just wanted to make sure that the commercial

10:21:50 17  success, just not commercial success, commercial success

10:21:57 18  attributed to the patents that we have been talking about,

10:22:00 19  correct?

10:22:02 20  A.    It would go to the success of the products that are

10:22:02 21  accused, that are identified to be the infringing products.

10:22:02 22  Q.    And we've already established that VoiceBox didn't

10:22:02 23  have any products that used the patents, correct?

10:22:12 24  A.    That's my understanding, and you addressed that

10:22:12 25  earlier.

Reed - cross

10:22:17 1   Q.       And we've already -- and you do agree with me, sir,

10:22:22 2   don't you, that Alexa is not described in the patents?

10:22:27 3              MR. MACDONALD:  Objection, again, Your Honor, I

10:22:29 4   think that's a technical question, and I also believe it's

10:22:33 5   vague.

10:22:33 6              THE COURT:  Sustained.

10:22:38 7   Q.       Do you know, sir, if the Echo devices are described

10:22:41 8   in the patent?

10:22:43 9              MR. MACDONALD:  Same objection.

10:22:44 10             THE COURT:  Sustained.

10:22:46 11  Q.       You do agree with me, sir, that thousands of talented

10:22:49 12  individuals at Amazon have built and are still working on

10:22:51 13  Alexa and Echo that drives the commercial success of Alexa

10:22:56 14  and Echo that we have been talking about in this case?

10:22:59 15  A.       I do agree that thousands of Amazon's very talented

10:23:03 16  individuals, and they continue to work to improve to try to

10:23:06 17  compete with Google, they view themselves behind Google in

10:23:11 18  terms of context.

10:23:12 19  Q.       VB Assets, the plaintiff in this case, that would not

10:23:15 20  be the party at issue in the hypothetical negotiation,

10:23:16 21  correct?

10:23:18 22  A.       Correct, as I described, it would be the owner of the

10:23:22 23  patents at the time, which was VoiceBox Technologies.

10:23:24 24  Q.       And VoiceBox never sued Amazon, correct?

10:23:27 25  A.       Correct.

539

Reed - redirect

10:23:28 1    Q.      And today, VB Assets, the plaintiff's company, that's

10:23:33 2    an asset holding company, correct?

10:23:37 3    A.      Correct.  But it's still the potential to work with

10:23:41 4    other companies related to voice commerce.

10:23:44 5    Q.      But at the moment, right now, the plaintiff is a

10:23:48 6    company that holds assets, agreed?

10:23:50 7    A.      I don't believe that it was addressed in, the other

10:23:54 8    day with Mr. Kennewick.  Certainly they are the plaintiff

10:23:57 9    and here they are addressing their patents.  But I don't

10:24:00 10   think it was addressed whether they're not other goals that

10:24:04 11   VB Assets has.

10:24:05 12   Q.      You do not know, sir, you spent hundreds of hours on

10:24:09 13   this case, do you know if VB Assets is a company that's just

10:24:12 14   holding assets or you don't know?

10:24:14 15   A.      My understanding is that VB Assets continues to have

10:24:17 16   goals of being able to work with other companies to aid in

10:24:23 17   voice commerce and voice advertisements.

10:24:26 18            MS. SHAMILOV:  No further questions.  Thank you

10:24:28 19   very much, Mr. Reed.

10:24:29 20            THE COURT:  All right.  Thank you.  Redirect.

10:24:37 21                    REDIRECT EXAMINATION

10:24:38 22   BY MR. MACDONALD:

10:24:40 23   Q.      Very, very briefly, Mr. Reed.

10:24:42 24            You got a number of questions about whether or

10:24:45 25   not Amazon made major contributions to the success of Alexa.

Reed - redirect

10:24:49 1   My question to you, is does your damages model give Amazon

10:24:54 2   increase for its contributions to Alexa?

10:24:56 3   A.     It absolutely does, my damages analysis focuses on

10:25:00 4   the proxy for the advantages of the patented technology

10:25:03 5   while giving credit to Amazon for all the contributions.

10:25:07 6   Q.     What proportion of the total that Amazon has spent

10:25:11 7   developing Alexa are reflected in -- sorry.  Let me rephrase

10:25:15 8   that.  The royalty amount that you calculated in this case,

10:25:18 9   what proportion of the total costs of Amazon spent on Alexa

10:25:23 10  does the damages when calculated represent?

10:25:27 11  A.     It's a tiny portion, one of those documents that I

10:25:30 12  addressed early in my testimony was showing investments of

10:25:36 13  $5 billion a year, losses that are calculated by Amazon that

10:25:40 14  were $2.6 billion a year, this has gone on for many years

10:25:45 15  now, this has been almost ten years since that beginning

10:25:48 16  time period, so the losses are huge, and tens of billions of

10:25:52 17  dollars and the royalty here is $46.7 million.

10:25:57 18  Q.     In your review of the documents in this case, did you

10:26:00 19  see any information that told you how much revenue Amazon

10:26:03 20  derives from every Alexa user?

10:26:07 21  A.     Yes.  I saw information that showed additional

10:26:11 22  revenue that Amazon gets, for example, from Amazon.com.  So

10:26:17 23  an Alexa user spends more with Amazon.com, and it was

10:26:22 24  measured as $400, additional $400.

10:26:22 25  Q.     And just to refresh the jury, under your formula, a

10:26:31 1    new Alexa user, $0.40 for VoiceBox correct?

10:26:35 2    A.    $0.40 and it doesn't have anything to do with all the

10:26:38 3    other benefits that are flowing to Amazon, it's focused on

10:26:41 4    the measure of the cost savings related to preserving

10:26:44 5    customers from having less friction.

10:26:46 6    Q.    And the $0.40, is that one time or every year?

10:26:50 7    A.    One time, and it would continue into the future.  So

10:26:55 8    if additional complex dialogues are added next year, there

10:26:59 9    is no additional payments for all the customers that are

10:27:02 10   maintained because there is only a royalty payment that

10:27:04 11   occurs once for the active users.

10:27:08 12   Q.    Amazon's counsel asked you some questions about some

10:27:11 13   of the negotiations that took place in 2018.  To your

10:27:16 14   knowledge, did any of the companies -- have you seen any

10:27:20 15   evidence of any of the companies leaving aside Amazon for

10:27:23 16   one second infringe any of the VoiceBox patents that were

10:27:26 17   being discussed?

10:27:27 18   A.    I didn't see evidence --

10:27:29 19          MS. SHAMILOV:  Objection, Your Honor.  We were

10:27:31 20   just talking about technical opinion about infringement.

10:27:34 21          THE COURT:  Hold on.

10:27:51 22          MR. MACDONALD:  I'll rephrase the question, Your

10:27:51 23   Honor.

10:27:52 24   Q.    In the 2018 discussions that Amazon's counsel

10:27:56 25   discussed with you, was there an assumption of validity of

Reed - redirect

10:27:59 1    the patents in any of those discussions?

10:28:01 2    A.      There was not, no.

10:28:02 3    Q.      Was there an assumption of infringement in any of

10:28:06 4    those discussions?

10:28:06 5    A.      No.

10:28:08 6    Q.      Are the absence of those two factors important in

10:28:11 7    your mind to whether or not those 2018 discussions are

10:28:17 8    relevant to the reasonable royalty calculations in this

10:28:20 9    case?

10:28:20 10   A.      Yes, the assumption differences are what I addressed

10:28:22 11   earlier in my testimony, it's a very slim difference and it

10:28:27 12   highlights the position of the parties at that hypothetical

10:28:31 13   negotiating table in late 2014.

10:28:33 14   Q.      You got a number of questions about single-turn

10:28:36 15   interactions.  Would it influence your opinion if a large

10:28:41 16   number of single shot interactions were found not to

10:28:45 17   infringe?

10:28:48 18   A.      Well, I think ultimately it doesn't affect the

10:28:51 19   opinion over the longer term because the royalty structure

10:28:55 20   which allows for maintaining customers, monthly active

10:29:01 21   customers forever and continuing to improve the Alexa

10:29:05 22   system, that would reflect that $0.40 payment in the case of

10:29:11 23   the '681 patent.  And importantly also that doesn't have any

10:29:14 24   other bearing on the other two patent families, the voice ad

10:29:19 25   patents, this would not relate to that, the voice commerce

10:29:22 1    patents, this would not relate to that.  To the extent it

10:29:25 2    would have a bearing on the '681 patent, I think ultimately

10:29:29 3    the full structure of my royalty model is appropriate.

10:29:34 4                MR. MACDONALD:  Thank you very much.  No further

10:29:36 5    questions.

10:29:36 6                THE COURT:  All right.  Thank you, sir.  You're

10:29:38 7    excused.

10:29:39 8                All right.  What's next?

10:29:41 9                MR. YOON:  Your Honor, that completes VB

10:29:46 10   Assets's presentation of witnesses.  But as Your Honor was

10:29:50 11   aware, Amazon is going to be calling several fact witnesses

10:29:54 12   that are only going to be testifying once.  Our case will

10:29:58 13   remain open until those witnesses testify.

10:30:00 14               THE COURT:  All right.  Thank you.

10:30:02 15               So at this point, before Amazon begins its

10:30:05 16   presentation, let's take our morning break.  Come back

10:30:08 17   around quarter of.

10:30:09 18               COURTROOM DEPUTY:  All rise.

10:30:11 19               (Jury exiting the courtroom at 10:30 a.m.)

10:30:39 20               (A brief recess was taken.)

10:51:05 21               COURTROOM DEPUTY:  All rise.

10:51:06 22               (Jury entering the courtroom at 10:51 a.m.)

10:51:22 23               THE COURT:  All right everyone, welcome back.

10:51:24 24   Please be seated.

10:51:30 25               Mr. Hadden, what's next?

Strom - direct

10:51:35 1          MR. HADDEN:  Thank you, Your Honor.  Amazon

10:51:37 2  calls its first witness, Dr. Nikko Strom.

10:51:49 3          COURTROOM DEPUTY:  Please raise your right hand.

10:51:52 4  Please state and spell your full name for the record.

10:51:55 5          THE WITNESS:  Nikko Strom.  N-I-K-K-O.

10:52:00 6  S-T-R-O-M.

10:52:01 7          NIKKO STROM, having been duly sworn, was

10:52:06 8  examined and testified as follows:

10:52:08 9                  DIRECT EXAMINATION

10:52:09 10 BY MR. HADDEN:

10:52:16 11 Q.      Good morning.

10:52:18 12 A.      Good morning.

10:52:19 13 Q.      Could you introduce yourself to the jury, please?

10:52:22 14 A.      My name is Nikko Strom.

10:52:25 15 Q.      And what do you do?

10:52:27 16 A.      I am vice-president and distinguished scientist at

10:52:32 17 Amazon.  I'm working on the Alexa AI and machine learning.

10:52:37 18 Q.      Before we talk about your work at Amazon, can you

10:52:41 19 describe your education for the jury?

10:52:42 20 A.      I have a master's degree in physics, and a doctorate,

10:52:47 21 a Ph.D. in speech technologies at KTH, the Royal Institute

10:52:52 22 of Technology in Stockholm, Sweden.

10:52:57 23 Q.      What was the focus of your Ph.D., Dr. Strom?

10:53:01 24 A.      I focused on automatic speech recognition and I used

10:53:06 25 artificial neural networks to improve the speech

Strom - direct

10:53:10 1    recognition.

10:53:10 2    Q.      What is an artificial neural network?

10:53:15 3    A.      An artificial neural network is a computer program, a

10:53:19 4    mathematical model that is inspired by the human brain.

10:53:23 5    Q.      Could we have some slides to help explain this, Dr.

10:53:28 6    Strom?

10:53:28 7    A.      Yes, we do.   Here is a demonstration of the human

10:53:32 8    brain.   But the point is that the human brain has billions

10:53:36 9    of neurons, and it has synapses that are connecting all the

10:53:45 10   neurons, it's creating a very large network.   Our official

10:53:49 11   neural networks are computer programs that do something

10:53:52 12   similar.   Here we see an illustration of the nodes in an

10:53:58 13   artificial network, to the left numbers would come in at the

10:54:02 14   I know, then they would traverse all these connections

10:54:05 15   between the nodes, and the connections also have numbers

10:54:11 16   that are strength of the connection, as the information

10:54:15 17   passes from layer through layer like this in the neural

10:54:19 18   network the numbers change.   And at the end to the right is

10:54:22 19   the output or the output numbers that will come out.

10:54:27 20   Q.      Did you invent a new neural network in your Ph.D.

10:54:31 21   research, sir?

10:54:33 22   A.      I did.   It was a new type of neural network called

10:54:38 23   recurrent time delay neural network.   It's really good at

10:54:44 24   recognizing time sequences, and that is very important for

10:54:50 25   speech because in recognizing things like your rhythm and

Strom - direct

10:54:55  1   your syllables and how speech is put together.

10:55:00  2   Q.      And did you publish any scientific papers regarding

10:55:04  3   the neural network you invented?

10:55:06  4   A.      Yes, I did.  I published several papers, but I think

10:55:10  5   we have one here from 1992.

10:55:14  6   Q.      And were there other benefits for speech recognition

10:55:18  7   that came from the neural network that you invented?

10:55:23  8   A.      One of the things I was working on is you know how

10:55:26  9   everyone's voice is a little different and we have different

10:55:30 10   accents and dialects, and people can even pronounce words

10:55:34 11   differently, words like tomato, tomato, the pronunciation

10:55:42 12   can be different for everyone.  So I focused on how to get

10:55:45 13   the neural networks to be able to cover all those different

10:55:49 14   variants.

10:55:50 15   Q.      And when did you get your Ph.D., sir?

10:55:53 16   A.      I got my Ph.D. in 1998.

10:55:55 17   Q.      What did you do after you got your Ph.D.?

10:55:58 18   A.      That was an exciting time.  I actually got an

10:56:02 19   opportunity to work at MIT, at the computer signs and

10:56:07 20   artificial intelligence lab at MIT, it was very exciting for

10:56:14 21   a young scientist like myself to come there.  I work in a

10:56:18 22   group called the spoken language systems group.

10:56:20 23   Q.      Why did you choose to join this spoken language

10:56:24 24   systems group at MIT?

10:56:26 25   A.      It was and still is one of the foremost groups that

10:56:31 1   work on computer interfaces that are using this language to

10:56:37 2   communicate or interface with people.  So we can call it

10:56:41 3   conversational systems.  And I was excited to work with that

10:56:44 4   because my speech recognition research was into that area.

10:56:53 5   Q.     What did you work on at MIT?

10:56:55 6   A.     I worked a system called Galaxy.

10:56:58 7   Q.     What is Galaxy?

10:57:01 8   A.     Galaxy is a conversational system where the user

10:57:05 9   would speak into a microphone and the computer would perform

10:57:10 10  tasks or answer questions.  For example, it would -- you

10:57:14 11  would be able to search for flight tickets or you could ask

10:57:19 12  for the weather, or you could look up information about

10:57:23 13  hotels and restaurants.

10:57:26 14  Q.     And what particularly did you work on on Galaxy while

10:57:38 15  at MIT?

10:57:38 16  A.     I worked on integrating with the automatic speech

10:57:43 17  recognition system.  I also worked on something called turn

10:57:46 18  taking, and that is how the computer and the human is taking

10:57:52 19  turns in a conversation.

10:57:55 20  Q.     And what did you do after your work at MIT?

10:57:55 21  A.     After MIT, I joined a startup company called Tellme

10:58:02 22  Networks in California.

10:58:05 23  Q.     Why did you join Tellme Networks?

10:58:10 24  A.     Well, Tellme Networks commercialized conversational

10:58:14 25  systems.  And so it was exciting for me to be able to bring

Strom - direct

10:58:20 1    that to many more people.  You could just call a 1-800

10:58:24 2    number and get to the system and you could ask for things

10:58:26 3    like the weather again or you could book travel on Orbits or

10:58:33 4    you could even trade stocks on eTrade.  But my favorite was

10:58:38 5    actually to buy pizza on Dominos, you could call this system

10:58:43 6    and you could say go to Dominos and then it would tell you

10:58:48 7    what the specials were, but then I could just say reorder my

10:58:54 8    last order and pizza would show up at my door 45 minutes

10:58:58 9    later.  At the time that was magic.

10:59:00 10   Q.     How long did you work at Tellme?

10:59:02 11   A.     I worked there for seven years until 2007.

10:59:06 12   Q.     What did you do after Tellme?

10:59:07 13   A.     After Tellme, so Tellme Networks was a start up

10:59:12 14   company that was acquired by Microsoft.  So at that time I

10:59:16 15   joined a different group in Microsoft.  That group was

10:59:21 16   called the Speech Components Group.

10:59:24 17   Q.     What did you do in the Speech Components Group at

10:59:28 18   Microsoft?

10:59:29 19   A.     I worked on their automatic speech recognition system

10:59:30 20   for Windows and for other Microsoft products.  For example,

10:59:38 21   it used for the visual impaired so that they could use the

10:59:41 22   Microsoft product.  I also worked on incorporating the

10:59:47 23   neural network technology to their ASR system.  ASR is

10:59:52 24   automatic speech recognition.

10:59:54 25   Q.     How long did you work at Microsoft?

Strom - direct

A.      I worked at Microsoft for about four years, until 2011.

Q.      And then why did you leave Microsoft?

A.      Sorry, can you repeat?

Q.      Why did you leave Microsoft in 2011?

A.      Oh, in the spring of 2011, some folks from Amazon contacted me about a project they had and they wanted to hire me.  It was a completely secret and confidential project so I really didn't have any idea what it was about, but they seemed -- they were excited and it seemed like an interesting project.

        Then I had more conversations and eventually they told me it would be about speech technologies and they told me a little bit more about the scope of it, and it sounded really exciting, but I still didn't know much.  But in September of 2011, I joined Amazon.

Q.      And after you joined Amazon, did they tell you what the secret products were?

A.      Yeah.  So I joined Amazon together with another group of experts in speech technologies, and at Amazon there is this ritual that we have where when you get ready on a secret project, it's called a disclosure.  So we all got in a room and then someone told us what the product was.  It was a small device that you can have in our homes and you're supposed to be able to talk to it and it can talk back to

11:01:37  1   you and play music and such things.  But it wasn't going to

11:01:42  2   be close to your mouth, it was going to be far away from

11:01:45  3   you.  In speech recognition, it was going to be about 10,

11:01:50  4   15 feet away so that it would work in a room and at home,

11:01:53  5   right.  So in speech recognition we call this far field

11:01:58  6   speech recognition.  I can tell you some of the people that

11:02:01  7   were in that room were kind of scared because it hadn't been

11:02:05  8   done before, so -- and this was -- we had joined the company

11:02:10  9   not knowing.

11:02:11 10            Me, personally, though, I thought that you know,

11:02:14 11   I wanted this new challenge.  For me it was exciting.  But

11:02:20 12   it was a mixed bag.

11:02:22 13   Q.    Why were some of the people in this room apprehensive

11:02:24 14   about this project?

11:02:28 15   A.    So the far field automatic speech recognition, that's

11:02:32 16   when the microphone is far away and you still want to use a

11:02:36 17   computer to understand what they are saying, that hadn't

11:02:40 18   been solved yet, that was a problem that had been worked on

11:02:43 19   in academia.  And we actually had an -- early on we had an

11:02:51 20   advisory board of prominent professors and industry people

11:02:56 21   that we wanted to learn from, so we actually went ahead and

11:03:01 22   we did the same thing with them.  I remember the first

11:03:03 23   meeting when we had -- they also got the disclosure.  And

11:03:08 24   then we told them what the product was going to be.  And

11:03:12 25   there was this bit of awkward silence after, actually.  And

11:03:20 1    then eventually one of the professors, I think his name was

11:03:27 2    Criminae, he's a German very famous professor, he told us

11:03:31 3    that Amazon, you should probably do something simpler, this

11:03:36 4    is not -- we don't even know how to do this yet, if you want

11:03:39 5    to build a product, that's very risky.

11:03:42 6              So that's why I know this is not something that

11:03:47 7    had been done before.

11:03:49 8    Q.    And why, can you explain why this is a difficult

11:03:53 9    problem in speech recognition?

11:03:54 10   A.    Yes.  So it's difficult for many different reasons,

11:03:59 11   but one is when the microphone -- so I don't have an -- so I

11:04:03 12   have the nice microphone here, but if I had a close talking

11:04:09 13   microphone, I would hold it like this.  In this case, my

11:04:13 14   voice goes directly very short path into the microphone and

11:04:17 15   everything else is sort of drowned out by my voice, it's

11:04:20 16   Amazon Echo, very clear signal.  But when the microphone is

11:04:23 17   very far away, maybe where you are, then first of all, there

11:04:29 18   is this thing called reverberation, so my sound will bounce

11:04:34 19   around on the ceilings and walls.  This room is a big room,

11:04:38 20   so there is a different kind of reverberation than at home

11:04:41 21   and it has lots of hard surfaces like wood.  But every room

11:04:45 22   is different, so you got different reverberation in every

11:04:50 23   room.  And the one problem for speech recognition is that

11:04:52 24   that reverberation makes all these different ways for sound

11:04:58 25   to bounce around before it reaches the microphone, they take

Strom - direct

11:05:02 1   different time.  So you get -- the microphone will record a

11:05:06 2   mix of my sound but at different times.  It makes it much

11:05:11 3   more muffled than noisy.

11:05:13 4   Q.    Why don't we notice this reverberation?

11:05:18 5   A.    So people don't really notice it.  So we don't think

11:05:22 6   about it, because we have this beautiful auditory system

11:05:26 7   that consists of an inner ear, the auditory nerve to the

11:05:30 8   brain and then there is an auditory cortex, and they all do

11:05:34 9   things that we don't know about, that we don't think about,

11:05:38 10  but they isolate the voice that we are listening to, so they

11:05:42 11  don't hear all that.  A microphone on the other hand is just

11:05:45 12  picking up the difference in pressure of the air, and that

11:05:48 13  is everything it does.

11:05:51 14  Q.    And are there additional problems or challenges with

11:05:55 15  far field speech recognition beyond the reverberations?

11:05:59 16  A.    Yes.  If we are -- we can hear the air conditioning

11:06:07 17  here, for example, so there is always noise in the room, and

11:06:10 18  there isn't a lot of noise in this room because it's a

11:06:13 19  courtroom, but at home there could be much more noise.

11:06:17 20  There could be the car driving by.  TV on.  The radio on in

11:06:22 21  the background.  We can have someone cooking.  You know,

11:06:27 22  people talking in the background.  So all that noise, it

11:06:31 23  doesn't matter that much when you hold a microphone close to

11:06:35 24  your mouth like this because it's drowned out by my much

11:06:35 25  stronger voice here, but when the microphone is far away

Strom - direct

11:06:43 1    from me, it's also relatively closer to all those noise

11:06:47 2    signals, so the signal will be much more noisy.

11:06:51 3    Q.      How did you and the folks at Amazon go about solving

11:06:54 4    this far field speech recognition problem?

11:06:57 5    A.      Yeah, this was a hard problem.  And we had several

11:06:59 6    things we did to solve this problem.  One important thing is

11:07:05 7    that we used an array of microphones.  What that means is we

11:07:09 8    had several, not just one microphone in the device, but

11:07:12 9    seven different microphones.  When you use that with the

11:07:15 10   right software, you can point the listening in one

11:07:20 11   particular direction, it's called the beam.  It is

11:07:25 12   complicated signal processing software, but it's cancelling

11:07:30 13   out all the sounds from outside of that beam.  So we had to

11:07:34 14   do that and we had to write the software for that and put

11:07:39 15   that in the electronics and the device.  But we also have to

11:07:42 16   do one more thing, we also have to have the algorithm to

11:07:48 17   determine where to point that beam because up to point it to

11:07:51 18   the user, not somewhere else, right.  So between those two

11:07:56 19   programs, the computer programs that we had to put on the

11:07:59 20   device, we got a signal that was much clearer than what it

11:08:05 21   would otherwise had been, and that helped a lot.

11:08:08 22   Q.      Was that enough to make the far field speech

11:08:12 23   recognition work?

11:08:12 24   A.      No.  It turns out that even after all that, the

11:08:17 25   signal is more noisy, and there it's also different, it

11:08:23 1   sounds differently than the signal from a near speaking

11:08:27 2   microphone.

11:08:28 3          So all the existing speech recognition solutions

11:08:33 4   that were out there, they couldn't work very well on that

11:08:38 5   signal, so we also had to improve on the automatic speech

11:08:42 6   recognition software itself.

11:08:43 7   Q.     Did you use your Ph.D. research on improving that

11:08:48 8   speech recognition software?

11:08:50 9   A.     Yes.  We used the artificial neural networks

11:08:55 10  solution.  By then these networks were called deep neural

11:08:59 11  networks or DNN, so we used DNN's that were very similar to

11:09:04 12  the research I had done.

11:09:06 13  Q.     And during this time period at Amazon, did you build

11:09:10 14  prototype devices?

11:09:13 15  A.     Yes.  We did build several prototype devices, I think

11:09:19 16  I have -- I should have one with me here.  But I don't see

11:09:23 17  it.  Do we have that?

11:09:33 18  Q.     It should be up there, somewhere.

11:09:35 19  A.     Up here.  Well it's not there.

11:09:42 20  Q.     If it's not there, it's not there.

11:09:48 21  A.     Sorry, it's not here.  I was promised I was going to

11:10:02 22  be reunited with one of our earlier prototypes, I'm sorry

11:10:06 23  it's not here.  It would have been awesome.

11:10:12 24  Q.     You say one of your particular earlier prototypes.

11:10:16 25  Are there particular prototypes that you remember?

11:10:20 1    A.      This one I was hoping to have here, it was -- it was

11:10:27 2    a first one that would do an end to end speech recognition

11:10:34 3    and solution.  So we had our engineer, one of our engineers

11:10:42 4    speak, he would say play music by Sting, and the device

11:10:49 5    would start playing music.  Than I could tell you, there was

11:10:52 6    a lot of cheering.  All those people that said it couldn't

11:10:56 7    be done, I think we thought a little bit about them, too, at

11:10:59 8    that time, it was pretty awesome, celebration, it was a

11:11:04 9    great memory.

11:11:07 10   Q.      If we go back to how you use neural networks at

11:11:13 11   Alexa, why did you decide that you needed to use neural

11:11:16 12   networks when you were building Alexa?

11:11:19 13   A.      Neural networks or artificial neural networks are

11:11:24 14   very good at learning all the different variants, and we had

11:11:33 15   lots variants.  We had the different room acoustics, the

11:11:38 16   reverberation, we had the different noise sources at homes,

11:11:41 17   people's homes and we had all the different noises that

11:11:44 18   people use, children, male, female voices, accents,

11:11:50 19   dialects.  All of that, and we also knew that we were going

11:11:52 20   to build a system that was very broad, it could do a lot of

11:11:55 21   different things, you could say many different things to it.

11:12:00 22   Because of all of that, we knew that artificial neural

11:12:04 23   network was a great solution for it.

11:12:06 24   Q.      How do artificial neural networks learn to do all

11:12:10 25   these different things and recognize these different types

556

Strom - direct

11:12:14  1   of voices?

11:12:15  2   A.      So, of course, it's a computer algorithm, it's a

11:12:21  3   mathematical algorithm that's running on a computer.  But

11:12:24  4   it's not that different from how humans learn actually.  We

11:12:29  5   need examples first, and then we use those examples to train

11:12:34  6   the neural networks.  So the way it works is that you have

11:12:39  7   the neural network, you get some inputs and then it produces

11:12:44  8   a module, sometimes it's correct, that's fine, sometimes

11:12:49  9   it's not, then we correct it.  And it's not that different

11:12:55 10   from how people learn.  But we iterate that many times over

11:13:00 11   and over until the network do well, that's how it works.

11:13:05 12   Q.      Where did you get the examples you used to train the

11:13:09 13   neural networks in Alexa?

11:13:12 14   A.      For -- we trained the automatic speech recognition

11:13:18 15   system, we needed recordings of people speaking.  So what we

11:13:22 16   did was we used these prototypes that we had built, and we

11:13:29 17   had -- we put them in a room, or many different rooms, and

11:13:34 18   we had people talk to them.  We made scripts for the people

11:13:39 19   so that they would say things that made sense for the

11:13:42 20   device, things like can you tell me the weather tomorrow,

11:13:47 21   and all kinds of things like that.  And we recorded many,

11:13:52 22   many of those and then we used that to train or have the

11:13:58 23   neural network learn from them.

11:13:59 24   Q.      At this point, how much data has been used to train

11:14:04 25   Alexa's neural networks?

11:14:07 1    A.      At this point we have millions of hours of speech

11:14:10 2    that we're using to train the neural network.

11:14:15 3    Q.      Can you kind of walk us through at a high level how

11:14:23 4    an Alexa -- a request to Alexa gets processed.  If a user

11:14:28 5    says, play the beat also, what happens?

11:14:32 6    A.      Play the beat also.  So the first thing that happens

11:14:36 7    of course is we already talked about the device in your home

11:14:39 8    is using that beam former record of your voice, or capture

11:14:46 9    your voice and digitize it.  Then it sends that digitized

11:14:50 10   signal to Amazon's cloud, the data center with all the

11:14:54 11   computers on it.  And there we use two different machine

11:15:01 12   learning programs.  The first one is speech recognition,

11:15:04 13   which takes that signal and generates the most likely words

11:15:10 14   that the user said.  And the second one is called natural

11:15:15 15   language understanding, which is called the NLU, also, and

11:15:19 16   that's where we take the words and we try to understand the

11:15:23 17   meaning of the words.

11:15:28 18           The ASR system is very simplified, it's based on

11:15:36 19   all these neural networks, so deep neural networks and it

11:15:39 20   also has something called a language model, that's a model

11:15:42 21   that given previous words it predicts the next word in the

11:15:47 22   same utterance, play The Beatles, it would know if I say

11:15:52 23   play the, it will have all the likelihoods for what the next

11:15:58 24   word can be, that makes the ASR systems job a little easier.

11:16:02 25           After that ASR will come up with the most likely

Strom - direct

11:16:07 1   sequence of words.  Let's say in this case it actually got

11:16:10 2   it right, and the sequence of words would be Alexa play The

11:16:16 3   Beatles.

11:16:16 4   Q.      Were you in the courtroom, Dr. Strom, when Dr. Polish

11:16:20 5   testified about Alexa's NLU?

11:16:23 6   A.      Yes, I was.

11:16:24 7   Q.      Was Dr. Polish's description of how Alexa's NLU works

11:16:30 8   accurate?

11:16:30 9   A.      No, it wasn't.

11:16:32 10  Q.      So how does Alexa's NLU determine the meaning of

11:16:37 11  words?  I think we have a slide.

11:16:41 12  A.      So for a few things, for a few simple things like if

11:16:47 13  the user said Alexa stop, for example, that unambiguous, we

11:16:55 14  know the meaning of that, and users say that quite

11:16:58 15  frequently.  So we use rules for that.  One reason we use

11:17:02 16  rules for something like that is if music is playing and the

11:17:07 17  customer is saying Alexa stop, you really want to stop the

11:17:10 18  music right away.  We don't want to wait for processing and

11:17:14 19  then stop it, that's kind of annoying.  So that's one

11:17:17 20  reason.  But the other reason is there is only a few of

11:17:20 21  these and we can use rules for that.

11:17:22 22          For everything else, we use different neural

11:17:26 23  networks and we use different neural networks for different

11:17:30 24  areas.  So we call them domains.  So in this slide we have

11:17:34 25  six domains, but there is actually many more, so as an

11:17:39  1   example, we have a shopping domain for shopping requests.

11:17:43  2   We have music for music requests and so on.

11:17:45  3          The words Alexa play the Beatles also would be

11:17:54  4   processed by each one of these neural networks at the same

11:17:57  5   time, and the output of these neural networks is the meaning

11:18:02  6   of or what the these neural networks think is the meaning of

11:18:08  7   what you said.  So each one of these would have a meaning as

11:18:11  8   output.

