08:33:10

```
                    IN THE UNITED STATES DISTRICT COURT

                      FOR THE DISTRICT OF DELAWARE


VB ASSETS, LLC,                ) VOLUME 4
                               )
            Plaintiff,         )
                               ) C.A. No. 19-1410(MN)
v.                             )
                               )
AMAZON.COM SERVICES LLC,       )
                               )
            Defendant.         )



                    Tuesday, November 7, 2023
                    9:00 a.m.
                    Jury Trial


                    844 King Street
                    Wilmington, Delaware



BEFORE:   THE HONORABLE MARYELLEN NOREIKA
          United States District Court Judge




APPEARANCES:


                WILSON SONSINI GOODRICH & ROSATI PC
                BY:   NEAL C. BELGAM, ESQ.
                BY:   JAMES C. YOON, ESQ.
                BY:   MATTHEW A. MACDONALD, ESQ.
                BY:   RYAN R. SMITH, ESQ.
                BY:   BRAD TENNIS, ESQ.
                BY:   JAMIE Y. OTTO, ESQ.


                            Counsel for the Plaintiff
```

Johnson - direct

1    APPEARANCES CONTINUED:

2

3            ASHBY & GEDDES
             BY:  STEVEN J. BALICK, ESQ.

4            -and-

5            FENWICK & WEST LLP
6            BY:  J. DAVID HADDEN, ESQ.
             BY:  SAINA S. SHAMILOV, ESQ.
7            BY:  RAVI R. RANGANATH, ESQ.
             BY:  VIGEN SALMASTLIAN, ESQ.
8            BY:  MELANIE MAYER, ESQ.
             BY:  JEFFREY WARE, ESQ.

9
                     Counsel for the Defendant

10

11

12            — — — — — — — — — — —

13

14

09:03:29  15            THE COURT:   All right.  Good morning, everyone.

09:03:31  16    Bring in the jury.

09:03:38  17            (Jury entering the courtroom at 9:03 a.m.)

09:03:55  18            THE COURT:  All right, everyone.  Welcome back.

09:04:00  19    Everyone can be seated.

09:04:02  20            Mr. Hadden.

09:04:05  21            MR. HADDEN:  Thank you, Your Honor.

09:04:06  22    BY MR. HADDEN:

09:04:07  23    Q.    Good morning, Dr. Johnson.

09:04:09  24    A.    Good morning.

09:04:10  25    Q.    Where we left off yesterday we were talking about the

09:04:15  1    written description requirement.  Do you recall that?

09:04:17  2    A.     Yes.

09:04:18  3    Q.     And we had completed the '681 patent and we were

09:04:21  4    about to move on to the '176 patent, do you recall?

09:04:25  5    A.     Yes.

09:04:25  6    Q.     One more question on the '681 patent before we move

09:04:28  7    on?

09:04:29  8    A.     Sure.

09:04:29  9    Q.     Is there any description in the '681 patent of

09:04:32 10    machine learning?

09:04:33 11    A.     The '681 patent didn't really have any kind of like

09:04:36 12    technology for how to carry out the steps which is what we

09:04:39 13    were just talking about.  That includes either rule based or

09:04:42 14    machine learning kind of approaches, but it specifically did

09:04:45 15    not talk about the kind of steps or the kind of technology

09:04:47 16    that relates to artificial intelligence and machine

09:04:47 17    learning.

09:04:54 18    Q.     Do any of the patents in this case, describe machine

09:04:56 19    learning?

09:04:56 20    A.     No, that's not what these are about.

09:04:58 21    Q.     Going back to what we have on the slide here, could

09:05:02 22    you explain your analysis, whether or not the '176 patent,

09:05:02 23    Claim 40 meets the written description requirement?

09:05:12 24    A.     Yes.  So we're talking about written description

09:05:12 25    again.

Johnson - direct

09:05:29 1          THE COURT:  You guys got to tell me what's going

09:05:32 2     on, if there is a problem, tell me.

09:05:34 3          MR. HADDEN:  It's on our screen but not the big

09:05:38 4     screen.

09:05:38 5          THE COURT:  You keep stepping away from the

09:05:40 6     podium and talking, let me know so I know whether to pay

09:05:44 7     attention or not.

09:05:44 8          MR. HADDEN:  Thank you, Your Honor.

09:06:29 9          THE COURT:  I don't know if that's progress.

09:06:31 10         MR. HADDEN:  I don't know, do shadow puppets --

09:06:34 11         THE COURT:  We're dealing with government

09:06:36 12    equipment here, so don't hold this against the parties.  We

09:06:42 13    could probably use a few of their coders in here.  No

09:06:53 14    pressure, Mark.  We're just all watching.

09:07:57 15         All right.  I think we're going to have to call

09:08:01 16    our IT folks.  I'm going to let you guys go and you can hang

09:08:05 17    out in the jury room for a few minutes and we'll try to get

09:08:11 18    this done as quickly as we can.

09:08:13 19         COURTROOM DEPUTY:  All rise.

09:08:15 20         (Jury exiting the courtroom at 9:08 a.m.)

09:08:34 21         THE COURT:  You guys can be seated.  Mark, can

09:08:37 22    you reboot it one more time.  And also call IT at the same

09:08:44 23    time.

09:08:44 24         COURTROOM DEPUTY:  Yes.

09:10:57 25         (Discussion off the record.)

Johnson - direct

09:14:13 1          THE COURT:  All right.  We're going to take a

09:14:16 2   break for about five to ten minutes.

09:14:18 3               (A brief recess was taken.)

09:39:35 4          COURTROOM DEPUTY:  All rise.

09:39:42 5               (Jury entering the courtroom at 9:39 a.m.)

09:39:57 6          THE COURT:  All right.  Welcome back.  Sorry

09:40:00 7   about that delay.  Everyone may be seated.  Can you all see

09:40:08 8   that TV screen?  All right.  Mr. Hadden.

09:40:14 9          MR. HADDEN:  Thank you, Your Honor.

09:40:15 10  BY MR. HADDEN:

09:40:16 11  Q.     Hello again, Dr. Johnson.  So we were talking about

09:40:19 12  written description and now on the '176 patent, Claim 40,

09:40:24 13  can you explain your analysis with respect to this claim,

09:40:28 14  starting with the claim element?

09:40:30 15  A.     Yes.  Can you hear me okay?  I was having a little

09:40:33 16  trouble hearing you.

09:40:37 17         THE COURT:  You're very quiet, Mark is the

09:40:39 18  microphone working?

09:40:41 19         MR. HADDEN:  I don't think the microphone is on.

09:40:45 20  Q.     Can you hear me?

09:40:46 21  A.     Yes.

09:40:46 22  Q.     Can you hear me now?  Thank you, sorry about that.

09:40:49 23         So go ahead, Dr. Johnson.

09:40:52 24  A.     So just as a reminder, we're talking about written

09:40:55 25  description, which is about whether or not the patent shows

09:40:58  1   that the inventors actually possessed the full scope of the

09:41:02  2   claims when they're filed.  Right?  So in this particular

09:41:06  3   patent we're talking about an advertising system and it's

09:41:10  4   about selecting an advertisement in the context for language

09:41:13  5   utterance.  At a large scope what I would say about this

09:41:17  6   patent is that similar to what we saw with the '681, what's

09:41:21  7   described in the patent itself and in the specification is

09:41:24  8   just a broad description kind of the block diagram level of

09:41:28  9   the same things that are in the claim.  Here is an example

09:41:31 10   from the patent, this is one of the figures, and the words

09:41:33 11   that go with it about this, so it's about selecting an

09:41:37 12   advertisement within a context that's been identified from

09:41:40 13   the utterance.  What it says is that you should do that.

09:41:42 14   Here is a block diagram that says advertisement selection.

09:41:46 15   And the words are that this advertisement selection module

09:41:49 16   may correlate the information about the request to select

09:41:53 17   advertisements.  That's not a how, that's just what you're

09:41:58 18   trying to do, trying to take what the user said and figure

09:42:01 19   it out.

09:42:02 20   Q.    Have you seen other evidence in this case that

09:42:02 21   suggest that the inventors didn't have full possession of a

09:42:02 22   solution?

09:42:02 23   A.    Mr. Freeman talked about this and said that they did

09:42:10 24   not have anything, and that the patent didn't show anything

09:42:12 25   about how to select an advertisement.

Johnson - direct

09:42:14 1    Q.       How about Mr. Kennewick, what did he have to say?

09:42:17 2    A.       I think he was talking about VoiceBox products and

09:42:20 3    solutions, and he said they did not have products that could

09:42:24 4    select an advertisement in the context of the utterance.

09:42:27 5    Q.       So what is your conclusion with respect to whether or

09:42:30 6    not the '176 patent meets the written description

09:42:33 7    requirement?

09:42:33 8    A.       Based on everything I have seen in the patent, there

09:42:35 9    is no evidence that the inventors actually possessed the

09:42:40 10   full scope of the claims for the '176 patent, Claim 40.

09:42:42 11   Q.       Let's look at the 197 patent, can you highlight the

09:42:47 12   language here and whether or not there is written

09:42:49 13   description support?

09:42:49 14   A.       Yeah, I'll just talk about this one example,

09:42:52 15   identifying whether the pronoun refers to a product or

09:42:55 16   service, you remember that's one of the things that's

09:42:57 17   important in this patent claim.

09:42:58 18   Q.       Does the patent explain or show that the inventors

09:43:00 19   had a solution for doing that?

09:43:00 20   A.       No, actually, so if you look in the patent

09:43:00 21   specification itself, what you remember is it's shared with

09:43:10 22   the '176 and '097, had the same patent specification, but

09:43:12 23   different sets of claims, right?  In the patent

09:43:12 24   specification, the word pronoun is not even mentioned,

09:43:12 25   right, it's in the abstract at the very beginning, which

09:43:22 1    again the abstracts are different from these two patents,

09:43:25 2    and what's in the abstract is basically what's in the claim

09:43:28 3    itself.  That you should try to -- responsive to the

09:43:33 4    existence of a pronoun, make a determination of whether the

09:43:36 5    pronoun refers to a product or service.  The patent does not

09:43:39 6    say anything about pronouns at all and certainly doesn't

09:43:42 7    tell you how you might do that.

09:43:44 8    Q.    Is there any description in the patent which shows

09:43:46 9    the inventors possessed the solution for having a computer

09:43:51 10   system that can recognize a pronoun and what it refers to?

09:43:55 11   A.    No, it's not even mentioned, so that wouldn't be

09:44:03 12   possible.

09:44:03 13   Q.    Have you seen other evidence in this case that's

09:44:06 14   consistent with your opinion?

09:44:07 15   A.    Dr. Polish was asked about this, and just agreed that

09:44:10 16   the patent doesn't show about how to do that job, like how

09:44:14 17   to determine what the pronoun refers to.

09:44:17 18   Q.    And did Dr. Polish contest that there is no solution?

09:44:22 19   A.    No, he agreed with that.

09:44:24 20   Q.    And how about what did Mr. Freeman say?

09:44:28 21   A.    He said that they had not invented a way to do this

09:44:31 22   at the time.

09:44:33 23   Q.    What's your conclusion with respect to whether or not

09:44:35 24   the '097 patent meets this written description requirement

09:44:40 25   of showing the possession of a solution?

Johnson - direct

A.      I think that's pretty clear, it doesn't even mention this in the patent spec at all.

Q.      Let's go to the last patent, the '703 patent, you have some language highlighted here.  Can you explain why?

A.      This has a bunch of steps.  Again this is about identifying a product or service, this is for eCommerce, so it's about identifying that product and confirming shipping and payment information and carrying that out after the user has confirmed that information.  Again what the '703 patent has is block diagram level of description of kind of the same words of what are in the claims here, so it says to carry these steps out, here is a block diagram that shows it, but looking at all the language in the patent, everything is kind of just high level description of the steps, examples of the information that you would use, but no how, no description of how someone might accomplish those steps.  That's throughout the whole patent.

Q.      Have you seen other evidence in this case that supports your opinion that the '703 patent doesn't describe that the inventors possessed a solution?

A.      Mike Kennewick was asked about this and agrees that the patent does not describe how you would do that.

Q.      How about Mr. Freeman, did he provide evidence that confirmed this?

A.      He just confirmed that VoiceBox had not

Johnson - direct

commercialized any products that did this.

Q.      So coming back to the full claim, what is your opinion with respect to the written description requirement in the '703 patent?

A.      In my opinion, the patent does not express that the inventors actually possessed the full scope of the claims.

Q.      Let's switch gears now and talk about obviousness. Have you reached opinions about whether or not the patent in this case are obvious to a person of skill in the art?

A.      Yes, if you're a person of skill in the art looking at the prior work that was done in this voice space, in my opinion these are all obvious.

Q.      What are you showing on this slide, sir?

A.      So this is an example of some different voice processing systems that were around say 1995 to 2005 time frame.  There was actually a lot of work in this space, a lot of companies sort of doing start ups.  Some of the examples we heard about are the MIT Galaxy, the Tellme system, the Nuance United system at the far right are ones that we've already talked about.  And I'll talk about those a little more to show what those do to actually carry out the steps of these patents.

Q.      Great.

        If you have your binder in front of you there, Dr. Johnson, can you look at DTX 291.

09:47:14 1   A.      Let me see if I can find that.  All right.  I have

09:47:20 2   that.

09:47:20 3   Q.      Is that a document that you referred to and relied on

09:47:24 4   in forming your opinions in this case?

09:47:26 5   A.      Yes, I reviewed this.

09:47:28 6           MR. HADDEN:  Your Honor, move DTX 291 into

09:47:31 7   evidence.

09:47:31 8           MR. SMITH:  No objection.

09:47:32 9           THE COURT:  Thank you.  It is admitted.

09:47:32 10          (DTX Exhibit No. 291 was admitted into

09:47:33 11  evidence.)

09:47:33 12  BY MR. HADDEN:

09:47:34 13  Q.      If you look at the same binder, do you see tab DTX

09:47:38 14  293?

09:47:39 15  A.      Yes, the very next one.

09:47:40 16  Q.      Is that another document you relied on in forming

09:47:43 17  your opinions in this case?

09:47:44 18  A.      Yes, that's correct.

09:47:46 19          MR. HADDEN:  DTX 293 into evidence, Your Honor.

09:47:48 20          MR. SMITH:  No objection.

09:47:49 21          THE COURT:  Thank you.  It is admitted.

09:47:49 22          (DTX Exhibit No. 293 was admitted into

09:47:52 23  evidence.)

09:47:52 24  BY MR. HADDEN:

09:47:52 25  Q.      So we heard from Dr. Polifroni about the Galaxy

09:48:04 1    system, what are seeing here Dr. Johnson?

09:48:07 2    A.      This was what Dr. Polifroni was talking about, Galaxy

09:48:12 3    was a system built at MIT over an extended period of time

09:48:17 4    starting in 1994 with a usable system that people could call

09:48:20 5    into, it designated reference architecture about a

09:48:25 6    government initiative about speech communication, basically.

09:48:29 7    Q.      I think we saw this diagram before, but can you

09:48:32 8    explain again what this shows?

09:48:33 9    A.      This is just a picture of the overall architecture, I

09:48:36 10   think Dr. Polifroni called it a spoke-and-hub architecture,

09:48:39 11   there was a central system, a lot of resources, these were

09:48:43 12   the different components that were used in the spoken

09:48:46 13   language system that was Galaxy.

09:48:47 14   Q.      If we look at the MIT Galaxy system compared to the

09:48:51 15   '681 patent, let's start with the first element you have

09:48:55 16   here, the preamble of the claim it talks about a cooperative

09:48:59 17   conversational voice user interface.  Did Galaxy have that

09:49:03 18   cooperative conversation voice user interface?

09:49:07 19   A.      Yes, it was a conversational system that

09:49:09 20   Dr. Polifroni talked about, you could call it on your

09:49:12 21   telephone and interact by voice and if you were at a

09:49:14 22   computer that had a microphone, you could interact by voice

09:49:17 23   and then also see things on your screen.

09:49:20 24   Q.      Is that what we saw in that demonstration video?

09:49:22 25   A.      That's right, we saw him using it.

Johnson - direct

09:49:26 1    Q.      If we go to this next part of the preamble that talks
09:49:30 2    about computer executable instructions, did the Galaxy
09:49:36 3    system have computer executable instructions that performed
09:49:38 4    the steps of the claim?
09:49:39 5    A.      Yeah, it ran on servers at the MIT lab, was
09:49:44 6    accessible to the public, Dr. Polifroni talked about a
09:49:47 7    little bit.
09:49:47 8    Q.      What's your conclusion, did the MIT Galaxy, did it do
09:49:51 9    everything required by the preamble of this claim?
09:49:53 10   A.      Yeah, it did all these things in this first little
09:49:56 11   part.
09:49:56 12   Q.      Now, if we look at the next element A that talks
09:50:00 13   about receiving an utterance to an input device, does MIT
09:50:04 14   Galaxy do that?
09:50:07 15   A.      Yes, this is receiving an utterance that has
09:50:12 16   different meanings in different contexts.  That's what's
09:50:15 17   required, Dr. Polifroni gave an example of this.  I will use
09:50:18 18   this utterance to kind of map the claim as we talk about it
09:50:21 19   and again the example is how about Cambridge.
09:50:24 20   Q.      And what are the different meanings and different
09:50:27 21   contexts that that utterance corresponds to?
09:50:32 22   A.      So, there is two things here, the how about, you
09:50:35 23   wouldn't know what that refers to, whether it's talking
09:50:38 24   about weather or traffic or what it might be.  And
09:50:41 25   Cambridge, you don't know which Cambridge that would be.

09:50:45 1    Those are both words and phrases that have different

09:50:49 2    meanings and different contexts.

09:50:50 3    Q.     If we look at the next element B that requires to

09:50:53 4    accumulate short-term shared knowledge about the current

09:50:56 5    conversation, did the MIT Galaxy system do that?

09:50:59 6    A.     Yes, it had a component called the history record

09:51:02 7    that saved history information about previous utterances in

09:51:06 8    the user's conversation and here the document excerpt just

09:51:11 9    shows that it interprets the user's utterance in the context

09:51:14 10   of what has previously been spoken in the dialogue.

09:51:17 11   Q.     And what has previously been spoken in the dialogue,

09:51:21 12   does that count as short-term shared knowledge?

09:51:23 13   A.     Right, that's short-term shared knowledge about the

09:51:26 14   current conversation that comes from utterances previous in

09:51:28 15   the same conversation.

09:51:30 16   Q.     And what does this slide show regarding that

09:51:34 17   short-term -- use of that short-term knowledge?

09:51:36 18   A.     This is just showing that what was doing that was the

09:51:38 19   history record.  And I think Dr. Polifroni talked about a

09:51:41 20   little bit also.

09:51:44 21   Q.     If we go and look at your next slide, you highlight

09:51:51 22   some language in a prior utterance, weather, can you explain

09:51:52 23   what you're describing here?

09:51:57 24   A.     If the prior utterance was about weather, it would

09:52:00 25   have been handled by the Jupiter part of the Galaxy system,

Johnson - direct

09:52:04  1    which was the weather component.  The system knew that and

09:52:08  2    had the information it came from the prior utterance and

09:52:10  3    would then interpret the how about in how about Cambridge to

09:52:13  4    mean asking about weather.

09:52:15  5    Q.    So what is your conclusion with respect to whether or

09:52:17  6    not the Galaxy system did this step B that requires

09:52:22  7    accumulating short-term shared knowledge?

09:52:24  8    A.    It accumulated knowledge about previous utterances

09:52:27  9    and carried that through the dialogue with the user.

09:52:30  10   Q.    Go to the next element, which is the one that talks

09:52:33  11   about accumulate long-term shared knowledge, did the MIT

09:52:37  12   Galaxy system do that?

09:52:39  13   A.    Yeah, Dr. Polifroni talked about this also, this was

09:52:42  14   the user model that could save off data about user

09:52:46  15   information, for example their address, where they lived.

09:52:48  16   That came from past conversations, so a user could call in

09:52:52  17   and at some point could identify that they lived in a

09:52:55  18   particular place.  And that could be done by voice, although

09:52:58  19   you could also get it from enrollment information via the

09:53:01  20   screen but it could be done by voice.  And it was saved in

09:53:04  21   the user model.

09:53:05  22   Q.    If we go to the next, this same accumulating

09:53:08  23   long-term shared knowledge, does this show an example of how

09:53:12  24   that would work?

09:53:12  25   A.    Yes.  If you say how about Cambridge, and the system

Johnson - direct

09:53:16 1    knows from the user model that you live in Boston, it's

09:53:19 2    going to know that you're talk about Cambridge Boston -- or

09:53:23 3    Cambridge, Massachusetts, rather than Cambridge, England.

09:53:28 4    Q.    Is that one of the examples that Dr. Polifroni

09:53:31 5    describes as well?

09:53:31 6    A.    Yes, that's the same utterance we're talking about

09:53:34 7    here, yes.

09:53:35 8    Q.    If we go to the next element D, the one that requires

09:53:38 9    identify a context associated with the utterance, did the

09:53:41 10   MIT Galaxy system do that?

09:53:43 11   A.    Yes.  It had a context resolution component, again

09:53:46 12   Dr. Polifroni talked about that.  Its task was to basically

09:53:50 13   figure out what the user was trying to do and direct the

09:53:54 14   user to the correct component of the system.  In this case,

09:53:57 15   it does that using the long-term shared knowledge and the

09:54:01 16   short-term shared knowledge.

09:54:05 17   Q.    If we look again at the how about Cambridge example,

09:54:11 18   can you explain how that works?

09:54:12 19   A.    Yeah, the component that comes from short-term shared

09:54:16 20   knowledge is that how about refers to weather, and that came

09:54:19 21   from the previous utterance that mentioned weather and was

09:54:22 22   handled by the Jupiter weather system.

09:54:24 23   Q.    And how about the use of long-term shared knowledge

09:54:27 24   to identify context, how is that done?

09:54:30 25   A.    The data that was in the user model would be what

Johnson - direct

09:54:33 1    would tell the system that this is about Cambridge,

09:54:37 2    Massachusetts, and together that informs what the overall

09:54:41 3    context of the utterance is.

09:54:42 4    Q.    What's your conclusion with respect to whether or not

09:54:45 5    MIT Galaxy did the step D, the identify a context?

09:54:48 6    A.    Yes, that model we just talked about, the context

09:54:53 7    resolution component did this.

09:54:55 8    Q.    And if we go to the final -- oh I'm sorry -- yeah,

09:55:01 9    the final element, or the next to final element, E,

09:55:05 10   establish an intended meaning for the utterance within the

09:55:07 11   identified context.  Can you explain how the MIT Galaxy

09:55:10 12   system did that?

09:55:11 13   A.    Yeah.  Once the system had identified a context, it

09:55:14 14   would then proceed to figure out what the user was saying

09:55:18 15   and it would interpret these words how about Cambridge as

09:55:21 16   basically meaning the user was trying to get the weather for

09:55:24 17   Cambridge, Massachusetts.

09:55:27 18   Q.    And is that what you're showing, we're seeing here on

09:55:30 19   the next slide?

09:55:30 20   A.    Yes, this is an illustration of what the system would

09:55:33 21   understand the user to be meaning by that how about

09:55:36 22   Cambridge.

09:55:37 23   Q.    What's your conclusion with respect to step E,

09:55:41 24   establishing an intended meaning, did the MIT Galaxy system

09:55:45 25   do that?

Johnson - direct

09:55:45 1    A.      Yes, it established an intended meaning within the

09:55:51 2    identified context to disambiguate intents that have

09:55:55 3    different meanings and different contexts, which is exactly

09:55:57 4    the example we just showed.

09:55:59 5    Q.      Finally we get to the last element which is the one

09:56:01 6    about generating response to the utterance, where the

09:56:04 7    response is grammatically or syntactically adapted, do you

09:56:09 8    recall that?

09:56:09 9    A.      Yes.

09:56:09 10   Q.      Did MIT Galaxy system do that as well?

09:56:12 11   A.      Yeah, they had a contextual grounding component,

09:56:15 12   right, so what they did is before they gave the response

09:56:17 13   back to the user, they added some contextual information,

09:56:22 14   this contextual grounding component.  And their example

09:56:25 15   right here is a response to a query regarding New York City

09:56:29 16   might start with in New York City tomorrow, and before it

09:56:32 17   gives the rest of the response to the user.

09:56:34 18   Q.      And how would that apply to your how about Cambridge

09:56:39 19   example?

09:56:40 20   A.      So if you said how about Cambridge, that system could

09:56:42 21   use that contextual grounding component and start to reply

09:56:42 22   the weather in Cambridge, Massachusetts is.

09:56:42 23   Q.      What is your conclusion with respect to element F,

09:56:52 24   the generating a response that is grammatically or

09:56:55 25   syntactically adapted, did the MIT Galaxy do that?

Johnson - direct

09:56:59 1   A.      That contextual grounding component is exactly that.

09:57:03 2   Q.      So if we go back to the full claim, Dr. Johnson,

09:57:07 3   what's your conclusion with respect to MIT Galaxy?

09:57:11 4   A.      So we've stepped through this whole claim and seen an

09:57:14 5   example utterance following through all the way, we see that

09:57:17 6   it does every one of these steps in the MIT Galaxy system,

09:57:20 7   so in my opinion the MIT Galaxy system carried out all these

09:57:23 8   steps in practice years before the '681 patent was filed.

09:57:27 9   Q.      So is it obvious?

09:57:30 10   A.      Yes.

09:57:31 11   Q.      And what does Dr. Polish dispute, if anything, about

09:57:37 12   your analysis?

09:57:38 13   A.      There was just one element that he disputed and that

09:57:41 14   was the accumulated long-term shared knowledge component

09:57:45 15   that was about the user model component.

09:57:48 16   Q.      And what about Mr. Peck, did he dispute anything?

09:57:52 17   A.      So Dr. Polish was kind of using Mr. Peck's analysis

09:57:57 18   of the Galaxy code.  And he had pointed out that there is a

09:58:02 19   component -- the component that stores the user model in the

09:58:06 20   system, he didn't find where if you were a new user or a

09:58:10 21   guest user it ever wrote that back to the database, which

09:58:13 22   means it would disappear.  We heard from Dr. Polifroni that

09:58:17 23   the code that MIT Galaxy shared omitted some of the user

09:58:22 24   model saving components because the fact they were worried

09:58:25 25   about privacy and they didn't want other developers to have

09:58:29 1    access to that database.  But the main thing actually is

09:58:33 2    that regardless of that, if you were a registered user of

09:58:37 3    the system, the system would in fact update your user model,

09:58:41 4    save it back into long-term and when you call back into the

09:58:43 5    system it would call it up and use it, and the code actually

09:58:47 6    supports that also, it was only the new user that Mr. Peck

09:58:50 7    was talking about.  In my opinion, even with that dispute,

09:58:53 8    that does not change the fact that MIT Galaxy did this.

09:58:55 9    Q.      And what if the user called back before the Galaxy

09:59:02 10   had been shut down for some reason, would it use the user

09:59:06 11   model from memory?

09:59:07 12   A.      Yeah it was in memory, it would pull that

09:59:10 13   information.

09:59:10 14   Q.      Did Mr. Peck dispute that?

09:59:12 15   A.      No, not at all.

09:59:14 16   Q.      Okay.  So this just shows the timing of Galaxy with

09:59:20 17   respect to the patent; is that right?

09:59:22 18   A.      Yeah, this is just showing that Galaxy was doing this

09:59:26 19   years before the '681 patent was filed.

09:59:28 20   Q.      Let's move on to the '176 patent and look at Claim 40

09:59:32 21   and again the MIT Galaxy system.  And if we start with the

09:59:38 22   first part of the claim that talks about selecting and

09:59:41 23   presenting advertisements, is there any dispute that at

09:59:42 24   least under Dr. Polish's opinion, Galaxy offered

09:59:50 25   advertisements?

Johnson - direct

09:59:51 1    A.       No, Dr. Polish acknowledged that offering a flight

09:59:54 2    back to the user is an advertisement in this same way that

09:59:58 3    Amazon would send user results to a search engine for an

10:00:03 4    advertisement.

10:00:04 5    Q.       Did the Galaxy system do that, did it offer a flight

10:00:10 6    back to a user that a user could make a reservation for?

10:00:14 7    A.       Yes, and could do that either by voice or on screen

10:00:18 8    if you were at a computer, this is showing you the screen,

10:00:20 9    but if you were on the phone, it could do it by phone.

10:00:23 10   Q.       What's your conclusion with respect to the first part

10:00:27 11   of this Claim 40 in MIT Galaxy?

10:00:30 12   A.       Galaxy carries this out.

10:00:31 13   Q.       If we look at the next part of the claim, it talks

10:00:34 14   about an input device that receives a natural language

10:00:37 15   utterance.  Did Galaxy have that component?

10:00:40 16   A.       Yes, I don't think there is a dispute on this at all.

10:00:43 17   They took input from a user and those contained the

10:00:48 18   requests.

10:00:48 19   Q.       If we go on to element B, the speech recognition

10:00:52 20   engine coupled to the input device, did the MIT Galaxy

10:00:52 21   system have that component?

10:00:52 22   A.       Yes.  And just as a reminder, there was a specific

10:01:02 23   construction by the Court of what a speech recognition

10:01:02 24   engine is, software hardware that recognizes the words or

10:01:02 25   phrases in the natural language utterance, that's a great

Johnson - direct

10:01:12  1    definition and that's exactly what the Galaxy did with

10:01:16  2    words.

10:01:16  3    Q.      In your highlighting, in yellow here, the speech

10:01:19  4    recognition component of Galaxy, is that right?

10:01:20  5    A.      Right, that's the part that does this step.

10:01:23  6    Q.      So what's your conclusion then with respect to this

10:01:26  7    step in the Claim 40, whether it's met by the Galaxy system?