11:18:12  9          We call that meaning intent.  And the meaning

11:18:15 10   can also contain something called entities.  And in this

11:18:20 11   case the intent is to play something obviously and the

11:18:23 12   entity is The Beatles, the thing.  There is many different

11:18:27 13   things like that, it can be a location or a time, those are

11:18:31 14   all entities.

11:18:39 15   Q.     And does the NLU identify a subject area for the

11:18:46 16   user's request before it runs these different DNN's?

11:18:50 17   A.     No.  All the DNN's are running at the same time.  And

11:18:55 18   the only thing that's coming in as input to them are the

11:19:00 19   words that we spoke.

11:19:02 20   Q.     And why did the NLU determine all these possible

11:19:02 21   meanings at the same time?

11:19:02 22   A.     NLU, the NLU system will have to be very efficient.

11:19:12 23   And if you had to run -- if you decided that you wanted to

11:19:20 24   run first and then check if that's a good one and then try

11:19:24 25   the next one and so on, remember, there isn't just six in

11:19:29 1   the real system, there is many more.  If you had to do that,

11:19:34 2   then it would be a very slow and inefficient system.

11:19:38 3   Q.      Would it be possible for Alexa to determine, for

11:19:44 4   example, that play The Beatles is a music request without

11:19:48 5   running the other DNN's?

11:19:49 6   A.      No, that's hard, because it's all relative to the

11:19:53 7   other DNN's.  So once you start, you have only the words,

11:19:57 8   you don't have the meaning, the system only knows what the

11:20:02 9   words are.  So to know which one is better than the others,

11:20:06 10  you would really have to run all of them.

11:20:09 11  Q.      And does the NLU use prior conversations that the

11:20:18 12  user had with Alexa in order to determine a meaning of the

11:20:22 13  words?

11:20:22 14  A.      No, it does not.  As I said earlier, the inputs to

11:20:27 15  these, all of these neural networks is only the words that

11:20:32 16  you just spoke.

11:20:34 17  Q.      And why did Amazon build its NLU to work in that way?

11:20:42 18  A.      So, again, it has to do with efficiency.  So we have

11:20:50 19  thousands of customers using a system at the same time every

11:20:54 20  second.  And actually each one of these neural networks is

11:21:01 21  running -- sorry, each one of the requests are running on a

11:21:05 22  different computer for efficiency.  So even if you're having

11:21:08 23  a multi-turn where you go back and forth with Alexa a couple

11:21:14 24  of times, even then each one of your requests are actually

11:21:15 25  processed on a different computer in the warehouse.  So if

Strom - direct

11:21:28  1   we needed to use prior requests, that would mean that all of

11:21:37  2   the computers in the network would have to store all of the

11:21:41  3   prior requests, right, and we would have to send all of

11:21:48  4   those requests across the network to other computers that

11:21:51  5   would need them.  If it's five turns of conversation, then

11:21:58  6   we would have to find five different turns at different

11:22:01  7   computers and send that to the one that is actually

11:22:05  8   processing, that would be a very unwieldy and inefficient

11:22:09  9   system so we decided not to implement it that way.

11:22:12  10  Q.    If you look in the binder, there is a document

11:22:15  11  PTX-226.  Do you recognize that, Dr. Strom?

11:22:20  12  A.    Yes.

11:22:23  13  Q.    Can you put up PTX-226, and in particular, slide 32,

11:22:31  14  Mr. Patterson?

11:22:32  15        What does this show, Dr. Strom?

11:22:36  16  A.    This is one of those multi-turn conversations, so

11:22:42  17  here there is a back and forth, the user first says set an

11:22:46  18  alarm.  But we can't set an alarm without knowing the time,

11:22:51  19  so Alexa ask, for what time?  And that's going to be

11:22:57  20  important later, I think.  Alexa said for what time?  And

11:23:02  21  then the user answers six, and then the conversation goes on

11:23:02  22  further.

11:23:02  23  Q.    Was this example of the user saying six in the middle

11:23:10  24  of this dialogue one of the examples that Dr. Polish talked

11:23:14  25  about?

11:23:15 1    A.      Yes, he talked about that dialogue.

11:23:18 2    Q.      Was his description of how Alexa processes the user

11:23:24 3    saying six, was that accurate?

11:23:26 4    A.      No, it was not.

11:23:28 5    Q.      Let's look at page 34, please, Mr. Patterson.   What

11:23:35 6    does this explain about how Alexa processes the word six in

11:23:39 7    that example?

11:23:41 8    A.      Let's look at the top line where it says utterance

11:23:44 9    six and then to the right of that is someone's name.   So

11:23:47 10   this shows the result, the output of the different neural

11:23:54 11   networks that computed the meaning.   Here we only show three

11:23:59 12   here, so that's confusing.   It was six in the previous one

11:24:03 13   but here is three different intents coming from three

11:24:08 14   different neural networks, three different meanings coming

11:24:11 15   from three different neural networks.

11:24:13 16           You see only the middle one has to do with

11:24:16 17   notifications.   So notifications is alarms is part of

11:24:21 18   notifications.   The other two are completely different, it's

11:24:25 19   about setting the volume of a device, or the last one has to

11:24:29 20   do with playing a song when the song ends.   So this just

11:24:35 21   shows the output of the NLU neural network.

11:24:38 22   Q.      But just to make it a little clearer, so first we

11:24:46 23   have those three rows on the right next to the utterance

11:24:52 24   six, the first one says global dot set volume intent volume

11:24:57 25   level equals six.   Do you see that, Dr. Strom?

11:25:02 1    A.      Yes.

11:25:02 2    Q.      What does that represent in terms of the diagram we

11:25:05 3    are looking at before with the different neural networks?

11:25:08 4    A.      So this would be the output from the neural network

11:25:11 5    and the global dot set volume intent is a type of intents

11:25:17 6    and that's the meaning that we talked about.  And then where

11:25:22 7    it says volume level equals six, that's one of the entities.

11:25:27 8    Six is an entity and the intent is to change the volume.

11:25:32 9    Q.      So when the user said six, that -- strike that.  When

11:25:35 10   the user said six, that particular DNN interpreting that as

11:25:41 11   meaning that six is a volume level that the user is trying

11:25:44 12   to get to, is that accurate?

11:25:46 13   A.      Yeah, that's accurate, yeah.

11:25:51 14   Q.      And then if we look at the third one, the music

11:25:56 15   intent, it has song name equals six.  How did Alexa

11:26:01 16   determine that?

11:26:01 17   A.      That would come from another one of the neural

11:26:05 18   networks, this would be the music domain neural network.

11:26:09 19   And then it came up with another intent, there is actually a

11:26:12 20   song called Six.

11:26:18 21   Q.      Can we go to the page 33, Mr. Patterson?

11:26:22 22           What does this page explain, Dr. Strom?

11:26:22 23   A.      So here again we see the intent, the intent for the

11:26:40 24   alarm here.  It set notification intent if you look at the

11:26:45 25   table at the bottom.  What's important here is this is a

11:26:51 1    slide from our NLU experts, and in red here it says the NLU

11:26:55 2    models are currently not aware of dialogue context.  And

11:26:59 3    dialogue context is just the previous utterances, the

11:27:03 4    previous requests were made.

11:27:07 5    Q.     Did this mean that when the NLU interpreted user

11:27:13 6    saying six, it didn't know that the user had previously said

11:27:17 7    I want to set an alarm?

11:27:20 8    A.     That's right.  The neural network only uses the words

11:27:26 9    -- the word -- and it's only one word in this case, six,

11:27:30 10   from the user.

11:27:31 11   Q.     You mentioned that Amazon designed the NLU this way

11:27:36 12   because it needed to be stopped and didn't want all those

11:27:41 13   computers in the data center having to talk to each other to

11:27:44 14   process a single request.  Are there other reasons that

11:27:47 15   Amazon built the NLU to just use the words that come in?

11:27:51 16   A.     Yes.  It turns out that only a small number of the

11:27:58 17   requests are actually multi-turn.  95 percent of all of the

11:28:02 18   requests for Alexa are what we call single shots or single

11:28:08 19   turn, which means the user just says one thing, turn on the

11:28:12 20   lights, for example, and then we're done.  And that -- so we

11:28:18 21   optimize the system to be very efficient for those kind of

11:28:22 22   requests.

11:28:22 23   Q.     And Dr. Polish talked about speaker ID.  Does the

11:28:29 24   Alexa NLU use the speaker ID to determine the meaning of

11:28:32 25   words?

Strom - direct

11:28:34 1    A.       No, it does not.

11:28:36 2    Q.       And after Alexa processes the word six in our example

11:28:44 3    through those different neural networks, what does it do

11:28:48 4    next?

11:28:49 5    A.       After that our system is using other machine learning

11:28:56 6    algorithms, so I think I forgot to mention that -- that all

11:29:00 7    the different intents that are coming from the different

11:29:04 8    neural networks, they're compiled into what we call an NBest

11:29:09 9    list, so that's a list of all the intent, and each one of

11:29:13 10   the intents has a confidence score designed with it,

11:29:17 11   depending on how sure we are about that meaning.  And these

11:29:21 12   -- after all this now that we are -- we have the list, then

11:29:27 13   we have other machine learning methods that can boost or

11:29:33 14   lower the score of some intents, depending on other factors

11:29:41 15   like other features in the system.  This is called

11:29:43 16   re-ranking, so now we changed some of the scores and then we

11:29:49 17   re-rank the list so something else might end up on the top.

11:29:52 18   Q.       Let's look at slide 36 of the same presentation.

11:30:01 19            Does this show an example of this re-ranking

11:30:05 20   that you talked about?

11:30:07 21   A.       Yeah, this slide -- this slide here is one of the

11:30:12 22   things that can be used for the re-ranking.  So if you look

11:30:16 23   in the table here, it says the dialogue account was slot

11:30:22 24   solicitation, that just means that Alexa asked for

11:30:27 25   something.  And what did Alexa ask for?  Alexa asked for

11:30:30 1   time.  Alexa said, it said what time.  And so now the system

11:30:39 2   knows that, and it can boost things that have meanings that

11:30:46 3   are -- that work together with that.  Right?  So that

11:30:52 4   doesn't seem to apply to set volume intent.  And it doesn't

11:30:57 5   seem to apply to music or song names because it's about

11:31:02 6   time.  So the notification intents here, the meaning that

11:31:07 7   has to do with alarm gets a higher score and re-rank that

11:31:11 8   higher.

11:31:12 9   Q.      And does this re-ranking process change any of the

11:31:16 10  meanings that have already been determined?

11:31:18 11  A.      It does not.  So if you look at the text here, it's

11:31:22 12  the same thing, it's global dot set volume intent, volume

11:31:31 13  level intents and the meanings and the entities are still

11:31:34 14  exactly the same.

11:31:37 15  Q.      After the Alexa NLU finishes this process including

11:31:46 16  the re-ranking, what does Alexa do with that NBest list that

11:31:51 17  we get?

11:31:52 18  A.      So after that, we have to dispatch to some computer

11:31:57 19  programer that can actually do this.  So there is different

11:32:01 20  programs for different domains.  And they call that routing.

11:32:06 21  So you route to one of all these programs that can handle

11:32:11 22  the request by the user.

11:32:13 23  Q.      And do those applications that NBest list gets routed

11:32:20 24  to, do they determine the meaning of any of the words the

11:32:24 25  user spoke?

Strom - direct

11:32:25  1    A.      No, the applications or the computer programs that

11:32:29  2    are handling the request, they are only working on the

11:32:32  3    intent and entity, that's the meaning, they don't change the

11:32:38  4    meaning.

11:32:38  5    Q.      Mr. Patterson, can you see that slide with

11:32:42  6    Dr. Polish's example?

11:32:44  7            Dr. Polish talked about this example where he

11:32:51  8    asked two different questions.  Alexa, what color, and Alexa

11:32:58  9    what color is it.  Do you recall that, sir?

11:33:02 10    A.      I remember that.  That was an interesting example.

11:33:06 11    Q.      Can you explain what actually went on with this

11:33:10 12    example?

11:33:11 13    A.      So in Dr. Polish first utterance he asked for an

11:33:15 14    iPhone case.  All of the things we discussed happen, all the

11:33:21 15    NLU models are running, after all the processing, eventually

11:33:26 16    the system decided to call the shopping program.  And so

11:33:30 17    that handled that, and it seemed like it handled it quite

11:33:34 18    well.

11:33:35 19            For the second turn, then, Dr. Polish said what

11:33:40 20    color?  Same thing happened, all the neural networks are

11:33:46 21    running, they all produce different meanings, or intents.

11:33:51 22    There are no entities.  There will be one intent for each

11:33:56 23    one of the networks.  But this is sort of a general

11:34:01 24    question, what color.  So the system didn't understand what

11:34:06 25    he wanted, and it routed that question to what's called a

11:34:16  1    general knowledge domain.  And that's -- and that found

11:34:21  2    something on the web that doesn't make sense here.  It's

11:34:27  3    nonsensical in this context, right?

11:34:30  4              Next, Dr. Polish tried to say what color is it.

11:34:37  5    Same thing happened, all the neural networks are running,

11:34:42  6    all the processing is happening, all the intents are

11:34:45  7    rescored and re-ranked, and this time probably it sounds

11:34:51  8    like he's asking about some thing, we decide to route this

11:34:59  9    to the speech -- sorry, to the shopping program again.

11:35:03 10    Right?  And now the shopping program has it.  It has only

11:35:10 11    one thing that it has, knows that the user is talking about,

11:35:13 12    the user is talking about an iPhone case.  And so now it can

11:35:20 13    give the right answer.  But it's not actually using this is

11:35:25 14    it, because it doesn't matter.  If we had managed to route

11:35:31 15    the first one correctly, if when Dr. Polish said what color,

11:35:36 16    if we had routed that correctly to the shopping program, the

11:35:43 17    shopping program would do exactly the same thing, it would

11:35:47 18    give the right answer about the iPhone case.  It doesn't

11:35:50 19    matter if there is an entity there or not, so we were not

11:35:52 20    actually using that.

11:35:54 21    Q.      And is the fact that Alexa routed the what color

11:36:02 22    request to the wrong application, general knowledge versus

11:36:06 23    shopping, does that show in fact that when it when it

11:36:11 24    interpreted the color it doesn't know the user previously

11:36:15 25    asked for an iPhone case?

Strom - direct

11:36:20 1          MR. YOON:  Objection, leading, Your Honor.

11:36:22 2          THE COURT:  Do you want to rephrase it?

11:36:24 3          MR. HADDEN:  Sure.

11:36:24 4  BY MR. HADDEN:

11:36:25 5  Q.      The fact that what color went to the general purpose

11:36:30 6  application instead of shopping, what does that tell you

11:36:33 7  about how it was processed?

11:36:35 8  A.      Well, this is just one more example of demonstration

11:36:40 9  that these NLU models, a number of natural language

11:36:47 10  understanding neural networks, they only process the current

11:36:57 11  words, they don't know anything about the previous words.

11:37:03 12  Q.      Now, we heard some testimony from Dr. Polish and

11:37:06 13  Mr. Peck that Alexa uses rules.  Do you recall that?

11:37:12 14  A.      Yeah, I remember that, yep.

11:37:14 15  Q.      Does Alexa use rules?

11:37:16 16  A.      Yes, of course, Alexa using the rules.  So all

11:37:21 17  computer programs are rules, and our engineers have written

11:37:26 18  millions of lines of code for Alexa.  When we talk about

11:37:31 19  rules based versus machine learning and AI, what we mean is

11:37:38 20  a rules based system only has rules and that is the thing

11:37:41 21  that doesn't work well because all of this, that's the

11:37:45 22  difference.  We use rules for like a mentioned earlier,

11:37:48 23  right, we use rules for when someone says Alexa stop, that's

11:37:52 24  a good example of when you want to use a rule.

11:37:55 25  Q.      And why would a rules based approach not work for

Strom - direct

11:38:00 1    Alexa?  I think we might have a slide for this.

11:38:05 2    A.    Is there a slide?

11:38:07 3          But Alexa works no matter how you say it, at

11:38:12 4    least we want Alexa to work that way.  So we strive to make

11:38:17 5    Alexa understand you no matter how you phrase your question.

11:38:20 6    And there are a lot of ways you can phrase questions about

11:38:23 7    all the things that Alexa can do.  Here is an example of

11:38:28 8    just one intent in Alexa, it's about weather.  So you can

11:38:32 9    say what's the weather, you can say tell me the forecast, or

11:38:36 10   you can say will it rain, you can even say more unusual

11:38:41 11   things like do I need an umbrella, or even do I need

11:38:46 12   sunglasses tomorrow.  All of those things, if you had a rule

11:38:51 13   base, someone would have to come up with all of these

11:38:55 14   examples and someone would have to like construct rules that

11:38:59 15   can understand all the ways you can do this without

11:39:04 16   accidentally overlapping with some other intents, because

11:39:09 17   you didn't know the words, so this is why we using machine

11:39:13 18   learning instead of rules to make this possible.

11:39:16 19   Q.    And does -- is Alexa able to get the intent correct

11:39:25 20   even if it hasn't seen an example of a user saying something

11:39:31 21   in exactly that way?

11:39:34 22   A.    Yeah.  Remember that the neural networks, they learn

11:39:38 23   from examples.  Right?  So -- but the examples might not

11:39:42 24   cover all the possible ways.  There is lots and lots of

11:39:46 25   examples, but there can still be places where some customer

11:39:53 1    said something in a completely new way.  But the powerful

11:39:58 2    thing about machine returning in that is neural networks,

11:40:01 3    they can extrapolate some other new things based on similar

11:40:05 4    examples that they have heard.

11:40:06 5              MR. HADDEN:  Your Honor, if I could, I'm sorry,

11:40:08 6    I forgot to put the prototype on the witness stand during

11:40:25 7    the break.  May I hand it up?

11:40:27 8              THE COURT:  Yes.

11:40:29 9              THE WITNESS:  Here it is.  Thank you.

11:40:34 10   BY MR. HADDEN:

11:40:35 11   Q.     Now that you actually have it, could you explain what

11:40:39 12   that is to the jury, please, Dr. Strom?

11:40:42 13   A.     Sure.  Okay.  So this is the prototype I talked about

11:40:47 14   earlier.  We 3D printed it in black plastic here.  On top

11:40:54 15   here you can see five microphones.  This is an R & D

11:41:00 16   prototype in the Echo that we actually released has seven,

11:41:05 17   but this one at least works for that time.  You can also see

11:41:11 18   here the circuit board that we had for this one, it doesn't

11:41:15 19   actually fit inside of the device.  We had many of these

11:41:21 20   circuit boards that we iterated before we got it right, so

11:41:26 21   we didn't want to spend the time and money to miniaturize

11:41:30 22   the electronics to sit inside at that time.

11:41:33 23   Q.     Thank you, sir.

11:41:33 24          How long did it take to develop Alexa?

11:41:37 25   A.     It took about three years until we launched the first

Strom - direct

11:41:44 1    device, and it took millions of hours of engineers and

11:41:49 2    scientists.

11:41:50 3    Q.      Are you still working on it today to try to improve

11:41:53 4    it?

11:41:54 5    A.      Of course we keep improving it for our customers.

11:41:58 6    Q.      Have you been awarded any patents for your work on

11:42:03 7    Alexa?

11:42:05 8    A.      Yes, for my work on Alexa, I have been awarded about

11:42:09 9    40 patents myself personally, the team, though, has

11:42:14 10   something like 400 patents awarded.

11:42:18 11   Q.      Does Amazon and the scientists like yourself at

11:42:22 12   Amazon, do you share the discoveries you make in bringing

11:42:29 13   Alexa to the world?

11:42:29 14   A.      Yeah, we try to do that.  I think we have a slide on

11:42:33 15   that, right?  Anyway, we have a website where we show all

11:42:41 16   our publications, engineers and scientists at Amazon or

11:42:45 17   Alexa are publishing in AI and speech recognition and

11:42:51 18   natural language understanding and such fields.

11:42:57 19   Q.      Had you heard about VoiceBox before this lawsuit, Dr.

11:43:01 20   Strom?

11:43:01 21   A.      Yes, I have.

11:43:02 22   Q.      When did you first hear VoiceBox?

11:43:02 23   A.      The first time I heard of VoiceBox was after I joined

11:43:12 24   in the project and I learned that some of my colleagues had

11:43:16 25   had a meeting and that was in 2011.  Had a meeting with

Strom - direct

11:43:21 1   VoiceBox.

11:43:21 2   Q.      Did you go to that meeting in 2011?

11:43:24 3   A.      I did not.  No.

11:43:29 4   Q.      And why did other folks from Amazon meet with

11:43:33 5   VoiceBox in 2011?

11:43:35 6   A.      We knew then that the product that we were going to

11:43:40 7   build would require machine learning, and AI, and we were

11:43:45 8   looking for companies that had experience in natural

11:43:48 9   language understanding, or NLU, using machine learning.

11:43:59 10  Q.      What resulted from the meeting with VoiceBox in 2011?

11:44:03 11  A.      We didn't partner with VoiceBox in 2011.  My

11:44:07 12  understanding is that at the time we determined that

11:44:11 13  VoiceBox did not have experience in natural -- in machine

11:44:18 14  learning for natural language understanding.

11:44:20 15  Q.      So did Amazon develop its own machine learning based

11:44:26 16  NLU?

11:44:26 17  A.      Yes.  We met with some other companies, too, but no

11:44:32 18  one had what we needed, so we decided to build the NLU

11:44:37 19  ourselves.

11:44:38 20  Q.      And have you personally met with VoiceBox before this

11:44:41 21  lawsuit?

11:44:42 22  A.      Later in 2017, I met with VoiceBox.

11:44:48 23  Q.      Was that after the Echo and Alexa had already been

11:44:51 24  launched?

11:44:51 25  A.      Yeah, at that point, Echo, the first version launched

11:44:58 1   in 2014, so it was several years earlier.  And at the time

11:45:04 2   in 2017 we were about to launch the second generation of the

11:45:09 3   Echo.

11:45:09 4   Q.      What was the purpose of the meeting in 2017?

11:45:13 5   A.      My understanding was that VoiceBox were looking to

11:45:17 6   sell the company, in particular the automotive business.

11:45:22 7   Q.      And did Amazon purchase the automotive business?

11:45:27 8   A.      No, Amazon passed on that at that time.

11:45:30 9   Q.      Now, before I let you go, we talked about the

11:45:34 10  decision you made back in 2011 when you left your job at

11:45:39 11  Microsoft and joined Amazon for this undisclosed secret

11:45:45 12  project.  Looking back, did you make the right decision?

11:45:47 13  A.      Yes, of course, it was a scary decision, but you

11:45:53 14  know, for someone who has spent all my career on speech

11:46:00 15  recognition and these speech systems, it's been an amazing

11:46:06 16  ride to be part of Amazon and Alexa.  We have millions of

11:46:11 17  users now, using our systems.  Actually enjoying using it

11:46:18 18  and getting utility from it.  So it's just an amazing

11:46:23 19  feeling for me, and there is no doubt in my mind at all that

11:46:27 20  I made the right decision.

11:46:29 21            MR. HADDEN:  Thank you, Dr. Strom.

11:46:31 22            THE COURT:  Thank you.  Cross-exam.

11:46:35 23                    CROSS-EXAMINATION

11:46:36 24  BY MR. YOON:

11:46:36 25  Q.      Good morning, Dr. Strom.

Strom - cross

11:46:41  1   A.       Good morning.

11:46:42  2   Q.       Can you hear me okay?

11:46:43  3   A.       Yes.

11:46:44  4   Q.       Thank you.

11:46:44  5            Now, just to kind of recap, you joined Amazon in

11:46:50  6   September 2011; correct?

11:46:52  7   A.       That's correct.

11:46:53  8   Q.       And when you joined Amazon, you began work on the

11:46:58  9   secret project, I think the name was Doppler?

11:47:01 10   A.       That is correct, yes.

11:47:05 11   Q.       And Doppler was the Amazon internal code name for

11:47:08 12   what ultimately became Alexa and Echo, is that fair to say?

11:47:12 13   A.       Yes, that's fair.

11:47:15 14   Q.       Now, let's talk a little bit about the VoiceBox

11:47:20 15   meeting with Amazon.  October 2011 was approximately one

11:47:24 16   month after you joined Amazon; correct?

11:47:28 17   A.       That sounds right, yes.

11:47:29 18   Q.       And I think you indicated when you were talking with

11:47:33 19   counsel, you did not yourself attend the meetings at the

11:47:40 20   beginning of October of 2011, and you were not -- is that

11:47:44 21   correct?

11:47:44 22   A.       Yeah, that's correct.

11:47:45 23   Q.       And at the time the meetings were occurring, you were

11:47:48 24   not aware of the meetings?

11:47:51 25   A.       Yeah, it was a long time ago, but my recollection is

Strom - cross

11:47:54 1  yes, I learned about them after.

11:47:57 2  Q.      Now, if we could have PTX Exhibit 33 on the screen.

11:48:12 3  Actually, take that down for one second.

11:48:15 4          Dr. Strom, you indicated that you learned about

11:48:18 5  the meetings later; is that fair to say?

11:48:20 6  A.      Yes.

11:48:21 7  Q.      And if you would look at in your binder, the

11:48:25 8  cross-examination binder, there is exhibit PTX 33.

11:48:52 9  A.      33.  That's an e-mail, right?

11:48:59 10 Q.      Yes.  You see that that e-mail is dated Halloween

11:49:04 11 2011, do you see that?

11:49:07 12 A.      October 27th, 2011.

11:49:09 13 Q.      Oh, look at the top e-mail, sir, October 31st, 2011.

11:49:18 14 A.      October 31st, yep.

11:49:22 15 Q.      And you're one of the recipients on this October 31st

11:49:26 16 e-mail, correct?

11:49:27 17 A.      That's right.

11:49:28 18 Q.      And the subject of the e-mail is VoiceBox updated

11:49:33 19 next step?

11:49:37 20 A.      Yeah.

11:49:40 21          MR. YOON:  And we would like to now move into

11:49:42 22 evidence exhibit PTX 33.

11:49:42 23          MR. HADDEN:  No objection.

11:49:44 24          THE COURT:  Thank you.  It is admitted.

11:49:46 25          (PTX Exhibit No. 33 was admitted into evidence.)

11:49:46 1          MR. YOON:  If we could have that on the screen.

11:49:48 2  BY MR. YOON:

11:49:48 3  Q.      You mentioned the October 27th e-mail.  If we could

11:49:52 4  just look at the header of the October 27th e-mail.

11:49:56 5  Actually -- yes, if we look at the header of the

11:49:59 6  October 27th e-mail that you were forwarded.  Do you see

11:50:04 7  that this e-mail, and I apologize, Dr. Strom, if I

11:50:09 8  mispronounce the name, Marcello Typrin, do you see that?

11:50:14 9  A.      Yes, I see that.

11:50:16 10 Q.      Do you also see this e-mail is cc Nick Komorous?

11:50:21 11 A.      Yes.

11:50:24 12 Q.      It says "we met with VoiceBox yesterday to understand

11:50:27 13 their NLU."  Do you see that?

11:50:30 14 A.      Yes.

11:50:31 15 Q.      And when you joined Amazon in the secret Doppler

11:50:36 16 project, your focus was on the ASR portion, is that fair to

11:50:40 17 say?

11:50:40 18 A.      That's fair, that was my focus.

11:50:42 19 Q.      So in the October 2011 time frame, you were not

11:50:46 20 working on the NLU technology relating to Alexa; correct?

11:50:51 21 A.      That's correct.

11:50:52 22 Q.      Now, if could go to the fourth and fifth paragraph of

11:50:56 23 Exhibit 33.  The ones that begin "VoiceBox has a v1 NLU

11:51:07 24 platform."  You understand that Mr. Typrin was one of the

11:51:11 25 engineers that met with VoiceBox?

Strom - cross

11:51:17 1    A.        From an e-mail, yes.

11:51:20 2    Q.        And what Mr. Typrin informed the management team at

11:51:24 3    Amazon and then this e-mail was forwarded to you is that

11:51:29 4    VoiceBox has v1 NLU platform available today, and will be

11:51:36 5    releasing a version two in the summer 2012.  Do you see

11:51:45 6    that?

11:51:49 7    A.        Yes.

11:51:49 8    Q.        And Amazon did not have an NLU platform available and

11:51:53 9    working as of October 2011; correct?

11:52:00 10   A.        At that time we were looking for companies that could

11:52:06 11   help us with our info, yes.

11:52:10 12   Q.        In October of 2011, Amazon was looking for companies

11:52:14 13   to help them and in particular NLU companies, natural

11:52:18 14   language understanding?

11:52:19 15   A.        Yes.

11:52:19 16   Q.        And it says "standing up Voicebox's v1 NLU platform

11:52:24 17   in the near term would allow you to get a functional NLU

11:52:30 18   back-end running soon."  Do you see that?

11:52:34 19   A.        I see that.

11:52:36 20   Q.        One of the things that at least the engineer from

11:52:38 21   Amazon was considering is getting an Alexa system up that

11:52:42 22   would use the VoiceBox v1 NLU platform, correct?

11:52:46 23   A.        Yeah, that's what it says, yep.

11:52:48 24   Q.        And the benefit of that would be that it would help

11:52:52 25   Amazon, number two, understand the overall Doppler user

Strom - cross

11:52:58 1    experience sooner rather than later.  It could also be a

11:53:02 2    faster path to deploy for launch in September 2012."  Do you

11:53:08 3    see that?

11:53:08 4    A.      I see that.

11:53:09 5    Q.      And September 2012 is about 11 months after

11:53:13 6    October 2011?

11:53:15 7    A.      Yep, that's correct.

11:53:18 8    Q.      And Amazon did not launch Alexa in September 2012;

11:53:24 9    correct?

11:53:25 10   A.      They launched in 2014.

11:53:27 11   Q.      In November 2014; correct?

11:53:30 12   A.      Yes, I think that's right.

11:53:31 13   Q.      And so roughly three years after the meeting with

11:53:35 14   VoiceBox?

11:53:40 15   A.      Yes, that's correct.

11:53:43 16   Q.      And you mentioned the issue of collecting the data,

11:53:47 17   we talked about the millions of hours.  One of the benefits

11:53:50 18   of having an NLU at launch would be it would allow you to

11:53:56 19   collect data sooner, correct?

11:53:58 20   A.      That would be one have the potential benefits, yes.

11:54:02 21   Q.      And Echo needed an NLU at launch, is that fair to

11:54:06 22   say?

11:54:06 23   A.      Yeah, it needed a machine learning based on NLU at

11:54:10 24   launch.

11:54:12 25   Q.      Let's talk about the 2017 meeting at VoiceBox, Dr.

Strom - cross

11:54:21 1  Strom.  You did meet with VoiceBox in 2017, correct?

11:54:26 2  A.    I did, yes.

11:54:27 3  Q.    You were there when VoiceBox presented demos and a

11:54:32 4  road map to Amazon, is that fair to say?

11:54:34 5  A.    That's what I remember, yes.

11:54:38 6  Q.    Let's talk -- in 2017, were you also a vice-president

11:54:43 7  at Amazon?

11:54:44 8  A.    I was not.

11:54:44 9  Q.    What was your title in let's say January through

11:54:48 10 March of 2017?

11:54:52 11 A.    I don't remember exactly when my promotions happened,

11:54:56 12 to be honest, but I was probably a principal applied

11:55:01 13 scientists, but don't take my word for it.

11:55:05 14 Q.    Understood, sir, and I'm not disputing your

11:55:08 15 qualifications at all.

11:55:09 16       Let's talk about in this early part of 2017.  At

11:55:15 17 that time when you met with VoiceBox, you were not aware

11:55:17 18 that VoiceBox had patents; correct?

11:55:22 19 A.    I mean, I didn't know for sure, but all technology

11:55:27 20 companies tend to have patents, so I would have assumed

11:55:30 21 that.

11:55:30 22 Q.    But it's fair to say that you did not review any

11:55:33 23 VoiceBox patent in the 2017 time frame, correct?

11:55:36 24 A.    That's correct.