10:01:31  8    A.      Galaxy did this.

10:01:34  9    Q.      Finally if we go to step C, which talks about the

10:01:37  10   conversational language processor, did the MIT Galaxy system

10:01:42  11   have a conversational language processor?

10:01:44  12   A.      Yes, that was the language understanding component

10:01:47  13   together with context resolution, you might also lump in

10:01:51  14   language generation or dialogue manager but the core

10:01:54  15   components of the natural language understanding were the

10:01:57  16   language understanding and the context resolution.

10:01:59  17   Q.      If we go to the next element, we have a label here

10:02:03  18   C.1.  Interpret the recognized words or phrases wherein the

10:02:08  19   interpreted recognized words or phrases includes

10:02:11  20   establishing a context to the natural language utterance.

10:02:14  21   Did the Galaxy system that?

10:02:17  22   A.      This established a context that is similar to what we

10:02:20  23   saw in the '681 patent about identifying a context and

10:02:23  24   Galaxy did that in that context resolution component, as we

10:02:27  25   talked about in the how about Cambridge.

742

Johnson - direct

10:02:30 1  Q.      What's your conclusion, did the Galaxy system do this

10:02:33 2  requirement of C.1 of recognizing the interpreted words or

10:02:37 3  phrases and including establishing a context?

10:02:40 4  A.      Yes, it did.

10:02:41 5  Q.      If we go to the next one, we have two of them

10:02:43 6  together here, C.2, select an advertisement in the context

10:02:48 7  established by the natural language utterance and then

10:02:51 8  present the selected advertisement via an output device.

10:02:55 9  Did Galaxy do that?

10:02:56 10  A.      Yeah, so if you asked for flights, what it would

10:03:00 11  return was flights, so that's an advertisement in the

10:03:02 12  context, and it proceeded that via either phone or on the

10:03:06 13  computer screen.

10:03:09 14  Q.      If we go to the next element D, this is the last part

10:03:13 15  of the claim, and it talks about this adaptive miss --

10:03:18 16  adaptive misrecognition engine?

10:03:21 17  A.      Yes.

10:03:21 18  Q.      Can you explain how this worked in Galaxy?

10:03:24 19  A.      Yeah.  So the Galaxy system was tracking what the

10:03:27 20  user said and filling in information in this flight record

10:03:30 21  in the history record all the time.  And when it saw

10:03:34 22  something that indicated that it had misunderstood something

10:03:38 23  previous, right, if there was a contradiction in what the

10:03:41 24  user said, for example, it would identify that and then go

10:03:45 25  back and correct it.  So this is an example, the person says

Johnson - direct

10:03:47 1    they want to go from San Francisco to Boston, and then the

10:03:51 2    system replies, okay, Northwest flights from San Francisco

10:03:56 3    to Denver.  That's a misrecognition, it's returning Denver,

10:04:00 4    they asked for Boston.  The user then says I need a flight

10:04:05 5    going to Boston, Massachusetts, that's a predetermined

10:04:09 6    event, in the patent I should add, when it says it's a

10:04:12 7    predetermined event -- one example they might give is it's

10:04:17 8    something else the user says afterwards might indicate that

10:04:17 9    the system misunderstood, this is exactly what the patent

10:04:20 10   says a predetermined event might be.

10:04:22 11   Q.     What does the system do after that predetermined

10:04:25 12   event?

10:04:25 13   A.     It goes back and reinterprets, so corrects the Denver

10:04:29 14   and puts it back to Boston to make that correction and

10:04:32 15   reinterpret those words and then carries out what the user

10:04:36 16   wanted.

10:04:37 17   Q.     So did the Galaxy system do those final requirement

10:04:41 18   of the adapting misrecognition and reinterpreting the words?

10:04:47 19   A.     It had a component that was looking for these kind of

10:04:51 20   areas and then corrected them.

10:04:52 21   Q.     What was your conclusion with respect to the '176

10:04:55 22   Claim 40 and the MIT Galaxy system?

10:04:55 23   A.     We've seen that the Galaxy system could do all these

10:05:00 24   steps in the '176 patent, Claim 40.

10:05:02 25   Q.     Let's go on and look at what does, if anything, does

744

Johnson - direct

10:05:08 1   **Dr. Polish dispute in your analysis?**

10:05:09 2   **A.     He just disputed that very last part that the**

10:05:13 3   **conversational language engine incorrectly interpreted the**

10:05:18 4   **words or phrases in response to detecting a predetermined**

10:05:21 5   **event.**

10:05:22 6   **Q.     And is he right?**

10:05:24 7   **A.     No, I just talked through that exactly and that's**

10:05:27 8   **exactly what the system was doing, so I just disagree with**

10:05:30 9   **that dispute.**

10:05:31 10  **Q.     Again, was MIT Galaxy before the filing of the '176**

10:05:36 11  **patent?**

10:05:37 12  **A.     Galaxy was doing the same thing years before the '176**

10:05:41 13  **patent was filed.**

10:05:42 14  **Q.     Let's go on and look at the '097 patent, Claim 23.**

10:05:48 15  **We start, we have a few of the claim elements together here**

10:05:51 16  **on the screen and some information about Galaxy.  Can you**

10:05:54 17  **explain what you're showing here?**

10:05:55 18  **A.     Sure.  So language processing based on**

10:05:58 19  **advertisements, one or more physical processors with**

10:06:01 20  **computer program instructions that carry out the sequence of**

10:06:04 21  **steps and the first of those provide an advertisement**

10:06:07 22  **associated with the product or service, I think we've kind**

10:06:09 23  **of talked about each of these already.  In the MIT Galaxy**

10:06:12 24  **system, you interacted with the system by voice over the**

10:06:15 25  **phone, and it would return with offers of flights that you**

10:06:20 1    could make.

10:06:21 2    Q.      So did the MIT Galaxy system do these three parts of

10:06:25 3    Claim 23 of the '097 patent?

10:06:28 4    A.      Yes, it did.

10:06:29 5    Q.      If we go on, you have the next two elements, C and D.

10:06:34 6    Can you explain how MIT Galaxy did those elements of the

10:06:37 7    claim?

10:06:38 8    A.      Sure.  So C is pretty straightforward, receive a

10:06:43 9    natural language utterance of the user, which it does after

10:06:45 10   the advertisement is presented.  Then interprets the

10:06:48 11   language utterance based on the advertisement and this is

10:06:50 12   the key part, responsive to the existence of a pronoun in

10:06:54 13   the natural language utterance, determine whether the

10:06:56 14   pronoun refers to one or more of the product or service.

10:06:59 15            So this is an example, MIT Galaxy actually had a

10:07:04 16   fairly complex what it called discourse entity resolution

10:07:09 17   system.  I do think Dr. Polifroni talked about that a little

10:07:12 18   bit.  That included resolving pronouns.  If a person said

10:07:16 19   something like does it serve dinner, it would try to figure

10:07:19 20   out what it was referring to and match it up and then fill

10:07:22 21   that it in with what it was referring to.  In this example

10:07:26 22   that it is referring to American flight 3742, which is of

10:07:31 23   course a product or service that could be purchased in

10:07:33 24   Galaxy.

10:07:34 25   Q.      Did Galaxy do these two steps in the '097 patent?

Johnson - direct

10:07:38 1    A.      Yes.   In the text here at the bottom is just an

10:07:41 2    excerpt from one of the documents that explicitly says that

10:07:44 3    the pronoun is resolved by the context resolution server.

10:07:48 4    Q.      What's your conclusion then with respect to the '097

10:07:51 5    patent, Claim 23, and whether it was obvious given the MIT

10:07:56 6    Galaxy system?

10:07:57 7    A.      Yeah, in my opinion, MIT Galaxy renders the '097

10:08:01 8    patent, Claim 23, obvious.

10:08:03 9    Q.      And does Dr. Polish dispute any part of your

10:08:07 10   analysis?

10:08:08 11   A.      No, none of these elements that I talked about does

10:08:10 12   Dr. Polish dispute that the MIT Galaxy system did.

10:08:13 13   Q.      Okay.   Again, we had the same filing date for the

10:08:18 14   '097 patent of February 2007; is that right?

10:08:21 15   A.      That's correct.   So you can see here the Galaxy

10:08:23 16   system was carrying out these steps and doing what the

10:08:26 17   patent described years before this patent was filed.

10:08:29 18   Q.      Look in your binder again, Dr. Johnson, there should

10:08:33 19   be an exhibit, DTX 208.   Do you see that?

10:08:41 20   A.      308.   408.   There it is.

10:08:50 21   Q.      DTX 208 is a document that you relied on in your

10:08:54 22   analysis in this case?

10:08:56 23   A.      Oh, yeah, yeah, I recognize this.

10:08:58 24            MR. HADDEN:   Move DTX 208 into evidence, Your

10:09:00 25   Honor.

Johnson - direct

10:09:00 1          MR. SMITH:  No objection.

10:09:02 2          THE COURT:  Thank you.  It is admitted.

10:09:02 3          (DTX Exhibit No. 208 was admitted into

10:09:03 4     evidence.)

10:09:03 5     BY MR. HADDEN:

10:09:04 6     Q.    What is DTX 208 and what are you showing on the

10:09:07 7     screen here, Dr. Johnson?

10:09:08 8     A.    So United Airlines had a system that was actually

10:09:12 9     built by Nuance for them that allowed you to do ticketing

10:09:15 10    including purchase of tickets for United Airlines.  So this

10:09:19 11    was a speech recognition system to do that.

10:09:23 12    Q.    Can you look at the next exhibit, it should be in

10:09:25 13    your binder, DTX 209?

10:09:27 14    A.    Yeah, I got that.

10:09:29 15    Q.    Is DTX 209 another document that you relied on in

10:09:33 16    this case?

10:09:34 17    A.    Yes.

10:09:34 18          MR. HADDEN:  Move DTX 209 into evidence, Your

10:09:37 19    Honor.

10:09:37 20          MR. SMITH:  No objection.

10:09:38 21          THE COURT:  Thank you.  It is admitted.

10:09:38 22          (DTX Exhibit No. 209 was admitted into

10:09:38 23    evidence.)

10:09:38 24    BY MR. HADDEN:

10:09:38 25    Q.    What is DTX 209 and what is it showing here?

10:09:41 1    A.      So this is showing a portion of the call flow diagram

10:09:45 2    that's in this document.  If a person called in, if they

10:09:49 3    said something like ticketed, the system would recognize

10:09:52 4    that and go and look up their information in the system and

10:09:56 5    if they had an existing reservation in the system, it would

10:10:00 6    identify that existing reservation, and allow them to

10:10:03 7    purchase it immediately.

10:10:05 8    Q.      If you look at one more time in your binder, I think

10:10:09 9    DTX 653.  Do you have that, Dr. Johnson?

10:10:29 10   A.      Yep.

10:10:30 11   Q.      Did you rely on DTX 653?

10:10:34 12   A.      Just a second.

10:10:36 13   Q.      Sure.

10:10:38 14   A.      Yes, this is the Partovi patent.

10:10:42 15          MR. HADDEN:  Move DTX 653 into evidence, Your

10:10:45 16   Honor.

10:10:45 17          MR. SMITH:  No objection.

10:10:46 18          THE COURT:  Thank you.  It is admitted.

10:10:46 19          (DTX Exhibit No. 653 was admitted into

10:10:47 20   evidence.)

10:10:47 21   BY MR. HADDEN:

10:10:47 22   Q.      What is DTX 653?

10:10:49 23   A.      This is a patent, electronic commerce from 1989 by

10:10:52 24   Tellme, which is a company that we heard Nikko Strom had

10:10:52 25   worked for.

Johnson - direct

10:11:00 1  Q.      Now, can you explain how the combination of United

10:11:06 2  and this Partovi Tellme patent relates to Claim 25 of the

10:11:12 3  '703 patent?

10:11:14 4  A.      Sure.  So this patent is about eCommerce, right, it

10:11:17 5  has a bunch of steps and combining these two different

10:11:21 6  pieces of prior art together, which in my opinion would have

10:11:24 7  been obvious to a person of skill in the art to do, you have

10:11:29 8  all the steps there.

10:11:30 9  Q.      So let's start with what we have on the screen here

10:11:32 10  which is the first three parts of Claim 25.  Can you explain

10:11:35 11  how those were described in the United system?

10:11:38 12  A.      Sure.  This is just a system for providing voice

10:11:41 13  commerce, which this United system was.  Processors,

10:11:45 14  programmed with computer instructions, this ran on servers,

10:11:48 15  had code, and then those processors have to carry out these

10:11:51 16  steps.  The first is the receive a user input comprising a

10:11:55 17  natural language utterance, in this example that utterance

10:11:58 18  is ticket.

10:11:59 19  Q.      So did the United system do everything that is

10:12:02 20  required by these first three parts of Claim 25?

10:12:06 21  A.      Yes, it did.

10:12:06 22  Q.      Now, if we go to the next slide, we have two more

10:12:12 23  pieces of the claim, one that talks about providing without

10:12:16 24  further user input, and obtaining further user input, the

10:12:24 25  receipt of user of the input one or more words recognize at

10:12:29  1    the output of the speech recognition engine.  What is this

10:12:33  2    talking about and how does it relate to the United system?

10:12:36  3    A.      Doctor David Pepper was the lead on the system.  You

10:12:39  4    may remember there was a short video of deposition

10:12:42  5    testimony, I think just last night, playing this, and so

10:12:47  6    this -- he talked about this component of the system.  The

10:12:50  7    United system was based on speech recognition, so this is

10:12:53  8    pretty straightforward.  And again you're applying the

10:12:56  9    Court's construction of what a speech recognition engine is.

10:12:59  10   This showed that in fact this system at the bottom here had

10:13:02  11   speech recognition for ticket related questions and booking

10:13:06  12   and purchases.

10:13:07  13   Q.      Was Nuance a well known company for providing speech

10:13:11  14   recognition technology at that time?

10:13:12  15   A.      Yes, they built this for United.

10:13:15  16   Q.      So what's your conclusion with respect to these first

10:13:18  17   two pieces of the claim, did the United system do these?

10:13:23  18   A.      Yes, these are straightforward steps and the United

10:13:26  19   system did these.

10:13:27  20   Q.      If we look at the next slide, we have a next couple

10:13:33  21   of pieces of the claim.  Can you explain what these are and

10:13:33  22   how they relate to what the United system did before?

10:13:36  23   A.      Yeah.  So if you remember, this patent requires you

10:13:40  24   to determine without further user input after the receipt of

10:13:42  25   the user input, a context based on the one or more words or

10:13:47 1   phrases.  So in the United system after the person said

10:13:51 2   ticket, and without any further input, it went and looked up

10:13:55 3   existing reservations, it had something called a PNR,

10:14:01 4   personal name record, it would look that up and gave them

10:14:03 5   the existing reservation and the context was okay, we're

10:14:07 6   working in the existing part of the call flow.  The second

10:14:11 7   piece here is it identifies without further user input after

10:14:15 8   receipt of the user input the product or service to be

10:14:17 9   purchased on behalf of the user based at least on the

10:14:20 10  determined context.  So within this existing reservation

10:14:23 11  services context inside the personal name record of the

10:14:26 12  person, it would pull out the reservation that was there,

10:14:30 13  and that was the product or service to be purchased, that

10:14:33 14  existing reservation.

10:14:35 15  Q.    So what's your conclusion then with respect to these

10:14:40 16  two parts of the claim, and the United system?

10:14:45 17  A.    As described in the documents and as Dr. Pepper

10:14:48 18  talked about, this is how the system worked, this is part of

10:14:50 19  the flow relating to existing reservation services, it

10:14:54 20  carried out these steps.

10:14:55 21  Q.    If you look at the next part of the claim, it talks

10:14:58 22  about obtaining payment information, A.6 here and then A.7

10:15:02 23  talks about obtaining without further user input after the

10:15:07 24  receipt of the user input shipping information.

10:15:10 25  A.    Yes.

752

Johnson - direct

10:15:10  1    Q.      Did the United system do that?

10:15:13  2    A.      Yes.  So as you flow down after the person says

10:15:17  3    ticket, it goes through what it called the purchase part of

10:15:20  4    the flow.  Just to point out, purchase is not another thing

10:15:23  5    a user says in this flow, if it's in quotes it's something

10:15:26  6    the user said, otherwise it's just kind of naming that part

10:15:30  7    of the flow.  So it did reservation payment collection,

10:15:33  8    including get credit card number, and in this system the get

10:15:37  9    credit card number is actually talking about software that's

10:15:39 10    specified in that first document that we were looking at all

10:15:42 11    the software components.  Then it would get receipt time

10:15:47 12    type, if you're buying a flight, the receipt information

10:15:50 13    link, the e-mail address is how that would be delivered or a

10:15:54 14    mailing address and it would pull that in the system.

10:15:56 15    Q.      Just to be clear, as you said this purchase it is a

10:15:59 16    description of the step that the system would take to

10:16:02 17    complete the purchase of the flight if the user said ticket

10:16:06 18    it?

10:16:06 19    A.      Yes, the only thing the user said is ticket it, and

10:16:10 20    it's carrying out these steps still.

10:16:12 21    Q.      Did the United system do these two parts of the

10:16:12 22    claim?

10:16:15 23    A.      Yes, it did.

10:16:19 24    Q.      Now, the last part of the claim is this provide

10:16:22 25    without further user input after the receipt of the user

Johnson - direct

10:16:27 1    input the request for user confirmation to use the payment

10:16:31 2    information and shipping information for purchase

10:16:34 3    transaction for the product or service.  Now, you have

10:16:38 4    United plus Partovi, can you explain that?

10:16:42 5    A.     The United system had sort of part of this, it had

10:16:46 6    code that confirmed credit card information, but it was not

10:16:50 7    really explicit that there was an explicit confirmation to

10:16:55 8    using shipment and payment information so the combination of

10:16:58 9    Partovi is to add that, the Partovi patent explicitly, it

10:17:02 10   was the one-word commerce model, it had an explicit showing

10:17:07 11   to confirm credit card information and confirm shipping

10:17:09 12   information, in this case things like home address or work

10:17:12 13   address.

10:17:12 14   Q.     And that's what you show highlighted in the bottom

10:17:16 15   box there?

10:17:16 16   A.     That's from the Partovi patent at the bottom, at the

10:17:19 17   top is the United system.  So what I'm saying is a person of

10:17:22 18   skill in the art would easily have known that they could add

10:17:25 19   a confirmation of payment and shipping information to

10:17:27 20   confirm that in the system and that would have been easy to

10:17:30 21   do.

10:17:33 22   Q.     What's your conclusion then with respect to this

10:17:34 23   final element of the claim in the '703 patent?

10:17:37 24   A.     So in my opinion this is rendered obvious by the

10:17:40 25   combination of that United system plus the Partovi patent.

Johnson - direct

10:17:49 1    Q.      Again, showing that confirmation step?

10:17:52 2    A.      Yeah, it's kind of showing what would happen if you

10:17:55 3    combined the two, you would go here and get the information

10:17:57 4    and then kind of after you get that shipping and payment

10:18:01 5    information, you would confirm do you want to use this

10:18:03 6    credit card and send the -- you know, receive the tickets,

10:18:08 7    if they were hard copy, which we used to have hard copy

10:18:11 8    tickets if you remember, send it to the user, so that's how

10:18:14 9    that would work.

10:18:15 10   Q.      And if we go back to this full claim, the '703,

10:18:18 11   what's your conclusion then with respect to the '703, Claim

10:18:22 12   25 and the United system combined with Partovi?

10:18:26 13   A.      My opinion is the United system plus the Partovi for

10:18:30 14   that last element renders the '703 patent and Claim 25

10:18:36 15   obvious.

10:18:36 16   Q.      And does Dr. Polish dispute any of your analysis?

10:18:39 17   A.      No, in looking at all those individual elements,

10:18:41 18   there were no elements that he identified that were

10:18:45 19   disputed, in fact, he didn't even address this combination

10:18:47 20   at all, so it didn't even talk about it.

10:18:49 21   Q.      Did Dr. Polish talk about the United system at all?

10:18:52 22   A.      No, he didn't talk about it.

10:18:54 23   Q.      Going back to our timeline, were both Partovi and the

10:18:58 24   United system before the filing date of the '703 patent?

10:19:02 25   A.      Remember the '703 patent wasn't until 2014, so it was

Johnson - direct

10:19:05 1   later than those other patents, so that United system ten

10:19:08 2   years before, that in combination with the Partovi patent,

10:19:11 3   it was actually 15 years before that, clearly rendered this

10:19:15 4   obvious a long time before.

10:19:17 5   Q.      We have two other things we need to talk about.  One

10:19:19 6   of them is this secondary consideration, in particular

10:19:24 7   commercial success.  Can you explain what this is and what

10:19:27 8   your conclusions were?

10:19:28 9   A.      Yeah.  So this is a requirement of doing an

10:19:32 10  obviousness analysis.  You have to consider whether there

10:19:34 11  are like extra factors that might have implied that even

10:19:39 12  though you thought it was obvious that maybe there was

10:19:41 13  something about it that wasn't obvious that you should

10:19:43 14  consider.  One of those is commercial success, like if

10:19:46 15  someone writes a patent and they have a whole bunch of

10:19:49 16  commercial success on the products from that patent that

10:19:51 17  sort of suggests that the patent might not have been so

10:19:54 18  obvious.

10:19:54 19  Q.      Is there any indication of commercial success related

10:20:00 20  to these patents?

10:20:01 21  A.      No, we had evidence that already showed that there

10:20:04 22  were no commercialized products by VoiceBox that ever used

10:20:07 23  any of these patents, so there was no commercial success to

10:20:11 24  point to that would support that that's a special factor to

10:20:14 25  consider.

Johnson - direct

10:20:14 1   Q.      Did Dr. Polish dispute that?

10:20:17 2   A.      No, did he didn't dispute that VoiceBox products did

10:20:20 3   not use these patents.

10:20:21 4   Q.      And then there is -- can we look at Alexa's success

10:20:25 5   to show that the patents caused commercial success?

10:20:29 6   A.      Yeah, Dr. Polish pointed to the Alexa products which

10:20:32 7   of course were very successful as indications of commercial

10:20:35 8   success that supports these patents weren't obvious.  As I

10:20:40 9   have said already, I don't believe these Alexa products

10:20:42 10  infringe at all, and since they don't infringe, they're not

10:20:45 11  carrying out these patents and they don't provide any

10:20:47 12  evidence that supports anything about obviousness.

10:20:51 13  Q.      Another one of these secondary consideration is this

10:20:55 14  long felt unmet need satisfied by the patent, did you see

10:20:59 15  any evidence of that in this case?

10:21:01 16  A.      I have not.  There is really no technology in the

10:21:05 17  patents that would satisfy a need, right.  And as we've

10:21:08 18  seen, these systems were rendered obvious by systems years

10:21:12 19  before, so certainly there was nothing unmet, so in my

10:21:14 20  opinion I see nothing.

10:21:18 21  Q.      When you talk about the people that come up with

10:21:20 22  solutions before, that's what you're showing here?

10:21:22 23  A.      There are solutions in this space to do these steps

10:21:27 24  so clearly there is no unmet need that was satisfied by the

10:21:30 25  patents.

Johnson - direct

Q.      And what are you showing on this slide with respect
to --

A.      Just again the patents don't have technologies, kind
of goes back to the written description stuff that I've
talked about, don't actually have technology in them to
carry out the steps, therefore they wouldn't be meeting any
need.

Q.      Now, I have one last topic to talk about, which is
whether or not the technology in the claims of three of
these patents was well-known and conventional?

A.      Yes.

Q.      Start with Claim 40 of the '176 patent.  What is your
conclusion with respect to that?

A.      So, again, this is an additional analysis that I was
asked to do.  It's kind of different from the other things.
Whether there was any -- whether everything in these patents
was well-known and conventional in terms of what was
presented.  So what I would say about this is if you look at
the steps that are in this patent claim, '176 Claim 40, and
why you did the selecting, the advertisement, and then the
adaptive misrecognition engine, each of these steps were
things that people would have known if you wanted to do
this, these were the steps you would normally do to carry
out this process.  Right.  None of them individually were
innovative, they're all well-known conventional steps, and

Johnson - direct

10:22:44 1  the way they're connected, the order in which you connect

10:22:46 2  these things together is kind of the obvious way and in fact

10:22:49 3  the only way, obviously you have to receive the utterance

10:22:52 4  first, you do the reinterpretation at the end, so there is

10:22:55 5  nothing in the individual steps that is anything other than

10:22:58 6  just conventional and nothing about the order of the steps

10:23:01 7  is anything unconventional.

10:23:03 8  Q.     Is there any new or inventive technology to do these

10:23:07 9  steps that's described in this claim?

10:23:09 10  A.     There is not, nothing innovative or really anything

10:23:12 11  at all as we talked about before.

10:23:13 12  Q.     Let's discuss the same issue for '097 patent, Claim

10:23:18 13  23, is your opinion?

10:23:19 14  A.     I would say the same thing, I would say if you look

10:23:23 15  at the steps themselves, the individual elements, there is

10:23:25 16  nothing unconventional about what is disclosed in those

10:23:29 17  steps, it's all conventional ideas, conventional technology,

10:23:32 18  and the order in which the steps are carried out are kind of

10:23:35 19  the obvious order you would have to do this in.  I didn't

10:23:38 20  find anything innovative, so in my opinion everything in

10:23:42 21  this patent was well-known and conventional, in this patent

10:23:45 22  specifically.

10:23:45 23  Q.     Finally we go to '703, Claim 25, what is your

10:23:49 24  conclusion, is there any technology that's described in

10:23:52 25  these claim elements that was not well-known and

759

Johnson - cross

10:23:55 1    conventional?

10:23:55 2    A.      No, this is an eCommerce one, it had a bunch of steps

10:23:59 3    in it.  As we saw, there were systems that already did all

10:24:03 4    these, so obviously technology was known.  If you look at

10:24:06 5    these steps for doing eCommerce, the order in which they

10:24:09 6    happen, right, identifying the product and service, getting

10:24:14 7    shipping information and then confirming, these are

10:24:17 8    conventional ideas, there was no innovative or

10:24:20 9    unconventional ideas in the patent, so in my opinion

10:24:23 10   everything in the patent is well-known and conventional.

10:24:26 11             MR. HADDEN:  Thank you very much for your time,

10:24:28 12   Dr. Johnson.

10:24:30 13             THE WITNESS:  Thank you.

10:24:31 14             THE COURT:  All right.  Cross-exam.

10:24:34 15                   CROSS-EXAMINATION

10:24:35 16   BY MR. SMITH:

10:24:51 17   Q.      Dr. Johnson, good morning.

10:24:52 18   A.      Good morning.

10:24:53 19   Q.      And I may be asking some questions about a binder

10:24:58 20   that says Michael Johnson cross-examination.

10:25:02 21   A.      I don't have those binders, I don't think.  I have

10:25:02 22   just the direct binders right now.  Are they in this box?

10:25:12 23   Q.      And Dr. Johnson --

10:25:12 24             THE COURT:  You can also use the side there of

10:25:21 25   the bench.

10:25:22  1          THE WITNESS:  Thank you.  Great.  I'll probably

10:25:24  2   set them right down here.

10:25:25  3   Q.      There is a big binder that has all your expert

10:25:28  4   reports in it.  And then there is a smaller binder with some

10:25:31  5   documents.  Maybe just pull up the smaller binder?

10:25:34  6   A.      Small binder?

10:25:35  7   Q.      You may not need to get to the big one?

10:25:38  8   A.      Sure.

10:25:39  9   Q.      And so you have that binder that says Michael Johnson

10:25:43 10   cross-examination, Volume I of one?

10:25:45 11   A.      1 of 1, Michael Johnson cross-examination, yes.

10:25:48 12   Q.      Thank you.

10:25:49 13          Appreciate that.  Dr. Johnson, you didn't show

10:25:55 14   us any source code about Alexa in your direct examination;

10:26:01 15   is that right?

10:26:01 16   A.      Did not show you source code for Alexa?  No.  So my

10:26:08 17   analysis I was looking at essentially what VB Assets,

10:26:12 18   Dr. Polish presented, and I addressed theirs, and I talked

10:26:16 19   about source code, but I didn't show any on the screen if

10:26:19 20   that's what you're asking, that's correct.

10:26:21 21   Q.      I was just asking for yes or no, if you haven't shown

10:26:24 22   --

10:26:24 23          THE COURT:  Just so we're clear and I do it for

10:26:26 24   both sides, I let the witness answer yes or no, but then I

10:26:30 25   let them give a brief explanation.

Johnson - cross

10:26:31 1                    THE WITNESS:  Yes, ma'am.

10:26:33 2      Q.      Okay.  Thank you, Dr. Johnson, I appreciate that.

10:26:36 3              If you could turn to in your binder, it's

10:26:41 4      labeled DTX 389.  So that's actually kind of the top tab

10:26:49 5      there.  Do you see that?

10:26:52 6      A.      DTX 389.  Yeah, I got it.

10:26:54 7      Q.      Thank you very much.

10:26:56 8              Can you open that to the first page?

10:26:59 9      A.      Yes.

10:26:59 10     Q.      And before I ask you that, would you agree that some

10:27:04 11     systems in Alexa are rule based?

10:27:07 12     A.      Some systems?  What do you mean by some systems?

10:27:11 13     Q.      Well, would you -- some parts of Alexa are manual

10:27:16 14     rule based, right?

10:27:16 15     A.      Sure, we heard Dr. Strom talk about some of the

10:27:21 16     things that Alexa does that use rules, yeah.

10:27:24 17     Q.      If you take a look at 389, do you see that this is a

10:27:32 18     confidential document about Alexa?

10:27:34 19     A.      Yes, this looks like a 2018 document and I have seen

10:27:37 20     this before, this is about their ranking and arbitration

10:27:40 21     system.