11:55:40 25 Q.    If we could now on -- if you would take a look at

Strom - cross

| 11:55:44 | 1 | your binder and look at PTX 38, please.  And Dr. Strom, do |
| 11:56:03 | 2 | you see that this is an e-mail from Douglas Booms dated |
| 11:56:10 | 3 | January 25th, 2017, to a number of individuals at Amazon, |
| 11:56:16 | 4 | including yourself? |
| 11:56:17 | 5 | A.     I see that, yes. |
| 11:56:20 | 6 |          MR. YOON:  We would now like to move into |
| 11:56:22 | 7 | evidence exhibit PTX 38. |
| 11:56:23 | 8 |          MR. HADDEN:  No objection. |
| 11:56:24 | 9 |          THE COURT:  Thank you.  It is admitted. |
| 11:56:25 | 10 |          (PTX Exhibit No. 38 was admitted into evidence.) |
| 11:56:25 | 11 | BY MR. YOON: |
| 11:56:26 | 12 | Q.     And looking at this one, do you see that the subject |
| 11:56:32 | 13 | is confirmed for VoiceBox meeting? |
| 11:56:34 | 14 | A.     Yes, I see that. |
| 11:56:36 | 15 | Q.     And it indicated that there would be a meeting that |
| 11:56:38 | 16 | would start on February 2nd at 9:00 a.m. and go to 1:00 |
| 11:56:45 | 17 | p.m.? |
| 11:56:45 | 18 | A.     Yes. |
| 11:56:46 | 19 | Q.     And if you could go to the bottom part of that |
| 11:56:42 | 20 | e-mail, which has the agenda.  And do you see that this |
| 11:56:52 | 21 | provides the agenda for that February 2002 meeting? |
| 11:57:02 | 22 | A.     I see that, yes. |
| 11:57:02 | 23 | Q.     And you were listed as one of the recipients at this |
| 11:57:12 | 24 | meeting, correct, participants at this meeting? |
| 11:57:12 | 25 | A.     Yep.  Yep. |

582

Strom - cross

11:57:14  1    Q.      And the technology overview included parser, NLU

11:57:21  2    tuning, DNN development, system, feature, and architecture

11:57:27  3    overview.   Correct?

11:57:29  4    A.      I see that, yes.

11:57:31  5    Q.      And you understood that in the January 2017 time

11:57:35  6    frame, VoiceBox had an AI based parser, correct?

11:57:43  7    A.      I didn't remember that, but that's possible, we were

11:57:49  8    looking at this for automotive business and I don't know if

11:57:52  9    that was used for that, but it is possible.

11:57:57 10    Q.      And the agenda also indicates a product deep dive on

11:58:02 11    NLU?

11:58:04 12    A.      Yep, yeah, I see that.

11:58:07 13    Q.      Now, Mr. Booms is an executive at Amazon; correct?

11:58:15 14    A.      That's correct.

11:58:16 15    Q.      And he's a high ranking executive in the business

11:58:21 16    development department?

11:58:22 17    A.      I don't actually know his title, to be honest.

11:58:26 18    Q.      Well, sir, did Mr. Booms or any of the senior

11:58:30 19    leadership team at Amazon tell you about the VoiceBox

11:58:37 20    patents?

11:58:39 21    A.      No, they would not have done that.

11:58:42 22    Q.      Did Mr. Booms or any of the senior leadership at

11:58:47 23    Amazon's team tell you that VoiceBox had identified its

11:58:50 24    patents to Amazon as part of the due diligence?

11:58:55 25    A.      I don't remember they told me that, no.

Strom - cross

11:58:58  1    Q.      Did any one of Amazon's senior executive team tell

11:59:02  2    you what they learned about Voicebox's patents?

11:59:06  3    A.      About the patents?

11:59:07  4    Q.      Yes.

11:59:08  5    A.      No.

11:59:08  6    Q.      And doctor, you have kind of provided us your

11:59:15  7    distinguished background, your Ph.D.  Is it fair to say,

11:59:19  8    though, that you personally are not curious about patents

11:59:22  9    because you get most of your information from academic

11:59:26 10    papers?

11:59:26 11    A.      That's right, I don't read patents.  I find it easier

11:59:31 12    to find information on the web.

11:59:34 13    Q.      We can take that down.  Let's talk a little bit about

11:59:37 14    your experience at MIT Galaxy for a moment.

11:59:40 15            When you were there, you were working on the ASR

11:59:43 16    portion of MIT Galaxy, is that fair to say?

11:59:46 17    A.      Yes, I was working with Jim Glass on ASR.

11:59:50 18    Q.      And while you were there, MIT Galaxy did not have the

11:59:56 19    capability that would permit a user to complete a purchase

11:59:59 20    transaction on MIT Galaxy, is that fair to say?

12:00:04 21    A.      It could not do commerce at that time, yes, sir.

12:00:11 22    Q.      Now, let's talk about exhibit PTX-226 on the screen.

12:00:17 23    And this is a document that was discussed in your direct

12:00:21 24    examination, sir?

12:00:24 25    A.      Yes, I recognize this document.

Strom - cross

12:00:25 1    Q.      And also it's been discussed by multiple witnesses in

12:00:28 2    this case.  And do you remember, who is Kelly Vanee?

12:00:32 3    A.      Kelly Vanee was, when I worked with him, he was on

12:00:37 4    the NLU team, he was an expert.

12:00:38 5    Q.      So he was an expert in -- an NLU expert within

12:00:43 6    Amazon, correct?

12:00:44 7    A.      Amazon Alexa, yeah.

12:00:46 8    Q.      Now, if we could now go to page 2, slide two.  During

12:00:54 9    your testimony, you had talked about the far field

12:00:59 10   microphone.  Do you recall that?

12:01:01 11   A.      I remember that, yes.

12:01:02 12   Q.      And the far field microphone would be what's in the

12:01:06 13   actual Alexa device itself; correct?

12:01:10 14   A.      That's correct, I don't think it's in the right most

12:01:15 15   one there, but it's in the two left devices.

12:01:18 16   Q.      Yes, I apologize, so these two devices would have the

12:01:22 17   far field microphone, correct?

12:01:24 18   A.      That's correct.

12:01:25 19   Q.      And this would be the audio signal that Alexa would

12:01:29 20   send that these Echo devices would send to the Alexa

12:01:32 21   platform; is that correct?

12:01:32 22   A.      Yes, it's symbolizes that.

12:01:33 23   Q.      Now, you agree that the Alexa has both an ASR and an

12:01:42 24   NLU; correct?

12:01:47 25   A.      Those are two machine learning systems, so that's my

Strom - cross

12:01:53 1  understanding.

12:01:53 2  Q.      So the Alexa system would have an ASR machine

12:01:58 3  learning system and an NLU machine learning system; correct?

12:02:02 4  A.      That is correct.

12:02:03 5  Q.      And the ASR system would receive the audio that came

12:02:08 6  from the far field microphone, correct?

12:02:14 7  A.      That's correct, yes.

12:02:17 8  Q.      The far field microphone would not be providing its

12:02:21 9  signal to the NLU, correct?

12:02:23 10  A.      No, it does not.

12:02:25 11  Q.      The NLU would receive the -- a text, a list of NBest

12:02:32 12  text words from the ASR, is that fair to say?

12:02:36 13  A.      Yeah, that's fair to say.

12:02:38 14  Q.      And so the ASR would identify and determine the

12:02:41 15  words; is that correct?

12:02:48 16  A.      Yeah, determine -- yeah, it's kind of high level, but

12:02:54 17  it -- it finds the most likely words, there are errors in

12:03:00 18  ASR, but yeah.

12:03:01 19  Q.      I understood that, I think we saw that color example,

12:03:04 20  maybe.  But the ASR would identify the most likely words, is

12:03:06 21  that fair to say?

12:03:06 22  A.      That's right.

12:03:06 23  Q.      And they would provide a text of those most likely

12:03:12 24  words to the NLU?

12:03:12 25  A.      That is correct, yes.

586

Strom - cross

12:03:17 1    Q.      And the NLU as we have been discussing would

12:03:22 2    determine a meaning?

12:03:23 3    A.      Right.

12:03:24 4    Q.      If we could go to page 3.  The NLU of Alexa has two

12:03:31 5    stages, a recognition stage and a resolution stage; correct?

12:03:38 6    A.      That's correct, yep.

12:03:41 7    Q.      And in the recognition stage, that stage determines

12:03:46 8    intent classification.  Is that correct?

12:03:52 9    A.      Intent classification and the entity is recognized,

12:03:58 10   so the words are recognized that are going to be part of an

12:04:03 11   entity.

12:04:03 12   Q.      If we could advance to page 5.  And I think you used

12:04:08 13   this example that the NLU, whether any of the text words

12:04:14 14   were any of these would determine the intent would be to get

12:04:20 15   weather; is that correct?

12:04:21 16   A.      That's what we talked about, yes.

12:04:32 17   Q.      Now, if we could go to page 10.

12:04:39 18           So this would be what happens in the recognition

12:04:43 19   stage, or Stage 1 of the NLU, correct?

12:04:51 20   A.      That's a description of that, yep.

12:04:55 21   Q.      If we go to page 11.  Now, page 11, so this is again

12:05:00 22   still we're talking about the recognition stage.  Do you see

12:05:03 23   that?

12:05:05 24   A.      Yes.

12:05:06 25   Q.      And this is the NLU core pipeline.

Strom - cross

12:05:12  1    A.       Yes.  Yes.

12:05:13  2    Q.       And would that input request represent the words that

12:05:18  3    came from the ASR?

12:05:22  4    A.       That's correct, yep.

12:05:23  5    Q.       And so the words that came from the ASR would be

12:05:26  6    provided to all three of these pipelines; correct?

12:05:33  7    A.       That's right, yep.

12:05:35  8    Q.       And you mentioned that and acknowledged that the

12:05:41  9    Alexa NLU uses rules, you see the thing here exact match

12:05:46 10    rules?

12:05:46 11    A.       Yes, I see that.

12:05:47 12    Q.       And it would be fair to say that there are hundreds

12:05:50 13    of words and phrases that the exact match rules?

12:05:57 14    A.       They're probably in the hundreds.

12:05:59 15    Q.       So for hundreds of phrases Alexa would determine

12:06:04 16    intent using rules, correct?

12:06:05 17    A.       That's right, yes.

12:06:06 18    Q.       Now, in your discussion with counsel, you have been

12:06:10 19    talking about DNN models.  Do you recall that?

12:06:12 20    A.       Yes, I recall that.

12:06:14 21    Q.       And we talked about the machine learning, you had the

12:06:17 22    brain and you had the six different DNN models, shopping,

12:06:22 23    music, do you recall that?

12:06:24 24    A.       I remember, but six was just the example.

12:06:27 25    Q.       I think that at least in the trial people talk about

Strom - cross

12:06:30 1    37.    I'm not trying to limit it to six?

12:06:33 2    A.       Great.

12:06:34 3    Q.       But all of these DNN models, they would be right

12:06:38 4    here, correct, in the bottom left rectangle box here?

12:06:41 5    A.       That is correct, that's where they would be.

12:06:43 6    Q.       Now if we could go to page 32.  And we've all

12:06:50 7    discussed this multi-turn example; correct?

12:06:53 8    A.       Yep.

12:06:53 9    Q.       And this is an example shown in Mr. Vanee's report

12:07:02 10   that might be shown to engineers at Amazon, correct?

12:07:05 11   A.       That's correct.

12:07:06 12   Q.       And you agree that Alexa can do the action shown on

12:07:10 13   this slide, correct?

12:07:11 14   A.       It can, yes.

12:07:14 15   Q.       If we go to slide 35.  We talked about the first

12:07:18 16   step, but in the second step -- actually if you go back one

12:07:22 17   Step 34.  Go back one more.

12:07:25 18            During your testimony, this particular slide 33

12:07:29 19   was discussed here.  And it says the NLU models are not

12:07:33 20   currently aware of the dialogue context.  Do you recall

12:07:33 21   that?

12:07:33 22   A.       Of course, yes.

12:07:33 23   Q.       And that was the model box in the lower left of the

12:07:41 24   pipeline, correct?

12:07:41 25   A.       That's correct.

Strom - cross

12:07:47 1    Q.      Go to the next page.  The NLU itself uses a two-stage

12:07:53 2    approach, Step 1, recognize and generate just intent, no

12:07:57 3    intent, or slots for the current turn utterance; correct?

12:08:00 4    A.      Yes.

12:08:01 5    Q.      And so you do agree that the word six could have

12:08:05 6    multiple different meanings; correct?

12:08:08 7    A.      That's what the slide is showing, right.

12:08:11 8    Q.      And the slide shows that the word six could be the

12:08:16 9    name of a song or it could be going with an alarm, correct?

12:08:20 10   A.      Yep.

12:08:22 11   Q.      Now, if we go to the second step, you go to the next

12:08:27 12   page, now, in the second step, in the NLU for Alexa there is

12:08:33 13   a context interpreter to merge the yes intent, no intent,

12:08:39 14   multi-turn intent slots with previous turn intent and slots;

12:08:44 15   correct?

12:08:49 16   A.      Yes, that's correct.

12:08:50 17   Q.      During the operation of the NLU, at least during the

12:08:53 18   multi turn circumstance, the NLU remembers the previous turn

12:08:59 19   and intent and slots, correct?

12:09:00 20   A.      The previous turn and intents and slots can be

12:09:02 21   remembered, yes, that's correct.

12:09:07 22   Q.      If we can go to slide 38.  In this example here,

12:09:11 23   we've gone through it and it knows from the previous intent

12:09:14 24   that the intent was to set the alarm, that's indicating by

12:09:18 25   the set notification; correct?

Strom - cross

12:09:22 1    A.        That's correct.

12:09:23 2    Q.        And it also knows previously that the number six was

12:09:27 3    given; correct?

12:09:30 4    A.        Yes, this is slot filling, so the slot has been

12:09:38 5    filled, yep.

12:09:39 6    Q.        And then whether the person in response to Alexa says

12:09:43 7    morning, it then knows that the alarm will be set for

12:09:48 8    6:00 a.m. in the morning, correct?

12:09:56 9    A.        Sorry, I don't have the full context for this now.

12:09:59 10   Q.        No problem.  If we could go back to slide 32 for a

12:10:03 11   moment.  You recall there was Alexa, set an alarm.  Do you

12:10:09 12   see that?

12:10:09 13   A.        Yes, I see the morning now at the end of the

12:10:15 14   dialogue.

12:10:15 15   Q.        So in the example here it says Alexa set an alarm,

12:10:19 16   the first turn and Alexa determines that could be associated

12:10:24 17   with the intent set an alarm, correct?

12:10:33 18   A.        After that utterance is processed, it will actually

12:10:38 19   be handled by the notifications application, which is

12:10:42 20   handling alarms.  It is determined then.

12:10:42 21   Q.        And also that alarm notification, the handling of it,

12:10:51 22   it would have gotten the highest score as the most likely

12:10:55 23   intent?

12:10:55 24   A.        After all the processing steps that we talked about

12:10:58 25   and the reordering, correct.

Strom - cross

12:11:00 1  Q.      And then in the next step here it knows the intent

12:11:04 2  was to set an alarm when you say the number six, correct?

12:11:07 3  A.      In this case, Alexa actually asked for what time and

12:11:12 4  that is what matters, so the fact that Alexa asked for

12:11:16 5  something and they asked what time, that is what helps

12:11:21 6  understand what six means.

12:11:22 7  Q.      And when it does six as we saw there, it knows that

12:11:28 8  the previous turn had indicated an intent of set the alarm;

12:11:35 9  correct?

12:11:35 10  A.      It knows that it has that meaning, yes.

12:11:39 11  Q.      And then when Alexa asked six in the morning or

12:11:44 12  evening and the user says morning, it knows that the

12:11:47 13  previous intent was set the alarm, it knows that the user

12:11:52 14  has told it the number six and then it determines that it is

12:11:57 15  an alarm for 6:00 a.m.; correct?

12:12:08 16  A.      It's in the slots that have been filled, so the

12:12:10 17  6:00 a.m. has been filled and the slots in the algorithm.

12:12:15 18  Q.      Once all the slots are filled, Alexa will create the

12:12:18 19  action of informing the user by speaking alarm set for

12:12:22 20  6:00 a.m. tomorrow; correct?

12:12:26 21  A.      Yeah, that's the application of handling the request.

12:12:31 22  Q.      And if we could go to page 21.  Page 22, actually.

12:12:41 23  And the context interpreter can re-rank, correct, sir?

12:12:50 24  A.      Sorry, say that again.

12:12:52 25  Q.      Yeah, this is a slide entitled re-ranking, do you see

12:12:56  1    that?

12:12:56  2    A.      I see that.

12:12:57  3    Q.      This is done by the context interpreter?

12:13:07  4    A.      I don't actually know.  It doesn't say on this slide.

12:13:12  5    It could be.

12:13:12  6    Q.      You see that the system features indicate ASR, ER,

12:13:18  7    and context can be an input that causes a re-ranking,

12:13:24  8    correct; sir?

12:13:25  9    A.      That's right, yes.

12:13:27 10            MR. YOON:  Thank you.

12:13:29 11            THE COURT:  Redirect.

12:13:31 12            MR. HADDEN:  Thank you.

12:13:32 13                      REDIRECT EXAMINATION

12:13:33 14    BY MR. HADDEN:

12:13:34 15    Q.      Pull up that page 22 of that -- page 22 that he was

12:13:43 16    just being asked about.  Hello again, Dr. Strom.  Now this

12:13:54 17    re-ranking process, isn't that the same process we talked

12:13:58 18    about when we were looking at the example six, when it was

12:14:04 19    getting its score boosted?

12:14:06 20    A.      It's Amazon Echo, the same process.

12:14:07 21    Q.      In that re-ranking process, does the Alexa NLU

12:14:12 22    determine any meanings for words?

12:14:14 23    A.      It does not.  It changes the scores.

12:14:18 24    Q.      And in that example, if we look at page 32, please,

12:14:25 25    Mr. Patterson.  Now we talked about whether the user says

Strom - redirect

12:14:32 1    six, you recall that?

12:14:33 2    A.      I remember, yep.

12:14:34 3    Q.      And just to refresh the jury's understanding, when

12:14:42 4    the user says six, does the Alexa NLU use any information

12:14:47 5    that the user previously said Alexa set an alarm to

12:14:51 6    understand what six means?

12:14:53 7    A.      It does not, no.

12:14:54 8    Q.      And if we had instead of talking about six talked

12:14:58 9    about the word morning that you were just asked about, the

12:15:03 10   user says morning, how would Alexa's NLU process work?

12:15:11 11   A.      The same way we talked about earlier, the first thing

12:15:14 12   that would happen is that NLU models would receive the word

12:15:19 13   morning and then each one of the many domain models return a

12:15:26 14   meeting meaning and we would get a list, a score list of all

12:15:29 15   the different meanings from the models.  There would then be

12:15:35 16   a re-ranking based on other features, and that would

12:15:40 17   eventually give us the meaning that is the most likely out

12:15:44 18   of all the domains.  And that meaning would be passed into

12:15:50 19   the notification domain, which handles alarms.

12:15:52 20   Q.      Anywhere in that process would the Alexa NLU use any

12:15:58 21   of the prior utterances that we've seen on this page?

12:16:02 22   A.      It would not use the utterances of the prior user

12:16:07 23   requests.

12:16:08 24   Q.      And counsel asked you about whether Alexa remembers

12:16:15 25   what you said, or something like that.  Now, you're not here

12:16:22 1  saying that applications don't know what you have said or

12:16:27 2  told it before, correct?

12:16:29 3  A.     That's correct.  Applications can have memory of the

12:16:34 4  history of the user interaction.

12:16:36 5  Q.     Like in Dr. Polish's example about the iPhone case,

12:16:41 6  where did Alexa remember Dr. Polish had asked about an

12:16:47 7  iPhone case?

12:16:47 8  A.     The shopping application remembers that they were

12:16:52 9  talking about an iPhone case is why next time we get to the

12:16:56 10 shopping application, it knows that that's the thing that it

12:17:00 11 needs to answer questions about.

12:17:02 12 Q.     And is that the same for the alarm application?

12:17:06 13 A.     They all work the same way, yep.

12:17:08 14 Q.     So does either the shopping application -- we'll

12:17:12 15 start with that.  Does the shopping application determine

12:17:15 16 the meanings of the words he said?

12:17:17 17 A.     No, they don't.  The meaning is determined by the NLU

12:17:21 18 system, and the models or and in some cases, rules.

12:17:25 19 Q.     And does the alarm application determine the meanings

12:17:29 20 of any of the words that we see on this example 32?

12:17:33 21 A.     No, it doesn't determine the meaning.

12:17:36 22 Q.     Now, you were asked a bit about the meeting that you

12:17:40 23 had with VoiceBox in 2017.  Do you recall that?

12:17:52 24 A.     I remember, yep.

12:17:54 25 Q.     And had the Amazon and Alexa team already developed

12:18:01  1    Alexa's NLU before that meeting?

12:18:04  2    A.      Yes, we launched in 2014 with an NLU based on machine

12:18:10  3    learning and we have been integrating on that, improving it

12:18:14  4    for several years by then.

12:18:16  5    Q.      And at that 2017 meeting, did anybody from VoiceBox

12:18:20  6    say that Amazon was using its technology?

12:18:25  7    A.      To me, no, not that I know of.  I mean, no, not to

12:18:30  8    me.

12:18:30  9    Q.      And as you know, did anybody from VoiceBox at that

12:18:34 10    meeting say that Amazon was using its patents?

12:18:37 11    A.      No.

12:18:39 12    Q.      Let me ask you to look, if you could, back at the

12:18:45 13    document that VB Assets's counsel asked you about first,

12:18:50 14    which is PTX 003.  Do you see that?  Can you show that,

12:18:57 15    Mr. Patterson?

12:18:58 16    A.      003, right?  The e-mail?

12:19:05 17    Q.      All right.  Are you there?

12:19:06 18    A.      Marcello e-mail?

12:19:09 19    Q.      Yes.  Can we blow up the first two paragraphs of the

12:19:12 20    e-mail from Mr. Typrin.  This should be PTX 33.  If we just

12:19:25 21    blow up the first two paragraphs.  This is the e-mail that

12:19:30 22    Mr. Typrin sent the day after that meeting with VoiceBox in

12:19:41 23    2011.  Do you see that?

12:19:42 24    A.      I see it, yep.

12:19:42 25    Q.      And he says, "we met with VoiceBox yesterday to

Strom - redirect

12:19:47 1    understand their NLU capabilities."  Do you see that?

12:19:50 2    A.      Yes.

12:19:51 3    Q.      And then in the next paragraph, he says "the bottom

12:19:54 4    line is that their NLU is based on manual tuning, not on

12:19:59 5    machine learning."  Do you see that?

12:20:02 6    A.      Yes, this is what I remember from the discussion

12:20:07 7    after.

12:20:07 8    Q.      And what was your understanding when Mr. Typrin said

12:20:13 9    the bottom line is that their NLU is based on manual tuning

12:20:17 10   and not machine learning?

12:20:20 11   A.      I think by manual tuning he means those rules that

12:20:25 12   they have been talking about a lot here, and he's pointing

12:20:29 13   out that it's not machine learning which is what we were

12:20:33 14   looking for.

12:20:34 15   Q.      And you were asked about this paragraph, let's go

12:20:38 16   down to the fifth paragraph about standing up Voicebox's --

12:20:42 17   yes.  Right there, Mr. Patterson.

12:20:45 18         Now, did Amazon ever use any data from VoiceBox

12:20:54 19   to train its machine learning models?

12:20:57 20   A.      No.

12:20:57 21   Q.      Did Amazon ever stand up Voicebox's NLU platform?

12:21:02 22   A.      Not that I remember, no.

12:21:07 23   Q.      Did Amazon ever use anything from VoiceBox?

12:21:12 24   A.      I can't think of anything.

12:21:15 25   Q.      I'm sorry?

```
12:21:16  1    A.       I cannot think of anything.  I don't know of anything
12:21:20  2    that was used from VoiceBox.
12:21:22  3                    MR. HADDEN:  Thank you.  No further questions,
12:21:24  4    Dr. Strom.
12:21:25  5                    THE COURT:  Thank you.  Thank you, sir.  You are
12:21:27  6    excused.
12:21:28  7                    THE WITNESS:  Thank you.
12:21:29  8                    THE COURT:  What's next?
12:21:32  9                    MS. SHAMILOV:  We will recall Ryan Thomas to the
12:21:36  10   stand.
12:21:37  11                   THE COURT:  How long do you think that will be?
12:21:39  12                   MS. SHAMILOV:  His direct will be at least
12:21:41  13   thirty minutes.
12:21:42  14                   THE COURT:  Let's take our lunch break before we
12:21:44  15   start that.  Let's come back around 1 o'clock or a little
12:21:47  16   after one.
12:21:48  17                   COURTROOM DEPUTY:  All rise.
12:21:52  18                   (Jury exiting the courtroom at 12:21 p.m.)
12:22:09  19                   THE COURT:  All right.
12:22:12  20                   (A brief recess was taken.)
13:09:59  21                   COURTROOM DEPUTY:  All rise.
13:10:02  22                   (Jury entering the courtroom at 1:10 p.m.)
13:10:22  23                   THE COURT:  All right.  Welcome back, everyone.
13:10:24  24   Please be seated.
13:10:26  25                   What's next?
```

Thomas - direct

| | | |
|---|---|---|
| 13:10:28 | 1 | MS. SHAMILOV:  Amazon calls Mr. Ryan Thomas to |
| 13:10:32 | 2 | the stand. |
| 13:10:34 | 3 | COURTROOM DEPUTY:  Please raise your right hand. |
| 13:10:43 | 4 | Please state and spell your full name for the record. |
| 13:10:47 | 5 | THE WITNESS:  Ryan Paul Thomas, R-Y-A-N, |
| 13:10:52 | 6 | P-A-U-L, T-H-O-M-A-S. |
| 13:10:56 | 7 | RYAN PAUL THOMAS, having been duly sworn, as |
| 13:11:01 | 8 | examined and testified as follows: |
| 13:11:03 | 9 | DIRECT EXAMINATION |
| 13:11:04 | 10 | BY MS. SHAMILOV: |
| 13:11:09 | 11 | Q.      Good afternoon. |
| 13:11:10 | 12 | A.      Good afternoon. |
| 13:11:11 | 13 | Q.      Would you please introduce yourself to the jury? |
| 13:11:14 | 14 | A.      Yeah, my name is Ryan Thomas. |
| 13:11:17 | 15 | Q.      And what do you do Mr. Thomas? |
| 13:11:19 | 16 | A.      I'm principal of applied science at Amazon. |
| 13:11:22 | 17 | Q.      Mr. Thomas, are you going to have heart surgery soon? |
| 13:11:26 | 18 | A.      Actually next Tuesday. |
| 13:11:29 | 19 | Q.      If you need a pause for a break, would you please let |
| 13:11:33 | 20 | the Court know? |
| 13:11:34 | 21 | A.      I will.  I think there is very little chance that |
| 13:11:38 | 22 | I'll run into an issue today, but if I do so, I'll let you |
| 13:11:42 | 23 | know. |
| 13:11:42 | 24 | Q.      Mr. Thomas, do you have any degrees? |
| 13:11:45 | 25 | A.      I have two degrees.  I have a bachelors degree in |

Thomas - direct

13:11:47 1    mathematics and a masters degree in mathematics, both of

13:11:52 2    them are from Utah State University.

13:11:55 3    Q.      How did you end up at Amazon?

13:11:57 4    A.      So I worked for a small company called Yap that

13:12:02 5    Amazon purchased in 2011.  And at that point, I started

13:12:07 6    working at Amazon.

13:12:08 7    Q.      And what was this company, Yap?

13:12:11 8    A.      So Yap was a small startup that focused on speech

13:12:17 9    recognition, turning words into audio, turning audio into

13:12:22 10   words.  Our main product was we made a service that mobile

13:12:26 11   phone companies could use that would let them transcribe a

13:12:30 12   voice mail message into words, and the mobile phone

13:12:34 13   companies would use that actually in their visual voice

13:12:37 14   mails so you didn't have to read your e-mail, or listen to

13:12:40 15   your e-mail, you read it.

13:12:42 16   Q.      How long did you work for Yap?

13:12:43 17   A.      I worked for Yap for about three years.

13:12:46 18   Q.      What was your first position there?

13:12:48 19   A.      So I actually think I was the first scientist that

13:12:52 20   Yap hired.  And I was a scientist there.

13:12:52 21   Q.      And what did you work on at Yap as the scientist

13:12:56 22   there?

13:12:59 23   A.      Yap was a small company so I got to do lots of

13:13:04 24   things.  But the primary focus was making the speech

13:13:05 25   recognition better for voice mail, text, voice mails are

13:13:13 1    kind of a different language than people use talking to

13:13:17 2    themselves normally and the audio quality of the cell phone

13:13:22 3    call, well, you guys probably know what that's like, it's

13:13:26 4    not really great audio, we tried to make the speech

13:13:30 5    recognition better for that.  Yap also built its own

13:13:33 6    technology to do speech recognition and I helped on that as

13:13:37 7    well.

13:13:37 8    Q.    And did you have any speech recognition technology

13:13:40 9    experience before you joined Yap?

13:13:42 10   A.    I did.  For eight years I worked on a product called

13:13:49 11   Dragon Natural Speaking.  It was software you could buy that

13:13:53 12   would enable you to do speech recognition on a computer.

13:13:57 13   You don't think about it nowadays because it's already built

13:14:01 14   into your operating system, but back in the day you had to

13:14:05 15   buy it, so Dragon Natural Speaking, Nuance was the company

13:14:12 16   that produced it, and I worked for about eight years for

13:14:15 17   them.

13:14:15 18   Q.    What did you do after Amazon purchased Yap?

13:14:18 19   A.    So after Amazon purchased Yap, the scientists and

13:14:24 20   engineers that were working at Yap went to work for Amazon.

13:14:27 21   We were assigned to what they call Project Doppler at the

13:14:31 22   time.  And that's the project that built the Echo device and

13:14:35 23   the Alexa service.

13:14:38 24   Q.    And was Dr. Strom on that team as well?

13:14:42 25   A.    Dr. Strom was, in fact we shared an office for a

601

Thomas - direct

13:14:46 1    little while.  But Dr. Strom joined about a week after I

13:14:49 2    did.

13:14:50 3    Q.       And how did you learn what you were going to work on

13:14:55 4    once you went with Amazon?

13:14:56 5    A.       Well, this is a good story.  I kind of like to tell

13:15:00 6    it.  We were gathered together, all of us were gathered

13:15:03 7    together in a conference room there in Seattle, Greg Hart,

13:15:07 8    who is the vice-president over the project came in and he

13:15:11 9    had this bottle of Mountain Dew soda that he was holding in

13:15:16 10   his hand.  And what he said is guys what we're going to do

13:15:19 11   here is we're going to build a computer about the size of

13:15:22 12   this soda and the computer is going to be like nothing you

13:15:27 13   have ever seen and will not have a screen, the way you're

13:15:30 14   going to interact with it is by voice from across the room.

13:15:34 15   You're going to be able to ask it any question you want, it

13:15:37 16   will respond, it will have a speaker in it, it will play

13:15:40 17   music if you want, you can use it to play music, you can use

13:15:43 18   it to make a phone call.  And he just kind of laid out this

13:15:47 19   idea of here is all the things that we're going to be able

13:15:51 20   to do with this speech technology that you guys are going to

13:15:54 21   help bring.

13:15:55 22   Q.       When was the first time you heard of VoiceBox?

13:15:58 23   A.       So, I hadn't heard of VoiceBox until after I started

13:16:02 24   working at Amazon.

13:16:02 25   Q.       And that was around what, September of 2011?

Thomas - direct

13:16:06 1    A.        Yes, I started in September, September 9th of 2011.

13:16:11 2    Q.        How did you hear about VoiceBox back then?