10:27:41 22     Q.

10:27:41 23              MR. SMITH:  I would like to move DTX 389 into

10:27:45 24     evidence, please.

10:27:46 25              MR. HADDEN:  No objection.

Johnson - cross

10:27:46 1              THE COURT:  Thank you.  It's admitted.

10:27:46 2              (DTX Exhibit No. 389 was admitted into

10:27:49 3     evidence.)

10:27:49 4

10:27:49 5     BY MR. SMITH:

10:27:49 6     Q.      And Dr. Johnson if you could go to the very last page

10:27:52 7     of this document.  And do you see that there is a diagram

10:27:58 8     that says in the left-hand corner it says Alexa AI current

10:28:03 9     state routing.  Do you see that?

10:28:05 10    A.      Yeah, I see that.

10:28:06 11    Q.      And then there is legend towards the bottom left, do

10:28:11 12    you see that?

10:28:13 13    A.      I see that.

10:28:14 14    Q.      There is a blue part that says rule based, do you see

10:28:17 15    that, too?

10:28:18 16    A.      Yes, I do.

10:28:19 17    Q.      Then if you look over on the right, it shows that

10:28:24 18    Amazon did some color coding showing which parts were rule

10:28:29 19    based, do you see that?

10:28:30 20    A.      Sure, I see all that.  These were different

10:28:33 21    components, some of this is NLU, some of this is routing

10:28:36 22    stuff, some of this is other stuff, but yeah, I see that.

10:28:39 23    Q.      All the stuff in blue is the ruled based?

10:28:42 24    A.      Sure, in this diagram those are the things that are

10:28:45 25    identified as rule based in this different system I assume

763

Johnson - cross

10:28:49 1    around 2018.

10:28:50 2    Q.      And 2018, that's about four years after Alexa was

10:28:54 3    released?

10:28:55 4    A.      Sure, that's about right.

10:28:57 5    Q.      So four years into Alexa, and all the stuff in blue

10:29:02 6    is rule based?

10:29:03 7    A.      Sure.  Although one thing I would note is that none

10:29:06 8    of the infringement allegations that I have looked at have

10:29:09 9    mentioned anything about rules, so I don't know that this is

10:29:12 10   relevant to Alexa infringement.  But it's true that this

10:29:15 11   shows some rules.

10:29:16 12   Q.      So in your view, whether or not Alexa uses rules or

10:29:21 13   doesn't use rules, that's just not relevant to infringement?

10:29:24 14   A.      So not exactly, but sort of.  Mr. Kennewick said

10:29:28 15   something about this the first day, he said it doesn't

10:29:31 16   matter.  So in a sense that's true, all that matters is

10:29:33 17   whether you carry out the elements of the claim as they're

10:29:36 18   presented.  The thing is that the way these patents are put

10:29:39 19   together, the steps are really more oriented towards the

10:29:42 20   deep neural networks and machine learning and not -- excuse

10:29:45 21   me, the way the patents are put together, the steps, they're

10:29:48 22   more oriented toward a rule based system and that's

10:29:51 23   different than a deep neural networks system, that's all I'm

10:29:55 24   saying.

10:29:55 25   Q.      I appreciate that, Dr. Johnson.  Why don't we go to

Johnson - cross

10:29:59 1   another document that I think you have seen a lot in this

10:30:01 2   case.  This is PTX 0226.

10:30:05 3   A.      0226.  Let me find that.

10:30:08 4   Q.      And this, Dr. Johnson, this is the -- this is a

10:30:15 5   native document.  So you may want to just take a look on the

10:30:22 6   screen because it's a native PowerPoint?

10:30:24 7   A.      I remember this, we talked about it a bunch.

10:30:26 8   Q.      And you have heard other witnesses like Nikko Strom

10:30:33 9   and Dr. Polish, they were also questioned about this

10:30:37 10  particular document?

10:30:38 11  A.      Yeah, a bunch of people have talked about this

10:30:41 12  particular document.  This was a document I think around

10:30:44 13  2016, pretty early, that was an illustration of how the NLU

10:30:48 14  worked that was used internally to explain to non-NLU

10:30:51 15  engineers some of the general ideas.

10:30:53 16  Q.      You're familiar with PowerPoint?

10:30:55 17  A.      Of course.

10:30:55 18  Q.      You know that -- and why don't we go to page 33,

10:31:02 19  slide 33 of this.  And this -- is this one of the slides

10:31:07 20  that you took -- or you were asked about on direct?

10:31:11 21  A.      Yes.

10:31:11 22  Q.      And you studied this slide I imagine quite a bit in

10:31:11 23  this case?

10:31:11 24  A.      Sure.  Yeah.

10:31:11 25  Q.      And you said you were familiar with PowerPoint.  Did

Johnson - cross

10:31:19  1    you know in PowerPoint you can see there is notes in the

10:31:23  2    slides sometimes?

10:31:24  3    A.      I did know that, although I don't know that I have

10:31:27  4    looked at notes in this.  That's fine.  Sure, I knew you

10:31:30  5    could have that.

10:31:31  6    Q.      Let me try taking a look on slide 33, Mr. Smith, if

10:31:36  7    we can try to take a look at how this looks in native.

10:31:41  8    Okay?

10:31:41  9    A.      Sure.

10:31:42 10    Q.      Okay.  So this is how we got the document from Amazon

10:31:45 11    in native format.  And then at the very bottom, do you see

10:31:50 12    there -- that's the note section, isn't it?

10:31:53 13    A.      Sure, that is the note section.

10:31:55 14    Q.      And you said you hadn't taken a look at that before

10:31:58 15    today?

10:31:58 16    A.      I don't recall that, it could be that I have seen it,

10:32:00 17    but I don't remember.  I do have the native PowerPoint, so

10:32:03 18    it could be that I have seen it, but I see it right now.

10:32:06 19    Q.      Do you see there it says rules can do it, do you see

10:32:07 20    that?

10:32:09 21    A.      Yeah, sure.

10:32:10 22    Q.      And then there is a -- I think the statement you

10:32:13 23    talked about in your direct examination was, it says NL

10:32:14 24    models -- NLU models are currently not aware of dialogue

10:32:24 25    context, do you see that?

Johnson - cross

10:32:25  1    A.       That's correct.

10:32:25  2    Q.       So isn't this saying that at least at this point the

10:32:31  3    rules in Alexa were aware of the dialogue context?

10:32:36  4    A.       Definitely not.  That's not what that says to me at

10:32:41  5    all.  I don't know what they mean by rules can do it, but I

10:32:45  6    can't even imagine how that would be possible and it's not

10:32:50  7    considered relevant at all about anything I understand about

10:32:52  8    Alexa.

10:32:52  9    Q.       You understand I think from Mr. Vanee's testimony

10:32:55 10    that Amazon made a video that they used to train their

10:33:00 11    engineers with this presentation?

10:33:01 12    A.       That sounds about right.

10:33:02 13    Q.       When you were doing your work on this case, did you

10:33:04 14    ever ask Amazon to see that video?

10:33:08 15    A.       I don't recall seeing that video, it could be that I

10:33:11 16    have, but I just don't remember.  I don't recall seeing

10:33:14 17    that.  I do remember Kelly Vanee testified about a whole

10:33:18 18    bunch of this in the slides in his deposition.

10:33:20 19    Q.       But again, this was the first time you saw the note

10:33:22 20    that says rules can do it?

10:33:25 21    A.       That I remember, yes.

10:33:28 22    Q.       Yesterday I believe you testified something to the

10:33:33 23    effect that Alexa doesn't have context.  Do you remember

10:33:36 24    testifying about that?

10:33:37 25    A.       I don't, that -- that doesn't sound right, but it

Johnson - cross

10:33:42 1    could be that I said that and didn't realize my wording.

10:33:45 2    Q.    Let me ask you this.  Would you agree today with the

10:33:48 3    proposition that Alexa doesn't have context?

10:33:51 4    A.    So Alexa being like the whole system?  To be honest,

10:33:57 5    I would have to have you say what you mean by context,

10:34:00 6    because you're using the word like it's English.  For

10:34:03 7    example, if we go to the '681 patent and talk about identify

10:34:06 8    a context and you ask me does Alexa do this step of

10:34:10 9    identifying a context, of course the answer is no as I've

10:34:13 10   already testified.  But you ask some question where you use

10:34:16 11   the word context and you say does Alexa have this and this

10:34:20 12   document has the word context in a bunch of places, so I

10:34:23 13   would acknowledge that it has something that somebody might

10:34:26 14   call context somewhere.

10:34:28 15          MR. SMITH:  Your Honor, can we -- would it be

10:34:31 16   possible to refresh the witness's recollection with his

10:34:35 17   trial transcript yesterday or can we show it --

10:34:38 18          THE COURT:  Why don't you just ask him what he

10:34:41 19   recalls saying?

10:34:42 20          MR. SMITH:  Okay.

10:34:42 21   BY MR. SMITH:

10:34:42 22   Q.    So just to be clear, you don't remember saying that

10:34:46 23   Alexa doesn't have context yesterday?

10:34:48 24   A.    I don't.  If I said that, that wouldn't have been the

10:34:51 25   sort of general spirit that I meant, I more specifically

Johnson - cross

10:34:56 1    want to convey that the Alexa NLU does not identify a

10:34:59 2    context in the sense of these claims or any of the claims.

10:35:02 3    Q.    Mr. Smith, could you put up page 691 --

10:35:09 4              THE COURT:  Is this the trial transcript?

10:35:11 5              MR. SMITH:  Yes.

10:35:12 6              THE COURT:  No, you're not going to put that on

10:35:14 7    the screen, but you can show it to him, if you want, you can

10:35:17 8    hand it to him, or you can read it to him, and ask him what

10:35:20 9    he said, but you're not going to put it on the screen any

10:35:23 10   more than I let other people put trial transcripts on the

10:35:26 11   screen.

10:35:27 12             MR. SMITH:  I understand.  Thank you, Your

10:35:29 13   Honor.

10:35:30 14   BY MR. SMITH:

10:35:30 15   Q.    Mr. Smith, could you publish this to -- let's move on

10:35:35 16   we'll come back to that.

10:35:37 17             Why don't we go to in your binder, this is that

10:35:43 18   cross binder, PTX 474.

10:35:47 19   A.    Sure.  I got it.

10:35:49 20   Q.    Okay.  And Dr. Johnson, have you seen PTX 474 before?

10:36:01 21   A.    So it looks vaguely familiar, but I suspect it's been

10:36:02 22   a while.  So the answer is maybe.  Sorry.

10:36:12 23   Q.    I understand there is a lot of documents.

10:36:12 24   A.    Yes.

10:36:15 25   Q.    Let me ask you this.  Is Exhibit 474 the type of

Johnson - cross

10:36:20 1    technical document that you were looking at from Amazon in

10:36:24 2    this case?

10:36:28 3    A.      So I've seen a lot of technical documents, some of

10:36:34 4    them were WIKI pages, this looks like a WIKI page, I can't

10:36:39 5    tell quite when, a lot of the WIKI pages contained a lot of

10:36:44 6    huge amount of info that some people posted, often people at

10:36:47 7    Amazon trying to say how different features work and they

10:36:50 8    did have good information about how those features worked

10:36:53 9    and sometimes had information that was inaccurate too, but I

10:36:57 10   have seen a bunch of WIKIs.

10:36:59 11   Q.      And you agree this was an Amazon WIKI?

10:37:02 12   A.      Looks like it from what I can tell.

10:37:05 13              MR. SMITH:  Plaintiff seeks to move in exhibit

10:37:08 14   PTX 0474.

10:37:11 15              MR. HADDEN:  No objection.

10:37:11 16              THE COURT:  Thank you.  It is admitted.

10:37:11 17              (PTX Exhibit No. 0474 was admitted into

10:37:12 18   evidence.)

10:37:12 19   BY MR. SMITH:

10:37:12 20   Q.      And Dr. Johnson, why don't we go to a page ending in

10:37:20 21   0006.  Do you see that?

10:37:24 22   A.      Sure.

10:37:25 23   Q.      Do you see at the bottom there is a section that says

10:37:28 24   definitions.  Do you see that?

10:37:29 25   A.      Sure.

Johnson - cross

10:37:30 1   Q.      And then if we go to the next page, the first bullet

10:37:34 2   says conversation context, do you see that?

10:37:39 3   A.      Sure.

10:37:39 4   Q.      It says conversation context existing term, referring

10:37:42 5   to the data stored about the conversation that lives in

10:37:46 6   conversation storage.  A collection of opaque text.  Do you

10:37:53 7   see that?

10:37:53 8   A.      Sure.

10:37:53 9   Q.      Had you seen that definition in the document before

10:37:56 10  today?

10:37:57 11  A.      I hadn't.  I also am not sure what it is referring

10:38:02 12  to, like which part of Alexa we're talking about and what

10:38:06 13  the context of the word context is.  Sorry.

10:38:09 14  Q.      No problem.

10:38:10 15  A.      But anyway, I don't recall seeing this, but that's

10:38:12 16  fine.

10:38:13 17  Q.      Let me ask you about another document.

10:38:15 18  A.      Sure.

10:38:15 19  Q.      Why don't you turn in your binder to DTX 0108.  It's

10:38:28 20  basically the fourth document in there.

10:38:30 21  A.      Yep, I have it.

10:38:31 22  Q.      And do you see what we try to do here was just

10:38:36 23  printout a native Amazon presentation that was produced to

10:38:41 24  us from Amazon, do you see that?

10:38:44 25  A.      Yeah, it looks pretty old school.

Johnson - cross

Q.      You see the title of this is Alexa overview.  Do you see that?

A.      Yes.

Q.      Is this one of the documents that you have seen in the case?

A.      It seems familiar, but I don't remember for sure.

Q.      Okay.  Would you agree you looked at a lot of technical Amazon presentations in the case, and this is one of those, of that type?

A.      So I wouldn't probably call this a technical presentation.  It looks like this is very long time ago and it's pretty high end.  I see some stuff about OP1s which are sort of forward looking documents that Amazon has about strategy.  So I don't know if the things that are in this are descriptions of how the system, they hope it will work or how it does work.  And the date looks like 2011.  So yeah, I couldn't tell you.  I would not call this a technical document.  It looks like more sort of a front end overview marketing kind of document.

Q.      But it looks like a document from Amazon, is that right?

A.      Sure.

            MR. SMITH:  At this point we'll move into evidence DTX 0108.

            MR. HADDEN:  No objection.

Johnson - cross

10:39:55 1          THE COURT:  Thank you.  It is admitted.

10:39:55 2          (DTX Exhibit No. 0108 was admitted into

10:39:55 3  evidence.)

10:39:55 4  BY MR. SMITH:

10:39:56 5  Q.     And Dr. Johnson, why don't we go to slide 29 in this

10:40:04 6  document.  I just want to see if you have seen this diagram

10:40:08 7  before.  You see at the top of this diagram, it says Alexa

10:40:11 8  deals with ambiguity?

10:40:13 9  A.     I'm going to assume what you have on the screen is

10:40:16 10 slide 29 because I don't have slide numbers.  But I can look

10:40:18 11 at what you have on the screen.

10:40:20 12 Q.     I appreciate that.  Thank you.  Do you see there is a

10:40:23 13 slide that says Alexa deals with ambiguity?

10:40:26 14 A.     Sure.

10:40:26 15 Q.     In kind of the right-hand portion, there is a box

10:40:30 16 with a little logo for Alexa, do you see that?

10:40:32 17 A.     Sure.

10:40:32 18 Q.     There is a large box that says context?

10:40:36 19 A.     Yes.

10:40:37 20 Q.     And have you seen this before today?

10:40:45 21 A.     Maybe, this seems familiar, it's pretty old, this is

10:40:49 22 just a list of a bunch of information that Alexa uses.  I

10:40:54 23 mean, it has the word context at the top, so I see the word

10:40:57 24 context if that's what you're pointing to but a lot of

10:41:00 25 things here are just different kinds of information that

10:41:03 1   Alexa or pieces of Alexa have related to use.  Certainly not

10:41:07 2   related to do the identify a context steps of any of these

10:41:10 3   patents that we're talking about.

10:41:12 4   Q.      Have you recently in the course of preparing to

10:41:17 5   testify in this case gone to the Amazon website and looked

10:41:20 6   around at documentation on the public website about what

10:41:24 7   they may be saying or not saying about context?

10:41:27 8   A.      Other than ordering stuff, no, not recently.

10:41:34 9   Q.      Would you agree, or have you heard of something

10:41:40 10  called Amazon Science before?

10:41:42 11  A.      Yeah, I think -- didn't Nikko Strom put up Amazon

10:41:47 12  Science or show that, that's where Amazon publishes

10:41:50 13  documents to the public and stuff like that, sure.

10:41:53 14  Q.      Exactly.  Have you gone to the Amazon Science web

10:41:56 15  page and taken a look at what they say about Alexa?

10:41:59 16  A.      Not recently and not in connection with the case.  I

10:42:02 17  have been there to actually look up technical information

10:42:05 18  because they sometimes publish some really good papers.

10:42:11 19  Q.      So Amazon Science would be pretty accurate

10:42:14 20  information, you say?

10:42:15 21  A.      So if there is published papers that have been peer

10:42:19 22  reviewed, the day it posted, they would be an accurate

10:42:22 23  description of the technology or the ideas, because a lot of

10:42:25 24  times research papers are more ideas, that are in those

10:42:28 25  papers.  So I would trust those papers have gone through

10:42:32 1   peer review to be accurate papers, sure.  Although that's

10:42:36 2   not going to tell you what's inside Alexa code, right?

10:42:39 3   Q.      Would you agree that some of the machine learning

10:42:43 4   models in Alexa use context?

10:42:49 5   A.      So which machine learning models do you want to talk

10:42:52 6   about?  It has a bunch of machine learning models.

10:42:55 7   Q.      Just as a general -- at least one machine learning

10:42:59 8   model in all of Alexa, you would agree does use context?

10:43:03 9   A.      What do you mean by context?

10:43:05 10  Q.      Well, the same way I think you were using context

10:43:09 11  when you were talking about --

10:43:12 12  A.      So my definition of context, we're in a patent case

10:43:15 13  that's about context, so my definition is what's in the '681

10:43:19 14  patent which is a thing that you identify from a short or

10:43:22 15  long-term knowledge, right, that's what context is.  And in

10:43:26 16  the context of that, no.

10:43:28 17  Q.      Why don't you take a look at, in your binder I have a

10:43:32 18  tab that says IX two.

10:43:39 19  A.      I got it.

10:43:40 20  Q.      And why don't you turn, we'll not put this up on the

10:43:44 21  screen, but if you turn to the second page of this --

10:43:50 22  actually on the first page, Dr. Johnson, do you see this

10:43:52 23  document says Amazon Science at the top?

10:43:55 24  A.      Yes.

10:43:55 25          MR. HADDEN:  Objection, Your Honor.  This is one

10:43:59 1   of the documents that we discussed previous that we were not

10:44:02 2   to talk about.

10:44:03 3              THE COURT:  All right.  Let's go out into the

10:44:05 4   hall.  What document is this?

10:44:10 5              MR. SMITH:  Your Honor, this is actually just

10:44:12 6   from their website, this is not the document --

10:44:15 7              THE COURT:  I don't want you to talk about it in

10:44:16 8   front of the jury, I just want to know what document we're

10:44:19 9   talking about, do I have a copy of it?

10:44:22 10             MR. SMITH:  I don't believe so.  We can move on

10:44:24 11  from this, if that's -- if it would move things along.

10:44:29 12             THE COURT:  Okay.  I guess that was sustained,

10:44:34 13  but I didn't really have to rule on it because he withdrew

10:44:36 14  it.

10:44:38 15             MR. BELGAM:  Your Honor, I think Mr. Buckson

10:44:43 16  does have this document.

10:44:44 17             THE COURT:  Well, he withdrew.

10:44:47 18  BY MR. SMITH:

10:44:48 19  Q.    Why don't we go back to the native document we're

10:44:51 20  talking about earlier, 226.

10:44:54 21  A.    Yeah, I've got to get back there in a second.

10:44:58 22             MR. HADDEN:  One more time?

10:44:59 23             MR. SMITH:  226.

10:45:01 24  Q.    Actually that's the native one, so maybe we can put

10:45:04 25  that on the screen.  I just want to ask you a couple of

10:45:07  1    questions about slide 32.

10:45:09  2    A.      Sure.

10:45:10  3    Q.      Now, I think you were asked -- and this was that

10:45:15  4    multi-turn example I think that you talked about earlier.

10:45:19  5    A.      Sure.

10:45:19  6    Q.      Do you recall that?

10:45:20  7    A.      Yes.

10:45:21  8    Q.      Would you agree that the NLU in Alexa at least at

10:45:24  9    this time had a recognition phase and a resolution phase?

10:45:28 10    A.      So, I remember that from this document, so sure.  I

10:45:33 11    mean, you know, if you look in the code, you can see what it

10:45:36 12    does, right.  That's the way they were describing it in this

10:45:39 13    PowerPoint to the users and they used it a lot so clearly

10:45:43 14    they thought of it in that way, so sure.

10:45:45 15    Q.      And would you agree that during the resolution phase,

10:45:51 16    the context interpreter uses the dialogue act that

10:45:56 17    identified the target time slots associated with the prompt

10:45:59 18    for in this example for what time?

10:46:04 19    A.      So, just to clarify, we're talking about the

10:46:07 20    utterance six, the one in the middle, right?  And what you

10:46:10 21    called a second step or the resolution is what we talked

10:46:13 22    about as re-ranking, right?  And we're talking about the

10:46:16 23    context interpreter as what is used in that re-ranking,

10:46:20 24    right?  And the information that it has when it's

10:46:24 25    re-ranking, which again is not interpreting meanings or

Johnson - cross

10:46:27 1    identifying a context, when it's re-ranking, includes the

10:46:30 2    prompt that was sent to the user previously, which is

10:46:33 3    exactly what you have highlighted, for what time, so I agree

10:46:37 4    with that, yes.

10:46:39 5    Q.      And you would agree that that -- in this resolution

10:46:43 6    phase, the context interpreter would narrow down the

10:46:48 7    possible hypotheses for the utterance six?

10:46:50 8    A.      No.  It re-ranks them and changes scores, but not

10:46:57 9    that I know of.  It has still a list of meanings on the

10:47:00 10   other side.

10:47:01 11   Q.      Would you mind if you could take a look at the large

10:47:05 12   binder that had your expert reports in it.

10:47:08 13   A.      Sure.

10:47:09 14   Q.      And if we could go to in particular your rebuttal

10:47:12 15   expert report.

10:47:17 16   A.      Sure.  If I can find it.  Just a second.  Rebuttal

10:47:28 17   and reply expert reports appendixes.

10:47:31 18   Q.      Yeah, if you could go to your rebuttal expert report,

10:47:37 19   paragraph 62.

10:47:39 20   A.      Make sure I got the right one.  Paragraph 62.  Way up

10:47:45 21   front.  Okay.

10:47:48 22   Q.      And in paragraph 62, do you see that the sentence

10:47:51 23   that begins with "during the resolution phase the context

10:47:56 24   interpreter uses the dialogue act."

10:48:00 25   A.      Sure, I see that.

Johnson - cross

10:48:01 1    Q.      It says "during the resolution phase the context

10:48:04 2    interpreter, CI, uses the dialogue act that identifies the

10:48:09 3    target time slot associated with the prompt for "for what

10:48:16 4    time" to "narrow down "the possible hypotheses for the

10:48:22 5    utterance six as likely relating to time."  Do you see that?

10:48:26 6    A.      I totally see that.

10:48:27 7    Q.      And that was the statement that you put in your

10:48:31 8    expert report; right?

10:48:32 9    A.      Yep, right here.

10:48:35 10   Q.      And why don't we go to -- from this same

10:48:40 11   presentation, slide 36.  And this is something I think you

10:48:48 12   were asked about earlier, this is the C I merge portion of

10:48:51 13   this?

10:48:51 14   A.      Yes.

10:48:56 15   Q.      And do you see where it says dialogue act on there?

10:49:00 16   A.      Sure.

10:49:01 17   Q.      Okay.  And now, with respect to this, would you agree

10:49:06 18   that the context interpreter uses the dialogue act here to

10:49:13 19   narrow down the NBest list of possible interpretations of

10:49:17 20   the current natural language utterance?

10:49:19 21   A.      So let me be real clear about this, just to point out

10:49:22 22   the thing that's at the top left is a chart of information

10:49:26 23   intended for the viewers of the presentation to understand

10:49:31 24   what's going on in this example.  This is not a list of

10:49:34 25   things inside Alexa code, so this is just information for

10:49:37 1    the users to sort of set the context to them of what we're

10:49:41 2    talking about.  Because otherwise we get this implicit ideas

10:49:45 3    that all the things over here are inputs and that's not

10:49:48 4    necessarily the case.

10:49:49 5           There is a couple of errors on this slide, I

10:49:52 6    think Kelly Vanee testified about those, I'm not sure that's

10:49:56 7    related to your question.  With regard to your question,

10:49:59 8    specifically, the dialogue act is input to the context

10:50:02 9    interpreter, and that is the prompt that was sent to the

10:50:05 10   users the previous time as a part of the re-ranking.

10:50:09 11   Q.    And would it be fair to characterize the NBest list

10:50:13 12   as having possible interpretations of the natural language

10:50:16 13   utterance?

10:50:19 14   A.    Sure, all possible interpretations, it's reordered

10:50:22 15   and rescored, so like this idea of narrowing down is more

10:50:26 16   about, some of them might have higher scores and some of

10:50:29 17   them might have had real low scores, but in a sense that's

10:50:35 18   narrowing down, but you also always have these multiple

10:50:38 19   interpretations and they are the same interpretations before

10:50:42 20   you did about the re-ranking, I had a list of

10:50:46 21   interpretations and after the re-ranking you still have the

10:50:48 22   interpretations and all those interpretation also are sent

10:50:51 23   out to the application.

10:50:52 24   Q.    Thank you, Dr. Johnson.  I appreciate that.  If we

10:50:56 25   could pull up DTX 586, which I believe is already in

10:51:01 1    evidence.  And further down the slide --

10:51:12 2    A.      Do you know where I would find this one?

10:51:14 3    Q.      This is another DTX, this one should be in your

10:51:21 4    binder.  Well, maybe -- would you mind just taking a look at

10:51:28 5    the screen?

10:51:29 6    A.      No, I don't mind.

10:51:30 7    Q.      And Mr. Smith, if we could go further down to I think

10:51:35 8    it was -- maybe just keep going through the presentation

10:51:40 9    quickly here.  And okay, if could go back up one.  So this

10:51:48 10   is on, this is DTX 586, 0013, do you see that, Dr. Johnson?

10:51:53 11   A.      Yeah, I don't know what that means.

10:51:55 12   Q.      Okay.

10:51:55 13   A.      And I don't know, is this something we talked about

10:51:59 14   previously, or is this a new thing?

10:52:02 15   Q.      I think in your slides, do you remember you were

10:52:05 16   talking about with --

10:52:06 17   A.      I remember this picture on the screen, I just don't

10:52:09 18   remember what this document is.

10:52:10 19   Q.      I was just going to ask you about the picture.  Do

10:52:12 20   you remember you mentioned that the example we said, it says

10:52:17 21   Alexa play music, do you remember that?

10:52:19 22   A.      Yes, I do remember that.

10:52:20 23   Q.      And then you said -- I think you said what would

10:52:24 24   happen is it would just start playing music.  Do you kind of

10:52:28 25   remember that from yesterday?

Johnson - cross

A.      Sure, that's what I was saying the directive Alexa

voice response and play back through a speaker, you know, I

have Alexa playing music all the time.  I think it says

something to me, but I don't remember what it says.  This

doesn't show you what is said back to the user, but clearly

accomplishing of the speakers's intent is the play back

music through the speaker.

Q.      That's what I was really just asking, is when Alexa

-- when you say Alexa play music, it plays music, but it

also verbally responds to you, right?

A.      I think most of the time, but to be honest, we can

try it out, I don't remember what Alexa says exactly.  This

was about that adaptive response thing and what I was mostly

saying is there is nothing here that shows an adaptive

grammatically or syntactically response.

Q.      Let me turn to invalidity for a little bit.

A.      Sure.

Q.      You understand that patents are examined by a patent

examiner before they're issued?

A.      Of course.

Q.      And the patent examiner looks at prior art; is that

right?

A.      Yep.

Q.      And the patent examiner also studies the patent

specification to make sure the things like the written

Johnson - cross

10:53:40 1   description requirement are met, right?

10:53:41 2   A.      Yeah, that's what they're supposed to do, yes.

10:53:43 3   Q.      They're also supposed to check the patent document to

10:53:46 4   make sure, whether it's unpatentable subject matter or not,

10:53:51 5   right?

10:53:52 6   A.      Yes, that's right.

10:53:52 7   Q.      For all four patents in this case, there is a patent

10:53:55 8   examiner that checked for all those things, they checked for

10:53:58 9   obviousness, they checked for written description, and they

10:54:01 10  checked for unpatented subject matter, right?

10:54:03 11  A.      They were supposed to do that for all of those,

10:54:06 12  right.

10:54:06 13  Q.      In your opinion, the patent examiner for the '681

10:54:09 14  made a mistake on obviousness, written description, and on

10:54:14 15  patent subject matter, right?

10:54:15 16  A.      Yeah, that's correct, that's my opinion.

10:54:17 17  Q.      And for the '176 patent your opinion is that patent

10:54:20 18  examiner made a mistake for obviousness, unpatentable

10:54:25 19  subject matter, and written description, too, right?

10:54:27 20  A.      That is correct, that's my opinion.

10:54:28 21  Q.      And for the '097, the patent examiner, perhaps a

10:54:33 22  different person made mistakes on obviousness, written

10:54:35 23  description, and unpatentable subject matter, right?