13:16:14 3    A.        So I heard about VoiceBox in kind of two different

13:16:17 4    ways.  The first way was socially.  So it turns out that I

13:16:23 5    went to church with a fellow named Dan Carter.  We had kids

13:16:27 6    about the same age.  And so as you're sitting around just

13:16:31 7    kind of chitchatting and small talk he mentioned he worked

13:16:35 8    for a company called VoiceBox, which I never heard of.  And

13:16:38 9    I mentioned that I worked at Amazon.

13:16:41 10             After that point, I started to notice that I

13:16:44 11   actually drove right by their office every day on my way to

13:16:47 12   work.  So they were a local company.  And then I learned

13:16:52 13   about him from the work context about a month or so after I

13:16:56 14   started when I was invited to a meeting where VoiceBox was

13:16:59 15   going to be making a presentation to us.

13:17:01 16   Q.        How did those meetings come about?

13:17:04 17   A.        So my understanding of that is that VoiceBox had

13:17:10 18   approached Amazon with the idea of using their technology to

13:17:14 19   voice enable the Kindle E book reader.  And the Kindle team

13:17:20 20   wasn't necessarily experts in speech at the time, they knew

13:17:22 21   that our group was working on it.  And so they asked us to

13:17:27 22   kind of participate in the meeting.

13:17:29 23   Q.        And how many meetings did Amazon have with VoiceBox

13:17:34 24   in October of 2011?

13:17:35 25   A.        There were two meetings.

Thomas - direct

13:17:37 1   Q.     And were you at both of those meetings?

13:17:41 2   A.     I was at both.

13:17:43 3   Q.     Now, did Amazon have any requirements for partnership

13:17:50 4   opportunities that may come to them on the Doppler project

13:17:54 5   at the time?

13:17:54 6   A.     Yes, we did.  We had very particular requirements

13:17:57 7   that we were looking for from a technology partner.  And

13:18:06 8   like, for example, one of the ones that come to mind is that

13:18:09 9   we really needed the thing to have a machine learning

13:18:14 10   component of what's happening because of all the things that

13:18:17 11   we were going to be trying to teach Alexa how to do.

13:18:22 12        I think we even wrote that down in the

13:18:26 13   documents.

13:18:26 14   Q.     You have two binders in front of you, I think the one

13:18:29 15   closest to you.  If you can open that.  And it should be

13:18:33 16   tabbed with PTX 37 in there.  Please let me know once you

13:18:37 17   find it.

13:18:38 18   A.     I found the tab.  Okay.  Yep.  I got it.

13:18:41 19   Q.     Is this a document that you just mentioned?

13:18:42 20   A.     This is, yes.

13:18:42 21        MS. SHAMILOV:  Your Honor, I move PTX 37 into

13:18:42 22   evidence, please.

13:18:42 23        MR. SMITH:  No objection.

13:18:50 24        THE COURT:  Thank you.  It's admitted.

13:18:52 25        (PTX Exhibit No. 37 was admitted into evidence.)

Thomas - direct

**BY MS. SHAMILOV:**

Q.    What does this document describe, sir?

A.    This document does -- is the description for that partnering criteria that we were talking about.

Q.    Mr. Patterson could we please turn to page two of this document.  And let's blow up that partnering criteria all the way with number 1 paragraph, just the one.  Thank you, sir.

       So, Mr. Thomas, does this describe the partner criteria you came up with at the time?

A.    Yes.  Yes, it does.

Q.    Can you please just explain to the jury what was one of the NLU technologies requirements that you said back then?

A.    Yeah.  So this is a very long way of saying we needed to have machine learning.  So what we were doing in this, in describing this is first this is kind of an educational description of what we wanted.  We're explaining that there are two ways of building these natural language understanding systems, one is to manually write the rules that help you parse and understand what the sentence means, and the other is to leverage machine learning.  And the second thing we did is we tried to illustrate the value here with some examples.  So when you're trying to say -- someone might say I want to listen to Lady Gaga, or play Lady Gaga,

Thomas - direct

13:20:20 1    or I want to hear some Lady Gaga.  Those are all three

13:20:24 2    different ways of actually saying it, and if I had to write

13:20:27 3    all of those down in my parsing rules, I have to write all

13:20:30 4    those descriptions down or the alternative is I use the

13:20:34 5    machine learning model to try to get an understanding of

13:20:39 6    hear, listen to, and play kind of all mean the same thing,

13:20:42 7    so I'm actually able to do it much easier, much quicker if

13:20:46 8    I'm able to use the machine learning.

13:20:48 9              So what we said is it's critical that we have

13:20:51 10   this machine learning in the system because of all the

13:20:54 11   things we wanted it to do, we needed to be able to teach it

13:20:59 12   a million things, that's when I'm talking about there is

13:21:02 13   obvious scaleability advantages to having this machine

13:21:07 14   learning component.

13:21:08 15   Q.    Mr. Thomas, the last sentence in this paragraph says

13:21:11 16   "we require an NLU technology built using a statistical

13:21:15 17   approach given its scaleability advantages over a

13:21:19 18   rules-based approach."  Is the statistical approach another

13:21:23 19   phrase for machine learning?

13:21:24 20   A.    It is.  At the end of the day, when you train a

13:21:28 21   machine learning model, it's just a table of statistics

13:21:31 22   about the training data.  We would interchangeably talk

13:21:35 23   about a statistical approach or machine learning, it's all

13:21:38 24   the same thing.

13:21:39 25   Q.    It refers to these scaleability advantages that the

13:21:44 1  statistical approach gives over rules based approach.  Can

13:21:47 2  you please explain to the jury what scaleability advantages

13:21:51 3  mean in this context?

13:21:53 4  A.    Scaleability in this context, we're talking about the

13:21:57 5  idea of the amount of work it actually takes to teach Alexa

13:22:03 6  new words, it's a tremendous amount of work just to teach

13:22:07 7  Alexa how to play songs because of how many songs there are,

13:22:11 8  if I want to add playing an artist, if I want to add play

13:22:15 9  music, every time when I go to repeat that and add more it's

13:22:19 10 more effort.  If that effort is significant, then I can't go

13:22:23 11 very fast.  I can't scale the system so that it's able to do

13:22:26 12 the breadth of everything we wanted to do.  If you remember,

13:22:29 13 we wanted to build an Alexa that you could talk about

13:22:33 14 anything to.  And so having something that would slow us

13:22:35 15 down would prevent us from having that, that's why we needed

13:22:39 16 the machine learning scale.

13:22:41 17 Q.    Why did Amazon not partner with VoiceBox in 2011?

13:22:45 18 A.    So ultimately the reason is that we carefully

13:22:52 19 listened to everything that they had to tell us and we were

13:22:55 20 listening for them to talk about if there was any machine

13:22:56 21 learning components to what they were doing.  And what we

13:23:00 22 found is that they were really only using rules.  And

13:23:05 23 because of that, we felt like they didn't satisfy our first

13:23:10 24 requirement, not only that, but we thought there was a

13:23:12 25 significant risk they wouldn't be able to fill our third

13:23:16 1   requirement which is around adding new domain scale ability.

13:23:20 2   Q.     Did Amazon partner with any other companies for its

13:23:28 3   Alexa development?

13:23:29 4   A.     No, we did not.

13:23:30 5   Q.     Mr. Patterson, if we can put back DTX 37 and if we

13:23:36 6   could go to page 3.  Mr. Thomas does the document explain

13:23:39 7   the valuations of various companies that Amazon met with for

13:23:44 8   potential partnership at that time?

13:23:46 9   A.     Yes.  This is a table where we summarized the

13:23:49 10  investigations we were able to do.  So we talked about eight

13:23:52 11  or so different companies.  I think you'll see that VoiceBox

13:23:57 12  is there about two thirds down the table.  In that second

13:24:01 13  column where we say statistical or rules, we had written

13:24:07 14  rules there to specify that all we found was a purely

13:24:14 15  rules-based system, only rules and there was no statistical

13:24:19 16  component.

13:24:19 17  Q.     Let's talk a little bit about the actual meeting.

13:24:24 18  When was the first meeting with VoiceBox that you attended?

13:24:26 19  A.     It was about mid October of 2011, this was about a

13:24:32 20  month or more after I started at Amazon.

13:24:34 21  Q.     Where was that first meeting?

13:24:35 22  A.     The first meeting was in Seattle's offices, Amazon's

13:24:36 23  offices in Seattle.

13:24:42 24  Q.     How far was the Alexa project at that time?

13:24:45 25  A.     So it was pretty far along.  We had already had a lot

Thomas - direct

13:24:49 1    of the hardware design done, they knew how the microphone

13:24:54 2    array was going to work, how the speaker was.  They had 3D

13:24:58 3    printed prototypes to show us what the device might look

13:25:04 4    like.  And at that point we had also been able to spend

13:25:10 5    about a month on the project kind of designing the overall

13:25:15 6    architecture, how the speech recognition system is going to

13:25:20 7    interact with the NLU system, how they would be able to

13:25:24 8    actually work together.  We had a prototype NLU system that

13:25:27 9    one of our engineers, Shawn Fitzgerald, had built.  And

13:25:31 10   yeah, we made a fair amount of progress.

13:25:34 11   Q.     And why were you asked to attend the meeting with

13:25:39 12   VoiceBox?

13:25:39 13   A.     So, the group that VoiceBox originally approached,

13:25:44 14   that Kindle group didn't really have a lot of speech

13:25:49 15   expertise and they knew that our group was working on it.

13:25:52 16   They asked me to come and evaluate the technology and

13:25:55 17   evaluate them as a technology partner.

13:25:57 18   Q.     Did VoiceBox disclose any technical details at that

13:26:00 19   first meeting with Amazon?

13:26:01 20   A.     They did some, yeah, they talked enough about their

13:26:02 21   technology that we came away with the impression that it was

13:26:02 22   a rules based system but we didn't know everything about it.

13:26:12 23   Q.     And did you and the team discuss that first meeting

13:26:17 24   with each other after?

13:26:18 25   A.     Yes, we did.  We sent e-mails after.

Thomas - direct

Q.      In that binder of yours that you have open, there

should be DTX 648.   648.

A.      Yes.

Q.      Is this one of those e-mails which the team exchanged

after that first meeting?

A.      Yes.

        MS. SHAMILOV:  Your Honor, I move DTX 648 into

evidence, please.

        THE COURT:  Thank you.  It is admitted.

        (DTX Exhibit No. 648 was admitted into

evidence.)

BY MS. SHAMILOV:

Q.      Mr. Thomas, if you could go to the second page.

Mr. Thomas, at the top is that an e-mail from you to the

team?

A.      Yep.

Q.      And it's dated October 20, 2011, that was right after

the meeting, sir, the next day?

A.      Yeah, I believe so.  Yes.

Q.      And what did you say to your team after that first

meeting?

A.      So what I said here, and I used different words than

we had been talking about, I said what I think we had heard

there, they talked about they used an ontology system to do

this.  An ontology system is just another way of talking

Thomas - direct

13:27:36 1    about having this kind of list of rules that they use in

13:27:39 2    describing all the concepts.  What I heard was they were

13:27:46 3    purely using this ontology system and I also expressed a

13:27:49 4    concern that if that's the way that we based our technology,

13:27:53 5    it would be very expensive to actually extend this and work

13:27:57 6    with a system like this.

13:27:58 7    Q.      And is that the last sentence that you're seeing on

13:28:01 8    this screen, is you telling your team that expanding the

13:28:07 9    system would be impractical?

13:28:08 10   A.      Yeah, it is.

13:28:12 11   Q.      If we could, Mr. Patterson, go a little down in this

13:28:15 12   e-mail.  You end this e-mail by saying "I would like to

13:28:22 13   continue -- right there.  Right before Ryan.

13:28:28 14           So you end your e-mail by saying "I would like

13:28:33 15   to continue to listen to what they have to say and see

13:28:35 16   exactly what's real, but I'll be doing it with an eye

13:28:39 17   towards using their system to bootstrap the Stochastic."

13:28:44 18   What did you mean by that?

13:28:49 19   A.      I was hoping we would find a way to partner with a

13:28:52 20   company like VoiceBox, and even VoiceBox in particular.

13:28:55 21   There would be a lot of advantages to it.  They were a local

13:28:58 22   company.  They had experience.  They were working in the

13:29:00 23   right field.  We had a tremendous amount of work to do.  But

13:29:04 24   even though at this point I knew that we couldn't use their

13:29:09 25   system as probably the basis for the Alexa systems, there

Thomas - direct

13:29:12 1    were other ways we could use their system, in particular I

13:29:17 2    was curious to see if we could use the VoiceBox technology

13:29:19 3    to help us build a system that would let us collect data

13:29:23 4    that we could then use to train a machine learning system

13:29:26 5    with this data.  The blocking to getting the machine

13:29:28 6    learning is I needed training data for it, and if I could

13:29:32 7    actually use the system to help me build a beta version or

13:29:37 8    that I could use to collect data, it would help.

13:29:39 9    Q.     Now, did you end up using anything from VoiceBox to

13:29:43 10   train Alexa's neural network?

13:29:46 11   A.     No, we didn't end up using anything from VoiceBox, we

13:29:49 12   ended up doing it ourselves.

13:29:51 13   Q.     Did you send out any other e-mails to your team

13:29:55 14   expressing to them what you would like to see at the second

13:29:58 15   meeting?

13:29:58 16   A.     Yes, I did.

13:30:00 17   Q.     If I could have you find the tab that should say PTX

13:30:04 18   90 in your binder, sir.

13:30:06 19   A.     Yes.  I got it.

13:30:14 20        MS. SHAMILOV:  Is that the e-mail sir?

13:30:15 21        THE WITNESS:  Yes, it is.

13:30:17 22        MS. SHAMILOV:  Your Honor, I move PTX 90 into

13:30:20 23   evidence.

13:30:21 24        MR. SMITH:  No objection.

13:30:22 25        THE COURT:  Thank you.  It is admitted.

Thomas - direct

13:30:24 1          (PTX Exhibit No. 90 was admitted into evidence.)

13:30:24 2  BY MS. SHAMILOV:

13:30:25 3  Q.      Mr. Patterson, if we could pull up under concepts,

13:30:32 4  the first two lines.   Thank you, sir.

13:30:34 5          Mr. Thomas, what is it that you were telling

13:30:37 6  your team here, what do you mean by "I would like to

13:30:41 7  understand what is the representation of a concept at the

13:30:43 8  present time like, is it human curated or statistically

13:30:47 9  driven."

13:30:47 10 A.      Yeah, I'm still kind of using the oncology language

13:30:51 11 when I'm talking about the concept, the concept is the idea

13:30:54 12 that I'm trying -- that we're trying to get the natural

13:30:58 13 language system to understand.   And I'm saying I would

13:31:00 14 really like to ask how they represent their concepts.   Do

13:31:03 15 they write rules around this.   Or do they have any other

13:31:08 16 way.

13:31:10 17 Q.      Did you end up meeting with VoiceBox the second time?

13:31:17 18 A.      Yes, I did.

13:31:18 19 Q.      Roughly when was that after the first meeting?

13:31:20 20 A.      This was probably a week or so after, toward the end

13:31:24 21 of October.

13:31:24 22 Q.      And where was that meeting, the second meeting?

13:31:26 23 A.      This time we met at the VoiceBox offices in Bellevue.

13:31:30 24 Q.      And why did you meet at VoiceBox offices there?

13:31:33 25 A.      I think it was just a common courtesy, they visited

Thomas - direct

13:31:39 1    us the first time we visited them, it didn't hurt my

13:31:43 2    feelings that their office was a lot closer to me, so it was

13:31:46 3    a lot easier to get there.

13:31:48 4    Q.    And what did VoiceBox share with Amazon at that

13:31:52 5    second meeting?

13:31:53 6    A.    The second meeting started, had a lot of the same

13:31:56 7    flavor as the first.  They gave us a presentation, and --

13:32:00 8    but the advantage was it was slower pace, we were able to

13:32:04 9    ask more questions.  They showed us a demo of the user

13:32:09 10   interface they used to actually modify and maintain their

13:32:13 11   system.

13:32:13 12   Q.    And what was your reaction when you saw that demo?

13:32:17 13   A.    So of all the things that we saw and heard that day,

13:32:24 14   that demo was kind of the thing that stood out to me.  What

13:32:29 15   I remember is they brought in one of their voice engineers

13:32:33 16   that sat down in front of this screen and looked fairly

13:32:36 17   complex to me, they had 5 or 6 different columns of boxes

13:32:40 18   and you know 10 or 15 different rows of things, and what we

13:32:45 19   watched is that engineer actually, you know, finding the

13:32:42 20   right box to click on and the right stuff to type in and he

13:32:52 21   was able to actually control the system and make it do more

13:32:57 22   things.  But what I remember looking at is saying there

13:33:02 23   really is no secret sauce to being able to write these

13:33:02 24   rules, there is no easy way to do it, it's just hard.  I

13:33:02 25   looked at the expertise of that person operating it and

Thomas - direct

13:33:12 1    thought there is no way I am going to be able to get this up

13:33:16 2    and running quick enough to actually build Alexa.

13:33:19 3    Q.      Did you discuss the second meeting with your team as

13:33:22 4    well?

13:33:22 5    A.      I did, yes, we sent e-mails again.

13:33:25 6    Q.      What was the team's conclusion after this meeting

13:33:27 7    with VoiceBox?

13:33:28 8    A.      So I think our conclusion is that our initial

13:33:32 9    impressions were correct, that all that there was -- that

13:33:36 10   they were only rules based in their system, there was not a

13:33:39 11   machine learning component.  So they just didn't have the

13:33:42 12   technology, it wasn't a good match for us.

13:33:45 13   Q.      Mr. Patterson, can you please bring up PTX 33 that's

13:33:51 14   already in evidence.

13:33:52 15           Mr. Thomas, is this the e-mail from Mr. Marcello

13:34:01 16   Typrin, is that the conversation you had after the second

13:34:03 17   meeting with VoiceBox?

13:34:04 18   A.      It is.

13:34:04 19   Q.      Mr. Patterson, if we could go to the second paragraph

13:34:07 20   in this e-mail, please.  When Mr. Typrin said "the bottom

13:34:12 21   line is NLU is based on manual tuning, not to machine

13:34:17 22   learning."  What did that mean to your team?

13:34:25 23   A.      What we were saying is it was a hundred percent based

13:34:27 24   on manual tuning these rules, there was not a machine

13:34:32 25   learning component here, it didn't fit our first

Thomas - direct

13:34:34 1   requirement.

13:34:35 2   Q.      Who was Mr. Typrin?

13:34:39 3   A.      Marcello Typrin was our product manager.  He was the

13:34:45 4   main product manager that we had at Yap.  And when he

13:34:48 5   followed over to Amazon, he was still in that role.

13:34:51 6   Q.      And sir, did you use anything you learned about

13:34:54 7   VoiceBox in Alexa's development?

13:34:58 8   A.      No, we did not.

13:34:59 9   Q.      Now, during the meetings with VoiceBox, did VoiceBox

13:35:03 10  tell Amazon that it had any patents?

13:35:06 11  A.      They did.

13:35:08 12  Q.      And did you look at any VoiceBox patents?

13:35:12 13  A.      I didn't.  It's not my job to kind of review patents.

13:35:18 14  We have a whole team of trained lawyers and engineers that

13:35:22 15  are experts in this.  They're much better at it than I would

13:35:25 16  be.  But I think what I can tell you is that from everything

13:35:30 17  I heard from them that day and knowing everything that we

13:35:33 18  were trying to do, it was fundamentally different, I

13:35:37 19  couldn't imagine there was any issue here.

13:35:39 20  Q.      Sir, are you an inventor of any patents from your

13:35:42 21  work on the Alexa?

13:35:42 22  A.      I am.

13:35:43 23  Q.      How many patents, sir?

13:35:46 24  A.      I believe -- I believe on the Alexa work I have about

13:35:52 25  19 patents and there is a handful of others from different

Thomas - cross

13:35:56 1    things at different companies.

13:35:58 2    Q.      And you are feeling okay, sir?

13:36:00 3    A.      The heart rate is going, I won't lie.  But yeah, I'm

13:36:05 4    okay.

13:36:06 5            MS. SHAMILOV:  No further questions.

13:36:12 6            THE COURT:  Cross-exam.

13:36:17 7                      CROSS-EXAMINATION

13:36:19 8    BY MR. SMITH:

13:36:22 9    Q.      Good afternoon, Mr. Thomas.

13:36:24 10   A.      Good afternoon.

13:36:28 11   Q.      Now, one thing I just want to follow-up on that you

13:36:33 12   were asked was you said that the Doppler project was fairly

13:36:39 13   far along when you started?

13:36:41 14   A.      Correct.

13:36:41 15   Q.      And you started I think you said in what was it,

13:36:44 16   September of 2011?

13:36:47 17   A.      Correct.  Yes.

13:36:48 18   Q.      And when you started at that point, would you agree

13:36:52 19   that Amazon was just in the early stages of developing an

13:36:55 20   NLU?

13:36:55 21   A.      Yeah, I would agree with that.  Yes.

13:37:02 22   Q.      And back in 2011 when you joined, you didn't know of

13:37:11 23   any existing group within Amazon that could do -- you didn't

13:37:12 24   know of any existing group within Amazon that could do work

13:37:22 25   to perform the natural language technology; right?

Thomas - cross

13:37:26 1    A.      No, I did not.

13:37:31 2    Q.      Is it true that the company you came over from, Yap,

13:37:35 3    was focused on ASR?

13:37:38 4    A.      ASR meaning automatic speech recognition.

13:37:42 5    Q.      That's right?

13:37:43 6    A.      Yes.

13:37:44 7    Q.      And did Yap, the company you came over from, have NLU

13:37:51 8    technology?

13:37:52 9    A.      No, we did not.

13:37:55 10   Q.      And when you started back in September of 2011, you

13:38:00 11   weren't aware of any plan for how the NLU for Alexa would be

13:38:06 12   implemented?

13:38:09 13   A.      Sorry, I didn't catch the time frame you were asking.

13:38:13 14   Q.      I'm sorry.  When you started at Amazon in September

13:38:19 15   of 2011, you weren't aware of any plan for how the NLU would

13:38:24 16   be implemented?

13:38:26 17   A.      No, when I started, I was not aware.

13:38:31 18   Q.      And the purpose of you meeting with VoiceBox, I think

13:38:37 19   in October of 2011, was so that you could help evaluate the

13:38:41 20   technology for Amazon?

13:38:42 21   A.      Evaluate the technology and evaluate the company as a

13:38:47 22   partner as well.

13:38:48 23   Q.      And is it true that the technical folks who met with

13:38:51 24   VoiceBox were the very same folks who were working on the

13:38:56 25   Doppler project?

13:39:01 1   A.      So the technical folks that were there, Frederick and

13:39:08 2   Shawn, were also on the Doppler project, with myself.

13:39:11 3   Q.      I think you mentioned that -- strike that.  Was the

13:39:14 4   Doppler project secret at Amazon?

13:39:18 5   A.      Yes, it was.

13:39:20 6   Q.      So you never told anybody at VoiceBox that you were

13:39:22 7   working on the project Doppler when you were meeting with

13:39:27 8   them, right?

13:39:27 9   A.      No, we did not.

13:39:31 10  Q.      And I think you mentioned earlier that at the second

13:39:46 11  meeting, so you said there was a first meeting at Seattle at

13:39:51 12  Amazon and then you guys had another meeting at Bellevue at

13:39:54 13  the VoiceBox offices, is that right?

13:39:56 14  A.      Correct.

13:39:57 15  Q.      At that second meeting, you were basically able to

13:40:00 16  look over the shoulder of a VoiceBox developer who was

13:40:04 17  working on a workstation; right?

13:40:07 18  A.      So, I wouldn't characterize it that way.  The way

13:40:15 19  they chose to give the demo to us, they had someone come in

13:40:21 20  and sit down there and we were able to see, right, but it's

13:40:25 21  not like we were snooping around the office or anything.  We

13:40:29 22  were only getting the things that they were freely giving.

13:40:32 23  Q.      You were able to see a VoiceBox developer

13:40:36 24  workstation; right?

13:40:38 25  A.      Yes.

Thomas - cross

13:40:41 1    Q.      And what that developer was working on was, sounds

13:40:45 2    like the actual rules that we have been talking about, some

13:40:49 3    of the VoiceBox rules for their NLU?

13:40:52 4    A.      Yes, that's what we saw.

13:40:53 5    Q.      And you saw that while you were at VoiceBox?

13:40:55 6    A.      Yes.

13:40:56 7    Q.      And why don't we maybe go back to some of these

13:41:03 8    e-mails.  I think one of them was, if we could put up on the

13:41:07 9    screen, DTX 648, which I believe is in evidence.  And why

13:41:16 10   don't we go to towards the bottom of that -- well, actually,

13:41:21 11   towards the bottom of the second page.  So this is the

13:41:24 12   second page ending in Bates number 992.  And do you see that

13:41:28 13   there is an e-mail from Greg Hart, do you see that?

13:41:32 14   A.      Yes.

13:41:34 15   Q.      I think you mentioned on your direct that Greg Hart

13:41:37 16   was the guy at Amazon who was the vice-president in charge

13:41:40 17   of the Doppler project, is that correct?

13:41:42 18   A.      That's correct.

13:41:42 19   Q.      The guy who is in charge of the whole project for

13:41:46 20   Doppler went to go meet with VoiceBox, right?

13:41:49 21   A.      Oh, he was there when VoiceBox came to visit us.  He

13:41:52 22   didn't go to Bellevue to visit.

13:41:55 23   Q.      Okay.  Thank you.  I appreciate that.  So this is

13:41:59 24   after the first meeting; right?

13:42:02 25   A.      This is after the first one, yes.

Thomas - cross

13:42:02 1    Q.      And one of the things he mentioned in his e-mail was

13:42:13 2    the first line says "core technology we have is equivalent

13:42:17 3    to Siri."  Do you see that?

13:42:20 4    A.      Yes.

13:42:20 5    Q.      He also wrote "Contextual use of voice."  Do you see

13:42:24 6    that?

13:42:24 7    A.      I do.

13:42:25 8    Q.      And then he also wrote "Stanford research and

13:42:29 9    VoiceBox have patents in space."  Do you see that?

13:42:32 10   A.      Yes.

13:42:33 11   Q.      And then the next sentence he wrote, "looking to

13:42:36 12   create next version of digital assistant."  Do you see that?

13:42:40 13   A.      Yes.

13:42:43 14   Q.      And I believe you knew that some aspects of the

13:42:52 15   VoiceBox digital assistant device were similar to some

13:42:55 16   aspects of the Doppler device which eventually became the

13:43:00 17   Echo, right?

13:43:04 18   A.      So I don't think we ever actually had a presentation

13:43:11 19   or a demonstration of their assistant.  I know that they --

13:43:15 20   so as I understand it, the lines that you're pointing at

13:43:20 21   here, these are contemporaneous notes that largely just

13:43:23 22   follow the presentation that VoiceBox gave.  Greg is just

13:43:27 23   writing down things as he's being told.  Right.

13:43:31 24           So in the meetings that we had, they had

13:43:36 25   mentioned that they were building a digital assistant or had

Thomas - cross

13:43:41 1   maybe plans to do so, but we didn't talk about the details

13:43:44 2   of the digital assistant at any point.

13:43:47 3   Q.    But you knew that some aspects of the VoiceBox device

13:43:51 4   were similar to some aspects of Doppler which became Echo,

13:43:57 5   right?

13:43:57 6   A.    Well, I'm not sure how much I knew about the way the

13:44:03 7   digital assistant might have worked.  So I know that they

13:44:09 8   presented -- they used the word digital assistant and the

13:44:12 9   times we had access to things like Siri, so people had a

13:44:16 10   concept of what a digital assistant might be like, but I

13:44:19 11   didn't really know what they meant when they were talking

13:44:22 12   about a digital assistant.

13:44:24 13   Q.    This might help maybe refresh your recollection a

13:44:28 14   little bit.  If you go to what says cross-examination binder

13:44:32 15   in front of it, and the very first thing is a deposition

13:44:36 16   transcript at the very front.  Do you see that?

13:44:39 17   A.    Yes.

13:44:40 18   Q.    If you could go to -- there are four pages to a page

13:44:44 19   here, but if you go to page 26, and then there is page 100

13:44:48 20   there.  Do you see that?  Sorry, this is going to be an eye

13:44:52 21   exam test.  I apologize.

13:45:02 22   A.    Page 26.  Okay, I have got 26.

13:45:12 23   Q.    Do you see there is a question and answer there

13:45:21 24   starting on line 10 through 21.  Do you see that?

13:45:22 25   A.    Yes.

Thomas - cross

13:45:30 1    Q.      And did that refresh your recollection that some

13:45:35 2    aspects of the device you learned about for VoiceBox were

13:45:39 3    similar to aspects of Echo?

13:45:45 4    A.      Yeah.  I mean, it's -- they were -- anything in this

13:45:55 5    space is going to have some amount of similarities, right.

13:45:58 6    Q.      Yes, I think that's what we were asking about.

13:46:02 7              And why don't we go to the next page of this

13:46:06 8    e-mail.  And do you see kind of in the middle there is a big

13:46:11 9    section that says "patents."

13:46:14 10   A.      Yes.

13:46:14 11   Q.      Do you see that.  And then there are some sub bullets

13:46:19 12   where it says 12 awarded patents for contextual and

13:46:23 13   conversational speech tech, do you see that?

13:46:25 14   A.      Yes.

13:46:25 15   Q.      And then the fourth bullet down it says "have patent

13:46:29 16   on voice ads issued in 2010."  Do you see that?

13:46:32 17   A.      I do.

13:46:33 18   Q.      So you learn about the VoiceBox patents from the

13:46:40 19   meeting and Greg Hart, the guy who is in charge of the whole

13:46:45 20   project writes it down in an e-mail he sends to everybody.

13:46:49 21   Earlier you mentioned you didn't look at the patents, so my

13:46:53 22   question really is who did?

13:46:58 23   A.      I don't know.

13:46:59 24   Q.      Now, I think one other thing I wanted to ask you

13:47:10 25   about was just a couple of follow-up questions here.  If we

Thomas - cross

13:47:16 1    could go to PTX 0037 which I think you talked about a little

13:47:26 2    bit in your examination.  And if we look here at the second

13:47:31 3    paragraph, do you see the first sentence says "natural

13:47:35 4    language plays a central role in the Doppler-Alexa

13:47:40 5    experience."  Do you see that?

13:47:41 6    A.    Yes.

13:47:41 7    Q.    Was that your belief at the time that it made a

13:47:46 8    central role?

13:47:47 9    A.    Yes, it is.

13:47:49 10   Q.    And then it goes on to say that the NLU is

13:47:52 11   essentially the brains of the system.  Do you see that?

13:47:56 12   A.    Yes.

13:47:56 13   Q.    And that's what your team thought back then that the

13:48:01 14   NLU was the brains of the whole Alexa?

13:48:05 15   A.    Well, so, what I will say is there is multiple levels

13:48:09 16   that can be called the brains.  Like it takes intelligence

13:48:13 17   to be able to translate the sound into words.  That's a

13:48:16 18   speech recognition.  So that's part of the brain.  It takes

13:48:22 19   -- it takes a brain to actually figure out how to get the

13:48:25 20   meaning behind the words once you recognize them, and that's

13:48:28 21   what NLU is.  You need both parts of those systems to

13:48:32 22   actually build Alexa.

13:48:34 23   Q.    But the NLU is a very, very important part of the

13:48:39 24   Alexa project, correct?

13:48:41 25   A.    Yes, I would agree with that, yes.

Thomas - cross

13:48:43 1    Q.      And why don't we go back to -- you will actually --

13:48:50 2    it's the same, the document we were looking at earlier, I

13:48:53 3    apologize for switching, so 648 again.  I just wanted to ask

13:48:59 4    you -- so if we go to the top -- sorry, this is DTX.  Okay.

13:49:07 5    So if we go to actually the second page of this e-mail, so

13:49:11 6    the next page, and this is the top of it this is the e-mail

13:49:15 7    that you wrote with some thoughts about the meeting with

13:49:19 8    VoiceBox.

13:49:20 9    A.      Yes.