10:54:37 24  A.      That's correct.  I guess with regard to obviousness,

10:54:40 25  I do want to clarify, whether I would call that a mistake,

Johnson - cross

10:54:44 1    because if they didn't have the prior art in their

10:54:46 2    references when they were looking at it, they could have

10:54:49 3    made the best decision that was possible given what they

10:54:52 4    saw.  They weren't aware of some of these pieces of prior

10:54:55 5    art, so I don't want to necessarily call that a mistake, but

10:55:01 6    in my opinions, these patents are invalid for all those

10:55:04 7    reasons in all these cases.

10:55:05 8    Q.      The same for the '703 patent, the examiner you think

10:55:09 9    made a mistake for obviousness, written description, and

10:55:13 10   unpatentable--

10:55:13 11   A.      I believe that patent is invalid for all those

10:55:15 12   reasons.

10:55:16 13   Q.      In your view, all four patents, three mistakes for

10:55:19 14   each patent?

10:55:20 15   A.      Yeah, straight up.

10:55:21 16   Q.      Okay.  Now, I think one thing you just mentioned was

10:55:24 17   that you weren't sure if the Patent Office necessarily had

10:55:27 18   all the information it needed for obviousness, right?

10:55:30 19   A.      So, that's a question of all the references that I

10:55:33 20   looked at, and it did not look like it had looked at the

10:55:37 21   prior art that I used necessarily, right, and so to the

10:55:40 22   extent that they had not considered some of those prior art

10:55:42 23   references at the time that they did that original

10:55:46 24   prosecution, right, perhaps you could understand that they

10:55:50 25   had not seen everything, that's all.

Johnson - cross

10:55:51 1   Q.      And you understand that the Patent Office had access

10:55:54 2   to at least some of the MIT Galaxy papers when they

10:55:59 3   prosecuted the '681 patent, right?

10:56:01 4   A.      They should have, they were published all over the

10:56:03 5   place, I had seen them.

10:56:04 6   Q.      And you have no reason to believe they did not have

10:56:07 7   access to that all the time?

10:56:09 8   A.      In my opinion, they should have known about those

10:56:13 9   papers sure, but they weren't necessarily on the reference

10:56:16 10  list.

10:56:16 11  Q.      You're not saying they were absent from the reference

10:56:19 12  list, are you?

10:56:20 13  A.      I don't recall, I would have to check.  I'm saying to

10:56:22 14  the extent that any of those were missing, maybe they were

10:56:25 15  trying to make their best judgment in what they had in front

10:56:28 16  of them.

10:56:28 17  Q.      Now, I think one thing on the MIT Galaxy issue is one

10:56:33 18  of the issues in this case is the long-term shared

10:56:36 19  knowledge, right?

10:56:37 20  A.      Yes.

10:56:39 21  Q.      And you mentioned I think looking at some source code

10:56:42 22  for MIT Galaxy in your direct examination.  Do you recall

10:56:46 23  that?

10:56:47 24  A.      Oh, yeah.

10:56:49 25  Q.      And I believe that for that particular term, the

785

Johnson - cross

10:56:53 1    accumulating long-term shared knowledge, you were unable to

10:56:59 2    cite any source code in your expert report?

10:57:02 3    A.     I don't think that's correct.  I could go back and

10:57:05 4    check, of course, so there was code about the user model in

10:57:10 5    the Mercury system I thought that I had seen.  It was

10:57:14 6    absent, I remember it maybe not being in some of the others.

10:57:18 7    We heard Dr. Polifroni talk about this, so the code that was

10:57:21 8    on MIT, versus the code that was released by MIT to the

10:57:25 9    public didn't have everything.

10:57:26 10   Q.     Why don't we take a look, if you could take a look in

10:57:30 11   your cross-examination binder, I think the first tab is a

10:57:33 12   deposition transcript.

10:57:35 13   A.     Sure.  Sorry, which binder are we talking about?

10:57:38 14   Q.     This is the smaller cross-examination binder.

10:57:42 15   A.     Sure.

10:57:43 16   Q.     Is that the one that says cross-examination, 1 of 1?

10:57:47 17   A.     That's this one.

10:57:49 18   Q.     Sorry?

10:57:49 19   A.     No problem.

10:57:50 20   Q.     I think it's the first tab in there.

10:57:52 21   A.     Oh okay.

10:57:54 22   Q.     Do you see where it says deposition?

10:57:55 23   A.     Sure.

10:57:56 24   Q.     If you could go to page 189 of that, please?

10:58:05 25   A.     Sure.  Is this the --

Johnson - cross

10:58:08  1    Q.      The first tab.

10:58:13  2    A.      Yeah, I'm just trying to make sure I understand.   189

10:58:16  3    is the number, it looks like that's on page 48?

10:58:19  4    Q.      Yes.   Thank you very much.

10:58:21  5    A.      Yeah.

10:58:21  6    Q.      I'm just going to see if this was your testimony.

10:58:24  7    There is a question that says, "and in this particular

10:58:27  8    section where you discuss long accumulating long-term shared

10:58:31  9    knowledge in this specific section, you don't cite any

10:58:35 10    specific source code, do you?

10:58:37 11            And then answer:   "So it looks like I don't

10:58:41 12    directly cite source code."

10:58:44 13            And then you go on from there.   Do you see that?

10:58:46 14    A.      Yeah, that's because the source code cites were in

10:58:49 15    the background section of the report, not in the individual

10:58:52 16    elements.   So I talked about what the different code did,

10:58:54 17    but then the background section was where there were a lot

10:58:58 18    of source code cites.   Absolutely that's what I said in the

10:59:02 19    deposition, that's correct.

10:59:02 20    Q.      You understand the deposition was under oath just

10:59:05 21    like now?

10:59:05 22    A.      Yeah, it was accurate.   Correct.

10:59:08 23            MR. SMITH:   Thank you, Dr. Johnson.   I

10:59:10 24    appreciate your time.

10:59:12 25            THE COURT:   Redirect.

REDIRECT EXAMINATION

BY MR. HADDEN:

Q.      Very briefly, Dr. Johnson.  Does the fact that an

Amazon document used the word context have anything to do

with whether or not Alexa uses the '681 patent or any of

these other patents?

A.      No, it has to carry out the steps as written in the

claim element specifically.

Q.      Does the word context have meanings outside of the

claim of this patent?

A.      Apparently the word context has a lot of contexts.

              MR. HADDEN:  Thank you.  Thank you very much.

              Thank you, sir, you're excused.

              Let's take our morning break.

              COURTROOM DEPUTY:  All rise.

              (Jury exiting the courtroom at 10:59 a.m.)

              THE COURT:  All right.  We'll take our fifteen

minute break.  I just want to make sure with all this

discussion about context, nobody is bringing up claim

construction, right?

              MR. HADDEN:  I am not, Your Honor.

              THE COURT:  I was told there was no claim

construction issue on this.  That's correct?

              MR. YOON:  That's correct, Your Honor.  There is

no claim construction.

11:00:35 1          THE COURT:  All right.

11:00:37 2              (A brief recess was taken.)

11:21:56 3          COURTROOM DEPUTY:  All rise.

11:21:57 4              (Jury entering the courtroom at 11:21 a.m.)

11:22:07 5          THE COURT:  All right.  Welcome back.  Everyone,

11:22:13 6  please be seated.

11:22:17 7          MS. SHAMILOV:  Your Honor, at this time Amazon

11:22:19 8  calls its next witness, Dr. Keith Ugone.

11:22:39 9          COURTROOM DEPUTY:  Please raise your right hand.

11:22:41 10  Please state and spell your full name for the record.

11:22:44 11          THE WITNESS:  Keith Raymond Ugone.  Last name is

11:22:48 12  U-G-O-N-E.

11:22:50 13          Keith Raymond Ugone having been duly sworn as

11:22:55 14  examined and testified as follows:

11:22:58 15              DIRECT EXAMINATION.

11:23:00 16  BY MS. SHAMILOV:

11:23:04 17  Q.      Good morning.

11:23:05 18  A.      Good morning.

11:23:05 19  Q.      Would you please introduce yourself to the jury?

11:23:08 20  A.      Sure, as you just heard my name is Keith Ugone, and

11:23:12 21  last name is spelled U-G-O-N-E.

11:23:14 22  Q.      What do you do doctor?

11:23:15 23  A.      I'm sorry?

11:23:16 24  Q.      What do you do?

11:23:17 25  A.      Oh, I'm a forensic economist, so what I do is in

11:23:22 1    cases like this, disputes like this, I evaluate damage

11:23:25 2    claims.

11:23:25 3    Q.    Did you prepare some slides today to show to the

11:23:29 4    jury?

11:23:29 5    A.    Yes, I have.

11:23:31 6    Q.    Before we get into the specific work you did for the

11:23:34 7    case, would you please tell us a little bit about your

11:23:37 8    education and work experience?

11:23:39 9    A.    Sure.  So I have got a slide here that has my

11:23:42 10   educational and work experience.  On the left-hand side is

11:23:45 11   my education, so I got a bachelors degree in economics from

11:23:49 12   the University of Notre Dame in 1977.  Then I got a masters

11:23:53 13   degree in economics from the University of Southern

11:23:57 14   California in 1979.  And I got my Ph.D. in economics from

11:24:00 15   Arizona State University in 1983.

11:24:03 16   Q.    And what did you do after you got your Ph.D.?

11:24:06 17   A.    So when I was at Arizona state I was teaching college

11:24:12 18   classes, and that's what I started to do after I got my

11:24:15 19   Ph.D.  So I went to the California State University schools,

11:24:21 20   Cal State North Ridge, I taught there full-time for two

11:24:24 21   years, 83 to 85, and I enjoyed teaching, so I even continued

11:24:29 22   teaching part-time for another seven years after that.  In

11:24:32 23   1985 I joined what was Price Waterhouse at the time, they

11:24:35 24   were one of the big four accounting firms, you probably

11:24:38 25   heard of them, in the academy award ballots, but I was there

11:24:42 1    for 18 years until 2003.  And then in 2004 I joined Analysis

11:24:48 2    Group and I have been with them ever since.

11:24:50 3    Q.     What does Analysis Group do?

11:24:52 4    A.     Analysis Group really is kind of a consulting firm we

11:24:56 5    do economic, financial strategy consulting, provide those

11:25:00 6    types of services to companies, to government agencies, to

11:25:04 7    law firms that you know, have clients, business clients.

11:25:08 8    That's the type of work we do.

11:25:10 9    Q.     Have you been recognized by courts as an expert in

11:25:13 10   patent cases?

11:25:14 11   A.     So, I have been recognized by courts, yes.

11:25:17 12   Q.     And how many times, do you recall?

11:25:18 13   A.     Well, in patent cases since 1990, I have probably

11:25:24 14   testified in 60, 60 different patent cases and 150 cases

11:25:28 15   overall, so that's all since 1990.

11:25:31 16              MS. SHAMILOV:  Your Honor, at this time I

11:25:33 17   proffer Dr. Ugone as an expert in forensic economics

11:25:37 18   evaluation and patent damages.

11:25:39 19              MR. MACDONALD:  No objection, Your Honor.

11:25:40 20              THE COURT:  All right.  He will be recognized as

11:25:41 21   such.

11:25:42 22   BY MS. SHAMILOV:

11:25:42 23   Q.     Doctor, can you please tell the jury what you did in

11:25:45 24   this case?

11:25:45 25   A.     Yeah, I was asked to evaluate the work that Mr. Reed

11:25:49 1   had put forth and presented to the jury in terms of you

11:25:54 2   know, claim damages for VB Assets.  And I have some issues

11:26:00 3   with the work that he did.  And I'm here to explain that to

11:26:04 4   the jury.

11:26:04 5   Q.    And just to be clear, because you're here talking

11:26:07 6   about damages, does that mean that you or the jury should

11:26:11 7   think that Amazon infringes these patents or that the patent

11:26:14 8   are valid?

11:26:15 9   A.    No, no, I'm not giving any sort of technical opinion,

11:26:18 10   I'm only here to evaluate the work of Mr. Reed should the

11:26:24 11   patents be found to be valid and infringed, but if they're

11:26:27 12   not, then as Mr. Reed even admitted yesterday, then you

11:26:32 13   don't listen to the damages testimony if the patents aren't

11:26:34 14   valid or infringed.

11:26:35 15   Q.    What information did you consider in performing your

11:26:38 16   analysis?

11:26:38 17   A.    Well, I won't go through all of these, you can see on

11:26:43 18   the slide here everything I considered.  Obviously the

11:26:45 19   patents, there were Amazon documents, VoiceBox documents,

11:26:49 20   there were agreements and license agreements.  There were

11:26:54 21   expert reports.  There was trial testimony I listened to.

11:26:57 22   Publicly available data.  So -- and frankly, you know, we

11:27:02 23   were -- we have different interpretation of how this all

11:27:07 24   plays out, but Mr. Reed and I looked at pretty much the same

11:27:11 25   data, but you'll see where he and I diverge in terms of how

Ugone - direct

11:27:17 1   we interpret that data.

11:27:18 2   Q.    We heard Mr. Reed talk about a hypothetical

11:27:20 3   negotiation.   Who would the parties be at this hypothetical

11:27:23 4   negotiation, doctor?

11:27:23 5   A.    This is an important point.   The jury has heard about

11:27:27 6   a hypothetical negotiation, so you're trying to figure out

11:27:29 7   if the parties had gotten together, you know, what would

11:27:33 8   they have agreed to for a royalty payment for the use of the

11:27:38 9   patents.   They never got together, that's why it's called a

11:27:41 10  hypothetical negotiation, but the parties sitting across

11:27:43 11  from each other at this hypothetical negotiation would have

11:27:47 12  been VoiceBox on the one hand because they were the ones

11:27:50 13  that owned the patents at the time, and Amazon on the other,

11:27:55 14  would be on the other side of the table.   So it's not VB

11:27:58 15  Assets, it's VoiceBox who owned the patents at the time.

11:28:01 16  VoiceBox ended up, as we know, never sued Amazon, but it's

11:28:06 17  VB Assets in the courtroom today, but VoiceBox would have

11:28:09 18  been at the hypothetical negotiation.

11:28:11 19  Q.    Now, at the time of this -- the parties being

11:28:14 20  VoiceBox and Amazon at this hypothetical table in this

11:28:16 21  hypothetical room, what would VoiceBox be thinking?

11:28:21 22  A.    I summarized it on the left here, but think about

11:28:24 23  what each side is bringing to the table.   And VoiceBox would

11:28:27 24  be mentally saying and they would also communicate to Amazon

11:28:32 25  across this negotiating table that they have the patents.

11:28:36 1   And basically if you want to use the patents in your

11:28:40 2   products and services, you have got to get a license from

11:28:43 3   me.  I'm saying from me, me pretending I'm VoiceBox.  They

11:28:47 4   would say I've got the patents and you need to get a license

11:28:50 5   from me.  But it would also be known that, you know,

11:28:54 6   VoiceBox hadn't really ever had a product that incorporated

11:28:59 7   the teachings of the patents.  And frankly, you know, we've

11:29:05 8   talked about and seen some very complicated things at trial

11:29:09 9   here and it would take a company with the resources like

11:29:12 10  Amazon to actually kind of commercialize products that could

11:29:18 11  incorporate those teachings of the patent, if they were able

11:29:23 12  to kind of agree upon a license.

11:29:26 13          So those are the things that kind of would be on

11:29:29 14  the VoiceBox side, they got the patents but they also know

11:29:33 15  to get any money out of the patents, they're going to have

11:29:36 16  to license to somebody like Amazon.

11:29:37 17  Q.      What would Amazon think at the hypothetical

11:29:39 18  negotiation?

11:29:39 19  A.      Amazon on the other side, if you think about it,

11:29:42 20  they've got a -- frankly the way I say it here, they've got

11:29:42 21  to do all the hard work.  They have to take whatever this

11:29:50 22  idea is in the patents and get it embedded in products and

11:29:52 23  get a product that's going to use and be able to provide to

11:29:57 24  people and everything that's in the background.  And we've

11:30:01 25  heard testimony from you know, Dr. Strom and also

Ugone - direct

11:30:08  1    Dr. Johnson about what's required, some of the R & D they

11:30:11  2    had to do, the far field speech recognition, machine

11:30:14  3    learning, there was even, you know, fancy terms, deep neural

11:30:19  4    networks that we saw the brain and everything else on the

11:30:22  5    slides.  So all of that had to be developed and as we heard

11:30:26  6    from Dr. Johnson, a lot of that was totally unrelated to the

11:30:32  7    patents-in-suit, but all of that had to go into, you know,

11:30:35  8    frankly getting, you know, Alexa to work.

11:30:38  9    Q.     Would Amazon also consider the patents that it itself

11:30:42 10    had?

11:30:42 11    A.     Yeah.  It ends up that Amazon has like 400 patents on

11:30:49 12    Alexa, and I think they have got nowadays, you know, 10,000

11:30:54 13    people working on the Alexa service.  So that just gives you

11:30:58 14    an idea of the investment that was required on the

11:31:02 15    right-hand side of the table here from Amazon to get this

11:31:05 16    all commercialized.

11:31:06 17    Q.     And what would be the payment structure that the

11:31:09 18    parties would agree on at this hypothetical negotiation?

11:31:14 19    A.     Well a payment structure, Mr. Reed had talked about a

11:31:17 20    running royalty rate, but I really believe it would be a

11:31:20 21    lump sum payment structure would be the payment agreement

11:31:24 22    that the parties would agree to.

11:31:27 23    Q.     Would you please explain to the jury what it means

11:31:30 24    lump sum versus running royalty?

11:31:32 25    A.     Sure.  So the easiest way to think about it, and it's

11:31:39 1   always good to kind of just think about the words, lump sum

11:31:43 2   payment.  That means there will be a one-time payment.  So

11:31:47 3   there would be a one-time payment to kind of use the

11:31:50 4   technology.  And then you would kind of have a freedom to

11:31:54 5   operate and embed that technology in whatever products or

11:31:57 6   services you wanted to.  That's a very common type of

11:32:02 7   license agreement payment structure for high tech companies,

11:32:06 8   you see that all the time.  So Mr. Reed didn't talk about

11:32:09 9   it, but it's a lump sum payment structure.  That's as

11:32:14 10  opposed to as you see at the bottom there what's called a

11:32:17 11  running royalty payment structure where you kind of pay

11:32:23 12  loosely speaking per unit.  So think about, it's almost like

11:32:28 13  a tax when you go to the grocery store or you go to a store

11:32:32 14  and you're buying products and you have to make a payment on

11:32:35 15  everything you buy, that's more of a running type payment

11:32:39 16  structure, as opposed to just a one-time payment.

11:32:42 17  Q.    What are you showing here on the slide at the bottom

11:32:45 18  with all these little people with numbers and dollar signs

11:32:49 19  above them?

11:32:49 20  A.    So what's going on at the bottom here is another way

11:32:52 21  of kind of presenting what Mr. Reed had talked about, but he

11:32:56 22  put a payment on, depending on the patent, you'll remember

11:33:01 23  from yesterday, either new Alexa users, new Alexa Shopping

11:33:08 24  users, or new Alexa Shopping purchasers.  And so these

11:33:14 25  people here represent somebody in those categories.  And he

11:33:20 1   said, you know, royalty rates would either be $0.40 or $0.22

11:33:26 2   or another $0.22 depending on which category people fell

11:33:31 3   into.  Now the thing is, it didn't quite come out yesterday,

11:33:35 4   but one person instead of just paying $0.40 or $0.22 or

11:33:41 5   $0.22, the way Mr. Reed's model was built, you could end up

11:33:46 6   paying as much as $0.84 because the same new user could fall

11:33:52 7   into each of the categories, so it would be the 40 plus the

11:33:56 8   22, plus the 22.  So it ranges from 22 to 62 to $0.84 per

11:34:03 9   user depending on how that user is cataloged in a sense.

11:34:07 10  Q.     And why would a lump sum payment structure make sense

11:34:12 11  for VoiceBox and Amazon in a hypothetical negotiation?

11:34:14 12  A.     Well the reason why it would make sense, if you think

11:34:18 13  about it, with a running royalty rate and how this is kind

11:34:22 14  of calculated, A, you would have to keep a lot of different

11:34:26 15  business records to try to keep track of all these new users

11:34:29 16  and accounts, but also companies like budgeting certainty

11:34:34 17  and there is some uncertainty as to what the royalty

11:34:38 18  payments would be when it's this sort of running royalty

11:34:42 19  rate payment structure, plus you have to reveal confidential

11:34:46 20  information, those types of things.  But I think there is

11:34:49 21  two big additional considerations.  One is on the VoiceBox

11:34:52 22  side, when it's a lump sum payment, they get all their money

11:34:56 23  up front, they get that in that first time one time payment,

11:35:02 24  they don't have to wait years to get the payment, they get

11:35:05 25  it all up front.  And frankly on the Amazon side, we saw all

11:35:10 1    the, you know, the research and development they're doing

11:35:13 2    and they're constantly working on improving Alexa, and if

11:35:22 3    Amazon is making all these improvements and gets new users,

11:35:28 4    they still have to pay a royalty on those new users and

11:35:33 5    Amazon would be sitting at the negotiating table saying hey,

11:35:37 6    wait a minute, I got to do all this investment which is

11:35:40 7    going to grow users and I'm going to have to pay you,

11:35:43 8    VoiceBox, for the improvements that Amazon is making.  And

11:35:47 9    there would be resistance to that if you really kind of

11:35:50 10   think about it.  So a lump sum payment structure solves

11:35:54 11   those problems.

11:35:55 12   Q.    Now you mention that you disagree with Mr. Reed's

11:35:58 13   analysis and he made several errors.  Is that right?

11:36:01 14   A.    Yes.

11:36:02 15   Q.    So let's talk about the first -- actually briefly can

11:36:06 16   you tell us about the errors in his analysis?

11:36:12 17   A.    I'm sorry?

11:36:12 18   Q.    Can you briefly tell us about the errors you found

11:36:15 19   in Mr. Reed's analysis?

11:36:16 20   A.    I have put them in three -- it's weird I have to go

11:36:20 21   around the screen to see you.  There is three big areas of

11:36:24 22   disagreement I have with Mr. Reed's analysis.  The first one

11:36:27 23   is, and this is like really important to an economist, that

11:36:30 24   he dismisses some market evidence.  And I'll talk about

11:36:32 25   that.  Because with an economist, you think about what's

11:36:41 1   happening in the marketplace when you're determining value.

11:36:44 2   And he dismisses some of that market evidence.

11:36:46 3           And he's also got some problems with the

11:36:50 4   assumptions he's making.  And then when he finally uses

11:36:54 5   numbers that he puts into his calculations, those end up

11:36:58 6   inflating damages, I'll go through these in more detail but

11:37:02 7   at a high level.

11:37:03 8   Q.    Let's talk about the first error that Mr. Reed

11:37:06 9   dismisses market evidence in your opinion.  Can you please

11:37:09 10  walk us through the evidence you reviewed on this point?

11:37:13 11  A.    Sure.  I looked at kind of two different categories

11:37:16 12  of evidence.  One was what was VoiceBox trying to do in the

11:37:19 13  marketplace.  And then also, you know, are there any kind of

11:37:24 14  comparable agreements that one can use as a guidepost.  So

11:37:28 15  there is two areas.  As we see here, without taking too much

11:37:33 16  time on it, but we got a lot on this slide, but ultimately

11:37:39 17  VoiceBox was trying to sell the patents-in-suit and some

11:37:43 18  other patents.  And they approached a lot of what we'll call

11:37:48 19  high tech companies.  You can see up here, you've got Apple,

11:37:52 20  you got Google, you got Microsoft, you have TiVo on the

11:37:52 21  left-hand side, going across the top, Facebook, Intel, and

11:38:00 22  even Amazon.  And Amazon, you know, would have, you know

11:38:05 23  their engineers in the legal department kind of look at

11:38:10 24  these patents and make a determination if it was something

11:38:14 25  that was worthy of buying.  And all of these companies, they

11:38:17 1   were approached by VoiceBox to see if they would buy the

11:38:21 2   patents-in-suit and also some other patents, and all of

11:38:25 3   these companies turned down the offer by VoiceBox.  So there

11:38:31 4   was no interest.

11:38:32 5          And it was even kind of interesting, some of

11:38:35 6   them expressed that what VoiceBox was asking for was way too

11:38:40 7   high and we'll see some of that.

11:38:42 8          And I'm pretty sure all of them never even made

11:38:46 9   a counter offer.  The point is if you think about it, what

11:38:51 10  does that tell you about what's going on in the marketplace.

11:38:54 11  It tells you that there is either no interest in whatever is

11:38:58 12  trying to be sold, if you think about it from an economic

11:39:01 13  perspective or what's being asked for is just way too high

11:39:05 14  and these people didn't want to make a counter offer.

11:39:08 15         But this is an umbrella of what's going on in

11:39:11 16  the marketplace and you can't dismiss that.  When you do a

11:39:16 17  bunch of mathematical calculations and say $46 million,

11:39:19 18  you've got to take a step back and say does that even make

11:39:23 19  sense in light of what's going on in the marketplace and

11:39:27 20  that's one of the issues that I have is the number that Mr.

11:39:29 21  Reed presented to the jury doesn't make sense in light of

11:39:33 22  what's happening in the marketplace.

11:39:33 23  Q.    Sir, you have a binder in front of you from us that

11:39:37 24  should say direct examination.  Could you please turn to DTX

11:39:42 25  77 in your binder.

Ugone - direct

11:39:45 1    A.      I am there.

11:39:47 2    Q.      Did you consider the document sir?

11:39:50 3    A.      Yes I have.

11:39:51 4            MS. SHAMILOV:  Your Honor, I move DTX 77 into

11:39:54 5    evidence, please.

11:39:55 6            MR. MACDONALD:  No objection, Your Honor.

11:39:56 7            THE COURT:  All right.  Thank you, it's

11:39:58 8    admitted.

11:39:59 9            (DTX Exhibit No. 77 was admitted into evidence.)

11:39:59 10   BY MS. SHAMILOV:

11:40:04 11   Q.      Dr. Ugone, can you please turn to DTX 80 in your

11:40:07 12   binder?

11:40:07 13   A.      Did you say 80?

11:40:08 14   Q.      Yes, 80.  Did you consider this as well?

11:40:12 15   A.      I have seen this before, yes.

11:40:14 16           MS. SHAMILOV:  Your Honor, I move DTX 80 into

11:40:16 17   evidence.

11:40:17 18           MR. MACDONALD:  No objection, Your Honor.

11:40:18 19           THE COURT:  Thank you.  It is admitted.

11:40:19 20           (DTX Exhibit No. 80 was admitted into evidence.)

11:40:19 21   BY MS. SHAMILOV:

11:40:21 22   Q.      Dr. Ugone, if you could turn to DTX 93 in your binder

11:40:24 23   and let us know if you have considered that document as

11:40:27 24   well?

11:40:27 25   A.      Yes, I have considered this document.

Ugone - direct

11:40:30 1          MS. SHAMILOV:  Your Honor I move DTX 93 into

11:40:32 2   evidence, please.

11:40:33 3          MR. MACDONALD:  No objection, Your Honor.

11:40:34 4          THE COURT:  Thank you.  It is admitted.

11:40:34 5          (DTX Exhibit No. 93 was admitted into evidence.)

11:40:34 6   BY MS. SHAMILOV:

11:40:37 7   Q.      Dr. Ugone, what are you showing on the slide here?

11:40:39 8   A.      So what we have on the slide here is just basically

11:40:42 9   the reactions of some of the companies that VoiceBox had

11:40:48 10  approached.  And this is just frankly showing to the jury

11:40:51 11  what these documents say that Samsung basically sent back to

11:40:56 12  VoiceBox, Samsung has decided to pass on the attached

11:41:00 13  opportunity.  That's DTX 77.

11:41:03 14          RPX, which kind of acquires patents for a

11:41:13 15  conglomeration of companies said in their response to

11:41:16 16  VoiceBox, eight figures is way off base -- way off based on

11:41:21 17  our assessment.  Now Count 10 figures, 6 series, 2 more,

11:41:28 18  you're talking about 10 million or more that RPX is saying

11:41:33 19  that's way off base.  And Apple is saying we are passing on

11:41:37 20  this opportunity.  So all we're trying to show here, I

11:41:39 21  showed the prior slide of everybody that had kind of turned

11:41:44 22  down the opportunity to purchase the patents, and I'm just

11:41:46 23  showing some examples of what they were saying.

11:41:46 24  Q.      And sir, could you move -- turn to DTX 096 in your

11:41:52 25  binder?

Ugone - direct

11:41:55  1    A.      I am there.

11:42:00  2    Q.      Did you consider this document?

11:42:01  3    A.      I did.

11:42:02  4            MS. SHAMILOV:  Your Honor I move DTX 96 into

11:42:03  5    evidence, please.

11:42:05  6            MR. MACDONALD:  No objection, Your Honor.

11:42:09  7            THE COURT:  Thank you.  It is admitted.

11:42:10  8            (DTX Exhibit No. 96 was admitted into evidence.)

11:42:10  9    BY MS. SHAMILOV:

11:42:11 10    Q.      And Dr. Ugone, what are you showing on this slide?

11:42:15 11    A.      Well, this is an e-mail from Cash Elston to George

11:42:21 12    Alexander, by the way, a little background, Cash Elston was

11:42:27 13    a broker that VoiceBox had retained or hired to try to sell

11:42:33 14    the patents.  So he's doing that work to try to sell the

11:42:37 15    patents.