13:49:20 10   Q.      And then in this there is a paragraph that begins "so

13:49:26 11   in the long run," do you see that, I think Voicebox's

13:49:30 12   approach will be surpassed by the stochastic model based

13:49:35 13   approaches.  Do you see that?

13:49:36 14   A.      Yes.

13:49:38 15   Q.      "But even if we know the answer in the long run, the

13:49:41 16   question is what to do in the near term."  Do you see that?

13:49:45 17   A.      Yes.

13:49:45 18   Q.      In the next paragraph you wrote, "I think it makes a

13:49:49 19   lot of sense to license some oncology-based companies who

13:49:52 20   has a working system in the domains we want to work in."  Do

13:49:52 21   you see that?

13:49:52 22   A.      Yes.

13:49:58 23   Q.      So you're suggesting that it might make sense to

13:50:02 24   license a rules-based company just to get you guys off the

13:50:02 25   ground?

Thomas - cross

13:50:08 1   A.      Yes, that's -- I think that's exactly what I said

13:50:11 2   before.  I can look, it would have been great if we had been

13:50:15 3   able to get something to work.

13:50:18 4   Q.      And then -- and you would agree that ultimately

13:50:24 5   Amazon did not license any company to provide an NLU?

13:50:31 6   A.      We didn't.  Because you got to remember the whole

13:50:34 7   strategy wasn't just to license the technology to a company,

13:50:38 8   at the same time we're looking at hiring people, it's a

13:50:42 9   dynamic thing and we're exploring many different paths at

13:50:46 10  the same time.  One of those was to license.

13:50:47 11  Q.      And I think earlier you said that the ontology system

13:50:52 12  was basically just another way to say a rules-based system?

13:50:56 13  A.      Correct.

13:50:57 14  Q.      Amazon didn't license a rules-based system, but

13:51:01 15  Amazon did ultimately build their own rules-based system

13:51:07 16  that they used for a while; right?

13:51:11 17  A.      Yes, yes we did.

13:51:15 18          MR. SMITH:  Thank you, Mr. Thomas.

13:51:18 19          THE COURT:  All right.  Thank you.  Any

13:51:20 20  redirect?

13:51:21 21          MS. SHAMILOV:  Yes, Your Honor.

13:51:24 22                  REDIRECT EXAMINATION.

13:51:26 23  BY MS. SHAMILOV:

13:51:32 24  Q.      Mr. Thomas, just one question I think, following up

13:51:34 25  on this last question counsel asked you.  The rules-based

Thomas - cross

13:51:38 1    system that Amazon built, that's for a trained neural

13:51:43 2    network?

13:51:44 3    A.      Yes, it was, we stood up a rules based system that we

13:51:47 4    could use to generate data.  We took that data and fed it to

13:51:51 5    the training algorithm and got a machine learning module out

13:51:55 6    of it.

13:51:56 7    Q.      You did not build a rules based NLU, correct?

13:51:59 8    A.      No, we did not.

13:52:01 9            MS. SHAMILOV:  Thank you, sir.  No further

13:52:03 10   questions.

13:52:03 11           THE COURT:  Thank you very much.  Thank you,

13:52:05 12   sir, you are excused.

13:52:07 13           THE WITNESS:  Thank you.

13:52:08 14           THE COURT:  What's next?

13:52:09 15           MS. SHAMILOV:  Your Honor, at this time we're

13:52:11 16   going to play a deposition clip from, it's just going to be

13:52:15 17   the witness is going to be doctor David Pepper.  He is a

13:52:19 18   Nuance technical lead to the United project.  Amazon's

13:52:23 19   designations will be three minutes and 9 seconds, VB Assets

13:52:27 20   designations will be one minute and 20 seconds.

13:52:30 21           Thank you.

13:52:31 22           (Videotape deposition of David Pepper:)

13:52:41 23   Q.      Can you please state your name for the record?

13:52:42 24   A.      David Pepper --

13:52:45 25           THE COURT:  Hold on.  Sir, we're going to listen

Thomas - cross

13:52:48 1    to a deposition, you've got a four-minute re-brief.

13:52:51 2              THE WITNESS:  Okay.  Thank you.

13:52:53 3              (Videotape deposition of David Pepper:)

13:52:59 4    A.    David Pepper.

13:53:01 5    Q.    And can you please just provide the spelling just so

13:53:04 6    we have that?

13:53:04 7    A.    D-A-V-I-D, last name Pepper, P-E-P-P-E-R.

13:53:09 8    Q.    And are you currently employed at Nuance?

13:53:11 9    A.    Yes, I am.

13:53:13 10   Q.    And how long have you been at Nuance?

13:53:17 11   A.    Over 24 years.

13:53:20 12   Q.    So I introduced a new exhibit, Exhibit 7.  Can you

13:53:26 13   please pull that up?

13:53:27 14   A.    Okay.

13:53:28 15   Q.    I'll share the screen with you again.

13:53:33 16         Do you recognize this document?

13:53:35 17   A.    Yes, it looks like the document from United Airlines

13:53:39 18   project.

13:53:41 19   Q.    What is CT I phase one referring to?

13:53:48 20   A.    CT I would be computer telephony interaction and I

13:53:52 21   assume this was the first phase of that part of the system.

13:53:55 22   Q.    Did you work on this project?

13:53:56 23   A.    Yes.

13:54:02 24   Q.    What was your role?

13:54:06 25   A.    Tech lead and developer.

Thomas - cross

13:54:09 1    Q.        And for the record, Exhibit 8 is a document with a

13:54:12 2    Bates number N U A N- 19-14010-00003147 through 3149.   Have

13:54:25 3    you looked to see Exhibit 8 that I'm sharing with you?

13:54:37 4    A.        Yes.

13:54:38 5    Q.        What is Exhibit 8?

13:54:39 6    A.        A high-level call flow of the CB and T application.

13:54:44 7    Q.        And here, CB and T is referring to the customer

13:54:48 8    booking and ticketing application, is that right?

13:54:51 9    A.        Yes.

13:54:51 10   Q.        And so this is referring to the same United Airlines

13:54:54 11   implementation that we discussed in the previous document;

13:55:01 12   is that right?

13:55:01 13   A.        Correct.

13:55:02 14   Q.        And this document, I guess if we look at the next

13:55:09 15   page ending in the Bates number 3148 -- 3149, sorry, it

13:55:15 16   identifies a date on the top right corner.  Do you see that?

13:55:21 17   A.        Are you talking about the change travel dates that --

13:55:30 18   what are -- at the upper right-hand corner.

13:55:34 19   Q.        Correct.  Yes.  On the page ending in 3149 under the

13:55:38 20   heading flights and fares, there is a version and the date

13:55:42 21   2004 January 21st.

13:55:42 22   A.        Oh, the -- document data, I thought you were talking

13:55:42 23   about the date collection module or something.

13:55:52 24   Q.        No.

13:55:52 25   A.        Yes.

Thomas - cross

13:55:54 1    Q.      And this date corresponds to the same time period

13:55:59 2    that we were discussing for the previous document; is that

13:56:02 3    right?

13:56:02 4    A.      Yes, January of 2004.

13:56:06 5    Q.      And this United system described in Exhibit 7, this

13:56:12 6    is a menu-based system just like the M I N T system, right?

13:56:19 7    A.      You know, directed dialogue menus with natural

13:56:23 8    language short cuts.

13:56:24 9    Q.      And can you turn to the page ending in 3132, please.

13:56:29 10   A.      Okay.

13:56:30 11   Q.      And in -- in the table there, do you see the heading

13:56:34 12   that says payment collection?

13:56:39 13   A.      Yes.

13:56:41 14   Q.      And five rows beneath payment collection there is get

13:56:58 15   CC number, do you see that?

13:56:59 16   A.      Yes.

13:57:00 17   Q.      And you understand that to be credit card number?

13:57:03 18   A.      Yes.

13:57:04 19   Q.      And the data source is user over in the fourth column

13:57:07 20   there, right?

13:57:08 21   A.      Uh-huh.

13:57:08 22   Q.      And then if you go down seven rows, do you see where

13:57:12 23   it says "collect address"?

13:57:12 24   A.      Yes.

13:57:18 25   Q.      The data source for collect address is also user,

Polifroni - direct

13:57:24  1   right?

13:57:25  2   A.      Yes.

13:57:25  3              (End of videotape deposition.)

13:57:32  4              MR. HADDEN:  Amazon calls its next witness,

13:57:38  5   Dr. Joseph Polifroni.

13:58:01  6              COURTROOM DEPUTY:  Please raise your right hand.

13:58:08  7   Please state and spell your full name for the record.

13:58:11  8              THE WITNESS:  Joseph, J-O-S-E-P-H,

13:58:19  9   P-O-L-I-F-R-O-N-I.

13:58:19 10              JOSEPH POLIFRONI, having been duly sworn, was

13:58:27 11   examined and testified as follows:

13:58:27 12                   DIRECT EXAMINATION

13:58:28 13   BY MR. HADDEN:

13:58:33 14   Q.      Good afternoon, sir.

13:58:35 15   A.      Good afternoon.

13:58:36 16   Q.      Could you please introduce yourself to the jury?

13:58:38 17   A.      Yes.  My name is Joe Polifroni.

13:58:41 18   Q.      What are you here to tell the jury about today

13:58:44 19   Dr. Polifroni?

13:58:42 20   A.      I'm here to talk about the Galaxy system which I

13:58:47 21   worked on in 1990s and early 2000s.

13:58:51 22   Q.      What was Galaxy?

13:58:52 23   A.      Galaxy was a spoken dialogue system that was

13:58:55 24   developed at the laboratory for computer science at MIT.  It

13:58:55 25   gave people access to information over a toll free number

13:59:04  1   using speech.

13:59:06  2   Q.      Before we get into details of Galaxy, can you tell

13:59:09  3   the jury about your educational background?

13:59:11  4   A.      Yes.  I have a Ph.D. in computer science from the

13:59:14  5   University of Sheffield and a masters degree in linguistics

13:59:19  6   from the University of Pittsburgh and a bachelors in

13:59:23  7   linguistics from Penn State University.

13:59:25  8   Q.      Can I ask you, Doctor, to slow down a little bit for

13:59:27  9   the court reporter?

13:59:28 10   A.      Okay.

13:59:29 11   Q.      Thank you, sir.  And what was the general focus of

13:59:32 12   your Ph.D.?

13:59:33 13   A.      The focus of my Ph.D. was ways of automatically

13:59:38 14   configuring a dialogue system to respond to user queries.

13:59:43 15   Q.      And you talked about some degrees in linguistics.

13:59:47 16   What was the focus of your studies in linguistics, sir?

13:59:50 17   A.      As an undergrad I focused mainly on Acoustics

13:59:55 18   phonetics, which was the study of the sound in language and

13:59:58 19   how they're produced.  In my masters program I worked more

14:00:01 20   on natural language processing and specifically got into

14:00:05 21   dialogue systems and how to evaluate them.

14:00:07 22   Q.      And what's your current job?

14:00:09 23   A.      I am currently director of natural language

14:00:12 24   processing at a place called Navian Network.  I lead a group

14:00:17 25   of people who are responsible for taking the cryptic

Polifroni - direct

14:00:22 1    sometime abbreviated notes that physicians take when they're

14:00:25 2    reviewing a case and convert those into language that's

14:00:28 3    friendly that a patient can understand.

14:00:31 4    Q.      Thank you, sir.

14:00:32 5            Let's go back in time to when you began working

14:00:35 6    on the Galaxy system at MIT.  When was that?

14:00:39 7    A.      That was in the mid 1990s when the system was first

14:00:43 8    being developed.

14:00:44 9    Q.      And how long have you -- did you work on the Galaxy

14:00:49 10   system altogether?

14:00:49 11   A.      Altogether about 14 years.  I worked there on the

14:00:52 12   Galaxy system throughout my time at MIT, and then later when

14:00:57 13   I was working on my Ph.D., and then when I returned to

14:01:00 14   Boston after my Ph.D. and had the first job after my Ph.D.

14:01:05 15   Q.      And why was MIT developing the Galaxy system back in

14:01:11 16   the 1990s?

14:01:12 17   A.      MIT had one of the best spoken dialogue systems

14:01:16 18   groups in the world at that time.  And this was before there

14:01:21 19   were smartphones, but there was information on the web, real

14:01:24 20   information.  And we wanted to explore ways of making that

14:01:28 21   information accessible to people over the phone using

14:01:31 22   conversational speech.  So not needing to worry about

14:01:35 23   hesitations or false starts.  Mispronunciations, people

14:01:39 24   could speak rapidly and we would still be able to understand

14:01:42 25   them.

Polifroni - direct

14:01:43  1  Q.      And how was the Galaxy system at MIT, who was funding

14:01:50  2  that?

14:01:50  3  A.      It was funded primarily by DARPA, the Defense

14:01:57  4  Advanced Research Project Agency, which was a branch of the

14:01:58  5  Department of Defense, which has traditionally funded sort

14:02:02  6  of cutting edge technology.

14:02:04  7  Q.      How did the DARPA funding work with respect to the

14:02:07  8  Galaxy project?

14:02:09  9  A.      DARPA had a sort of a way of promoting scientific

14:02:17 10  development that encouraged both collaboration and

14:02:21 11  competition.  So the DARPA would settle on a task that all

14:02:25 12  of the groups that got funding would need to work on and we

14:02:29 13  would collect data together and share those data.  But then

14:02:32 14  periodically DARPA would take some of the data we collected,

14:02:36 15  create a test set out of it, and then send it back to us.

14:02:40 16  We had to run our systems on that test set and send the

14:02:43 17  output to DARPA.  DARPA would score those results and then

14:02:48 18  publish the ranks, where we rank on performance on the test.

14:02:52 19  Q.      And when you're talking about these other

14:02:58 20  institutions that you were competing with, can you give the

14:03:00 21  jury some sense of who they were?

14:03:02 22  A.      Yes, they were places like Carnegie Mellon

14:03:06 23  University, Stanford Research Institute and several other

14:03:09 24  companies at the time that were interested in developing

14:03:11 25  speech capability.  Spoken dialogue capabilities.

Polifroni - direct

14:03:14 1    Q.      How did the Galaxy system do in these competitions?

14:03:17 2    A.      On the individual components of the system, the MIT

14:03:21 3    system usually came close to top or close to the top.  But

14:03:25 4    as far as the Galaxy architecture itself, we were the only

14:03:29 5    group who had the architecture, so that was ours.

14:03:32 6    Q.      And how did that affect the role of Galaxy and the

14:03:37 7    larger DARPA project?

14:03:39 8    A.      What it meant was that the Galaxy architecture was

14:03:43 9    chosen as the reference architecture for the initiative, for

14:03:47 10   the DARPA initiative.

14:03:49 11   Q.      What does it mean for Galaxy to be the reference

14:03:51 12   architecture?

14:03:53 13   A.      It means that all the other groups that worked on the

14:03:57 14   initiative and got funding from DARPA used the Galaxy

14:04:01 15   architecture, developed their systems within that

14:04:03 16   architecture.

14:04:04 17   Q.      Back in the late '90s, what could a user do with the

14:04:09 18   Galaxy system?

14:04:11 19   A.      Users could ask about flights and fares, it knew

14:04:12 20   up-to-date real information on flights and fares.  It knew

14:04:12 21   about the weather.  It knew about things like restaurants

14:04:22 22   and theaters and tourist attractions in the Boston area.  It

14:04:27 23   knew about flight status, flights that were in the air.  And

14:04:31 24   you could also set reminders using the Galaxy system.

14:04:34 25   Q.      And was the Galaxy system open to the public?

Polifroni - direct

14:04:37 1    A.      Yes, it was, that was a big part of what -- of our

14:04:41 2    research agenda was to make it accessible and get as much

14:04:45 3    real data as possible.

14:04:46 4    Q.      How would folks find out about the Galaxy system so

14:04:51 5    they could use it?

14:04:51 6    A.      It was largely word of mouth.  We had cards printed

14:04:55 7    up with the Galaxy -- with the toll free number on it and it

14:04:58 8    would describe some of the capabilities of Galaxy.  We also

14:05:02 9    wrote -- and we took those cards everywhere and distributed

14:05:06 10   them as widely as we could.  We also published a lot of

14:05:11 11   papers at that time at meetings and conferences and

14:05:13 12   presented those.  We created videos that we shared publicly

14:05:19 13   and also for developers, we had source code that we

14:05:22 14   distributed.

14:05:23 15   Q.      And did you bring one of those videos with you today,

14:05:27 16   sir?

14:05:27 17   A.      I did.  Yes.

14:05:29 18   Q.      The video is DTX 248.  I would like to show it and

14:05:36 19   move it into evidence, Your Honor?

14:05:38 20              MR. YOON:  No objection, Your Honor.

14:05:39 21              THE COURT:  All right.  Thank you.  It's

14:05:42 22   admitted.

14:05:43 23              (DTX Exhibit No. 248 was admitted into

14:05:43 24   evidence.)

14:05:43 25   BY MR. HADDEN:

Polifroni - direct

14:05:45 1    Q.      Before we see it, could you just explain to the jury

14:05:48 2    a little bit about what they're going to see in the video,

14:05:52 3    sir?

14:05:52 4    A.      What you're going to see is the web interface to the

14:05:57 5    Galaxy system and the voice you'll hear is mine and you'll

14:06:00 6    hear me asking questions about flights and weather.  There

14:06:04 7    will be a delay between when I ask the query and when the

14:06:08 8    system responds and that's because the system is going out

14:06:10 9    to web and getting the real information to answer the

14:06:14 10   question.

14:06:14 11   Q.      When you talk about the web interface, could you

14:06:17 12   explain that a little bit more to the jury?

14:06:20 13   A.      There were two ways to interact with the Galaxy

14:06:23 14   system, one was strictly with voice, so it was completely

14:06:26 15   over the phone.  With the other one, there was a web

14:06:28 16   interface where people used the computer audio and a web

14:06:32 17   browser.

14:06:33 18   Q.      And on the web interface, would you still interact

14:06:37 19   with the voice?

14:06:37 20   A.      Yes.

14:06:38 21   Q.      Let's go ahead and see the video, Mr. Patterson.

14:06:42 22           (Video played. )

14:08:37 23   BY MR. HADDEN:

14:08:38 24   Q.      Can you explain a little bit more to the jury what we

14:08:42 25   just saw in that demonstration?

Polifroni - direct

14:08:44 1   A.      Yes.  It started out the interaction started out with

14:08:48 2   me asking for flights from Boston to Washington.  Or

14:08:52 3   Washington to Boston, sorry.  And then the system asked me

14:08:56 4   for a date.  I was able to specify that using just a single

14:09:00 5   word.  The system incorporated that into what it already

14:09:04 6   knew that I was interested in and was able to provide me

14:09:07 7   with a list of flights.

14:09:09 8           I was then able to ask about fares that

14:09:12 9   pertained to those flights and I could drill down and ask a

14:09:16 10  question about a specific flight.  And then I switched

14:09:19 11  domains and asked about the weather.

14:09:22 12  Q.      Were videos like the one we just saw, I believe this

14:09:26 13  is an excerpt from a longer video, were those made available

14:09:29 14  to the public?

14:09:30 15  A.      Yes, they were.  We made them available to all of our

14:09:34 16  sponsors and we also put them up on YouTube.

14:09:37 17  Q.      You mentioned earlier that you wrote papers about

14:09:40 18  Galaxy.  If you look in the binder that you should have

14:09:44 19  there, do you see exhibit DTX 308?

14:09:42 20  A.      Yes.

14:09:42 21  Q.      What is DTX 308?

14:09:57 22  A.      That is the masters thesis written by Ed Filisko,

14:09:57 23  it's called context resolution server to the Galaxy

14:10:01 24  conversational system.

14:10:03 25           MR. HADDEN:  Move DTX 308 into evidence, Your

Polifroni - direct

14:10:07 1    Honor.

14:10:07 2                    MR. YOON:  No objection, Your Honor.

14:10:09 3                    THE COURT:  Thank you.  It is admitted.

14:10:09 4                    (DTX Exhibit No. 308 was admitted into

14:10:10 5    evidence.)

14:10:10 6    BY MR. HADDEN:

14:10:11 7    Q.      What was your role with respect to Mr.

14:10:17 8    Filisko's theories that we see here?

14:10:19 9    A.      I worked with him fairly closely on this thesis.  Ed

14:10:23 10   came to MIT several years after I was there and I helped him

14:10:27 11   understand how the Galaxy system worked and how he could put

14:10:30 12   the component that he was working on into the overall

14:10:33 13   architecture.

14:10:35 14   Q.      If we look at a figure on the top of page 22, please,

14:10:42 15   Mr. Patterson.  Could you just blow up the figure.

14:10:45 16            What does this figure show?

14:10:47 17   A.      This is a schematic of the architecture that we used

14:10:52 18   for Galaxy, we called it a hub and spoke architecture.

14:10:57 19   Q.      Why was Galaxy designed in this hub and spoke

14:11:00 20   architecture?

14:11:02 21   A.      It was a very effective way to develop systems that

14:11:02 22   have multiple components and could get quite complex if they

14:11:10 23   were just a single piece of code.  This enabled developers

14:11:12 24   to work on several parts of the system without worrying

14:11:16 25   about causing problems to another part of the system.  It

Polifroni - direct

14:11:19  1    was also really a useful way to promote collaboration among

14:11:25  2    different groups where a single group somewhere might only

14:11:28  3    want to develop a single component of a system and test it

14:11:31  4    out inside another group's overall architecture.

14:11:36  5    Q.      Can you kind of walk us through how these different

14:11:40  6    components would interact when a user said something to

14:11:44  7    Galaxy like we saw your video?

14:11:47  8    A.      Sure.  The interaction began on the left-hand side in

14:11:50  9    the middle in the RECTANGLE marked Audio/GUI.  That is the

14:11:57 10    system that initiated the conversation in the days of the

14:12:02 11    audio server that it picked up the phone and played a

14:12:06 12    greeting and then listened for either web interface or the

14:12:10 13    audio server, it listened for a user query.

14:12:13 14    Q.      And what with happen next after the audio was

14:12:17 15    received by that audio/GUI?

14:12:21 16    A.      Once the audio was recorded, it was moving

14:12:26 17    counterclockwise, it would go to the speech recognition

14:12:30 18    system, that was part of the system, where the speech

14:12:32 19    recognition component, that was part of the system that was

14:12:34 20    responsible to remember recognizing the words, just the

14:12:37 21    words that the user had said.

14:12:38 22    Q.      What would happen after the speech recognition

14:12:40 23    recognized the spoken words?

14:12:42 24    A.      Then those words would be sent to the language

14:12:46 25    understanding component, again moving counterclockwise.  And

Polifroni - direct

14:12:50  1   language understanding component would be the part that

14:12:52  2   would just figure out what the user, the meaning of the user

14:12:57  3   utterance, what the user was trying to achieve.  And that

14:13:00  4   worked in combination with the context resolution component

14:13:03  5   to incorporate what was said in the current query into

14:13:07  6   everything from the proceeding query in the conversation and

14:13:11  7   also anything that the system knew about the user to make a

14:13:15  8   complete query.

14:13:16  9   Q.      And what types of or categories of information did

14:13:21 10   the context resolution component use to help interpret the

14:13:27 11   query the user's spoken utterance?

14:13:30 12   A.      There were two sources of information for that.  One

14:13:32 13   was the dialogue history which was everything that had

14:13:36 14   preceded the current query in the current conversation, so

14:13:40 15   anything that the user had talked about or that the system

14:13:42 16   had responded with.  And the other component, the other

14:13:46 17   source of information for the context resolution server was

14:13:49 18   the user model where we stored information about individual

14:13:53 19   users such as their home, their home city or their fare

14:13:56 20   preferences.

14:13:58 21   Q.      And did the user model retain information that a user

14:14:02 22   provided during a conversation with Galaxy?

14:14:06 23   A.      Yes, it could.  The user could change their home city

14:14:10 24   in a conversation with the system.

14:14:12 25   Q.      You mentioned that the user model is created for each

Polifroni - direct

14:14:18 1    registered users.  Why did users have to register the

14:14:22 2    Galaxy?

14:14:23 3    A.     The users had to register so we had an ID that we

14:14:27 4    could use to access their user model information when they

14:14:31 5    logged in again so we could know this information about

14:14:34 6    them, like their home city.

14:14:36 7    Q.     In addition to their home city, what other

14:14:38 8    information was included in the user model for a registered

14:14:43 9    user?

14:14:44 10   A.     We knew their e-mail addresses, we knew their phone

14:14:47 11   numbers and we knew their fare classes.  And we also stored

14:14:51 12   completed itineraries in the user module.

14:14:54 13   Q.     How could a user provide that information that was

14:14:57 14   stored in the user model to the Galaxy system?

14:15:00 15   A.     There were two ways.  One was at registration which

14:15:03 16   was a web-based interface and they would be queried for it

14:15:08 17   and they would enter it then and in the other way in a

14:15:13 18   conversation they could change, for example, their home

14:15:15 19   city.

14:15:15 20   Q.     If the user changed their home city in a

14:15:18 21   conversation, perhaps they moved after they registered,

14:15:23 22   would their user model be updated to the new home city?

14:15:27 23   A.     Yes, that information would be processed and stored.

14:15:31 24   Q.     And when you said the update would be stored, how

14:15:36 25   would the user model store it in the Galaxy system?

Polifroni - direct

A.      The user model would store it in a separate server
that was just part of the MIT servers, in a relational
database.

Q.      And if the MIT servers running Galaxy were rebooted
from somewhere, how would the user model get persisted?

A.      The user model persisted in the same ways that files
persisted if you reboot your computer, it was stored on
discs in a permanent way and could be accessed even if the
system was restarted.

Q.      Would the user model be moved back into memory on a
Galaxy if a user called back later?

A.      Yes, it would.

Q.      So if a user called in and changed their home city
from San Francisco to Boston, and they hung up, and then
called back later and had another conversation with Galaxy,
would Galaxy use the new home city Boston when it retrieved
the user model?

A.      Yes, if they asked about, just said what's the
weather like, they would be given the weather for Boston.

Q.      If we go back to the figure that we have up from
Dr. Filisko's thesis and we talked about context resolution
and the language understanding, what would happen next in
the process of processing a user's request like the weather
in Boston?

A.      Once the query was understood in its full context, it

643

Polifroni - direct

14:17:19 1    would be sent to the dialogue manager and the dialogue

14:17:22 2    manager was responsible for retrieving the information that

14:17:26 3    would satisfy the user's query.  As you saw in the video,

14:17:32 4    the dialogue manager asked me to provide a date, for

14:17:35 5    example, and then once it had the departure city and the

14:17:40 6    destination city and the date, it was able to go to the

14:17:43 7    database and retrieve the information that matched those

14:17:47 8    constraints.

14:17:47 9    Q.    I saw on the video we watched on the screen where the

14:17:51 10   response came back it mentioned Eaasy Sabre.  What's Eaasy

14:17:59 11   Sabre?

14:17:59 12   A.    Eaasy Sabre was a system that was part of American

14:18:05 13   Airlines at that time, that contained information about all

14:18:08 14   flights and fares worldwide and fare classes.  And we had

14:18:11 15   access to the safer system with the Galaxy system at MIT.

14:18:15 16   Q.    If we continue on our journey around the hub here,

14:18:21 17   after we got to dialogue manager and the database, there is

14:18:25 18   a spoke called language generation.  What did that do?

14:18:28 19   A.    Language generation was responsible for creating a

14:18:31 20   sentence or a set of sentences that summarized the

14:18:34 21   information that it had retrieved from the database.  And

14:18:37 22   then the text to speech component spoke those sentences to

14:18:41 23   the user.

14:18:42 24   Q.    If you could, sir, could you look in your binder

14:18:46 25   again, there should be a tab DTX 294.  Do you see that?

Polifroni - direct

A.      Yes.

Q.      What is DTX 294?

A.      That is a paper that I wrote with Stephanie Seneff that called dialogue management in the Mercury flight reservation systems.  We gave our systems the names of Greek Gods, and Mercury was the name we gave to the flight and fare system.

MR. HADDEN:  I would move DTX 294 into evidence, Your Honor.

MR. YOON:  No objection, Your Honor.

THE COURT:  Thank you.  It is admitted.

(DTX Exhibit No. 294 was admitted into evidence.)

BY MR. HADDEN:

Q.      When was this paper, DTX 294 published?

A.      It was presented at a conference in Seattle in 2000, and it was made available to all the conference participants at that time and published in the proceedings of the conference.

Q.      We look at the, toward the bottom of the right-hand column on the first page, Mr. Patterson, heading knowledge representations.  What is this referring to, Dr. Polifroni?

A.      Knowledge representation was the way the system stored and processed what it knew about the conversation and the user.

Polifroni - direct

14:20:07 1   Q.      If we look at the next page of this document, on the

14:20:17 2   -- underneath the table that shows the dialogue on the

14:20:22 3   right-hand column, in the middle of the paragraph it says

14:20:26 4   "thus the user model retains both the initial user

14:20:29 5   preferences and all of the details of the current flight

14:20:32 6   plan as they become available."  Do you see that, Dr.

14:20:36 7   Polifroni?

14:20:36 8   A.      Yes, I do.

14:20:37 9   Q.      What is that describing?

14:20:39 10  A.      That referred to the way that the user model, the way

14:20:44 11  the system processed information as the conversation

14:20:48 12  proceeded.  So it kept track of, for example, all partial

14:20:53 13  itineraries, all that was not saved to the user model.  It

14:20:57 14  also kept track of any completed itineraries, and those were

14:21:01 15  saved to the user model.  And it kept track of the use, for

14:21:05 16  example, changed their home city.  And that was not only

14:21:08 17  saved to the user model, but then used in subsequent

14:21:11 18  queries.

14:21:14 19  Q.      Is this there an example of how the user model was

14:21:16 20  used in this paper?

14:21:16 21  A.      Yes, in the table immediately above the sentence

14:21:21 22  we're looking at.

14:21:23 23  Q.      Okay.

14:21:24 24  A.      The first few utterances -- this is real dialogue

14:21:26 25  within the system.  In the first few utterances of that

Polifroni - direct

14:21:32 1    dialogue are just concerned with getting to know who the

14:21:35 2    user is.  But then the first real query is the fifth line, I

14:21:40 3    want to travel to Washington Dulles.  And the system is able

14:21:44 4    to just say okay from Boston to Washington Dulles, can you

14:21:50 5    provide the departure or arrival time or airline preference.

14:21:55 6    The system didn't ask where the user wanted to fly from, it

14:21:58 7    knew that from the user model.

14:22:10 8    Q.    Now, you mentioned that in addition to flight

14:22:16 9    scheduling that the Galaxy system also could provide weather

14:22:20 10   information.  I think there is an example of that in your

14:22:23 11   video, is that right?

14:22:24 12   A.    Yes, that's correct.

14:22:25 13   Q.    So what would the Galaxy system do with the request

14:22:38 14   for the weather, if the user asked what's the weather in San

14:22:46 15   Francisco?

14:22:46 16   A.    The system would go off to the database and the most

14:22:51 17   up the date information it could on the weather and speak a

14:22:53 18   response like the weather in San Francisco is sunny and

14:22:57 19   70 degrees.

14:22:57 20   Q.    What would the Galaxy system do if the next thing the

14:23:01 21   user said was how about Cambridge?

14:23:04 22   A.    So that was ambiguous on two dimensions, how about

14:23:08 23   Cambridge, the user didn't specify whether it was flights or

14:23:12 24   weather, whether it was restaurants in Cambridge or a

14:23:18 25   restaurant named Cambridge, that was the first part of the

Polifroni - direct

14:23:21 1    ambiguity.  Two other ambiguous parts of that is the system

14:23:26 2    knew multiple cities named Cambridge.

14:23:30 3    Q.    Lets start with the first one.  How would the Galaxy

14:23:33 4    system figure out what the user was asking for when they say

14:23:36 5    how about Cambridge?

14:23:37 6    A.    It would go into the dialogue history, for example in

14:23:40 7    this example, the preceding query was what was the weather

14:23:44 8    in San Francisco.  It would see that the preceding query was

14:23:48 9    about weather and assume that that "how about Cambridge?"