11:42:37 16            George Alexander is at Amazon, and this is an

11:42:43 17    exchange back and forth.  But basically, what it's saying is

11:42:46 18    VoiceBox wants to sell these five families to the highest

11:42:52 19    bidder in the next 30 days, but at the very bottom, we

11:42:55 20    anticipate this portfolio of seminal voice assets will sell

11:43:01 21    for between five around $10 million.  So that's what they

11:43:02 22    thought it would sell for, and that's what they were in a

11:43:08 23    sense hoping to get.  And I'll just note that everybody was

11:43:12 24    turning down the offer, and here, you know, Mr. Reed gave

11:43:16 25    the opinion of you know, $46 million.

Ugone - direct

11:43:18 1   Q.      You mentioned earlier that Amazon trained engineers

11:43:24 2   and the legal department in the response to this e-mail.

11:43:27 3   Did they respond to this offer?

11:43:31 4   A.      Yes, Amazon responded back that they were going to

11:43:36 5   pass on the offer.

11:43:37 6   Q.      Sir, what are you showing on this slide to the jury?

11:43:41 7   A.      So on this slide here, this is another series of

11:43:44 8   e-mails, but again, Cash Elston, the broker trying to sell

11:43:48 9   the patents, to Mike Kennewick, basically saying you know as

11:43:56 10  far as being a bit more aggressive, 7 to 10 million, you

11:44:00 11  know, that may be a stretch, but he's going to give it a

11:44:05 12  shot, that's what he says.  But Mr. Kennewick at the bottom

11:44:09 13  talks about some options, but he ultimately says maybe we

11:44:14 14  can settle on seven to $8 million to sell the patents.  So

11:44:18 15  that tells us something about you know, VoiceBox's

11:44:23 16  willingness to accept in terms of a payment for the patents

11:44:28 17  that we're talking about.  So we kind of have just to bring

11:44:32 18  in a little more economics, we've kind of seen what I'll

11:44:37 19  call the demand side of the market, that's the Amazon, the

11:44:39 20  Samsung, the TiVo, those are the people that would buy the

11:44:44 21  patents, and this is the supply side, VoiceBox, what they're

11:44:48 22  willing to sell for, their willingness to accept, so we kind

11:44:53 23  of have this market dynamic going on but it's all at numbers

11:44:58 24  way less than what we've seen presented as claim damages.

11:45:01 25  Q.      Is there a difference between a sale of a patent and

Ugone - direct

11:45:04 1   a license of the patent from an economist perspective?

11:45:08 2   A.      There is, I'm not sure if the jury was picking up

11:45:11 3   that I was saying that they were trying to sell the patents.

11:45:14 4   But when you sell the patent, there is a lot more rights

11:45:17 5   that go along with it, because you own it.  As opposed to

11:45:21 6   when you license it, you didn't own the patent and other

11:45:24 7   people can even license it.  So it's not going to be to be

11:45:29 8   the same, have the same value when you own the patent.  When

11:45:34 9   you own the patent, you can even try to license it to

11:45:36 10  others, there is all kinds of benefits when you buy a patent

11:45:39 11  versus when you license.  The point I was trying to make is

11:45:43 12  that even when they were trying to sell the patents which

11:45:46 13  would have more rights, they weren't able to do so at the

11:45:49 14  numbers that I have been talking about.

11:45:50 15  Q.      Thank you, sir.

11:45:51 16          Would you please in your binder find DTX 473?

11:46:03 17  A.      I am there.

11:46:04 18  Q.      And did you consider this document, sir?

11:46:06 19  A.      I did, yes.

11:46:07 20          MS. SHAMILOV:  Your Honor, I move into evidence

11:46:09 21  DTX 473, please.

11:46:14 22          MR. MACDONALD:  No objection.

11:46:17 23          THE COURT:  Thank you.  It is admitted.

11:46:17 24          (DTX Exhibit No. 473 was admitted into

11:46:18 25  evidence.)

Ugone - direct

11:46:18 1    BY MS. SHAMILOV:

11:46:19 2    Q.    Doctor, if you could also turn to DTX 472 in your

11:46:22 3    binder.

11:46:29 4    A.    I am there.

11:46:29 5    Q.    And did you consider this document, sir?

11:46:31 6    A.    I did, yes.

11:46:32 7            MS. SHAMILOV:  Your Honor, I move DTX 472 into

11:46:35 8    evidence.

11:46:35 9            MR. MACDONALD:  No objection.

11:46:38 10            THE COURT:  Thank you.  It is admitted.

11:46:38 11            (DTX Exhibit No. 472 was admitted into

11:46:39 12    evidence.)

11:46:39 13    BY MS. SHAMILOV:

11:46:39 14    Q.    And Dr. Ugone, what are you showing on this slide?

11:46:42 15    A.    Well, these are two patent agreements, purchase

11:46:50 16    agreements where Amazon actually purchased some patent or

11:46:56 17    patents, one from a company called Converse, the other was

11:47:00 18    from a company called Unisys.

11:47:08 19            And I can explain these if you don't mind.

11:47:10 20    Q.    Yes, please.

11:47:11 21    A.    On the left-hand side you see a picture of the

11:47:14 22    Converse agreement that was in 2013 and Amazon acquired some

11:47:20 23    patents and some foreign patents and U.S., and they

11:47:24 24    purchased it for $825,000, so -- and these patents dealt

11:47:32 25    with this speech type, you know, recognition that we're

11:47:35 1    talking about, so it was comparable technology.

11:47:39 2              And I had to do some adjustments to those

11:47:43 3    numbers, which I'll come back to.  But then on the

11:47:47 4    right-hand side, you got a similar type thing where Unisys

11:47:51 5    sold to Amazon some patents for 250,000, and again it was a

11:47:58 6    patent purchase, but it dealt with comparable technology as

11:48:01 7    I understand it.  So you have -- it's kind of like when

11:48:05 8    you're trying to sell your house or figure out the value of

11:48:08 9    your house, you look at what your neighbor, you know, sold

11:48:12 10   their house for, or what other people bought similar houses

11:48:16 11   for, and you use that as a benchmark or as a guidepost and

11:48:20 12   you may have to make some adjustments.  But that's what's

11:48:23 13   going on here.  So you got the VoiceBox patents and we're

11:48:27 14   trying to figure out what the licensing value of them are,

11:48:30 15   so let's see what happened with other agreements for a

11:48:34 16   similar technology.

11:48:35 17             And you see where Amazon made a purchase for

11:48:41 18   825,000 and 250,000.  It's kind of like even when you're

11:48:48 19   comparing houses and you got to count the bedrooms and

11:48:51 20   bathrooms, it's the same thing with these sort of purchase

11:48:54 21   agreements, they can be, you know, covering different time

11:48:58 22   periods, they can be covering different families of patents.

11:49:02 23   And so I made some adjustments to figuratively speaking, you

11:49:08 24   know, adjust for the number of bedrooms and bathrooms, here

11:49:12 25   I'm talking about the length of the patents before they

11:49:16  1   expired and also the number patent families.  When I made

11:49:22  2   those adjustments, the 825,000 have an implied value of

11:49:27  3   about 5.2 million.  And the Unisys agreement, which had the

11:49:33  4   purchase price of 250,000, when I made those similar

11:49:37  5   adjustments, taking into account how long the patents would

11:49:40  6   last until they expired, and also the number of patent

11:49:44  7   families, that implied value was 4.1 million.  So what I'm

11:49:50  8   looking for here is to try to get a gauge for a guidepost or

11:49:56  9   a benchmark as to give me an indicator of value or licensing

11:50:00  10  value for the patents-in-suit by looking at kind of similar

11:50:04  11  technologies and agreements.

11:50:07  12          And basically with my analysis, I get this four

11:50:09  13  to $5 million range.

11:50:13  14  Q.      Thank you, sir.

11:50:14  15          On this slide, do you recall Mr. Reed talking

11:50:18  16  about comparison of growth of Alexa versus Alexa Shopping

11:50:22  17  and he focused on the years 2018.  On this slide you're

11:50:27  18  showing data from 2019 and 2020 and you're saying Mr. Reed

11:50:30  19  does not use this data.  What are you trying to show with

11:50:33  20  this slide?

11:50:34  21  A.      Remember I said at the beginning that Mr. Reed chose

11:50:38  22  some inputs in his calculations that ended up either were

11:50:41  23  illogical or inflated numbers.  Mr. Reed basically said if

11:50:46  24  you compare Alexa overall, purple, to Alexa Shopping, the

11:50:52  25  gray bar, on the left-hand side, he's saying purple was

11:51:00 1   greater than gray, that Alexa overall grew at a higher rate

11:51:04 2   than Alexa Shopping.  And he said that was due to, remember

11:51:08 3   this 1.5 turn differential, he said there was 1.5 more turns

11:51:17 4   that Alexa Shopping had.  He said basically that difference

11:51:23 5   in growth rate is due to that 1.5 more turns and without

11:51:28 6   those turns you can grow faster.  The problem is if you just

11:51:31 7   looked at the next two years, it flip-flops.  If Alexa

11:51:37 8   Shopping has this higher number of turns, they have actually

11:51:41 9   got the higher growth rate, the gray bars are higher than

11:51:44 10  the purple bars.  So for me, his whole theory just falls

11:51:49 11  apart at that point in terms of the basis for his

11:51:52 12  calculations.

11:51:53 13          So just to make sure it's clear, he's basically

11:51:56 14  saying 2018, Alexa overall grew at a ten percent higher

11:52:02 15  rate.  Well that's not true in the next two years.

11:52:06 16  Q.    So are you saying Mr. Reed's selected some data and

11:52:12 17  not the others?

11:52:13 18  A.    Well, I can't speak of what was going on in his mind.

11:52:18 19  He used the bars on the left, he didn't use the bars on the

11:52:21 20  right.  But I would have looked to the right to just cross

11:52:25 21  check the conclusions I was drawing.

11:52:28 22  Q.    And sir, what are you showing on this slide with

11:52:30 23  respect to inflated cost savings?

11:52:33 24  A.    Yeah, remember what he said was well, if you lose

11:52:35 25  customers because of the 1.5 extra turns, remember what he

11:52:42 1    said, if you got 1.5 extra turns, that's going to irritate

11:52:46 2    customers, they're going to stop using Alexa.  And his

11:52:50 3    theory was that Amazon would want to replace those

11:52:54 4    customers, so they would have to somehow sell more Echos to

11:52:58 5    do that.  And to do that, they would be losing $20 per Echo

11:53:03 6    Dot or Echo Show on average.  So he says, but if you use the

11:53:08 7    patent, you don't have to do that and you'll save that

11:53:13 8    money.

11:53:14 9            Well, there was a lot more than the Echo Dot and

11:53:18 10   Echo Show, there was also the original Echo that was very

11:53:21 11   popular.  And if you include that as an option, the $20 goes

11:53:25 12   down to $11.48.  If you look at all the Echos that were out

11:53:31 13   there, it goes down to $11.28.  He's using $20 when if you

11:53:38 14   look at all the data and if you follow his methodology, I

11:53:44 15   don't agree with it, if you followed his methodology, it

11:53:47 16   wouldn't be $20 at all, it would be something more in the

11:53:50 17   $11 range.

11:53:51 18   Q.    So does using the $20 instead of using the figures on

11:53:54 19   the right in the $11 range inflate Mr. Reed's damages

11:53:58 20   opinion?

11:53:58 21   A.    Yes, if you use $20 you have a much higher damages

11:54:02 22   claim number than if you use the numbers on the right.

11:54:05 23   Q.    Do you recall Mr. Reed yesterday testifying that he

11:54:08 24   had an error in his report that you pointed out that he had

11:54:12 25   to correct?

Ugone - direct

11:54:12 1    A.        Yes, I remember that.

11:54:13 2    Q.        Are you telling the jury that there are more errors

11:54:16 3    that Mr. Reed made?

11:54:17 4    A.        Well, there are some additional issues.  These are

11:54:20 5    types of conceptional errors, that you really need to think

11:54:24 6    about when you're putting a damages model together.  And it

11:54:28 7    was just some data that was not fully incorporated into his

11:54:32 8    analysis, let's put it that way.

11:54:34 9    Q.        And Dr. Ugone, so what's the overall, what are you

11:54:38 10   showing here, what's the overall conclusion?

11:54:40 11   A.        So my overall conclusion is on the far right this is

11:54:43 12   the number that Mr. Reed presented to the jury, the

11:54:46 13   $46.7 million through December 2023, that's his claimed

11:54:54 14   royalty damages number.  But remember what I was saying,

11:54:57 15   there is inputs in the calculations that, you know, are

11:55:01 16   questionable and really should be different, his model,

11:55:05 17   frankly falls apart when you look at longer time periods.

11:55:10 18   But if you just also look to what is the market saying, they

11:55:14 19   couldn't sell these patents for five to $10 million.  You

11:55:20 20   see that on the far left, everyone was turning them down and

11:55:24 21   wasn't even making a counter offer.  And then if you also

11:55:27 22   take, look as I use my analogy, comparable houses or

11:55:32 23   comparable types of technology and patents, those were in

11:55:36 24   the 4 to $5 million range as well.

11:55:38 25             The point is that when you start doing that

11:55:41 1    cross checking rather than just doing mathematical

11:55:44 2    calculations, you see how over stated Mr. Reed's claimed

11:55:48 3    damages figure is that he presented to the jury.

11:55:52 4            MS. SHAMILOV:  Thank you, Dr. Ugone.

11:55:55 5            THE COURT:  Thank you.  Cross-exam.

11:56:07 6                    CROSS-EXAMINATION

11:56:09 7    BY MR. MACDONALD:

11:56:14 8    Q.       Good afternoon, Dr. Ugone.  I'm going to make an

11:56:19 9    apology, I learned it as Ugone, I'm not doing that

11:56:21 10   intentionally, if I get it wrong, I apologize.

11:56:25 11   A.       It's Ugone.

11:56:25 12   Q.       Dr. Ugone, you work for a company called Analysis

11:56:29 13   Group; is that right?

11:56:29 14   A.       That's correct, yes.

11:56:30 15   Q.       Analysis Group is charging for your time in this

11:56:34 16   matter, is that true?

11:56:35 17   A.       That's correct.

11:56:35 18   Q.       And at the rate that Analysis Group was charging out

11:56:39 19   at, at least last year, was $825 an hour, is that right?

11:56:42 20   A.       That's correct.

11:56:42 21   Q.       Now, this is not the first case in which you have

11:56:47 22   given sworn testimony for Amazon, is that right?

11:56:50 23   A.       That's correct.  Yes.

11:56:52 24   Q.       In fact, how many times have you given sworn

11:56:55 25   testimony in a case for Amazon?

11:57:00 1   A.      If we're talking about trials, I believe this is the

11:57:03 2   second trial.  So either -- a year or two years ago I

11:57:09 3   testified, I was retained by Amazon as a rebuttal damages

11:57:13 4   expert and testified at trial for them.

11:57:15 5   Q.      Right.  And if we also include depositions, how many

11:57:18 6   times have you testified on behalf of Amazon?

11:57:22 7   A.      Over the course of my career, I frankly haven't added

11:57:28 8   it together, but I'm willing to say four times, maybe.

11:57:31 9   Q.      Well --

11:57:32 10  A.      You may have to count, I don't have the count.

11:57:36 11  Q.      Do you recall that in 2011 you testified for Amazon

11:57:39 12  in a case brought by a company called Bedrock Computer

11:57:44 13  Technologies?

11:57:44 14  A.      2011, actually I don't remember that, but okay, I'll

11:57:47 15  accept your representations.

11:57:49 16  Q.      But you prepared a list of prior testimony that was

11:57:52 17  attached to your report in this case.

11:57:54 18  A.      Yes, I'm not disputing you, I'm just saying I

11:57:58 19  wouldn't independently remember that case from twelve years

11:58:01 20  ago.

11:58:01 21  Q.      Got it.  In 2013 you testified for Amazon in a case

11:58:06 22  brought by a company called SFA Systems, LLC, is that true?

11:58:11 23  A.      Sure.

11:58:12 24  Q.      In 2015 you testified for Amazon in a case called

11:58:16 25  ContentGuard Holdings, is that also true?

Ugone - cross

11:58:17 1    A.       Yeah, these are all depositions?

11:58:18 2    Q.       Depositions, yes, sir.

11:58:19 3    A.       So once every two years, I get a case from Amazon.

11:58:22 4    Q.       Right.  And then in 2017 you testified for Amazon in

11:58:25 5    a case brought by a company called Virginia Innovations

11:58:29 6    Sciences?

11:58:29 7    A.       That one I remember, yes, another two years.

11:58:32 8    Q.       And then in 20 -- in 2020, you testified again for

11:58:36 9    them at trial; is that right?

11:58:38 10   A.       That would be the same case I believe, but at trial,

11:58:42 11   so you can decide how you want to count that.

11:58:44 12   Q.       Sure.  And then in 2021, you testified for Amazon in

11:58:47 13   a case brought by a company called, I might not say this

11:58:51 14   right, but EOLAS Technologies?

11:58:54 15   A.       What's the name?

11:58:55 16   Q.       EOLAS, E-O-L-A-S, Technologies?

11:58:58 17   A.       I think I know which one you're talking about, but

11:59:01 18   yes.

11:59:01 19   Q.       And then last year, you testified for Amazon in a

11:59:04 20   case brought by a company called Master Objects

11:59:06 21   Incorporated, is that right?

11:59:10 22   A.       Yes.

11:59:10 23   Q.       By my count that's eight times you have testified

11:59:12 24   over seven cases, does that sound right to you?

11:59:16 25   A.       Yeah, seven cases over twelve years, sure.

Ugone - cross

11:59:19 1    Q.     Okay.  So in your direct testimony, you talked about

11:59:23 2    some things that the parties would be thinking to themselves

11:59:26 3    and saying to each other in the hypothetical negotiation, do

11:59:29 4    you recall that?

11:59:29 5    A.     Sure.  Yes.

11:59:30 6    Q.     And, in fact, in your expert report, one of the

11:59:35 7    things you said that VoiceBox would be thinking was that

11:59:39 8    VoiceBox would not view Amazon as a competitor.  Is that

11:59:44 9    right?

11:59:44 10   A.     Yes.  Especially in the same way that we think of

11:59:47 11   companies, you know, Ford versus Chevy, or something like

11:59:54 12   that, or Samsung versus Apple, it's clearly not that type of

11:59:59 13   competitive relationship.

12:00:00 14   Q.     Right.  What you wrote in your expert report was

12:00:03 15   VoiceBox would not view Amazon as a competitor, true?

12:00:07 16   A.     I'll agree with that and I will stand behind it.

12:00:10 17   Q.     And the context -- and all else being equal, that

12:00:14 18   factor in your mind is a reason why VoiceBox would take a

12:00:18 19   lower royalty in the hypothetical negotiation; right?

12:00:21 20   A.     Well, I think we -- if you don't mind, it's a little

12:00:27 21   bit of more of explanation that if companies are competitors

12:00:31 22   and you license a competitor, you might worry about losing

12:00:35 23   sales, so you might want a higher royalty.  If they're not

12:00:40 24   competitors in the same way, there isn't that pressure about

12:00:42 25   worrying about losing sales, so there is not the same upward

12:00:47 1    pressure, so on average when companies are competitors,

12:00:51 2    holding everything else constant and ignoring everything

12:00:55 3    else, if they're competitors, it's usually a higher royalty

12:01:00 4    rate than when they're not competitors.

12:01:02 5    Q.      Exactly.  If the licensor, in this case, VoiceBox, is

12:01:06 6    worried that they might lose sales that means they're going

12:01:10 7    to demand more money in the hypothetical negotiation, right?

12:01:12 8    A.      Yeah, maybe two comments.  That their willingness to

12:01:16 9    accept may change, but you still have a negotiation between

12:01:20 10   the parties and you still have, you know, market indicators.

12:01:25 11   You can't just say you know, it's going to be some

12:01:28 12   unreasonably high $46 million when comparable houses are

12:01:37 13   being sold for five to six.

12:01:39 14   Q.      One of the hypothetical negotiation in your opinion,

12:01:41 15   you agree would happen near the end of 2014, right?

12:01:45 16   A.      Correct.

12:01:45 17   Q.      In 2014, in June of 2014, VoiceBox had a number of

12:01:51 18   B2B partnerships with automotive companies, is that right?

12:01:55 19   A.      If you're referring to Toyota, I know that, yes.

12:01:57 20   Q.      You wrote also in your report, didn't you, that

12:02:01 21   VoiceBox in 2014 had a B2B relationship with Chrysler?

12:02:08 22   A.      Yes.

12:02:08 23   Q.      And also with Renault, the French car company, right?

12:02:12 24   A.      But the best we also know that 70 percent of the

12:02:15 25   revenues were coming from Toyota and the Samsung agreement,

12:02:19 1    relatively smaller amounts were coming from these other

12:02:23 2    companies.

12:02:23 3    Q.      And VoiceBox also had a B2B relationship with Dodge,

12:02:26 4    right, the car company?

12:02:27 5    A.      Yeah.

12:02:27 6    Q.      And it also had a B2B relationship with Fiat, the

12:02:34 7    Italian car company?

12:02:35 8    A.      Sure.

12:02:36 9    Q.      We already mentioned Toyota, they had a relationship

12:02:39 10   with Toyota, right?

12:02:40 11   A.      Yes.

12:02:40 12   Q.      And Toyota was one of VoiceBox's biggest more

12:02:44 13   important customers?

12:02:45 14   A.      That's what I was saying, that ends up being

12:02:47 15   important, which we may talk about.

12:02:49 16   Q.      Now isn't it also true, sir, that by 2016 Amazon had

12:02:53 17   concluded that the automotive sector was a spectrum of

12:02:57 18   strategic importance for Alexa?

12:03:00 19   A.      I think they were considering it, sure.

12:03:01 20   Q.      Do you have your cross binder up there, sir?  I

12:03:05 21   probably should have covered that earlier.

12:03:07 22   A.      I believe I do, it's the big one?

12:03:08 23   Q.      Yes, it's the big one, but don't worry, we're only

12:03:12 24   going to do a couple.  Can you turn to PTX 256, please.

12:03:33 25   A.      I'm sorry, can you give me the number again?

Ugone - cross

| | | |
|---|---|---|
| 12:03:36 | 1 | Q.    Yes, absolutely.  PTX 256. |
| 12:03:39 | 2 | A.    I'm there, okay. |
| 12:03:42 | 3 | Q.    Is this a document you recognize, sir? |
| 12:03:45 | 4 | A.    I believe so.  It's a 2016 document and it's talking |
| 12:03:50 | 5 | about, it's a press release, dealing with Alexa for as an |
| 12:03:57 | 6 | automobile solution. |
| 12:03:58 | 7 | Q.    This is an Amazon document, right? |
| 12:04:00 | 8 | A.    Yes. |
| 12:04:01 | 9 | MR. MACDONALD:  Plaintiff moves to admit PTX |
| 12:04:03 | 10 | 256. |
| 12:04:04 | 11 | MS. SHAMILOV:  No objection. |
| 12:04:05 | 12 | THE COURT:  Thank you.  It is admitted. |
| 12:04:05 | 13 | (PTX Exhibit No. 256 was admitted into |
| 12:04:06 | 14 | evidence.) |
| 12:04:06 | 15 | BY MR. MACDONALD: |
| 12:04:07 | 16 | Q.    So the first page of this document you said is a |
| 12:04:10 | 17 | press release, and it says Amazon announces Alexa for |
| 12:04:15 | 18 | Automotive, a fully featured automotive solution powered by |
| 12:04:18 | 19 | voice, right? |
| 12:04:18 | 20 | A.    Yes. |
| 12:04:19 | 21 | Q.    And it's dated March 15, 2016? |
| 12:04:21 | 22 | A.    That is correct. |
| 12:04:22 | 23 | Q.    That's just a year and change after the hypothetical |
| 12:04:24 | 24 | negotiation, the first hypothetical negotiation, right? |
| 12:04:28 | 25 | A.    Yeah a year and a quarter or so, sure. |

12:04:31 1    Q.      And on the next page of that document, right at the

12:04:33 2    top in that first paragraph, this says we follow by

12:04:39 3    highlighting why we believe winning voice in automotive is

12:04:43 4    of strategic importance, do you see that?

12:04:46 5    A.      I'm sorry, your -- you're going a little fast for me?

12:04:51 6    Q.      I apologize for that.  First paragraph, second line?

12:04:54 7    A.      Of the next page?

12:04:56 8    Q.      Yeah of the next page, page 2.

12:04:59 9    A.      And it starts with we follow by highlighting.

12:05:02 10   Q.      We follow by highlighting why we believe winning

12:05:06 11   voice in automotive is of strategic importance.

12:05:09 12   A.      Yes, I do see that.

12:05:10 13   Q.      Amazon is saying just a year and change after the

12:05:14 14   hypothetical negotiation that automotive is an important

12:05:16 15   sector they're going to pursue for Alexa, right?

12:05:19 16   A.      Yeah, and they say why we believe Alexa will be

12:05:23 17   successful and what steps are required to get there and they

12:05:26 18   go through, you know, all of those considerations.

12:05:28 19   Q.      Sure.  All right.  And on the next page, excuse me,

12:05:30 20   page 4, if you don't mind right at the -- again right at the

12:05:38 21   top, third line of that first paragraph.

12:05:42 22   A.      Just bear with me a second.  Okay.  Page 4, third

12:05:42 23   line.

12:05:52 24   Q.      Yeah.  You see it says he will view base VoiceBox is

12:05:55 25   the provider for Toyota, Fiat, Dodge, Chrysler, Maserati,

12:06:04 1  Renault, Mazda, and Subaru, do you see that?

12:06:06 2  A.      Yes, I do.

12:06:06 3  Q.      Then if you look at the next page, just below the

12:06:10 4  numbered bullets, page 5, in that paragraph, do you have

12:06:15 5  that?

12:06:16 6  A.      The next page, again.

12:06:20 7  Q.      Right below if numbers, you got 1, 2, 3, 4, 5 there

12:06:26 8  and the paragraph right below that?

12:06:27 9  A.      Yes.

12:06:27 10  Q.      In the second sentence of that paragraph, we have

12:06:30 11  received validation for all of them for most OEMs we have

12:06:34 12  met with the to date including these, Ford, VW, Honda,

12:06:39 13  Toyota, Volvo and BMW, right?

12:06:43 14  A.      Frankly you have done some jumping around and I don't

12:06:48 15  mean anything by that.

12:06:49 16  Q.      No, I may have error in reading it, I apologize if I

12:06:53 17  did?

12:06:54 18  A.      But also I was just saying that we're now suddenly

12:06:58 19  taking some sentences without getting the context of them,

12:07:01 20  like where it talked about VoiceBox being the provider.

12:07:04 21  Right after that it talks about VoiceBox's poor product and

12:07:08 22  automatic speech recognition is poor and limited vocabulary

12:07:13 23  and little or no natural language understanding.  And then

12:07:17 24  over here you're having me read a sentence when we haven't

12:07:20 25  gotten a context of why Alexa -- I'm just saying I'm a

Ugone - cross

12:07:25 1    little confused by where you're going with this.

12:07:28 2    Q.     Let's establish one point.  You understand this

12:07:30 3    document to indicate that just over a year after the

12:07:33 4    hypothetical negotiation, Toyota, or excuse me, Amazon is

12:07:37 5    pursuing the automotive sector as a place for Alexa?

12:07:42 6    A.     That there is a market opportunity, that's

12:07:45 7    competition in the marketplace, yes.

12:07:46 8    Q.     And they're meeting with automotive companies already

12:07:50 9    by March of 2016 to try to get Alexa into cars?

12:07:59 10   A.     Amazon thinks they have a good product so they're

12:08:02 11   trying to promote it.

12:08:04 12   Q.     They're trying to get that business for Alexa?

12:08:06 13   A.     I believe so, yes.

12:08:07 14   Q.     By March of 2016, they have already met with Toyota

12:08:11 15   who you previously testified was one of VoiceBox's most

12:08:15 16   important clients; true?

12:08:17 17   A.     That's not quite what is in my report since you're

12:08:23 18   going to by report.  VoiceBox knew that Toyota retention was

12:08:30 19   at risk.  They knew that Toyota and frankly Samsung were

12:08:34 20   looking elsewhere.  They knew there was a huge risk of

12:08:38 21   losing that business, so it's not like they had a product,

12:08:41 22   as we all know the products did not incorporate the patents

12:08:44 23   in suit, we know that, from some of the documents I have

12:08:47 24   seen.  And some of the testimony.  But my point is that

12:08:52 25   there were other factors and other considerations going on

821

Ugone - cross

12:08:57 1   in the marketplace rather than just pointing out some of the

12:09:00 2   things that you're pointing out.

12:09:01 3   Q.      Sure.  But it is factually true that within just over

12:09:06 4   a year of the hypothetical negotiation, Amazon was meeting

12:09:09 5   with VoiceBox's most important customer in the automotive

12:09:14 6   sector, true?

12:09:15 7   A.      That is true.  But Apple was coming out with Car

12:09:19 8   Play, Samsung was coming out with Android Auto, there were a

12:09:25 9   lot of different dynamics going on in the marketplace that

12:09:29 10  put VoiceBox frankly business at risk, in addition to the

12:09:33 11  quality of the product.

12:09:35 12  Q.      Well, let's talk about the quality of the product

12:09:37 13  point that you made very quickly.

12:09:40 14          Let's look back at the paragraph that you wanted

12:09:43 15  to talk about on the previous page.  That top paragraph

12:09:48 16  beginning embedded command and control voice interfaces?

12:09:51 17  A.      Let me catch up with you.

12:09:54 18  Q.      Yeah, absolutely.

12:10:03 19          You indicated that your reading of this

12:10:05 20  paragraph was that VoiceBox --

12:10:07 21  A.      I apologize, I --

12:10:08 22  Q.      I thought you were there, I apologize?

12:10:11 23  A.      No, which sentence, can you show me --

12:10:13 24  Q.      The very top of page 4, that first paragraph.