14:23:51 10   meant the weather in Cambridge.

14:23:54 11   Q.    If we talk about the next ambiguity, which is which

14:23:58 12   Cambridge are we talking about, how would the Galaxy system

14:24:01 13   resolve that ambiguity?

14:24:04 14   A.    They could use the user model, for example if I were

14:24:08 15   the caller, it would give the weather in Cambridge,

14:24:13 16   Massachusetts because I live in Boston and Cambridge

14:24:17 17   Massachusetts is right next door.

14:24:20 18   Q.    I think there is an example where in this paper, or

14:24:23 19   in this -- how do you say it again?

14:24:26 20   A.    Filisko.

14:24:28 21   Q.    Filisko, he said where a user asked about a flight

14:24:35 22   and the system identified a flight and then the user says,

14:24:40 23   does it serve dinner, do you recall that example?

14:24:42 24        MR. YOON:  Objection, this is starting to ask

14:24:45 25   for expert testimony on a document that he's not an author

14:24:48 1  on.

14:24:51 2  BY MR. HADDEN:

14:24:51 3  Q.     Are you familiar with Galaxy being able to respond to

14:24:54 4  the question, does it serve dinner after the user asked

14:24:58 5  about flights?

14:24:59 6  A.     Yes, I am.  And that would also be a case where the

14:25:03 7  system would use the discourse history.  Part of the

14:25:06 8  discourse history stored all the -- every piece of

14:25:09 9  information that the system had offered to the user.  And so

14:25:12 10  the system would know first of all if you asked does it

14:25:15 11  serve dinner, it would know that that was a flight that was

14:25:18 12  being talked about because those were the things that could

14:25:21 13  serve dinner.  And then it would look for a single flight

14:25:25 14  that had been mentioned in history and assume that the user

14:25:28 15  was asking about that flight and answer the question about

14:25:30 16  that flight.

14:25:31 17  Q.     Was the Galaxy system able to determine if the

14:25:35 18  program -- if a pronoun "it", did it serve dinner refers to

14:25:42 19  the flight that had been discussed earlier?

14:25:45 20  A.     Yes, it used the mechanism I just described to find a

14:25:48 21  single flight in its discourse history.

14:25:51 22  Q.     Now, if a user had asked to book a flight from

14:25:57 23  San Francisco to Boston, would the Galaxy system

14:26:01 24  misinterpret the speech, understanding the flight to be to a

14:26:02 25  different city like Austin, could the system reinterpret the

Polifroni - direct

14:26:11 1  request and fix it?

14:26:12 2  A.     The first thing that would happen was the system

14:26:15 3  would make a mistake, and give the response to, for flights

14:26:21 4  from San Francisco to Austin, and that was usually because

14:26:25 5  -- the speech recognizer was really pretty good, but there

14:26:28 6  was background noise, people spoke sometimes, might have

14:26:32 7  stuttered or there might be something else with the signal,

14:26:35 8  so it did make mistakes, and when it did, it would just in

14:26:40 9  this case give the flights from San Francisco to Austin.

14:26:44 10 Q.     And if the user corrected it by saying no, Boston,

14:26:50 11 what would the system do at that point?

14:26:52 12 A.     It would understand that that was a partial query and

14:26:55 13 that it was referring to a destination, if they had said no,

14:27:00 14 to Boston, for example, they would know it was a

14:27:05 15 destination, a new destination, it would look in the

14:27:08 16 dialogue history and see it already had a source and

14:27:11 17 destination but assume that query was a correct correction

14:27:15 18 to two preceding destination so would answer flights from

14:27:18 19 San Francisco to Boston.

14:27:20 20 Q.     Where did Galaxy get all the flight information that

14:27:22 21 we saw on that video?

14:27:25 22 A.     It got it from Sabre, as I said which was a system

14:27:28 23 that was maintained by American Airlines that had

14:27:31 24 information about flights around the world.

14:27:34 25 Q.     I saw on the video that the system would also provide

Polifroni - direct

14:27:38 1  back the price for different flights.  Is that accurate?

14:27:41 2  A.    Yeah, it had all of that information.

14:27:42 3  Q.    Did the user actually buy a ticket through Galaxy?

14:27:47 4  A.    No, we allow people to say book it, but all that did

14:27:50 5  was result in sending an e-mail with a detail of the ticket

14:27:55 6  rather.  MIT had a policy that just didn't allow us to take

14:28:00 7  -- make payment transactions.  So we were not allowed to do

14:28:04 8  that.

14:28:05 9  Q.    What would it have taken to add the ability to

14:28:09 10  complete the purchase of Galaxy?

14:28:12 11  A.    The Sabre system gave us everything we needed and we

14:28:15 12  could have just sort of hooked up with a third party that

14:28:18 13  would enable us to take payment, we could have done that.

14:28:23 14  Q.    Did you review any Galaxy source code as part of this

14:28:26 15  case?

14:28:26 16  A.    I did, yes.

14:28:28 17  Q.    And did you notice anything about that code when with

14:28:32 18  you reviewed it?

14:28:33 19  A.    It was a snapshot in time, and it was partial code.

14:28:38 20  We made that code available to other groups who might want

14:28:42 21  to jump start their own development of these systems or

14:28:47 22  might want to develop a particular component, but the code

14:28:50 23  wasn't meant to replicate the full capability of the MIT

14:28:54 24  system.

14:28:56 25  Q.    And when MIT shared the source code with other groups

14:29:01 1    at Carnegie Mellon or whoever developed the system, were

14:29:05 2    there parts of the system that they didn't share with other

14:29:08 3    groups?

14:29:09 4    A.    One thing that wasn't in that code was anything that

14:29:11 5    had to do with the user model.  MIT was very concerned about

14:29:17 6    protecting the anonymity of subjects that helped us with our

14:29:21 7    research, whether they donated genomic information or simply

14:29:26 8    their voice and sort of the same protocols applied.

14:29:30 9    Anything that might have revealed where they kept that

14:29:33 10   information or how we accessed that information would not

14:29:38 11   have been shared.

14:29:38 12   Q.    And did MIT have a policy that whether what you

14:29:45 13   describe in a published paper and whether or not it had to

14:29:48 14   actually work when you published the paper?

14:29:50 15   A.    Yes, it was also a fairly strict policy that we were

14:29:54 16   only able to describe things that had been implemented and

14:29:58 17   tested and that typically that we could provide examples of

14:30:02 18   in the paper.

14:30:04 19   Q.    Is there a paper from the early 2000s describe Galaxy

14:30:10 20   as being able to do something, would it be a fact that

14:30:14 21   Galaxy could do it at that point?

14:30:16 22   A.    Yes, it would.

14:30:17 23   Q.    When you factor in your time working fourteen years

14:30:21 24   on Galaxy, are you proud about it?

14:30:24 25   A.    It's hard to remember now how sort of kind of

14:30:28 1    revolutionary it was to use conversational speech and access

14:30:32 2    real information on the web.  And it seems like such a

14:30:37 3    no-brainer now, but at the time it was -- it felt like we

14:30:42 4    were doing something very different and we were pushing the

14:30:46 5    envelope and I'm sort of proud and happy to have been part

14:30:49 6    of that.  And hopefully made a contribution.

14:30:52 7                MR. HADDEN:  Thank you very much, sir.

14:30:54 8                THE COURT:  Thank you.  Cross-exam.

14:30:56 9                MR. YOON:  Yes.

14:30:57 10                     CROSS-EXAMINATION

14:30:58 11   BY MR. YOON:

14:30:59 12   Q.    I apologize for my accent a little bit.  Is it

14:31:03 13   Polifroni?

14:31:03 14   A.    Polifroni.

14:31:05 15   Q.    Polifroni.  Thank you, Dr. Polifroni.

14:31:09 16         Dr. Polifroni, we're going to talk about a

14:31:12 17   couple of things kind of as a background.  Amazon has paid

14:31:16 18   you $500 an hour for your work as a consultant in this case,

14:31:19 19   is that fair to say?

14:31:21 20   A.    That is correct.

14:31:22 21   Q.    And you have not seen the patents in this case,

14:31:26 22   correct?

14:31:26 23   A.    I have not seen the patents.

14:31:28 24   Q.    And so it's fair to say that you have not analyzed

14:31:31 25   the patents in this case?

Polifroni - cross

14:31:32 1    A.      I have not.

14:31:35 2    Q.      Now, you showed the demonstration video that we

14:31:42 3    watched.   That demonstration video didn't show any type of

14:31:46 4    update to the user model, correct?

14:31:48 5    A.      It did not, no.

14:31:49 6    Q.      And in this case, Amazon provided you access to the

14:31:55 7    source code for Galaxy that has been produced in this case,

14:31:58 8    correct?

14:31:59 9    A.      Uh-huh.   Yes.

14:32:00 10   Q.      And that source code did not have any source code

14:32:03 11   relating to the user model, correct?

14:32:06 12   A.      No, no, as I said, I'm not surprised about that,

14:32:10 13   that's the kind of thing that we would not have wanted to

14:32:12 14   make publicly available.

14:32:14 15   Q.      I understand.   But in terms of the evidence in the

14:32:17 16   case, the source code that you looked at did not have the

14:32:19 17   user model, correct?

14:32:21 18   A.      It did not, that's correct.

14:32:22 19   Q.      And it didn't have any code as to how the user model

14:32:25 20   was updated?

14:32:26 21   A.      Not that I saw, no.

14:32:27 22   Q.      And I didn't have any code as to the date that the

14:32:30 23   user model was implemented for any particular version,

14:32:36 24   correct?

14:32:37 25   A.      It had a time stamp on it for the time of that code,

14:32:40 1    but no, because it didn't have the user model information in

14:32:43 2    it, no, it didn't.

14:32:46 3    Q.       Now, MIT Galaxy as you mentioned was a hug and spoke

14:32:53 4    architecture that allowed the modularized kind of block

14:32:56 5    development of spoken language dialogue systems in various

14:33:01 6    types of domains, is that fair to say?

14:33:03 7    A.       Yes.

14:33:03 8    Q.       For example, as to Galaxy, there was no music

14:33:07 9    interface or domain, correct?

14:33:10 10   A.       No, there was not.

14:33:13 11   Q.       And now, you use the name Mercury, and that was the

14:33:17 12   name for the MIT Galaxy domains for flight reservations?

14:33:21 13   A.       That's correct.

14:33:23 14   Q.       And let's talk about DTX 294.  That was the article

14:33:28 15   that you were the author of.  Can we have that on the

14:33:31 16   screen?

14:33:31 17   A.       DTX 294.  Yes.

14:33:33 18   Q.       And that's both in I think your direct binder, sir,

14:33:38 19   and your cross-examination binder?

14:33:39 20   A.       Yes.

14:33:39 21   Q.       And if we could -- this is the article that you had

14:33:42 22   mentioned earlier that was presented in Seattle?

14:33:46 23   A.       Yes.

14:33:46 24   Q.       If we could just go to the abstract.  And so this

14:33:51 25   paper describes a dialogue model of the Mercury system that

Polifroni - cross

14:33:57 1   had been under development over the past year or two.

14:34:00 2   Correct?

14:34:01 3   A.     Uh-huh.  Yes.

14:34:02 4   Q.     And Mercury provides the tell phone access to an on

14:34:07 5   line flight database, and allows users to plan and price

14:34:13 6   "itineraries between major airports worldwide" correct?

14:34:17 7   A.     Yes.

14:34:17 8   Q.     Your article doesn't discuss how the user model was

14:34:22 9   implemented, does it?

14:34:24 10  A.     It refers to the user model and what is stored in the

14:34:27 11  user model, but it doesn't refer to how it was processed.

14:34:31 12  Q.     And now if we could look at Section 4 of this

14:34:39 13  article, which is data collection and evaluation.

14:34:43 14  A.     Uh-huh.

14:34:44 15  Q.     And it says "with Mercury, perspective users -- it

14:34:51 16  doesn't say that.  Go down a little further.  Expand back,

14:34:54 17  Mr. Smith.

14:34:55 18         We have prospective users must first enroll by

14:35:11 19  filling in a simple form a web page where we enter minimally

14:35:12 20  their name, their e-mail address and their password (a date)

14:35:22 21  when someone officially enrolled in the Mercury dialogue

14:35:22 22  system, they typed in their name, e-mail address and

14:35:22 23  password on a keyboard, correct?

14:35:30 24  A.     Yes, that's correct.

14:35:33 25  Q.     And now if we could go to in your binder

Polifroni - cross

cross-examination binder DTX 301.

A.      Uh-huh.

Q.      This is another article that you authored, sir, with respect to the Mercury flight reservation system.  Correct?

A.      Yes, it is.

        MR. YOON:  We would like to move into evidence DTX 301.

        MR. HADDEN:  No objection.

        THE COURT:  Thank you.  It is admitted.

        (DTX Exhibit No. 301 was admitted into evidence.)

BY MR. YOON:

Q.      And this is another article, and is it Seneff?

A.      Seneff.

Q.      This is the second article that you wrote with Dr. Seneff?

A.      Yes.

Q.      If we could turn to page 5 there please, you see there is a reference to signing on, the top of the left column, if we could expand that.

A.      Yes.

Q.      Let's say someone types in to the Mercury system their name, their e-mail address and password, they would sign on to the system by providing orally their name and password that was even coded as of the date.  Correct?

Polifroni - cross

A.      Yes.

Q.      And if the system over the telephone, there was some type of incompatibility, the Mercury system would invite the user to enter the password using the telephone keypad, correct?

A.      Yes.

Q.      If we go to sources and destination.  Now if we expand the next section there, source and destination.  And if you go to the bottom paragraph, it says "when the system determines -- start at the top.

        It talks about a number of difficult situations that can arise regarding cities?

A.      Uh-huh.  Yes.

Q.      And here, it says, "when the system determines that a hypothesized source or destination is likely to be incorrect, it invites the user to enter the city using the telephone keypad."  Correct?

A.      Yes.

Q.      In the Mercury system, if it couldn't determine what the -- you couldn't say your name and password, you could use the keypad or when the source destination couldn't be determined, you could use the keypad, correct?

A.      Yes.

Q.      And I think as the article acknowledges, using a telephone keypad was -- could be quite tedious, correct?

14:38:22 1    A.      Yes.

14:38:23 2    Q.      If we now look at -- let's now go to the thesis which

14:38:35 3    is DTX 308.  And was it Mr. Filisko?

14:38:39 4    A.      Yes.

14:38:39 5    Q.      Did he become Dr. Filisko?

14:38:42 6    A.      He did.

14:38:42 7    Q.      Dr. Filisko.  If we could turn to page 70, the high

14:38:47 8    level description.  And as to page 60, if we would blow up

14:38:54 9    the second paragraph under 4.1 high level description.  It

14:38:59 10   says, "the Galaxy web-based interface allows a user to make

14:39:07 11   references via mouse clicks."  Do you see that?

14:39:09 12   A.      Yes.

14:39:09 13   Q.      In the example you showed with the web interface, you

14:39:14 14   would ask a question and the information would come on the

14:39:16 15   screen, correct?

14:39:17 16   A.      Yes.

14:39:17 17   Q.      But also the user could interface with that web

14:39:21 18   interface either by typing or clicking a mouse, correct?

14:39:24 19   A.      Yes, typically a mouse was used when a map was being

14:39:26 20   displayed.

14:39:26 21   Q.      When a map was being displayed, the mouse click was

14:39:33 22   treated just as if the user had spoken the reference, except

14:39:37 23   that it is made more salient than any spoken reference.  Do

14:39:42 24   you see that?

14:39:42 25   A.      Yes, I do.

Polifroni - cross

Q.      If someone was using the web interface, they would click on the mouse and say if I point to the city of where I am from, Detroit, I got my piston cuff links on, if I pointed to Detroit, it would understand, it would use the click of the mouse, right?

A.      I don't recall that you could use the mouse click in cases where flights were being displayed, but I do know you could use mouse clicks when a map -- you could say I want to go from here to MIT for example and click a point on a map.

Q.      If we could now go back to your article which was Exhibit 294.  If we could advance a couple of pages.  Now, this was here when they're talking about a dialogue, this is Table 1, this is the example dialogue that's shown there?

A.      Yes.

Q.      And that dialogue was either current conversations the user was having with the system, correct?

A.      Yes.

Q.      And we can now advance.  And if you could advance in particular to data collection and evaluation.  And if we could blow up the paragraph beginning, overall 73 percent. In the example of your article, overall 73 percent of the bookings were successful; correct?

A.      Yes, that's what it says, yes.

Q.      And if you go down a few lines, you see that three of the failures are due to the user simply hanging up in

Polifroni - cross

14:41:30 1    frustration and three others are due to the system hanging

14:41:34 2    up due to a misrecognized good-bye.  Do you see that?

14:41:38 3    A.      I do.

14:41:39 4    Q.      And so the users would go through that full dialogue

14:41:43 5    we saw in Table 1, correct?

14:41:45 6    A.      Yes.

14:41:46 7    Q.      And that it's during that time the system misheard

14:41:51 8    the word or thought it had heard the word good-bye, it could

14:41:55 9    result in a disconnect, is that fair to say?

14:41:58 10   A.      It could, yes.

14:42:01 11   Q.      If you go down further, it says "finally four of the

14:42:06 12   failures involved completely correct book goes, but the

14:42:10 13   system was unable to follow through with the pricing and/or

14:42:15 14   e-mailing of the "Itinerary."  Correct?

14:42:22 15   A.      Yes.

14:42:22 16   Q.      Lastly, some of the failures involved inadequacy of

14:42:27 17   the dialogue module once the user did not provide the

14:42:32 18   expected response to a system request?

14:42:34 19   A.      Yes.

14:42:35 20   Q.      Doctor, you mentioned that MIT did not allow

14:42:40 21   purchases to be made with the Galaxy system, correct?

14:42:44 22   A.      That is correct.

14:42:45 23   Q.      And is it fair to say that Galaxy was not entitled to

14:42:50 24   generate -- was not intended by MIT to generate money?

14:42:55 25   A.      Yes, that is correct.

Polifroni - cross

14:42:56 1    Q.    And you did not work on the ASR with respect to

14:43:01 2    Galaxy, is that fair to say?

14:43:02 3    A.    I did not, no.

14:43:03 4    Q.    Now, you do agree, sir, that the Galaxy architecture

14:43:07 5    was implemented as a set of software, correct?

14:43:10 6    A.    Galaxy was sort of a single architecture that enabled

14:43:17 7    various components to work together to receive, understand

14:43:20 8    and generate a response.  So in that -- under that

14:43:26 9    definition of -- I forget how you phrased it, how did you

14:43:31 10   phrase --

14:43:31 11   Q.    Yeah, the Galaxy architecture was implemented as a

14:43:36 12   set of software, correct?

14:43:37 13   A.    Yes, under that definition, I would say yes, it was

14:43:41 14   established by software.

14:43:42 15   Q.    And doctor, you agree that Galaxy did not have a

14:43:46 16   single set of software, the software was constantly being

14:43:50 17   worked on, correct?

14:43:51 18   A.    The software was constantly being -- continually

14:43:56 19   being worked on, one of the goals of the group was to

14:43:59 20   educate and provide a sand box for people to work on these

14:44:04 21   systems.

14:44:04 22   Q.    And as of December 2007 when you stopped working on

14:44:10 23   Galaxy, the people at MIT was still working on the software

14:44:12 24   of the Galaxy architecture framework, is that fair to say?

14:44:18 25   A.    I don't actually remember how much was being worked

Polifroni - redirect

14:44:21 1    on at the time.  But there were still people who had worked

14:44:25 2    on Galaxy at MIT.

14:44:27 3                    MR. YOON:  Doctor, thank you for your time.

14:44:31 4                    THE COURT:  Redirect?

14:44:32 5                    MR. HADDEN:  Briefly.

14:44:33 6                         REDIRECT EXAMINATION

14:44:33 7    BY MR. HADDEN:

14:44:35 8    Q.      Can we go to PDX 308 again, Mr. Patterson, and in

14:44:42 9    particular page 31.  If we look in the top paragraph halfway

14:44:53 10   through, it begins, "In U(4) the user still desires more

14:45:05 11   information and asks if it serves dinner.  This pronoun must

14:45:11 12   be resolved by the CR server to be American flight 3742."

14:45:16 13             Do you see that, sir?

14:45:17 14   A.      I do.

14:45:18 15   Q.      Does it describe an example of this Galaxy

14:45:21 16   understanding what it refers to?

14:45:23 17   A.      Yes.

14:45:24 18   Q.      Okay.  And there are some questions about telephone

14:45:28 19   keypad.

14:45:30 20   A.      Uh-huh.

14:45:30 21   Q.      Was using the telephone keypad kind of the mode of

14:45:34 22   last resort if you couldn't communicate with Galaxy?

14:45:38 23   A.      It was the mode of last resort, the goal of the group

14:45:41 24   was to design conversational systems and we wanted to make

14:45:44 25   speech the main modality.

14:45:46  1          MR. HADDEN:  Thank you very much, Doctor.  I

14:45:48  2     appreciate it.

14:45:49  3          THE COURT:  All right.  Thank you, sir.  You're

14:45:51  4     excused.  All right, let's take our afternoon break, come

14:45:55  5     back around 3 o'clock.

14:45:56  6          COURTROOM DEPUTY:  All rise.

14:45:59  7          (Jury leaving the courtroom at 2:45 p.m.)

14:46:20  8          (A brief recess was taken.)

15:06:31  9          COURTROOM DEPUTY:  All rise.

15:06:37 10          (Jury entering the courtroom at 3:06 p.m.)

15:06:45 11          THE COURT:  All right, everyone.  Welcome back.

15:06:56 12     Please be seated.

15:06:57 13          What's next?

15:07:02 14          MR. HADDEN:  Amazon calls its next witness, Dr.

15:07:05 15     Michael Johnson.

15:07:08 16          COURTROOM DEPUTY:  Please raise your right hand.

15:07:10 17     Please state and spell your full name for the record.

15:07:16 18          THE WITNESS:  My name is Michael Thur Johnson,

15:07:21 19     M-I-C-H-A-E-L, T-H-U-R, J-O-H-N-S-O-N.

15:07:27 20          MICHAEL JOHNSON, having been duly sworn, was

15:07:31 21     examined and testified as follows:

15:07:32 22                 DIRECT EXAMINATION

15:07:32 23     BY MR. HADDEN:

15:07:32 24     Q.     Good afternoon, Dr. Johnson.

15:07:32 25     A.     Good afternoon.

664

Johnson - direct

15:07:40 1    Q.      Can you please introduce yourself to the jury?

15:07:43 2    A.      I'm Mike Johnson, I am professor and chair of

15:07:47 3    electrical and computer engineering at the University of

15:07:51 4    Kentucky.

15:07:51 5    Q.      What were you asked to do in this case, Dr. Johnson?

15:07:54 6    A.      At a high level, I was asked to take a look at the

15:07:58 7    accused Alexa product and the VoiceBox asserted patents,

15:08:03 8    consider the allegations of VoiceBox Assets and take a look

15:08:07 9    at whether or not the accused electrical products infringe

15:08:11 10   those patents.  I was also asked to take a look at the

15:08:14 11   patents themselves and identify whether or not those patents

15:08:17 12   are valid for a couple of different criteria.

15:08:20 13   Q.      And as far as your analysis of the validity of the

15:08:22 14   patents, have you considered the MIT Galaxy system that we

15:08:26 15   just heard about from Dr. Polifroni?

15:08:30 16   A.      The Galaxy system that we heard from Dr. Polifroni

15:08:35 17   and also prior to that played the deposition video of Dr.

15:08:37 18   Pepper, those are both related to the prior art.

15:08:40 19   Q.      Did you also prepare some slides to help explain your

15:08:42 20   opinions today?

15:08:42 21   A.      Yeah, we have got some slides here.

15:08:52 22   Q.      This has some information about your background.

15:08:58 23   Could you briefly describe for the jury your education?

15:09:01 24   A.      Sure.  So I have bachelor's degrees in electrical

15:09:06 25   engineering and computer science engineering from the

1  LeTourneau University of Texas.  I have a master's in

2  electrical engineering from University of Texas, San

3  Antonio, and a Ph.D. from Purdue University in electrical

4  and computer engineering and that focused on speech

5  recognition.

6  Q.     What areas do you perform research in at the

7  University of Kentucky?

8  A.     All of my research over my career has focused on

9  natural language understanding and speech recognition,

10 applications of speech recognition technology, those kind of

11 things.  I regularly teach and do research in those areas.

12 Q.     Have you published scientific papers in the field of

13 speech processing and machine learning?

14 A.     Yeah, I have a little over 150 peer reviewed

15 articles.

16 Q.     And are you the member of any technical societies or

17 organizations?

18 A.     Yeah, there is a list, counsel, at the bottom of the

19 slides here, biggest ones are IEEE, which we have heard

20 about before, Institute of Electrical and Electronic

21 Engineers, also the Acoustical Society of America, and as a

22 department chair, I'm connected to the International Speech

23 Communication Association.

24        MR. HADDEN:  Amazon would tender Dr. Johnson as

25 an expert in speech technology, natural language

15:10:20 1    understanding, and machine learning and artificial

15:10:24 2    intelligence.

15:10:30 3            MR. SMITH:  No objection.

15:10:31 4            THE COURT:  He will and so committed.

15:10:33 5    BY MR. HADDEN:

15:10:34 6    Q.     What information did you consider in performing your

15:10:36 7    analysis in this case?

15:10:37 8    A.     So there are a ton of documents.  All the patents

15:10:40 9    themselves and what we call file histories, which are in all

15:10:45 10   the patent records from the Patent Office.  All the

15:10:46 11   documentation about Alexa, that includes the products

15:10:49 12   themselves and I did some testing, source code for the

15:10:51 13   products, all sorts of technical documents, some of which

15:10:55 14   you've seen already, and also interviewed some Alexa

15:10:59 15   engineers of how the products work.

15:11:01 16   Q.     Okay --

15:11:01 17   A.     There is also of course Court materials, things like

15:11:04 18   claim construction about how you interpret terms and things

15:11:07 19   like depositions and expert reports that have been produced

15:11:10 20   in the case.

15:11:12 21   Q.     And did you review the computer source code for

15:11:12 22   Alexa?

15:11:18 23   A.     I did, I looked at all the source code that was

15:11:21 24   identified by Mr. Peck in his report and some others as

15:11:24 25   well.

Johnson - direct

Q.     Now, one of the things that the jury has to consider in evaluating obviousness, which we'll get to later in your presentation is what a person of ordinary skill in the art, what the qualifications would be.  Do you have an opinion on what that would be in this case?

A.     Yeah, my understanding is the parties have agreed on this definition, so this is similar, maybe identical to what Dr. Polish presented.  That would be a bachelor's degree in computer science, computer engineering, electrical engineering or a related field in computing technology, at least two years of computer science or related experience with automatic speech recognition or natural language understanding or equivalent, education, research, experience, and knowledge.  Between experience and education those can trade off a little bit.  And this is specifically with regard to the times of the patent, you put yourself in the frame of mind of this person of ordinary skill to consider the those patents.

Q.     And did you have at least this level of skill in the art at the time these patents were filed?

A.     Yes, I have been working in this area since the mid to late '90s and was a person of skill in the art at the time of these patents.

Q.     Now, are these the patents that you have analyzed in this case?

Johnson - direct

A.      Yes, that's right, we have talked about all four of these before, the '681 patent from 2006, I think what we call the voice ad patent, the '176 and '097, which are both 2007, and the '703 patent, that was 2014.

Q.      And what are the Amazon products that are accused in this case?

A.      So these are Alexa Cloud services and specific devices that run Alexa Cloud services, which includes the Echo family of products, the Fire tablet and Fire TV family of products.

Q.      Let's start with the '681 patent.  And this is the asserted claim.  Can you kind of just walk the jury through this and give the jury a sense of what's going on in this claim?

A.      Sure.  We're going to talk about each and every step as we've already done before at least once, but before we do that, at a high level, this is about a conversational voice interface system focused around the idea of identifying a context.  When you get the user, the first thing that you do is identify a context and then the rest of the steps are done within that, you determine the intended meaning within the identified context and you adaptively respond back to the user using that identified context.  So I have high level, that's the idea.

Q.      Can we see how that's kind of expressed in the words

Johnson - direct

in this claim?

A.    Yeah.  So this -- the utterance has to include one or more words that have different meanings and different contexts, we talked about that a few times over the last week.

Q.    Did the patent kind of give an example of what such an utterance would be?

A.    Yeah, Mr. Kennewick and Mr. Freeman both used the same example, a good example, it comes straight from the patent language itself.  So the example is if the user says what about traffic?  That could have multiple possible meanings depending on what the identified context is, as examples if the context is something like music, the person might be talking about the Steve Winwood band.  If they're talking about movies, they might be talking about the movie Traffic, if they're talking about navigation systems, they're probably talking about the traffic along the road.  Those three things, movies, music, navigation systems are the ideas of what the context is in this patent.

Q.    So if we start with this utterance, how does the claim sort of describe how we would get to a meaning?

A.    So once you receive an utterance, the first thing, an utterance just means what a person said, we have been using that word a lot, it just means what they said.  Once you receive what the person said, you identify a context

Johnson - direct

15:15:21 1    associated with those words before you go about and do other

15:15:24 2    things, including before you determine a meaning.  The first

15:15:26 3    thing you would do, for example, is determine like somehow

15:15:29 4    that the context is music.

15:15:33 5    Q.     And once you determine that the context is music,

15:15:36 6    what happens next?

15:15:37 7    A.     Well, once you identify that the context is music,

15:15:40 8    that simplifies things and you can determine that what

15:15:43 9    traffic would mean in that case is the Steve Winwood band.

15:15:48 10   Q.     If we look at the next elements of the claim, which

15:15:53 11   you have highlighted here, D and E.  Is that what we just

15:15:59 12   saw?

15:15:59 13   A.     That's right.  I would like to start with element D

15:16:02 14   specifically because that's the first thing that happens

15:16:05 15   after the user says something.  The previous items we'll go

15:16:10 16   back and talk about because those are used as part of

15:16:12 17   identifying a context.

15:16:14 18   Q.     Okay.  And the steps of identifying the context and

15:16:19 19   the establishing the meaning, did the patent tell you where

15:16:24 20   that's done?

15:16:25 21   A.     Yeah, this is a figure from the patent, Figure 1.

15:16:28 22   This has a conversational speech engine.  Each of the

15:16:31 23   patents sort of has a block diagram somewhat similar to

15:16:34 24   this, that identifies a language processor, conversational

15:16:38 25   speech engine like this, that is the thing that carries out

Johnson - direct

these steps, specifically the steps of identifying the

context and determining the meaning.  The main thing to

point out here is that this is separate from the automatic

speech recognition box, which you can see right to the left

of the red box here, and it's separate from the

applications.  So things that are done in the speech

recognition or in the applications, can't be the things that

are carrying out the steps that belong in that

conversational speech engine, for example.

Q.      Just to be clear, that speech recognition is that

done in the box ASR 110 in this diagram?

A.      Correct.

Q.      When you talk about the applications, is that shown

in the Box 145 under the yellow box?

A.      That's right.

Q.      What are the kind of examples of applications in this

patent?

A.      Well, applications might be things that would carry

out those intended meanings, things like playing music,

perhaps, right, or identifying what the traffic is or a

navigational route.

Q.      What are we -- going back to the football for?

A.      This is just a reminder, you mentioned this in your

opening, when we're doing infringement analysis, it's

important that in order to infringe, the accused products

15:17:56 1   have to carry out every single step that's in the patent.

15:17:59 2   If one is missing, then the products wouldn't infringe.

15:18:02 3   This football example is just to illustrate that, it's made

15:18:06 4   of leather, it's stitched, it's filled with air, but it's

15:18:09 5   not round in shape, so because that one word is missing we

15:18:12 6   don't do this step, therefore a football would not infringe

15:18:16 7   this patent.

15:18:16 8   Q.     We're going to walk through now your infringement

15:18:19 9   analysis.  If we start with again this '681, Claim 13, can

15:18:27 10  you go through element by element and explain what's going

15:18:32 11  on for us?