12:10:15 25  A.      Okay.  Just bear with me one second while I catch up.

Ugone - cross

Q.      The last line, I want to focus you on the last line.

A.      I have quickly read -- yeah, I quickly read the whole paragraph.

Q.      All right and this last line says but Nuance and VoiceBox do have richer cloud based speech technologies and will be able to offer better capabilities as cars become connected with sufficient data bandwidth.  Do you see that?

A.      Yes, I do.

Q.      In March 2016, Amazon is recognizing that Nuance -- or excuse me, that VoiceBox has richer cloud based speech technologies, right?

A.      Than some of the other things that are out there, but Apple is coming out with their Apple Car Play and Samsung is coming out with Android Auto.

Q.      Sure.

        Let's just turn to talk briefly about a hypothetical negotiation and some of the rules of a hypothetical negotiation?

A.      Sure.

Q.      In a hypothetical negotiation, the licensee, here Amazon, right, can't say I shouldn't have to pay because I don't infringe.  Right?

A.      I agree.

Q.      And they can't say I shouldn't have to pay, the patent is not valid?

823

Ugone - cross

12:11:58 1   A.      An assumption of the hypothetical negotiation, an

12:12:03 2   assumption is that the patent is valid and, or patents are

12:12:08 3   valid and infringed, otherwise you wouldn't be having the

12:12:11 4   negotiation, so that's a --

12:12:13 5           THE COURT:  All right.  Can we keep it a little

12:12:15 6   bit shorter because he's running out of time.

12:12:17 7           THE WITNESS:  Okay.  Sorry.

12:12:18 8   Q.      All right.  Can I have defense slide ten up, please?

12:12:25 9   You talked in your testimony about some efforts to sell the

12:12:30 10  patents in 2018 to various companies.  Right?

12:12:34 11  A.      Yes.

12:12:34 12  Q.      And this slide --

12:12:36 13  A.      2017 and 2018.

12:12:38 14  Q.      Sure.  And this slide that's up here is some of the

12:12:40 15  companies that you said had no interest in the patents,

12:12:43 16  correct?

12:12:44 17  A.      Correct.

12:12:44 18  Q.      You're not offering any opinions that any of the

12:12:47 19  companies listed on this slide infringe VoiceBox's patents,

12:12:51 20  are you?

12:12:51 21  A.      No, I'm not giving that opinion, no.

12:12:54 22  Q.      You're not offering any evidence today that any of

12:12:57 23  these companies in their discussions with VoiceBox conceded

12:13:00 24  that they infringed the patents, are you?

12:13:02 25  A.      Not saying that, they all seemed to indicate that

12:13:10 1    they evaluated the patents and they all passed.  That's all

12:13:14 2    I'm saying.

12:13:14 3    Q.      Right.  And you didn't see any evidence that let's

12:13:17 4    say Apple for example said to VoiceBox, we know we're

12:13:21 5    infringing this, but we're going to pass on this one?

12:13:24 6    A.      No, we didn't see that.  But we did see where you

12:13:26 7    know, RPX said look, you're asking way too much for these

12:13:31 8    patents.

12:13:31 9    Q.      But you're not aware of RPX conceding that it

12:13:35 10   infringed the patents, right?

12:13:36 11   A.      But you don't normally see that in letters going back

12:13:39 12   and forth.

12:13:39 13   Q.      Right, because the hypothetical negotiation and what

12:13:41 14   happens in the actual marketplace are different, right?

12:13:44 15   A.      There is a different assumption in a hypothetical

12:13:47 16   negotiation, I'll agree with you.

12:13:49 17   Q.      Let's -- can I have defense slide 14, please.  You

12:13:56 18   talked in your testimony about two patent purchases Unisys

12:14:00 19   and Converse?

12:14:02 20   A.      Yes.

12:14:02 21   Q.      Now, you're not a technical expert, are you?

12:14:05 22   A.      No, I will agree, I'm an economist.

12:14:08 23   Q.      You're in no position to offer an opinion that Amazon

12:14:12 24   infringed either of these patents, are you?

12:14:13 25   A.      No, I can't speak to whether Amazon infringed them,

Ugone - cross

12:14:17  1    they did purchase these patents, so they made that purchase.

12:14:21  2    Q.      Right.  And you're not in a position to offer

12:14:24  3    testimony that Amazon used the technology described in

12:14:27  4    either of these patents; are you?

12:14:28  5    A.      No, I can't speak the use or alleged infringement,

12:14:33  6    but I can say that here were some market transactions for

12:14:37  7    the comparable technologies.

12:14:39  8    Q.      Right.  And so my question is about comparable

12:14:44  9    technology, you didn't do any work to analyze the value of

12:14:47 10    the technology that was described in the patents -- let me

12:14:52 11    rephrase that question.  When you say they're comparable,

12:14:55 12    you're not offering a technical opinion?

12:14:57 13    A.      I'm not offering a technical opinion.  I did get

12:14:59 14    input on that from others, there was also Mr. Hayden's

12:15:05 15    testimony that the jury saw about the Converse agreement, I

12:15:09 16    also did look at you know, kind of the names of the patents

12:15:16 17    and so forth, but I'm not giving a technical opinion.  But I

12:15:20 18    did look to that and I did have supporting testimony.

12:15:22 19    Q.      So you're not offering the testimony that these

12:15:25 20    patents are technically comparable to what the VoiceBox

12:15:26 21    patents describe?

12:15:28 22    A.      I'm not independently doing that, but if you look at

12:15:32 23    the exhibits that contain the patents names, you'll see that

12:15:36 24    they are very similar to voice recognition, we know from

12:15:40 25    Mr. Hayden's testimony that they got them for Alexa related

12:15:45 1    reasons which is voice recognition.  So I do have that as

12:15:50 2    support.

12:15:50 3                MR. MACDONALD:  No further questions.

12:15:52 4                THE COURT:  Thank you.  Redirect.

12:15:58 5                     REDIRECT EXAMINATION

12:15:58 6    BY MS. SHAMILOV:

12:16:01 7    Q.       Dr. Ugone, we have evidence in this case of Cash

12:16:03 8    Elston on behalf of VoiceBox approaching Amazon and asking

12:16:07 9    Amazon to purchase or consider purchasing the patents.  Do

12:16:10 10   you recall that?

12:16:10 11   A.       Correct, yes.

12:16:11 12   Q.       Did he say in that real negotiation that Amazon

12:16:14 13   infringes the patents?

12:16:16 14   A.       I'm sorry.  At no time did I see them making that

12:16:19 15   assertion against Amazon, if that's what you're asking.

12:16:23 16   Q.       Mr. Patterson, can we please pull PTX 256.  And go to

12:16:29 17   page 4.  Top paragraph.  This is the paragraph that counsel

12:16:35 18   asked you about, and he focused on the last sentence.  But I

12:16:39 19   would like to focus on the middle one, where the sentence

12:16:42 20   says "value based VoiceBox is the provider for Toyota, Fiat,

12:16:42 21   Dodge, and it list other companies."  Do you see that?

12:16:51 22   A.       Yes, I do.

12:16:52 23   Q.       And then it says well these embedded voice systems

12:16:56 24   work reasonably well for simple commands or control

12:17:02 25   utterance, they have seen limited success due to poor

Peck - direct - rebuttal

12:17:04  1    automatic speech recognition, ASR, limited vocabulary and

12:17:09  2    little or no natural language understanding, NLU, did I read

12:17:13  3    that correctly sir?

12:17:14  4    A.    In fact, that's what I was trying to point out when I

12:17:17  5    was answering the cross question.

12:17:20  6              MS. SHAMILOV:  Thank you so much, doctor.  No

12:17:22  7    more questions.

12:17:23  8              THE COURT:  Thank you, sir.  You are excused.

12:17:26  9    What's next?

12:17:27  10             MR. HADDEN:  Amazon rest its case.  Thank you,

12:17:30  11   Your Honor.

12:17:31  12             THE COURT:  Rebuttal?

12:17:32  13             MR. YOON:  Yes, Your Honor.  Our first witness

12:17:34  14   we're going to call is Mr. Peck.  And pursuant to Your

12:17:37  15   Honor's order in the break, we'll address the motion.

12:17:47  16             THE COURT:  All right.  You can go.

12:17:54  17             Sir, I'll just remind you that you're still

12:17:58  18   under oath.

12:17:58  19             JOHN PECK, having been previously sworn, was

12:18:02  20   examined and testified as follows:

12:18:02  21                     DIRECT EXAMINATION

12:18:02  22   BY MR. SMITH:

12:18:02  23   Q.    Hello Mr. Peck.

12:18:10  24   A.    Hello.

12:18:12  25   Q.    Now earlier in this case you testified about some

828

Peck - direct - rebuttal

12:18:15  1    source code analysis regarding the Amazon code.  What are

12:18:18  2    you here to testify about now?

12:18:21  3    A.      I'm here to testify about my analysis of the MIT

12:18:25  4    Galaxy source code.

12:18:26  5    Q.      And were you here for Dr. Polifroni and Dr. Johnson's

12:18:33  6    testimony where they touched on that issue?

12:18:34  7    A.      Yes, I was.

12:18:35  8    Q.      And did you hear any testimony that the source code

12:18:41  9    for MIT Galaxy lacked the user model?

12:18:45 10    A.      Yes, I did hear that testimony.

12:18:47 11    Q.      And did you analyze source code for MIT Galaxy?

12:18:51 12    A.      Yes, I did.

12:18:55 13    Q.      And when you analyzed the source code for MIT Galaxy,

12:18:59 14    did you find that the user model in there?

12:19:02 15    A.      Yes, I did.

12:19:03 16    Q.      And Mr. Peck, if you could pull open your binder

12:19:10 17    here, rebuttal examination.  Do you see the document that's

12:19:13 18    listed there?

12:19:14 19    A.      Yes, I see that.

12:19:15 20    Q.      Do you see that it's DTX 0246A?

12:19:19 21    A.      I see that.

12:19:20 22    Q.      And what is this document?

12:19:22 23    A.      This is an excerpt from the MIT Galaxy source code

12:19:27 24    that I reviewed.

12:19:28 25    Q.      Did you prepare this excerpt?

Peck - direct - rebuttal

12:19:29 1    A.      Yes, I did.

12:19:31 2              MR. SMITH:  Plaintiff moves to admit DTX 0246-A.

12:19:37 3              MR. HADDEN:  No objection.

12:19:39 4              THE COURT:  Thank you.  It is admitted.

12:19:39 5              (DTX Exhibit No. 0246-A was admitted into

12:19:40 6    evidence.)

12:19:40 7    BY MR. SMITH:

12:19:40 8    Q.      Mr. Smith, if you could pull up that exhibit.  And if

12:19:45 9    you could go to line 243 through 311.  I'm sorry, 293

12:19:57 10   through 311.  And now, Mr. Peck, do you see on the left hand

12:20:03 11   portion of the screen that there is line 293 there?

12:20:07 12   A.      Yes, I see that.

12:20:08 13   Q.      And then 294, it says fetch, underscore, user,

12:20:14 14   underscore, info, underscore, from database, do you see

12:20:17 15   that?

12:20:17 16   A.      Yes, I see that.

12:20:18 17   Q.      And what's being shown here in the code?

12:20:21 18   A.      This is source code that's fetching information about

12:20:24 19   a user from a database and placing it into a data structure

12:20:30 20   called user model.

12:20:32 21   Q.      So was your understanding that this is the user model

12:20:36 22   that we were hearing about testimony earlier?

12:20:36 23   A.      Yes, it is.

12:20:40 24   Q.      And was it your understanding MIT produced this

12:20:47 25   source code?

Peck - direct - rebuttal

12:20:47 1    A.       Yes, that's my understanding.

12:20:49 2    Q.       And did MIT produce the content of a database with

12:20:56 3    user model information?

12:20:58 4    A.       No, MIT did not produce a corresponding database of

12:21:02 5    content.

12:21:03 6    Q.       Does this code show the interactions between the code

12:21:09 7    and the database?

12:21:10 8    A.       Yes, it does.

12:21:11 9    Q.       In the course of your analysis, did you analyze

12:21:14 10   whether or not the user model was ever saved after

12:21:18 11   conversations with users?

12:21:20 12   A.       Yes, I analyzed that.

12:21:22 13   Q.       What did you find?

12:21:23 14   A.       I found that no evidence in the source code of

12:21:27 15   information from the user model being saved back to the

12:21:30 16   database.

12:21:30 17   Q.       And did you hear any testimony earlier about some

12:21:35 18   potential distinction between guest users, regular users?

12:21:40 19   A.       I heard that.

12:21:41 20   Q.       In your analysis was there any distinction with the

12:21:44 21   user model in the code about guest users or regular users?

12:21:48 22   A.       No, there was no distinction.

12:21:50 23   Q.       And so in your view, did you see any evidence that

12:21:54 24   the user model regardless of whether it's for guest users or

12:22:00 25   regular users was ever stored after a conversation?

Peck - cross - rebuttal

12:22:03 1    A.      No, I did not.

12:22:04 2              MR. SMITH:  Thank you, Mr. Peck.  No further

12:22:06 3    questions.

12:22:06 4              THE COURT:  All right.  Thank you.

12:22:09 5    Cross-examine.

12:22:10 6                    CROSS-EXAMINATION

12:22:11 7    BY MR. HADDEN:

12:22:15 8    Q.      Hello, Mr. Peck.  Now you were talking about this

12:22:19 9    user model and if I understand it correctly, the user model

12:22:22 10   would store information about users of the Galaxy system, is

12:22:29 11   that correct?

12:22:29 12   A.      Yes, that's my understanding.

12:22:30 13   Q.      And at least for registered user, the user model

12:22:34 14   would be stored in a database; is that correct?

12:22:36 15   A.      Yes, that's my understanding.

12:22:37 16   Q.      And when the user was registered, access to Galaxy

12:22:44 17   system, the user model would be retrieved from the database

12:22:48 18   and put into data structures in memory in the Galaxy system,

12:22:54 19   is that correct?

12:22:54 20   A.      Yes, that is correct.

12:22:55 21   Q.      And when those -- whether the user model was in

12:22:59 22   memory in the Galaxy system, it could be changed based on

12:23:02 23   what the user said in a conversation; correct?

12:23:02 24   A.      Yes, that's correct.  The data structure memory could

12:23:10 25   be changed.

Peck - cross - rebuttal

Q.      If the user called into Galaxy and changed their
hometown, that would be updated in the user model?

A.      Yes, in your example, that's correct.

Q.      And then if the user hung up, did something else, and
came back and called in to Galaxy, Galaxy would then use the
updated user model in memory, right?

A.      If the software was still running and that data
structure was still in memory, then use the user would be
reunited.

Q.      One more question.  You don't know for a fact, do
you, whether or not there is additional Galaxy code that you
didn't see that would also deal with the user model; right?

A.      I reviewed the version of source code that MIT
produced for this case.  I did search for additional
versions using Google and bank, I did not turn up any.  I
also used an older technology called FTP, that was popular
in the '90's and accessed a number of MIT source code cites
and looked for source code but I was unsuccessful.

Q.      But you understood from Dr. Polifroni that only
portions of the source code from Galaxy were shared with
collaborators and the public in general, do you recall that
testimony?

A.      I recall that testimony.

Q.      Did you have any basis for disputing that testimony?

A.      No, I don't have any basis to dispute that testimony.

12:24:40  1   My analysis is with regard to the version of source code

12:24:43  2   produced in this case.

12:24:44  3   Q.      And as far as Dr. Polifroni described the

12:24:47  4   functionality of Galaxy, you don't dispute any of that, do

12:24:51  5   you?

12:24:52  6   A.      My analysis is based on the source code.  My analysis

12:24:57  7   shows that they don't seem to be right, saves back to the

12:25:01  8   database.

12:25:02  9   Q.      What you saw from the screen, you don't dispute

12:25:06 10   that's the way Galaxy worked, did you?

12:25:08 11   A.      Could you be more specific about when you say how

12:25:12 12   Galaxy worked?

12:25:13 13   Q.      Sure.  I'll stop there.

12:25:16 14            MR. HADDEN:  Thank you.

12:25:16 15            THE COURT:  Thank you.  Redirect.

12:25:18 16            MR. SMITH:  No, Your Honor.

12:25:19 17            THE COURT:  All right.  Thank you.  Thank you,

12:25:20 18   sir.  You're excused.  At this point we're going to take our

12:25:24 19   lunch break.  I do have to deal with a couple of motions and

12:25:27 20   things that we deal with.  So let's take until about 1:20.

12:25:32 21            COURTROOM DEPUTY:  All rise.

12:25:32 22            (Jury exiting the courtroom at 12:25 p.m.)

12:25:54 23            THE COURT:  Everyone can be seated.  Do you have

12:26:00 24   some motions you want to make?

12:26:00 25            MR. YOON:  Mr. Smith will make our Rule 50

12:26:10 1    motion about their validity case, Your Honor.

12:26:13 2           MR. SMITH:  So Your Honor, VB Assets would move

12:26:24 3    under Rule 50 for the IPR estoppel issue on the '681 patent.

12:26:32 4    And the basis is that the evidence presented was on really

12:26:35 5    publications and the system was just used as a label.  And

12:26:39 6    the documents matched the system.  We also move on that the

12:26:46 7    -- there is no evidence with respect to the '681, '176, and

12:26:52 8    '097 patents that the system was actually made in the United

12:26:57 9    States with the alleged functionality prior to the priority

12:27:01 10   dates of those patents.  For the '681 patent, insufficient

12:27:05 11   evidence of long-term shared knowledge, used in a system.

12:27:09 12   For the '176, and the '097 patents, no evidence of selecting

12:27:14 13   or presenting ads.  Specifically for the '097 patent, no

12:27:19 14   evidence of providing ads to the user with respect to the

12:27:23 15   MIT system.  And the '703 patent, no evidence that the

12:27:27 16   United system was actually made or used in the United States

12:27:30 17   with the alleged features during the applicable time periods

12:27:34 18   and there is no evidence with respect to United of obtaining

12:27:38 19   payment information without user input or obtaining address

12:27:42 20   information or payment information.

12:27:47 21          We're also moving under 101 under the Step 2 for

12:27:51 22   the remaining patents that were -- there is no evidence that

12:27:56 23   the claims are nothing but well understood, routine, and

12:27:59 24   conventional.  At most, the evidence presented single prior

12:28:02 25   art references that we dispute qualify as prior art.  And

further, merely being prior art doesn't establish that a feature is conventional.

Specifically, for the '681 patent, Amazon did not prove -- make its burden of showing specific ordering, showing the specific ordering of steps that they allege are necessary for infringement.  And for the '703, '176 and '097 patents, these claims as we heard all require in some form or fashion the use of context.  There is no evidence that that was conventional, or well understood, certainly in the context of ad delivery or product purchases.  And the '703 patent, there is no prior art with the ability to void collecting credit card and payment information.  And then with respect to written description, no evidence that the claim elements were not set forth in the specification.  And no evidence that a person of ordinary skill in the art couldn't have built the invention, simply evident that VB Assets hadn't gotten around to it.

And finally, there is no evidence that the claims, the invention as a whole, was not disclosed in the specification from the perspective of a person of ordinary skill in the art at the relevant times in those patents.

THE COURT:  All right.  Thank you.  Do you guys want to respond?  The part that I would like to hear some response to, or twofold, one, I know that I heard some testimony from the witness on Galaxy being in the United

12:29:35 1    States, but can you just tell me what there is about the

12:29:38 2    United system being in the United States.  And secondly, I

12:29:42 3    did listen to the testimony on Step 2 of 101, and it was

12:29:47 4    pretty conclusory saying well it's all well-known and

12:29:52 5    conventional based on essentially one piece of prior art or

12:29:56 6    a couple of pieces of prior art, and then he just said it's

12:29:59 7    not innovative, which sounded to me like it was mixing up

12:30:04 8    102 with 101.  Help me with those two issues.

12:30:08 9              MR. HADDEN:  Yes, Your Honor.  So I think we had

12:30:13 10   testimony that Galaxy is in the US.

12:30:15 11             THE COURT:  Yeah, the Galaxy, that one I heard.

12:30:17 12   But it's the other once that they --

12:30:21 13             MR. HADDEN:  It is in the US and Dr. Pepper is

12:30:24 14   in the U.S. and it's for United and people can make

12:30:27 15   reservations in U.S.  And Nuance, the company that operated

12:30:31 16   it, is a U.S. company.

12:30:32 17             THE COURT:  Is that all in the record?

12:30:34 18             MR. HADDEN:  Yes.

12:30:35 19             THE COURT:  Okay.

12:30:36 20             MR. HADDEN:  I'm sorry, I forgot that last one.

12:30:38 21             THE COURT:  101.  101 that was just awfully

12:30:41 22   cursory.

12:30:41 23             MR. HADDEN:  On '681, we didn't address it, I

12:30:47 24   thought we had an agreement.

12:30:48 25             THE COURT:  I didn't agree to that.

12:30:49 1          MR. HADDEN:  I understand that.  If you change

12:30:51 2    your mind, it looks -- I understand.

12:30:53 3          THE COURT:  You guys all put in your -- I didn't

12:30:55 4    agree to it, and you all put in your verdict sheet that '681

12:30:59 5    is going to the jury on that issue.  And having looked back

12:31:03 6    at things, I may change my mind on whether it's directed to

12:31:06 7    an abstract idea, so whatever you do, you did at your peril.

12:31:11 8          MR. HADDEN:  Understood.  I won't address '681

12:31:16 9    if you decide that it is abstract, then we didn't put on

12:31:19 10   evidence of Step 2, I agree.  On the other ones, I think the

12:31:23 11   evidence is kind of two flavors, one that there is no actual

12:31:27 12   technology in the claims, that the claims were just

12:31:29 13   functional descriptions of what someone should do, which I

12:31:33 14   think is a legitimate Step 2 argument, right, the inventive

12:31:37 15   concept has to be a technical improvement.  And Dr. Johnson

12:31:40 16   addressed that and showed that there was no technical

12:31:44 17   improvement in the claim.

12:31:45 18          To the extent that the functions alone were

12:31:48 19   sufficient, that they were all well-known and conventional.

12:31:52 20   Standard eCommerce things that were done by United and done

12:31:57 21   by eCommerce website's.  In addition, the basic steps of

12:32:02 22   voice recognition, that was conventional, well-known, and

12:32:06 23   goes back to MIT and other prior art that he put up as part

12:32:10 24   of the obviousness description.

12:32:14 25          THE COURT:  All right.  Well you agree, though,

12:32:16 1   that if something is obvious, that doesn't necessarily make

12:32:21 2   it well-known, routine and conventional.

12:32:23 3             MR. HADDEN:  I agree completely Your Honor.  I

12:32:25 4   think the problem with these claims and what they address,

12:32:28 5   not so much all these steps in fifty different prior art

12:32:32 6   references, there was no there there, it was the additional

12:32:35 7   inventive part of the claim that takes it out of Step 1.

12:32:39 8             THE COURT:  All right.  Okay.  I am going to

12:32:41 9   reserve on those motions.  And I think with respect to 101,

12:32:51 10  as I said yesterday, I hadn't agreed to what your proposal

12:32:56 11  was.  I think what I am going to do is reserve on that and

12:33:01 12  we'll see what the jury does and I will allow you all to

12:33:07 13  convince me either the Step 1, I got it wrong in part

12:33:15 14  before, or if the jury comes back with Step 2, you guys can

12:33:20 15  -- one of you can argue that the jury got it wrong.

12:33:25 16            All right.  We'll be back.

12:33:27 17            (A brief recess was taken.)

13:26:23 18            COURTROOM DEPUTY:  All rise.

13:26:24 19            MR. YOON:  Your Honor, may Dr. Polish go in the

13:26:27 20  box.  Or should he wait to be called?

13:26:33 21            THE COURT:  The jury is out there.  He can come

13:26:33 22  up.  I'll just remind you, sir, that you're still under

13:26:33 23  oath.

13:26:36 24            (Jury entering the courtroom at 1:26 p.m.)

13:26:52 25            THE COURT:  All right.  Everyone may be seated.

13:26:54 1    Welcome back.  I think we have it fixed.  Let's see.

13:27:02 2    BY MR. YOON:

13:27:03 3    Q.    Can you put up the first slide the claim

13:27:08 4    construction, there you go, it works.

13:27:11 5                    DIRECT EXAMINATION.

13:27:12 6                MR. YOON:  All set, Your Honor.

13:27:13 7                THE COURT:  Yes.

13:27:15 8    BY MR. YOON:

13:27:16 9    Q.    Dr. Polish, for everyone here, you're the last

13:27:19 10   witness we're presenting in the case.  Dr. Polish, you were

13:27:23 11   here for the testimony of -- you can take that down,

13:27:26 12   Mr. Smith, I just wanted to make sure the system worked.

13:27:30 13   Dr. Polish you were here for the testimony of Amazon expert

13:27:34 14   Dr. Johnson, regarding the validity of the four patents in

13:27:37 15   this case?

13:27:38 16   A.    Yes I was.

13:27:39 17   Q.    Based on all the analysis that you have done in this

13:27:41 18   case, including listening to the presentations of

13:27:44 19   Dr. Johnson, what is your opinion regarding the validity of

13:27:47 20   the '681, '176, '097, and '703 patents?

13:27:52 21   A.    That all four of them are valid.

13:27:55 22   Q.    And if we could now put on the screen.  When you

13:28:00 23   applied your validity analysis, did you apply the Court's

13:28:02 24   claim construction order?

13:28:04 25   A.    Yes, I did.

13:28:05 1    Q.      And if we go to the next slide.

13:28:07 2            And Dr. Polish, in conducting your validity

13:28:10 3    analysis, did you use the level of skill of a person of

13:28:13 4    ordinary skill in the art as the baseline for your analysis?

13:28:16 5    A.      Yes, I did.

13:28:17 6    Q.      If we can go to the next slide.  Dr. Polish in

13:28:21 7    forming your opinion, did you review the prosecution history

13:28:24 8    and cited references of the VoiceBox patents?

13:28:27 9    A.      Yes.

13:28:27 10   Q.      Let's talk about now Amazon's defenses.  We're going

13:28:33 11   to talk about each of them, but let's start with the prior

13:28:36 12   art obviousness arguments that Dr. Johnson presented.  If we

13:28:43 13   could now look at the next slide, the '681 patent, Claim 13.

13:28:47 14           And this is what we have been calling the

13:28:50 15   cooperative conversation patent?

13:28:52 16   A.      Yes.

13:28:52 17   Q.      If we can now advance to the next slide.

13:28:56 18           Dr. Polish, you reviewed the prosecution history

13:29:01 19   for the '681 patent as part of your analysis, correct?

13:29:04 20   A.      Yes.

13:29:04 21   Q.      And during the prosecution of the '681 patent over

13:29:08 22   five years, approximately how many references were

13:29:11 23   considered?

13:29:11 24   A.      Over 375 references.

13:29:14 25   Q.      By the patent examiner?

13:29:16 1    A.       That's right.

13:29:16 2    Q.       And?

13:29:19 3             MR. YOON:  We would now move into evidence, Your

13:29:22 4    Honor, an excerpt of the prosecution history of the '681

13:29:27 5    patent, PTX 6.

13:29:28 6             MR. HADDEN:  No objection.

13:29:31 7             THE COURT:  Thank you.  It is admitted.

13:29:31 8             (PTX Exhibit No. 6 was admitted into evidence.)

13:29:31 9    BY MR. YOON:

13:29:33 10   Q.       Dr. Polish, were any of the references considered by

13:29:35 11   the Patent Office in granting the '681 patent references

13:29:41 12   related to the MIT Galaxy product that we've heard -- Galaxy

13:29:49 13   Academic Platform that we have heard so much about?

13:29:51 14   A.       Yes, yes, it was.

13:29:52 15   Q.       If we can now go to the -- advance it, Mr. Smith.

13:29:57 16             And do you see there is an article here entitled

13:30:00 17   Development of HRL Route Navigation Dialogue System?

13:30:05 18   A.       Yes, I see that.

13:30:06 19   Q.       And this patent is identified in this article -- this

13:30:10 20   article is identified in the patent of the '681 patent?

13:30:12 21   A.       This is identified in the body of the patent.

13:30:12 22   Q.       And if we could now go and look at the bottom portion

13:30:21 23   of the right part.  And then the upper portion of the left

13:30:24 24   part.  During the prosecution history of the '681 patent,

13:30:28 25   Dr. Polish, was the Patent Office aware of the MIT Galaxy

13:30:34 1    product?

13:30:35 2    A.      Yes, they were.   Certainly as indicated by this

13:30:37 3    reference, this reference including the Galaxy system.

13:30:42 4    Q.      Now, you were here for the testimony of Dr. Polifroni

13:30:49 5    as well as their expert, Mr. Johnson, correct?

13:30:53 6    A.      Yes.

13:30:53 7    Q.      And you saw the spoke-and-hub diagram, both in

13:31:00 8    Dr. Polifroni and Dr. Johnson's testimony?

13:31:01 9    A.      Yes.

13:31:02 10   Q.      And that diagram was before the Patent Office when it

13:31:06 11   issued the '681 patent; correct?

13:31:08 12   A.      Yes, it was.

13:31:10 13   Q.      And so the '681 patent was granted over 375 prior art

13:31:16 14   references, including the MIT Galaxy product; correct?

13:31:20 15   A.      That's right.

13:31:21 16   Q.      And you heard Dr. Johnson's opinion that the Patent

13:31:25 17   Office just got it wrong?

13:31:26 18   A.      Yes, I heard that opinion.

13:31:27 19   Q.      If we could now go to the next slide.

13:31:31 20          And in this case here, is it your understanding

13:31:37 21   that Dr. Johnson is arguing that he believed that Claim 13

13:31:41 22   of the '681 patent was obvious?

13:31:42 23   A.      Yes.