15:18:32 12  A.     Sure.  So this first element is pretty simple, we

15:18:35 13  talked about this before, computer executable instructions

15:18:39 14  that are operable to do the following steps, just means

15:18:42 15  computer code, software, and that's all that's required

15:18:45 16  here.

15:18:46 17  Q.     Okay.  And did Mr. Peck offer an opinion about how

15:18:51 18  Alexa computer code meets any of these steps?

15:18:59 19  A.     Mr. Peck was asked much more broad general questions

15:19:02 20  things like does Alexa have a speech recognition engine.  He

15:19:02 21  was not asked to look at source code to identify whether

15:19:08 22  Alexa carries out these specific steps, so he did not look

15:19:11 23  at that.

15:19:12 24  Q.     And how did Dr. Polish.  Dr. Polish only looked at

15:19:16 25  Mr. Peck's report, and the code identified there.  So

Johnson - direct

15:19:20 1   neither of the experts identified whether there was source

15:19:24 2   code that carries out these specific steps?  And again, did

15:19:30 3   Mr. Peck give any opinion that Alexa infringed this claim?

15:19:35 4   A.     No, he asked him about that, he acknowledged that's

15:19:38 5   not what he was asked to do.

15:19:43 6   Q.     If we go back to the claim, why did you put a red X

15:19:43 7   there?

15:19:48 8   A.     Obviously Alexa does have source code, they have

15:19:52 9   software.  This is to identify that no one looked to

15:19:55 10  determine whether that computer executable source code

15:19:58 11  actually does these steps and therefore this element is not

15:20:02 12  met.

15:20:02 13  Q.     Now, we've highlighted several elements here and put

15:20:07 14  in red references to an utterance and the utterance.  What

15:20:11 15  are you showing here, Dr. Johnson?

15:20:13 16  A.     So, this is just a patent concept.  The first time

15:20:17 17  something a patent is introduced, that for example here is

15:20:20 18  receive an utterance, that's identifying that thing.  The

15:20:24 19  rest of the way through, when we say the utterance, it's

15:20:27 20  referring back to that original utterance and it has to.

15:20:30 21  Right?  So every time you say the utterance, it's referring

15:20:33 22  back to that original an utterance.  What that means is in

15:20:37 23  this patent each of these steps has to be carried out on

15:20:40 24  that same utterance that's introduced way up here in part A,

15:20:44 25  that's why I identified that carefully, to show this, you

15:20:48 1    have to step through and show that the technology, the

15:20:50 2    products here do this for an utterance.

15:20:52 3    Q.      And did Dr. Polish show that?

15:20:56 4    A.      So he pointed at different parts of Alexa technology

15:21:00 5    that did different things in different places and used

15:21:04 6    different utterances to show that.  So he never stepped

15:21:07 7    through 1 example and said here is what these steps are and

15:21:09 8    here is what these mean in this particular example, so he

15:21:12 9    did not do that.

15:21:13 10   Q.      And would that have been necessary to show

15:21:16 11   infringement?

15:21:17 12   A.      Yes.  You would have to show that the system was

15:21:19 13   capable of processing all these steps in the way they're

15:21:22 14   described in the patent.

15:21:23 15   Q.      So if we just stop here, has Dr. Polish shown any

15:21:31 16   infringement?

15:21:31 17   A.      Actually we already have two reasons there is no

15:21:34 18   infringement, one is that no one looked at the source code

15:21:37 19   to see whether or not these steps are executed by the Alexa

15:21:40 20   source code and next is no one showed an example of how

15:21:42 21   Alexa processes a single utterance all the way through these

15:21:46 22   steps.

15:21:50 23   Q.      If we go past that, are there other reasons that you

15:21:52 24   found that Alexa doesn't infringe this claim?

15:21:56 25   A.      Yes, there are a number of these individual elements

Johnson - direct

15:22:00 1  that Alexa clearly does not infringe, we can talk about

15:22:03 2  those.

15:22:03 3  Q.     Start with this one, why did you pick to start with

15:22:06 4  element D?

15:22:07 5  A.     Again, this is the first thing that happens after you

15:22:09 6  get an utterance, so I would like to start with identify a

15:22:11 7  context and then go back and talk about the other pieces.

15:22:14 8  Q.     If we look at this element, what is shown here on

15:22:18 9  this slide?

15:22:18 10 A.     So, just again, that there was no source code

15:22:21 11 identified by Mr. Peck or reviewed by Dr. Polish,

15:22:26 12 specifically about identifying a context associated with the

15:22:29 13 utterance.

15:22:33 14 Q.     What do we see here?

15:22:35 15 A.     So this is an example.  If you were to carry out this

15:22:39 16 patent, the way it's written, the first thing you would have

15:22:42 17 to do is identify a context.  In Alexa, the sort of

15:22:47 18 corresponding idea would mean you would the have to pick the

15:22:52 19 shopping deep neural network and run that as if you decided

15:22:56 20 that you're going to do shopping, in advance of having

15:23:00 21 interpreted any meaning and then carry it through this rest

15:23:02 22 of the steps.  We have seen multiple times already that that

15:23:05 23 is not what Alexa does, it does not determine a context or

15:23:07 24 identify a context before it goes and determines meanings,

15:23:11 25 which is what the claims requires.

Johnson - direct

15:23:17 1    Q.        We show here some examples of I think this is from

15:23:21 2    that deep dive document that we have seen several times, is

15:23:25 3    that right, Dr. Johnson?

15:23:26 4    A.        Yeah, that's right.

15:23:27 5    Q.        What are you showing here?

15:23:29 6    A.        This is just to illustrate the flow in Alexa.  You

15:23:33 7    have seen this already, I actually thought we did a good job

15:23:36 8    of walking through this earlier.  The sound itself comes the

15:23:39 9    device at the top left, it goes to the speech recognition

15:23:42 10   engine marked ASR, that turns it into text, basically it's

15:23:46 11   really of possibly texts for that utterance because it does

15:23:50 12   sometimes make mistakes.  And then that text is sent on to

15:23:53 13   the natural language understanding unit and that then

15:23:58 14   determines a large number of potential meanings or possible

15:24:02 15   meanings for that text.

15:24:04 16   Q.        Okay.  And if we look at the next slide, what are you

15:24:09 17   showing here, Dr. Johnson?

15:24:10 18   A.        Again, just an illustration, we have seen this one

15:24:13 19   before, but if the user said six and focus on the utterance

15:24:16 20   being six, after previously saying Alexa set an alarm, the

15:24:21 21   way Alexa processes that, it is just with the word six,

15:24:25 22   right, just those words, and they go through all the deep

15:24:29 23   neural networks that we've heard much about to determine

15:24:32 24   possible meanings.  And then a list of possible meanings is

15:24:36 25   constructed from that and that then moves on to further

Johnson - direct

15:24:39 1    steps and processing.

15:24:41 2    Q.      And is this what Dr. Strom explained earlier today?

15:24:44 3    A.      Yes, he went into detail about how these deep neural

15:24:49 4    networks work and they always have a list of multiple

15:24:54 5    meanings.

15:24:56 6    Q.      Now, does Dr. Polish disagree that the Alexa natural

15:25:02 7    language understanding outputs multiple meanings?

15:25:06 8    A.      Dr. Polish acknowledged that the NLU outputs multiple

15:25:11 9    interpretations and keeps multiple interpretations.

15:25:14 10   Q.      So going back to the claim element about identifying

15:25:19 11   a context, how does this show that Alexa did not identify a

15:25:25 12   context before determining the meaning?

15:25:27 13   A.      Well, I mean at a high level, just that Alexa doesn't

15:25:30 14   work that way.  Alexa puts the words through all the

15:25:33 15   different deep neural networks and figures out a whole bunch

15:25:36 16   of possible meanings and it never actually identifies a

15:25:39 17   context.  Even after it has the multiple meanings, it

15:25:42 18   actually pushes out to applications multiple possible

15:25:46 19   meanings, never selects a context, never even identifies

15:25:49 20   only one meaning.  It pushes the list out to applications,

15:25:53 21   so it never identifies a context.

15:25:55 22   Q.      Now, in Dr. Polish's presentation, put up this slide.

15:26:00 23   Does this slide show that Alexa identifies a context before

15:26:02 24   it determines a meaning?

15:26:10 25   A.      So, this just shows that when Dr. Polish was doing

Johnson - direct

his analysis, he actually skipped over the identify a

context step.  He went right from accumulate long-term

shared knowledge to establish an intended meaning, put a

green checkmark there but he did not actually talk about

what it is in Alexa that identifies a context.

Q.      So if we again just stop there and go back to your

football soccer ball, and the fact that Dr. Polish didn't

actually explain or even put in bold this identifying a

context step, what did that mean with respect to

infringement?

A.      That would be sufficient to show that there is not

infringement.

Q.      So what's your conclusion, then, in addition to the

other reasons we talked about, does Alexa do this identify a

context associated with the utterance?

A.      Alexa does not practice this element.

Q.      If we go to the next almost, element E, can you tell

the jury what this element requires?

A.      So, once you have a context, you then have to

determine an intended meaning right, within the identified

context.  Again, that's not how Alexa works because it's

already doing all the possible meanings.  Right?  So it

never determines an intended meaning within the identified

context.

Q.      Again, did Mr. Peck identify or find the source code

15:27:36 1    in Alexa that does this establish an intended meaning for

15:27:41 2    the utterance within the identified context?

15:27:43 3    A.      No, neither Mr. Peck nor Dr. Polish showed source

15:27:46 4    code to carry out these specific steps.

15:27:49 5    Q.      And if we go back to the diagram from Dr. Strom's

15:27:54 6    explanation, is an intended meaning being established within

15:27:59 7    an identified context?

15:28:00 8    A.      It is not.  There are a lot of meanings being

15:28:03 9    established, right, within the individual deep neural

15:28:06 10   networks and they're passed along in a long list, right, and

15:28:09 11   passed on, but there is no intended meaning being

15:28:12 12   established within the identified context as the claim

15:28:14 13   requires.

15:28:17 14   Q.      What's your conclusion, then, with respect to this

15:28:20 15   element, requires establishing an intended meaning for the

15:28:24 16   utterance within the identified context?

15:28:25 17   A.      Again, Alexa doesn't work this way, so the Alexa

15:28:29 18   products do not infringe this element.

15:28:32 19   Q.      We go to element B.  Can you read this element for

15:28:35 20   the jury and tell them what it required?

15:28:37 21   A.      Sure.  So this is about accumulating short-term

15:28:41 22   shared knowledge.  And in that identify a context step which

15:28:45 23   we already showed was not met, it requires doing that, using

15:28:48 24   accumulated short-term knowledge and accumulated long-term

15:28:51 25   knowledge.  So these two earlier elements talk about how you

accumulate short-term knowledge and long-term knowledge.  So

this one requires accumulating short-term, shared knowledge

about the current conversation that has to include knowledge

received at the voice during the current conversation, which

would basically mean previous utterances in the same

conversation would give you short term shared knowledge.

Q.      And why, if we look again at the evidence that's been

presented, did Mr. Peck identify or find any source code

that did in this in Alexa?

A.      He did not.

Q.      You should have in your binder an exhibit tab, DTX

711.  Do you have that, Dr. Johnson?

A.      Let me make sure.

Q.      It might be in a different binder?

A.      I'm looking.  Yes, I have it.

Q.      What is DTX 711, sir?

A.      This is a document, I think we've seen previously,

maybe, it was at least we saw some of these charts, I think.

It shows information about Alexa sort of strategic planning

and that kind of thing, it's that kind of document.

Q.      Did you consider this document in offering your

opinions in this case?

A.      Yes, I did.

            MR. HADDEN:  Move DTX 711 into evidence, Your

Honor.

Johnson - direct

15:30:26 1            MR. SMITH:  No objection.

15:30:27 2            THE COURT:  Thank you.  It is admitted.

15:30:27 3            (DTX Exhibit No. 711 was admitted into

15:30:28 4    evidence.)

15:30:28 5    BY MR. HADDEN:

15:30:31 6    Q.    Is this an excerpt from that document, Dr. Johnson?

15:30:34 7    A.    This is from the very first page towards the top.

15:30:38 8    What this just shows is the number of multi-turn utterances

15:30:43 9    in the percentage of what they call traffic, which is the

15:30:47 10   speech that people use with Alexa and it shows that

15:30:50 11   basically on average, only five percent of utterances during

15:30:53 12   this time frame have what they call multi-turns, so it

15:30:57 13   required the person to say more than one thing to accomplish

15:30:59 14   what they wanted.  Which of course means that 95 percent of

15:31:02 15   the time, Alexa users accomplish what they wanted to

15:31:05 16   accomplish with just a sickle utterance.  The reason I

15:31:08 17   mention that here is because the short-term knowledge

15:31:11 18   element requires that there be basically knowledge about the

15:31:15 19   current conversation right, that comes from basically

15:31:18 20   previous utterances in the same conversation.  And because

15:31:22 21   of that, 95 percent of the time, even if all the other

15:31:25 22   things were met, a normal Alexa interaction couldn't meet

15:31:30 23   this particular patent, 95 percent of the time just because

15:31:34 24   of that factor.

15:31:36 25   Q.    And Dr. Polish talked about there being a possibility

15:31:43 1    of a single utterance that could also somehow have

15:31:48 2    short-term knowledge about itself.  Do you recall that

15:31:51 3    testimony?

15:31:51 4    A.     Yes, I remember he said that.

15:31:54 5    Q.     Did Dr. Polish identify any such utterance?

15:31:58 6    A.     No, I'm not sure what he meant by that or what kind

15:32:02 7    of utterance that might be.

15:32:03 8    Q.     Did that make sense, would it be possible to have an

15:32:07 9    utterance that was also based on, or that you could have a

15:32:10 10   single utterance that would be an utterance as well as

15:32:13 11   information about the utterance from the conversation?

15:32:16 12   A.     That's hard for me to understand what that would

15:32:18 13   mean.  You have to have knowledge about the utterance that

15:32:20 14   comes from the current conversation, again, we're about to

15:32:24 15   use to identify the context which happens before any

15:32:27 16   determining meaning, so you have to have knowledge about the

15:32:32 17   utterance from the current conversation if it was the same

15:32:36 18   utterance, you haven't done anything with it yet, I just

15:32:39 19   don't see how that's possible.

15:32:41 20   Q.     Okay.  We heard some testimony this morning from Mr.

15:32:47 21   Reed about how these patents purportedly reduce

15:32:51 22   conversations by some amount of turns, one-and-a-half or

15:32:52 23   something.  Is there anything in this '681 patent, Claim 13

15:33:01 24   that would reduce the number of turns in a claim?

15:33:04 25   A.     No.  This patent you to have multiple turns, right.

15:33:10 1    So if the patent itself is not even applicable to single

15:33:14 2    turn conversations so you could never reduce it to one or

15:33:17 3    else you wouldn't be carrying out the patent.  And that's

15:33:20 4    not what the patent says its purpose is, if you read it and

15:33:24 5    track and read through, you don't find that the reason we

15:33:27 6    are doing this is to reduce the number of turns, that's

15:33:30 7    something that VB Assets has pointed as a possible benefit

15:33:35 8    but it's not really what the patent is about, right.

15:33:40 9    Q.      If we go back to this example of six in this

15:33:46 10   multi-turn example, does Alexa use any shared short-term

15:33:54 11   knowledge to identify a context with the for the word six?

15:33:59 12   A.      First it doesn't identify a context which we saw.

15:34:04 13   Let's put that aside and talk about how Alexa works.  When

15:34:07 14   it gets that utterance six, right, and it gets those words

15:34:11 15   in, it only uses six.  It does not know what the previous

15:34:15 16   utterance is, and while it's determining the intended

15:34:19 17   meaning, it doesn't have any other information from anywhere

15:34:22 18   basically because these are just the words from what the

15:34:25 19   person spoke.  So there is no short-term knowledge that

15:34:28 20   could be used to identify a context to determine the

15:34:33 21   intended meaning at all.

15:34:34 22   Q.      Now, we heard some testimony earlier from Dr. Strom

15:34:39 23   about the re-ranker.  Did the re-ranker use short-term

15:34:47 24   shared knowledge to identify a context to determine the

15:34:51 25   meaning of the words?

Johnson - direct

A.      So, again, there is no identifying the context in Alexa.  Putting that aside, the re-ranker works on already determined meanings.  Right?  And the continuing that's being pointed here, the re-ranker is about this concept of a dialogue act and the dialogue act carries information about a prompt that an application sent to a user, not about what the user said, so it's information about what was sent back, information that comes from an Alexa application, like the alarm application.  The re-ranker does allow you to use that information about what the prompt was that went back to the user to reorder those interpreted meanings, right, and for example, with the one we're doing where the number six was after someone talking about setting an alarm, it would know that the system had said what time, and that would allow it to re-rank to move time equals six up to the top of the list.

        But again this full list of meanings is still going to be sent on to applications later.

Q.      Does the re-ranker change any of these meanings that have already been determined?

A.      No, the same meanings, they're just reordered.

Q.      Go back to this multi-turn example.  Dr. Polish pointed to the user having previously said Alexa set an alarm as being short-term shared knowledge.  Is that used at all by Alexa in determining the meaning of six?

Johnson - direct

15:36:23 1    A.      It is not, it is actually that second thing for what

15:36:26 2    time that goes back to the re-ranker.  Right.  And then

15:36:30 3    again that's after meanings have been interpreted.

15:36:33 4    Q.      And what does this diagram, or slide from that same

15:36:40 5    deep dive presentation, what does that tell you about

15:36:45 6    whether or not Alexa uses this accumulated short-term shared

15:36:49 7    knowledge?

15:36:50 8    A.      This actually says the same thing, and we've seen

15:36:52 9    this slide before a few times, this was internal information

15:36:56 10   used to talk -- for the NLU team to talk to other engineers

15:37:01 11   at Amazon to help them understand how the NLU works, so it's

15:37:05 12   a high level diagram.  They thought it was important enough,

15:37:08 13   like it wouldn't be obvious to just a normal person that

15:37:11 14   this is how Alexa works, they wanted to explain, we don't

15:37:14 15   have any dialogue context, meaning we don't know what the

15:37:17 16   previous words were that the user spoke, so however we're

15:37:21 17   going to make this thing work, we can't use that

15:37:24 18   information, we don't have it.  Dr. Strom talked about why

15:37:27 19   this was in terms of efficiency and computation.

15:37:32 20   Q.      What did you determine with respect to this element B

15:37:36 21   that talks about accumulating short-term shared knowledge

15:37:39 22   about the current conversation?

15:37:40 23   A.      Based on what I have just shown, Alexa does not work

15:37:44 24   this way, so I have marked this out as another element that

15:37:48 25   Alexa doesn't do.

Johnson - direct

15:37:48  1    Q.      If we go to this next element C, can you read this

15:37:52  2    element for the jury and explain what it requires?

15:37:54  3    A.      Sure.  So this is the other piece that has to get

15:37:57  4    used when you identify a context.  It's accumulate long-term

15:38:01  5    shared knowledge that includes knowledge about one or more

15:38:05  6    past conversations with the user.  I should also say this is

15:38:09  7    knowledge about the user that includes knowledge from one or

15:38:11  8    more past conversations with the user.

15:38:16  9    Q.      And again, has anybody from VB Assets's side

15:38:21  10   identified any Alexa source code that actually does this?

15:38:24  11   A.      They have not.

15:38:32  12   Q.      Dr. Polish put up this slide next to this element.

15:38:35  13   Can you explain what is described on the right-hand side of

15:38:38  14   this slide?

15:38:39  15   A.      Sure.  So there is three things here.  I'll actually

15:38:42  16   talk about four things.  So the three things that are here

15:38:45  17   are called mutable models, enrollment profile and

15:38:49  18   supplemental models.  These three things are all things that

15:38:53  19   are sort of deprecated features in Alexa's speech

15:38:58  20   recognition engine that they used to did use to try to

15:39:00  21   improve speech recognition for individual users.  Right.  So

15:39:04  22   they had ways in which they could like adjust the speech

15:39:07  23   recognition model to be customized for a particular

15:39:10  24   individual.  These were all features that would basically

15:39:12  25   customize the model.  My understanding is they are no longer

Johnson - direct

used.   Regardless of whether these are used, they're all in

the speech recognition engine.   We already saw that speech

recognition is separate from that conversational speech

engine that is identifying a context in determining intended

meanings.   So these things are not used by the NLU, right,

they are not used in anything related to language

understanding, these are about speech recognition.

The fourth thing that I just wanted to mention

is the enrollment profile that's here is actually different

than the Voice ID that Dr. Polish talked about.   Alexa does

have a feature where it will learn your voice and recognize

who you are, right?   And I think he marked that as Voice ID

or something like that.   And that information can be used by

applications to sort of customize interactions back to the

user, so it sounds friendly and it knows who you are.   I

think it can even like some apps use it to know what your

play list is, like separate play lists if there are

different users in the same household.   That information is

not used in the natural language understanding system.

Q.    If we just look at this slide, if I understand your

testimony, the first point was that these three things

listed here are no longer used in Alexa, is that your

understanding?

A.    That is my understanding, yes.

Q.    And were any of these when they were still part of

Johnson - direct

15:40:40 1  Alexa, were any of them used to determine the meaning of the

15:40:44 2  words in Alexa?

15:40:45 3  A.     They were not.  They were in the speech recognition

15:40:48 4  engine.

15:40:55 5  Q.     And is the distinction between speech recognition and

15:40:58 6  natural language undergoing what you're showing on the

15:41:00 7  slide?

15:41:00 8  A.     Yeah, that's all, that follows with the separation

15:41:04 9  between speech recognition and anything doing language

15:41:07 10 understanding.

15:41:07 11 Q.     And then you mentioned Voice ID that Dr. Polish

15:41:11 12 talked about?

15:41:11 13 A.     Yeah, I forgot I had a slide.

15:41:13 14 Q.     Yeah.  Is Voice ID used by NLU when it's determining

15:41:18 15 the meaning of words?

15:41:19 16 A.     It's not, I just mentioned this a couple of minutes

15:41:22 17 ago, Voice ID allows applications to customize things that

15:41:28 18 are user facing to get better customer experience.  The

15:41:31 19 DNN's that run here, the deep neural networks, there is just

15:41:35 20 like one music deep neural network that's everybody's, it's

15:41:36 21 not customized to the individual users, it does not have

15:41:41 22 different like language understanding models for individual

15:41:47 23 users, that would not be efficient, if you understand the

15:41:51 24 hundreds of thousands of utterances that Alexa has to

15:41:54 25 process in the cloud, it wouldn't work to do that.

Johnson - direct

15:41:56 1  Q.      So let me stop here again?

15:42:01 2  A.      Sure.

15:42:02 3  Q.      Does Alexa use any accumulated long-term shared

15:42:06 4  knowledge from past conversations with the user when it's

15:42:11 5  determining the meaning of the words the user speaks at some

15:42:16 6  point?

15:42:16 7  A.      It does not.  The deep neural networks have no

15:42:20 8  knowledge of anything related to one or more past

15:42:23 9  conversations with the user.

15:42:24 10  Q.      So if we come back to the chart, what's your

15:42:29 11  conclusion with respect to this element C that talks about

15:42:32 12  accumulating long-term shared knowledge about the user?

15:42:35 13  A.      So this is just another element that is different

15:42:38 14  from how Alexa works, so I have marked it off here, no, not

15:42:42 15  what Alexa does.

15:42:46 16  Q.      If we can to the final element in claim F that talks

15:42:49 17  about generating a response, can you read this to the jury

15:42:52 18  and then explain what it's talking about?

15:42:53 19  A.      Sure.  This requires generating a response that is

15:42:57 20  grammatically or syntactically adapted back to the user.

15:43:01 21  Based on the identified context, I should add that as well.

15:43:04 22  Q.      And this is a slide from Dr. Polish's presentation

15:43:10 23  with respect to this final element.  First question, does

15:43:15 24  anything in this slide show that Alexa grammatically or

15:43:20 25  syntactically adapts responses?

Johnson - direct

A.      No, this is just a request Alexa play music and I
assume the response would be to play music.  I don't know
anything that would grammatically or syntactically adapt
that response for any reason.  Again, I have not seen
anything that suggest that Alexa does this at all, it
doesn't make sense from my knowledge.

Q.      And if we look at this arrow up here on the diagram,
it just says voice -or Alexa voice response directive, do
you see that?

A.      Yes.

Q.      Does that indicate any grammatical or syntactic
adapting?

A.      No, that means play music, so I think it's going to
start playing music.

Q.      And just go back here.  Did Dr. Polish identify
Amazon source code that grammatically or syntactically
adapts a response?

A.      No, he just said that Alexa responds and that that
was sufficient, but he didn't identify anything that
grammatically or syntactically adapts a response.

Q.      Did Mr. Peck identify a source code that
grammatically or syntactically adapts a response?

A.      No, he said he didn't look at that.

Q.      Did Dr. Polish identify any Amazon documents that
describes grammatically and syntactically adapted a

Johnson - direct

response?

A.      No.

Q.      Did he point to any testimony from any Amazon engineers that describes grammatically or syntactically adapting a response?

A.      Not that I saw.

Q.      If we go back to Claim 13 after going through these elements, what is your conclusion?

A.      Well, we've seen a whole bunch of difference reasons that I laid out as to why the Alexa products don't work this way and don't infringe this claim.

Q.      Again, back to your football soccer ball slide, how many of these elements would you have to cross off in red for there to be no infringement?

A.      Just one, even the last one we talked about would be sufficient.

Q.      Let's move on to the next patent.  The '176 patent and Claim 40.  Did you analyze this patent as well?

A.      I did.

Q.      So let's start with this element D.  Can you read this for the jury and explain what it's talking about?

A.      Sure, before I do that, do you mind if I just kind of summarize what this is?

Q.      Why don't you give a high level overview of what's happening in this claim?

Johnson - direct

A.      Yeah, we've seen so many of this, high level this is one of the advertisements patents.  It's pretty simple.  You select an advertisement in the context that was established for what the user said and then you have a misrecognition engine that determines whether the conversational language processor incorrectly interpreted something and then it goes back and reinterprets.  So this is about presenting an ad and then reinterpreting something about what the user said when this adaptive misrecognition engine.

Q.      And if we again start with element D, can we explain what's going on here?

A.      Yeah, so the first thing that happens is you interpret the recognized words or phrases wherein that includes establishing a context for the utterance.  So this is similar to the idea of what we saw in the '681, you have to establish a context as part of interpreting the recognized words or phrases.

Q.      Does this relate to the analysis we saw for the '681 where you're talking about Alexa not establishing a context?

A.      Right.  Remember, I said that Alexa never identifies a context at any point, right, it takes these deep neural networks, it finds a bunch of different possible meanings, makes a list, does stuff with the list and eventually passes the list on to applications, it never identifies a context.

Q.      So does the NLU process Alexa when it's determining

Johnson - direct

15:47:19 1   the meaning of the words to establish a context?

15:47:21 2   A.      It does not establish a context.

15:47:58 3                THE COURT:  Why don't you go back to the podium?

15:48:02 4                MR. HADDEN:  I'm sorry, yes, Your Honor.

15:48:21 5                I apologize, Your Honor.

15:48:23 6   BY MR. HADDEN:

15:48:24 7   Q.      If we go back to this slide from Dr. Polish's

15:48:28 8   presentation where he is discussing this step of interprets

15:48:33 9   the recognized words or phrases wherein interpreting the

15:48:37 10  recognized words or phrases includes establishing a context

15:48:41 11  for the natural language utterance.  And he shows this same

15:48:45 12  diagram we saw before from this Amazon invent document.  Do

15:48:54 13  you see that?

15:48:54 14  A.      Yes, I see that.

15:48:55 15  Q.      Now, is there anything in this diagram on the

15:49:00 16  right-hand side of Dr. Polish's slide that shows wherein

15:49:06 17  interpreting the recognized words or phrases includes

15:49:10 18  establishing a context?

15:49:11 19  A.      No.  You can see still even in this slide you can

15:49:12 20  kind of see there is multiple pieces of paper up there

15:49:18 21  showing that there are multiple meaning in the natural

15:49:21 22  language understanding engine.  It does not establish a

15:49:24 23  context.

15:49:26 24  Q.      And this is another slide that Dr. Polish put up.

15:49:31 25  And he had the red box about this context interpreter.  Does

Johnson - direct

this, what's shown on the right of this slide, does this

show that the interpreting in the recognized words or

phrases includes establishing a context?

A.     It does not.  This is related to the re-ranker that

we talked about earlier, that's where this comes into play.

Again, it's only reordering already determined meanings.

Q.     And we have this arrow here with respect to the two

step approach.  Is this step, the second step that's

described in this document, is this even performed in

Dr. Polish example?

A.     You mean the play music example we just saw?

Q.     No, the example that he went through, I think it was

asking about an iPhone case?

A.     Buy an iPhone, I want to buy an iPhone case, maybe.

In the I want to buy an iPhone case example, that's

something Alexa can reply to single-turn utterance, there is

no dialogue act, if you remember that dialogue act is the

part two that passes the prompt information from the

application to do the re-ranking, so this whole thing about

two step approach and context interpreter is not relevant to

the example that Dr. Polish used at all.

Q.     And did Dr. Polish essentially admit that?

A.     Yeah.  You asked him about that, and he said that

that's correct.

Q.     Go back to this slide.  What's your conclusion about

Johnson - direct

15:51:06  1   whether or not Alexa interprets the recognized words or

15:51:10  2   phrases wherein interpreting the recognized words or phrases

15:51:14  3   includes establishing a context for the natural language

15:51:17  4   utterance?

15:51:17  5   A.      Alexa never establishes a context, so this is just

15:51:21  6   not how Alexa works.

15:51:23  7   Q.      Now, the next element, E, can you read that and

15:51:28  8   explain it to for the jury, Dr. Johnson?

15:51:32  9   A.      This just requires selecting an advertisement in that

15:51:35 10   condition text, something about the context to select an

15:51:38 11   advertisement for the initial user.

15:51:39 12   Q.      Does Alexa select an advertiser in the context that

15:51:44 13   was established?

15:51:44 14   A.      Alexa doesn't establish a context, given that it

15:51:48 15   doesn't establish a context, it couldn't identify an

15:51:50 16   advertiser for the context, so it does not.

15:51:54 17   Q.      So what's your conclusion, then, with respect to this

15:51:58 18   element E about selecting an advertisement in this context?

15:52:00 19   A.      Alexa doesn't do that.

15:52:02 20   Q.      Now, if you go to the last element G, this one is a

15:52:02 21   little longer, it's adaptive miss recognition engine.  Could

15:52:02 22   you again read this element for the jury and explain what it

15:52:14 23   requires, Dr. Johnson?

15:52:14 24   A.      This is the most complicated part it has this

15:52:18 25   adaptive misrecognition engine configured to determine that

15:52:22 1     the conversational language incorrectly interpreted the

15:52:25 2     words or phrases in response to detecting a redetermined

15:52:28 3     event.  So it figures this predetermined event that tells it

15:52:32 4     that the words or phrases were incorrectly interpreted.  And

15:52:36 5     then the conversational language processor reinterprets the

15:52:39 6     words or phrases in response to the predetermined event.  So

15:52:43 7     it presses an ad and then something happens after the ad

15:52:47 8     that is a predetermined event that says oh, something about

15:52:50 9     what happened tells me that I misrecognized something

15:52:54 10    earlier, I'm going to go back and fix that.

15:52:57 11    Q.     And does -- did Mr. Peck find any source code in

15:53:03 12    Alexa that does this detecting and reinterpreting?

15:53:07 13    A.     He acknowledged he had not looked at this.

15:53:09 14    Q.     Did Dr. Polish identify any source code in Alexa that

15:53:13 15    does this detecting a predetermined event and reinterpreting

15:53:17 16    the words and phrases in response?

15:53:19 17    A.     He did not.

15:53:21 18    Q.     Now, Dr. Polish put up this slide which is an example

15:53:25 19    of Alexa, I want to buy an iPhone case.  Do you see that?

15:53:28 20    A.     I do.