13:31:44 24   Q.      Do you agree with that opinion?

13:31:45 25   A.      No, I don't.

13:31:46  1    Q.      Why not?

13:31:47  2    A.      Because it would -- because the elements of the

13:31:56  3    patent were not disclosed in the prior art.

13:31:59  4    Q.      Let's go to the next slide.  And what factors did you

13:32:03  5    consider in determining whether or not the claims of the

13:32:06  6    '681 patent were obvious in light of, for example, MIT

13:32:11  7    Galaxy?

13:32:11  8    A.      Well the factors considered are who a person of

13:32:16  9    ordinary skill in the art was at the time of the invention.

13:32:20 10    The scope and content of the prior art, and the differences

13:32:23 11    between the prior art and the invention.  And also secondary

13:32:27 12    considerations can be considered, as well.

13:32:29 13    Q.      If we go to the next slide.

13:32:32 14            Now in Dr. Johnson's presentation, he relied on

13:32:36 15    three -- two articles and a thesis, is that correct?

13:32:39 16    A.      That's right.

13:32:40 17    Q.      Did you review those papers?

13:32:41 18    A.      I did.

13:32:42 19    Q.      Did you hear the testimony of Dr. Johnson and

13:32:45 20    Dr. Polifroni?

13:32:45 21    A.      Yes.

13:32:46 22    Q.      Do you agree that those articles disclose a single

13:32:50 23    system?

13:32:50 24    A.      No, I don't.

13:32:51 25    Q.      And why not?

13:32:52  1    A.      Well, so, the articles are from several different

13:32:58  2    years and describe several different aspects of a framework

13:33:04  3    that has been -- that has been added and augmented over the

13:33:09  4    years.  So it's not defining a single system that existed at

13:33:13  5    a particular moment in time.

13:33:15  6    Q.      And you heard Dr. Polifroni's testimony regarding the

13:33:23  7    source code for -- relating to the MIT Galaxy academic

13:33:30  8    efforts?

13:33:30  9    A.      Yes.

13:33:31 10    Q.      And did a single set of software exist for Galaxy?

13:33:34 11    A.      No.  It seems not.  He was testifying in fact that

13:33:40 12    the Galaxy system was constantly being changed and modified.

13:33:47 13    Q.      And you were here for the demonstration of the

13:33:51 14    Mercury MIT Galaxy where Dr. Polifroni discussed the video?

13:33:56 15    A.      Yes.

13:33:56 16    Q.      And did that video show any type of update of the

13:34:00 17    user profile?

13:34:01 18    A.      No, it didn't.

13:34:03 19    Q.      Now, you were here for both Dr. Polifroni's and

13:34:09 20    Mr. Peck's testimony regarding the source code of the MIT

13:34:12 21    Galaxy; correct?

13:34:14 22    A.      Yes.

13:34:14 23    Q.      And does the source code produced in this case and by

13:34:19 24    MIT disclose or show the system updating the user profile?

13:34:24 25    A.      No.  The code never writes a user profile to a

13:34:31  1    database.

13:34:31  2    Q.        How does that relate to the issue of whether or not

13:34:35  3    Galaxy had long-term shared knowledge?

13:34:37  4    A.        Well, it's -- it means that whatever information was

13:34:42  5    being collected during a given conversation with the system,

13:34:46  6    that information is not persisted to subsequent

13:34:50  7    conversations.  So it wouldn't be long-term shared

13:34:53  8    knowledge.

13:34:53  9    Q.        Now, during this case, did you hear counsel for

13:34:57 10    Amazon asking about a situation where you're on Galaxy and

13:35:02 11    the phone disconnects and you dial back in?

13:35:04 12    A.        Yes, I heard that.

13:35:05 13    Q.        Is there any evidence in this case that that actually

13:35:08 14    happened?

13:35:08 15    A.        No, I have never seen any evidence that that's

13:35:11 16    actually happened.

13:35:12 17    Q.        Is there any evidence in this case that that happened

13:35:14 18    in a situation where the user profile was updated?

13:35:17 19    A.        No, certainly not.

13:35:19 20    Q.        Now, do any of the articles that you have seen in

13:35:22 21    this case impact your view of that situation?

13:35:25 22    A.        Yes.  There in fact was one of the articles, one of

13:35:30 23    the Seneff articles, I don't recall which one specifically

13:35:35 24    talked about that the system made a mistake and as a result

13:35:40 25    hung up on the user, she termed it catastrophic because you

13:35:46 1    would lose whatever you had done up to that point, so it was

13:35:51 2    clear at least when she was writing that paper that there

13:35:53 3    was no persistence of progress through the dialogue within

13:35:58 4    the system.

13:35:58 5    Q.     Go to the next slide.  And so what elements do you

13:36:03 6    believe that was missing, even if MIT Galaxy was a system, a

13:36:07 7    single system, what do you believe was missing from Claim

13:36:11 8    13?

13:36:11 9    A.     So, there is no accumulated long-term knowledge about

13:36:15 10   the user wherein the knowledge, the long-term knowledge,

13:36:20 11   long-term shared knowledge includes knowledge about one or

13:36:23 12   more past conversations with the user.

13:36:26 13   Q.     And was there any other element that you felt was

13:36:29 14   missing from the MIT Galaxy academic platform?

13:36:34 15   A.     Yes, this identified context associated with the

13:36:37 16   utterance is missing, at least because this context has to

13:36:44 17   be associated with long-term shared knowledge and there is

13:36:47 18   no long-term shared knowledge.

13:36:49 19   Q.     Now, let's turn to the '176 patent, and this is Claim

13:37:00 20   40.  Let's go to the '176 patent.  Did you review the

13:37:03 21   prosecution history of the '176 patent?

13:37:03 22   A.     I did.

13:37:06 23   Q.     With regards to that, how many references were

13:37:09 24   considered during the three years it was being evaluated?

13:37:11 25   A.     Over 200 references were considered over the three

13:37:15 1    years.

13:37:15 2                  MR. YOON:  We now move into evidence an excerpt

13:37:18 3    from the '176 patent prosecution history PTX 8.

13:37:23 4                  MR. HADDEN:  No objection.

13:37:24 5                  THE COURT:  Thank you.  It is admitted.

13:37:25 6                  (PTX Exhibit No. 8 was admitted into evidence.)

13:37:25 7    BY MR. YOON:

13:37:25 8    Q.      And during the prosecution of the '176 patent, was

13:37:31 9    the Patent Office aware of the MIT Galaxy system?

13:37:35 10   A.      Yes.

13:37:36 11   Q.      If we could go to -- advance in there, Mr. Smith.  So

13:37:51 12   is this the same article that was discussed earlier with

13:37:55 13   regards to the '681 patent?

13:37:56 14   A.      Yes, that same article was brought up in this context

13:38:00 15   as well.

13:38:00 16   Q.      Can you pull that article up?  It's PTX 7, I

13:38:08 17   apologize.  I apologize Your Honor, I may have said the

13:38:13 18   wrong number.  No, it is PTX 8.  That's the '176 patent

13:38:20 19   prosecution history.

13:38:30 20              And if we could advance that document to the

13:38:33 21   article.  No, that's okay.  Mr. Smith, we're looking at the

13:38:42 22   article, it's on page 149, it's VoiceBox 149.

13:39:10 23              This is the article we saw earlier, sir.  If we

13:39:12 24   could just blow up the bottom portion again and the top.

13:39:22 25              During the prosecution of the '176 patent, the

13:39:29  1  Patent Office granted the patent over the Galaxy system;

13:39:35  2  correct?

13:39:36  3  A.      Yes.

13:39:36  4  Q.      And it also did it over the other 200 references?

13:39:39  5  A.      Yes, that's right.

13:39:40  6  Q.      We now can advance back to the slides.  And we go to

13:39:50  7  slide 15.

13:39:52  8          And you looked at the two articles and the

13:39:56  9  thesis that Dr. Johnson relied on for his '176 invalidity

13:40:02 10  opinion; correct?

13:40:03 11  A.      Yes.

13:40:03 12  Q.      You can advance the slide.

13:40:05 13          Does your testimony about the MIT Galaxy

13:40:11 14  articles not being a single system from the '681 apply to

13:40:15 15  your '176 analysis?

13:40:16 16  A.      Yes, it's also not a system here as well.

13:40:19 17  Q.      And what -- in addition to that, what other elements

13:40:23 18  were missing from Claim 40 of the '176 patent?

13:40:26 19  A.      Okay.  Well this last element calls for an adaptive

13:40:30 20  misrecognition engine, and it goes on, and it talks about

13:40:35 21  detecting a predetermined event which would imply that there

13:40:39 22  was some problem.  And that's not found in the MIT Galaxy

13:40:44 23  system.

13:40:44 24  Q.      And Dr. Polish, you were here for Dr. Polifroni's

13:40:49 25  testimony?

13:40:49  1  A.      Yes.

13:40:50  2  Q.      And Dr. Polifroni testified what the Galaxy system

13:40:57  3  would do if it didn't understand an address or what the user

13:41:02  4  said.  What would happen?

13:41:03  5  A.      So he testified that what would happen is it would

13:41:05  6  ask the user to either use the telephone keypad to type

13:41:09  7  something in or you could type something in at the computer

13:41:12  8  screen if you were operating from a computer screen.  There

13:41:15  9  was nothing in the system that would let you fix things from

13:41:19 10  a voice point of view.

13:41:21 11  Q.      And does that support your opinion that the MIT

13:41:27 12  Galaxy was lacking the last element of Claim 40?

13:41:30 13  A.      Yes.  There is no adaptive misrecognition engine

13:41:33 14  there.  There is simply a failure and then something else

13:41:37 15  comes in to fix it.

13:41:39 16  Q.      If we can now go to the '097 patent.  And let's go to

13:41:46 17  the prosecution history of Claim 23 of the '097 patent.

13:41:49 18          How many years was the '097 patent reviewed by

13:41:52 19  the Patent Office?

13:41:52 20  A.      The Patent Office looked at it for nine years.

13:41:52 21  Q.      How many references did the Patent Office examine

13:41:52 22  before it issued the '097?

13:42:01 23  A.      Over 200 references.

13:42:02 24  Q.      Were the claims of the patent granted over those

13:42:05 25  references?

13:42:06 1   A.       Yes.

13:42:07 2   Q.       If we can advance the slide.  And with regards to the

13:42:12 3   MIT Galaxy, are these the same articles and theses that we

13:42:17 4   have been discussing?

13:42:18 5   A.       Yes, it is.

13:42:19 6   Q.       Does your testimony regarding whether these articles

13:42:22 7   disclose a single system apply to the '097 as well?

13:42:25 8   A.       Yes.

13:42:26 9   Q.       Go to the next slide.

13:42:27 10           And what element was missing with respect to

13:42:32 11  Claim 23 of the '097 patent with respect to Galaxy?

13:42:38 12  A.       So the last element which is interpret the natural

13:42:42 13  language utterance based on the advertisement and responsive

13:42:46 14  to the existence of a pronoun in the natural language

13:42:49 15  utterance, determine whether the pronoun refers to one or

13:42:52 16  more product or service or a provider of the product or

13:42:58 17  service.

13:42:59 18  Q.       Did you see any evidence that Galaxy interpreted the

13:43:02 19  natural language utterance based on the advertisement?

13:43:04 20  A.       No, I saw no indication of that.

13:43:06 21  Q.       Now let's go to the '703 patent, Claim 25.  And if we

13:43:12 22  could now advance.

13:43:16 23           How many references was considered by the seven

13:43:22 24  -- during the prosecution of the three years of prosecution

13:43:24 25  of the '703 patent?

13:43:26  1    A.      Over 200 references.

13:43:28  2    Q.      And?

13:43:30  3            MR. YOON:  We now move into evidence PTX '007,

13:43:33  4    the excerpt to the prosecution history.

13:43:36  5            MR. HADDEN:  No objection.

13:43:37  6            THE COURT:  Thank you.  It is admitted.

13:43:37  7            (PTX Exhibit No. 007 was admitted into

13:43:37  8    evidence.)

13:43:37  9    BY MR. YOON:

13:43:38 10    Q.      And with regards to PTX '007.  Can we have that on

13:43:43 11    the screen?  And Mr. Smith, if you could advance that to

13:43:48 12    VoiceBox 3672.

13:43:54 13            And during the prosecution of the '703 patent,

13:44:03 14    was the Patent Office aware of MIT Galaxy?

13:44:07 15    A.      Yes, I believe so.

13:44:09 16    Q.      And did it grant the '703 patent over the MIT Galaxy

13:44:13 17    system?

13:44:13 18    A.      Yes, it did.

13:44:17 19    Q.      Now, let's turn now to one of the references.  During

13:44:21 20    the testimony of Dr. Johnson's opinion about Claim 25, he

13:44:29 21    was talking about a Partovi reference, do you recall that?

13:44:35 22    A.      Yes.

13:44:35 23    Q.      He was trying to use the Partovi reference to supply

13:44:39 24    the last element of Claim 25?

13:44:41 25    A.      Yes, that's right.

13:44:42 1    Q.    Does the Partovi reference actually disclose that

13:44:46 2    last element?

13:44:46 3    A.    No it doesn't.

13:44:47 4    Q.    Why not?

13:44:48 5    A.    The last element is provided without further user

13:44:50 6    input after the receipt of user input, a request for user

13:44:54 7    confirmation to use the payment information, and the

13:44:56 8    shipping information for a purchase transaction for the

13:44:59 9    product or service and Partovi doesn't do that, Partovi

13:45:09 10   collects information and passes it along to another vendor

13:45:12 11   to then further process.

13:45:13 12   Q.    Now if we could turn now to patent eligibility, the

13:45:17 13   second of Amazon's invalidity defenses.

13:45:22 14   A.    Okay.

13:45:26 15   Q.    During Dr. Johnson's testimony, did Dr. Johnson offer

13:45:29 16   any testimony regarding patent eligibility with respect to

13:45:33 17   the '681 patent?

13:45:35 18   A.    Yes, I believe he did.

13:45:42 19   Q.    Let me rephrase the question, sir?

13:45:42 20   A.    Yeah.

13:45:44 21   Q.    In his testimony, Dr. Johnson, he offered opinions as

13:45:48 22   to the '176, '097, and '703 patents; correct?

13:45:52 23   A.    Yes.

13:45:52 24   Q.    He did not offer an opinion with respect to the '681?

13:45:57 25   A.    That's right.

13:45:58 1    Q.      Well, now let's focus then on the first patent here,

13:46:02 2    the '097 patent.

13:46:04 3    A.      Okay.

13:46:05 4    Q.      This is the language of Claim 23.  Starting with the

13:46:09 5    '097 patent, does Claim 23 of the patent only involve

13:46:16 6    activities that were well understood, routine and

13:46:19 7    conventional at the time of the invention?

13:46:22 8    A.      No.

13:46:22 9    Q.      And why not?

13:46:23 10   A.      Well, it offers ideas that go beyond what was

13:46:28 11   conventional.

13:46:32 12   Q.      And what would be an example of a cited element in

13:46:37 13   Claim 23 that was not well understood, routine or

13:46:43 14   conventional at the time the patent was filed?

13:46:46 15   A.      Using an advertisement and then having the user

13:46:49 16   respond to the advertisement, using a pronoun was not a

13:46:54 17   normal thing to be doing.  And it enables the computer to

13:46:59 18   understand the context and then proceed from there.

13:47:03 19   Q.      And does the specification of the '097 patent provide

13:47:07 20   further support for why this was unconventional and not well

13:47:12 21   understood?

13:47:12 22   A.      Yes.  And I cite here to that the point that they're

13:47:20 23   making in the specification is that these computer -- these

13:47:25 24   computer interactions systems can be very complicated and

13:47:28 25   difficult to use and one of the ways to get around that and

13:47:31 1    avoid having to memorize things is to simply present the

13:47:37 2    user with an advertisement or some kind of call to action

13:47:41 3    and then get a simple response.

13:47:45 4    Q.    Now let's go to the '176 patent, Claim 40?

13:47:52 5              MR. YOON:  Your Honor, also, I would like to

13:47:55 6    admit, move into evidence, PTX '008, which was the

13:47:59 7    prosecution history for the '176 patent.

13:48:02 8              THE COURT:  The whole thing or an excerpt?

13:48:03 9              MR. YOON:  The excerpt, it's only an excerpt,

13:48:07 10   Your Honor.

13:48:08 11             MR. HADDEN:  No objection.

13:48:09 12             THE COURT:  Thank you.  It is admitted.

13:48:09 13             (PTX Exhibit No. 008 was admitted into

13:48:10 14   evidence.)

13:48:10 15   BY MR. YOON:

13:48:10 16   Q.    And looking at the Claim 40, is it, in your opinion,

13:48:17 17   does the steps and elements of Claim 40 recite only

13:48:21 18   activities that were well-known, routine, conventional and

13:48:26 19   well understood at the time of the invention?

13:48:27 20   A.    No, it goes beyond that.

13:48:29 21   Q.    And what elements of Claim 40 were not well

13:48:33 22   understood, routine or conventional at the time of the

13:48:37 23   filing of the '176 patent?

13:48:39 24   A.    So these three elements, interpret the recognized

13:48:44 25   words or phrases where an interpreting the recognized words

13:48:48 1    or phrases includes establishing a context for the natural

13:48:51 2    language utterance, selecting an advertisement in the

13:48:54 3    context established for the natural language utterance, and

13:48:58 4    present the selected advertisement via an output device.

13:49:05 5    Q.    And now turning to the specification of the '176

13:49:10 6    patent, and to move forward, does the specification of the

13:49:14 7    '176 patent illustrate that these ideas were not well

13:49:19 8    understood, routine or conventional?

13:49:22 9    A.    Yes.  So in the middle column here it says this is an

13:49:28 10   excerpt from the patent specification that talks about, as

13:49:32 11   we talked about before, being able to shortcut the

13:49:36 12   complexity of some of the interactions and just present an

13:49:40 13   ad and get a response.  And the column on the right is an

13:49:46 14   excerpt that indicates that it's looking for

13:49:53 15   misunderstanding, misrecognition, and then makes available a

13:49:58 16   whole range of other systems to help you figure out what the

13:50:03 17   person meant to say.

13:50:04 18   Q.    And by the right column, are you referring to column

13:50:07 19   four, lines 45, to column, 5 line 9 of the '176 patent?

13:50:12 20   A.    That's correct.

13:50:12 21   Q.    Let's now turn to the '703 patent, Claim 25.  And are

13:50:22 22   the elements and steps recited in Claim 25 of the '703

13:50:22 23   patent only involving activities that were well understood,

13:50:32 24   routine and conventional at the time the patent was filed

13:50:37 25   for in the '703?

13:50:38 1    A.      No, it goes beyond that.

13:50:40 2    Q.      And what steps or elements of the '703 patent were

13:50:44 3    not well understood, routine or conventional at the time the

13:50:50 4    patent was filed?

13:50:50 5    A.      So, the business about being able to proceed directly

13:51:00 6    to an immediate purchase if you have the information

13:51:03 7    available was not a conventional thing to do, and it was an

13:51:08 8    advance over the prior art.

13:51:09 9    Q.      And would you just for the record, identify which

13:51:13 10   elements that you believe were not conventional and well

13:51:16 11   understood?

13:51:16 12   A.      Yes, the element that includes determine without

13:51:20 13   further user input after receipt of the user input, a

13:51:23 14   context based on at least on one or more words or phrases,

13:51:28 15   and then the element, obtain without further user input

13:51:31 16   after receipt of the user input, shipping information with

13:51:35 17   which to deliver the product or service, wherein the

13:51:37 18   shipping information specifies a name or address of a

13:51:40 19   recipient to which the product or service is to be delivered

13:51:42 20   after the product or service is purchased, and then the

13:51:48 21   element requires without further user input after the

13:51:50 22   receipt of the user input, a request for user confirmation

13:51:55 23   to use the payment information and the shipping information

13:51:57 24   for a purchase transaction for the product or service.

13:52:02 25   Q.      And what do you mean by conventional approaches lack

13:52:07 1    context?

13:52:08 2    A.    So conventional approaches that preceded this

13:52:21 3    wouldn't understand where you were in the transaction and

13:52:23 4    would be trying to collect all that information from you at

13:52:26 5    the time of the transaction as opposed to this where you're

13:52:30 6    embedding the user's interaction in a previous set up that

13:52:34 7    allows this to be streamlined.

13:52:37 8    Q.    And now let's turn to the last defense, the written

13:52:41 9    description defense.

13:52:42 10   A.    Okay.

13:52:43 11   Q.    And Dr. Polish, do the patent specifications for the

13:52:49 12   four patents at issue describe each and every limitation of

13:52:51 13   a patent in sufficient detail that they would be recognized

13:52:54 14   by a person of ordinary skill in the patents as something

13:52:58 15   the inventors invented?

13:53:00 16   A.    Yes.

13:53:00 17   Q.    And sir, during your direct examination in this case,

13:53:05 18   we went through the specification of each of the patents.

13:53:08 19   Do you recall that?

13:53:09 20   A.    Yes.

13:53:09 21   Q.    And we're not going to go over that again here.  So

13:53:12 22   let's just kind of focus on a couple of items.  So let's

13:53:18 23   discuss Claim 13 of the '681 patent, and there was a

13:53:21 24   discussion in Dr. Johnson's testimony as to whether or not

13:53:25 25   the accumulate element was disclosed and described to a

person of ordinary skill in the patent.  Was it?

A.      Was it described?  Yes.

Q.      And could you explain why?

A.      So here is a quote, here is a section from the patent specification that specifically talks about that "the input received during a single conversation may be retained in a session input accumulator.  And that the session input accumulator may accumulate a current user interface state relating to other modal inputs to further build shared knowledge models and more accurate adaptive responses," so they're describing there how to collect information into this accumulator.

Q.      And is that also supported by previous review of the patent?

A.      Yes.

Q.      The patent you cited, was that column 13, lines 48 to 37?

A.      Yes.

Q.      Is there a further support in the specification for the short-term shared knowledge element?

A.      Yes.  So in column four, lines 55 to 60, it says "the shared knowledge may include cross modality awareness wherein additional accumulating input relating to user utterances request locations, et cetera, the shared knowledge may accumulate a current user interface state

13:54:52 1    relating to other modal inputs to further build shared

13:54:59 2    knowledge models."

13:55:00 3    Q.      Would both of those passages provide sufficient

13:55:07 4    information for a person of ordinary skill in the art to

13:55:10 5    understand the nature of the invention?

13:55:11 6    A.      Yes.

13:55:11 7    Q.      And the aspect of the claim that says wherein the

13:55:14 8    short-term shared knowledge includes knowledge about the

13:55:17 9    utterances received at the voice during the current

13:55:20 10   conversation, is that shown in the specification of the

13:55:24 11   patent at columns 14, lines 24 to 30?

13:55:27 12   A.      Yes.

13:55:28 13   Q.      How so?

13:55:29 14   A.      So it says, a user, a user and a voice user interface

13:55:37 15   may share assumptions and expectations such as topic

13:55:40 16   knowledge, conversation history, word usage, jargon, tone,

13:55:44 17   as in formal, humorous, terse, et cetera, or other

13:55:49 18   assumptions and/or expectations that facilitate interactions

13:55:53 19   at a human to machine interface.

13:55:54 20   Q.      Would that be understood by a person of ordinary

13:55:57 21   skill in the art to disclose the invention?

13:55:59 22   A.      Yes.

13:56:02 23   Q.      Now, let's talk about accumulate long-term shared

13:56:05 24   knowledge about the user.  Is that disclosed and supported

13:56:09 25   by the specification of the '681 patent at column 13, lines

13:56:15  1    **38 to 47 and Figure 3?**

13:56:17  2    **A.      Yes.**

13:56:17  3    **Q.      And how so?**

13:56:19  4    **A.      So it says input severed during a single conversation**

13:56:22  5    **may be retained in a session input accumulator.  And let me**

13:56:31  6    **see here.  Request locations, et cetera, the session input**

13:56:40  7    **accumulator may accumulate a current user interface state**

13:56:44  8    **relating to other modal inputs to further build shared**

13:56:48  9    **knowledge models and more accurate adaptive responses, e.g.**

13:56:52 10    **when a user utters a -- this is probably cut off here.  This**

13:56:57 11    **is talking about collecting information about the user's**

13:57:02 12    **interaction and accumulating it.**

13:57:04 13    **Q.      Let's also talk -- another patent about long-term**

13:57:09 14    **shared knowledge, is that at column five, lines 10 to 14?**

13:57:13 15    **A.      Yes.**

13:57:13 16    **Q.      What does it say about long-term shared knowledge to**

13:57:16 17    **a person of ordinary skill there?**

13:57:18 18    **A.      Long-term shared knowledge may include explicit or**

13:57:22 19    **implicit user references, a history of recent context,**

13:57:26 20    **requests, et cetera, user specific jargon related to**

13:57:31 21    **vocabularies and/or capabilities of a context most often use**

13:57:35 22    **word choices or other information.  This is information that**

13:57:38 23    **would be used from conversations to conversation about the**

13:57:42 24    **user.**

13:57:42 25    **Q.      And a person of ordinary skill with respect to the**

13:57:46 1   patents here would have a bachelors degree in computer

13:57:50 2   science, computer engineering, electrical engineering,

13:57:53 3   engineering computational linguistic or a related field,

13:57:58 4   correct?

13:57:58 5   A.      Yes.

13:57:59 6   Q.      And they would have at least two years of experience

13:58:01 7   with automatic speech recognition, natural language

13:58:04 8   understanding, engineering, and computational linguistic,

13:58:09 9   correct?

13:58:09 10   A.      That's right.

13:58:10 11   Q.      Would such a person understand how to store the

13:58:12 12   information that we have been discussing with respect to

13:58:15 13   short-term and long-term knowledge?

13:58:16 14   A.      Yes, certainly.

13:58:21 15   Q.      And is the long-term shared knowledge further

13:58:25 16   supported by column 16, lines 40 to 53 of the patent?

13:58:32 17   A.      Okay.  Yes.

13:58:34 18   Q.      And how is it so?

13:58:36 19   A.      So this is describing potential sources of shared

13:58:41 20   knowledge.  It says long-term shared knowledge may come from

13:58:42 21   several sources, including user references, or a plug in

13:58:47 22   data source such as a subscription interface to a remote

13:58:52 23   database, expertise of a user, for example, based on

13:58:52 24   frequency of errors, types of tasks requested, et cetera,

13:58:52 25   the user may be identified as a novice, intermediate,

13:59:03  1    experienced or other type of user.  Agent-specific

13:59:06  2    information and/or language may also apply to other agents,

13:59:12  3    for example, by coupling information from an agent to

13:59:16  4    incorporate the information into other agents, frequently

13:59:19  5    used topics passed in from the section input accumulator,

13:59:23  6    frequently used verbs, nouns or other parts of speech,

13:59:26  7    and/or other syntax information passed in from the session

13:59:30  8    input accumulator, or other sources of long-term shared

13:59:35  9    knowledge may be used.

13:59:40 10    Q.     And does the specification at column seven, lines 61

13:59:44 11    to column eight, line 1 illustrate the use of identifying

13:59:49 12    contexts?

13:59:51 13    A.     Yes.

13:59:54 14    Q.     And how does it do that?

13:59:56 15    A.     So it talks about conversational speech engine may

14:00:01 16    include a conversational language processor that generates

14:00:04 17    an adaptive conversational response to a request or series

14:00:08 18    of requests using a free form voice search, a noise

14:00:15 19    tolerance module or other context determination process.

14:00:18 20    Q.     Now, moving forward now to the '176 patent, are all

14:00:24 21    the claim elements described and supported by the

14:00:29 22    specification of the patent?

14:00:30 23    A.     Yes.

14:00:31 24    Q.     And did you discuss how that is shown in your direct

14:00:35 25    examination earlier?

14:00:35 1    A.     Yes, I did.

14:00:37 2    Q.     And with respect to just this element as an

14:00:41 3    illustration, how does the patent support Claim 40?

14:00:44 4    A.     So this section, which is from column 3, line 16 to

14:00:56 5    23, the system may include a speech recognition engine, for

14:01:00 6    example an automatic speech recognizer, that may recognize

14:01:04 7    words or phrases in an utterance using inquiries in one or

14:01:08 8    more dictionaries and phrase tables.  In addition, as

14:01:10 9    further described there in, fuzzy set possibilities or prior

14:01:14 10   probabilities for the words in the dictionary and phrase

14:01:17 11   tables may be dynamically updated to maximize the

14:01:21 12   probability of correct recognition at each stage of the

14:01:25 13   dialogue.

14:01:26 14   Q.     Is that at column three, lines 16 to 23?

14:01:29 15   A.     Yes.

14:01:29 16   Q.     Let's now advance to the '097 patent.  Are the claim

14:01:33 17   elements of the '097 patent described and supported in the

14:01:37 18   specification of the patent?

14:01:38 19   A.     Yes.

14:01:39 20   Q.     And during your direct examination earlier, the '176

14:01:42 21   and '097 patents have the same specification?

14:01:47 22   A.     That's right.

14:01:49 23   Q.     And would your discussion of the specification of the

14:01:52 24   '176 patent apply to the '097?

14:01:55 25   A.     Yes.

14:01:55  1   Q.      And are all the elements described in the

14:01:57  2   specification?

14:01:58  3   A.      Yes, they are.

14:01:59  4   Q.      And would a person of ordinary skill in the art

14:02:02  5   understand that the invention was described in the patent

14:02:06  6   and in the possession of the inventors?

14:02:09  7   A.      Yes.

14:02:10  8   Q.      Let's now look at the last patent here, Claim 25 of

14:02:14  9   the '703 patent.  Are all the claim elements there supported

14:02:18 10   by the specification of the '703 patent?

14:02:22 11   A.      Yes.