15:53:29 21    Q.     Okay.  And does this show any predetermined event or

15:53:33 22    reinterpreting a misinterpretation?

15:53:38 23    A.     No, this doesn't seem connected to the patent claim.

15:53:42 24    There is no reinterpretation.  There would have to be -- if

15:53:45 25    the advertisement was Amazon's choice, for example, there

Johnson - direct

15:53:51  1    would have to be something after that that was a
15:53:53  2    predetermined event that caused the system to recognize that
15:53:56  3    it misrecognized something, I don't see anything like that
15:54:00  4    in this example.
15:54:01  5    Q.      Dr. Polish also put up this slide, again, re-ranker
15:54:06  6    diagram from that Amazon deep dive document.  Does this
15:54:12  7    re-ranker diagram on the right-hand side, does that show any
15:54:16  8    reinterpreting of the words or phrases in response to the
15:54:19  9    predetermined event?
15:54:21 10    A.      It's not.  First of all, the re-ranker would not have
15:54:24 11    been used in Dr. Polish's examples which was a one shot
15:54:28 12    utterance.  But if you had a two sequence of some kind, what
15:54:31 13    this re-ranker does, is again it takes dialogue acts or
15:54:36 14    other information, dialogue act comes from the application
15:54:39 15    and a prompt that goes back to the user and it reorders the
15:54:43 16    meanings and can rescore them, but it never does anything
15:54:47 17    with the meanings, doesn't change the meanings or determine
15:54:49 18    the meanings, therefore it can't reinterpret any meanings.
15:54:53 19    In a sense, we've already seen that Alexa only uses the
15:54:57 20    current words, and the next utterance, it uses those current
15:55:01 21    words, it doesn't ever go back and say oh, I got previous
15:55:04 22    words wrong.  It's not even using previous words in what
15:55:08 23    it's doing now, so there is nothing that would even make
15:55:12 24    sense for Alexa to do this reinterpretation, it would be
15:55:16 25    like a system redesign element.

Johnson - direct

15:55:18  1   Q.      Just to go back to that last point, make sure it's

15:55:21  2   clear.   Is there any time that Alexa would interpret the

15:55:25  3   words to those DNNs that we saw and then somehow reinterpret

15:55:30  4   those same words through that process?

15:55:32  5   A.      No, once it goes through the deep neural networks and

15:55:36  6   you have the list of the intended meanings, those move on in

15:55:38  7   this system.   It never goes back and says, oh, I'm going to

15:55:43  8   tweak something, you can't, there is nothing in the there to

15:55:46  9   tweak, if you ran it again it would do the same thing, but

15:55:49 10   there is no reinterpretation that ever happened.

15:55:51 11   Q.      Did Dr. Polish ever identify any actual

15:55:54 12   reinterpretation?

15:55:55 13   A.      He did not point to anything.

15:55:58 14   Q.      If we go back to Claim 40, then, what was your

15:56:01 15   conclusion with respect to this last element that requires

15:56:04 16   an adaptive misrecognition engine and that it reinterprets

15:56:12 17   based on some predetermined adaptive event?

15:56:14 18   A.      I crossed that off because Alexa doesn't work that

15:56:17 19   way and in general that means Alexa accused products do not

15:56:20 20   infringe this patent claim.

15:56:24 21   Q.      Again you have three red X's here, how many would it

15:56:28 22   take to show that Alexa doesn't infringe?

15:56:31 23   A.      Just one, just that adaptive misrecognition engine it

15:56:35 24   clearly doesn't have.

15:56:36 25   Q.      Moving on to the next patent, the '097 patent, Claim

Johnson - direct

23.   Can you give us a higher level explanation of what's going on in this claim?

A.     This is also pretty simple, it's about advertisements.  So you provide an advertisement to the user and you receive then a natural language utterance from the user.  And then you interpret that utterance based on the advertising you just gave them and you figure out whether there was a pronoun in there and then you determine whether the pronoun refers to one or more product or service that may have been in the advertisement, but you determine whether it's a product or a service.

Q.     Again, this is a claim that talks about computer program instructions, is that right?

A.     That's right, Dr. Polish talked about computer program instructions.

Q.     Why does that matter?

A.     Again, Dr. Polish or Mr. Peck did not look at source code specifically to see whether these sequence of elements were carried out by Alexa.

Q.     Go to the last element here, and I know you talked about the pronoun already, but could you just read this element and then explain why you think Alexa doesn't do this?

A.     Yes.  This claim requires that responsive to the existence of a pronoun to determine if a pronoun exists, you

15:57:58 1   determine whether the pronoun refers to a product or

15:58:01 2   service, that's what's required.

15:58:04 3   Q.      And again, has Mr. Peck identified any source code in

15:58:10 4   Alexa that does this?

15:58:11 5   A.      No, he did not.

15:58:12 6   Q.      And did Dr. Polish identify any source code in Alexa

15:58:16 7   that does this?

15:58:16 8   A.      He did not.

15:58:18 9   Q.      So does Alexa resolve their pronoun it in the example

15:58:25 10   that Mr., or Dr. Polish used the shopping example?

15:58:29 11   A.      It does not.  Vinod Krishnan is a senior manager for

15:58:34 12   Alexa Shopping, you may remember that Dr. Polish

15:58:37 13   specifically accused Alexa Shopping of infringing this

15:58:40 14   particular patent.  And Vinod, Mr. Krishnan was asked,

15:58:46 15   whether Alexa Shopping results from, and he specifically

15:58:51 16   said Alexa Shopping does not do that.  He actually

15:58:54 17   specifically said it doesn't call what's called anaphora

15:58:58 18   resolution.  Anaphora is a fancy word for a word that refers

15:59:02 19   to something else and a pronoun is an example of that.  So

15:59:05 20   he said specifically shopping doesn't do that.

15:59:05 21           There is a pretty clear reason for this.  If you

15:59:09 22   look at that example, Alexa, I want to buy an iPhone case,

15:59:14 23   shopping already knows, it's already in your cart.  They

15:59:17 24   don't need to, if you say something like buy it later, they

15:59:21 25   don't need to go figure out what you're talking about, it's

Johnson - direct

in your cart.  So there is no need to figure out what a

pronoun might be referring to, it's in your cart, they just

need confirmation to go ahead and buy something, so Alexa

Shopping doesn't do that.

Q.     Did you confirm that in your own use of Alexa?

A.     Yeah, just as an illustration I tried buy it now

versus buy now, and saw that when you said buy now it goes

ahead and places an order, and this is for paper towels, I

said add paper towels in my cart and I said buy now, it

prompted buy it now, and I just said buy now and it did it

the same either way.

Q.     Did Dr. Polish identify any testimony from Amazon

engineers that a shopping interaction would actually

determine the meaning of the it pronoun?

A.     No, he just used examples, I think he used the what

color versus what color is it, looks like it's paying

attention to whether there is a pronoun, but I think Dr.

Strom already talked about exactly what that case was doing,

that wasn't about whether there was a pronoun there

necessarily.

Q.     Did Dr. Polish identify any Amazon documents that

would indicate that in that example the pronoun it was being

determined to refer to the iPhone case or anything else?

A.     No, he didn't provide any evidence that supports that

claim.

Johnson - direct

16:00:50 1   Q.      So if we go back to the claim now, what is your
16:00:55 2   conclusion with respect to this element E?
16:00:58 3   A.      So for the two reasons we just discussed, in my
16:01:01 4   opinion, the accused Alexa products do not infringe the '097
16:01:06 5   patent, Claim 23.
16:01:07 6   Q.      You were here for Dr. Strom's explanation about what
16:01:10 7   was actually going on in that example that Dr. Polish used
16:01:14 8   about what color versus what color is it, do you recall
16:01:17 9   that?
16:01:17 10  A.      Yes.
16:01:18 11  Q.      And was Dr. Strom's explanation, there was a
16:01:23 12  downstream routing issue, is that consistent with your
16:01:26 13  understanding of how Alexa works?
16:01:28 14  A.      Yeah, that seemed pretty obvious for the fact that it
16:01:32 15  responded like totally off topic.  Clearly it wasn't
16:01:36 16  processed by shopping.  I mean, again, as he said, that
16:01:39 17  pointed out that it doesn't use knowledge from the previous
16:01:42 18  utterance.  Mostly what it shows is that the difference
16:01:45 19  between those two processing claims is that one of them got
16:01:48 20  directed to shopping correctly and one of them should have
16:01:51 21  gotten directed to shopping but was incorrectly not directed
16:01:55 22  there.
16:01:56 23  Q.      Thank you, Dr. Johnson.
16:01:57 24          If we get to the final patent, the '703 patent,
16:02:01 25  this is Claim 25.  You are just going to walk us through at

Johnson - direct

16:02:05 1    a high level what's going on in this claim?

16:02:08 2    A.    This is about voice commerce, even though there are a

16:02:11 3    lot of words here, it's actually pretty straight forward.

16:02:15 4    You get input from a user, and you basically figure out

16:02:20 5    whether this refers to a product or a service, you go and

16:02:24 6    get payment information and shipping information.  You get

16:02:28 7    all that, right?  And then without -- and that is without

16:02:32 8    further user input, specifically shipping information

16:02:35 9    without further user input.  And then you provide a

16:02:39 10   confirmation to use the shipping or payment information for

16:02:43 11   the system, at a high level that's what's in the claim.

16:02:46 12   Q.    You said you provide a confirmation.  Did you provide

16:02:48 13   a confirmation or a request for confirmation?

16:02:51 14   A.    Thank you, sorry, it specifically says you have to

16:02:53 15   provide a request for confirmation to the user to use that

16:02:56 16   payment or shipping information.  Thank you.

16:03:00 17   Q.    And again, this is a claim that requires program

16:03:04 18   instructions, is that right?

16:03:05 19   A.    Yes, it does, it says programmed with computer

16:03:02 20   program instructions.

16:03:02 21   Q.    And did Dr. Polish identify any computer program

16:03:14 22   instructions that does anything in this claim?

16:03:16 23   A.    He did not.

16:03:20 24   Q.    We start with this element E, which requires to

16:03:24 25   determine without further user input after the receipt of

Johnson - direct

16:03:26 1   the user input, a context based at least on the one or more

16:03:32 2   words or phrases.  Can you explain what this requires and

16:03:38 3   then whether Alexa does it?

16:03:39 4   A.      So this is determine a context, and at a high level

16:03:42 5   we've already seen that Alexa never determines a context or

16:03:46 6   produces or establishes or identifies a context.  So Alexa

16:03:49 7   does not determine a context, it just identifies a bunch of

16:03:54 8   possible meanings and keeps sending them through.

16:03:56 9   Q.      And again, did Mr. Peck identify any or find any

16:04:01 10  Alexa source code that does this determine a context?

16:04:03 11  A.      He did not.

16:04:05 12  Q.      And again, we're back to our DNN diagram.  Alexa

16:04:17 13  determines -- sorry, let me ask a better question.

16:04:23 14          Does Alexa determine a context when it's

16:04:26 15  interpreting the one or more words or phrases?

16:04:30 16  A.      It does not.  As we've seen it uses those deep neural

16:04:33 17  networks, it uses all of them and makes a list of possible

16:04:37 18  meanings, it never selects one or determines a context, it

16:04:40 19  just moves all the meanings through.

16:04:44 20  Q.      So if we go to the next element, F, can you explain

16:04:48 21  what's going on in this element?

16:04:49 22  A.      So, this just says identify a product or service.  It

16:04:54 23  says the product or service, excuse me, to be purchased

16:04:57 24  based at least on the determined context.

16:04:59 25  Q.      Okay.  So it's kind of some intervening language here

Johnson - direct

16:05:03 1    that we didn't put in red but I want to make sure we don't

16:05:07 2    miss it.

16:05:08 3    A.      Sure.

16:05:08 4    Q.      It says identify without further user input after

16:05:11 5    receipt of the user input, which is kind of an odd phrase,

16:05:15 6    but can you explain what that is requiring?

16:05:18 7    A.      There was one input, right, the user said one thing.

16:05:22 8    You have to identify without further user input after

16:05:26 9    receipt of that one thing, the product or service to be

16:05:29 10   purchased on behalf of the user based at least on the

16:05:33 11   determined context, you still haven't said anything else

16:05:36 12   yet.

16:05:37 13   Q.      Can we look at what Dr. Polish said in his slide?  He

16:05:44 14   has this example.  And what is the user input that

16:05:50 15   Dr. Polish is pointing to when he was describing this

16:05:54 16   language?

16:05:54 17   A.      So, the first time he said Alexa I want to buy an

16:05:58 18   iPhone case.

16:06:00 19   Q.      And did Dr. Polish show that a product was identified

16:06:08 20   within a determined context in that example?

16:06:10 21   A.      No, there was no reference to a determined context.

16:06:12 22   Alexa doesn't determine contexts.

16:06:16 23   Q.      So if we go back to the claim, what's your conclusion

16:06:23 24   with respect to this element F regarding identifying the

16:06:25 25   product or service to be purchased on behalf of the user

Johnson - direct

16:06:33 1    based at least on the determined context?

16:06:35 2    A.      Alexa doesn't determine a context, and because of

16:06:38 3    that, Alexa does not meet this element.

16:06:40 4    Q.      If we go to the next, or not the next element, we'll

16:06:44 5    skip the obtain payment information, and go to element H.

16:06:48 6    Can you explain this, read this, and explain what this

16:06:52 7    means?

16:06:52 8    A.      Sure.   This is obtain without further user input,

16:06:55 9    after the original user input, shipping information with

16:06:59 10   which to deliver the product or service, that has to include

16:07:02 11   name and address and some other things, but the core is you

16:07:05 12   have to obtain shipping information without further user

16:07:08 13   input after that original utterance.

16:07:09 14   Q.      When you say you have to, do you mean the system has

16:07:13 15   to?

16:07:13 16   A.      In the claim, the system in this case a system for

16:07:16 17   providing voice commerce must do that claim.

16:07:20 18   Q.      Sure, I did the same thing.  Did Mr. Peck identify or

16:07:25 19   find any source code in Alexa that does this obtain without

16:07:29 20   further user input shipping information?

16:07:31 21   A.      He acknowledged he had not looked for that.

16:07:35 22   Q.      Now, if we go back to Dr. Polish's example where the

16:07:41 23   user input is Alexa, I want to buy an iPhone case, did

16:07:46 24   Dr. Polish show that anything in Alexa would obtain shipping

16:07:50 25   information without further user input at that point?

16:07:54 1    A.       No, at this point, the system had put this item in a

16:07:59 2    cart, but it hasn't started any checkout processes or

16:08:02 3    anything because the user hasn't said to do that yet.  So at

16:08:06 4    this point there has been no obtained shipping information

16:08:09 5    without further user input.

16:08:11 6    Q.       So what is your conclusion, then, with respect to

16:08:14 7    this element H that requires obtaining without further user

16:08:18 8    input shipping information?

16:08:20 9    A.       Alexa doesn't do that because it doesn't go get the

16:08:23 10   shipping information until later basically, it doesn't do

16:08:26 11   that without further input.

16:08:28 12   Q.       Now, at one point in Dr. Polish's testimony, he

16:08:35 13   switched and started talking about buy it now.  Do you

16:08:37 14   recall that?

16:08:37 15   A.       Yes, I remember that.

16:08:39 16   Q.       Could buy it now be the user input in this claim?

16:08:43 17   A.       Buy it now was the original user input, then you

16:08:49 18   could try and say that that was concerning shipping

16:08:52 19   information, somehow, but it wouldn't identify the product

16:08:54 20   or service, because when you say buy it now, the product is

16:08:58 21   already in your cart.  It's exactly following the steps of

16:09:02 22   the claim.  One of these fails for one reason and the other

16:09:06 23   one fails for a different reasons.

16:09:07 24   Q.       Is it similar to what we saw in claim one of the '681

16:09:11 25   where you have to have a single consistent utterance to be

Johnson - direct

16:09:13 1   used throughout?

16:09:14 2   A.      Correct.

16:09:15 3   Q.      What is your conclusion, then, with respect to this

16:09:19 4   element?

16:09:20 5   A.      So again, going back to the Alexa I want to buy an

16:09:22 6   iPhone case, which is what we were mapping, it does not

16:09:26 7   carry out this step.  Alexa doesn't work that way.

16:09:29 8   Q.      This is just going back to the point we talked about

16:09:32 9   wherein this mapping, Dr. Polish switched between I want to

16:09:36 10  buy an iPhone case and buy it now?

16:09:38 11  A.      This is the same, same point.

16:09:47 12  Q.      If we go to the last element, I, can you just kind of

16:09:51 13  explain, read this element and explain what's required?

16:09:53 14  A.      So the key part is the system has to have a request

16:09:57 15  for user confirmation to use the payment information and the

16:10:01 16  shipping information.  It's fairly specific about that.  A

16:10:05 17  request for a user confirmation to use the payment

16:10:09 18  information and the shipping information.

16:10:11 19  Q.      Alexa would have to say something like confirm you

16:10:12 20  want to ship this to your address at blah, blah, blah?

16:10:18 21  A.      And use this credit card number.

16:10:21 22  Q.      Got it.

16:10:22 23          And does Alexa do that?

16:10:23 24  A.      It does not.

16:10:26 25  Q.      Okay.  And again, this is from Dr. Polish's

Johnson - direct

16:10:30 1   presentation, and when he says, Alexa I want to buy an

16:10:34 2   iPhone case, was there any request for confirmation, payment

16:10:39 3   and shipping information that came back from Alexa?

16:10:42 4   A.     No.   There was no request for confirmation of payment

16:10:46 5   or shipping information, there was just the text that

16:10:49 6   explains what Amazon's choice was and said you can say these

16:10:53 7   different things, but none of those is a request to confirm

16:10:56 8   payment and shipping information.

16:10:59 9   Q.     And if we even consider the switched utterance, buy

16:11:04 10  it now, and Dr. Polish said buy it now, did Alexa request

16:11:09 11  user confirmation of payment or shipping information?

16:11:13 12  A.     No, this is not a request for confirmation of payment

16:11:16 13  or shipping information, so neither the response to the

16:11:20 14  previous utterance was a request for payment -- confirmation

16:11:25 15  of payment and shipping information, nor the response right

16:11:27 16  here which is a statement that it's been ordered is a

16:11:30 17  request for confirmation of payment and shipping

16:11:33 18  information.

16:11:35 19  Q.     Thank you, Dr. Johnson.

16:11:37 20          So, in sum, did Dr. Polish ever show that Alexa

16:11:42 21  request -- made a request to the user for user confirmation

16:11:42 22  to use the payment or shipping information?

16:11:51 23  A.     No, Alexa doesn't ask for that particular

16:11:52 24  confirmation when you buy something.

16:11:55 25  Q.     So what's your conclusion, then, with respect to

Johnson - direct

16:11:58 1   Claim 25 of the '703 patent?

16:12:01 2   A.      So, for the reasons we just talked about, a number of

16:12:04 3   different reasons, in my opinion the accused products do not

16:12:07 4   infringe the '703 patent, Claim 25.

16:12:11 5   Q.      Before we switch to another topic, to sum up your

16:12:16 6   conclusion, what are your conclusions with respect to

16:12:19 7   whether or not Alexa uses any of the four patents in this

16:12:21 8   case?

16:12:21 9   A.      In my opinion, the accused Alexa products do not

16:12:25 10  infringe any of these four patents.

16:12:28 11  Q.      We're going to switch gears and talk about a couple

16:12:32 12  of invalidity issues.  Okay, Dr. Johnson?

16:12:35 13  A.      Yeah, sure.

16:12:36 14  Q.      The first one is this written description issue.  Can

16:12:39 15  you explain generally what the written description

16:12:43 16  requirement is for a patent?

16:12:44 17  A.      Sure.  This is my engineer's description of the

16:12:47 18  lawyer concept of written description.  In general a patent

16:12:51 19  has to indicate to a person of skill in the art that the

16:12:52 20  inventor actually like possesses the full scope of the

16:12:52 21  claimed invention.  They have to actually have invented that

16:13:00 22  and you can tell that from the patent documents that they

16:13:00 23  have actually invented it.

16:13:07 24  Q.      And let's go to the patents through and try to

16:13:11 25  understand your analysis on this point.  If we start with

16:13:15 1   the '681 patent again in Claim 13, you have broken it up

16:13:20 2   into some color coding here.  Can you explain what that

16:13:24 3   indicates?

16:13:24 4   A.      The purple at the top are the pieces where you have

16:13:27 5   to accumulate shared knowledge, short term shared knowledge,

16:13:32 6   current knowledge, long-term shared knowledge based on past

16:13:35 7   conversations.  The blue is the identify a context.  And the

16:13:39 8   establish an intended meaning for the utterance within that

16:13:42 9   context.  And then the green is that grammatically or

16:13:46 10  syntactically adapted response.  For written description

16:13:50 11  what would be required is that the patent shows that the

16:13:52 12  inventors had invented these things, knew how to do them and

16:13:56 13  showed a person of skill in the art what that invention was

16:13:59 14  and that they possessed the means to do that.

16:14:04 15  Q.      Okay.  If we look at the patent to see whether we can

16:14:07 16  find evidence that the inventor actually had solved this

16:14:10 17  problem and had an invention, you show this figure here.

16:14:16 18  What does this figure indicate to you?

16:14:17 19  A.      So this is a figure from the patent that is kind of a

16:14:21 20  block diagram of the pieces that they show that carry out

16:14:24 21  the steps of the claims.  And what I would say is that the

16:14:27 22  level of description in the patent is at the block diagram

16:14:31 23  level.  It sort of restates what's in this claims, you

16:14:35 24  should do these things, you should accumulate shared

16:14:38 25  knowledge, but it doesn't have what I would call detailed

Johnson - direct

16:14:41  1    steps on how one would carry that out.  So a person reading

16:14:45  2    this would not know that the inventors actually invented

16:14:49  3    this and they know how to do it.  We wouldn't be able to

16:14:52  4    tell that from reading the patent specification.

16:14:54  5    Q.     And have you seen other -- is there other evidence in

16:15:00  6    the patent itself that shows that there is no written

16:15:05  7    description that the inventors knew how to do this?

16:15:07  8    A.     Yeah, I have highlighted a few phrases to kind of

16:15:11  9    illustrate that.  The shared knowledge may include, so it

16:15:15 10    gives examples of what shared knowledge could be, but it

16:15:17 11    doesn't tell you how you figure out how to accumulate those

16:15:21 12    things or store them or how you would even use them later,

16:15:25 13    but how you would accumulate them, no details.

16:15:27 14    Q.     Does the patent tell you, does the patent describe

16:15:30 15    how someone would select which shared knowledge to

16:15:33 16    accumulate?

16:15:34 17    A.     No, it's just kind of a list of things that could be

16:15:37 18    shared, shared short-term knowledge, in this case, shared

16:15:40 19    knowledge.

16:15:41 20    Q.     And what is this example showing?

16:15:44 21    A.     Just a generic phrase, short-term data session may be

16:15:50 22    expired after a psychologically appropriate amount of time,

16:15:54 23    thereby humanizing system behavior.  These are the kind of

16:15:58 24    words that are in the patent describing how to do this.  It

16:16:01 25    really, again -- remember it came sort of the ideas of this,

Johnson - direct

'681 patent came from that VUE paper that Tom Freeman wrote that was based on that philosophical language paper from 1975 I think it was by Mr. Paul Grice, which they acknowledge are where these ideas came from.  The description in the patent is almost at the level of that 1975 philosophy of language paper.

Q.     So as a computer engineer reading this, does this tell you that the inventor actually had a solution for accumulating short-term shared knowledge and using it to determine or identify context?

A.     No.

Q.     We switch now to the element C that talks about accumulating long-term shared knowledge.  And does this describe that the inventor had a solution for accumulating long-term shared knowledge and using it along with short-term shared knowledge to identify a context?

A.     No, just general statements, long-term shared knowledge may generally be user-centric, inputs may be accumulated over time to build user, environmental, cognitive, historical or other long-term knowledge models, no idea how to do these, just the statement it could include these kinds of things.

Q.     Is this another example of the same types of descriptions or just describing what you would hope to do?

A.     Yeah, this is the same kind of thing, I don't want to

Johnson - direct

16:17:33  1    read through all of them, but it's just an idea of what kind

16:17:36  2    of things could be long-term shared knowledge, not how to

16:17:44  3    accumulate them.

16:17:45  4    Q.    Here is the longest one.  This is talking about

16:17:47  5    sources of long-term shared knowledge, is that right,

16:17:51  6    Dr. Johnson?

16:17:51  7    A.    Yes, you could read through this whole thing, but

16:17:54  8    it's just lists of things that could be long-term shared

16:17:57  9    knowledge, no suggestion of how you might go about

16:18:01 10    accumulating them, using them, doing something with them.

16:18:06 11    Q.    And if we look now at this element D, which is the

16:18:14 12    part that identifies this context using that long-term and

16:18:22 13    short-term shared knowledge, does this diagram show that the

16:18:27 14    inventors had a way to actually identify context using that

16:18:30 15    information?

16:18:30 16    A.    It just shows a box that says context determination,

16:18:34 17    you can see number 255 in the top right corner.  Right.  So

16:18:39 18    that's the level of at which they're describing how you

16:18:42 19    would identify a context as we've seen is like the core

16:18:46 20    piece of the idea of the patent, can you identify a context

16:18:50 21    first.

16:18:50 22    Q.    And have you seen evidence in this case that confirms

16:18:54 23    that in fact inventors didn't have or didn't possess this

16:18:59 24    invention, that they didn't have a solution?

16:19:02 25    A.    I think they acknowledged that they hadn't built

Johnson - direct

16:19:04 1    these things.  I think you asked Mr. Freeman, had he

16:19:07 2    invented a conversational speech engine, and he said no.

16:19:11 3    Q.      And did Dr. Polish also acknowledge in his deposition

16:19:15 4    that the patent doesn't describe how to actually do this?

16:19:18 5    A.      Yeah, he was asked if it describes how to do this,

16:19:21 6    and he acknowledged that it does not describe how to do your

16:19:25 7    job as an engineer I think is what he said.

16:19:29 8    Q.      Again if we get to the identifying a context for

16:19:32 9    short-term shared knowledge and long-term shared knowledge,

16:19:35 10   did Mr. Freeman confirm that he had no such solution?

16:19:39 11   A.      Yes.  Mr. Freeman basically said he would send that

16:19:43 12   off to the engineers to figure out how to do it, but the

16:19:46 13   patent did not yet show how to do it.

16:19:49 14   Q.      And finally, if we get to the last element of the

16:19:53 15   grammatically or syntactically adapting a response, did the

16:19:59 16   patent explain how you would do that?

16:20:01 17   A.      It says that contextually sensitive intelligent

16:20:05 18   responses may be generated from the intelligent hypotheses,

16:20:09 19   which again was a block in that block diagram.

16:20:12 20   Q.      Does the fact that intelligent contextually sensitive

16:20:16 21   responses may be generated, does that indicate to you as a

16:20:21 22   person of skill in the art that the inventors received an

16:20:24 23   actual solution for doing that?

16:20:26 24   A.      No, a person of skill in the art at the time would

16:20:28 25   read this and would not know at all that the inventors

16:20:32 1   actually knew how to do this or possessed this concept or

16:20:36 2   this invention.

16:20:38 3   Q.      If you look in your binder, there should be an

16:20:41 4   exhibit DTX-102.

16:20:46 5   A.      Just a second.

16:20:49 6   Q.      Sorry.  May be the wrong binder.

16:20:54 7   A.      Oh, I see it.  Yeah.

16:20:57 8   Q.      Okay.  Do you recognize DTX-102, sir?

16:21:02 9   A.      Yes, this is the VUE paper that was sort of, I think

16:21:05 10   Mr. Freeman might have called it a vision piece about this

16:21:09 11   idea.

16:21:10 12                  MR. HADDEN:  Move DTX-102 into evidence.

16:21:13 13                  MR. SMITH:  No objection.

16:21:16 14                  THE COURT:  Thank you.  It is admitted.

16:21:16 15                  (DTX Exhibit No. 102 was admitted into

16:21:18 16   evidence.)

16:21:18 17   BY MR. HADDEN:

16:21:19 18   Q.      Yes, can you again remind the jury what this paper

16:21:22 19   is?

16:21:25 20   A.      This is as we can see on the screen this high level

16:21:26 21   paper by Tom Freeman and Larry Baldwin about the idea of how

16:21:33 22   to take some of the ideas from Paul Grice's 1975 paper and

16:21:40 23   apply to them to computer speech.

16:21:42 24   Q.      Did Mr. Freeman acknowledge that this paper was just

16:21:47 25   aspirational and had no solution?

Johnson - direct

A.      Yeah, when he was asked about this, he said it was a vision piece that was aspirational in nature.

Q.      If we look at the piece of that paper that he testified about, it describes again this 1975 paper where this cooperative conversational idea came from; is that right?

A.      That's right.

Q.      Underneath that, Mr. Freeman testified about this, some of the concepts that he testified came from Mr. Grice's paper were the shared knowledge ideas, right?

A.      That's right.

Q.      And those are the same basic concepts that we went through in Claim 13 of the '681 patent; is that right?

A.      Yeah, that's the basic ideas from this 1975 paper are the core ideas of this patent claim.

Q.      And does that also include the shared long-term knowledge?

A.      Correct.

Q.      Okay.  And this idea that you would determine intents after having that shared long-term and short-term knowledge, did Mr. Freeman acknowledge that that too came from Mr. Grice's paper?

A.      Yes, he did.

Q.      Finally, if we get to the adaptive response, did Mr. Freeman agree that that too came from Mr. Grice's 1975

Johnson - direct

paper?

A.    Yes, he admitted that.

Q.    If we look at what was in Mr. Grice's paper in 1975
as Mr. Freeman acknowledges and what we see in the claim,
what is your conclusion, what is this claim really doing?

A.    I would say this claim is an aspirational claim that
describes the idea of how to carry out these steps, except
maybe do it on a computer instead of as people, right, which
is kind of how they described it as well.  What's in the
patent and describes how to do this is really just more of
the same kind of claim language, aspirational in nature that
I do not think would convince a person of skill in the art
at the time that they actually had invented what's in this
patent.

Q.    And is it consistent with Mr. Freeman's testimony
that these ideas came from Mr. Grice?

A.    Yeah, he said that.

Q.    What is your conclusion, then, with respect to
whether or not the '681 patent meets the written description
requirement that shows that the inventors actually possessed
the full scope of this invention when they filed their
patent?

A.    In my opinion, this does not meet the written
description requirement.

Q.    Let's go to --

16:24:41  1             MR. HADDEN:  Your Honor, I'm going to jump to

16:24:43  2  another claim.  We're almost at 4:30.  I can keep on.

16:24:47  3             THE COURT:  Why don't we break for the day.

16:24:49  4             MR. HADDEN:  Sure.

16:24:49  5             THE COURT:  All right.  I wish you all safe

16:24:54  6  travels and just remind you not to talk about the case with

16:24:58  7  anyone outside of the courtroom.  See you tomorrow.

16:25:01  8             COURTROOM DEPUTY:  All rise.

16:25:02  9             (Jury exiting the courtroom at 4:25 p.m.)

16:25:22 10             THE COURT:  All right.  I haven't had a chance

16:25:29 11  to figure out what I was going to do with 101 based on your

16:25:34 12  letter and I have a 4:30 call today, so why don't we table

16:25:41 13  that for now.  And we can talk about it tomorrow when we

16:25:45 14  talk about the jury instructions.  All right.

16:25:50 15             MR. HADDEN:  Thank you, Your Honor.

16:25:51 16             THE COURT:  Anyone else have anything to talk

16:25:53 17  about?

16:25:53 18             MR. YOON:  No, Your Honor.

16:25:53 19             MR. HADDEN:  No, Your Honor.

16:25:54 20             THE COURT:  See you tomorrow.

21             (Court adjourned at 4:25 p.m.)

22       I hereby certify the foregoing is a true and
accurate transcript from my stenographic notes in the proceeding.

23

24                 /s/ Dale C. Hawkins
               Official Court Reporter

25                U.S. District Court