14:02:22 12   Q.      And did we discuss that specification during your

14:02:26 13   direct examination earlier in this case?

14:02:28 14   A.      Yes, we did.

14:02:29 15   Q.      And did that show that all the elements of the claim

14:02:32 16   are described in the specification?

14:02:34 17   A.      Yes.

14:02:34 18   Q.      And would a person of ordinary skill with the

14:02:38 19   training that we've discussed understand that the

14:02:41 20   specification describes each of the claim elements and that

14:02:44 21   the inventors were in possession of the patent?

14:02:48 22   A.      Yes.

14:02:49 23   Q.      And just illustrating with one example, the '703

14:02:51 24   patent, for example, is the without further user input

14:02:56 25   supported in the specification of the patent?

14:03:01 1    A.      Yes.   The patent describes that the natural language

14:03:07 2    utterance may be processed by a speech recognition engine to

14:03:10 3    recognize one or more words of the natural language

14:03:13 4    utterance.   The recognized words may then be processed along

14:03:17 5    with the context information associated with the user, by a

14:03:20 6    natural language processing engine to determine one or more

14:03:23 7    products or services and/or other information.

14:03:31 8                  MR. YOON:   Thank you, Dr. Polish.

14:03:32 9                  THE COURT:   Thank you.   Cross-examine.

14:03:36 10                        CROSS-EXAMINATION.

14:03:37 11   BY MR. HADDEN:

14:03:51 12   Q.      Hello, Dr. Polish.

14:03:53 13                  Now, you didn't mention anything about the

14:03:55 14   United system, did you?

14:03:58 15   A.      Just now, no, I did not.

14:04:00 16   Q.      In fact you didn't address Dr. Johnson's opinion that

14:04:06 17   Claim 25 of the '703 patent is obvious in light of the

14:04:10 18   United system and Partovi, correct?

14:04:12 19   A.      I addressed Partovi, but I did not address that

14:04:17 20   combination.

14:04:17 21   Q.      And you have never provided an opinion in this case

14:04:21 22   that the '703 patent is valid over the United system and

14:04:27 23   Partovi, right?

14:04:28 24   A.      Well, I have addressed the fact that Partovi, that

14:04:36 25   Partovi doesn't work within this element and so the

14:04:39  1    combination doesn't work.

14:04:40  2    Q.      Well, you have never provided the opinion to this

14:04:43  3    jury or any other time in this case that the combination of

14:04:47  4    the United system and Partovi did not render the claim

14:04:52  5    obvious, correct?

14:04:54  6    A.      I did not specifically address the United system plus

14:04:58  7    Partovi, I have only addressed Partovi.

14:05:01  8    Q.      Let's look at slide 199, of Dr. Johnson's

14:05:06  9    presentation, Mr. Patterson.

14:05:08 10            And this is describing that last element that

14:05:12 11    you said Partovi did not describe, correct?

14:05:24 12    A.      I'm sorry, what am I looking at here?

14:05:26 13    Q.      It was the last element that you said was missing

14:05:29 14    from Partovi; right?  And if we look at the box labeled

14:05:34 15    Partovi, it says, for example, the system might prompt do

14:05:41 16    you want this order sent to your billing address, home

14:05:43 17    address, or work address.  That is requesting a confirmation

14:05:49 18    from the user of a shipping address; right?

14:06:01 19    A.      So --

14:06:04 20    Q.      Correct?

14:06:04 21    A.      So that quote is requesting that information, but as

14:06:09 22    I said about Partovi, Partovi doesn't actually make a

14:06:13 23    purchase transaction.

14:06:15 24    Q.      That's not the requirement of the claim.  The

14:06:18 25    requirement of the claim is a request for user confirmation

14:06:22 1   to use the payment information and shipping information, and

14:06:26 2   that's what Partovi is doing, right?

14:06:28 3   A.      Well the rest of the element is for a purchase

14:06:31 4   transaction for a product or service and Partovi does not

14:06:36 5   make a purchase transaction for a product or service.

14:06:39 6   Q.      What do you think this is describing, it says which

14:06:42 7   credit card would you like to use and where do you want the

14:06:46 8   product shipped.  Is that not describing a purchase

14:06:49 9   transaction?

14:06:49 10  A.      It's collecting information.  And then it passes --

14:06:53 11  and in Partovi it passes it along to some other entity to

14:06:59 12  then process.

14:06:59 13  Q.      To make a purchase transaction, right?

14:07:02 14  A.      It's passing it along to another entity to process.

14:07:07 15  Q.      Okay.  Let's look at slide 162, please,

14:07:11 16  Mr. Patterson.  This is from Dr. Johnson's presentation on

14:07:19 17  MIT Galaxy?

14:07:19 18  A.      Okay.

14:07:20 19  Q.      Just to be clear, that paper you put up, that paper

14:07:22 20  wasn't from anybody at MIT, correct?  The authors of that

14:07:28 21  paper that you said the Patent Office considered, they were

14:07:31 22  not at MIT, correct?

14:07:33 23  A.      I don't know where -- I don't recall where they were

14:07:35 24  from.  They were quoting -- they were quoting information

14:07:40 25  about some version of the Galaxy system and showing a

14:07:44 1    diagram from it.

14:07:45 2    Q.      Well, let's be clear.  That paper was about a

14:07:48 3    different system created by different people and what it

14:07:51 4    said was that it was based on the Galaxy architecture,

14:07:56 5    right?

14:07:56 6    A.      Yes, it said it was using the Galaxy architecture

14:08:00 7    showing that they were aware of it as the Patent Office

14:08:03 8    would have been aware of it.

14:08:04 9    Q.      It showed one figure of architecture, right, that's

14:08:11 10   all you showed?

14:08:13 11   A.      It made a reference to it in that paragraph, and then

14:08:15 12   it showed a figure from in paper, it made a reference to it

14:08:18 13   in the paper.

14:08:18 14   Q.      Let's be clear.  None of the MIT papers that

14:08:24 15   Dr. Johnson relied on were considered by the Patent Office,

14:08:28 16   right?

14:08:28 17   A.      As far as I know those papers were not considered by

14:08:31 18   the Patent Office, the system was.

14:08:32 19   Q.      None of the Galaxy source code that Dr. Johnson

14:08:37 20   relied on was considered by the Patent Office, right?

14:08:39 21   A.      I don't believe so, no.

14:08:40 22   Q.      And none of the testimony of Dr. Polifroni about how

14:08:45 23   Galaxy worked was considered by the Patent Office; right?

14:08:48 24   A.      That -- I believe that's correct.

14:08:51 25   Q.      Okay.  And your only issue with Dr. Johnson's finding

14:08:58 1  that MIT Galaxy rendered this claim invalid, you said that

14:09:02 2  Galaxy doesn't have long-term shared knowledge; right?

14:09:05 3  A.      That's not true.

14:09:07 4  Q.      That's what you just told us, isn't it?

14:09:09 5  A.      Well, I said that what he presented was not a system,

14:09:13 6  so there is not a system there.  So it's not prior art.  And

14:09:18 7  then beyond that, there is no long-term shared knowledge.

14:09:23 8  Q.      Okay.  So you're saying that the system that

14:09:27 9  Dr. Polifroni testified about and showed a video of did not

14:09:30 10  actually exist, is that your testimony?

14:09:32 11  A.      No, that is not my testimony.

14:09:34 12  Q.      So let's look at the element you said was missing,

14:09:37 13  this long-term shared knowledge.  Now, you were here just

14:09:42 14  half an hour or an hour ago when Mr. Peck was testifying,

14:09:46 15  right?

14:09:46 16  A.      Yes.

14:09:47 17  Q.      And Mr. Peck testified that in the MIT Galaxy source

14:09:51 18  code, he noted that the -- a user's -- user model could be

14:10:01 19  updated during a conversation with Galaxy, correct?

14:10:05 20  A.      Well, the user model over the course of -- over the

14:10:10 21  course of an existing conversation, user model would be

14:10:13 22  updated, yes.

14:10:14 23  Q.      And that user model after it was modified in a

14:10:19 24  conversation with the user, would stay in memory in the

14:10:22 25  Galaxy system, right?

A.       Well, it would be in memory, but it was never written

out to a database for future use.

Q.       Okay.  But there is no requirement in this claim of

writing anything to a database, is there?

A.       There is a requirement that it be used for future

conversations and interactions.

Q.       Correct.

A.       There was no indication that there was anyway for

that user model to be used again.

Q.       But that's exactly the opposite of what Mr. Peck just

testified.  I asked him if the user then called up again

with the updated user model they used, and he said yes, do

you recall that?

A.       In certain conditions we never have any idea whether

they existed or not, until the system was rebooted, there

might be some information persisting, but it would not be

written to a database and would not be saved.

Q.       But the claim doesn't say anything about writing to a

database.  If you call up and I change my hometown in my

user model, the next day I call up again and unless I pulled

Galaxy out of the wall by the plug, it would use my updated

user model with my new hometown, that's exactly what

Mr. Peck just testified to?

A.       There is no showing about it in any of the articles.

Q.       Just to be clear, you never actually looked at the

14:11:42 1   MIT Galaxy source code, did you?

14:11:43 2   A.      Yes, of course I did.

14:11:45 3   Q.      You did.  Okay.  Let's look at your deposition, sir,

14:11:50 4   this should be at page 267, lines 1 through 7.  Let me know

14:11:55 5   when you have that.

14:12:03 6   A.      Which day was it?

14:12:04 7   Q.      It was 267, they're numbered sequentially.  So the

14:12:09 8   second day.

14:12:14 9   A.      Second day.

14:12:16 10  Q.      Are you there?

14:12:17 11  A.      Just about.  Okay.

14:12:20 12  Q.      The question was:

14:12:21 13          "Question:  Did you review the MIT Galaxy course

14:12:25 14  source code in this case?"

14:12:28 15          And your answer was:

14:12:29 16          "Answer:  Did I personally review it you're

14:12:31 17  asking?

14:12:32 18          "Question:  Yes.

14:12:33 19          "Answer:  No, I didn't?"

14:12:35 20          Is that your testimony?

14:12:38 21  A.      That's my testimony.  I also said I relied on parts

14:12:40 22  of it that I got from Mr. Peck.  And I subsequently read it.

14:12:42 23  Q.      So let's look, Mr. Patterson, at slide '176.  This is

14:13:00 24  Dr. Johnson's slide regarding the '176 patent and how it's

14:13:00 25  obvious in light of Galaxy.  If I understand it right, the

14:13:09 1   only element you're contesting is the last one about an

14:13:13 2   adaptive misrecognition engine, is that right?

14:13:16 3   A.    I'm contesting that it's a system and I'm contesting

14:13:20 4   that it doesn't have an adaptive miss -- I'm saying it

14:13:23 5   doesn't have an adaptive misrecognition engine.

14:13:26 6   Q.    Let's look at slide 179, please, Mr. Patterson.  This

14:13:31 7   is again a slide from Dr. Johnson's presentation and it has

14:13:36 8   this example of a Galaxy paper, DTX 293.  Do you see that?

14:13:43 9   A.    Yes.

14:13:44 10   Q.    And this Galaxy paper, DTX 293, that was not

14:13:49 11   considered by the Patent Office in any of these patents.

14:13:52 12   Right?  In the prosecution?

14:13:53 13   A.    I believe that's correct.

14:13:55 14   Q.    Right.  And this example shows that when the user

14:13:59 15   says San Francisco to Boston, and if the system miss

14:14:04 16   recognizes that and says San Francisco to Denver, do you see

14:14:08 17   that?

14:14:08 18   A.    Yes.

14:14:09 19   Q.    The user says I need a flight going to Boston, in

14:14:12 20   response the system will reinterpret the original request

14:14:17 21   and say flights from San Francisco to Boston, right?

14:14:21 22   A.    I don't see that as a reinterpretation.  It just has

14:14:25 23   I need a flight going to Boston, Massachusetts, so it's now

14:14:31 24   answering a response to that.  There is no indication that

14:14:32 25   there is a misrecognition engine going on there, it's just

14:14:37 1 picking up the next -- it's picking up the next request and

14:14:40 2 processing that.

14:14:41 3 Q.     That's not true, because the response after the

14:14:44 4 predetermined event is okay, flights from San Francisco to

14:14:50 5 Boston.  The system only knows that the flight is from

14:14:54 6 San Francisco to Boston because of the first request that

14:14:57 7 was miss recognized, right, the user didn't say

14:15:01 8 San Francisco the second time, right?

14:15:03 9 A.     The user did not say San Francisco the second time.

14:15:07 10 It has been filling information out as it went including the

14:15:11 11 date, including the departure city, and then there is a new

14:15:16 12 request that included -- that included the date and the

14:15:21 13 departure city and it just put in a new destination city.

14:15:26 14 Q.     You're ignoring the fact that the document itself

14:15:29 15 says misrecognized after the first utterance.  Do you see

14:15:34 16 that?  That's not something Dr. Johnson added, that was

14:15:37 17 something in the MIT document itself, wasn't it?

14:15:41 18 A.     Well, misrecognized is referring there to that the

14:15:45 19 ASR didn't understand Boston and saw it as Denver.

14:15:48 20 Q.     Right.  That's the whole purpose of this

14:15:52 21 misrecognition engine, to correct when there was a miss

14:15:55 22 recognized word; right?

14:15:57 23 A.     But that misrecognized is just an annotation from the

14:16:00 24 author, the system is not -- hasn't determined that Boston

14:16:04 25 was misrecognized there.

14:16:08 1    Q.      The document itself says that Boston is

14:16:12 2    misrecognized, we agree on that, don't we, doctor?

14:16:14 3    A.      The document is pointing that out, yes.

14:16:17 4    Q.      Let's look at slide 179, Mr. Patterson.  Sorry, let

14:16:25 5    me go to 184, please.  Sorry.

14:16:28 6            Now, this is Dr. Johnson's slide showing that

14:16:32 7    MIT Galaxy renders the Claim 23 of the '097 patent obvious.

14:16:39 8    And my understanding is other than contesting somehow that

14:16:44 9    Galaxy was actually a system, your only dispute is with

14:16:49 10   respect to this last element that requires resolving a

14:16:53 11   pronoun.  Isn't that right?

14:16:54 12   A.      Well, that it's involving an advertisement and that

14:16:58 13   it's response is responsive to the existence of a pronoun.

14:17:03 14   Q.      Let's look at slide 183, please, Mr. Patterson.  Now,

14:17:07 15   again, this is an example from an article about, or a paper

14:17:14 16   about the MIT Galaxy system, what we see at the bottom,

14:17:17 17   right?

14:17:21 18   A.      I'm not sure where this is from.

14:17:25 19   Q.      We know it's not a paper that was considered by the

14:17:27 20   Patent Office in allowing this patent, right?

14:17:30 21   A.      I'm sorry, say that again.

14:17:32 22   Q.      This information here about the Galaxy system that we

14:17:37 23   see on the screen was never considered by the Patent Office

14:17:40 24   when it allowed any of these patents; correct?

14:17:44 25   A.      I don't know what this document is and it is

describing here.

Q.      But if we look at this example, it has the system saying American flight 3742 arrived at 6:44 p.m. in Calgary, shall I add this flight to your itinerary.  Do you see that?

A.      Yes.

Q.      The system is proposing a flight to the user and the user response is does it serve dinner, do you see that?

A.      Yes.

Q.      And the system responds no meal is served on the first leg and dinner is served on the second leg.  And the paper goes on to explain that in this dialogue, the system understands that "it" refers to the American flight 3742; right?

A.      Yes.

Q.      So in this system, in this example, MIT Galaxy is determining that the pronoun "it" refers to a service that is being offered, American flight 3742, right?

A.      I believe -- this document is talking about that pronoun being disambiguated as referring to the American flight.  Whether that's an advertisement or what exactly this -- what system this is attached to, I don't know.  But yes, it is -- the "it" is referring to the American flight 3742.

Q.      Galaxy does exactly what you said was the only missing element of this claim, right?

14:19:19  1   A.      Galaxy -- this description that's describing

14:19:23  2   something, I'm not sure what, is referring to disambiguating

14:19:27  3   a pronoun.

14:19:29  4                MR. HADDEN:  Thank you, doctor.  No further

14:19:30  5   questions.

14:19:31  6                MR. YOON:  Can you please keep that on?

14:19:33  7                THE COURT:  Redirect.

14:19:34  8                MR. YOON:  Just one.

14:19:35  9                      REDIRECT EXAMINATION.

14:19:36 10   BY MR. YOON:

14:19:36 11   Q.      The claim begins interpret the natural language

14:19:39 12   utterance based on the advertisement.  Do you see that?

14:19:41 13   A.      Yes.

14:19:42 14   Q.      And is that present in Galaxy?

14:19:46 15   A.      No.

14:19:48 16                MR. YOON:  No further questions, Your Honor.

14:19:49 17                THE COURT:  All right.  Thank you.  Thank you,

14:19:51 18   sir.  You are excused.  What's next?

14:19:54 19                MR. YOON:  At this time, Your Honor, the

14:19:55 20   plaintiff, VB Assets, has completed its presentation of its

14:19:55 21   rebuttal case.

14:19:55 22                THE COURT:  All right.  And so we have to deal

14:20:02 23   with jury instructions and then just closing arguments,

14:20:07 24   right?

14:20:07 25                MR. YOON:  Jury instructions and verdict form

14:20:09 1    and closing arguments.

14:20:11 2              THE COURT:  All right.  So members of the jury,

14:20:13 3    I'm going to let you go for today.  We have to spend a

14:20:16 4    little bit of time figuring out the jury instructions, but

14:20:19 5    when you come in tomorrow, I'm going to give you the

14:20:22 6    instructions, and we'll have closing arguments and you can

14:20:26 7    begin your deliberations.

14:20:28 8              All right.  Thank you very much.  Safe travels.

14:20:31 9              COURTROOM DEPUTY:  All rise.

14:20:32 10             (Jury exiting the courtroom at 2:20 p.m.)

14:20:52 11             THE COURT:  All right.  You guys can be seated.

14:21:22 12   All right.  So I wanted to go through the jury instructions

14:21:27 13   that you sent to us so that we can get you our proposed ones

14:21:33 14   and then I do appreciate you coming up with more agreements.

14:21:42 15   But I wanted to go through and make sure I understand a few

14:21:46 16   of these.

14:21:47 17             So on the burdens of proof, what's the problem

14:21:54 18   with Amazon proposal?

14:22:01 19             MR. YOON:  Your Honor, I thought we had accepted

14:22:04 20   Amazon's proposal, that was resolved.

14:22:06 21             THE COURT:  Well it's not, so I'm going to

14:22:06 22   accept that.  There is actually a whole bunch of stuff.  And

14:22:11 23   some of this, like I didn't even understand VB Assets wasn't

14:22:16 24   a sentence.

14:22:16 25             So what I was planning to do -- actually, yeah,

14:22:27 1  VB Assets's proposal at one point said clear and convincing

14:22:30 2  evidence is highly probable, which -- so what I am going to

14:22:37 3  say, you can look at it, but I am going to adopt Amazon's

14:22:40 4  proposals there because I think they're correct and make

14:22:44 5  sense and doesn't hurt to have them.

14:22:47 6          The next place where there was a dispute is in

14:23:00 7  obviousness.  Is that right?

14:23:02 8          MR. YOON:  Your Honor, I think the parties have

14:23:04 9  reached an agreement on all of these terms.  And I'm sorry

14:23:06 10 you haven't been given a draft.

14:23:10 11         THE COURT:  Well you guys have to tell me what

14:23:12 12 you agreed to because I only have this, we've already, you

14:23:17 13 know, done it and removed all your sources and I'm not going

14:23:20 14 to keep doing that over and over.  We have what you gave us

14:23:24 15 for yesterday, and is that what you printed for me, Mark?

14:23:28 16 Friday, the third.  So I don't know, it's got all these

14:23:32 17 disputes in it.  Not a lot of disputes but a few disputes.

14:23:36 18         MR. YOON:  I do have a clean copy.

14:23:39 19         THE COURT:  I'm not looking at that, because I

14:23:41 20 don't know what then I have to do on this.  So you have to

14:23:42 21 tell me what did you agree to on burdens of proof, because I

14:23:47 22 have no idea, and --

14:23:50 23         MS. MAYER:  We agreed to exactly the conclusion

14:23:52 24 I came to.

14:23:55 25         MR. YOON:  We agreed to Amazon's Your Honor, on

14:23:55 1    that one.

14:23:55 2              THE COURT:  All right.  So what is the next one

14:23:57 3    where I have a dispute that you guys agreed to, or that you

14:24:01 4    didn't agree to?

14:24:03 5              MS. MAYER:  It's secondary considerations, Your

14:24:05 6    Honor, and for that one, it was just which of the factors

14:24:08 7    the parties had put evidence on.  And the parties have

14:24:11 8    agreed now that the evidence has come in, that we'll remove

14:24:15 9    factors five and six and that number two will stay in,

14:24:18 10   correct?

14:24:19 11             MR. YOON:  That's correct, Your Honor.

14:24:20 12             THE COURT:  So we're leaving tried and failed.

14:24:23 13             MS. MAYER:  Correct, Your Honor.

14:24:26 14             THE COURT:  And we're removing praise and

14:24:31 15   contrary to accepted wisdom.

14:24:35 16             MS. MAYER:  Correct.

14:24:36 17             THE COURT:  What is the next one?

14:24:37 18             MS. MAYER:  The next is written description, the

14:24:39 19   very next instruction.

14:24:41 20             THE COURT:  Okay.

14:24:41 21             MS. MAYER:  And for that, I think Amazon has

14:24:44 22   pointed out that VB Assets's proposal had some redundancies

14:24:51 23   in it.  So the parties conferred and what we jointly suggest

14:24:54 24   is from the VB Assets's proposal language the Court just

14:24:56 25   adds the second sentence with a slight modification.

14:25:02  1          THE COURT:  So just tell me what to type.  So

14:25:05  2  get rid of everything that says VB Assets's proposal through

14:25:09  3  where?

14:25:10  4          MS. MAYER:  So get rid of everything through the

14:25:13  5  second sentence which starts and we'll leave this, "the

14:25:16  6  requirement may be satisfied by --

14:25:21  7          THE COURT:  The written description requirement?

14:25:24  8          MS. MAYER:  Correct.

14:25:27  9          THE COURT:  Okay.  May be satisfied by.

14:25:29 10          MS. MAYER:  For example, any combination of the

14:25:36 11  words, structures, figures, diagrams, and formulas contained

14:25:44 12  in the patent specification, and delete -- and keep the then

14:25:51 13  however.

14:25:51 14          THE COURT:  I don't have a however on mine.

14:25:56 15          MS. MAYER:  The however is at the end -- we

14:25:59 16  delete the next sentence in VB Assets's proposal, but at the

14:26:02 17  very end of their proposal they have the word "however" just

14:26:05 18  to lead into the next sentence.

14:26:09 19          THE COURT:  However.  Go ahead.

14:26:12 20          MS. MAYER:  And then there is a second VB

14:26:14 21  Assets's proposal.

14:26:15 22          THE COURT:  However a mere wish is fine.

14:26:18 23          MS. MAYER:  However a mere wish or plan for

14:26:20 24  obtaining the planned invention is not an adequate written

14:26:25 25  description, the parties agreed on that.

14:26:27 1          THE COURT:  My computer just locked.  We're

14:26:29 2  having issues with computers.  Hold on.  Let me save this.

14:26:33 3  Okay.

14:26:34 4          MS. MAYER:  And then remove the second VB

14:26:37 5  Assets's proposal.

14:26:39 6          THE COURT:  All the way to the end of that?

14:26:42 7          MS. MAYER:  All the way to the end, that second

14:26:45 8  --

14:26:45 9          THE COURT:  The next word is in the instruction

14:26:47 10  is in evaluating?

14:26:49 11          MS. MAYER:  Correct.

14:26:49 12          THE COURT:  So that paragraph that had a bunch

14:26:52 13  of disputes now says the written description requirement may

14:26:57 14  be satisfied by, for example, any combination of the word,

14:27:01 15  structure, figures, diagrams and formulas, contained in the

14:27:04 16  patent specification, however, a mere wish or plan for

14:27:11 17  obtaining the claimed invention is not an adequate written

14:27:14 18  description.  In evaluating whether the specification has

14:27:18 19  provided an adequate written description we may consider

14:27:21 20  factors such as.

14:27:24 21          MS. MAYER:  That's fine, Your Honor.

14:27:25 22          THE COURT:  Okay.  Any -- so that's all --

14:27:33 23          MS. MAYER:  That's all the disputes.

14:27:37 24          THE COURT:  Do we need all of the -- I guess you

14:27:41 25  guys went through all of these Georgia-Pacific factors, I

14:27:48  1    know most of my colleagues don't even read those anymore, so

14:27:53  2    do we have to read all of those?

14:27:57  3              MS. MAYER:  Not from Amazon's perspective, Your

14:28:00  4    Honor.

14:28:00  5              MR. YOON:  Not from VB Assets's perspective.

14:28:02  6              THE COURT:  So what do you want me to do with

14:28:04  7    respect to those?  It's D.

14:28:22  8              MS. MAYER:  Your Honor, just one thing before I

14:28:23  9    forget, in the obviousness instruction, this is for letter

14:28:28 10    H, prior art, I'm sorry, this is prior art instruction, we

14:28:33 11    could remove the Yonebayashi reference, and that's on

14:28:40 12    page 13.

14:28:49 13              THE COURT:  So it's just MIT Galaxy, United, and

14:28:53 14    patent 737658 to Partovi?

14:29:02 15              MS. MAYER:  Correct, Your Honor.

14:29:03 16              THE COURT:  And then what are we doing with the

14:29:07 17    factors?

14:29:11 18              MR. YOON:  Give me one second, Your Honor.  I'm

14:29:13 19    just reading them.

14:30:05 20              Your Honor, with regards to the Georgia-Pacific

14:30:08 21    factors, plaintiff VB Assets would be fine removing factors

14:30:12 22    one, three, six and nine.

14:31:22 23              MS. MAYER:  Amazon is okay dropping three, six,

14:31:24 24    and nine, we would like to keep number one, we think there

14:31:32 25    was evidence on that point.

14:31:33  1          MR. YOON:  No objection to that, Your Honor,

14:31:35  2   we're just trying to streamline.

14:31:47  3          THE COURT:  I'll get rid of these.  I know that

14:31:52  4   Judge Bryson has recently said that he's kind of revamped

14:31:55  5   his jury instructions, I want to see what he did on these

14:31:59  6   and I might make a different proposal, but for now I will at

14:32:03  7   least remove three, six, and nine.  I mean, it's just

14:32:08  8   ridiculous that the jury has to sit there and listen to this

14:32:11  9   when -- I get it that it's the law, but it seems silly to

14:32:17 10   just bore them with that.

14:32:19 11          Okay.  So with that, we will send you out our

14:32:27 12   proposals.  You can read thru them to make sure we didn't

14:32:30 13   include any typos or anything.  As for the verdict sheet, I

14:32:36 14   did make some changes to the verdict sheet to conform with

14:32:41 15   how I usually do things.  I know that Amazon doesn't want

14:32:47 16   willfulness until the end, the very end, but that's not the

14:32:50 17   way I do it, so I'm going to do infringement, willfulness,

14:32:56 18   and then obviousness, written description, I mean

14:32:59 19   invalidity, written description, invalidity, obviousness,

14:33:02 20   and ineligibility.  And then damages.

14:33:08 21          MR. BELGAM:  Your Honor, on the instructions if

14:33:10 22   we have any questions or comments, how do you want us to get

14:33:12 23   back to Your Honor, by letter or e-mail?

14:33:15 24          THE COURT:  Well, you can, if they're small

14:33:18 25   comments, small nits and you all agree on them, you can just

14:33:21 1  make them.  If there is an objection, you can make the

14:33:25 2  objection in the morning before the jury comes in.  And if

14:33:29 3  it's any proposal that you all don't agree on, you can I

14:33:36 4  guess come in the morning and tell us what it is, or you

14:33:40 5  can -- because I'm going to need you guys to bring me

14:33:43 6  multiple copies of it, so hopefully you can agree it before

14:33:47 7  the morning, because otherwise it's just going to waste the

14:33:50 8  jury's time.

14:33:55 9              MR. BELGAM:  Understood, thank you.

14:33:56 10             THE COURT:  I guess if we give this to you, we

14:34:01 11  can e-mail it to you now, and if you have comments before

14:34:05 12  5:30 that you think I need to deal with, you can tell me,

14:34:09 13  otherwise you can make whatever changes that you all agree

14:34:13 14  to.  And anything that there is an objection to that you

14:34:16 15  just want to preserve for the record, you can do that

14:34:19 16  tomorrow.

14:34:20 17             All right.  Anything else we need to discuss?

14:34:25 18             MR. YOON:  Just one minor thing, Your Honor.

14:34:27 19  Under your procedures, the plaintiff should identify how

14:34:32 20  much rebuttal time he's reserving for its closing argument

14:34:36 21  before it starts, and I want to make sure because I have

14:34:39 22  never tried a case in front of Your Honor, I am going to

14:34:42 23  reserve some rebuttal time, it will be based on whatever

14:34:45 24  time we have left.

14:34:46 25             THE COURT:  That's fine.  Are you guys going to

14:34:48  1   make any motions?

14:34:50  2               MR. HADDEN:  No, we'll file the motions, Your

14:34:54  3   Honor.

14:34:54  4               THE COURT:  All right.

14:34:57  5               COURTROOM DEPUTY:  All rise.  Court is

14:34:59  6   adjourned.

14:35:00  7               (Court adjourned at 2:35 p.m.)

          8

          9               I hereby certify the foregoing is a true and
              accurate transcript from my stenographic notes in the proceeding.
         10

         11                             /s/ Dale C. Hawkins
                                      Official Court Reporter
         12                             U.S. District Court

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25